# 14-4133

## UNITED STATES COURT OF APPEALS

For the

## SECOND CIRCUIT

UNITED STATES OF AMERICA,

Appellee,

v.

Hao Chao, aka Sealed Defendant 2, aka Little Beijing,

Defendant

and

Xing Lin, aka Sealed Defendant 1, aka Ding Pa,

Defendant-Appellant

On Appeal from the United States District Court
for the Southern District of New York

## APPENDIX
### Volume 1 of 3 (Pages A-1 to A-300)

Megan Wolfe Benett, Esq.
750 Third Avenue, 32nd Floor
New York, New York 10017
(212) 973-3406
mbenett@kreindler.com
*Attorney for Defendant Appellant Xing Lin*

**TABLE OF CONTENTS**

**Page**

District Court Docket Entries .........................................................A. 1

Notice of Appeal filed November 3, 2014 .................................A. 22

Initial Indictment filed February 9, 2011 ..................................A. 23

Draft Plea Agreement dated January 10, 2012 ...........................A. 26

Draft Superseding Information ...................................................A. 31

Plea Transcript held before the
Honorable Miriam Goldman Cedarbaum dated
June 27, 2012 .............................................................................A. 34

Transcript of Conference held before the
Honorable Miriam Goldman Cedarbaum, dated
June 28, 2012 .............................................................................A. 90

Transcript of Conference held before the
Honorable Miriam Goldman Cedarbaum, dated
July 12, 2012 .............................................................................A. 101

Second Superceding Indictment filed September 28, 2012 .....A. 115

Transcript of Indictment held before the
Honorable Miriam Goldman Cedarbaum, dated
July 26, 2012 .............................................................................A. 133

Transcript of Conference held before the
Honorable Miriam Goldman Cedarbaum, dated
October 19, 2012 .......................................................................A. 146

i

Transcript of Conference held before the
Honorable Miriam Goldman Cedarbaum, dated
January 31, 2013 ........................................................A. 160

Transcript of Conference held before the
Honorable Miriam Goldman Cedarbaum, dated
April 3,2013 .............................................................A. 181

Transcript of Trial Proceeding held before the
Honorable Miriam Goldman Cedarbaum, dated
April 9, 2013 ............................................................A. 201

Transcript of Trial Proceeding held before the
Honorable Miriam Goldman Cedarbaum, dated
April 10, 2013 ..........................................................A. 219

Transcript of Trial Proceeding held before the
Honorable Miriam Goldman Cedarbaum, dated
April 11, 2013 ..........................................................A. 363

Transcript of Trial Proceeding held before the
Honorable Miriam Goldman Cedarbaum, dated
April 15, 2013 ..........................................................A. 500

Transcript of Trial Proceeding held before the
Honorable Miriam Goldman Cedarbaum, dated
April 16, 2013 ..........................................................A. 531

Transcript of Trial Proceeding held before the
Honorable Miriam Goldman Cedarbaum, dated
April 17, 2013 ..........................................................A. 562

Transcript of Trial Proceeding held before the
Honorable Miriam Goldman Cedarbaum, dated
April 18, 2013 ..........................................................A. 596

Transcript of Trial Proceeding held before the
Honorable Miriam Goldman Cedarbaum, dated
April 22, 2013 ........................................................A. 627

Transcript of Trial Proceeding held before the
Honorable Miriam Goldman Cedarbaum, dated
April 23, 2013 ........................................................A. 653

Transcript of Trial Proceeding held before the
Honorable Miriam Goldman Cedarbaum, dated
April 24, 2013 ........................................................A. 688

Transcript of Trial Proceeding held before the
Honorable Miriam Goldman Cedarbaum, dated
April 25, 2013 ........................................................A. 712

Jury Verdict Form dated April 24, 2013 ...................A. 721

Government Sentencing Submission dated
September 15, 2014 ................................................A. 723

Defense Sentencing Submission dated
October 6, 2014 ......................................................A. 734

Government Sentencing Submission dated
October 20, 2014 ....................................................A. 741

Defense Sentencing Submission dated
October 21, 2014 ....................................................A. 744

Transcript of Sentencing dated October
21, 2014 ..................................................................A. 748

APPEAL,ECF

# U.S. District Court
## Southern District of New York (Foley Square)
## CRIMINAL DOCKET FOR CASE #: 1:11-cr-00114-SHS-1

Case title: USA v. Lin et al

Date Filed: 02/09/2011
Date Terminated: 10/29/2014

Assigned to: Judge Sidney H. Stein

### Defendant (1)

**Xing Lin**
*TERMINATED: 10/29/2014*
*also known as*
Sealed Defendant 1
*TERMINATED: 10/29/2014*
*also known as*
Ding Pa
*TERMINATED: 10/29/2014*

represented by **Joel Steven Cohen**
Joel S. Cohen, P.C.
225 Broadway, Suite 1203
New York, NY 10007
(212) 571-8899
Fax: (212) 571-9557
Email: jcesq99@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Megan Wolfe Benett**
Kreindler & Kreindler
750 Third Avenue
New York, NY 10017
(212) 973-3406
Fax: (212) 972-9432
Email: mbenett@kreindler.com
*ATTORNEY TO BE NOTICED*

### Pending Counts

18:1962-7480.F RACKETEERING
CONSPIRACY
(1ss)

18:1962-7480.F RACKETEERING
(2ss)

18:924J.F VIOLENT CRIME/DRUGS
/MACHINE GUN WHERE DEATH
OCCURS (MURDER)
(3ss)

### Disposition

Imprisonment: Life; No Term Of
Supervised Release Imposed

Imprisonment: Life; No Term Of
Supervised Release Imposed

Imprisonment: Life; No Term Of
Supervised Release Imposed

# A. 1

18:1951.F INTERFERENCE WITH
COMMERCE BY THREAT OR
VIOLENCE (EXTORTION)
(4ss)

Imprisonment: 240 Months; No Term Of
Supervised Release Imposed.

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| 18:924J.F VIOLENT CRIME/DRUGS /MACHINE GUN WHERE DEATH OCCURS (MURDER) (1) | Dismissed |
| VIOLENT CRIME/DRUGS/MACHINE GUN WHERE DEATH OCCURS - (Title 18 USC Sections 924(j)(1) and 2.) (1s) | Dismissed |
| INTERFERENCE WITH COMMERCE BY THREAT OR VIOLENCE - (Title 18 USC Sections 1951 and 2.) (2s) | Dismissed |
| INTERFERENCE WITH COMMERCE BY THREAT OR VIOLENCE (3s) | Dismissed |
| 18:1951.F INTERFERENCE WITH COMMERCE BY THREAT OR VIOLENCE (EXTORTION CONSPIRACY) (5ss) | Dismissed |

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
| --- | --- |
| None | |

**Plaintiff**

| | | |
| --- | --- | --- |
| **USA** | represented by | **Peter M. Skinner** |
| | | U.S. Attorney's Office, SDNY (St Andw's) |
| | | One St. Andrew's Plaza |
| | | New York, NY 10007 |

**A. 2**

(212) 637-2601
Fax: (212) 637-2730
Email: pskinner@bsfllp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elie Honig**
U.S. Attorney's Office, SDNY (St Andw's)
One St. Andrew's Plaza
New York, NY 10007
212-637-2474
Fax: 212-637-2527
Email: Elie.Honig@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Jennifer Eileen Burns**
U.S. Attorney's Office, SDNY (St Andw's)
One St. Andrew's Plaza
New York, NY 10007
(212)-637-2315
Fax: (212)-637-2527
Email: jennifer.burns@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/09/2011 | 2 R | SEALED INDICTMENT as to Sealed Defendant 1 (1) count(s) 1, Sealed Defendant 2 (2) count(s) 1. (jm) (Entered: 08/22/2011) |
| 02/10/2011 | 1 | SEALED DOCUMENT placed in vault. (nm) (Entered: 02/10/2011) |
| 08/22/2011 | 3 | Order to Unseal Indictment as to Sealed Defendant 1, Sealed Defendant 2.. (Signed by Judge Miriam Goldman Cedarbaum on 8/22/11)(jm) (Entered: 08/22/2011) |
| 08/22/2011 | | INDICTMENT UNSEALED as to Xing Lin, Hao Chao. (jm) (Entered: 08/22/2011) |
| 08/22/2011 | | Case Designated ECF as to Xing Lin, Hao Chao. (jm) (Entered: 08/22/2011) |
| 08/22/2011 | | Case as to Xing Lin, Hao Chao ASSIGNED to Judge Judge Miriam Goldman Cedarbaum. Judge Judge Unassigned no longer assigned to the case.. (jm) (Entered: 08/22/2011) |
| 08/22/2011 | | Minute Entry for proceedings held before Judge Miriam Goldman Cedarbaum:Initial Appearance as to Xing Lin held on 8/22/2011. Dft Xing Lin present w/retained counsel Joel Steven Cohen, Esq. AUSAs Elie Honig and Jennifer Burns present. Special Agent Timothy Varian and Immigration and Customs Enforcement Detective Edward Scali present. Crt rptr Karen Gorlaski. Interpreter Sky Yeung present. ARRAIGNMENT HELD. The dft waives the detailed reading and enters a plea of not guilty to Count 1 (sole count) of Indictment 11 Cr. 114 (MGC). |

## A. 3

| | | |
|---|---|---|
| | | Discovery is to be produced by September 19, 2011. A status conference is scheduled for September 26, 2011 at 10 a.m. T/E from the Speedy Trial clock, in the IOJ. Dft remanded. ( Status Conference set for 9/26/2011 at 10:00 AM before Judge Miriam Goldman Cedarbaum.) ( Discovery due by 9/19/2011.) (Court Reporter Karen Gorlaski) (ja) (Entered: 09/14/2011) |
| 08/22/2011 | | Minute Entry for proceedings held before Judge Miriam Goldman Cedarbaum: Arraignment as to Xing Lin (1) on Count 1 held on 8/22/2011. Plea entered by Xing Lin (1) to Count 1 of Not Guilty. (Court Reporter Karen Gorlaski) (ja) (Entered: 09/14/2011) |
| 08/23/2011 | 6 | NOTICE OF ATTORNEY APPEARANCE: Joel Steven Cohen appearing for Xing Lin. (Cohen, Joel) (Entered: 08/23/2011) |
| 09/01/2011 | 7 | NOTICE OF ATTORNEY APPEARANCE Jennifer Eileen Burns appearing for USA. (Burns, Jennifer) (Entered: 09/01/2011) |
| 09/26/2011 | | Minute Entry for proceedings held before Judge Miriam Goldman Cedarbaum:Status Conference as to Xing Lin held on 9/26/2011, as to Xing Lin( Motions due by 10/24/2011., Government Responses due by 11/7/2011, Jury Trial set for 1/17/2012 at 09:30 AM before Judge Miriam Goldman Cedarbaum., Oral Argument set for 11/16/2011 at 11:00 AM before Judge Miriam Goldman Cedarbaum.) Defendant Xing Lin present with retained counsel Joel Steven Cohen, Esq. AUSA's Elie Honig and Jennifer Burns present. Court Guido Tascione present. Interpreter Sky Yeung present. Defense motions to be served and filed on October 24, 2011 by noon. Opposition by the government is due November 7, 2011 by noon. Oral argument is set for November 16, 2011 at 11:00am. The jury trial is scheduled for January 17, 2012 at 9:30am. Time between not and then is excluded from the Speedy Trial Clock, in the interest of justice. Defendant continued remanded. (jw) (Entered: 09/27/2011) |
| 10/24/2011 | 8 | FILING ERROR - ELECTRONIC FILING FOR NON-ECF DOCUMENT - FIRST MOTION for Extension of Time to file defendant's pre-trial motions, with the consent of the Government. Document filed by Xing Lin. (Cohen, Joel) Modified on 10/25/2011 (ka). (Entered: 10/24/2011) |
| 10/25/2011 | | ***NOTE TO ATTORNEY THAT THE ATTEMPTED FILING OF Document No. 8 as to Defendant(s) Xing Lin: HAS BEEN REJECTED. Note to Attorney Joel Steven Cohen : Other than letters filed under a cover marked Sentencing Memorandum, THE CLERK'S OFFICE DOES NOT ACCEPT LETTERS FOR FILING either through ECF or otherwise, except where the judge has ordered that a particular letter be docketed. Letters may be sent directly to a judge. (ka) (Entered: 10/25/2011) |
| 10/28/2011 | 9 | FILING ERROR - ELECTRONIC FILING FOR NON-ECF DOCUMENT - FIRST MOTION to Suppress in and out of Court identification of the defendant. Document filed by Xing Lin. (Attachments: # 1 Exhibit, # 2 Exhibit)(Cohen, Joel) Modified on 10/28/2011 (ka). (Entered: 10/28/2011) |

**A. 4**

| | | |
|---|---|---|
| 10/28/2011 | | ***NOTE TO ATTORNEY THAT THE ATTEMPTED FILING OF Document No. 9 as to Defendant(s) Xing Lin: HAS BEEN REJECTED. Note to Attorney Joel Steven Cohen : Other than letters filed under a cover marked Sentencing Memorandum, THE CLERK'S OFFICE DOES NOT ACCEPT LETTERS FOR FILING either through ECF or otherwise, except where the judge has ordered that a particular letter be docketed. Letters may be sent directly to a judge. (ka) (Entered: 10/28/2011) |
| 11/16/2011 | | Minute Entry for proceedings held before Judge Miriam Goldman Cedarbaum:Status Conference as to Xing Lin held on 11/16/2011. The defendant Xing Lin present with retained counsel Joel Steven Cohen, Esq. AUSA Peter Skinner present. Court reporter Joanne Mancari present. Foo Chow Interpreter Daniel Yang present. The hearing on defendant's Wade motion did not go forward, as the defendant withdrew the motion. T/E between now and January 17, 2012 (Jury Trial) from the Speedy trial clock, IOJ. Defendant continued remanded.( Ready for Trial by 1/17/2012.), As to Xing Lin (Court Reporter Joanne Mancari) (ja) (Entered: 11/23/2011) |
| 11/17/2011 | 10 | ENDORSED LETTER as to (11-Cr-114-01) Xing Lin addressed to Judge Miriam Goldman Cedarbaum from Attorney Joel S. Cohen dated October 27, 2011 re: Please accept this letter in lieu of a formal motion pursuant to Rule 12(b)3(c) of the Federal Rules of Criminal Procedure granting an evidentiary hearing in accord with United States v. Wade, 388 U.S. 218(1967), and thereafter suppressing eyewitness identification in the above-referenced case. ENDORSEMENT: Motion withdrawn by defendant. So Ordered. (Signed by Judge Miriam Goldman Cedarbaum on 11/16/2011) [*** NOTE: This pdf only has one page, checked with Chambers and this is to be docketed. ***] (bw) (Entered: 11/18/2011) |
| 12/16/2011 | 11 | FILING ERROR - ELECTRONIC FILING FOR NON-ECF DOCUMENT - FIRST MOTION to Continue *jury selection and trial, with the Government's consent.* Document filed by Xing Lin. (Cohen, Joel) Modified on 12/19/2011 (ka). (Entered: 12/16/2011) |
| 12/16/2011 | 12 | NOTICE OF ATTORNEY APPEARANCE Peter M. Skinner appearing for USA. (Skinner, Peter) (Entered: 12/16/2011) |
| 12/19/2011 | | ***NOTE TO ATTORNEY THAT THE ATTEMPTED FILING OF Document No. 11 as to Defendant(s) Xing Lin: HAS BEEN REJECTED. Note to Attorney Joel Steven Cohen : Other than letters filed under a cover marked Sentencing Memorandum, THE CLERK'S OFFICE DOES NOT ACCEPT LETTERS FOR FILING either through ECF or otherwise, except where the judge has ordered that a particular letter be docketed. Letters may be sent directly to a judge. (ka) (Entered: 12/19/2011) |
| 01/26/2012 | 13 | ORDER EXCLUDING TIME UNDER THE SPEEDY TRIAL ACT as to Xing Lin, Hao Chao. Time excluded from 1/26/2012 until 2/23/2012. (Signed by Judge Miriam Goldman Cedarbaum on 1/26/2012)(dnd) (Entered: 01/27/2012) |
| 03/06/2012 | 14 | NOTICE of Change of Address as to Xing Lin. New Address: Joel S. Cohen, PC, 225 Broadway, Suite 1203, New York, New York, 10007, 212-571-8899. (Cohen, |

## A. 5

| | | |
|---|---|---|
| | | Joel) (Entered: 03/06/2012) |
| 03/09/2012 | 15 | ORDER EXCLUDING TIME UNDER THE SPEEDY TRIAL ACT as to Xing Lin, Hao Chao. Time excluded from 3/9/12 until 3/20/12. IT IS HEREBY FOUND THAT: 1. The ends of justice served by the requested continuance outweigh the interests of the public and the defendants in a speedy trial and IT IS HEREBY ORDERED THAT:The time between today's date and March 20, 2012, be and hereby is excluded from calculation under the Speedy Trial Act, 18 U.S.C. § 3161(h) (7) (A), in the interests of justice. (Signed by Judge Miriam Goldman Cedarbaum on 3/9/12)(jw) (Entered: 03/09/2012) |
| 03/20/2012 | 16 | ORDER as to (11-Cr-114-01) Xing Lin.... IT IS HEREBY FOUND THAT: 1. The ends of justice served by the requested continuance outweigh the interests of the public and the defendants in a speedy trial and IT IS HEREBY ORDERED THAT: 1. The time between today's date and April 10, 2012, be and hereby is excluded from calculation under the Speedy Trial Act, 18 U.S.C. Section 3161(h)(7)(A), in the interests of justice. (Signed by Judge Miriam Goldman Cedarbaum on 3/20/2012)(bw) (Entered: 03/20/2012) |
| 04/12/2012 | | Minute Entry for proceedings held before Judge Miriam Goldman Cedarbaum:Status Conference as to Xing Lin held on 4/12/2012. No matter was held. The court has scheduled a status conference for Tuesday April 17, 2012 at 3:00 PM. (dnd) Modified on 4/12/2012 (dnd). (Entered: 04/12/2012) |
| 04/12/2012 | | Set/Reset Hearings as to Xing Lin: Status Conference set for 4/17/2012 at 3:00 PM before Judge Miriam Goldman Cedarbaum. (dnd) (Entered: 04/12/2012) |
| 04/17/2012 | | Minute Entry for proceedings held before Judge Miriam Goldman Cedarbaum: Status Conference as to Xing Lin (1) held on 4/17/2012. Defendant Xing Lin present with retained counsel Joel Steven Cohen, Esq. AUSA Peter Skinner present. Court Reporter Karen Gorlaski present. Foo Chow Interpreter Lily Lau present. Status Conference held. The court reschedules the jury trial to July 23, 2012 at 9:30 AM. Time between now and then is excluded from the Speedy Trial clock, in the interest of justice. Defendant continued remanded. (bw) (Entered: 04/18/2012) |
| 04/17/2012 | | ORAL ORDER as to Xing Lin (1). Time excluded from 4/17/2012 until 7/23/2012. Jury Trial set for 7/23/2012 at 09:30 AM before Judge Miriam Goldman Cedarbaum. (bw) (Entered: 04/18/2012) |
| 06/27/2012 | | Minute Entry for proceedings held before Judge George B. Daniels: Change of Plea Hearing as to Xing Lin held on 6/27/2012. Defendant Xing Lin present with retained counsel Joel Steven Cohen, Esq. AUSAs Peter Skinner and JenniferBurns present. Court Reporter Sam Mauro present. Foo Chow Interpreter Brenda Chen present. Plea Hearing began and is adjourned to Thursday June 28, 2012 at 3:00 PM. (dnd) (Entered: 07/02/2012) |
| 06/27/2012 | | Set/Reset Hearings as to Xing Lin: Change of Plea Hearing set for 6/28/2012 at 3:00 PM before Judge Miriam Goldman Cedarbaum. (dnd) (Entered: 07/02/2012) |
| 06/28/2012 | | Minute Entry for proceedings held before Judge Miriam Goldman Cedarbaum:Change of Plea Hearing as to Xing Lin held on 6/28/2012. Defendant |

**A. 6**

| | | |
|---|---|---|
| | | Xing Lin present with retained counsel Joel Steven Cohen, Esq. AUSAs Peter Skinner present. Court Reporter Kris Sellin present. Foo Chow Interpreter Brenda Chen present. Hearing continued, but no plea entered. A status conference is scheduled for July 12, 2012 at 10:30 AM. The court re-schedules trial to August 13, 2012 at 9:30 AM. The time between now and July 12, 2012 is excluded from the Speedy Trial clock in the interest of justice. Deft. Continued remanded. (dnd) (Entered: 07/02/2012) |
| 06/28/2012 | | Set/Reset Hearings as to Xing Lin: Status Conference set for 7/12/2012 at 10:30 AM before Judge Miriam Goldman Cedarbaum. Jury Trial set for 8/13/2012 at 9:30 AM before Judge Miriam Goldman Cedarbaum. (dnd) (Entered: 07/02/2012) |
| 07/10/2012 | 17 | TRANSCRIPT of Proceedings as to Xing Lin held on 6/28/2012 before Judge Miriam Goldman Cedarbaum. (ago) (Entered: 07/10/2012) |
| 07/11/2012 | 18 | TRANSCRIPT of Proceedings as to Xing Lin held on 6/27/2012, 3:00 p.m. before Judge Miriam Goldman Cedarbaum. (rjm) (Entered: 07/11/2012) |
| 07/12/2012 | | Minute Entry for proceedings held before Judge Miriam Goldman Cedarbaum: Status Conference as to Xing Lin held on 7/12/2012. Defendant Xing Lin present with retained counsel Joel Steven Cohen, Esq. AUSA Jennifer Burns present. Court Reporter Pam Utter present. Foo Chow Interpreter Lily Lau present. Status Conference held. The defense advises the court that the case will proceed to trial. The previously scheduled date for trial remains August 13, 2012. Proposed Voir Dire and Jury Instructions must be submitted to chambers by no later than August 9, 2012. Deft. Continued remanded. (dnd) (Entered: 07/17/2012) |
| 07/25/2012 | 19 ℝ | (S1) SUPERSEDING INDICTMENT FILED as to Xing Lin (1) count(s) 1s, 2s, 3s, Hao Chao (2) count(s) 1s, 2s, 3s. (bw) (Entered: 07/27/2012) |
| 07/26/2012 | | Minute Entry for proceedings held before Judge Miriam Goldman Cedarbaum:Arraignment as to Xing Lin (1) Count 1s,2s,3s held on 7/26/2012. Defendant Xing Lin present with retained counsel Joel Steven Cohen, Esq. AUSAs Jennifer Burns and Peter Skinner present. Court Reporter Steven Griffing present. Foo Chow Interpreter Daniel Yang present. Arraignment held. The defendant waives the detailed reading and enters a plea of not guilty to Count 1, Count 2 and Count 3 of Superseding Indictment S1 11 Cr. 114 (MGC)-1. At the request of counsel, trial is adjourned to October 30, 2012 at 9:30 AM. Requests to Charge and proposed Voir Dire are due in chambers no later than September 14, 2012.The time between now and October 30, 2012 is excluded from the Speedy Trial clock in the interest of justice. Deft. Continued remanded. (jw) (Entered: 07/30/2012) |
| 07/26/2012 | | Minute Entry for proceedings held before Judge Miriam Goldman Cedarbaum: Plea entered by Xing Lin (1) Count 1s,2s,3s Not Guilty. (jw) (Entered: 07/30/2012) |
| 07/26/2012 | | Minute Entry for proceedings held before Judge Miriam Goldman Cedarbaum: as to Xing Lin; Jury Trial set for 10/30/2012 at 09:30 AM before Judge Miriam Goldman Cedarbaum. (jw) (Entered: 07/30/2012) |
| 08/09/2012 | 21 | TRANSCRIPT of Proceedings as to Xing Lin held on 7/12/2012 before Judge Miriam Goldman Cedarbaum. (ago) (Entered: 08/09/2012) |

**A. 7**

| | | |
|---|---|---|
| 09/17/2012 | 22 | Request To Charge by USA as to Xing Lin, Hao Chao. (Skinner, Peter) (Entered: 09/17/2012) |
| 09/28/2012 | 23 R | (S2) SUPERSEDING INDICTMENT FILED as to Xing Lin (1) count(s) 1ss, 2ss, 3ss, 4ss, 5ss, Hao Chao (2) count(s) 1ss, 2ss, 3ss, 4ss, 5ss. (jm) (Entered: 10/01/2012) |
| 10/04/2012 | 25 | **FILING ERROR - ELECTRONIC FILING OF NON-ECF DOCUMENT -** STATUS REPORT *regarding the Superseding Indictment* by Xing Lin. (Cohen, Joel) Modified on 10/5/2012 (ka). (Entered: 10/04/2012) |
| 10/05/2012 | | **\*\*\*NOTE TO ATTORNEY THAT THE ATTEMPTED FILING OF Document No. 25 as to Defendant(s) Xing Lin: HAS BEEN REJECTED. Note to Attorney Joel Steven Cohen : Other than letters filed under a cover marked Sentencing Memorandum, THE CLERK'S OFFICE DOES NOT ACCEPT LETTERS FOR FILING either through ECF or otherwise, except where the judge has ordered that a particular letter be docketed. Letters may be sent directly to a judge. (ka)** (Entered: 10/05/2012) |
| 10/09/2012 | 26 R | TRANSCRIPT of Proceedings as to Xing Lin re: Conference held on 7/26/12 before Judge Miriam Goldman Cedarbaum. Court Reporter/Transcriber: Steven Griffing, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 11/2/2012. Redacted Transcript Deadline set for 11/13/2012. Release of Transcript Restriction set for 1/10/2013. (McGuirk, Kelly) (Entered: 10/09/2012) |
| 10/09/2012 | 27 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Xing Lin. Notice is hereby given that an official transcript of a Conference proceeding held on 7/26/12 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 10/09/2012) |
| 10/19/2012 | | Minute Entry for proceedings held before Judge Miriam Goldman Cedarbaum: Arraignment as to Xing Lin (1) Count 1ss,2ss,3ss,4ss,5ss held on 10/19/2012. Defendant Xing Lin present with retained counsel Joel Steven Cohen, Esq. AUSA Peter Skinner present. Court Reporter Kristin Carannante present. Foo Chow Interpreter Brenda Chen present. Arraignment held. The defendant waives the detailed reading and enters a plea of not guilty to Count 1,Count 2, Count 3, Count 4, and Count 5 of S2 11 Cr. 114 (MGC)-1 Superseding Indictment. Trial is adjourned to February 4, 2013 at 9:30 AM. The time between now and then is excluded from the Speedy Trial clock in the interest of justice. Defendant continued remanded. (jbo) (Entered: 11/28/2012) |
| 10/19/2012 | | Minute Entry for proceedings held before Judge Miriam Goldman Cedarbaum: Plea entered by Xing Lin (1) Count 1ss,2ss,3ss,4ss,5ss Not Guilty. (jbo) (Entered: 11/28/2012) |

**A. 8**

| 10/19/2012 | | Minute Entry for proceedings held before Judge Miriam Goldman Cedarbaum: As to Xing Lin, Jury Trial set for 2/4/2013 at 09:30 AM before Judge Miriam Goldman Cedarbaum. (jbo) (Entered: 11/28/2012) |
|---|---|---|
| 12/21/2012 | 28 R | FIRST MOTION in Limine. Document filed by USA as to Xing Lin. (Skinner, Peter) (Entered: 12/21/2012) |
| 01/03/2013 | 29 R | TRANSCRIPT of Proceedings as to Xing Lin re: Conference held on 10/19/12 before Judge Miriam Goldman Cedarbaum. Court Reporter/Transcriber: Kristen Carannante, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/28/2013. Redacted Transcript Deadline set for 2/7/2013. Release of Transcript Restriction set for 4/8/2013. (Rodriguez, Somari) (Entered: 01/03/2013) |
| 01/03/2013 | 30 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Xing Lin. Notice is hereby given that an official transcript of a Conference proceeding held on 10/19/12 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (Rodriguez, Somari) (Entered: 01/03/2013) |
| 01/18/2013 | 31 R | Request To Charge by USA as to Xing Lin, Hao Chao. (Burns, Jennifer) (Entered: 01/18/2013) |
| 01/20/2013 | 32 R | SECOND MOTION in Limine. Document filed by USA as to Xing Lin. (Skinner, Peter) (Entered: 01/20/2013) |
| 01/27/2013 | 33 R | THIRD MOTION in Limine. Document filed by USA as to Xing Lin. (Skinner, Peter) (Entered: 01/27/2013) |
| 01/28/2013 | 34 | ORDER as to Xing Lin. Upon the application of the United States of America, Freet Bharara, United States Attorney for the Southern District of New York, by and through Assistant United States Attorneys Jennifer E. Burns and Peter M. Skinner, of counsel, for an order precluding the dissemination of material produced pursuant to 18 U.S.C. § 3500 ("3500 material"), it is hereby ORDERED that (1) defense counsel must destroy or return to the Government all 3500 material (including all copies), at the conclusion of the trial of this matter or when any appeal has become final; (2) the defense is precluded from disseminating any 3500 material (and any copies) to anyone beyond the defendant, defense counsel, and any paralegal or staff employed by the defense; and (3) the defendant himself is precluded from taking any 3500 material (or any copies) with him into any jail facility, or possessing any 3500 material in any jail facility, either before, during, or after trial; except that the defendant may review 3500 material in the possession of defense counsel when in the presence of defense counsel. (Signed by Judge Miriam Goldman Cedarbaum on 1/28/2013)(dnd) (Entered: 01/28/2013) |

**A. 9**

| 01/31/2013 | | Minute Entry for proceedings held before Judge Miriam Goldman Cedarbaum: Pretrial Conference as to Xing Lin held on 1/31/2013. Defendant Xing Lin present with retained counsel Joel Steven Cohen, Esq. AUSAs Peter Skinner and Jennifer Burns present. Court Reporter Tara Jones present. Foo Chow Interpreter Laura Chen present. FPC held. Defendants Proposed Voir Dire is due February 8, 2013, and defendants Request to Charge is due February 15, 2013. Another Final Pretrial Conference is scheduled for April 3, 2013 at 10:30 AM. The Court postpones the trial to April 8, 2013 at 9:30 AM. The time between now and April 8, 2013 is excluded from the Speedy Trial clock in the interest of justice. Deft. Continued remanded. (jbo) (Entered: 02/01/2013) |
| --- | --- | --- |
| 01/31/2013 | | Minute Entry for proceedings held before Judge Miriam Goldman Cedarbaum: As to Xing Lin. Jury Trial set for 4/8/2013 at 09:30 AM. Pretrial Conference set for 4/3/2013 at 10:30 AM before Judge Miriam Goldman Cedarbaum. (jbo) (Entered: 02/01/2013) |
| 02/13/2013 | 35 R | Proposed Voir Dire Questions by Xing Lin. (Cohen, Joel) (Entered: 02/13/2013) |
| 03/19/2013 | 36 R | FOURTH MOTION in Limine. Document filed by USA as to Xing Lin. (Skinner, Peter) (Entered: 03/19/2013) |
| 04/03/2013 | | Minute Entry for proceedings held before Judge Miriam Goldman Cedarbaum: Pretrial Conference as to Xing Lin held on 4/3/2013. Defendant Xing Lin present with retained counsel Joel Steven Cohen, Esq. AUSAs Peter Skinner and Jennifer Burns present. Court Reporter Steven Griffing present. Foo Chow Interpreter Lily Lau present. FPC held. The trial is adjourned from April 8, 2013 to April 9, 2013. Deft. Continued remanded. (jbo) (Entered: 04/04/2013) |
| 04/08/2013 | 37 | ORDER as to Xing Lin. IT IS HEREBY ORDERED that Metropolitan Corrections Center shall accept non-institutional clothing no later than 7:30 AM on April 9 so that he may appear at trial in civilian clothing. (Signed by Judge Miriam Goldman Cedarbaum on 4/8/2013)(jw) (Entered: 04/08/2013) |
| 04/09/2013 | | Minute Entry for proceedings held before Judge Miriam Goldman Cedarbaum: Voir Dire held on 4/9/2013 as to Xing Lin. Defendant Xing Lin present with retained counsel Joel Steven Cohen, Esq. AUSAs Jennifer Burns and Peter Skinner present. Court Reporters Martha Drevis and Jennifer Thun present. Chinese Interpreters Brenda Chen and Danny Wang present. Jury selection began and completed. Jurors empaneled and sworn. Trial began. Court adjourned until Wednesday April 10, 2013 at 10:00 AM. (jbo) (Entered: 04/12/2013) |
| 04/09/2013 | | Minute Entry for proceedings held before Judge Miriam Goldman Cedarbaum: Jury Selection as to Xing Lin held on 4/9/2013. (jbo) (Entered: 04/12/2013) |
| 04/09/2013 | | Jury Impaneled as to Xing Lin. (jbo) (Entered: 04/12/2013) |
| 04/09/2013 | | Minute Entry for proceedings held before Judge Miriam Goldman Cedarbaum: Jury Trial as to Xing Lin held on 4/9/2013. (jbo) (Entered: 04/12/2013) |
| 04/11/2013 | | Minute Entry for proceedings held before Judge Miriam Goldman Cedarbaum: Jury Trial as to Xing Lin held on 4/11/2013. Defendant Xing Lin present with retained |

**A. 10**

| | | |
|---|---|---|
| | | counsel Joel Steven Cohen, Esq. AUSAs Jennifer Burns and Peter Skinner present. Court Reporters Martha Drevis and Jennifer Thun present. Chinese Interpreters Brenda Chen, Lilly Lau, Daniel Chan and Danny Yang present. Trial continued. Court adjourned until Monday April 15, 2013 at 10:00 AM. (jbo) (Entered: 04/12/2013) |
| 04/15/2013 | | Minute Entry for proceedings held before Judge Miriam Goldman Cedarbaum: Jury Trial as to Xing Lin held on 4/15/2013. Defendant Xing Lin present with retained counsel Joel Steven Cohen, Esq. AUSAs Jennifer Burns and Peter Skinner present. Court Reporters Martha Drevis and Jennifer Thun present. Chinese Interpreters Brenda Chen, Lilly Lau, Daniel Chen and Danny Yang present. Trial continued. Court adjourned until Tuesday April 16, 2013 at 10:00 AM. (jbo) (Entered: 04/18/2013) |
| 04/16/2013 | | Minute Entry for proceedings held before Judge Miriam Goldman Cedarbaum: Jury Trial as to Xing Lin held on 4/16/2013. Defendant Xing Lin present with retained counsel Joel Steven Cohen, Esq. AUSAs Jennifer Burns and Peter Skinner present. Court Reporters Martha Drevis and Jennifer Thun present. Chinese Interpreters Brenda Chen, Lilly Lau, Daniel Chan, Mary Wang and Danny Yang present. Trial continued. Court adjourned until Tuesday April 17, 2013 at 10:00 AM. (jbo) (Entered: 04/18/2013) |
| 04/17/2013 | | Minute Entry for proceedings held before Judge Miriam Goldman Cedarbaum: Jury Trial as to Xing Lin held on 4/17/2013. Defendant Xing Lin present with retained counsel Joel Steven Cohen, Esq. AUSAs Jennifer Burns and Peter Skinner present. Court Reporters Martha Drevis and Jennifer Thun present. Chinese Interpreters Brenda Chen, Lilly Lau, Daniel Chan, Mary Wang and Danny Yang present. Trial continued. Court adjourned until Tuesday April 18, 2013 at 10:00 AM. (jbo) (Entered: 04/18/2013) |
| 04/18/2013 | | Minute Entry for proceedings held before Judge Miriam Goldman Cedarbaum: Jury Trial as to Xing Lin held on 4/18/2013. Defendant Xing Lin present with retained counsel Joel Steven Cohen, Esq. AUSAs Jennifer Burns and Peter Skinner present. Court Reporters Martha Drevis and Jennifer Thun present. Chinese Interpreters Brenda Chen, Lilly Lau, Daniel Chan, Mary Wang and Danny Yang present. Trial continued. Court adjourned until Monday April 22, 2013 at 10:00 AM. (jbo) (Entered: 04/18/2013) |
| 04/22/2013 | | Minute Entry for proceedings held before Judge Miriam Goldman Cedarbaum: Jury Trial as to Xing Lin held on 4/22/2013. Defendant Xing Lin present with retained counsel Joel Steven Cohen, Esq. AUSAs Jennifer Burns and Peter Skinner present. Court Reporters Martha Drevis and Jennifer Thun present. Chinese Interpreters Brenda Chen, Danny Yang present. Trial continued. Government and Defense rest. A Charge conference is scheduled for April 23, 2013 at 10:00 AM, and trial will continue at 2:30 PM. (jbo) (Entered: 04/25/2013) |
| 04/23/2013 | | Minute Entry for proceedings held before Judge Miriam Goldman Cedarbaum: Jury Trial as to Xing Lin held on 4/23/2013. Defendant Xing Lin present with retained counsel Joel Steven Cohen, Esq. AUSAs Jennifer Burns and Peter Skinner present. Court Reporters Martha Drevis and Jennifer Thun present. Chinese Interpreters |

## A. 11

| | | |
|---|---|---|
| | | Brenda Chen, Danny Yang present. Trial continued. Charge conference held. Closing arguments by both sides held. Court is adjourned to April 24, 2013 at 10:00 AM. (jbo) (Entered: 04/25/2013) |
| 04/24/2013 | | Minute Entry for proceedings held before Judge Miriam Goldman Cedarbaum: Jury Trial as to Xing Lin held on 4/24/2013. Defendant Xing Lin present with retained counsel Joel Steven Cohen, Esq. AUSAs Jennifer Burns and Peter Skinner present. Court Reporters Martha Drevis and Jennifer Thun present. Chinese Interpreters Brenda Chen, Danny Yang present. Trial continued. Jurors charged. Deliberations began. Trial adjourned to Thursday April 25, 2013 at 9:00 AM. (jbo) (Entered: 05/03/2013) |
| 04/25/2013 | | Minute Entry for proceedings held before Judge Miriam Goldman Cedarbaum: Jury Trial as to Xing Lin held on 4/25/2013. THIS ENTRY IS EXACTLY AS IT APPEARS ON THE INDICTMENT: Defendant Xing Lin present with retained counsel Joel Steven Cohen, Esq. AUSAs Jennifer Burns and Peter Skinner present. Court Reporter Jennifer Thun present. Chinese Interpreter Danny Yang present. Deliberationscontinued and completed. Jury finds the defendant guilty on Count 1, Count 2, Count 3, and Count 4. Jury polled, verdict unanimous. Jury excused. PSI ordered. Defense motions by June 4, 2013. Sentencing set for September 10,2013 at 11:00 AM. Trial completed. (dnd) (Entered: 05/08/2013) |
| 04/25/2013 | | JURY VERDICT as to Xing Lin (1) Guilty on Count 1ss,2ss,3ss,4ss. (dnd) (Entered: 05/08/2013) |
| 04/25/2013 | | Order of Referral to Probation for Presentence Investigation and Report as to Xing Lin. (Signed by Judge Miriam Goldman Cedarbaum on 4/25/2013)(dnd) (Entered: 05/08/2013) |
| 04/25/2013 | | Set/Reset Deadlines/Hearings as to Xing Lin: Motions due by 6/4/2013. Sentencing set for 9/10/2013 at 11:00 AM before Judge Miriam Goldman Cedarbaum. (dnd) (Entered: 05/08/2013) |
| 05/14/2013 | 38 R | TRANSCRIPT of Proceedings as to Xing Lin re: Trial held on 4/9/2013 before Judge Miriam Goldman Cedarbaum. Court Reporter/Transcriber: Martha Drevis, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 6/7/2013. Redacted Transcript Deadline set for 6/17/2013. Release of Transcript Restriction set for 8/15/2013. (McGuirk, Kelly) (Entered: 05/14/2013) |
| 05/14/2013 | 39 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Xing Lin. Notice is hereby given that an official transcript of a Trial proceeding held on 4/9/2013 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 05/14/2013) |

## A. 12

| 05/14/2013 | 40 R | TRANSCRIPT of Proceedings as to Xing Lin re: Trial held on 4/10/2013 before Judge Miriam Goldman Cedarbaum. Court Reporter/Transcriber: Martha Drevis, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 6/7/2013. Redacted Transcript Deadline set for 6/17/2013. Release of Transcript Restriction set for 8/15/2013. (McGuirk, Kelly) (Entered: 05/14/2013) |
|---|---|---|
| 05/14/2013 | 41 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Xing Lin. Notice is hereby given that an official transcript of a Trial proceeding held on 4/10/2013 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 05/14/2013) |
| 05/14/2013 | 42 R | TRANSCRIPT of Proceedings as to Xing Lin re: Trial held on 4/11/2013 before Judge Miriam Goldman Cedarbaum. Court Reporter/Transcriber: Martha Drevis, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 6/7/2013. Redacted Transcript Deadline set for 6/17/2013. Release of Transcript Restriction set for 8/15/2013. (McGuirk, Kelly) (Entered: 05/14/2013) |
| 05/14/2013 | 43 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Xing Lin. Notice is hereby given that an official transcript of a Trial proceeding held on 4/11/2013 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 05/14/2013) |
| 05/14/2013 | 44 | TRANSCRIPT of Proceedings as to Xing Lin re: Trial held on 4/15/2013 before Judge Miriam Goldman Cedarbaum. Court Reporter/Transcriber: Martha Drevis, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 6/7/2013. Redacted Transcript Deadline set for 6/17/2013. Release of Transcript Restriction set for 8/15/2013. (McGuirk, Kelly) (Entered: 05/14/2013) |
| 05/14/2013 | 45 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Xing Lin. Notice is hereby given that an official transcript of a Trial proceeding held on 4/15/2013 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 05/14/2013) |
| 05/14/2013 | 46 | TRANSCRIPT of Proceedings as to Xing Lin re: Trial held on 4/16/2013 before Judge Miriam Goldman Cedarbaum. Court Reporter/Transcriber: Martha Drevis, |

## A. 13

| | | |
|---|---|---|
| | | (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 6/7/2013. Redacted Transcript Deadline set for 6/17/2013. Release of Transcript Restriction set for 8/15/2013. (McGuirk, Kelly) (Entered: 05/14/2013) |
| 05/14/2013 | 47 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Xing Lin. Notice is hereby given that an official transcript of a Trial proceeding held on 4/16/2013 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 05/14/2013) |
| 05/14/2013 | 48 | TRANSCRIPT of Proceedings as to Xing Lin re: Trial held on 4/17/2013 before Judge Miriam Goldman Cedarbaum. Court Reporter/Transcriber: Martha Drevis, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 6/7/2013. Redacted Transcript Deadline set for 6/17/2013. Release of Transcript Restriction set for 8/15/2013. (McGuirk, Kelly) (Entered: 05/14/2013) |
| 05/14/2013 | 49 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Xing Lin. Notice is hereby given that an official transcript of a Trial proceeding held on 4/17/2013 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 05/14/2013) |
| 05/14/2013 | 50 | TRANSCRIPT of Proceedings as to Xing Lin re: Trial held on 4/18/2013 before Judge Miriam Goldman Cedarbaum. Court Reporter/Transcriber: Martha Drevis, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 6/7/2013. Redacted Transcript Deadline set for 6/17/2013. Release of Transcript Restriction set for 8/15/2013. (McGuirk, Kelly) (Entered: 05/14/2013) |
| 05/14/2013 | 51 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Xing Lin. Notice is hereby given that an official transcript of a Trial proceeding held on 4/18/2013 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 05/14/2013) |
| 05/14/2013 | 52 | TRANSCRIPT of Proceedings as to Xing Lin re: Trial held on 4/22/13 before Judge Miriam Goldman Cedarbaum. Court Reporter/Transcriber: Martha Drevis, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript |

A. 14

| | | | |
|---|---|---|---|
| | | | Restriction. After that date it may be obtained through PACER. Redaction Request due 6/7/2013. Redacted Transcript Deadline set for 6/17/2013. Release of Transcript Restriction set for 8/15/2013. (McGuirk, Kelly) (Entered: 05/14/2013) |
| 05/14/2013 | 53 | | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Xing Lin. Notice is hereby given that an official transcript of a Trial proceeding held on 4/22/2013 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 05/14/2013) |
| 05/14/2013 | 54 | | TRANSCRIPT of Proceedings as to Xing Lin re: Trial held on 4/23/13 before Judge Miriam Goldman Cedarbaum. Court Reporter/Transcriber: Martha Drevis, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 6/7/2013. Redacted Transcript Deadline set for 6/17/2013. Release of Transcript Restriction set for 8/15/2013. (McGuirk, Kelly) (Entered: 05/14/2013) |
| 05/14/2013 | 55 | | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Xing Lin. Notice is hereby given that an official transcript of a Trial proceeding held on 4/23/2013 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 05/14/2013) |
| 05/14/2013 | 56 R | | TRANSCRIPT of Proceedings as to Xing Lin re: Trial held on 4/24/13 before Judge Miriam Goldman Cedarbaum. Court Reporter/Transcriber: Martha Drevis, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 6/7/2013. Redacted Transcript Deadline set for 6/17/2013. Release of Transcript Restriction set for 8/15/2013. (McGuirk, Kelly) (Entered: 05/14/2013) |
| 05/14/2013 | 57 | | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Xing Lin. Notice is hereby given that an official transcript of a Trial proceeding held on 4/24/2013 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 05/14/2013) |
| 05/14/2013 | 58 | | TRANSCRIPT of Proceedings as to Xing Lin re: Trial held on 4/25/2013 before Judge Miriam Goldman Cedarbaum. Court Reporter/Transcriber: Martha Drevis, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 6/7/2013. Redacted Transcript Deadline set for 6/17/2013. Release of Transcript |

**A. 15**

| | | |
|---|---|---|
| | | Restriction set for 8/15/2013. (McGuirk, Kelly) (Entered: 05/14/2013) |
| 05/14/2013 | 59 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Xing Lin. Notice is hereby given that an official transcript of a Trial proceeding held on 4/25/2013 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 05/14/2013) |
| 06/03/2013 | 60 | **FILING ERROR - ELECTRONIC FILING OF NON-ECF DOCUMENT -** FIRST MOTION for Extension of Time to File *post-verdict motions*. Document filed by Xing Lin. (Cohen, Joel) Modified on 6/4/2013 (ka). (Entered: 06/03/2013) |
| 06/04/2013 | | **\*\*\*NOTE TO ATTORNEY THAT THE ATTEMPTED FILING OF Document No. 60 as to Defendant(s) Xing Lin: HAS BEEN REJECTED. Note to Attorney Joel Steven Cohen : Other than letters filed under a cover marked Sentencing Memorandum, THE CLERK'S OFFICE DOES NOT ACCEPT LETTERS FOR FILING either through ECF or otherwise, except where the judge has ordered that a particular letter be docketed. Letters may be sent directly to a judge. (ka)** (Entered: 06/04/2013) |
| 06/04/2013 | 61 | ENDORSED LETTER as to (11-Cr-114-01) Xing Lin addressed to Judge Miriam Goldman Cedarbaum from Attorney Joel S. Cohen dated June 3, 2013 re: Post-verdict motions are due in this case tomorrow. Sentencing is not until September 10. I have spent the past week away from my office writing an Eleventh Circuit appeal (United States v. Zhong Liang Li, 11-11227) which I filed Sunday morning. Owing to that end the press of other matters I haven't had time to complete the motions due in this case. I respectfully ask that the Court grant an extension of two weeks. ENDORSEMENT: Request granted. So Ordered. (Signed by Judge Miriam Goldman Cedarbaum on 6/4/2013)(bw) (Entered: 06/04/2013) |
| 06/17/2013 | 62 | **FILING ERROR - ELECTRONIC FILING OF NON-ECF DOCUMENT -** SECOND MOTION for Extension of Time to File *post-verdict motions*. Document filed by Xing Lin. (Cohen, Joel) Modified on 6/18/2013 (ka). (Entered: 06/17/2013) |
| 06/18/2013 | | **\*\*\*NOTE TO ATTORNEY THAT THE ATTEMPTED FILING OF Document No. 62 as to Defendant(s) Xing Lin: HAS BEEN REJECTED. Note to Attorney Joel Steven Cohen : Other than letters filed under a cover marked Sentencing Memorandum, THE CLERK'S OFFICE DOES NOT ACCEPT LETTERS FOR FILING either through ECF or otherwise, except where the judge has ordered that a particular letter be docketed. Letters may be sent directly to a judge. (ka)** (Entered: 06/18/2013) |
| 06/18/2013 | 63 | ENDORSED LETTER as to Xing Lin addressed to Judge Miriam Goldman Cedarbaum from Joel S. Cohen dated 6/17/2013 re: To request a one week extension of time, as I was unable to fully review the trial transcript and finish the motions...ENDORSEMENT..Request GRANTED. SO ORDERED. (Signed by Judge Miriam Goldman Cedarbaum on 6/17/2013)(jw) (Entered: 06/18/2013) |

# A. 16

| | | |
|---|---|---|
| 06/24/2013 | 64 | **FILING ERROR - ELECTRONIC FILING OF NON-ECF DOCUMENT -** FIRST MOTION to Dismiss *pursuant to Rule 29 and for a mistrial*. Document filed by Xing Lin. (Cohen, Joel) Modified on 6/25/2013 (ka). (Entered: 06/24/2013) |
| 06/25/2013 | | **\*\*\*NOTE TO ATTORNEY THAT THE ATTEMPTED FILING OF Document No. 64 as to Defendant(s) Xing Lin: HAS BEEN REJECTED. Note to Attorney Joel Steven Cohen : Other than letters filed under a cover marked Sentencing Memorandum, THE CLERK'S OFFICE DOES NOT ACCEPT LETTERS FOR FILING either through ECF or otherwise, except where the judge has ordered that a particular letter be docketed. Letters may be sent directly to a judge. (ka)** (Entered: 06/25/2013) |
| 07/22/2013 | 65 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** MEMORANDUM in Opposition by USA as to Xing Lin re 64 FIRST MOTION to Dismiss *pursuant to Rule 29 and for a mistrial*.. (Attachments: # 1 Exhibit A)(Skinner, Peter) Modified on 7/23/2013 (ka). (Entered: 07/22/2013) |
| 07/23/2013 | | **\*\*\*NOTE TO ATTORNEY TO RE-FILE DOCUMENT - DEFICIENT DOCKET ENTRY ERROR. Note to Attorney Peter M. Skinner as to Xing Lin: to RE-FILE Document 65 Memorandum in Opposition to Motion,. ERROR(S): Link to incorrect filing of document#64. \*\*\*NOTE: Use event code Memorandum of Law in Opposition(non-motion) located under Other documents. (ka)** (Entered: 07/23/2013) |
| 07/23/2013 | 66 | MEMORANDUM OF LAW in Opposition by USA as to Xing Lin *Opposition to Motion for Mistrial and Motion for Acquittal on Count Four*. (Attachments: # 1 Exhibit A)(Skinner, Peter) (Entered: 07/23/2013) |
| 09/16/2013 | | As to Xing Lin: Sentencing set for 11/18/2013 at 11:00 AM before Judge Miriam Goldman Cedarbaum. Sentence as to defendant Xing Lin is adjourned to November 18, 2013 at 11:00 AM. Cedarbaum, J.(Signed by Judge Miriam Goldman Cedarbaum on 9/16/2013)(ajc) Modified on 9/16/2013 (ajc). (Entered: 09/16/2013) |
| 11/18/2013 | | As to Xing Lin: Sentencing set for 1/23/2014 at 11:00 AM before Judge Miriam Goldman Cedarbaum. Sentence as to defendant Xing Lin is adjourned to January 23, 2014 at 11:00 AM. Cedarbaum, J. (Signed by Judge Miriam Goldman Cedarbaum on 11/18/2013)(ajc) Modified on 11/18/2013 (ajc). (Entered: 11/18/2013) |
| 03/18/2014 | 67 | Sentencing Letter by Xing Lin addressed to Judge Miriam Goldman Cedarbaum from Joel S. Cohen dated March 18, 2014 re: Request, on consent to adjourn sentence.. (Cohen, Joel) (Entered: 03/18/2014) |
| 05/21/2014 | 68 | **FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU -** Sentencing Letter by Xing Lin addressed to Judge Miriam Goldman Cedarbaum from Joel S. Cohen dated May 21, 2014 re: Permission, with the Government's consent, to file sentencing memo by May 27, 2014. (Cohen, Joel) Modified on 5/22/2014 (ka). (Entered: 05/21/2014) |
| 05/22/2014 | | **NOTE TO ATTORNEY TO RE-FILE DOCUMENT - DOCUMENT TYPE ERROR. Note to Attorney Joel Steven Cohen as to Xing Lin: to RE-FILE Document 68 Letter - Sentencing. Use the document type Letter found under** |

**A. 17**

| | | |
|---|---|---|
| | | the document list Other Documents. (ka) (Entered: 05/22/2014) |
| 05/22/2014 | | MEMORANDUM TO THE DOCKET CLERK: as to Xing Lin. Sentencing as to defendant Xing Lin is set for June 5, 2014 at 2:30 PM. (jbo) (Entered: 05/22/2014) |
| 05/22/2014 | | Set/Reset Hearings as to Xing Lin: Sentencing set for 6/5/2014 at 02:30 PM before Judge Miriam Goldman Cedarbaum. (jbo) (Entered: 05/22/2014) |
| 05/26/2014 | 69 | **FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU -** SECOND MOTION to Continue *sentence*. Document filed by Xing Lin. (Cohen, Joel) Modified on 5/28/2014 (ka). (Entered: 05/26/2014) |
| 05/28/2014 | | **NOTE TO ATTORNEY TO RE-FILE DOCUMENT - DOCUMENT TYPE ERROR. Note to Attorney Joel Steven Cohen as to Xing Lin: to RE-FILE Document 69 SECOND MOTION to Continue sentence. Use the document type Letter Motion found under the document list Motions. (ka)** (Entered: 05/28/2014) |
| 06/06/2014 | 70 | JOINT LETTER by USA as to Xing Lin addressed to Judge Miriam Goldman Cedarbaum from Jennifer Burns dated June 6, 2014 re: Sentencing Date Document filed by USA. (Burns, Jennifer) (Entered: 06/06/2014) |
| 06/16/2014 | | MEMORANDUM TO THE DOCKET CLERK: as to Xing Lin. Sentencing as to defendant Xing Lin for June 5, 2014 has been adjourned to July 1, 2014 at 11:30 AM. (jbo) (Entered: 06/16/2014) |
| 06/16/2014 | | Set/Reset Hearings as to Xing Lin: Sentencing set for 7/1/2014 at 11:30 AM before Judge Miriam Goldman Cedarbaum. (jbo) (Entered: 06/16/2014) |
| 09/15/2014 | 71 | SENTENCING SUBMISSION by USA as to Xing Lin. (Burns, Jennifer) (Entered: 09/15/2014) |
| 09/15/2014 | 72 | **FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU -** FOURTH MOTION to Postpone Sentencing *as to Xing Lin*. Document filed by Xing Lin. (Cohen, Joel) Modified on 9/16/2014 (ka). (Entered: 09/15/2014) |
| 09/16/2014 | | **NOTE TO ATTORNEY TO RE-FILE DOCUMENT - DOCUMENT TYPE ERROR. Note to Attorney Joel Steven Cohen as to Xing Lin: to RE-FILE Document 72 FOURTH MOTION to Postpone Sentencing *as to Xing Lin. Use the document type Letter Motion found under the document list Motions. (ka)* (Entered: 09/16/2014)** |
| 09/16/2014 | 73 | **FILING ERROR - DEFICIENT DOCKET ENTRY - SIGNATURE ERROR -** LETTER MOTION addressed to Judge Miriam Goldman Cedarbaum from Peter Skinner and Jennifer Burns dated September 16, 2014 re: Adjournment of Sentencing of Xing Lin . Document filed by USA as to Xing Lin. (Skinner, Peter) Modified on 9/17/2014 (ka). (Entered: 09/16/2014) |
| 09/17/2014 | | **\*\*\*NOTE TO ATTORNEY TO RE-FILE DOCUMENT - DEFICIENT DOCKET ENTRY ERROR. Note to Attorney Peter M. Skinner as to Xing Lin: to RE-FILE Document 73 LETTER MOTION addressed to Judge Miriam Goldman Cedarbaum from Peter Skinner and Jennifer Burns dated September** |

## A. 18

| | | |
|---|---|---|
| | | **16, 2014 re: Adjournment of Sentencing of Xing Lin .. ERROR(S): Attorney s/signature missing from document. (ka)** (Entered: 09/17/2014) |
| 09/17/2014 | | As to Xing Lin: Sentencing set for 10/7/2014 at 02:30 PM before Judge Miriam Goldman Cedarbaum. No matter held. An update to the docket for scheduling purposes as to defendant Xing Lin. Sentencing as to defendant Xing Lin for September 17, 2014 has been adjourned to October 7, 2014 at 2:30 PM.Cedarbaum, J. (Signed by Judge Miriam Goldman Cedarbaum on 9/17/2014) (ajc) (Entered: 09/17/2014) |
| 10/06/2014 | 74 | Sentencing Letter by Xing Lin addressed to The Honorable Miriam Goldman Cedaubaum from Joel S. Cohen dated October 6, 2014 re: Sentencing. (Cohen, Joel) (Entered: 10/06/2014) |
| 10/08/2014 | | MEMORANDUM TO THE DOCKET CLERK: as to Xing Lin. Sentencing as to defendant Xing Lin for October 7, 2014 has been adjourned to October 21, 2014 at 2:30 PM. (jbo) (Entered: 10/08/2014) |
| 10/08/2014 | | Set/Reset Hearings as to Xing Lin: Sentencing set for 10/21/2014 at 02:30 PM before Judge Miriam Goldman Cedarbaum. (jbo) (Entered: 10/08/2014) |
| 10/20/2014 | 75 | SENTENCING SUBMISSION by USA as to Xing Lin. (Burns, Jennifer) (Entered: 10/20/2014) |
| 10/21/2014 | 76 | Sentencing Letter by Xing Lin addressed to The Honorable Miriam Goldman Cedaubaum from Joel S. Cohen dated October 21, 2014 re: Reply to Government's October 20 submission.. (Cohen, Joel) (Entered: 10/21/2014) |
| 10/21/2014 | 77 | FIRST LETTER by Xing Lin addressed to Judge Miriam Goldman Cedarbaum from Joel S. Cohen dated October 21, 2014 re: Request that the Court recommend to the Bureau of Prisons that he be designated to the United States Penitentiary in Atlanta, GA so that he may receive visits from his wife and children, who reside in Atlanta (Cohen, Joel) (Entered: 10/21/2014) |
| 10/21/2014 | | Minute Entry for proceedings held before Judge Miriam Goldman Cedarbaum: Sentencing held on 10/21/2014 for Xing Lin (1) Count 1ss,2ss,3ss,4ss. Defendant Xing Lin present with retained counsel Joel Cohen, Esq. AUSAs Jennifer Burns and Peter Skinner present. Court Reporter Kris Sellins present. Chinese Interpreter Lily Lau present. Defendant is sentenced as follows: Counts 1, 2, and 3: Life imprisonment; Count 4: 240 months (to run concurrently with Counts 1, 2, and 3); No Supervised Release; Special Assessment: $400; Fine: $25,000; AUSA to submit order of restitution; Motion to dismiss underlying indictment granted. (jbo) (Entered: 10/29/2014) |
| 10/29/2014 | | DISMISSAL OF COUNTS on Government Motion as to Xing Lin (1) Count 1,1s,2s,3s,5ss. (dnd) (Entered: 10/30/2014) |
| 10/29/2014 | 78 R | JUDGMENT as to Xing Lin (1), Count(s) 1, 1s, 2s, 3s, 5ss, Dismissed; The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of: Counts 1, 2, and 3: Life Imprisonment, Count 4: 240 months (to run concurrently with Counts 1, 2, and 3) The court makes the |

## A. 19

| | | |
|---|---|---|
| | | following recommendations to the Bureau of Prisons: The defendant shall be designated to the United States Penitentiary in Atlanta, Georgia. The defendant is remanded to the custody of the United States Marshal. The defendant is to pay an assessment fee of $400.00 and a fine in the amount of $25,000.00. If the defendant is engaged in a BOP non-UNICOR program, the defendant shall pay $25 Per quarter toward the criminal financial penalties. However, if the defendant participates in the BOP's UNICOR program as a grade 1 through 4, the defendant shall pay 50% of his monthly UNICOR earnings toward the criminal financial penalties, consistent with BOP regulations at 28 C.F.R. section 545/11. (Signed by Judge Miriam Goldman Cedarbaum on 10/29/2014)(dnd) (Entered: 10/30/2014) |
| 11/03/2014 | 79 | NOTICE OF APPEAL by Xing Lin from 78 **R** Judgment. Filing fee $ 505.00, receipt number 465401108795. (nd) (Entered: 11/04/2014) |
| 11/04/2014 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet as to Xing Lin to US Court of Appeals re: 79 Notice of Appeal - Final Judgment. (nd) (Entered: 11/04/2014) |
| 11/04/2014 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files as to Xing Lin re: 79 Notice of Appeal - Final Judgment were transmitted to the U.S. Court of Appeals. (nd) (Entered: 11/04/2014) |
| 11/19/2014 | 80 **R** | TRANSCRIPT of Proceedings as to Xing Lin re: Sentence held on 10/21/2014 before Judge Miriam Goldman Cedarbaum. Court Reporter/Transcriber: Khristine Sellin, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/15/2014. Redacted Transcript Deadline set for 12/26/2014. Release of Transcript Restriction set for 2/20/2015. (McGuirk, Kelly) (Entered: 11/19/2014) |
| 11/19/2014 | 81 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Xing Lin. Notice is hereby given that an official transcript of a Sentence proceeding held on 10/21/2014 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 11/19/2014) |
| 12/17/2014 | 82 | TRANSCRIPT REQUEST by Xing Lin for a Plea proceeding held on 06/27/2012, 06/28/2012, 10/21/2014 before Judge Miriam Goldman Cedarbaum re: Appeal Record Sent to USCA - Electronic File, 79 Notice of Appeal - Final Judgment, Transmission of Notice of Appeal and Docket Sheet to USCA. Transcript due by 1/2/2015. (Benett, Megan) (Entered: 12/17/2014) |
| 07/28/2016 | 83 | LETTER addressed to Office of the Clerk from Defendant (11-Cr-114-01) Xing Lin, not dated re: Request to preserve Due Process claim based on "Johnson v. United States" 135 S.Ct. 2551 (2015) and "Welch v. United States," 136 S. Ct. 1257 (2016), which deemed "Johnson v. United States" as retroactive applicable on collateral review. (bw); [*** NOTE: Forwarded this document to Judge Stein's Chambers on 7/29/2016. ***] Modified on 7/29/2016 (bw). (Entered: 07/28/2016) |

# A. 20

| 07/29/2016 | 84 | NOTICE OF CASE REASSIGNMENT as to Xing Lin (1), to Judge Sidney H. Stein. Judge Miriam Goldman Cedarbaum no longer assigned to the case. (bw) (Entered: 07/29/2016) |
| 08/02/2016 | 85 | NOTICE OF ATTORNEY APPEARANCE: Megan Wolfe Benett appearing for Xing Lin. Appearance Type: Retained. (Benett, Megan) (Entered: 08/02/2016) |

| **PACER Service Center** | | | |
| **Transaction Receipt** | | | |
| 08/08/2016 14:53:21 | | | |
| **PACER Login:** | kreindlerllp:2581098:0 | **Client Code:** | 12345 |
| **Description:** | Docket Report | **Search Criteria:** | 1:11-cr-00114-SHS |
| **Billable Pages:** | 16 | **Cost:** | 1.60 |

**A. 21**

**Criminal Notice of Appeal - Form A**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: NOV 03 2014

## NOTICE OF APPEAL

### United States District Court

SOUTHERN District of New York

Caption:

UNITED STATES OF AMERICA

v.

LIN XING

Docket No.: 11 CR 114 (MBC)

CEDARBAUM

(District Court Judge)

Notice is hereby given that _____ LIN XING _____ appeals to the United States Court of Appeals for the Second Circuit from the judgment ✓, other | AND SENTENCE

(specify)

entered in this action on 10/29/14 .

(date)

This appeal concerns: Conviction only |___| Sentence only |___| Conviction & Sentence |✓| Other |___|

Defendant found guilty by plea | trial | N/A |

Offense occurred after November 1, 1987? Yes |✓| No |___| N/A |___|

Date of sentence: 10/21/14 N/A |___|

Bail/Jail Disposition: Committed |✓| Not committed | | N/A |

Appellant is represented by counsel? Yes ✓ | No | | If yes, provide the following information:

Defendant's Counsel: JOEL S. COHEN

Counsel's Address: 225 BROADWAY

NY NY 10007

Counsel's Phone: 212-571-8899

Assistant U.S. Attorney: PETER SKINNER, JENNIFER BURNS

AUSA's Address: ONE ST. ANDROWS PLAZA

NY NY

AUSA's Phone: 212-637-2200

_____
Signature

**A. 22**



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA,

     - v. -

                         SEALED INDICTMENT

XING LIN,
    a/k/a "Ding Pa," and         11 Cr.
HAO CHAO,
    a/k/a "Little Beijing,"

         Defendants.         **11 CRIM   114**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

COUNT ONE

     The Grand Jury charges:

     1.    On or about July 30, 2004, in the Southern District of New York and elsewhere, XING LIN, a/k/a "Ding Pa," and HAO CHAO, a/k/a "Little Beijing," the defendants, unlawfully, willfully, and knowingly, during and in relation to a crime of violence for which they may be prosecuted in a court of the United States, namely, a conspiracy to commit extortion in violation of Title 18, United States Code, Section 1951, did use and carry a firearm, and, in furtherance of such crime, did possess a firearm, and did aid and abet the use, carrying, and possession of a firearm, and in the course of that crime did cause the death of a person through the use of a firearm, which killing is murder as defined in Title 18, United States Code, Section 1111(a), to wit, LIN directed CHAO to shoot Chang Qin Zhou inside a club in Queens, New York, and CHAO did shoot Zhou as well as two bystanders, Mei Ying Li and "Victim-3", killing

**A. 23**

Zhou and Li, and wounding "Victim-3."

(Title 18, United States Code, Sections 924(j)(1) and 2.)

_____        _____
FOREPERSON                              PREET BHARARA
                                        United States Attorney

-2-

**A. 24**

Form No. USA-33s-274 (Ed. 9-25-58)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

XING LIN, a/k/a "Ding Pa," and
HAO CHAO, a/k/a "Little Beijing,"

Defendants.

SEALED INDICTMENT

11 Cr. _____

(Title 18, United States Code, Sections 924(j)(1) and 2.)

PREET BHARARA
United States Attorney.

A TRUE BILL

Foreperson.

**A. 25**



*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 10, 2012

**By Electronic Mail**
Joel S. Cohen, Esq.
128 Mott Street, Suite 706
New York, NY 10013

> Re:  **United States v. XING LIN, a/k/a "Ding Pa,"**
> **S1 11 Cr. 114 (MGC)**

Dear Mr. Cohen:

On the understandings specified below, the Office of the United States Attorney for the Southern District of New York ("this Office") will accept a guilty plea from XING LIN, a/k/a "Ding Pa" ("the defendant") to Count One of the above-referenced Superseding Information ("the Information").  Count One charges the defendant with aiding and abetting the discharge of a firearm during and in relation to a conspiracy to commit extortion, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(iii) and 2.  Count One carries a mandatory minimum sentence of ten years' imprisonment; a maximum sentence of life imprisonment; a maximum fine, pursuant to Title 18, United States Code, Section 3571, of the greatest of $250,000 or twice the gross pecuniary gain derived from the offense; a maximum term of five years' supervised release; and a mandatory $100 special assessment.

In addition to the foregoing, the Court must order restitution in accordance with Sections 3663, 3663A, and 3664 of Title 18, United States Code.  The restitution amount shall be specified by the Court, and shall be paid according to a plan established by the Court.  The parties agree, however, that the existence of a payment plan set by the Court will not bar Governmental collection efforts against any of the defendant's available assets.

In consideration of the defendant's plea to the above offense, the defendant will not be further prosecuted criminally by this Office (except for criminal tax violations as to which this Office cannot, and does not, make any agreement) for discharging a firearm, and aiding and abetting the discharge of a firearm, on or about July 30, 2004, inside a karaoke establishment in Flushing Queens, during and in relation to a conspiracy to commit extortion, it being understood that this agreement does not bar the use of such conduct as a predicate act or as the basis for a sentencing enhancement in a subsequent prosecution including, but not limited to, a prosecution pursuant to 18 U.S.C. §§ 1961 *et seq.*  In addition, at the time of sentencing, the Government will move to dismiss any open Count(s) against the defendant.  The defendant agrees that with respect to any and all

06.06.2011

**A. 26**

dismissed charges he is not a "prevailing party" within the meaning of the "Hyde Amendment," Section 617, P.L. 105-119 (Nov. 26, 1997), and will not file any claim under that law.

It is agreed that the defendant waives any objection or defense he may have as to venue with respect to Count One of the Superseding Information.

The defendant hereby admits the forfeiture allegation with respect to Count One of the Indictment and agrees to forfeit to the United States, pursuant to 21 U.S.C. § 853, any and all property constituting or derived from any proceeds the defendant obtained directly or indirectly as a result of the violation and any and all property used or intended to be used in any manner or part to commit and to facilitate the commission of the violation alleged in Count One of the Indictment. It is further understood that any forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon him in addition to forfeiture.

In consideration of the foregoing and pursuant to United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") Section 6B1.4, the parties hereby stipulate to the following:

A.      Offense Level

1.      The Guidelines Manual in effect as of November 1, 2011 applies to the offense conduct.

2.      Pursuant to U.S.S.G. § 2K2.4(b), the Guidelines sentence for Count One is the minimum term of imprisonment required by the statute, and Chapters Three and Four of the Guidelines do not apply to that count of conviction. As set forth above, Count One requires a mandatory minimum sentence of ten years' (120 months') imprisonment.

B.      Criminal History Category

Based upon the information now available to this Office (including representations by the defense), the defendant has no criminal history points.

In accordance with the above, the defendant falls within Criminal History Category I.

C.      Sentencing Range

Based upon the calculations set forth above, the defendant's stipulated Guidelines sentence is 120 months' imprisonment (the "Stipulated Guidelines Sentence").

The parties agree that neither a downward nor an upward departure from the Stipulated Guidelines Sentence set forth above is warranted. Accordingly, neither party will seek any departure or adjustment pursuant to the Guidelines that is not set forth herein. Nor will either

party suggest that the Probation Office consider such a departure or adjustment under the Guidelines, or suggest that the Court *sua sponte* consider any such departure or adjustment.

The parties agree that either party may seek a sentence outside of the Stipulated Guidelines Sentence, suggest that the Probation Office consider a sentence outside of the Stipulated Guidelines Sentence, and suggest that the Court *sua sponte* consider a sentence outside of the Stipulated Guidelines Sentence, based upon the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a).

Except as provided in any written Proffer Agreement(s) that may have been entered into between this Office and the defendant, nothing in this Agreement limits the right of the parties (i) to present to the Probation Office or the Court any facts relevant to sentencing; (ii) to make any arguments regarding the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a); (iii) to seek an appropriately adjusted Guidelines range if it is determined based upon new information that the defendant's criminal history category is different from that set forth above; and (iv) to seek an appropriately adjusted Guidelines range or mandatory minimum term of imprisonment if it is subsequently determined that the defendant qualifies as a career offender under U.S.S.G. § 4B1.1.

It is understood that pursuant to U.S.S.G. § 6B1.4(d), neither the Probation Office nor the Court is bound by the above Guidelines stipulation, either as to questions of fact or as to the determination of the proper Guidelines to apply to the facts. In the event that the Probation Office or the Court contemplates any Guidelines adjustments, departures, or calculations different from those stipulated to above, or contemplates any sentence other than the Stipulated Guidelines Sentence, the parties reserve the right to answer any inquiries and to make all appropriate arguments concerning the same.

It is understood that the sentence to be imposed upon the defendant is determined solely by the Court. It is further understood that the Guidelines are not binding on the Court. The defendant acknowledges that his entry of a guilty plea to the charged offenses authorizes the sentencing court to impose any sentence, up to and including the statutory maximum sentence. This Office cannot, and does not, make any promise or representation as to what sentence the defendant will receive. Moreover, it is understood that the defendant will have no right to withdraw his plea of guilty should the sentence imposed by the Court be other than the Sentencing Guidelines Sentence set forth above.

It is agreed (i) that the defendant will not file a direct appeal; nor bring a collateral challenge, including but not limited to an application under Title 28, United States Code, Section 2255 and/or Section 2241; nor seek a sentence modification pursuant to Title 18, United States Code, Section 3582(c), of any sentence at or below the Stipulated Guidelines Sentence of 120 months' imprisonment, and (ii) that the Government will not appeal any sentence at or above the Stipulated Guidelines Sentence of 120 months' imprisonment. This provision is binding on the parties even if the Court employs a Guidelines analysis different from that stipulated to herein. Furthermore, it is agreed that any appeal as to the defendant's sentence that is not foreclosed by this provision will be limited to that portion of the sentencing calculation that is inconsistent with (or not addressed by)

the above stipulation.  The parties agree that this waiver applies regardless of whether the term of imprisonment is imposed to run consecutively to or concurrently with the undischarged portion of any other sentence of imprisonment that has been imposed on the defendant at the time of sentencing in this case.  The defendant further agrees not to appeal any term of supervised release that is less than or equal to the statutory maximum.

The defendant hereby acknowledges that he has accepted this Agreement and decided to plead guilty because he is in fact guilty.  By entering this plea of guilty, the defendant waives any and all right to withdraw his plea or to attack his conviction, either on direct appeal or collaterally, on the ground that the Government has failed to produce any discovery material, *Jencks* Act material, exculpatory material pursuant to *Brady* v. *Maryland*, 373 U.S. 83 (1963), other than information establishing the factual innocence of the defendant, and impeachment material pursuant to *Giglio* v. *United States*, 405 U.S. 150 (1972), that has not already been produced as of the date of the signing of this Agreement.

The defendant recognizes that because he is not a citizen of the United States, his guilty plea and conviction make it very likely that his deportation from the United States is presumptively mandatory and that, at a minimum, he is at risk of being deported or suffering other adverse immigration consequences.  The defendant acknowledges that he has discussed the possible immigration consequences (including deportation) of his guilty plea and conviction with defense counsel.  The defendant affirms that he wants to plead guilty regardless of any immigration consequences that may result from the guilty plea and conviction, even if those consequences include deportation from the United States.  It is agreed that the defendant will have no right to withdraw his/her guilty plea based on any actual or perceived adverse immigration consequences (including deportation) resulting from the guilty plea and conviction. It is further agreed that the defendant will not challenge his conviction or sentence on direct appeal, or through litigation under Title 28, United States Code, Section 2255 and/or Section 2241, on the basis of any actual or perceived adverse immigration consequences (including deportation) resulting from his guilty plea and conviction.

It is further agreed that should the conviction(s) following the defendant's plea(s) of guilty pursuant to this Agreement be vacated for any reason, then any prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this agreement (including any counts that the Government has agreed to dismiss at sentencing pursuant to this Agreement) may be commenced or reinstated against the defendant, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement or reinstatement of such prosecution.  It is the intent of this Agreement to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date that this Agreement is signed.

It is further understood that this Agreement does not bind any federal, state, or local prosecuting authority other than this Office.

Apart from any written Proffer Agreement(s) that may have been entered into between this Office and defendant, this Agreement supersedes any prior understandings, promises, or conditions between this Office and the defendant. No additional understandings, promises, or conditions have been entered into other than those set forth in this Agreement, and none will be entered into unless in writing and signed by all parties.

Very truly yours,

PREET BHARARA
United States Attorney

By: _____
Jennifer E. Burns
Peter Skinner
Assistant United States Attorneys
(212) 637-2315/2601

APPROVED:

_____
Elie Honig
Deputy Chief, Organized Crime Unit

AGREED AND CONSENTED TO:

_____     _____
XING LIN                            DATE

APPROVED:

_____     _____
Joel Cohen, Esq.                    DATE
Attorney for XING LING

**A. 30**

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
UNITED STATES OF AMERICA,            :

          - v. -                     :        **SUPERSEDING INFORMATION**

XING LIN,                            :        S1 11 Cr. 114 (MGC)
     a/k/a "Ding Pa,"
                                     :
               Defendant.
                                     :
-----------------------------------X
```

<u>COUNT ONE</u>

The United states Attorney charges:

1.   On or about July 30, 2004, in the Southern District of New York and elsewhere, XING LIN, a/k/a "Ding Pa," the defendant, unlawfully, willfully, and knowingly, during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, namely, a conspiracy to commit extortion in violation of Title 18, United States Code, Section 1951, did use and carry a firearm, and, in furtherance of such crime, did possess a firearm, and did aid and abet the use, carrying, and possession of a firearm, and in the course of that crime the firearm was discharged, to wit, LIN directed a co-conspirator not named herein ("CC-1") to shoot Chang Qin Zhou inside a club in Queens, New York, and CC-1 did shoot Zhou as well as two bystanders, Mei Ying Li and "Victim-3",

**A. 31**

killing Zhou and Li, and wounding "Victim-3."

(Title 18, United States Code, Sections 924(c)(1)(A)(iii) and 2.)

_____
PREET BHARARA
United States Attorney

**A. 32**

Form No. USA-33s-274 (Ed. 9-25-58)

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA**

**- v. -**

**XING LIN, a/k/a "Ding Pa,"**

**Defendant.**

<u>**SUPERSEDING INFORMATION**</u>

S1 11 Cr. 114 (MGC)

(Title 18, United States Code, Sections 924(c)(1)(A)(iii) and 2.)

<u>PREET BHARARA</u>

United States Attorney.

**A. 33**

C6rnlinp                    Plea

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,                    New York, N.Y.

            v.                               11 Cr. 114 (MGC)

XING LIN,

                    Defendant.

------------------------------x

                                             June 27, 2012
                                             3:00 p.m.

Before:

                HON. MIRIAM GOLDMAN CEDARBAUM,

                                             District Judge

                        APPEARANCES

PREET BHARARA
    United States Attorney for the
    Southern District of New York
BY: PETER SKINNER
    JENNIFER BURNS
    Assistant United States Attorneys

JOEL COHEN
    Attorney for Defendant

ALSO PRESENT:
Brenda Chen, Foochow Interpreter

**A. 34**

C6rnlinp                    Plea

(In open court)

THE COURT:  Now I think you should get up, Mr. Lin.  I understand that you want to enter a plea of guilty to the charges against you, is that correct?

THE DEFENDANT:  Yes.

THE COURT:  All right.

Before I can enter your plea of guilty, I have to satisfy myself that you understand the consequences of entering a plea of guilty and that you are in fact guilty of the crime to which you are pleading.

THE DEFENDANT:  Yes.

THE COURT:  So for both of those purposes, I would like to ask you some questions.

THE DEFENDANT:  Sure.

THE COURT:  First how much education have you had?

THE DEFENDANT:  Elementary school.

THE COURT:  That was in China?

THE DEFENDANT:  Yes.

THE COURT:  All right.  As I recall you have lived in this country for quite a long time, isn't that right?

THE DEFENDANT:  Yes.

THE COURT:  So, although you do understand some English, you would prefer to have English translated for you since Chinese is your native tongue, is that right?

THE DEFENDANT:  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A. 35**

C6rnlinp                    Plea

THE COURT:  All right.  We have provided you with a Chinese interpreter.

Where are you from in China?  Do you speak Mandarin?

THE DEFENDANT:  Fujian, China.

THE COURT:  I see.  Do you speak Fukienese, Madam interpreter?

THE INTERPRETER:  Yes, I do, your Honor.

THE COURT:  You have been provided with a Fukienese interpreter, somebody who could translate what you say in your native language to me and who can translate what I say in English to you into Fukienese.

Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  Nevertheless, if I ask you something that you do not understand, that is not entirely clear to you, if you tell me, I will try to make it more understandable to you.

THE DEFENDANT:  OK.

THE COURT:  Because it's very important that you think about what you tell me, and that you understand what you are being asked and what you tell me.

THE DEFENDANT:  OK.

THE COURT:  Have you discussed this plea carefully with your lawyer?

THE DEFENDANT:  Yes.

THE COURT:  Are you satisfied that your lawyer has

C6rnlinp                    Plea

given you good advice, that he has represented you well?

THE DEFENDANT:  Yes.

THE COURT:  Do you have any doubt about that?

THE DEFENDANT:  No.

THE COURT:  Very well.  Then I would like to first talk to you about what you are giving up when you enter a plea of guilty, because you have an absolute right to continue to plead not guilty, and, if you do so, you are entitled to a trial before a jury of 12 persons.  At that trial, with the assistance of your lawyer throughout, you are entitled to confront the witnesses against you and cross-examine them.  And at that same trial you have no obligation yourself to speak or testify because nobody can compel you to incriminate yourself.

Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  All right.  At a trial you would have the power of the Court to subpoena witnesses in your behalf and present evidence that shows that you are not guilty of the crime charged.

Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  But if I enter your plea of guilty, it will be as if that jury of 12 persons brought in a verdict of guilty after a full trial at which you would have had the assistance of counsel throughout and the government proved its

C6rnlinp                    Plea

charges against you beyond a reasonable doubt.  And you will stand convicted.  There will be no further trial of any kind. You are giving up all of the rights associated with trial if I enter your plea of guilty.

Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  This is the time you have to decide, because if you enter a plea of guilty now, you will not be able to withdraw it later.

Do you understand that?

THE DEFENDANT:  Yes, I understand.

THE COURT:  Very well.

Then I would like to review with you the agreement that you have entered into with the government.

Have you gone over this agreement carefully with your lawyer?

THE DEFENDANT:  Yes.

THE COURT:  And do you understand --

THE DEFENDANT:  Yes.

THE COURT:  -- all of the things you are giving up when you enter this agreement?  I want to particularly draw to your attention that Count One of this indictment against you charges you with a crime, aiding and abetting the discharge of a firearm in furtherance of a conspiracy to commit extortion, and that if I enter your plea of guilty to that charge, you are

**A. 38**

C6rnlinp                    Plea

subject to a term of imprisonment of a minimum of ten years in prison.

Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  Very well.  And if I enter your plea of guilty to Count One -- there is only one count here, isn't that correct?

MR. SKINNER:  Yes, your Honor.

The defendant is actually pleading to a superseding information that contains one count.

THE COURT:  Thank you.  All right.

I see that there is a superseding information that has been filed against you.  There are two things I want to ask you about that.  Under our Constitution you are absolutely entitled not to be tried without an indictment by a grand jury.

Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  I see there is now filed against you a superseding information, which is not an indictment by a grand jury but is a charge by the prosecutor, the United States Attorney's Office.

Did you agree to be tried on an information and give up your right to an indictment by a grand jury?

THE DEFENDANT:  I agree.

THE COURT:  Well, did you make that agreement?  Did

C6rnlinp             Plea

you agree that you could be charged by a charge by the United States Attorney's office and that you did not require, as you are entitled to under our law, an indictment by a grand jury?

THE DEFENDANT:  Yes.

THE COURT:  Did you discuss that with your lawyer?

THE DEFENDANT:  Yes.

THE COURT:  And do you understand what you gave up in agreeing to that?

THE DEFENDANT:  Yes.

THE COURT:  Very well.

Is there a consent here to the filing of an information?

MR. SKINNER:  Yes, your Honor.  The defendant signed a waiver prior to his appearance today.

THE COURT:  Good.  Thank you.  All right.

I have in front of me a document called waiver of indictment in which you signed a consent to give up your right to an indictment by a grand jury.

Do you remember that?

THE DEFENDANT:  Yes, I do.

THE COURT:  And is this your signature on this document called waiver of indictment?

THE DEFENDANT:  Yes.

THE COURT:  Very well.

Did you do that with the understanding that you had a

**A. 40**

C6rnlinp                         Plea

right not to give that up?

THE DEFENDANT:  Yes.

THE COURT:  Then let me turn back to what you are pleading guilty to, because in addition to the penalty that the law sets for the charge against you, as I explained, it requires that you be sentenced to at least ten years in prison, but you may be sentenced to up to life in prison.

Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  In addition, you are subject to a fine -- which is it gain or loss, if anything?

MR. SKINNER:  It would be loss to the victims, your Honor, gain to the defendant.  The same figure either way.

THE COURT:  There was money derived from the offense?

MR. SKINNER:  Yes, your Honor.  The defendant was engaged in an extortion, and some payments were made in advance of the offense.

THE COURT:  So, in addition to the term of imprisonment that I have told you about, you are subject to a fine of $250,000 or twice -- there is something missing here.  You are speaking of gain.  You just told me it was loss.

MR. SKINNER:  It's twice the gross --

THE COURT:  This just says pecuniary gain.  It should be twice the loss.

MR. SKINNER:  Well, it's the same figure either way,

C6rnlinp                    Plea

your Honor.  Here in the plea agreement --

THE COURT:  I understand.  But it matters which it is. You just told me that it's loss, not gain.

MR. SKINNER:  I stand corrected.  The plea agreement says pecuniary gain to the defendant, and the fine would be the greater of twice the gross pecuniary gain or $250,000, whatever is larger.

THE COURT:  Do you think there was pecuniary gain here or -- pecuniary loss to the victims you told me.

MR. SKINNER:  I believe there was both.

THE COURT:  What was the pecuniary gain here?

MR. SKINNER:  The money the victims paid to the defendant as part of the extortion.  So that was gain to the defendant.

THE COURT:  But this does not charge a conspiracy to commit extortion.  It charges aiding and abetting the discharge of a gun in relation to a conspiracy to commit extortion.

MR. SKINNER:  Yes.  The discharge of the gun in aid of the extortion.  So the fine would be -- we haven't agreed to any actual gain to the defendant yet.  The Court may find at sentencing that restitution is proper in an amount to be paid in accordance to the --

THE COURT:  I am going to have to get to the restitution anyhow.

MR. SKINNER:  Precisely.  But if the Court were to

**A. 42**

C6rnlinp                    Plea

find that the defendant did gain from committing this offense, then the fine for purposes of the maximum penalties that can be imposed against the defendant, the fine would then be twice whatever the Court determined the gain to have been.

THE COURT:  I understand.  But I'm asking you now, this is an agreement you have made.

Which is it?  What is it that is the fine we are talking about?

MR. SKINNER:  We don't know the figure, your Honor. We can figure that out up to the time of sentencing or even 90 days past that.  We will advise the Court if we think there was a gain to the defendant at the time of sentencing.

THE COURT:  Is the $250,000 the greatest?

MR. SKINNER:  I don't know, your Honor.

THE COURT:  If you don't know, how can you tell the defendant what he's facing on a fine?

MR. SKINNER:  The defendant's the one who is admitting his guilt.  The defendant knows --

THE COURT:  I understand.  But you and I need to understand what it is that he expects in this agreement.

MR. SKINNER:  I think the defendant can be properly advised -- he can allocute to the greater of either $250,000 or whatever his gain might have been.  And he knows what his gain might have been, so he knows the potential fine he's facing.

THE COURT:  Was there a gain?

C6rnlinp                    Plea

MR. SKINNER:  As I said, I know there were payments made by the victim in advance of the shooting.

THE COURT:  But how were those payments part of aiding and abetting the discharge of a gun?

MR. SKINNER:  Well, the Court may find that there was none then, and the $250,000 would be the largest fine.  Either way I think the defendant can be advised of the fine he's facing.

THE COURT:  What he needs to know is whether he may have to pay more than $250,000, and that's something that you should know.

MR. SKINNER:  And I'm advising the Court from the facts that I know right now, the fine is not larger than $250,000.

THE COURT: All right.  Thank you.

In addition to the prison term that I have explained to you, you are subject to a fine of $250,000, and, in addition, you are subject to a term of up to five years of supervised release after you are released from prison.

I'm sure your lawyer has explained to you that there is a mandatory special assessment of $100, which, although it's not a fine, is collectible as if were.

I should explain one more thing to you about supervised release.  If you should violate any of the conditions of supervised release, you are subject to an

**A. 44**

C6rnlinp                    Plea

additional term of imprisonment separate from the imprisonment for the underlying crime.

THE COURT: Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Very well.

In addition, if I enter your plea, in connection with your sentence, I must order restitution, that is, a return of any money you extorted illegally from another person.

Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Very well.

Have you thought carefully about all of these things?

THE DEFENDANT: Yes.

THE COURT: All right.

We are now in the Southern District of New York, which does not include the County of Queens.

Under our Constitution you are entitled to be prosecuted in the district in which your crime was committed.

Have you discussed that with your lawyer?

THE DEFENDANT: Yes.

MR. COHEN: Your Honor, briefly, if I may?

THE COURT: Yes.

MR. COHEN: I think once you hear the defendant's allocution it will satisfy the venue requirement, because although the discharge of the firearm occurred in the Eastern

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A. 45**

C6rnlinp                    Plea

District, some of the extortionate conduct occurred in Chinatown in Manhattan.

THE COURT:  Very well.

In any event, if he is prepared to agree to waive any defect in venue, that's what I want to understand.

MR. COHEN:  Of course, Judge.

THE COURT:  I take it that you do waive any objection that might be found to venue in this district, is that correct?

THE DEFENDANT:  Yes.

THE COURT:  Very well.  You considered that?  You talked to your lawyer about it and thought about whether you wanted to do it; is that right?

THE DEFENDANT:  Yes.

THE COURT:  Very well.

I see that you have other rights that you have given up in this plea agreement.  You have agreed that you will not file an appeal from the sentence on this plea or attack it in any way either directly by appeal or by moving collaterally against the validity of your sentence.  You have also agreed not appeal any term of supervised release that is within the statutory maximum.

MR. COHEN:  Your Honor, respectfully I think that the waiver of appeal is a waiver of appeal of any sentence at or below the stipulated guidelines level of 120 months.  I think the agreement preserves the right to appeal from any sentence

C6rnlinp                    Plea

in excess of 120 months.

MR. SKINNER:  We don't dispute that, your Honor.

THE COURT:  Very well.

Well, it's not just the stipulated guidelines sentence.  It's the mandatory minimum.

MR. COHEN:  It is both, your Honor.

MR. SKINNER:  In this case the guidelines sentence is equal to the mandatory minimum sentence of 120 months.  So the appeal waiver is, if the defendant is sentenced to 120 months, he waives his right to an appeal.  That would be the mandatory minimum.

THE COURT:  I see.  But if he's sentenced to more than 120 months, he may appeal that sentence?

MR. SKINNER:  Yes, your Honor.

MR. COHEN:  That's our understanding, Judge, yes.

THE COURT:  Let me ask the defendant what his understanding is.

What is your understanding as to what appeal you are giving up, Mr. Lin?

THE DEFENDANT:  Ten years.

THE COURT:  Do you understand that if you are sentenced to ten years or less, you have given up entirely any right to attack the sentence?

THE DEFENDANT:  Yes.

THE COURT:  Did you do that understanding and knowing

C6rnlinp                    Plea

that you didn't have to do it?

THE DEFENDANT:  Yes.

THE COURT:  Very well.

What is any other term of imprisonment that could have been imposed on this defendant that is referred to here?

MR. SKINNER:  Your Honor --

THE COURT:  That is the trouble with boilerplate.

MR. SKINNER:  Your Honor, the defendant may be imprisoned anywhere up to life, so that would be another term of imprisonment that could be imposed.

THE COURT:  This says, "whether the term of imprisonment is imposed to run consecutively or concurrently with the undischarged portion of any other sentence of imprisonment."

what other sentence of imprisonment are we talking about?

MR. SKINNER:  There is none, your Honor.

THE COURT:  Then why is this language here?

MR. SKINNER:  Your Honor, it's --

THE COURT:  Other than that it's boilerplate.

MR. SKINNER:  It's because at the time of the sentencing in the case, in theory, he could have an undischarged state case that we don't know about and he could be sentenced on it.

THE COURT:  Please, how can you make an arrangement

**A. 48**

C6rnlinp                    Plea

about something you don't know about?  Everybody has to know what it is they are agreeing to.

MR. SKINNER:  Your Honor, I know the Court has some issues with the boilerplate in the plea agreements.

THE COURT:  Of course, because it makes no sense to simply recite the language of a statute that has no application.

MR. SKINNER:  Well, I think theoretically there could be an application here.

THE COURT:  But this is not theoretical.  You are entering an agreement.

MR. SKINNER:  The defendant --

THE COURT:  This is not theoretical.  He has to understand what he's agreeing to.

MR. SKINNER:  I think the defendant does understand what he is agreeing to.  He's being advised --

THE COURT:  Why is this language added to make it more confusing?

MR. SKINNER:  It is not intended to be more confusing.

THE COURT:  The intent is not the critical point.  The purpose of a plea agreement is to set forth exactly what the defendant faces.

MR. SKINNER:  Precisely.

THE COURT:  Is there any basis for believing that there is any other sentence that has been imposed on him at any

**A. 49**

C6rnlinp                    Plea

prior time?

MR. SKINNER:  No, there is not.

THE COURT:  Then this language is confusing.

MR. SKINNER:  Your Honor, I'm not --

THE COURT:  It is a lawyer's duty to think carefully, not just to recite what the language of a statute.

MR. SKINNER:  We think quite carefully before entering into these plea agreements.

THE COURT:  You may.  But I have great difficulty with your putting in things that have no application.

MR. SKINNER:  There are instances, particularly with state court sentences or with an international defendant or, whatever it might be, where we might not be aware of an existing sentence.

THE COURT:  That would be negligence on your part.

MR. SKINNER:  He could be a fugitive on a sentence and for whatever reason we are not aware of it.

THE COURT:  You have not checked his state situation.

MR. SKINNER:  Of course we have, your Honor.

THE COURT:  That is what I would think.

MR. SKINNER:  We are not aware of an existing sentence.

THE COURT:  This doesn't help you if you are not aware of any other.

MR. SKINNER:  If there is something there, then it

C6rnlinp                    Plea

would be applicable, and for that reason I do not think it's surplusage.

THE COURT:  I don't think it would be applicable if the defendant doesn't understand it or know about it.  I don't understand the use of that language.  You speak of the undischarged portion of any other sentence.  Do you have any basis for believing that there is an undischarged portion of any other sentence?

MR. SKINNER:  Your Honor, at this time --

THE COURT:  I care about that.

MR. SKINNER:  At this time I do not.  At the time of sentencing there may be.

This defendant may go back to jail tomorrow and commit a felony offense in prison for which he's sentenced prior to the sentencing in this case.

THE COURT:  Oh, please.  Let's not get into the realm of fantasy.

MR. SKINNER:  That is not fantasy.

THE COURT:  It is fantasy.  Good lawyers don't have to dream up that kind of thing.

MR. SKINNER:  Good lawyers cover theoretical situations that might apply at the time of sentencing.

THE COURT:  Not in agreements.  In agreements both sides are entitled to know exactly what they are agreeing to.

MR. SKINNER:  I think the issue is whether the

**A. 51**

C6rnlinp                    Plea

defendant agrees what the plea agreement covers, and he can be asked.  And if he doesn't agree, we will explain it to him.

THE COURT:  I don't know what you mean agrees, this defendant is agreeing to everything that these words say.  I don't think he has any idea what you are talking about when you use this language.

MR. SKINNER:  With regard to the appeal waiver, the defendant is agreeing that he's waiving an appeal if he receives 120 months that would run consecutive to an undischarged sentence at the time of sentencing.  If the defendant --

THE COURT:  Counsel, have you discussed with the defendant that that is some possibility with respect to appeal of his sentence?

MR. COHEN:  Judge, the way that I explained that to him simply was to say that I don't believe it's applicable to him.

THE COURT:  If it's not applicable, it shouldn't be here.

MR. COHEN:  I don't disagree, Judge.  I have the same issues with boilerplate as you do, and I think I have had the same success with the government trying to remove boilerplate, although I didn't address it particularly in this case.

I have explained to Mr. Lin that, as we are unaware of any undischarged sentence he has anywhere in any jurisdiction

**A. 52**

C6rnlinp                    Plea

in the United States or elsewhere, that this simply is not applicable to him.

THE COURT:  Off the record.

(Discussion off the record)

THE COURT:  The one other important thing for you to know about, Mr. Lin, is that because you are not an American citizen being sentenced, being found guilty as you have admitted in this case subjects you to being removed from the United States when you come out of prison.

Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  What are other adverse immigration consequences other than removal from the United States?

MR. SKINNER:  What are other adverse?

THE COURT:  Yes.

MR. SKINNER:  Your Honor --

THE COURT:  Besides removal, which is what the statute now calls deportation, what are the other adverse consequences.

MR. SKINNER:  I think if the defendant applied to become a U.S. citizen he could still, in some cases he could be permitted to remain in the country but denied citizenship.

THE COURT:  Is that so?

MR. SKINNER:  Your Honor, I really --

THE COURT:  That's interesting.

MR. SKINNER:  I really don't care to speculate, but it

**A. 53**

C6rnlinp                    Plea

covers whatever adverse consequences there may be.

THE COURT:  All right.

This one at least comes a little closer to what you may really be concerned about.  But the important thing for the defendant is that he faces removal upon his release from prison.

And if you are removed, you will not be allowed to return to this country.  That is the important other consequence.

Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  Very well.

You have given up one other right in this agreement, and that is for most crimes there is a limit on the time during which you may be prosecuted, which we loosely call a statute of limitations.  If for any reason your plea should be vacated and the conviction set aside, you have agreed that you will give up any defense based on untimeliness, the fact that it is not within the time period for this crime.

Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  Did you discuss that with your lawyer?

THE DEFENDANT:  Yes.

THE COURT:  Did you think about it?

THE DEFENDANT:  Yes.

C6rnlinp                    Plea

THE COURT:  And do you wish to agree to that?

THE DEFENDANT:  Yes.

THE COURT:  Very well.

MR. COHEN:  Judge, may I speak to the government for a moment.

THE COURT:  Yes.

(Pause)

MR. COHEN:  Thank you, your Honor.

THE COURT:  All right.  Now I am going to ask Mr. Daniels to place you under oath, Mr. Lin.

(Defendant sworn)

THE COURT:  Do you know what perjury is?

THE DEFENDANT:  Yes.

THE COURT:  It means taking an oath to tell the truth, which you have just done, and then saying something that is not true.

Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  And that is itself a crime.

If after taking an oath to tell the truth you should lie about something that you say to me in answer to a question, that is the crime of perjury, and you may be prosecuted for that, do you understand, a separate charge against you?

THE DEFENDANT:  Yes.

THE COURT:  Very well.

**A. 55**

C6rnlinp　　　　　　　　Plea

Then I would like you to tell me exactly what you did that you want to plead guilty to.

THE DEFENDANT:  This right here.

MR. COHEN:  Judge, I have met with Mr. Lin numerous times, many times, and discussed what happened on the night of the incident for which he's taken responsibility.  Based on these many conversations I have prepared an allocution for him that is accurate, and he's confirmed is factually --

THE COURT:  I understand.  But I would really like to hear from him exactly what happened.

MR. COHEN:  And you will, Judge.  But what I am trying to explain is that we translated the allocution that he has confirmed the truth of into Chinese so that he would be able to read it.

THE COURT:  I understand.  But I try to avoid reading.

MR. COHEN:  I understand, too.  But it is a complicated set of elements that have to be satisfied.  All I'm trying to say is he doesn't read very well, as it turns out, because he was poorly educated.  He's going to try to read it and get through it.  If it doesn't work or if there are issues, we will deal with them as they come up.

THE COURT:  Suppose we first see what he tells me himself about what happened.

Was there a particular night that you went to a nightclub, or actually the club is described as a --

**A. 56**

C6rnlinp                    Plea

MR. COHEN:  Karaoke.

THE COURT:  Karaoke nightclub.

THE DEFENDANT:  July 31.

THE COURT:  Of this year?

THE DEFENDANT:  2004.

THE COURT:  And what happened there?

THE DEFENDANT:  A person with nickname Chow Small Beijing, he fired a gun.

THE COURT:  He had a gun with him?

THE DEFENDANT:  Yes.

THE COURT:  What was your connection with that man?

THE DEFENDANT:  We were friends.

THE COURT:  Were you only friends or were you in business together?

THE DEFENDANT:  Just friends.

THE COURT:  I see.  Did he work for you?

THE DEFENDANT:  He didn't work.  He only came out to dinner and hang out with me.

THE COURT:  All right.

And what happened when you saw him?

THE DEFENDANT:  At that time I was drunk, and then I told him to teach Mr. Zhou a lesson and then the other guy fired the gun.

THE COURT:  Who was the man you wanted to teach a lesson to?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A. 57**

C6rnlinp                    Plea

        THE DEFENDANT:  Last name was Zhou.

        THE COURT:  And who was he?  Why did you want to teach him a lesson?

        THE DEFENDANT:  Because of the bus business.

        THE COURT:  Was he in the bus business?

        THE DEFENDANT:  Yes.

        THE COURT:  What was his business with buses?

        THE DEFENDANT:  He was one of the shareholders in the bus business.

        THE COURT:  Whose bus business?

        THE DEFENDANT:  His bus business in South Carolina.

        THE COURT:  Did he own buses in South Carolina?

        THE DEFENDANT:  It was his at the beginning, and then I took over later.

        THE COURT:  You took over his bus business in South Carolina?

        THE DEFENDANT:  What?

        THE COURT:  Did you take over his bus business in South Carolina?

        THE DEFENDANT:  Yes.

        THE COURT:  And how did you do that?  Was it a corporation?

        THE DEFENDANT:  The company came up with some amount of the money and buy that business.

        THE COURT:  What company came up with the money?

**A. 58**

C6rnlinp                    Plea

THE DEFENDANT:  I don't remember the name of the company.

THE COURT:  Who owned that company?

THE DEFENDANT:  Kool Kuan and Zhing Chen.

THE COURT:  Was one of those the man who was shot?

THE DEFENDANT:  No.

THE COURT:  How was this his bus business?

THE DEFENDANT:  It's been long.  I forgot the name of the bus company.

THE COURT:  I don't need the name.

THE DEFENDANT:  Because at the beginning I wasn't there.

THE COURT:  I understand.  I'm not asking you for the name of the company.  I'm asking you who owned the company.

THE DEFENDANT:  Kool Kuan and Zhing Chen.

THE COURT:  Was one of those men shot in the karaoke place?

THE DEFENDANT:  No.

THE COURT:  Then why are we even talking about them? What about the man who was shot?  What lesson did you want to teach him?

THE DEFENDANT:  I only wanted the other person to curse at that person.

THE COURT:  I understand that.

I'm asking you, what lesson did you want to teach the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A. 59**

C6rnlinp                    Plea

person who was shot?

THE DEFENDANT:  What's a lesson?

MR. COHEN:  Judge, can I interject something here and maybe help?

THE COURT:  It depends.  This man is a businessman. He knows what he owns.  He knows what other people own.  I'm simply asking him who owned the bus company in South Carolina that he's talking about.

MR. COHEN:  And I think that just goes a little bit far afield.  I just want to apprise the Court of some facts that you might want to inquire into that would satisfy you that he knowingly is entering a plea of guilty to what he did.

THE COURT:  I know.  I need to know what he did.

MR. COHEN:  The facts are complicated, and I think that when you ask a question to him literally, like did you take over a bus company in South Carolina --

THE COURT:  No, I'm asking him why he wanted to teach somebody a lesson.

MR. COHEN:  I understand, Judge.

If I could just advise your Honor that Mr. Lin and Mr. Zhou were competitors in competing bus companies.

THE COURT:  Why can't he tell me that.

MR. COHEN:  He can and he will.

THE COURT:  Good.  That's what I want to know.

Did you own another bus company in South Carolina?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A. 60**

C6rnlinp                    Plea

THE DEFENDANT: Yes.

THE COURT: All right. So you owned one bus company in South Carolina and the man in the karaoke club owned another bus company in South Carolina, is that right?

THE DEFENDANT: Yes.

THE COURT: All right. And what did he do that made you want to curse him?

THE DEFENDANT: Which person?

THE COURT: The person who owned the bus company in South Carolina, the person whom you saw in the karaoke bar.

THE DEFENDANT: What did I want to do to him?

THE COURT: Why did you want to do anything to him?

THE DEFENDANT: Because he is one of the competitors for the bus company.

MR. COHEN: Judge, could I have a moment to speak to my client.

(Counsel conferred with the defendant)

MR. COHEN: If your Honor would again ask Mr. Lin why he wanted to teach Mr. Zhou a lesson, I think you will be satisfied with the answer.

THE COURT: Whether I'm satisfied or not, I would like an answer.

THE DEFENDANT: He was the competing bus company.

THE COURT: Yes.

THE DEFENDANT: And I would like to take over his bus

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A. 61**

C6rnlinp                    Plea

company.

THE COURT:  Well, we don't normally attack people who are competitors in business.

MR. COHEN:  Your Honor, I think the bus industry in Chinatown operates under a set of rules that's different from the general corporate structure of American business.

THE COURT:  That's what I want to hear.

Do you normally hurt your competitors physically?

THE DEFENDANT:  Yes.

THE COURT:  Do I understand that you owned a bus company in Georgia and one in South Carolina?

THE DEFENDANT:  Not the one in Georgia.

THE COURT:  I understand, but you owned one in Georgia?

THE DEFENDANT:  No.

THE COURT:  Isn't that where you live?  In Georgia?  Atlanta?

THE DEFENDANT:  I lived there.

THE COURT:  And didn't you have a business there?

THE DEFENDANT:  Atlanta, only a store.

THE COURT:  I see.  In Atlanta you owned a store.

MR. COHEN:  At the arraignment, your Honor, when your Honor was allocuting him, he indicated that after being shot in New York, Mr. Lin moved to Atlanta to try to get out of harm's way and he and his wife operated a small store.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A. 62**

C6rnlinp                    Plea

THE COURT:  That is not what I remembered.  That information I don't remember.  But I didn't realize he was in Atlanta for a short time.  I thought he told me he had lived in Atlanta for a long time.

MR. COHEN:  I think he said he had lived there for about a year.

THE COURT:  I thought he told me longer than that.

MR. COHEN:  It's possible, Judge.  I don't recall.  But he lived in Atlanta after being shot in New York, came to New York, and this incident happened and then he was gone.

THE COURT:  But he owned a bus company in South Carolina he told me just now.

MR. COHEN:  I think that the company operated a route between Chinatown and South Carolina.  Whether it was incorporated there or here, I don't know.

THE COURT:  All right.  Let me ask.

For how long did you own a bus company in South Carolina?

THE DEFENDANT:  Seven or eight years.

THE COURT:  And did you live in South Carolina?

THE DEFENDANT:  No.

THE COURT:  Where did you live?

THE DEFENDANT:  Atlanta.

THE COURT:  That's what I thought I knew.  And you lived in Atlanta for seven or eight years?

**A. 63**

C6rnlinp                    Plea

THE DEFENDANT:  Only two years over there and then in New York for four or five years.

THE COURT:  I see.  You lived in New York before you moved to Atlanta?

THE DEFENDANT:  Yes.

THE COURT:  Did you own a bus company in New York?

THE DEFENDANT:  It's the same company.

THE COURT:  I see.

THE DEFENDANT:  Going from Chinatown to South Carolina.

THE COURT:  I see.  That was the route?

THE DEFENDANT:  Yes.

THE COURT:  And for how long did you own that company?

THE DEFENDANT:  A couple of years.

THE COURT:  All right.  Now, do I understand that because this man you saw in the club was your competitor you wanted to do him harm?

THE DEFENDANT:  At that time I only wanted to teach him a lesson, but I didn't know that Small Beijing would use the gun to kill him.

THE COURT:  I see.  How did you help Small Beijing? Because that is what the charge against you, is that you helped him.

MR. SKINNER:  Your Honor, perhaps he could be asked if he knew whether little Beijing possessed a gun at the time that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A. 64**

C6rnlinp                    Plea

he asked him to teach him a lesson. Because the charge is possession of a gun in furtherance of a violent crime.

MR. COHEN: Respectfully, I think he already allocuted to the fact that he was aware that little Beijing had a firearm.

THE COURT: Yes, he did. He did. He said he knew he had a gun.

MR. SKINNER: I would just ask for clarification of that, because I did not get that fact down myself, and I think it's an important one.

THE COURT: And I agree with you.

All right. Did you expect Little Beijing to do what you wanted him to do?

THE DEFENDANT: At the beginning I had no idea.

THE COURT: Why did you ask him? Why didn't you do it yourself?

THE DEFENDANT: Because he was with me at that time and I was very drunk and I didn't know that he would do it.

THE COURT: What did you expect him to do?

You can't aid and abet if you don't expect.

THE DEFENDANT: Maybe just beat him or curse him.

MR. COHEN: Judge, if I may, I think that the person referred to as Little Beijing, other than being a friend, was also subordinate to --

THE COURT: That's what I asked before, whether he

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A. 65**

C6rnlinp                    Plea

worked for him.

MR. COHEN:  I don't think that he thinks of working for him in the formal sense, but I think he followed him as an underling.

THE COURT:  Did he pay him on a regular basis?  Was he an employee of some kind?

(Counsel conferred with the defendant)

THE DEFENDANT:  Little Beijing was my bodyguard.

THE COURT:  So he did work for you?

THE DEFENDANT:  Yes.

THE COURT:  So you expected him to follow your orders, and he expected to follow them, right?

This gentleman can't write it down unless you say it.

THE DEFENDANT:  Yes.

THE COURT:  All right.

What exactly did you tell Little Beijing to do?

THE DEFENDANT:  I told Little Beijing, Go there, teach him a lesson.

I thought he was going to curse or beat him, but I didn't expect he would pull out the gun and then shoot him.

THE COURT:  Did you know that he had a gun?

THE DEFENDANT:  Yes.

THE COURT:  You know there has to be some violation in this crime.  We haven't really gotten a clear notion of aiding and abetting here.

**A. 66**

C6rnlinp                    Plea

MR. SKINNER:  Your Honor, perhaps if the Court could ask the defendant if prior to the night of this incident at the karaoke club he had been trying to get money or to take over Zhou's bus business.  And if we can get that established, I have some other questions I would suggest.

THE COURT:  Very well.

Were you trying to raise money to buy the man's bus business.

MR. SKINNER:  I'm sorry, your Honor.  Was he trying to get money from Zhou or take over his bus business, one of those two things prior to that night.

THE COURT:  For what purpose?

MR. SKINNER:  Perhaps if the Court could just ask if prior to the night of the incident he had been trying to take over Zhou's bus business or get payments from Zhou.

THE COURT:  I see.

Were you trying before that night to either take over the bus business or get Zhou to pay you not to take it over?

I take it that is what you are talking about.

MR. SKINNER:  Well, close.

THE DEFENDANT:  Yes.

MR. SKINNER:  And did he threaten Zhou or one of Zhou's partners in connection with those efforts prior to the night of the incident?

THE COURT:  When you tried to get money from him, did

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A. 67**

C6rnlinp                    Plea

you tell him if he didn't give you money you would do him harm?

THE DEFENDANT:  Yes.

MR. SKINNER:  And did some of that take place in Manhattan.

THE COURT:  He's already waived venue.

MR. SKINNER:  True.

I guess the next question would be, and in asking Little Beijing to teach him a lesson, was that part of your overall effort to get money from Zhou?

THE COURT:  Let me understand.  Did you expect to see Zhou at that club?

THE DEFENDANT:  Yes, I did.

THE COURT:  So that was part of the reason you went to that club, right?

THE DEFENDANT:  No.  Actually, it was like he was there first and then I went there as well, so I ran into him. I saw him.

THE COURT:  I understand.  But you were not surprised to see him?

MR. COHEN:  Judge, I think that he misspoke.  I think that he was aware once, Mr. Lin was aware once he arrived at the club that Mr. Zhou was there and had not gone there anticipating seeing Zhou.

THE COURT:  When did you see this man before that night?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A. 68**

C6rnlinp              Plea

THE DEFENDANT:  In a restaurant in Chinatown.

THE COURT:  Shortly before that?

THE DEFENDANT:  A couple of days ago.  I forgot when.

THE COURT:  I see.  All right.

So you saw him in a restaurant in Chinatown, and what did you say to him there?

THE DEFENDANT:  At that time I didn't say anything to him in the restaurant.

THE COURT:  I see.  When was the last time before the night in the club that you spoke to this man?

THE DEFENDANT:  Two or three months before the nightclub incident.

THE COURT:  I see.  And what happened at that time when you saw him before that?

THE DEFENDANT:  When?

THE COURT:  When you saw him two or three months before.

THE DEFENDANT:  I told him that, give me the bus company to do.

THE COURT:  You wanted him to turn the bus company over to you?

THE DEFENDANT:  Yes.

THE COURT:  Did you offer to pay him anything for the bus company?

THE DEFENDANT:  Paying how much to him?

**A. 69**

C6rnlinp                    Plea

THE COURT:  Right.  Did you offer to pay him for the bus company?

THE DEFENDANT:  Just a little bit.

THE COURT:  I see.  You didn't think it was worth much?

THE DEFENDANT:  Right.

THE COURT:  What did he say?

THE DEFENDANT:  He said no.

THE COURT:  All right.

Then you didn't see him at all for two months?

THE DEFENDANT:  Right.

THE COURT:  Was that the first time you told him you wanted to buy the bus company?

THE DEFENDANT:  Yes.

THE COURT:  I see.  So you told him once that he should let you have the bus company?

THE DEFENDANT:  Yes.

THE COURT:  Did you tell him you would pay him something for it?

THE DEFENDANT:  Yes.

THE COURT:  How much did you tell him you would pay him?

THE DEFENDANT:  A couple of thousand to ten thousand for the bus route.

MR. COHEN:  Judge --

**A. 70**

C6rnlinp                     Plea

THE COURT:  I see.  It was the route you were looking to buy?

THE DEFENDANT:  We were competing this bus route.

THE COURT:  You both sent buses from New York to South Carolina?

THE DEFENDANT:  Yes.

THE COURT:  And you wanted him to stop sending his buses to South Carolina?

THE DEFENDANT:  Yes.

THE COURT:  I see.  So you were talking about the route?

THE DEFENDANT:  Yes.

THE COURT:  And he said no?

THE DEFENDANT:  Right.

THE COURT:  But you were still running a bus from New York to South Carolina, right?

THE DEFENDANT:  Yes.

MR. SKINNER:  Perhaps if you could ask if it was his intention to scare Zhou into stopping his buses that were competing with his.

THE COURT:  Did you want to frighten him out of using that route from New York to South Carolina?

THE DEFENDANT:  Yes.

MR. SKINNER:  Would that have been of value to him if he did that, meaning value to the defendant?

**A. 71**

C6rnlinp                    Plea

THE COURT:  What would that have done for you if he stopped sending his bus to South Carolina?

THE DEFENDANT:  I would have better business.

THE COURT:  That is, you would have more customers?

THE DEFENDANT:  Yes.

THE COURT:  You didn't fill your buses?

THE DEFENDANT:  Always full.

THE COURT:  They were always full.  So what difference did it make to you that he also sent buses?

THE DEFENDANT:  Because we were competing to each other and then we have to make the price, the ticket price cheaper.

THE COURT:  I see.  You could raise your prices if you got his buses off the road?  Is that what you are telling me?

THE DEFENDANT:  Yes.

THE COURT:  Did you own any other bus routes?

THE DEFENDANT:  No.

THE COURT:  Just from New York to South Carolina?

THE DEFENDANT:  South and North Carolina.

THE COURT:  Did he use a route to North Carolina also?

THE DEFENDANT:  Yes.

THE COURT:  Did a lot of Chinese people go to South or North Carolina?

THE DEFENDANT:  Many.

THE COURT:  Interesting.

**A. 72**

C6rnlinp                    Plea

MR. COHEN:  Judge, these interstate bus companies are very lucrative because all of the restaurant employees that work in these far-flung places basically reside in New York, and this is the way that they can get from here to there.  So they are actually quite lucrative, and price wars among these companies over the past few years have been rampant.

THE COURT:  Right.  But it has to come from him.

MR. COHEN:  I'm just trying to give your Honor some background.

THE COURT:  I understand.  You're giving me some background, right.

I gather you really wanted to get this man out of your way, is that right?

THE DEFENDANT:  Yes.

THE COURT:  And you wanted your bodyguard to beat him up when you saw him in the karaoke place in Queens, is that right?

THE DEFENDANT:  Yes.

THE COURT:  He was your bodyguard.  Didn't you know he was carrying a gun?

THE DEFENDANT:  I knew he had a gun.

THE COURT:  You did know he had a gun?

THE DEFENDANT:  Yes.

MR. COHEN:  Your Honor, it is not an element of the offense that the defendant intended that the gun be discharged.

**A. 73**

C6rnlinp                    Plea

THE COURT:  I understand.

I'm just trying to get a little information from the defendant in support of his plea.

MR. COHEN:  I understand, Judge.  But he did say several times to your Honor that he was aware that Little Beijing was armed and was carrying a gun.

THE COURT:  I missed it, so I wanted to get it clear.

MR. COHEN:  OK.  I apologize, your Honor.

THE COURT:  All right.  What exactly did you say to Little Beijing at the karaoke club?

THE DEFENDANT:  I told Little Beijing, Go there, make a threat to him.

THE COURT:  Well, after were you there and you were both in the club, what did you say to him?  You didn't have to tell him to go there if he was already there.

THE DEFENDANT:  Teach him a lesson.

THE COURT:  And you told him that in Fukienese?

THE DEFENDANT:  Mandarin.

THE COURT:  In Mandarin.  Little Beijing doesn't speak Fukienese?

THE DEFENDANT:  Right.

THE COURT:  I see.  So he doesn't come from Foochow?

THE DEFENDANT:  Not from Foochow.

THE COURT:  How about the man you wanted to teach a lesson to.  Does he speak Fukienese?

**A. 74**

C6rnlinp                    Plea

THE DEFENDANT:  Yes.

THE COURT:  He is from Foochow?

THE DEFENDANT:  Yes.

THE COURT:  Did you say anything to the man that you wanted to buy the bus company from in that karaoke place?

THE DEFENDANT:  Nothing.

THE COURT:  Well, I would like a little more allocution frankly.

MR. SKINNER:  Your Honor, the defendant's been charged with using, carrying, or possessing a firearm in connection with a crime of violence.  The crime of violence is a conspiracy to commit extortion.  Extortion requires that the defendant take or obtain or attempt to take or obtain the property of another; that it be without the other person's consent -- with the other person's consent, but that the consent be compelled by the wrongful use of actual or threatened force; that it affect interstate commerce; and that the defendant act unlawfully, willfully, and knowingly.

I think what we have here, at least as I have heard the allocution, is that the defendant intended to take the bus route from his competitor, Mr. Zhou, that he did it through threats and use of actual violence.  I think that we proffered --

THE COURT:  He didn't actually -- did he get the bus route?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A. 75**

C6rnlinp                    Plea

MR. SKINNER:  He attempted to do it.

THE COURT:  This is an attempt charge.

MR. SKINNER:  This is an attempt, and it's a conspiracy charge.

THE COURT:  Yes.

MR. SKINNER:  The intention here was, with others, Little Beijing and others, his intention was to get this bus route, the property of another and that he intended to take it through threats of violence and the actual use of violence, teaching him a lesson.

The bus route clearly affected interstate commerce because we have his own allocution to the fact that it went from New York all the way down to South Carolina.  It affected all the states in between.

We know that the defendant knew that Little Beijing possessed a gun.  The defendant was therefore constructively possesssing the gun himself --

THE COURT:  He's also told us that Little Beijing was his bodyguard, which is probably the most important thing he's said so far.

MR. SKINNER:  And we know that the defendant instructed him to teach him a lesson, to beat him or curse him or threaten him.  So I think that we have the possession and use of the weapon in connection with the extortion.

THE COURT:  Well, he didn't possess or use the weapon.

C6rnlinp                    Plea

MR. SKINNER:  Well, the person that he was committing the crime with, he could constructively possess the gun if he knew the other person had it.

THE COURT:  I don't know what you mean by constructively possess.  If I know you have a gun, I possess your gun?

MR. SKINNER:  Yes.  If you are my --

THE COURT:  I would like to see the case that holds that.

MR. COHEN:  If your Honor is acting as Mr. Skinner's bodyguard and Mr. Skinner is aware that you are armed in furtherance of your duties as his bodyguard I would say that's --

THE COURT:  It is a close question, I agree, but I would really like to get a little clearer -- there is a lot here that's just not being said, but I think it has to be said.

MR. SKINNER:  Certainly, your Honor.  We can ask more questions.

I think that the defendant's -- from what I have heard, and I have been listening awfully closely and taking a lot of notes and following the elements as we have gone, and I believe the defendant's allocution is sufficient to satisfy the crime that he's pleading guilty to.  If the Court disagrees, we can ask more questions.

THE COURT:  I think it's a close question.  I really

C6rnlinp                    Plea

like to be clear that he knows exactly what he's pleading to.

MR. SKINNER:  Precisely.  We all do.  We want a complete and full plea.

THE COURT:  Of course.

MR. SKINNER:  And I'm happy as well, if it helps, to proffer what the government's evidence at trial would be.

THE COURT:  Very well.

MR. SKINNER:  If we proceeded to trial, I proffer that we could prove beyond a reasonable doubt through testimony from eyewitnesses, law enforcement witnesses, forensic evidence, and telephone records in short the following:

That in 2004, the defendant was demanding payments from three partners who owned a bus company that operated out of Manhattan;

That the defendant and others threatened violence and harm to that business if the payments were not made.

MR. COHEN:  Could you go a little slower so she can translate.

MR. SKINNER:  Absolutely.

MR. COHEN:  Thank you.

THE COURT:  I understand that is the extortion part.

MR. SKINNER:  That there are partners in that bus company, including the victim, ultimate victim that we have talk about here, Mr. Zhou.

THE COURT:  Was this a partnership?  You said they

**A. 78**

C6rnlinp                    Plea

were partners.

MR. SKINNER:  Mr. Zhou had two other partners.

THE COURT:  This was a partnership?  That was the formal structure of the business?

MR. SKINNER:  I'm not sure if they were shareholders.

THE COURT:  You don't know what the organization of the bus company was, whether it was a corporation or a partnership.

MR. SKINNER:  Off the top of my head, no, your Honor. I think, as I am reflecting on what witnesses have told us, that they talked about shares.  So I believe it was --

THE COURT:  They were investors?  They were shareholders?

MR. SKINNER:  I know the witness referred to --

THE COURT:  Was he the majority shareholder?

MR. SKINNER:  Mr. Zhou?

THE COURT:  Yes, the one who was shot.

MR. SKINNER:  I think there were three equal shareholders in the bus company.

THE COURT:  I see.

MR. SKINNER:  I know one of the other shareholders was a man named Chen Huo Guang, and I believe and proffer based upon interviews we have had with him that he would testify at trial that he, Mr. Zhou, and a third man were equal shareholders in the bus company.

**A. 79**

C6rnlinp                    Plea

THE COURT:  Was he also threatened?

MR. SKINNER:  Yes.  He was threatened by the defendant.

THE COURT:  By the defendant?

MR. SKINNER:  By the defendant.

And that the defendant was receiving payments from them and that the defendant wanted to obtain his own shares in the corporation and that they refused.  And this happened all prior to the night of July 30, 2004.

THE COURT:  Let's let the interpreter translate what you're saying.

MR. SKINNER:  On July 30, 2004, then, Mr. Zhou was this the karaoke club in Queens.  The karaoke club itself had a number of smaller rooms.  People were divided into the different rooms, and they were singing karaoke in these rooms. Mr. Zhou was in one room.  The defendant and Little Beijing were in another room.

THE COURT:  I see.  They were actually in separate rooms?

MR. SKINNER:  In separate rooms, the defendant and Mr. Beijing -- and Little Beijing at this point, one or the other of them saw Mr. Zhou in the room.

They entered the room together, and this I think there may be some dispute on, but this is what our witnesses would testify to, that the defendant said, "Finish him" to Little

C6rnlinp                    Plea

Beijing; that Little Beijing then took out his gun, shot Mr. Zhou in the chest, one of the bullets went through Mr. Zhou, struck a waitress and killed her.

THE COURT: Oh, my Lord.

MR. SKINNER: And another bullet struck another waitress in the leg.

THE COURT: So there was more than one bullet that was shot?

MR. SKINNER: More than one bullet was fired, although I think the bullet that -- and again the trial is not for another month, I would have to go back through the forensic evidence, and part of this I think is based on what Mr. Cohen has told me -- but I believe the bullet that killed Mr. Zhou went through Mr. Zhou and killed the waitress. So it was one bullet that killed two people.

So the version of events that I proffer we could prove beyond a reasonable doubt at trial is slightly different than the version of events that the defendant has allocuted today. I think the key difference is that our witnesses say that the defendant said "finish him" when they went into the room.

THE COURT: Did your witnesses speak Fukienese?

MR. SKINNER: Our witnesses spoke -- I believe they spoke Fukienese and Mandarin.

THE COURT: I see. So, whichever language was used, they understood it.

C6rnlinp                    Plea

MR. SKINNER:  Yes.

THE COURT:  Because that is important, the language.

MR. SKINNER:  Yes.

Now, the defendant is allocuting today that what he said was teach him a lesson, that he understood Little Beijing, his bodyguard, had a gun.  And I believe he's allocuted -- and I think the Court should clarify this -- that it was his intent in saying teach him a lesson to further his overall efforts to get money from Mr. Zhou and Mr. Zhou's partners.

So I think the defendant has still sufficiently allocuted.  If there is a factual dispute that is important to sentencing, then we will have to have a Fatico hearing to resolve whether there was some difference in what was said. But for purposes of the plea today, I believe what he said is sufficient.  But I leave it to the Court to determine whether it in fact is sufficient.

THE COURT:  Of course.

Did your bodyguard go with you to the karaoke place?

THE DEFENDANT:  Yes.

THE COURT:  And you spoke to him in Mandarin, is that right?

THE DEFENDANT:  Yes.

THE COURT:  Did he say anything to the man who was shot?

THE DEFENDANT:  He didn't say anything.

C6rnlinp                    Plea

THE COURT:  He just took out a gun and shot?

THE DEFENDANT:  Yes.

THE COURT:  You said you intended him to beat up the man, is that right?

THE DEFENDANT:  Or curse.

THE COURT:  There is a big difference between cursing and beating.

THE DEFENDANT:  A lesson.

THE COURT:  Is cursing a lesson?

MR. COHEN:  Your Honor, I think several times Mr. Lin said beat him or curse him.

THE COURT:  I heard "beat" also.

MR. COHEN:  He said in the same phrase curse him or beat him.

THE COURT:  They are quite different, beating and cursing.  We have an English expression that words will never harm me, but beating harms people.

MR. COHEN:  I think what Mr. Lin was saying is it was fine with him if Little Beijing beat Mr. Zhou.

THE COURT:  Did Little Beijing beat other people for you?

THE DEFENDANT:  No.

THE COURT:  Then why did you think he would beat somebody?

THE DEFENDANT:  I said it in Mandarin to him:  That

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A. 83**

C6rnlinp                    Plea

was a nasty guy.  Just teach him a lesson.

THE COURT:  Had you ever said that before to Little Beijing?  Teach him a lesson, about anybody?

THE DEFENDANT:  No.  Because at that time we were drinking and then we happened to see him drinking there at the same time.

THE COURT:  Well, it is a very close question.  I will accept the plea, but I would really like to hear another allocution.

MR. COHEN:  An allocution at a later date, your Honor?

THE COURT:  I would like you to come back.

Let me ask Mr. Daniels when I can hear it, though.

He backs and fills a little.

MR. COHEN:  I think, your Honor, respectfully, he has tried to answer your Honor's questions.

THE COURT:  I understand.  But he doesn't want to answer them too completely.

MR. COHEN:  I think he's very nervous.

THE COURT:  I am sure that is true, which is why maybe we should just continue the allocution.  I have nothing else but the allocution at this point, and I take it the government has nothing else either.

MR. COHEN:  Judge, I think might it behoove us to put it over for a brief period, within the next couple of weeks, so that I can spend a little time with Mr. Lin.

**A. 84**

C6rnlinp                    Plea

THE COURT:  Very well.  I can hear him again on July 10.

MR. SKINNER:  But, your Honor, the issue for the government is that this is a significant trial involving a number of witnesses, forensic evidence that now is eight years old, and we are essentially starting to prepare already and will incur significant effort between now and the 10th if we are going to maintain the trial date that we have right now.

THE COURT:  I understand.

I would hear him tomorrow but his counsel thinks that it is not wise.

MR. SKINNER:  I am saying that it would be the government's strong preference to complete the allocution today, if not tomorrow.  If Mr. Cohen needs some time with his client, we can give it to him right now.  But it sounds like we are nearly there.

THE COURT:  I will put it over to tomorrow.

MR. COHEN:  That's fine, Judge.

THE COURT:  I will put it over to tomorrow afternoon.

MR. COHEN:  If he can be produced in the building an hour before and I can see him in the cell block, that will suffice.

MR. SKINNER:  We are already past the hour of producing the defendant.  It's past 4 o'clock.

THE COURT:  He's talking about tomorrow.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A. 85**

C6rnlinp                    Plea

MR. SKINNER:  We need to request the defendant by 4, but the marshals are saying that should be OK.  So we will request the defendant for production tomorrow.

THE COURT:  If he's produced at 2, I will hear you at 3.

MR. SKINNER:  We will do whatever the Court and defense need to get this finished.

MR. COHEN:  We will be here in the building at 2 o'clock in the cell block.

THE COURT:  Very well.

Will you arrange that the marshals will have him here at 2 o'clock?  I will hear him at 3.

MR. SKINNER:  He will be here in the morning.  That's when they bring them over.

MR. COHEN:  I will be over earlier.

THE COURT:  You may be able to see him earlier.

MR. COHEN:  We will.

Judge, can you give us a little bit of guidance as to what aspects of the allocution you would like to have fleshed out?

THE COURT:  I would like it to be clear -- if he never told him before to beat anybody, that is a little weird -- that saying teach him a lesson means that he should beat him.  Of course he is nervous, and my guess is he's reluctant to face up to the fact that he may well have instructed violence.

**A. 86**

C6rnlinp             Plea

MR. COHEN:  I don't think that's the case at all, your Honor.  I think he certainly did not intend the consequences that occurred.

THE COURT:  I am sure he didn't intend for the waitress to get hurt.

MR. COHEN:  Absolutely not.

THE COURT:  Well, I will hear you --

MR. COHEN:  I think your Honor said 3 o'clock tomorrow?

THE COURT:  At 3 o'clock, yes, because I have several other matters.

MR. COHEN:  Your Honor, can --

THE COURT:  How long had this man been his bodyguard, things of that kind, so that they spoke languages that they understood each other about.

MR. COHEN:  Of course.

I think, your Honor, if your Honor would allow me a little bit to fill in a little bit more background before we start tomorrow about how this industry operates in Chinatown, I have been involved in many, many of these cases and investigations over the years.  And it's really quite a different --

THE COURT:  Chinese people are very intelligent.  They know what they're doing.

MR. COHEN:  I am not saying otherwise.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A. 87**

C6rnlinp                    Plea

THE COURT:  Anything you can think of was invented in China thousands of years ago.  They are extremely intelligent people.

MR. COHEN:  I don't say different.

THE COURT:  Very well.

That is all that really remains, is to tighten up the allocution.

MR. SKINNER:  Your Honor, I think I have some appreciation for the Court's concerns, and I will talk to Mr. Cohen after the proceeding today.

THE COURT:  Good.

Off the record.

(Discussion off the record)

(Adjourned)

C6s1linc

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x

UNITED STATES OF AMERICA,

v.                                    11-CR-114 (MGC)

XING LIN,

                Defendant.            Conference

-------------------------------x

                                      New York, N.Y.
                                      June 28, 2012
                                      3:30 p.m.

Before:

            HON. MIRIAM GOLDMAN CEDARBAUM,

                                      District Judge

                        APPEARANCES

PREET BHARARA
    United States Attorney for the
    Southern District of New York
PETER M. SKINNER
    Assistant United States Attorney

JOEL COHEN, ESQ.
    Attorney for Defendant

ALSO PRESENT:   BRENDA CHEN, Interpreter

**A. 90**

C6s1linc

(In open court)

THE COURT: All right. Mr. Lin, you remain under the oath that I administered to you yesterday to tell the truth, the whole truth, and nothing but the truth. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: And you remember I told you that once you have made that oath, it's a crime for you to tell anything but the truth?

THE DEFENDANT: Yes.

THE COURT: All right.

MR. COHEN: Your Honor --

THE COURT: Then let me ask you something else.

MR. COHEN: If I may, Judge. Based on conversations that I had with Mr. Lin today, at this time we're not prepared to go forward with his plea of guilty that we attempted to enter yesterday. I'm not certain that a little bit more time for me to spend with him would be productive. If the government has no objection and it's okay with your Honor, I would ask to put this on for a date in the very near future and perhaps adjourn the trial date a week or two to take the pressure off so that we can have some time to spend discussing what Mr. Lin wishes to do.

THE COURT: Well, I also had the sense he just wasn't really quite ready to admit what he did.

C6s11inc

MR. COHEN: And I agree with you, and I think the responsibility for that is mine. I don't blame Mr. Lin. I hope your Honor doesn't blame Mr. Lin.

THE COURT: I don't blame anybody for anything. I just handle what comes.

MR. COHEN: I understand, your Honor.

THE COURT: But I was about to ask him -- but I guess I don't have to now -- whether within the last few days he's had anything that would affect the clarity of his mind, any substance or -- but it doesn't matter now.

MR. COHEN: I don't believe that he has. No, I don't believe that he has.

THE COURT: But I'd want to make sure his mind is clear.

MR. COHEN: I think his mind is clear, and at some time in the future I'll explain to your Honor what has occurred, but it's something that is not Mr. Lin's fault at all. So --

THE COURT: But it doesn't matter whose fault it is. It is often, and especially for some people, very difficult to confront personal wrongdoings.

MR. COHEN: That is true, your Honor, but I think it was, without saying much more than I need to, an issue with the interpreter that I had used to meet with Mr. Lin who speaks Mandarin.

THE COURT: Oh, I see.

MR. COHEN: And there was some difficulties. That's all I'm prepared to say at this time. And I'm not sure that everything that I said to Mr. Lin was translated accurately, and I now believe that things that he said to me were certainly not translated accurately, and I think that that's where the problems arose yesterday.

THE COURT: Language is very important --

MR. COHEN: Of course it is, Judge.

THE COURT: -- especially when we're dealing with a language that you may not understand.

MR. COHEN: Of course. You know, Judge, most people from the People's Republic of China speak their own provincial language as well as Mandarin because all the schools are --

THE COURT: No, I know that very well. Mandarin is a school language; it's not a home language.

MR. COHEN: Yes. Because Mr. Lin's education ended early in elementary school and his parents did not attend school at all, even Ms. Chen, our interpreter, has advised me that his Mandarin skills appear to be poor. So anyway, that's where we are.

THE COURT: His conversations with his bodyguard he told me was always in Mandarin, because his bodyguard doesn't know Fukienese.

MR. COHEN: That is correct, your Honor.

THE COURT: Why and how that happened, I don't need to know, because that's unusual also.

MR. COHEN: Judge, my request -- and I hope the government will either agree with me or join me -- is to -- is to ask that your Honor put the trial date off from July 23rd for maybe a week or two because I'd actually planned to not be in New York next week and would be upsetting my family plans to have to be in next week in order to deal with this.

THE COURT: Well, I will not be able to try this in August.

What is the estimated length of the trial?

MR. SKINNER: Your Honor, we would estimate the total length of trial of roughly two weeks.

THE COURT: It will take two weeks?

MR. SKINNER: Yeah, I think it will. When you factor in the testimony of eyewitnesses, the testimony of the partner in the business, of the victim, who also had a phone call with the defendant after the shooting, and testimony of the witnesses -- we'll have to put up the law enforcement witnesses just to establish the forensic evidence of the killings -- then I think we're looking at two weeks.

THE COURT: Actually, you told me that once before. And I have set aside the weeks of the 23rd and the 30th. And it's with great reluctance that I put it over, because I'm looking for a two-week period in the not-too-distant future.

C6s1linc

MR. COHEN: Judge, if I can just advise the court that I have a trial scheduled for September 4th in state court that's expected to last about two weeks and a trial in the --

THE COURT: That's no good.

MR. COHEN: And a trial before Judge Johnson in the Eastern District for October 9th, with the same defendant, that's also expected to last about two weeks.

THE COURT: What is the charge there?

MR. COHEN: The federal charges are tax fraud and forced labor and wire and mail fraud. The state charges are grand larceny and many, many counts of filing false instruments. It involves a former official at St. John's University who is accused of having stolen about a million dollars from them over a period of time.

THE COURT: But the federal charge is against the same defendant?

MR. COHEN: Same defendant.

THE COURT: And is it unrelated to these charges?

MR. COHEN: To?

MR. SKINNER: That's a totally different case, your Honor.

MR. COHEN: Not this defendant, Judge.

THE COURT: I'm sorry.

MR. COHEN: No. Both of those cases are the same defendant --

C6s1linc

THE COURT: The same defendant.

MR. COHEN: -- who has both state and federal charges. Mr. Lin was never an official at St. John's University.

THE COURT: No, certainly not. That one I know is not Mr. Lin.

Well, that's a problem.

Well, if it's going to be tried in the foreseeable future, as all criminal trials should be, I will have to come back in August to do it.

MR. COHEN: Can I speak to Mr. Skinner for a moment?

THE COURT: Go ahead.

(Counsel conferring)

THE COURT: Are both lawyers going to be available later in August?

MR. SKINNER: I will be, your Honor.

MR. COHEN: Judge, I can be available in August.

THE COURT: You can.

MR. COHEN: Yes.

THE COURT: Well, I try to get away for part of August, but if not, I won't.

MR. COHEN: I had similar hopes, but if your Honor directs us to be here, obviously we'll be here on trial.

THE COURT: Very well. When in September is your trial?

MR. COHEN: It's the day after Labor Day, your Honor.

C6s1linc

THE COURT: Well, I will try to put it on for the 13th of August, which puts us over a month, if the plea does not go forward.

MR. COHEN: And of course, if there should be a change in circumstances, we'll notify the court forthwith.

MR. SKINNER: Your Honor, I was going to suggest that perhaps we set a date for the week of July 9th to come back and find out whether the plea is going to go forward.

THE COURT: That's a very good idea.

MR. COHEN: I think that's a great idea.

THE COURT: A status conference.

MR. SKINNER: And if he's going to complete the plea at that point -- I'll note for the record first that we did go back through the plea transcript in detail from yesterday, and the government is of the view that the allocution was more than sufficient to satisfy the crimes charged. Nevertheless --

THE COURT: Well, I gather that counsel now has questions about --

MR. SKINNER: Well, so we'll come back.

THE COURT: -- if his client understood what he was saying.

MR. SKINNER: We'll come back on I think -- if the court will set a time the week of the 9th, we'll come back and find out whether we have a plea or not. We can complete the plea at that time or else find out he's not going to plead, and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300
A. 97

(212) 805-0300
A. 97

C6s1linc

if there's any pretrial issues, we can resolve that.

THE COURT: Yes. Because he actually hasn't yet entered the plea.

MR. COHEN: Could we, your Honor, have July 11th for that purpose, if that's convenient to the court? It's a Wednesday.

THE COURT: I know. I can do it on the 12th in the morning, at 10:30, if that's agreeable.

MR. SKINNER: That's fine for the government, your Honor.

MR. COHEN: And that's fine. I can do that as well, your Honor. Thursday, the 12th, at 10:30.

THE COURT: Correct.

I take it that you are concerned that you didn't fully understand what your client was telling you and he didn't understand what you were telling him; is that correct?

MR. COHEN: In part, your Honor. It's more a question of whether the interpreter actually accurately --

THE COURT: No, I understand. It's because of that that you are concerned.

MR. COHEN: What I'm saying is, I have questions about whether what the interpreter told me was said by my client was actually said by my client is the cause of my concern.

THE COURT: I see. And you have now arranged to have a Fukienese interpreter.

MR. COHEN: I will certainly endeavor to never use that interpreter again.

THE COURT: Well, I think you are well advised to use a Fukienese interpreter.

MR. COHEN: And as I've told Mr. Lin in the cell block, that next time I saw him it would be with a Fukienese interpreter.

THE COURT: Because I want to be sure that he knows what he's doing, and that there's not a failure of communication.

MR. COHEN: Absolutely, Judge. I share your concern very much.

THE COURT: Very well. 10:30 on July 12th.

I think I have already excluded the time between now and the other trial date.

MR. SKINNER: That's correct, your Honor, and the government would apply to exclude time from July 23rd until August 13th on the grounds of permitting the defendant to prepare for trial.

MR. COHEN: I join in the application.

THE COURT: All right. Mr. Lin, do you agree that I should put your trial over to August 13th, if necessary; that the time required for preparation of your defense and your other arrangements with your lawyer outweigh, in the interests of justice, your right to a speedy trial and the public's right

C6s1linc

to a speedy trial?

THE DEFENDANT: Yes.

THE COURT: Very well. I will adopt that finding and exclude the time between now and August 13th from the speedy trial clock.

Is there anything further?

MR. SKINNER: No, your Honor.

MR. COHEN: No, your Honor, and thank you for understanding.

THE COURT: Very well. Now we are going to reconvene on July 12th at 10:30 in the morning.

MR. COHEN: Yes, Judge. See you then.

THE COURT: Very well.

oOo

C7C5linC                    conference

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

                v.                      11 Cr. 114 (MGC)

XING LIN,

                Defendant.

------------------------------x

                                        July 12, 2012
                                        10:45 a.m.

Before:

                HON. MIRIAM GOLDMAN CEDARBAUM,

                                        District Judge

                        APPEARANCES

PREET BHARARA
    United States Attorney for the
    Southern District of New York
BY: JENNIFER BURNS
    Assistant United States Attorney

JOEL COHEN
    Attorney for Defendant

ALSO PRESENT:   LILY LAU, Foochow interpreter

(Case called)

THE COURT:  What is the current status of this matter?  Without any intention that the body guard shoot it is very hard to establish aiding and abetting.

MR. COHEN:  Your Honor, I think this matter is going to have to be resolved through trial.

THE COURT:  Very well.

MR. COHEN:  And I have so advised the government and we have already begun to discuss production of 3500 material.  With respect to law enforcement witnesses, them letting me know whether any potential witnesses have retired from law enforcement since then.  I think that Ms. Burns and I will work well together in making sure that we will all be ready to go on August 13th.

THE COURT:  Right.

I would like to point out something else that is a real deficiency in the allocution which is that it is alleged that this is done in relation to a conspiracy for extortion.  I didn't hear any testimony about an agreement of any kind with anybody.  You can't have a conspiracy with a single actor.  I'm sure that the government is aware of that.

MS. BURNS:  Yes, your Honor.

THE COURT:  Who is it that you allege to be the co-conspirator here?

MS. BURNS:  Little Beijing, the shooter, the

co-defendant here.

THE COURT:  It is your position that he is a co-conspirator in a conspiracy to extort money from the bus company?

MS. BURNS:  Yes; acting at the direction of this defendant and working with him in furtherance.

THE COURT:  Acting at the direction is a different matter.  Agreeing is what a conspiracy requires, not acting at the direction.

MS. BURNS:  Understood, your Honor.

THE COURT:  Acting at the direction is aiding and abetting.  Conspiring is entering an agreement to extort money from this company.  There was no testimony and no suggestion by the government that there is evidence of an agreement between the bodyguard and his employer to extort money from another entity.

MS. BURNS:  We will address that at trial.

THE COURT:  The agreement is for him to guard his employer, such as there is an agreement.  So, it is a little bit puzzling.  You are not alleging any other, you are simply alleging that -- well, there are a lot of holes to be filled in which is why I couldn't have accepted the plea now because the allocution didn't establish the crime.

You are charging aiding and abetting his own bodyguard in shooting someone as part of a conspiracy to extort money

from a third-party.  Isn't that right?  Isn't that what the indictment charges?

MS. BURNS:  That's correct, your Honor.

THE COURT:  I do not apply Pinkerton.  That is, Pinkerton, as you may know, is an optional theory which is not required to be applied in every case and because the facts of Pinkerton are so entirely different from the facts of this case I don't think that Pinkerton is properly applied here.

You recall that Pinkerton was a case of two brothers who ran a still in the south.

MS. BURNS:  Your Honor, I think we will address that in pretrial briefing, if we may.

THE COURT:  Yes.  Of course.  I am raising all of this.

MS. BURNS:  We appreciate that.

THE COURT:  So that you can address all of these things.

MS. BURNS:  Certainly, your Honor.

THE COURT:  Now is there anything that defense counsel would like to bring to my attention?

MR. COHEN:  Not at the moment, your Honor.

THE COURT:  You have seen the letter ostensibly setting out the legal elements?

MR. COHEN:  I have, your Honor.

THE COURT:  I'm a little unclear as to how the

government even thinks that Pinkerton even applies here.

MR. COHEN: We will await their submission, if they make one. I don't have anything to raise at this time. As I said, I think Ms. Burns, Mr. Skinner and I will be able to resolve any issues with respect to the production of discovery and matters of that nature.

THE COURT: Are you going to be prepared -- are both sides going to be prepared to go to trial on August 13th?

MS. BURNS: We are, your Honor.

MR. COHEN: I assume so.

THE COURT: Well, what do you mean you assume so?

MR. COHEN: That's a date that your Honor directed us to be ready. I can be ready by then.

THE COURT: Very well.

MR. COHEN: Assuming and providing that --

THE COURT: Before giving up a hope for vacation.

MR. COHEN: I am doing the same, your Honor, and I haven't even told my family yet. I will be telling them tonight, but.

THE COURT: I take it it is clear that your client really is not prepared to allocute to anything resembling the charge here?

MR. COHEN: That's correct, your Honor. I mean, if that date is not etched in stone and the Court wanted to move it a week or two beyond that you would have no objection from

me.  I could especially use the extra time to prepare.  I don't know what the government's view on that is.

THE COURT:  Let me talk to Mr. Daniels here.

(Pause)

THE COURT:  What is the best estimate of the length of the trial?

MS. BURNS:  Your Honor, between one to two weeks.

THE COURT:  That's a big spread.

MS. BURNS:  I know.  And when I said I thought we could accomplish this in one week to counsel this morning he looked a little bit surprised.  So, I never want to underestimate and I can't truly estimate the length of the cross-examination and perhaps any defense case that Mr. Cohen wants to put on.

THE COURT:  The government's case will take how long?

MS. BURNS:  Two full days, your Honor.

THE COURT:  Two days.

MS. BURNS:  That's our best estimate.

THE COURT:  How can the defendant's case take more than a week after that?

MR. COHEN:  Judge, if there is a defense case I don't think it will take more than a day.

THE COURT:  I would think so too.  See, if I thought it would only be a week I would put it on for the 20th but I'm afraid to do that if it is going to go over.

MR. COHEN:  As I have said, if there is a defense case, I can't see it being between more than half a day and a day.

THE COURT:  That's my experience with defense cases, frankly.  The real issue is the length of the government's case.

MS. BURNS:  Right, and it is somewhat of an estimate in part because our witnesses are not English-speaking, so that obviously extends a little bit of the time it takes for the testimony to get in.

THE COURT:  Well, many years ago I tried a case involving a Chinese bank here on Canal street where all of the witnesses testified in Chinese and it did not extend the length of the trial.

MR. COHEN:  Your Honor, respectfully, I tried a case before Judge Wood about 15 years ago where the government's estimate of the trial was eight days and eight weeks later we began our summations.

MS. BURNS:  I tend to estimate longer just to be safe.

MR. COHEN:  It was a case involving not Chinese bankers but Chinese gangsters and it just took a lot longer than anybody thought it would.

THE COURT:  Interesting.  Interesting.  Well, I find that, generally speaking, lawyers overestimate rather than underestimate how long evidence takes.

C7C5linC                    conference

MR. COHEN:  I agree.  I could try it the week of the 20th.

THE COURT:  Well, I had set aside two weeks because that's what you estimated.

MS. BURNS:  Right.

THE COURT:  Starting on the 13th.  If I push it a week that's what I'm raising if I push it to the 20th, whether there will be enough time.

MR. COHEN:  I think it would be a stretch to say there would be enough time to have summations and charge all in the same week, possibly.  I think we might be able to --

THE COURT:  I'm sorry.  To have what?

MR. COHEN:  To conclude the presentation of evidence and also have summations and charge.  I think that's overly optimistic but I think it is not unrealistic to think we might conclude the evidence within that week.

THE COURT:  I see.  Right.  And then of course the jury needs time to deliberate.

MR. COHEN:  Right.

THE COURT:  So, it is really safer to leave it starting the week of the 13th.  What I may do, which I usually do in cases that are longer than a week, is not sit on Friday so the lawyers -- which the lawyers generally very much appreciate because it gives them an opportunity to take stock, as it were, and I will tell the jury that we will not be

C7C5linC                    conference

sitting on Fridays.  I will estimate two weeks for the jury because I don't -- I prefer that they not be, have disappointed expectations but I will require -- not on general boiler plate of which I have more than enough of my own -- but on the substance of the charges proposed jury instructions by no later than August 9th.  The government has more than enough copies by now of all of my general charges.  I do not need or want charges on how you determine credibility and that sort of thing, or the burden of proof.  It is only with respect to the substantive charge, it is actually a single charge --

MS. BURNS:  That's correct, your Honor.

THE COURT:  -- that I would like a proposed jury charge because I tried to prepare a draft charge which we can address at the charge conference.

Very well.

MS. BURNS:  Would your Honor like proposed voir dire at that time as well if there are any specific questions relating to this case?

THE COURT:  Only if there are specific questions related to this case.

MS. BURNS:  Understood, your Honor.

THE COURT:  Because, again, I have my own standard voir dire inquiries.  I don't ask jurors what they believe what the law should be at that sort of thing and I don't ask them what they read or think because I think it is an unnecessary

intrusion in personal privacy which does not really cast any light. The important thing for me is to determine that the jurors are prepared to listen and to evaluate impartially and to that end I have a set of voir dire questions. But if there is anything peculiar about this case which requires additional questioning --

MR. COHEN: Your Honor, would it be possible for counsel to obtain from your chambers a copy of your general voir dire?

THE COURT: Absolutely.

MR. COHEN: As well as general jury instructions?

THE COURT: Absolutely. I do try to improve them all the time but that's with respect to clarity.

Very well. Is there anything further?

MS. BURNS: No, your Honor. Thank you.

MR. COHEN: Not at this time by us, your Honor. Thank you.

THE COURT: Then we will reconvene on Monday morning, August 13th, at 9:30. I should tell you two other things before you go just to take care of any housekeeping matters because we probably won't get a jury until 10:00 at the earliest, but I will not convene trial thereafter earlier than 10:00 because I find that that's a practical time and I offer coffee and muffins to jurors who come at 9:30 to be ready to go forward at 10:00.

MR. COHEN:  Then will your Honor sit through 5:00 or 4:30?

THE COURT:  Between 4:30 and 5:00 depending on the flow of the evidence, and we will take a short recess in the middle of the morning and a short recess in the middle of the afternoon.

I use the struck panel method which means that I will question enough jurors to produce a jury of 12 jurors and two or three alternates; I haven't decided yet which is safer.  The summer is not as hard a time as the winter to predict the health of jurors which means that I will question -- well, as you know, the government gets six peremptory challenges, the defendant gets 10, so if you add 16 to 12 we have 28, and if I include some for cause I will probably question 38 jurors initially.  I will then take counsel into the robing room to exercise challenges and I will first take challenges for cause and then peremptory challenges.  I will also interview any juror who raises a hand when I ask if there is any other problem that a juror finds will somehow make him an improper juror.  I will hear those first in the robing room with counsel.

MR. COHEN:  I was going to ask whether your Honor would hear those contemporaneously with the juror alerting the Court so that in the event --

THE COURT:  I will not because it slows things up.  I

hear them at the end of the voir dire so that we can all hear them -- hear their problem in chambers. I am not interested in jurors sharing problems.

MR. COHEN: Of course. Of course.

THE COURT: Which is one of the things that tends to happen.

MR. COHEN: I was just going to suggest that in the event that some of them will fall by the wayside it would be maybe more expeditious to --

THE COURT: I have never been left without enough jurors --

MR. COHEN: Okay.

THE COURT: -- using this system. I may interview 40, I haven't decided yet exactly how many, but it is my purpose to interview enough so that a certain number can fall by the wayside if there are appropriate challenges for cause or if I decide that a juror is unable to act impartially. And I find that it's more efficient to excuse the panel while I take the lawyers into the robing room and we end up impaneling a jury. That's part of the difference between the struck panel method and the so-called jury box method. If somebody gives me a good reason for being clearly unable to be impartial I may excuse that juror along the way without further discussion but I will try to examine enough jurors so that we will have enough left for challenges for cause.

There is always a first time for anything but this is a practice that I have tried to follow for quite a long time. In the beginning I experimented a good deal to see whether there is any difference in the time taken by the jury box method or the struck panel method and I discovered that there really isn't very much difference in time. I just find this a more efficient way.

You will exercise peremptory challenges simultaneously, though. That is, I will take challenges from each of you, each round -- we will do it in a couple of rounds. In the first round the government will challenge two and the defendant three. No, I think the defendant will challenge four in the first round and the government two. In the second round the defendant will challenge four and the government two. And in the third round the defendant will challenge two and the government one, peremptorily, but you will do it simultaneously. This is a matter that the Supreme Court has ruled on, that you are each getting your challenge even if you both challenge the same person.

Off the record.

(Discussion off record)

THE COURT: Very well. If there is any other questions about those things you can either do it in advance or when we convene to select a jury.

MS. BURNS: Thank you, your Honor.

MR. COHEN:  Thank you, Judge.

THE COURT:  Very well.

Now, I assume that you will arrange to have a Fukinese interpreter for both the defendant and the witnesses?

MS. BURNS:  Yes, your Honor.

THE COURT:  Very well.

o0o

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: SEP 2 8 2012

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,                    :

     - v. -                                  :                  **SUPERSEDING INDICTMENT**

XING LIN,                                    :                  S2 11 Cr. 114 (MGC)
    a/k/a "Ding Pa," and
HAO CHAO,                                    :
    a/k/a "Little Beijing,"
                                             :
        Defendants.
                                             :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## COUNT ONE
### (Racketeering Conspiracy)

The Grand Jury charges:

### The Enterprise

1.   At all times relevant to this Indictment, XING LIN, a/k/a "Ding Pa," and HAO CHAO, a/k/a "Little Beijing," the defendants, and others known and unknown, were members and associates of an organized criminal enterprise led by LIN (the "Ding Pa Organization" or the "Organization"). The Ding Pa Organization engaged in crimes including murder, manslaughter, assault, operating illegal gambling businesses, extortion, collection of debts by extortionate means, and other crimes.

2.   The Ding Pa Organization, including its leadership, membership, and associates, constituted an "enterprise," as that term is defined in Title 18, United States Code, Section 1961(4) -- that is, a group of individuals associated in fact. This enterprise was engaged in, and its activities affected, interstate and foreign commerce. The Ding

**A. 115**

Pa Organization was an organized criminal group based primarily in the Chinatown section of Manhattan that operated in the Southern and Eastern Districts of New York and elsewhere. The Ding Pa Organization constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise. This enterprise was engaged in, and its activities affected, interstate and foreign commerce.

<u>The Defendants</u>

3.   XING LIN, a/k/a "Ding Pa," the defendant, was a member and associate of the enterprise, the Ding Pa Organization. LIN was, at various times relevant to this Indictment, the leader of the Organization. In that capacity, LIN participated in the operation and management of the enterprise, participated in unlawful and other activities in furtherance of the conduct of the enterprise's affairs, and profited from the enterprise's affairs.

4.   HAO CHAO, a/k/a "Little Beijing," the defendant, was a member and associate of the enterprise, the Ding Pa Organization. At various times relevant to this Indictment, CHAO participated in the operation of the enterprise. Under the direction of XING LIN, a/k/a "Ding Pa," the defendant, CHAO participated in unlawful and other activities in furtherance of the conduct of the enterprise's affairs.

-2-

**A. 116**

<u>Purposes of the Racketeering Enterprise</u>

5.    The purposes of the enterprise included:

a.    Enriching the leaders, members and associates of the Ding Pa Organization through criminal activities;

b.    Preserving, protecting, and augmenting the power, territory and financial profits of the Ding Pa Organization, its leaders, members and associates, through the use of intimidation, violence, and threats of physical and economic harm; and

c.    Keeping victims and citizens in fear of the Ding Pa Organization, its leaders, members and associates, by committing and threatening to commit physical violence and by causing and threatening to cause physical and economic harm.

<u>Means and Methods of the Enterprise</u>

6.    Among the means and methods by which the defendants and other enterprise members and associates conducted and participated in the conduct of the affairs of the enterprise were the following:

a.    To protect and expand the enterprise's business and criminal operations, members and associates of the enterprise threatened to assault, and did murder, attempt to murder and assault, persons who engaged in activity that jeopardized (i) the power and criminal activities of the enterprise, (ii) the power of the leaders of the enterprise, and

-3-

**A. 117**

(iii) the flow of criminal proceeds to the leaders of the enterprise;

      b.   Members and associates of the enterprise promoted a climate of fear in their victims and the community through violence and threats of violence and economic harm;

      c.   Members and associates of the enterprise generated income for the enterprise through, among other things, (i) murder; (ii) attempted murder; (iii) manslaughter; (iv) assault; (v) extortion; (vi) collection of debts by extortionate means; and (vii) illegal gambling; and

      d.   The leaders, members, and associates of the Ding Pa Organization used and obtained firearms, knives, and other weapons to carry out and further its illegal activities.

<u>The Racketeering Conspiracy</u>

7.   From in or about at least 1996, up through and including in or about December 2009, in the Southern District of New York and elsewhere, XING LIN, a/k/a "Ding Pa," and HAO CHAO, a/k/a "Little Beijing," the defendants, and others known and unknown, being persons employed by and associated with the racketeering enterprise described in Paragraphs 1 through 6 above, namely, the Ding Pa Organization, which enterprise was engaged in, and the activities of which affected, interstate and foreign commerce, unlawfully, willfully, and knowingly combined, conspired, confederated, and agreed together and with each other

-4-

**A. 118**

to violate Title 18, United States Code, Section 1962(c), to wit, to conduct and participate, directly and indirectly, in the conduct of the affairs of that enterprise through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5), and as set forth below in paragraph 8.

<u>The Pattern of Racketeering</u>

8. The pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and 1961(5), through which XING LIN, a/k/a "Ding Pa," and HAO CHAO, a/k/a "Little Beijing," the defendants, and their co-conspirators agreed to conduct and participate in the conduct of the affairs of the enterprise consisted of multiple acts involving:

a. Murder, and conspiracy to commit murder, in violation of New York State Penal Law, Sections 125.25, 105.15, and 20.00;

b. Extortion, in violation of New York State Penal Law, Sections 155.05(2)(e), 155.40, 110 and 105;

c. Operating an illegal gambling business, in violation of New York State Penal Law, Section 225.05, 225.10, 105.05, 105.00, and 20.00; and

d. multiple acts indictable under the following provisions of federal law:

i. Title 18, Unites States Code, Section

-5-

**A. 119**

1955 (operating an illegal gambling business);

      ii.   Title 18 United States Code, Section 1951 (extortion); and

      iii. Title 18, United States Code, Section 894 (collection of debts by extortionate means).

9.   It was a further part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

(Title 18, United States Code, Section 1962(d).)

## COUNT TWO
### (Racketeering)

The Grand Jury further charges:

10.   Paragraphs 1 through 6 of this Indictment are repeated and realleged and incorporated by reference as though fully set forth herein.

11.   From in or about at least 1996 up through and including in or about December 2009, in the Southern District of New York and elsewhere, XING LIN, a/k/a "Ding Pa," and HAO CHAO, a/k/a "Little Beijing," the defendants, and others known and unknown, being persons employed by and associated with the racketeering enterprise described in Paragraphs 1 through 6 above, namely, the Ding Pa Organization, which enterprise was engaged in, and the activities of which affected, interstate and foreign commerce, willfully and knowingly did conduct and

-6-

**A. 120**

participate, directly and indirectly, in the conduct of the affairs of that enterprise through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5), to wit, through the commission of the following racketeering acts:

<u>The Pattern of Racketeering</u>

12.   The pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisted of the following acts:

<u>Racketeering Act One:</u>
<u>Murder and Conspiracy to Commit Murder</u>

13.   XING LIN, a/k/a "Ding Pa," and HAO CHAO, a/k/a "Little Beijing," the defendants, committed the following acts, either one of which alone constitutes the commission of Racketeering Act One:

**A.   Murder of Chang Qin Zhou.**

14.   On or about July 30, 2004, in the Eastern District of New York and elsewhere, XING LIN, a/k/a "Ding Pa," and HAO CHAO, a/k/a "Little Beijing," the defendants, and others known and unknown, unlawfully, intentionally, and knowingly did commit an act involving murder, and aided and abetted murder, to wit, with intent to cause the death of another person, LIN and CHAO and others did cause the death of Chang Qin Zhou, in violation of New York State Penal Law, Sections 125.25 and 20.00.

-7-

**A. 121**

**B. Conspiracy to Murder Chang Qin Zhou.**

15.   On or about July 30, 2004, in the Eastern District of New York and elsewhere, XING LIN, a/k/a "Ding Pa," and HAO CHAO, a/k/a "Little Beijing," the defendants, and others known and unknown, unlawfully, willfully, and knowingly conspired to murder Chang Qin Zhou, in violation of New York State Penal Law, Sections 125.25 and 105.15.

<u>Racketeering Act Two:</u>
<u>Extortion and Extortion Conspiracy — Bus Company Owners</u>

16.   XING LIN, a/k/a "Ding Pa," and HAO CHAO, a/k/a "Little Beijing," the defendants, committed the following acts, any one of which alone constitutes the commission of Racketeering Act Two:

**A.   Hobbs Act Extortion Conspiracy**

17.   From in or about March 2002, up to and including in or about December 2009, in the Southern District of New York and elsewhere, XING LIN, a/k/a "Ding Pa," and HAO CHAO, a/k/a "Little Beijing," the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit extortion, as that term is defined in Title 18, United States Code, Section 1951(b)(2), by obtaining money and property from and with the consent of other persons, to wit, individuals who owned and operated a bus company, which consent would have been and was

-8-

**A. 122**

induced by the wrongful use of actual and threatened force, violence, and fear, and thereby would and did obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3), in violation of Title 18, United States Code, Section 1951.

### B.   Hobbs Act Extortion

18.   From in or about March 2002, up to and including in or about December 2009, in the Southern District of New York and elsewhere, XING LIN, a/k/a "Ding Pa," and HAO CHAO, a/k/a "Little Beijing," the defendants, and others known and unknown, willfully and knowingly did commit and attempt to commit extortion, as that term is defined in Title 18, United States Code, Section 1951(b)(2), by obtaining money and property from and with the consent of another person, to wit, individuals who owned a bus company, which consent would have been and was induced by the wrongful use of actual and threatened force, violence, and fear, and thereby would and did obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3), to wit, LIN and CHAO extorted and attempted to extort money from individuals who owned a bus company, in violation of Title 18, United States Code, Sections 1951 and 2.

-9-

**A. 123**

C.   State Extortion

19.   From in or about March 2002, up to and including in or about December 2009, in the Southern District of New York and elsewhere, XING LIN, a/k/a "Ding Pa," and HAO CHAO, a/k/a "Little Beijing," the defendants, and others known and unknown, willfully and knowingly did obtain property by extortion committed by instilling in individuals who owned a bus company a fear that LIN, CHAO, and other persons, would cause physical injury to some person in the future and cause damage to property, in violation of New York State Penal Law, Sections 155.40 and 20.00.

**Racketeering Act Three:**
**Illegal Gambling Business — Mahjong Parlor**

20.   In or about 1996, in the Southern District of New York and elsewhere, XING LIN, a/k/a "Ding Pa," the defendant, and others known and unknown, willfully and knowingly did conduct, finance, manage, supervise, direct, and own, all and part of an illegal gambling business, which operated illegal gambling activities, to wit, a mahjong parlor, in violation of New York State Penal Law, Sections 225.05 and 225.10, and which business involved five and more persons who conducted, financed, managed, supervised, directed, and owned all and part of it, and which business had been and remained in substantially continuous operation for a period in excess of thirty days and had gross

-10-

**A. 124**

revenues of $2,000 in a single day, and aided and abetted the same, in violation of Title 18, United States Code, Sections 1955 and 2.

**Racketeering Act Four:**
**Illegal Gambling Business — Tien Lin Parlor**

21.   From in or about 1996, up to and including in or about 1997, in the Southern District of New York and elsewhere, XING LIN, a/k/a "Ding Pa," the defendant, willfully and knowingly did conduct, finance, manage, supervise, direct, and own all and part of an illegal gambling business, which operated illegal gambling activities, to wit, a gambling parlor where tien lin and other card games were played, in violation of New York State Penal Law, Sections 225.05 and 225.10, and which business involved five and more persons who conducted, financed, managed, supervised, directed, and owned all and part of it, and which business had been and remained in substantially continuous operation for a period in excess of thirty days and had gross revenues of $2,000 in a single day, and aided and abetted the same, in violation of Title 18, United States Code, Sections 1955 and 2.

-11-

**A. 125**

**Racketeering Act Five:**
**Illegal Gambling Business — Tien Lin Parlor**

22.   From in or about 1999, up to and including in or about 2002, in the Southern District of New York and elsewhere, XING LIN, a/k/a "Ding Pa," the defendant, willfully and knowingly did conduct, finance, manage, supervise, direct, and own all and part of an illegal gambling business, which operated illegal gambling activities, to wit, a gambling parlor where tien lin and other card games were played, in violation of New York State Penal Law, Sections 225.05 and 225.10, and which business involved five and more persons who conducted, financed, managed, supervised, directed, and owned all and part of it, and which business had been and remained in substantially continuous operation for a period in excess of thirty days and had gross revenues of $2,000 in a single day, and aided and abetted the same, in violation of Title 18, United States Code, Sections 1955 and 2.

**Racketeering Act Six:**
**Conspiracy to Collect Debt By Extortionate Means and**
**Collection of Debt By Extortionate Means**

23.   XING LIN, a/k/a "Ding Pa," the defendant, committed the following acts, either of which alone constitutes the commission of Racketeering Act Six:

-12-

**A. 126**

**A.   Conspiracy to Collect Debt by Extortion Means**

24.   In or about 2001 and 2002, in the Southern District of New York and elsewhere, XING LIN, a/k/a "Ding Pa," the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to participate in the use of extortionate means, as that term is defined in Title 18, United States Code, Section 891(7), to collect and attempt to collect an extension of credit and to punish a person, to wit, a gambling debtor, for the non-repayment of an extension of credit, in violation of Title 18, United States Code, Section 894.

**B.   Collection of Debt by Extortionate Means**

25.   In or about 2001 and 2002, in the Southern District of New York and elsewhere, XING LIN, a/k/a "Ding Pa," the defendant, and others known and unknown, willfully and knowingly did participate in the use of extortionate means, as that term is defined in Title 18, United States Code, Section 891(7), to collect and attempt to collect an extension of credit and to punish a person, to wit, a gambling debtor, for the non-repayment of an extension of credit, in violation of Title 18, United States Code, Sections 894.

(Title 18, United States Code, Section 1962(c).)

-13-

**A. 127**

## COUNT THREE
### (Murder)

The Grand Jury further charges:

26.   On or about July 30, 2004, in the Southern District of New York and elsewhere, XING LIN, a/k/a "Ding Pa," and HAO CHAO, a/k/a "Little Beijing," the defendants, willfully and knowingly, during and in relation to crimes of violence for which they may be prosecuted in a court of the United States, namely, extortion and conspiracy to commit extortion, in violation of Title 18, United States Code, Section 1951, did use and carry a firearm, and, in furtherance of such crimes, did possess a firearm, and did aid and abet the use, carrying, and possession of a firearm, and, in the course of that violation of Section 924(c) of Title 18, United States Code, did cause the death of a person through the use of the firearm, which killing is murder as defined in Title 18, United States Code, Section 1111(a), to wit, LIN directed CHAO to shoot Chang Qin Zhou inside a club in Queens, New York, and CHAO did shoot Zhou as well as two bystanders, Mei Ying Li and "Victim-3," killing Zhou and Li, and wounding "Victim-3."

(Title 18, United States Code, Sections 924(j)(1) and 2.)

**A. 128**

## COUNT FOUR
### (Extortion and Attempted Extortion)

The Grand Jury further charges:

27.    From in or about March 2002, up to and including in or about December 2009, in the Southern District of New York and elsewhere, XING LIN, a/k/a "Ding Pa," and HAO CHAO, a/k/a "Little Beijing," the defendants, and others known and unknown, willfully and knowingly did commit and attempt to commit extortion, as that term is defined in Title 18, United States Code, Section 1951(b)(2), by obtaining money and property from and with the consent of another person, to wit, individuals who owned a bus company, which consent would have been and was induced by the wrongful use of actual and threatened force, violence, and fear, and thereby would and did obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3), to wit, LIN and CHAO extorted and attempted to extort individuals who owned a bus company for money.

(Title 18, United States Code, Sections 1951 and 2.)

**A. 129**

## COUNT FIVE
### (Extortion Conspiracy)

The Grand Jury further charges:

28.   From in or about March 2002, up to and including in or about December 2009, in the Southern District of New York and elsewhere, XING LIN, a/k/a "Ding Pa," and HAO CHAO, a/k/a "Little Beijing," the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit extortion, as that term is defined in Title 18, United States Code, Section 1951(b)(2), by obtaining money and property from and with the consent of another person, to wit, individuals who owned a bus company, which consent would have been and was induced by the wrongful use of actual and threatened force, violence, and fear, and thereby would and did obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3).

### Overt Act

29.   In furtherance of the conspiracy, and to effect the illegal object thereof, the following overt act, among others, was committed in the Southern District of New York and elsewhere:

-16-

**A. 130**

a.   In or about 2003, XING LIN, a/k/a "Ding Pa," the defendant, called the part-owner of a bus company ("Victim-4") while Victim-4 was located in New York, New York, and threatened Victim-4 with harm if Victim-4 did not increase the amount of money Victim-4 was paying to LIN.

(Title 18, United States Code, Section 1951.)

_____   9/28/12    _____
FOREPERSON                        PREET BHARARA
                                  United States Attorney

-17-

**A. 131**

Form No. USA-33s-274 (Ed. 9-25-58)

---

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

- v. -

XING LIN, a/k/a "Ding Pa," and
HAO CHAO, a/k/a "Little Beijing,"

Defendants.

---

### SUPERSEDING INDICTMENT

S2 11 Cr. 114 (MGC)

(Title 18, United States Code, Sections
924(j)(1), 1951, 1962(d), 1962(c), and 2.)

---

PREET BHARARA
United States Attorney.

A TRUE BILL

_____     Foreperson.

---

9/28/12 FILED INDICTMENT WARRANT ISSUED

COTT, USMJ

**A. 132**

C7q7linc

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

       v.                                   11 Cr. 114 (MGC)

XING LIN,

          Defendant.

------------------------------x

                                 July 26, 2012
                                 11:45 a.m.


Before:

                    HON. MIRIAM GOLDMAN CEDARBAUM
                                 District Judge


                        APPEARANCES

PREET BHARARA
     United States Attorney for the
     Southern District of New York
BY:  JENNIFER BURNS
     PETER SKINNER
     Assistant United States Attorney

JOEL COHEN
     Attorney for Defendant

ALSO PRESENT:  DANIEL TANG, Interpreter

**A. 133**

C7q7linc

(Case called)

(In open court)

THE COURT:  I have just received the superseding indictment, and, Mr. Lin, have you received a copy of the superseding indictment that has been filed against you?

THE DEFENDANT:  Yes, yes.

THE COURT:  All right.  I think now you should get up, and I'm going to ask you some questions.  Have you had the indictment translated to you?

THE DEFENDANT:  Yes.

THE COURT:  All right.  And have you discussed it with your lawyer?

THE DEFENDANT:  Yes.

THE COURT:  Do you understand the charges against you?

THE DEFENDANT:  Yes, yes.

THE COURT:  I will be glad to explain anything that you do not understand on these charges so that you can decide whether you want to plead guilty or not guilty to them.

THE DEFENDANT:  I plead not guilty.

THE COURT:  Do you understand the charges well enough to enter pleas?  The first indictment against you had only one count.  This new indictment has three separate charges.

THE DEFENDANT:  Yes.

THE COURT:  Are you prepared to plead to all of those charges, to enter a plea of guilty or not guilty?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A. 134**

C7q7linc

THE DEFENDANT:  I plead not guilty.

THE COURT:  Count One charges you with extortion.  How do you plead to that charge?

MR. COHEN:  Your Honor, on the superseding indictment Count One charges murder.

THE COURT:  Oh, wait, just let me see that.  I see, that's the 924(j)?

MS. BURNS:  Yes, your Honor.

THE COURT:  Yes, all right.  Thank you.  Count One, as your lawyer has pointed out, and as I assume you have discussed together, charges you with the murder of two people.  How do you plead to that charge?

THE DEFENDANT:  Not guilty.

THE COURT:  Count Two charges you with extortion.  How do you plead to that charge?

THE DEFENDANT:  Not guilty.

THE COURT:  And Count Three charges you with conspiring to commit extortion.  How do you plead to that charge?

THE DEFENDANT:  Not guilty.

THE COURT:  Very well.  I will enter your pleas, and you may be seated.

Now, is this indictment going to change the length of the trial?

MS. BURNS:  No, I don't anticipate it will change the

C7q7linc

length, your Honor.

THE COURT:  Very well.  Is the defendant prepared to go to trial on the old schedule?

MR. COHEN:  No, your Honor.

THE COURT:  I'm going to have to really seek out a time when I can try it.  I was giving up part of my vacation to try you this summer.  But of course I have number of other criminal trials scheduled.  How much time do you need, Mr. Cohen?

MR. COHEN:  Your Honor, I think that about six weeks would be a reasonable amount of time.

THE COURT:  Yes.  Well, I cannot try you in September.  The question is when thereafter I can try it.

MR. COHEN:  Judge, I would be available in October, but I know Ms. Burns has a wedding scheduled in October.

THE COURT:  Are you getting married in October?

MS. BURNS:  I am, your Honor.

MR. COHEN:  And probably would appreciate not being on trial before or after that.

THE COURT:  I would think.  I would think.  The real question is should I put this over until the beginning of January, because I run into problems unless I get a lot of unexpected pleas.

MR. COHEN:  Judge, January would be better than starting on August 13.  And it seems like there isn't anything

C7q7linc

available between now and then.

THE COURT:  Well, I'm looking to see if I can somehow substitute you, but if October is the wedding time, it's hard to do it in October, right?  When are you getting married?

MS. BURNS:  October 13.

THE COURT:  I see.  And then you want to go on a honeymoon.

MS. BURNS:  I do have one booked.

THE COURT:  So, that takes up most of October.

MS. BURNS:  I appreciate the scheduling courtesies, but obviously I defer to defense counsel and defendant on their availability.

THE COURT:  Yes, of course.  I am supposed to be in Part I in the beginning of December.  I was going to substitute you for a trial in October, but I'm not going to interfere with a wedding unless --

MR. COHEN:  And the court is not available during November?

THE COURT:  Let's review what the estimated length of the trial is.

MS. BURNS:  Your Honor, I think it's safe for two weeks.  I think we will have all the evidence in within, you know, four trial days, but I expect we will probably go into the next week.

THE COURT:  But you do not expect it to make more than

C7q7linc

two weeks.

MS. BURNS: No. Obviously the government is always ready, and I appreciate the courtesies, but it's really up to the defendant as to when --

THE COURT: I understand. I understand.

MS. BURNS: OK, thank you.

THE COURT: Well, I will try to do it in November, if that's preferable. You certainly are entitled to a speedier trial, as speedy a trial as you are prepared for. I will have to bump a much shorter trial that was going to go into November. If I bump that trial, I could try this case, start the trial on October 30, which would take us into November. Now, when are you coming back?

MS. BURNS: I come back on the 29th, but we can make it work.

THE COURT: Well, I could push that a day, because we're going to have Election Day in the middle of the trial and also Veterans Day. I think the much shorter trial on the tax protester is something I will have to bump in order to have the time in November, before Thanksgiving that is.

Is it the government's view that if we start on the 31st, which is a Wednesday, the trial will be concluded by November 16? Do you have a calendar in front of you?

MS. BURNS: Your Honor, I think we can be completed the 16th.

C7q7linc

THE COURT:  Do you think we will get a jury verdict by the 16th?  You don't know.

MS. BURNS:  Right.

MR. COHEN:  Judge, let me just note that in terms of a defense case, at this point I'm contemplating possibly only calling the detectives that originally investigated this case, who are or were then members of the New York City Police Department.  I don't know who they are.  I would only ask that the government find out whether they are still employed by the police department and, if not, make arrangements for me to be able to contact them.

MS. BURNS:  We will certainly do that, your Honor. Most of the officers and detectives involved have since retired, so we will provide the contact information to defense counsel.

THE COURT:  Very well.  Remind me, how many witnesses is the government contemplating?

MS. BURNS:  Approximately ten, your Honor.

THE COURT:  Because of the two holidays that are interrupting the trial, I think I may have to start on the 30th.

MR. COHEN:  To the extent that some of the witnesses may be pathologists, or medical examiners or witnesses of that nature, we may be able to read stipulations to obviate the need to call them.

C7q7linc

THE COURT:  Yes, I'm talking about the outside date.

MR. COHEN:  I understand.

THE COURT:  Of course it could be shorter, and of course if the jury has a lot of trouble deliberating it may take longer.

I think we are safest if we start on the 30th, which is when I had the other trial scheduled to start, which is a Tuesday.  And by Tuesday morning we should get a jury panel pretty promptly because the criminal cases take priority.

Well, if I schedule it for January 7, there is no impediment to going as long as necessary.  That is, there is no holiday blocking it.  Well, there is one holiday during that period, but I can give you a longer period.

MR. COHEN:  Your Honor, may I ask why, if we weren't at the end of October we would have to conclude by November 16?  Does your Honor have another trial scheduled thereafter?

THE COURT:  Oh, wait a minute.  Is that what I said?

MR. COHEN:  Yes.

THE COURT:  No.  But if you want to celebrate Thanksgiving, which the jury will want -- no, that's not until the 22nd.

MR. COHEN:  Right.  I certainly think that starting in October would be preferable to starting in January.

THE COURT:  I do too, because I'm interested in speedy trials.  Well, we can't help it; there are a lot of holidays

C7q7linc

this year, including Election Day.

So, yes, if we start on October 30, that gives us -- I guess when you say two weeks, I just wonder whether it will take only two weeks. But we will take that risk, because I agree with you it should be promptly tried.

Very well. We will select a jury on October 30 at 9:30 in the morning. I should tell you that I use the struck panel method, which means that I will question enough potential jurors to provide for a jury of 12, and at that time of year I will take six alternates, which means we will select 18. And I will question enough jurors so that after I have completed the questioning, I will take counsel into the robing room, and you will exercise your challenges in rounds. First you will challenge for cause. I will include enough jurors I hope to make it possible, even if there is cause, to end up with 12 jurors and six alternates. Then we will do it in three rounds.

In the first round the government will challenge -- if you have that many challenges -- three challenges peremptorily; the defendant three. No, the defendant has to challenge more. Defendant will challenge four in the first round, four in the second round and two in the third round. The government will challenge -- this is peremptorily -- three in the first round, two in the second round and one in the third round, which will give you each whatever peremptory challenges you are entitled to under the law. I take peremptory challenges simultaneously,

C7q7linc

that is, you will each give me at the same time the jurors that you challenge.

MR. COHEN:  Your Honor, may I suggest, having spent about five years in the Homicide Bureau of the DA's office, that we get as large a venire as possible, because when the charge is murder I think that many, many more jurors will seek to opt out.

THE COURT:  I agree with you.  I agree with you.  I take it the death penalty is not being sought.

MS. BURNS:  That's correct, your Honor.

THE COURT:  No, that I agree with.  That's closer to the time when we will submit a request for the number of jurors.  But the trial will not be so lengthy that I am concerned about efforts to avoid the trial based on other grounds.  The first day we will convened at 9:30 so that we can do any other housekeeping matters before the panel comes, because we will not get a panel before 10 o'clock.  But thereafter we will convened trial at 10 in the morning.  And I will tell the jurors that if they come at 9:30, they will get muffins and coffee, so we can start promptly at ten.  I have found that to be an efficient way to start at ten.

All right.  I do want proposed jury charges, but as I told you before I don't need boilerplate.  I am interested only in substantive charges, and goodness knows the government has more than enough of my charges without giving me the original

C7q7linc

of the adaptation.

Now, technically you are entitled to be tried within 70 days after the superseding indictment.  Since this is probably is more than 70 days I want to be sure that the defendant agrees that you require the time between now and October 30th for proper preparation for your defense, such that the time required outweighs in the interests of justice both the defendant's and the public's right to a speedy trial.

Do you agree to that, Mr. Lin?

THE DEFENDANT:  Yes.

THE COURT:  All right.  I will adopt that finding and exclude the time between now and October 30 from the speedy trial clock.

Now, what else?  Has discovery been completed?

MS. BURNS:  It has, your Honor.  If we uncover any additional evidence, we will turn it over promptly.  We also provided 404(b) notice to the defendant based on information available at this time.

Your Honor, what date do you want the request to charge?

THE COURT:  I will tell you in just a moment.

MS. BURNS:  Thank you.

THE COURT:  Is there any reason why both sides cannot provide those by September 14?

MS. BURNS:  No, that's fine.

C7q7linc

MR. COHEN:  No, your Honor.

THE COURT:  Very well.

MR. COHEN:  Would your Honor like proposed voir dire at the same time?

THE COURT:  Again, I have my own voir dire, but if there is something special about this case that you think requires some particular question, I will certainly consider that.  That is, I don't need standard voir dire questions.

MR. COHEN:  No, I know, Judge.

THE COURT:  Just questions that have particular bearing on this case.

MR. COHEN:  I'm not interested in what people read or things of that nature.

THE COURT:  And I don't even ask the jury, because I consider that intrusive.  When people come to do their duty as citizens, they don't have to give up all personal privacy that has nothing to do with the case.  I do not ask jurors what they read, and what they believe, because I tell them it doesn't matter what they believe; they have to follow my instructions, and if they cannot do that, they cannot sit.

Yes, I would like that at the same time, any special voir dire questions that you request.

Is there anything further?

MS. BURNS:  No, your Honor.  Thank you.

MR. COHEN:  No, your Honor.

**A. 144**

C7q7linc

THE COURT:  Very well.  Good luck to everybody.

MR. SKINNER:  Thank you, your Honor.

MR. COHEN:  Thank you, Judge.

(Adjourned to October 30, 2012 at 9:30 a.m.)

caj2linc kjc

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,                    New York, N.Y.

       v.                                     11 Cr4. 114(MGC)

XING LIN,

              Defendant.

------------------------------x

                               October 19, 2012
                               3:25 p.m.

Before:

             HON. MIRIAM GOLDMAN CEDARBAUM,

                             District Judge

APPEARANCES

PREET BHARARA
    United States Attorney for the
    Southern District of New York
BY:  PETER M. SKINNER
    Assistant United States Attorney

JOEL S. COHEN
    Attorney for Defendant

ALSO PRESENT:

BRENDA CHEN, Fuzhou Interpreter

**A. 146**

caj2linc kjc

(In open court)

(Case called)

THE COURT:  Mr. Lin, have you seen the superseding indictment that's been filed against you?  I think you should get up.

THE DEFENDANT:  Yes, yes.

THE COURT:  And have you discussed it carefully with your lawyer?

THE DEFENDANT:  Yes.

THE COURT:  I will be happy to explain anything to you in it that you do not understand.  Do you understand what the charges against you are?

THE DEFENDANT:  Yes, I do.

THE COURT:  Do you understand it well enough to enter a plea to the charges?  I will be happy to explain them further to you if you have any questions about them.

THE DEFENDANT:  I understand.  I plead not guilty.

THE COURT:  All right.  There are several counts here, there are several crimes that are charged, so I am going to ask you as to each of them how you plead.

Count One charges you with belonging to a criminal enterprise, which charges a violation of a statute which prohibits basically a racketeering conspiracy, and it is charged that you were a member and indeed were the leader of a racketeering conspiracy.  Do you understand that charge?

**A. 147**

caj2linc kjc

THE DEFENDANT:  Yes.

THE COURT:  And how do you plead to that charge?

THE DEFENDANT:  Not guilty.

THE COURT:  Not guilty.

And then you are also charged in Count Two with actually participating in a racketeering conspiracy which charges that one of the racketeering acts of that criminal enterprise was the murder of Chan Qin Zhou.  How do you plead to that charge?

THE DEFENDANT:  Not guilty.

THE COURT:  There is a third charge in this superseding indictment which charges you with murder in that during and in relation to crimes of violence for which you may be prosecuted in a court of the United States, and those crimes of violence are named as extortion and conspiracy to commit extortion, it is charged that you did use and carry a firearm and caused the death of a person through the use of the firearm.  Now, that is a charge really of doing it yourself but also a charge of aiding and abetting somebody to do it.  And I take it the charge here is that you told somebody to do it, actually, is that correct?

MR. SKINNER:  That's correct, your Honor.

THE DEFENDANT:  No.

THE COURT:  A man known as Little Beijing, that you told him to commit extortion -- wait a minute.  I am moving

caj2linc kjc

from three to four.  First, that you did tell him to shoot Zhou, but it is also charged in Count Four -- first let me ask you how you plead to Count Three, to the charge that you are responsible for the murder of Chan Qin Zhou?  How do you plead to that charge?

THE DEFENDANT:  Not guilty.

THE COURT:  And then Count Four, there are actually four counts in this indictment.  It is also charged --

MR. COHEN:  Your Honor, actually there are --

THE COURT:  Is there a fifth?

MR. COHEN:  Yes.

MR. SKINNER:  There is a fifth, your Honor.

THE COURT:  I'm sorry.  I missed the fifth.  All right.  There are five charges against you.  The fourth charge is that you extorted money from another person who owned a bus company by the wrongful use of threatened force and fear and did, by that conduct, affect interstate commerce.

How do you plead to that charge?

THE DEFENDANT:  Not guilty.

THE COURT:  And it is also charged that you conspired to do that, that is, you agreed with others to commit extortion.

How do you plead to that?

THE DEFENDANT:  Plead not guilty.

THE COURT:  Very well.  I will enter your pleas and

caj2linc kjc

you may be seated.

Since there are many new charges here, I take it that this case will not go forward to trial on the previously set date, is that correct?

MR. COHEN:  That's correct, your Honor.  Couldn't be ready by then.

THE COURT:  Right.  I think even if the trial date is postponed, I think it is still a good idea to schedule a trial date now.

Has all discovery been completed?

MR. SKINNER:  Your Honor, I was explaining to Mr. Cohen before our conference today, there are three piece of discovery relating to conduct of the enterprise generally that the government would be seeking to introduce -- two bullets and video that are referenced in New York City Police Department reports that we have reviewed.  We are in the process of trying to obtain that evidence, assuming it still exists.  It is old evidence, one bullet from 2000 and one from 2003.

So I have described to Mr. Cohen what it is --

THE COURT:  I'm sorry.  What do you mean one bullet from 2000 and one from 2003?

MR. SKINNER:  There were two shootings that the defendant participated in that we will be seeking to introduce as evidence of the existence of the enterprise, and assuming --

THE COURT:  Who was shot apart from the bodyguard?

caj2linc kjc

MR. SKINNER:  In one instance there was a dispute at a gambling parlor in 2000 where the government alleges that we can prove that the defendant and his coconspirators opened fire in a gambling parlor in Chinatown, fled that gambling parlor, and were subsequently stabbed by -- defendant was stabbed by one of the people who worked for the owner of the gambling parlor.

THE COURT:  Defendant was stabbed or defendant stabbed someone?

MR. SKINNER:  The defendant was stabbed.

THE COURT:  Was stabbed.

MR. SKINNER:  There is a separate --

THE COURT:  What is the relevance of that?

MR. SKINNER:  Well, the government, in advance of whatever the trial date is, will be filing a motion in which we outline the evidence that we would seek to introduce as evidence of the existence of the criminal enterprise, that is here the criminal organization that the defendant ran.  And we think we can prove, and we will argue in the papers beforehand, that this particular shooting occurred in furtherance of the enterprise itself and is evidence of the existence of the enterprise that should be admitted.

Of course if the court disagrees, then we won't be introducing that, but that is one additional thing we were going to try and put in.  We flagged it to Mr. Cohen, and there

caj2linc kjc

is one bullet related to that shooting that we are trying to get. So we described that to him. I don't think -- when and if we are able to obtain --

THE COURT: This is the mahjong parlor.

MR. SKINNER: It was a rival mahjong parlor. It was not the defendant's mahjong parlor.

THE COURT: The defendant operates a mahjong parlor?

MR. SKINNER: The defendant did. The defendant operated multiple gambling parlors in Chinatown from 1996 to the early 2000s, as alleged in the racketeering charges.

THE COURT: What is the statutory period? What is the statute of limitations?

MR. SKINNER: The statute of limitations on a RICO charge is five years, but it can extend back so long as one act in furtherance of the racketeering conspiracy or in furtherance of the substantive racketeering enterprise occurred within five years. The allegation here is that one of the victims of the defendant's crimes was extorted up until 2009 but that the RICO enterprise runs back until at least 1996, which is when we have evidence that the defendant was operating illegal gambling parlors in Chinatown. So the charge date range within the indictment is 1996 until December of 2009.

THE COURT: Is there a time at which he stopped operating it?

MR. SKINNER: Well, the evidence that we have is that

caj2linc kjc

the extortion payments finished in December 2009, so -- we have every reason to believe there is a presumption that RICO conspiracies would continue, that it would have continued up until the time of his arrest, but the charge date period is to the evidence that we have, so it runs until the end of December 2009.

In any event, I got a little off track, there are three additional pieces of evidence that we are trying to obtain from the New York City Police Department.  We have described to Mr. Cohen what they are, and we will make them available to Mr. Cohen when and if we are able to obtain them, and there is no additional discovery that needs to be produced.

THE COURT:  You have concluded discovery?

MR. SKINNER:  Yes, your Honor, with the exception of those three things.  And if we obtain any additional evidence, say, medical records relating to the defendant's wounds at one of these shootings or the stabbing, we will make them available right away.  But for the time being we don't have anything else to produce.

THE COURT:  Very well.

Mr. Cohen, how much time do you need?

MR. COHEN:  Your Honor, at the outset, this was a difficult case to prepare because --

THE COURT:  It keeps moving.

MR. COHEN:  It keeps getting older.  Initially the

caj2linc kjc

homicide that was charged happened in 2004 and, and that's been difficult to deal with. But now we are going back eight years beyond that to 1996. So I am going to have to be looking at where my client was at that time, where he lived, where he worked. So I think we are talking about significant additional investigation. I am a single practitioner. I have been on trial for almost three weeks before Judge Johnson in the Eastern District with at least another week or two to go. I am thinking probably at least two months. And of course I think once the government files its *in limine* motion to admit evidence of the enterprise, if that happens sooner rather than later, it would certainly assist me in seeing (a) whether there is going to be opposition to that and on what basis. Of course there is a presumption that the enterprise continues, but that can certainly be rebutted by numerous things, and in this case possibly by the fact that Mr. Lin was arrested in Canada, and I'm not sure evidence exists he was in the United States even for a significant portion of the time.

So I am thinking that we can either set a trial date now several months hence or that the government could, by a certain date, file its motion *in limine*, and once we see what it is that we are deal with, then perhaps have a conference to address that and fix a trial date at that time.

THE COURT: Let me understand. I thought at the initial arraignment Mr. Lin told me that he had been living in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A. 154**

caj2linc kjc

the south. Did I misunderstand?

MR. COHEN: I think that was up to, if I recall correctly, up until the time of the incident charged on July 30, 2004.

THE COURT: I see. And since that time he has been living here?

MR. COHEN: I didn't say that, Judge. I said he was arrested in Canada. I am trying not to answer questions about where he was living, but I know that he was arrested in Canada, and it appears that there was some evidence that the government has that he had been living in Canada for a substantial period of time, which I have learned from reading the extradition request.

THE COURT: I see. I see. And when is it that you contend that he was running gambling facilities in Chinatown?

MR. SKINNER: 1996 until the early 2000s. I think the indictment alleges up until --

THE COURT: So it's really quite long time ago.

MR. SKINNER: The gambling parlors, yes. The gambling parlors were late '90s/early 2000s.

THE COURT: Where was he living at that time?

MR. SKINNER: In New York City. And then after the shooting and stabbing, after the shooting in 2003, he then -- it is our belief that he then moved to Atlanta, where he was up until the time of the shooting at the karaoke parlor -- that

**A. 155**

caj2linc kjc

was the murder that was the original charge in the indictment -- and that after that he fled the New York City area, we are not sure exactly where he was for a period of time, but that he eventually ended up in Canada.  Regardless, during all of that period of time, on a monthly basis he continued to collect extortion payments from one of the bus company extortion victims.  So the government's argument is going to be that enterprise --

THE COURT:  What do you mean throughout all that time?  What time are you talking about?

MR. SKINNER:  The time from the shooting in July of 2004 up until December of 2009, when the government's witness says he stopped make the payments.  He said during that entire period of time, roughly every month, I was getting money to the defendant through instructions that the defendant would give him as to who to pay, his wife or other people.  So the government's argument is that despite the fact that the defendant had fled the New York City area, certainly a large portion of criminal activity alleged took place in New York, and that he continued to -- he continued to benefit from the enterprise right up until 2009, when the payments stopped, regardless of where he may have been physically located.  But we don't have any objection to setting a trial date and scheduling a date by which we will file an enterprise motion, you know, sufficiently in advance of the date to give Mr. Cohen

caj2linc kjc

time to respond.  That's obviously fine with us.

THE COURT:  I have another criminal trial scheduled to begin on January 7 for which I have gotten various estimates of length.  Off the record.

(Discussion held off the record)

THE COURT:  I think the safest thing is to set this for the week starting February 4, if that's agreeable to counsel and to the defendant, of course.

MR. COHEN:  I think that makes sense, your Honor.  I would certainly urge Mr. Lin to agree that we require that time in order to adequately prepare to defend against these very serious charges.

THE COURT:  All right.  Mr. Lin, do you agree that I should exclude the time between now and February 4 from the Speedy Trial clock because you and your lawyers need to prepare your defense in this case, to take that time to prepare your defense?

THE DEFENDANT:  Yes.

THE COURT:  And I take it the government has no objection.

MR. SKINNER:  No, your Honor.  We would join in the application to exclude time.

THE COURT:  Very well.  Then I will set February 4 at 9:30 in the morning for the trial of this case.

Your best estimate of the length is what?

caj2linc kjc

MR. SKINNER:  Your Honor, I still think that, despite the broadened scope of the charges, we are looking at a two-week case at longest.  I think the government's trial evidence will be five to six trial days, add on jury selection and a defense case, and I think we are likely done in two weeks.  It could go a little bit longer.

THE COURT:  I understand.  I am just asking for your best estimate.  Nobody ever knows.

MR. SKINNER:  That's our estimate.  At this point in time we do not think that there will be significant -- many more new witnesses on top of the ones that we had planned to call all along to prove up the murder and extortion counts that were charged in the superseding indictment returned back in August.  We certainly will require some additional time, but we don't think we are talking about, you know -- we haven't turned what was a one- to two-week trial into a one-month trial.  We think it is still in the two-week range.

THE COURT:  Very well.  Then I will, as I said, set trial for February 4, at 9:30 in the morning, and I will exclude the time between now and then from the Speedy Trial clock.  I will adopt Mr. Lin's view that the time between now and then outweighs in the interest of justice, both his right to a speedy trial and the public's right to a speedy trial. And I will on that basis exclude the time between now and February 4 from the Speedy Trial clock.

caj2linc kjc

Is there anything further?

MR. COHEN:  Not by us, your Honor.

MR. SKINNER:  No, your Honor.  I think that was a key thing for us was the trial date.

THE COURT:  Very well.  You are all excused.

MR. SKINNER:  Thank you very much, your Honor.

- - -

D1VLLINC                    Conference

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

                v.                    11 CR 114 (MGC)

XING LIN,

                Defendant.

------------------------------x

                                      New York, N.Y.
                                      January 31, 2013
                                      3:08 p.m.


Before:

            HON. MIRIAM GOLDMAN CEDARBAUM,

                                      District Judge


                    APPEARANCES

PREET BHARARA
    United States Attorney for the
    Southern District of New York
JENNIFER BURNS
PETER M. SKINNER
    Assistant United States Attorneys

JOEL COHEN
    Attorney for Defendant

ALSO PRESENT:  LAURA CHEN, Fuzhou Interpreter

THE COURT:  I have several problems.  No. 1, my doctor tells me I shouldn't be here, and I'm not sure that putting the trial over for just a couple days is going to be long enough.

What is your best estimate of the length of the trial?

MS. BURNS:  Your Honor, I think our best estimate is about eight to ten trial days all together.

THE COURT:  Well, we have two holidays in the next few weeks.

MS. BURNS:  February and November are the worst months to have a trial.

THE COURT:  And if I had to move it, I would have to move it to April because I am committed to sitting in the Court of Appeals at the beginning of March and I have other conflicts in the calendar.

So the question is should I try to start next Wednesday or should we put it over?  I invite the advice of counsel.

MR. COHEN:  Your Honor, may I speak with my client for one moment?

THE COURT:  Please.

MR. COHEN:  Your Honor, may I introduce Danielle Coleman.  She's a third year law student at Brooklyn Law School and is interning at my office this semester.

(Pause)

THE COURT:  This is the first time in 27 years that

I've been in this position.

MS. BURNS:  And you have our sympathies on not feeling well, your Honor, certainly do.  We're just trying to figure out because we don't have any law enforcement witnesses; it's really lay witnesses.  So, we're in a different position than normal.

(Pause)

THE COURT:  Are you sure that it will only last -- how many days did you say?

MS. BURNS:  Eight to ten trial days.  We're factoring in that most of our witnesses or a good majority are non-English speaking.

THE COURT:  Which makes it take a little longer.

MS. BURNS:  A little bit, yes.

THE COURT:  Now, how about the interpreters, do they all speak Fuzhounese?

MS. BURNS:  They do.  So they're fully ready.

THE COURT:  But are the witnesses, do the witnesses speak Fuzhounese?

MS. BURNS:  Yes.

THE COURT:  Because that's a problem.

MS. BURNS:  Right.  We've been sensitive to that.

THE COURT:  Is that their native tongue, not Mandarin or Cantonese?

MS. BURNS:  Yes, and they've been translating in

Fuzhounese for the period of preparation.

THE COURT: But the witnesses will be speaking in Fuzhounese?

MS. BURNS: Yes.

THE COURT: All of them?

MS. BURNS: Yes.

THE COURT: All of the witnesses are from Fuzhou; is that right?

MS. BURNS: Yes, that's our understanding.

THE COURT: That's interesting. All right.

MR. COHEN: And, your Honor, I think I know two of the three interpreters that will be translating for the Court and government, and I've worked with them before and I know that they're more than qualified. They are really the best we have.

THE COURT: I'm less concerned with them than the witnesses.

MR. COHEN: Understand, Judge. The point I'm trying to make is I think they will have no difficulty with the witnesses because they're native Fuzhou speakers.

THE COURT: Thank you. I remember when we first started to look for Fuzhounese interpreters, because there are now many more people from Fuzhou here in Chinatown than once upon a time.

MR. COHEN: Very true.

Your Honor, if your Honor wants to know our position

**A. 163**

with respect to starting, we would be prepared to start next week. But, of course, I've discussed with Mr. Lin his right to a speedy trial and advised him that it might be in his interest to waive those rights in order to afford us more time to prepare and he's prepared to do that. So I would certainly have no objection to waiting a couple months for the certainty that we would have your Honor for the duration and, if anything unforeseen happened, we wouldn't be caught short.

MS. BURNS: Your Honor, it's our preference to go forward next week, understanding that may change next week if needed, but we can also work around the court holidays and have our witnesses always available as needed. At this point we've already turned over the 3500 material to the defense. We're very far along in being ready to go.

THE COURT: I understand, and I would prefer to be able to go forward as well.

MS. BURNS: I know you set this a long time ago with that expectation.

THE COURT: I know. Well, in the meantime, let me turn to other matters. If this were to go over, it would go over to April 8, which would be early in April.

I have not received much from you, Mr. Cohen. I have received a lot of stuff from the government. I have received requests for voir dire, which I'm not inclined to use because I always ask the jury panel very carefully and instruct them that

they must follow my instructions on the law, and if they disagree with the law, they still have to follow my instructions, and I ask whether there's anybody who cannot accept that principle.

I do not normally ask jurors about individual instructions on the law and individual views on the law because what is important to me is that they not have their own views on the law but are committed to following only what I instruct them, regardless of whether they agree with it or not.

Now, a number of the questions that the government has requested have to do with particular opinions, and I do not normally ask jurors for their particular opinions on the law because I consider it a more fundamental problem if a juror will not follow my instructions. And I have once or twice had jurors who told me they could not follow instructions they don't agree with. But I do not normally inquire about particular legal requirements, that is, I do not ask the opinion on jurors on whether something should or shouldn't be the law.

MR. SKINNER: Your Honor, that's fine. I actually don't think we proposed any that were specifically pegged to the law.

THE COURT: Yes, you're asking me to ask people their opinions, their views, and I don't normally do that.

MR. SKINNER: I understand. And we tried to be narrow

and we tried to focus in on views that might turn up bias particularly relevant to this trial.

I agree with your Honor that the broad question whether or not they will follow your instructions will address our concerns. We raised these because we thought they were particularly pertinent to this particular trial.

THE COURT: Right, but you've had hundreds of copies of my voir dire, and it is only if there is a particular problem in this trial that raises some question that I even consider singling out particular views of the law because I really do not want to suggest to jurors that they have or should have opinions of the law.

MR. SKINNER: I understand, your Honor. And, again, I don't think we're as focused on the jurors' opinion as to the law as we were on trying to identify particular biases that might be important at this trial. And, in particular, as we noted in our first suggested question, we are going to be calling a number of witnesses who are not in the country legally, who have no legal status and --

THE COURT: I will instruct the jurors about the things they may not have any bias on.

MR. SKINNER: I think that will address our concerns then, your Honor. We don't have any other concerns with regard to the voir dire, and we trust that your standard voir dire will achieve the same things we're looking for.

**A. 166**

D1VLLINC                    Conference

THE COURT:  I will, of course, take from you anything that I think I am missing, but I have received nothing from the defendant.

MR. COHEN:  Judge, the government was gracious enough to make fairly early disclosure of 3500 material.  I got it last week and, frankly, I've been so consumed and overwhelmed by reading it and there's a significant amount of it that I really haven't addressed the request to charge issue or the government's 404(b) motion, and I'm not at this point prepared to do it off the top of my head.

I would like to, since we're not going to start until Wednesday if we go forward next week, submit something over the weekend.

THE COURT:  Well, you know, I had set a deadline for requests to charge.

MR. COHEN:  I understand, Judge.  As you know, I'm a single practitioner.

THE COURT:  I do know that.  I do know that, but I set this deadline a long time ago.

MR. COHEN:  I understand, Judge.  And, your Honor, may I make a request of you?

THE COURT:  Yes.

MR. COHEN:  May I obtain from your chambers or your clerks a copy of your general charge on a conspiracy and mere presence?

D1VLLINC                    Conference

THE COURT:  What do you mean "mere presence"?

MR. COHEN:  Well, in charging, in charging conspiracy, I assume that your Honor will charge mere presence.

THE COURT:  Well, you shouldn't assume anything.  If there's some particular issue you're concerned about, you should give me a proposed charge on it.

MR. COHEN:  I will do that.

THE COURT:  Good.

MR. COHEN:  Very well.

THE COURT:  Good.  All right.  Now, I have received three motions in limine from the government, two of which are notices of enterprise evidence.  I haven't received anything from the defendant in response.

MR. COHEN:  Your Honor, similarly.

THE COURT:  For me, motion in limines about evidence are always premature because I cannot rule without hearing the evidence.

I also would like to draw the attention of the government that there's a very recent Second Circuit case which you do not address, which is United States v. Applins, 637 F.3d page 59.  It's not so recent.  It's 2011.

I would also like to draw to everyone's attention that the RICO conspiracy count and, indeed, the RICO substantive count, the indictment in this case alleges as a racketeering act or as a predicate act the New York state crime of operating

an illegal gambling business in violation of New York Penal Law

Section 225.05, and that is the provision on which your

requests to charge are submitted, on that particular state

crime.

Now, is it your position that a racketeering act may

be a gambling chargeable under state law which is a

misdemeanor?

MR. SKINNER:  No, your Honor.  I think you're correct

that a misdemeanor would not be chargeable.  Frankly, I thought

we had -- I'd have to go back and look.

THE COURT:  You have to take a closer look.  I think

you charge primarily a misdemeanor.

MR. SKINNER:  Your Honor, there's a number of New York

state gambling charges at issue.

THE COURT:  I'm talking only about the one under the

section you cite in the indictment.

MR. SKINNER:  Well, the indictment cites 225.05,

225.10, 105.05, 105.00.  And I don't remember this off the top

of my head.  I thought that while the New York state

misdemeanor would not give rise itself to a racketeering act,

that 1955 could.  1955 requires a violation of state law as a

predicate and that 1955 would hitch back on to the misdemeanor.

But we'll look into that and, of course, if there's --

THE COURT:  I think you should look at that because

I'm not at all sure that you need it.  But, in any event, I'm

**A. 169**

not sure that it helps you under the law.

MR. SKINNER:  We'll look at that.  And it may have been, it may have been listed -- we'll look into it.  I know it's something that we considered as we were putting the RICO indictment together and I thought we were careful to properly address it, but we will of course look at that again.

THE COURT:  What is a group A predicate act?

MR. SKINNER:  Within the definition of the RICO statute, your Honor?

THE COURT:  Mm-hmm.

MR. SKINNER:  Off the top of my head I'm not sure.  I'd have to go back and look at the statute.

THE COURT:  I think you should take closer look at predicate acts.

MR. SKINNER:  I know precisely what your Honor is referring to.  And if we've incorrectly included a misdemeanor, we'll address it.  If anything, it would probably mean excising a portion of the indictment.

THE COURT:  I understand, but I'd like to know what portion of the indictment you're excising.

MR. SKINNER:  I understand, your Honor.

THE COURT:  Have you requested a charge on aiding and abetting or maybe I missed it?

MR. SKINNER:  I thought the aiding and abetting language just included within the overall charge where it was

appropriate.

THE COURT:  Well, I'd have to take another look because I wasn't clear.

MR. SKINNER:  I don't believe we have a separate stand-alone aiding and abetting charge.  I think we had aiding and abetting language where it arose, but we can double check that as well.

THE COURT:  I'm sorry, aiding and abetting language where?

MR. SKINNER:  I thought it was within where appropriate to the individual charges, I thought we included the aiding and abetting language in that charge, but didn't have a stand-alone this is what aiding and abetting means under a separate header.

THE COURT:  You don't define aiding and abetting at all?

MR. SKINNER:  I thought we explained it in the scope of the other charges.

THE COURT:  It doesn't matter.  I have lots of charges on aiding and abetting.

MR. SKINNER:  I'm sure your charge is going to be the same as all the other standard aiding and abetting charges.

We also tried, we did try, your Honor, because I know the Court has issues with unnecessary language, particularly in the government's filing.

**A. 171**

THE COURT:  That's quite right.

MR. SKINNER:  We did try to prune down and leave the standard stuff out.

THE COURT:  Now, you also do request a charge on venue.  Is venue disputed in this case?

MR. COHEN:  No, your Honor.

THE COURT:  Excuse me?

MR. COHEN:  No, ma'am.

THE COURT:  Then I don't know why I have to have the jury deal with it.

MR. SKINNER:  We can have a stipulation as to venue, your Honor.  It's an element that needs to be proved by a preponderance.

THE COURT:  I understand.  But if it's not in dispute, I try not to give the jury questions they don't need to answer.

MR. COHEN:  Your Honor, venue for probably the most serious crime charged, murder, actually probably lies within the Eastern District.  But because venue for much of the other activity lies in the Southern District and it's clear that the cases will be tried as a single case, we would waive any objections to venue that might otherwise exist.

THE COURT:  Very well.

MR. SKINNER:  Of course, for the reasons we've explained a number of times, we believe venue is proper under the murder as well because the underlying extortion plainly

happened in Manhattan.  Regardless, there's no dispute.

THE COURT:  I understand, but that's not being disputed now anyhow.

MR. SKINNER:  Very well, your Honor.

THE COURT:  I just don't normally ask the jury to opine on something that's not at issue.

MR. SKINNER:  This is the first we've heard they would stipulate to venue.

THE COURT:  That's why we have conferences.

Well, unless there is some serious problem with it, if the defendant agrees that the time between now and April 8 for preparation of his defense outweighs his interest in a speedy trial and the public interest in a speedy trial, I am inclined to put this over.  And I take it that the defendant does agree with that finding --

MR. COHEN:  He does, your Honor.

THE COURT:  -- that the time between now and April 8 outweighs in the interest of justice both the defendant's and the government's and the public in general's right to a speedy trial; is that correct?

MR. COHEN:  It is, ma'am.

THE COURT:  Very well.  Then I will adopt that finding, and I will exclude the time between now and April 8 from the speedy trial clock.  And we will start trial at 9:30 in the morning on April 8, which is a Monday.

MR. COHEN:  Your Honor.

THE COURT:  Between now and then we should certainly be able to refine, first of all, we should get the requests to charge of the defendant.

MR. COHEN:  Yes.  I was about to say, your Honor, that given the additional time, I will within a week or two submit requests to charge as well as a written reply to the government's in limine motions.

THE COURT:  Very well.  I have one other question which is this.  I understand that as a general matter it doesn't matter whether the indictment charges both the defendant to be tried and the fugitive defendant in the title, but I think it is confusing for the jury since there's only one defendant on trial in this case to have two people named in the indictment.

MR. SKINNER:  We agree, your Honor.  It's always our practice where we only have one defendant to prepare a redacted version of the indictment that redacts out the other defendant and have that.

THE COURT:  That should also be done.

MR. SKINNER:  We can do that, your Honor.

THE COURT:  Because I will give the jury a copy of the indictment, ultimately.

MR. SKINNER:  And when I say redacted version, we actually take out.

D1VLLINC                    Conference

THE COURT:  Remove it.

MR. SKINNER:  Remove it so it doesn't look like something was removed.

THE COURT:  Excellent.

MR. SKINNER:  Show it to defense and we'll get you a copy.

THE COURT:  Excellent.

Is there anything else useful we can provide for?

MS. BURNS:  I don't know if your Honor wants to set deadlines for supplemental submissions so we're all on a schedule.

THE COURT:  Of course.  I agree we should all be on the same schedule.

I assume there is no special voir dire that you would like.  If there is something particular about this case that you want me to consider raising in the voir dire, Mr. Cohen, I should have it by no later than a week from tomorrow.

MR. COHEN:  Very well, Judge.

THE COURT:  And is there any reason why your request to charge shouldn't be submitted by no later than the following Friday?

MR. COHEN:  If I could have just the Monday after that, which is February 18.

THE COURT:  It's a holiday.  That's President's Day. We used to know when George Washington was born before we had

President's Day.  When I was a school child, excuse me, yes, Washington's birthday was a school holiday.

MR. COHEN:  We actually used to call it Washington's Birthday.

THE COURT:  That's exactly what it was and it could fall any day of the week and on the 22nd of February which is when George Washington was born.

MR. COHEN:  Your Honor, I can get you that by February 15.

THE COURT:  By February 15.  Good.  Very well.

Now, is there anything further that we can improve the trial with?

MS. BURNS:  Nothing we can think of at the moment, your Honor.  Thank you.

THE COURT:  Very well.  Mr. Cohen.

MR. COHEN:  Similarly, your Honor, nothing at the moment.  Feel better.  Take care of yourself.  Listen to your doctor.

MR. SKINNER:  Yes, your Honor.  Feel better.

THE COURT:  Thank you.  It's so unusual for me to get a cold to tell you the truth.

MR. SKINNER:  It's been a bad year for it.

THE COURT:  This is has been a horrible year because I had a flu shot in December, which I don't normally either, but it's really been linger and worsening.  I cannot remember ever

having had my health interfere with the beginning of a trial. Very well.

Now, is there anything else that can be resolved in advance of the trial? That's the important question.

MR. SKINNER: Your Honor, we have, we have our motions. I think the first motion with the supplement to it is designed to make sure there's no confusion as to what the government intends to introduce as its RICO enterprise evidence. I don't disagree with your Honor that much of that could be addressed at trial. It's filed out of an abundance of caution so we don't get an argument from the defendant later that he didn't anticipate certain things were going to come up. Of course, if we had rulings that some of that was going to be admissible because it clearly is in support of the enterprise and is properly coming in as enterprise evidence.

THE COURT: Right, but what I don't know is exactly what that proof is --

MR. SKINNER: Sure.

THE COURT: -- from the papers I now have.

MR. SKINNER: And if the Court has questions we'd be happy to proffer as to what some of the proof would be. I think almost all of it would be testimonial, and there are two shootings that would be backed up with ballistics evidence. Some of that evidence, so if we had rulings in advance, it might guide as to what we would reference in our opening

statement.  But other than that, I think some of this can be addressed during the trial.  And the same goes to --

THE COURT:  If I knew a little more specifically what evidence you're talking about, it would be easier to rule on the evidence.

MR. SKINNER:  Very well, your Honor.  I think on a point-by-point basis we can supplement with a proffer as to what the evidence would be.

THE COURT:  Fine.

MR. SKINNER:  I'll note as well that one of the shootings that we do reference in our papers, in talking to our witnesses, we now actually believe is direct evidence of the murder itself because it provided a motive for the murder.  So we can explain that as well in supplemental filing.

THE COURT:  Fine.  And then the defendant will be in a better position if he knows exactly what we're talking about by way of evidence.

MR. SKINNER:  Very well, your Honor.

THE COURT:  And I will be in a much better position to rule.

MR. SKINNER:  Okay.  So we can file a supplemental motion --

THE COURT:  Good.

MR. SKINNER:  -- that synthesizes the new information and the old so you have it all in one place.  And under each of

**A. 178**

the instances of other criminal conduct, which I think is what is really going to be in dispute, we can make a proffer as to what we expect the evidence will be.

THE COURT:  Good.

MR. SKINNER:  It will be a generalized proffer, but a proffer as to what we expect it to be.

THE COURT:  I understand.

MR. COHEN:  Does your Honor think it would be prudent to set perhaps a final final pretrial conference in advance of the April 8 jury selection date?

THE COURT:  Very well.  Although, if there are any problems that arise between now and then, I would expect to hold a conference.  I don't expect you to wait until April to find out what I plan to rule.  But I will set Wednesday, April 3, for a final pretrial conference, and we may have another conference before that.

MR. SKINNER:  What time would you like us, your Honor?

THE COURT:  10:30 in the morning.

I take it there's really no expectation that the other defendant who's now a fugitive will ever appear again in the United States.

MS. BURNS:  Not at this time, your Honor.

THE COURT:  And I also take it that it's clear that the death penalty is not being sought?

MS. BURNS:  That's correct, your Honor.

D1VLLINC                    Conference

THE COURT:  Good.  Very well.  If there's nothing further, you're all excused.

MS. BURNS:  Thank you.

oOo

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

        v.                 11 Cr. 114 (MGC)

XING LIN,

            Defendant.

------------------------------x

                             April 3, 2012
                             11:15 a.m.

Before:

               HON. MIRIAM GOLDMAN CEDARBAUM
                           District Judge

                     APPEARANCES

PREET BHARARA
    United States Attorney for the
    Southern District of New York
BY:  PETER SKINNER
    Assistant United States Attorney

JOEL COHEN
    Attorney for Defendant

ALSO PRESENT:  LILY LAU, Chinese Interpreter

**A. 181**

D437LINC

(In open court)

THE COURT: Please be seated. Now, I have not received any requests to charge from the defense.

MR. COHEN: Your Honor, the only additional request that I will be submitting will be one, as I've mentioned earlier, regarding real presence and association not being sufficient to warrant a finding of guilt.

THE COURT: But please submit it, because you are overdue.

MR. COHEN: I will, Judge.

THE COURT: All right. Now, the other thing while I have you, Mr. Cohen, is will anybody be sitting with you at counsel table?

MR. COHEN: Yes.

THE COURT: I need the names of any persons who will be in the courtroom.

MR. COHEN: Yes, Judge. Again with your permission, I will have a law student, Danielle Coleman.

THE COURT: That's Danielle, D-A-N-I-E-L-L-E?

MR. COHEN: Yes, Coleman, C-O-L-E-M-A-N. She is a third year student at Brooklyn Law School and is an intern at my office. And I may have a paralegal who works at my office as well. Her name is Jiaying -- J-I-A-Y-I-N-G -- Jiaying Wang, W-A-N-G.

THE COURT: And that's the way she pronounces it,

D437LINC

Jiaying?

MR. COHEN: Yes.

THE COURT: And it's W-A, not W-O.

MR. COHEN: W-A-N-G, correct, your Honor. But she pronounces it Wong.

THE COURT: All right. Anybody else?

MR. COHEN: Not that I expect, your Honor.

THE COURT: All right. And I know you don't want to tell me your witnesses, so I'm not going to mention any names of witnesses for the defense, unless you want to give me any names.

MR. COHEN: At present I don't have any proposed witnesses.

THE COURT: Very well. All right.

And I have all of your witnesses.

MR. SKINNER: Yes, your Honor, we do. We included a list of people and places in our proposed --

THE COURT: I saw the people. The places I don't understand really. What difference does it make?

MR. SKINNER: We typically give notice of places --

THE COURT: Well, you may do things typically, but I need to know why I should do something.

MR. SKINNER: The reason is so if a defendant happens to live there or have some intimate knowledge that involves their view of the facts.

MR. COHEN:  A juror.

MR. SKINNER:  Sorry.  If a juror happens to have a particular acquaintance.

THE COURT:  You didn't ask me to ask that, if they have a particular connection; you just asked me to know if they are familiar with that place.

First of all, you have given me names of restaurants with several names, and I don't understand which names they go by.

MR. SKINNER:  They go by multiple names, your Honor. That's why we gave you the names we know of.

THE COURT:  What do you mean they go by multiple names?

MR. SKINNER:  Just that.  It's an establishment that is known by more than one name.

THE COURT:  Known by whom?

MR. SKINNER:  By the witnesses.

THE COURT:  Don't restaurants have names on the door?

MR. SKINNER:  The witnesses we have interviewed have referred to the same place with different names.

THE COURT:  Is this in Chinese or in English?

MR. SKINNER:  All of our witnesses are talking in Chinese and then translated to English, so we give you the English translation of what we have.

THE COURT:  Well, if a Chinese restaurant has a

D437LINC

Chinese name on the door, there is no reason why anybody in the jury should know the translation.

MR. COHEN:  Unless they're Chinese.

THE COURT:  Unless they're Chinese.

MR. SKINNER:  Or unless the restaurant is --

THE COURT:  I don't understand how one restaurant can have three different names.

MR. SKINNER:  All right.  Well, if there is an issue with the name, we can go with the address then, so that they are at least familiar with the address.  Or if the court doesn't want --

THE COURT:  Well, since I'm going to ask where they live, we certainly will know the people who don't live in Manhattan.

MR. SKINNER:  Correct, your Honor.  And honestly I think overall our concern is less with the places, although --

THE COURT:  I would think the places are much less important.

MR. SKINNER:  Agreed.

THE COURT:  What difference does it make?

MR. SKINNER:  Well, it makes a difference for the reason I just stated, that if somebody does know a particular location, then we would like to know that.

THE COURT:  Why?

MR. SKINNER:  But I think relative to --

**A. 185**

D437LINC

THE COURT:  What does it bear on?  I like to understand what difference it makes.

MR. SKINNER:  It bears on the fact that the witnesses are supposed to be deciding this case based upon the evidence introduced at trial.

THE COURT:  The jurors.

MR. SKINNER:  The jurors.  Not based upon their own personal knowledge, what they might have learned elsewhere.

THE COURT:  That's a different matter.  That I will tell them.

MR. SKINNER:  OK.

THE COURT:  That they should not acquaint themselves with any particular place mentioned in the trial.

MR. SKINNER:  And the reason that we ask whether a juror knows about locations that will come up in the trial is so that if the juror already knows about that place, it might have some independent knowledge that would affect their deliberations.

THE COURT:  But it's very speculative, and I don't know what you would ask to follow up to mean -- I don't want any juror to think that the fact that he knows where Chinatown is, or any restaurant in Chinatown, has any bearing on anything.

MR. SKINNER:  Well, your Honor, we haven't asked for anything in general of Chinatown, and I think that --

THE COURT:  Well, there are a number of places in Chinatown.  You are asking about particular addresses.

MR. SKINNER:  Exactly, your Honor.  And if one of these witnesses happens for some reason to have lived at one of those addresses or to know it.

THE COURT:  Well, you are not --

MR. SKINNER:  I mean jurors.

THE COURT:  -- you are not asking me to ask if they lived there; you are asking me to ask are you familiar with, which to me is the vaguest possible way.  I don't know what that means.  If someone asked me are you familiar with Number 8 Madison Street, I wouldn't know what that meant.

MR. SKINNER:  It's a yes or no answer.

THE COURT:  Of course I've passed it; I have walked through that whole area.

MR. SKINNER:  I mean, your Honor, we may be familiar with Chinatown generally; you may be familiar with this street; but to be familiar with an address I think means to know that particular address, where it is and what's there.

(Continued on next page)

THE COURT: Yes. Well, I am not inclined to ask that then because I don't understand the particular problem.

MR. SKINNER: Very well, your Honor.

THE COURT: Thank you. All right. Now, have you both received -- have you provided and the defendant has received a redacted indictment?

MR. SKINNER: Correct, your Honor.

THE COURT: Very well. That's not a problem.

Now with respect to motions in limine about evidence, I usually field evidence at the trial. It's too hard for me to picture how it comes up until it comes you up and it may not.

MR. SKINNER: We don't have any objection to that, your Honor. We've provided notice to the Court and to the defendant as to what we intend to do so there won't be any surprises and we're fine with rulings as the evidence comes in.

THE COURT: Good. Now, I take it that your request to charge aiding and abetting is only with respect to Count Three; is that correct?

MS. BURNS: That's correct, your Honor.

THE COURT: Very well. Now the Supreme Court issued an opinion directly on use and possession of firearms couple of years ago in which they limited it somewhat to its more literal meaning. I think both sides should consult that opinion.

MR. SKINNER: We will, your Honor. And if it affects the charge we can discuss it at the charge conference.

**A. 188**

D43AALINC                    Conference

THE COURT: Very well. Yes, no, I do not -- I will rule on charge requests at the charge conference, of course.

Now, the defense has not offered any places that they would like me to mention.

MR. COHEN: Judge, there aren't any places that I'm aware of that the government has not --

THE COURT: Do you have any special interest in whether any juror knows where Eight Madison street is?

MR. COHEN: Not whether they know where it is, judge, but I understand Mr. Skinner's concern about whether a juror had personal familiarity with a premise or a location. But I think that could be covered with follow-up questions in the event that a juror said, yes, I have been to the restaurant at 11 Division Street. I think that juror then could perhaps at the side bar explain.

THE COURT: Well, if I'm going to refer to restaurants I would really like to know what they're actually called.

MR. SKINNER: Your Honor, we'll do our best. I think part of the issue is that the facts of this case took place over an extended period of time quite a while ago and some of the establishments have changed names and some of them have --

THE COURT: Well, that's why I would think the most sensible thing to do would be to use their current names because people are not going to remember from years ago unless they actually lived nearby.

**A. 189**

MR. SKINNER:  What we'll do is, certainly, we'll go back and verify what might be at these present addresses and what it might be called.

THE COURT:  Good.  Because a couple of them may be houses or buildings or apartment buildings.

MR. SKINNER:  Yes.  But what we know from having driven around last week to look at all the places, two of them are actually demolished right now and under construction.

THE COURT:  Oh, well, then there is no point in asking about that.

MR. SKINNER:  Unless they knew what was there in the early 2000s.

THE COURT:  You're not really concerned about that. You're concerned about whether they have any view of what's happening there.

MR. SKINNER:  And what I'm most concerned about is the location of the double murder and whether they have any independent knowledge of that particular --

THE COURT:  You are interested in the nightclub.

MR. SKINNER:  The nightclub right now is not a nightclub.  It's now a massage parlor.  So we'll get the name of the massage parlor and we ask anyone if they've been there.

THE COURT:  How long has it been a massage parlor?

MR. SKINNER:  I don't know but when we went to visit it last week it was a massage parlor.

**A. 190**

THE COURT:  I see.  Interesting.

MR. COHEN:  I'm guessing that's the sort of premises that a juror might not candidly answer had he or she been to that premises.

THE COURT:  Because it's a massage parlor?

MR. COHEN:  Yes.

MR. SKINNER:  We didn't see anything illicit going on there.

THE COURT:  Maybe we should ask if anybody has been to the karaoke place whatever that was called.

MR. SKINNER:  Your Honor, the address is what's most important and whether anybody had visited.

THE COURT:  I'm assuming people know the address of the places they go.

MR. SKINNER:  At least there's a karaoke club on -- boulevard.

THE COURT:  If it has a name.  I mean if it had a name it would be useful but depending on whether it called itself something in Chinese or English I think it matters what was the sign on the door.

MR. SKINNER:  Okay.  And we have pictures of it so we'll figure it out.

THE COURT:  Good.

MR. SKINNER:  And that's certainly the most important one.  So we'll figure out the best way to describe that

premises and the other ones I think are less important.

THE COURT: Less important I would think especially if they're private buildings.

MR. SKINNER: And they are with the exception of the restaurant.

THE COURT: Unless you think that one of these places is a gambling place which is a different matter.

MR. SKINNER: The gambling places are underground gambling places, so they occurred in backrooms.

THE COURT: I see. So they're not on public view.

MR. SKINNER: No. And that would certainly be apparent through the testimony at trial that these were hidden behind barbershops and things like that.

THE COURT: We don't need to concern ourselves with that.

MR. SKINNER: No. And I think the one establishment that is still in existence would be the restaurant at 31 Division Street and we'll check for the current name of the restaurant.

THE COURT: Very well. All right. In view of the fact that I am in the process of arraigning 39 new defendants, I think I would like to start the trial either in the afternoon or the following morning because they're still coming in from all over the country. I have several to arraign shortly, later today. But we're only, we're not even halfway through the

D43AALINC                    Conference

group.

MR. COHEN:  Some of us were here quite late one evening last week when the initial mass came before your Honor.

THE COURT:  Right.  And that was only a small piece.

MR. COHEN:  Judge, I have no objection to either one.

THE COURT:  All right.  Then, I think we what we will do just to see if we can hold this trial without interruption is start on Tuesday morning.  We will convene at 9:30.  We will not have a jury then.  It's so we can resolve any housekeeping matters that still exist.

MR. COHEN:  Judge?

THE COURT:  And then we will immediately proceed to voir dire when the jury panel comes up.

MR. COHEN:  There have a housekeeping matter that's sort of a personal nature.  I've discussed it with the government.  With your Honor's permission would like to discuss it with your Honor and the government at the side bar off the record if we could?

THE COURT:  Very well.

MR. COHEN:  Thank you.  May we do that now?

THE COURT:  Yes.

(Side bar held off the record)

THE COURT:  All right.  I just would like to remind you that I used the struck panel method of jury selection which means that I will interview enough jurors to produce a jury of

12 with four alternates. I think that that should be adequate because the weather is improving. In the dead of the winter I worry about people getting sick. And I will question enough jurors from whom you can if you exercise all of your preemptory challenges and a few challenges for cause, we will still have enough jurors for a jury of 12 with four alternates.

MR. COHEN: Judge, may I ask how many potential venire persons are going to be called?

THE COURT: I had planned to call 40.

MR. COHEN: Judge --

THE COURT: And from that group to be able to select a panel.

MR. COHEN: I don't know if it's possible at this late date to request some additional potential jurors but I've tried many murder cases. I was a prosecutor for the homicide bureau and it's my experience that many jurors without --

THE COURT: When they are murder --

MR. COHEN: May cause challenges, will themselves have aversion to sitting in a case of this nature.

THE COURT: That's true.

MR. COHEN: And just so we don't have to do everything twice it might be better.

THE COURT: I think that you're correct. I think that is a good idea if we can.

(Pause)

**A. 194**

THE COURT:  I understand that we've actually requested 60.  So we should have plenty.

MR. COHEN:  Hopefully, I think that's a much better --

THE COURT:  Right.  I couldn't remember.

MR. COHEN:  -- estimate.

THE COURT:  It's been a while.

MR. COHEN:  Thank you.

THE COURT:  You will be able to exercise your challenges.  After I question all of the jurors I will excuse the jury except for those who indicate particular problems, then I'll have them wait.  And then I will hear the particular problems of any juror with counsel in the robing room and we will then exercise first preemptory, first challenges for cause then and then peremptory challenges in three rounds.

In the first round the government will exercise three preemptory challenges and the defendant, four.

In the second round the government will exercise two preemptory challenges and the defendant, four.

In the third round the government will exercise one preemptory challenge and the defense, two.

And you will exercise your challenges simultaneously.  That is, you will see after each round the results but will you not see the other side's preemptory challenges before you make yours in any particular round.  The Supreme Court has passed on that a long time ago.  You are still all getting your

preemptory challenges.

And as you know if Juror No. 1 is excused, Juror No. 2 becomes No. 1 and they move up in exact numerical sequence. That's what the struck panel method does so that you do not take what we used to call a pig in a poke. You don't have to speculate about who will be left, which happens if you excuse jurors one by one. You can't foresee whether you are going to like less what you end up with. And it is also easier by this method to see if anybody is excusing particular genders or races or anything else in exercising peremptory challenges. But many of the judges of this court have been using this method for a long time.

MR. COHEN: Your Honor, I'll submit to your Honor's chambers late today two proposed orders. One would be a clothing order for the marshals to allow Mr. Lin to change clothing at the courthouse after they've inspected the clothing that I'll provide him.

THE COURT: Yes.

MR. COHEN: I guess the other would be a laptop order that would permit me and probably my paralegal to carry our laptops into the courthouse ad into the courtroom.

THE COURT: We have a complicated method. I mean, I have no problem with that but we have some rules that we enacted.

MR. COHEN: The only rule I am aware of it was that it

required the permission of the Court to --

THE COURT:  Well, you clearly require that.  But I thought we had something else we've required and I can't remember any more --

MR. COHEN:  I'll find timed out what it is and I will comply with it.

THE COURT:  Please find out and comply with whatever the preliminary requirements are because I have no trouble with that.

MR. SKINNER:  Your Honor, I'll note from the technology perspective that the person from our office that set up our equipment will coordinate with Mr. Daniels just so the Court and Mr. Cohen know what we intend to bring in.  We don't have recordings in this case so we're not planning to have speakers available.  We'll have a big screen television that we can put exhibits where ever the Court wants it.  We can put exhibits up so the jury can see it.  And I believe -- I'll doublecheck -- but I believe there's typically screens for the judge and for the witnesses as well but there will not be individual screens for the jurors.

THE COURT:  Yes, no, no, if you have a big screen over here I can see it perfectly.

MR. SKINNER:  So we'll have the big screen.  We'll have the Elmo.  So if there's a paper document we'll put it on the Elmo and it'll come up on the screen and Mr. Cohen will be

able link into that so if he has stuff on his laptop that he wants to put up, he can. And we'll give Mr. Cohen access to our exhibits that are scanned.

THE COURT: Yes, of course. All right. Is there anything else?

MR. COHEN: At trial we'll be sitting in the same positions? In other words, all counsel at this same --

THE COURT: I think the marshal will want the defendant at the back table with you.

MR. COHEN: OK. That's fine.

THE COURT: Isn't that correct?

THE MARSHAL: Yes.

THE COURT: And you'll all have more personnel, so you'll need more chairs. So you might as well use both of the tables.

MR. COHEN: Yes.

MS. BURNS: Your Honor, just because this is our final pretrial conference we wanted to put the status of the plea discussions that took place last year on the record so that there is no confusion. As your Honor recalls, there was a plea that was attempted to be entered to one count of aiding and abetting the discharge of a firearm during in relation to a conspiracy to commit extortion which is in violation of Title 18 U.S.C. Sections 924(C) and (2). The defendant did begin to plead guilty to that charge and withdrew his plea and that took

**A. 198**

place in or about June of July of last year.

THE COURT:  Actually, I rejected the plea, if you recall.

MS. BURNS:  Yes.  And we did come back and the defendant did not want to continue.

THE COURT:  Yes.

MS. BURNS:  And there have been no further discussions since that time.  And at this time based on the charges in the superseding indictment the defendant faces both statutory maximum of life and guideline sentences of life.

THE COURT:  All right.  Aiding and abetting the possession of a firearm, as a matter of evidence how would you prove aiding and abetting possession?

MS. BURNS:  Also, the use and possession.

THE COURT:  Well, the use is even harder.

MS. BURNS:  Well, we'll address that at trial I think with our evidence, your Honor.

THE COURT:  I would like to know what the government thinks that means.

MS. BURNS:  In this particular case where the defendant, the evidence will show, gave direction to another to use a firearm and discharged that firearm to shoot --

THE COURT:  That's aiding and abetting, yes, agree that if you prove that you are proving aiding and abetting because it's really --

**A. 199**

D43AALINC                    Conference

MS. BURNS:  That's our intent.  And I think that's all we have from the government, your Honor.  Thank you.

THE COURT:  Very well.  Is there anything further?

MR. COHEN:  Not from the defendant at this time, your Honor.  Thank you.

THE COURT:  Then this matter is adjourned to Tuesday morning at 9:30.

MR. SKINNER:  Thank you.

MS. BURNS:  Thank you.

THE COURT:  Very well.

(Adjourned)

D49VLINT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                                11 CR 114 (MGC)

XING LIN,

                  Defendant.             JURY TRIAL

------------------------------x

                                    New York, N.Y.
                                    April 9, 2013
                                    9:55 a.m.

Before:

                HON. MIRIAM GOLDMAN CEDARBAUM,

                                    District Judge

                      APPEARANCES

PREET BHARARA,
    United States Attorney for the
    Southern District of New York
PETER M. SKINNER
JENNIFER E. BURNS
    Assistant United States Attorneys

JOEL S. COHEN
    Attorney for Defendant

ALSO PRESENT:  BRENDA CHEN, Fuchow Interpreter
                DANIEL YANG, Fuchow Interpreter
                JESSICA CHACE, Paralegal
                TIMOTHY VARIAN, Special Agent, HSI
                JIAYING WANG, Legal Assistant

D49VLINT

(Trial resumed)

(In open court; jury not present)

THE COURT: While we are waiting for a jury panel, there are a few housekeeping matters that I would like to resolve.

The extortion in this case is in interstate commerce, or so it's charged. Is there any reason to talk about foreign commerce in explaining interstate commerce? Anything ought to be claimed was -- affected commerce between a state and a foreign government, a foreign country?

MR. SKINNER: Not with respect to the extortion in this case, your Honor, no.

THE COURT: Well, with respect to what?

MR. SKINNER: There will be testimony that the defendant, after the shootings in the karaoke bar, moved his gang to Toronto, Canada, and opened gambling parlors in Toronto.

THE COURT: Which charge is that in connection with?

MR. SKINNER: The racketeering charge, your Honor. It's evidence both of the racketeering enterprise that continued until December 2009, and it's evidence of the racketeering conspiracy which charges a conspiracy to operate gambling parlors and engage in an illegal enterprise.

THE COURT: You're charging operating gambling parlors in Canada?

**A. 202**

D49VLINT

MR. SKINNER:  No, your Honor.  It's evidence that the enterprise continued to operate, as charged, until December 2009.

THE COURT:  I understand.

But was the enterprise supposed -- the enterprise, when it was here, did not affect foreign commerce.

MR. SKINNER:  Your Honor, the enterprise did tangentially affect foreign commerce in that the extortion payments continued until December of 2009.  And the evidence at trial will show that the defendant was situated in Canada during that time period.  The payments were made --

THE COURT:  So you're saying that extortion payments were sent to the defendant in Canada?

MR. SKINNER:  Yes, your Honor.  That would be the inference we're arguing from the evidence.

THE COURT:  You have evidence of that?

MR. SKINNER:  Well, the payments were made on a monthly basis in cash to the defendant's wife as per the defendant's instructions that the payments should be made to his wife for a period of time for years before that.

THE COURT:  I see.  But what is the evidence that she was sending the money to him?

MR. SKINNER:  It's an inference, your Honor.  We don't have direct evidence.

THE COURT:  Maybe he wanted her to support herself

D49VLINT

with it.

MR. SKINNER:  He may have.  He may have also wanted some of it sent up to Canada.

THE COURT:  I understand.  But you have no evidence one way or the other.

MR. SKINNER:  No direct evidence.

THE COURT:  Well, it's not matter of direct or circumstantial; that's not really circumstantial evidence that he was receiving it in Canada.

MR. SKINNER:  Well, your Honor, I believe that the defendant, for a period of years, received the payments directly.  And then, after he put himself in a position where he had to flee, put another person in place to collect payments.  We can certainly argue that there's circumstantial evidence and an inference --

THE COURT:  I don't think that's circumstantial evidence.

MR. SKINNER:  That's what we intend to argue.

THE COURT:  Circumstantial evidence is not that loose.

MR. SKINNER:  That would be the, as I said, tangential effect on foreign commerce.  And, in any event, as I explained --

THE COURT:  If it were, if it were, it's a question.  I'm not sure that I need to talk about foreign commerce.  I'm just interested in how I'm going to explain these charges.

D49VLINT

MR. SKINNER:  Very well, your Honor.

THE COURT:  I don't think foreign commerce is of great significance in that.

MR. SKINNER:  I'm not arguing with you.  But I think that there is possibly -- not possibly, there is, as I argued in argument that there was, in fact --

THE COURT:  I'm not sure I'm going to permit you to call that circumstantial evidence.  I'll have to hear the evidence.

MR. SKINNER:  You'll hear the evidence, your Honor. And whether the jury --

THE COURT:  All right.  At least I know what you are thinking.

MR. SKINNER:  Thank you, your Honor.

MR. COHEN:  Your Honor, respectfully, I would ask that until we reach the point --

THE COURT:  I don't intend to charge the jury in the voir dire.

MR. COHEN:  I understand.

I would just ask that the government not open on that issue until we've reached a point in the trial where the Court is in a better position to evaluate whether that evidence or argument should even be made.

THE COURT:  Well, I don't think the government's going to elaborate heavily on interstate commerce in their opening.

**A. 205**

D49VLINT

Am I wrong?

MR. SKINNER:  You're absolutely correct, your Honor.

THE COURT:  All right.

Now, you have several citations to the aiding and abetting statute.  But there is nothing -- there are no factual statements in the indictment about aiding and abetting.  They are all substantive statements.  I don't like to -- well, this is just really -- we'll discuss this at the charge conference; I'm just raising it because these both relate really to the charge and not to the voir dire.

Now, you charge overt acts in Count Five, which is a conspiracy to commit extortion.  And as I understand, this, again, is not a matter of great opening concern.  As I understand it, it is unnecessary to charge overt acts in a conspiracy to commit extortion.

MR. SKINNER:  That's correct, your Honor.

THE COURT:  So this is what I would call surplusage.

MR. SKINNER:  Your Honor, it was included in the indictment to provide information for the defendant to understand the nature of the crimes charged.

THE COURT:  This is like a bill of particulars in the indictment.

MR. SKINNER:  To some extent, your Honor, yes.

THE COURT:  All right.

MR. SKINNER:  But I agree with you, the overt act

D49VLINT

requirement is not required, and we have no issue with taking the overt acts out of the version of the indictment that is sent to the jury.

THE COURT:  Good.  That's sent to the jury.  That's the important thing.  I don't want to confuse the jury.

MR. SKINNER:  We actually did not redact that out of the redacted indictment that we sent over last week, but we'll take care of that straightaway.

THE COURT:  Right.  As I said, these are matters I will really address in greater depth at the charge conference. But I also will not charge *Pinkerton*, which is an optional charge, because *Pinkerton* -- the facts of the *Pinkerton* case are so far afield from the facts of this case, that I don't find it an appropriate source for the charge.  I'm just giving you reference for the information for the future.

I think in the voir dire I will ask the jury with respect to places only, something like:  You will hear during the course of the trial reference to a karaoke bar on Kissena Avenue in Queens, which is no longer there.  Are any of you familiar with that bar?

That's the one place question I'm going to ask.

MR. SKINNER:  That's fine, your Honor.  I just note it's actually Kessina Boulevard, not Kessina Avenue.

THE COURT:  Thank you.  Yes.  I have it written properly, I just...

D49VLINT

THE COURT: All right.  Now, is there anything else --

MS. BURNS: Your Honor, we did --

THE COURT: -- before the jury panel arrives?

MS. BURNS: We did revise the list of names just to include some witnesses that had not been on our list back in --

THE COURT: You have added witnesses?

MS. BURNS: We have.

THE COURT: Well, I have not received it.

MS. BURNS: They are included on this list here.  I can give a copy up to your Honor.

THE COURT: Very well.

Now, who are all these many people?

MS. BURNS: These are the names we expect.  They are both witnesses and names that are going to come out in the course of the testimony, your Honor.  If your Honor wants a separate listing of anticipated witnesses, I can provide that, as well.

THE COURT: No, no, no.  I don't need to tell the jury who the witnesses are going to be.

MS. BURNS: Right.  That was what I anticipate, your Honor.  So it is a lengthy list, but comprehensive.

THE COURT: Oh, this is a substitute, is that what you're offering?

MS. BURNS: Yes.

THE COURT: For the list that I have already.

D49VLINT

MS. BURNS:  Yes, your Honor.

THE COURT:  All right.  So I'll switch to this one.

MS. BURNS:  Thank you.

MR. COHEN:  Your Honor, I have two potential names to add to the list of people that might either be witnesses or about whom people will hear.

One is Mary Wang, and the other is Detective Keith Ng, N-G.

THE COURT:  Well, I will ask them if they recognize those names or know any of those persons.

Just tell me again who they are.

MR. COHEN:  Mary Wang, W-A-N-G, and retired detective Keith Ng, Keith, K-E-I-T-H, N-G.

THE COURT:  I'm slow.  Mary Wang, W-A-N-G, or --

MR. COHEN:  Yes.

THE COURT:  And?

MR. COHEN:  Detective -- Retired Detective Keith, K-E-I-T-H, Ng, N-G.

THE COURT:  All right.  Thank you.

MR. COHEN:  Two questions, your Honor.

THE COURT:  Yes.

MR. COHEN:  With respect to the seating of the prospective jurors, are we going to have one through six in the front row or one through seven in the front row?

THE COURT:  We're going to fill all the seats.

D49VLINT

MR. COHEN:  No, I understand.

THE COURT:  We're going to have one through eight.

Did they remove a seat from this jury box?

MR. COHEN:  I see seven in the front row.

THE COURT:  I see a space in the jury box.  We've always had eight.

MR. COHEN:  Okay.

THE COURT:  What happened to the second seat?  We normally have 18 in the jury box, and the second row seems to be crowded.

MR. COHEN:  And my other question, your Honor, was --

THE COURT:  I don't know who's -- we should --

THE DEPUTY CLERK:  This is the way we have it, Judge.

THE COURT:  Seven, 14, and four is 18, yes.  All right.

MR. COHEN:  So it will be one through seven, and then eight in the --

THE COURT:  Correct.

MR. COHEN:  -- further seating.

THE COURT:  Correct.

MR. COHEN:  Okay.

THE COURT:  We'll go in sequence up to 18.

MR. COHEN:  Gotcha.  And, your Honor, may I just step out to the rest room before the jurors come in?

THE COURT:  Yes.  I will question jurors who sit in

D49VLINT

the back, as well.

MR. COHEN:  I understand that.

And if we have 18 here, I'm assuming that the juror to the furthest left will be No. 19?

THE COURT:  We will give that juror a number, but I don't know whether I'm going to start at that end or this end.

MR. COHEN:  Okay.

THE COURT:  But, yes, we will number each of the jurors in sequence.

MR. COHEN:  Okay.

THE COURT:  And you will hear the number.

MR. COHEN:  And can I step out to the rest room, Judge?

THE COURT:  I'm sorry?

MR. COHEN:  May I step out to the rest room?

THE COURT:  Yes, of course.

Actually, we can take a five-minute recess, because I've just been advised that there is some materials being read to the prospective jurors, and they will be here in about, what, ten minutes?  So we can take a ten-minute recess.

MR. SKINNER:  Thank you, your Honor.

(Recess)

THE COURT:  Please be seated.  I understand the jury panel is on their way.

(Pause)

D49VLINT

THE COURT:  There seems to be some confusion in the jury room, I'm sorry to say.  I'm going to take a brief recess.

I'll be back.

(Recess)

(A jury of 12 and 5 alternates was impanelled and sworn)

THE DEPUTY CLERK:  Thank you.

THE COURT:  I'd just like to give you a few preliminary instructions before you follow Mr. Daniels into the jury room, which will be your home away from home during the course of this trial.

When you arrive in the morning, you will go to that room in the back of the courtroom and leave your clothes, if we're not yet summer, because this morning was like summer. And those who come by 9:30 will get muffins and coffee there. And you will return there to refresh yourselves during the course of the day.  And in the meantime you will give Mr. Daniels your address and telephone number so that he can keep in touch in the event that we need to.

But I just now want to tell you a few things that you should know in connection with the trial.

I'd like to give you a little background on what will happen during the trial.  At the end of the trial, I will give you more detailed guidance on how you ought to go about reaching your verdict.  But now I simply want to explain how

the trial will proceed.

This is a criminal case, as we all know.  The defendant has been charged with the commission of federal crimes in an indictment filed by a grand jury sitting in this district.  The indictment is simply a description of the charges made by the government against the defendant; it is not evidence of anything.  The defendant has pleaded not guilty to the charges, and denies committing the offenses charged.  The defendant is presumed to be innocent, and you may not find him guilty unless all of you unanimously find that the government has proved his guilt beyond a reasonable doubt.

The first step in the trial will be an opening statement by the government.  The government goes first because it has the burden of proof, as I've explained.  In its opening statement, the government will tell you about the evidence which it intends to put before you.  But just as the indictment is not evidence, neither is the opening statement evidence. Its purpose is only to help you understand what the evidence will be and what the government will try to prove.  The lawyers are not witnesses.  Witnesses are people with firsthand knowledge of what happened, and they will testify under oath. The lawyers are not witnesses.

After the government's opening statement, the defendant's lawyer may make an opening statement, but he is not required to do so.

**A. 213**

D49VLINT                    Preliminary Instructions

The government will then offer evidence that it says will support the charges against the defendant.  The government's evidence will consist of the testimony of witnesses, as well as documents and exhibits.

Some of you have probably heard the terms "circumstantial evidence" and "direct evidence."  Do not be concerned with these terms.  You hear it too much on television, but that's not the law of the United States.  You are to consider all the evidence received during the trial.

After the government's evidence is presented, the defendant's lawyer may present evidence on the defendant's behalf, but he is not required to do so.  I remind you that the defendant is presumed to be innocent, and that the government must prove the guilt of the defendant beyond a reasonable doubt.  The defendant does not have to prove his innocence.

After you have heard all the evidence, the government and the defendant will each be given time for their final arguments.  I just told you that the opening statements by the lawyers are not evidence.  The same applies to the closing statements.  The closing arguments, they are not evidence either.

In their closing arguments, the lawyers, both for the government and the defendant, will attempt to summarize their cases and help you to understand the evidence that was presented.  But the lawyers are not witnesses; they have no

**A. 214**

D49VLINT                        Preliminary Instructions

personal knowledge of the facts.

The final part of the trial occurs when I instruct you about the rules of law that you are to use in reaching your verdict. After hearing my instructions, you will leave the courtroom together to make your decision. Your deliberations will be secret. Nobody will know what your discussions are outside of the jury room.

During the course of the trial -- right. And your deliberations will be secret.

During the course of the trial, you should not talk with any witness or with the defendant or with any of the lawyers in the case. Please do not talk with them about any subject at all. In addition, during the course of the trial, you should not talk about the trial with anyone else: Not your family, not your friends, not the people you work with. Also, you should not even discuss the case among yourselves until you have heard all of the evidence, and I have instructed you on the law, and you have gone to the jury room to make your decision at the end of the trial. It's important that you wait until all the evidence is received and you have heard my instructions on the rules of law before you deliberate even among yourselves. Evidence comes in bit-by-bit and piece-by-piece, and it's not until you've heard it all that you are ready to deliberate.

Please do not permit any third person to discuss the

**A. 215**

case in your presence.  And if anyone does so, despite your telling that person not to, please report that fact to me as soon as you are able.  You should not, however, discuss with your fellow jurors either that fact or any other fact that you feel is necessary to bring to my attention.

Let me add that during the course of the trial, you will receive all the evidence you properly may consider to decide the case.  Because of this, you should not attempt to gather any information on your own which you think might be helpful.  Do not engage in any outside reading on this case; do not attempt to visit any places mentioned in the case; and do not in any other way try to learn about the case outside the courtroom.  The reason for these rules, as I'm certain you understand, is that your decision must be made solely on the evidence presented at the trial in this courtroom.

At times during the trial, a lawyer may make an objection to a question asked by another lawyer or to an answer by a witness.  This simply means that the lawyer is requesting that I make a decision on a particular rule of law.  Do not draw any conclusion from such objections or from my rulings on the objections.  These only relate to the legal questions that I must determine and should not influence your thinking.

If I sustain an objection to a question, the witness may not answer it.  But do not attempt to guess what the answer might have been had I allowed the question to be answered.

**A. 216**

D49VLINT                        Preliminary Instructions

Similarly, if I tell you not to consider a particular statement, you should put that statement out of your mind, and you may not refer to that statement in your later deliberations.

During the course of the trial, I may ask a question of a witness. If I do so, that does not indicate that I have any opinion about the facts in the case.

Finally, let me clarify something you may wonder about later.

During the course of the trial, I may have to interrupt the proceedings to confer with the attorneys about the rules of law which should apply. Sometimes we will talk here at the sidebar, side of the bench, but some of these conferences may take time. So as a convenience to you, I may excuse you from the courtroom. I will try to avoid such interruptions as much as possible, but please be patient, even if the trial seems to be moving slowly, because conferences often save time for all of us.

Thank you all for your attention. And I will see you all tomorrow morning. And if it is at 9:30, you will receive coffee and muffins. But everybody must be in the courtroom by 10 o'clock.

Have a pleasant evening. And resist telling anybody about what you've seen and heard.

(Jury excused)

D49VLINT                    Preliminary Instructions

THE COURT:  Unless there's anything further, we will be in recess until tomorrow morning at 10 o'clock.

MR. SKINNER:  Nothing, your Honor.  Thank you.

MS. BURNS:  Thank you.

MR. COHEN:  Thank you, your Honor.

Have a good evening.

THE COURT:  You're all excused.

(Adjourned to April 10, 2013 at 10 o'clock a.m.)

Da6lin1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x

UNITED STATES OF AMERICA,

         v.                     11 CR 114 (MGC)

XING LIN,

            Defendant.         JURY TRIAL

-------------------------------x

                                New York, N.Y.
                                April 10, 2013
                                10:15 a.m.

Before:

         HON. MIRIAM GOLDMAN CEDARBAUM,

                               District Judge

                    APPEARANCES

PREET BHARARA,
    United States Attorney for the
    Southern District of New York
PETER M. SKINNER
JENNIFER E. BURNS
    Assistant United States Attorneys

JOEL S. COHEN
    Attorney for Defendant

ALSO PRESENT:  BRENDA CHEN, Fuchow Interpreter
                 DANIEL YANG, Fuchow Interpreter
                 LILY LAU, Fuchow Interpreter
                 JESSICA CHACE, Paralegal
                 TIMOTHY VARIAN, Special Agent, HSI
                 JIAYING WANG, Legal Assistant

**A. 219**

Da6lin1

(Trial resumed)

(In open court; jury not present)

THE COURT:  Good morning.  Please be seated.  Let's get the jury in.

(In open court; jury present)

THE COURT:  Good morning, members of the jury.  Please be seated.  I congratulate all of you for setting a good standard for yourself for coming promptly and enjoying early breakfast together.  Remember I told you yesterday that the first thing that will happen is what we call opening statements.  When the lawyers tell you what they hope to prove during the course of the trial and because the government has the burden of proof as I explained, the government representative, the prosecutor, makes the first opening statement.

Are you going to open, Mr. Skinner?

MR. SKINNER:  Yes, I am.

THE COURT:  Very well.  Go ahead.

MR. SKINNER:  Thank you.

In the early morning hours of July 30th, 2004 a group men and women were in a karaoke club in Queens.  They were in a private room having a good time.  One of the men in the group was singing for everyone else when all of a sudden two other men bust into that room.  One of those two men turned to the other and said, Shoot him.  The other man pulled out a gun,

Da6lin1

aimed it at the singer and started firing.  The singer fell to the ground.  That man had then walked over to the singer and stood over him and emptied his gun into him.  The two men who bust into that room then fled the room together.  The singer was dead.  He had been shot six times.  Two women in that room were also shot.  They both worked for the karaoke bar.  They were both in that room when the firing started.  One of them was hit in the head.  She died.  One was hit in the leg and she survived.

Ladies and gentlemen, this man, the defendant Xing Lin is the man who gave the order to shoot that night.  You are going to be hearing from two eyewitnesses during this trial, two people who were in that karaoke room at the time of the shooting and they are both going to tell you that Xing Lin walked into that room, he turned to the other man and he said, Shoot him.  Why did he do it?  Xing Lin was the head of a gang and the singer had crossed that gang.  As you will learn during the trial, he crossed them in more than one way.  So Lin murdered him as a result.  He walked into that room with the intent to kill the singer and he didn't leave until the job was done.  Of course he didn't kill just the singer.  When the bullets started flying in that small karaoke room that night, two other people were hit, two women who worked for the bar, innocent bystanders, people who were in the wrong place at the wrong time.  One of those women died.  One of those women was

Da6lin1

murdered by this man.

Now, those murders in the karaoke room are a big part of this trial, but they are not entire trial because this isn't a trial just about those murders. This is a trial about Lin's gang and Lin's gang committed a lot of crimes. As you will hear during the course of this trial, they ran gambling parlors, they extorted business people, they beat people, they stabbed people, they shot people over the course of years. Xing Lin was what you will hear -- he was what a term is Dai Lo. Dai Lo means big brother in Chinese. It is a term for leader of the gang. The leaders of the gang are called followers or kids and they are just that, young men who follow their Dai Lo and does what he tells them to do, including committing crimes. What do the followers yet out of it? I place to live, spending money, a cut of the money of the crimes committed by the gang.

You will learn during the trial that one of the ways Lin's gang earns money was by running illegal gambling parlors in Chinatown and elsewhere. They were casual places. They were not high-end establishments. We are talking about rooms behind Chinatown storefronts. A lot of money was bet in these rooms. Hundreds of thousands of dollars of money a night and Lin's gang took a cut every day. You will learn that another way Lin and his gang made money is by extorting business people by scaring them into giving them money. One of the people

Da6lin1

Lin's gang extorted was a businessman named Chen who owned a bus company.  You will see as the evidence in this trial unfolds that the extortion of Chen led to those murders in the karaoke room that I just told you about.

So let's talk for a moment about Chen.  Chen's bus company started small.  In 2001 he and a partner bought a van and started driving people from New York City to Charlotte, North Carolina and back.  In 2002 soon after they started that bus company, they learned that a bigger bus company was planning to run buses on the same route, the one from Chinatown to Manhattan to North Carolina.  Chen was worried that it would put him out of business so he turned to Lin for help.  He knew what Lin was.  He knew that Lin was a Dai Lo and he hoped that Lin would scare this rival company away.  So he offered Lin one-third of his company in exchange for Lin's help and Lin agreed to help and lo and behold what happened?  The competition went away.  No buses were run on that route from Chinatown to New York to North Carolina other than the ones from Chen's bus company.

What did Chen do?  He made good on his promise and he started paying Lin one-third of his profits in cash every month.  Chen is going to testify that he now viewed Lin as his Dai Lo, someone to whom he owed respect.  So when he heard in about 2002 that Lin was in the hospital, he went to him to pay a visit and Lin told Chen that he had ended up in the hospital

Da6lin1

because he was stabbed by a rival Dai Lo, another leader of a Chinatown gang. Lin explained that he and his followers had shot up to that Dai Lo gambling parlor and later the rival followers tracked Lin down and stabbed him.

Now, after the stabbing, Lin left. He moved from New York and he shifted his gang to Atlanta, but he left some of his followers in New York and he came back up to New York a lot. He came back up to collect money. He came back up to try to exact revenge on this rival who had stabbed him.

Now, the Chen the bus company owner was one of the people who kept paying Lin every month even after Lin had left and gone to Atlanta one-third of his profits in cash every month, but you are going to learn one-third of that bus company wasn't enough for Lin. In the summer of 2003, about a year before the murders in the karaoke bar, Lin demanded more from Chen. He wanted a bigger share of the bus company. He said he needed more money to cover the expenses of supporting all of his followers. Chen refused. He thought one-third was enough. Lin was anxious. Lin went to Chen's partner and tried to get Chen's partner to agree to force Chen out of the company. So at this point Chen turned to a man named Yi Qun for help. Yi Qun was his nickname.

I should note as well you will hear during the trial that Defendant Lin is often referred to as Ding Pa, which is his nickname.

Da6lin1

In any event, Chen turns to Yi Qun for help.  Yi Qun was a businessman.  He wasn't a Dai Lo, but he was friendly with a lot of Dai Los.  In fact, he was close friends with Lin's rival, the Dai Lo who had stabbed him  Yi Qun had power and respect in Chinatown, which is referred to as "face" in Chinatown.  After Chen went to Yi Qun for help lo and behold his partner changed his mind and decided that he was not going to side with Lin to kick Chen out of the company.  So now Lin was really angry.  You will learn that he called Chen and he demanded that they meet face-to-face and then met him the next day.  He went to a park in Queens and met Lin.  Chen was alone.  Lin was with his followers and Lin's followers were carrying guns.  Lin told Chen that he was losing face in Chinatown, that Chen wasn't giving him the respect he needed and he demanded to be paid more than what he was currently being paid.  Chen was afraid.  He was afraid for his life and he agreed to start paying an additional $22,000 every month on top of the one-third profits that he was already paying.

Around the same time in the spring of 2003 Chen had sold some of his remaining shares in that bus company to Yi Qun, the man he had gone to for help and try to force Chen out of the company.  Yi Qun didn't learn about those $2,000 payments at first however.  He didn't learn about them until the following year until about 2004.  When he found out about an extra $2,000 to the bus company money was going to Lin, he

Da6lin1

told Chen to stop.  So Chen called Lin and told Lin that another shareholder in the company has said I had to stop the extra payments.  Once again Lin was angry.  He said he knew who this other shareholder was and he threatened the other shareholder.  Nevertheless, in July of 2004 Chen stopped paying that extra money to Lin.

This brings us back to the murders in the karaoke room on July 30th, 2004.  The singer in the karaoke room, the man who was shot six times and died, that man was Yi Qun, the man who was close friend with the rival gangster who had stabbed Lin, the man who ordered Chen to stop paying Lin that extra money every month.

Now, as I told you at the beginning of my opening statement, the evidence will show that Lin ordered the killing of Yi Qun.  He went into Yi Qun's karaoke room.  He ordered the shooter to shoot Yi Qun.  He watched as the shooter executed Yi Qun.  He watched as two other women were struck in the crossfire and then he fled alongside the shooter.

Ladies and gentlemen, that is not end of the evidence that you will be hearing in this trial.  You will learn during this trial that a few days after the shooting Lin called Chen on the phone.  He didn't tell Chen where he was, but he told Chen that he still had followers in New York.  Chen will testify that he viewed this as a clear threat that he could still be reached by Lin.  Lin told Chen to keep making those

Da6lin1

one-third payments every month, but he told him to give the money to his wife.

Chen also asked Lin what happened.  He said, What happened the night of the shooting, because he heard about it in the meantime.  Lin admitted during this phone call that he told the shooter, Get rid of him, but he said that he meant shoot him in the arm or leg even though he said, Get him.

Following the shooting Chen did as he was told.  Although Lin was gone and he was afraid of him and he kept making those payments every month in cash and now he gave the money to Lin's wife.  You will learn that after these shootings Lin relocated.  He went to Canada.  He ended up in Toronto.  He set up the same gang up there and he went back to doing what he knew best, running gambling parlors and using force to gain advantage.

So how are we going to prove all this?  You will hear testimony from witnesses, you will see forensic evidence and you will see records from phone companies and banks.  A number of different witnesses are going to testify that Lin was a Dai Lo.  You will hear testimony from witnesses who knew Lin, testimony from witnesses who knew Lin's followers and they will tell you that they heard Lin giving his followers instructions. They will testify that he heard his followers saying that they followed Lin.  You will hear from one of Lin's followers, a young man who was a member of the gang shortly in the time

Da6lin1

period preceding the murders that happened in 2004 and he is going to tell you what it was like to be a part of Lin's gang. He is going to tell you that he followed Lin's orders and he did what Lin told him to do. You will also hear testimony from a number of witnesses about a gambling parlor here in Manhattan and in Atlanta and Toronto. You will hear from Chen. He is going to explain to you how he went to Lin for help but ended up being victimized by Lin as well.

With regard to the karaoke room shooting, there is quite a bit of evidence. As I mentioned earlier, you will hear testimony from two people who were in that room. They will tell you what they saw and what they heard that night. They will tell you how two men came into the room and Line was one of those men and how Lin ordered the shooting of Yi Qun. You will also hear from a witness who saw Lin and the shooter in the hallway outside the karaoke room just before the shooting. This witness knew Lin and he will testify that he tried to say hello to him, but Lin and the shooter rushed by him and didn't stop to give him the time of day. They pushed right into that karaoke room, they slashed the door behind him and the next thing he realized he was hearing bangs and seeing flashes through the window of the karaoke room. He will testify how he ran into the common area of the bar for help and turned around in time to see Lin and another man running down the hallway in the direction of a door that let out of the club.

The bouncer who worked in the karaoke club that night is going to testify that.  A detective will testify.  An EMS paramedic will testify.  You will see ballistics evidence.  You will see diagrams of the floor plan.  You will see photos of the crime scene.  You will also see photos of an Infinity SUV that the New York City Police Department found parked near that club right on the street outside.  You will see Lin's driver's license and checkbook and other documents with his name on them that the NYPD found inside that SUV.

You will also hear from a livery cab driver.  This driver will explain that Lin called him about 6:00 in the morning on July 30th of 2004 and asked the driver to meet him in Queens.  He said he needed to go pick up his car, that he left it out on the street the night before.  The driver will explain that he agreed to meet Lin, but Lin didn't show up.  Instead when two of Lin's followers showed up and they got into the car and they said they needed to go to the karaoke bar to pick up Lin's car; but when they got there, they found police all over the place and they refused to get out of the car and they drove away.

In short, during this trial you are going see and hear many different types of evidence and by the end of this trial when you've heard and seen all of the evidence and testimony that evidence and testimony is going to prove to you beyond any reasonable doubt that Lin is guilty of the crimes charged.  He

Da6lin1

is guilty of racketeering, for running a gang, he is guilty of extortion and he is guilty of murder.

Thank you.

MR. COHEN:  May I, Judge?

THE COURT:  Please.

MR. COHEN:  Good morning.  May it please, your Honor, government counsel, agents, members of the jury, Mr. Lin, Mr. Lin's family, even though none of you have heard any of the evidence yet in this case, everybody sitting here understands and knows it is a very serious case.  It is serious for the government.  It's serious for Mr. Lin.  It's serious for his family.

Mr. Skinner very adeptly laid out for you a scenario. He told you in detail what the evidence in this case is going to prove to you, but just like Judge Cedarbaum told you yesterday, Pete Skinner was not a witness to any of these events, Jen Burns wasn't and I wasn't.  None of us were there because you need to know that it is not the prosecutors or me or even Judge Cedarbaum that is going to decide who is telling the truth in this courtroom.  It is going to be up each and every one of you 12 good citizens who eventually go to deliberate on this case.

Again, my name is Joel Cohen and my job and responsibility and privilege here is to represent Mr. Lin who sits next to me.  The evidence that you will hear during this

Da6lin1

trial will not prove -- will not prove -- to you and will not come close to proving to you beyond a reasonable doubt that you are to return a guilty verdict in this case.  The government's witnesses will testify.  They may create speculation, they may create suspicion, they may create smoke, but you are going to learn when you hear the instructions from Judge Cedarbaum that in a federal criminal trial the presence of smoke doesn't necessarily mean the presence of fire.

The evidence will show you as you listen, as you hear the witnesses testify that those witnesses cannot be trusted.  They cannot be trusted and you will understand why as the trial progresses.  And if the witnesses cannot be trusted, the case cannot be trusted.  You can have one witness, five witnesses, 10 witnesses testify for the government and if each one of them individually is unreliable, is not credible, is not believable and has proveable reasons to lie, the fact that it is one, five or 10 worth is nothing.  10 times zero is still zero.

In cases like this it is very often so that witnesses who are cooperating with the government are sitting in jail and they are waiting to testify because they are hoping for leniency and because they understand and they hope that their testimony is the price for their freedom.  The evidence here is going to be a little bit different and it is going to show you something different.  One of the government's witnesses has already bought his freedom by testifying at another trial and

Da6lin1

instead of serving a 70-year sentence that he face instead walked out of the courtroom.  He is in the United States illegally.  He should have been deported, but he is still here. I think all of the government witnesses that you hear from have been ordered to be deported from the United States years and years ago and you will understand why they are still here. Okay, because trying to please the government, trying to give the government what they think it wants is the price for them to stay in the United States.

The evidence will show you that it is not an accident, it is not a mistake, it is not an error that has kept them in the United States.  You will understand immigration judges have ordered that these people be removed.  They have ordered that they be sent back to China, but they are all desperate to stay here and in fact they are all still here.  Not a coincidence. These people are here because they are producing for the government.  They are producing for the government by their testimony here.  They are producing some of them for the government by working as informants in the street and the price of their ability to stay here is the services that they render to the government.

The evidence will show you that the mere presence of these people in the United States after they have been ordered to leave is the reward that they have received last month, last week, today, tomorrow, next week and it's a reward that they

Da6lin1

desperately want.  You will see and hear some of the outrageous lies these people have told to agents and immigration services. Agent Varian is an agent of the United States Customs and Immigration Enforcement Service.  It used to be called, ICE, Immigration, Homeland Security.  You will learn that these witnesses have lied maybe to him, maybe not to him, but to other ICE agents and they are all still here.  Can you trust folks like to?  You will have to decide that.

You will learn that from the evidence and from the lack of believable, reliable and credible evidence that the government will not prove these charges to your satisfaction beyond a reasonable doubt because they will not present any witnesses that are consistent, credible or unbiased and it doesn't have a great deal to gain from giving the government what they think the government wants and what they want right now, the government wants in this courtroom, is Mr. Lin.

You will learn that there are two different kinds of biases that these witnesses have.  One is that many of them don't like Mr. Lin very much.  Frankly, I wouldn't be candid with you if I didn't tell you that Mr. Lin isn't the nicest guy around.  He wasn't.  He wasn't.  He made enemies.  You are going to meet some of these enemies because they are going be sitting on the witness stand over the next few days of this trial.  That is a bias.  Of course the other big bias that they have is they really need to stay in the United States.  Nobody

Da6lin1

wants to go back to China.

The government will call a number of witnesses in the next few days.  I will tell you now I may not call any.  So I am going to ask each of you as you sit here throughout the trial to honor the instructions that Judge Cedarbaum gave you and that she will repeat to you in much, much greater detail at the end of the case.  The government, the government right here, the folks at this table have the burden of proof beyond a reasonable doubt.  That when it comes to witnesses, it is the quality of the witnesses that testify, the believability of the witnesses that testify and not the number of witnesses that testify that matter.

Please remember I do not have to prove or present any evidence that Mr. Lin is not guilty.  The government has to try to prove that he is.  So to wrap things up for you, the trial is not a referendum on whether or not you like Mr. Lin or approve of the lifestyle that he lived.  You may not.  Maybe he wasn't a nice guy.  In the indictment nowhere is he charged with not being a nice guy.  That is not what he is charged with.  He is charged with specific federal crimes.  Those specific federal crimes must be proven if they can be by the witnesses to testify.

Mr. Lin drank too much, Mr. Lin gambled a lot and he got into a lot of fights.  All true.  You know what?  He was pretty unpopular with a lot of people in Chinatown.  Then he

Da6lin1

made the mistake of investing in one of the most competitive businesses in the city and that is the Chinese bus business. Some of the witnesses who testified here will be people who competed with Mr. Lin in the business. Other people will testify, particularly those who were present on the night of the horrendous shootings at the karaoke were friends of Yi Qun, the man who was killed, who the government tells you is a businessman. The evidence may show different, but that is what they say.

You know, nobody can ever say that a criminal trial is a popularity contest, certainly not a trial where somebody is charged with murder and particularly charged with murder where innocent folks were hurt or killed. But as I said you will not only probably not like the way Mr. Lin lived his life, you may not like many of the government witnesses either. The issue, though, isn't who is likeable. It is not whether you like them. It is not whether you approve of them. It is whether or not you can believe them, believe them beyond a reasonable doubt. So please, please, please listen carefully to the witness who testify. Listen not only to the direct examination because it is easy to tell a story, okay. I can put a witness on the stand, Mr. Skinner can put a witness on the stand and ask them to tell what happened. You have to listen to the cross-examination, okay, to see whether or not that story that they have told is consistent with stories they have told in the

Da6lin1

past, it is consistent with what other witnesses have told you, it is a story that makes sense and is coming from uninterested people that don't have an interest in the outcome of the case.

Most important and finally resist the temptation -- because we all have a temptation. It is natural. You hear something, you form an opinion. Wow, that was a terrible thing, and it was a terrible thing, you have an opinion. Please resist the temptation to form opinions and to make decisions until you have heard all of the evidence. And not even until you have heard all of the evidence, wait until Judge Cedarbaum instructs you on the law. But then heard all of the evidence and her instructions, go into the jury room with open minds, sit down amongst yourselves, talk to each other, talk about the witnesses, do you believe this one, that one, was this one any more believable because this one was not believable, and reach a decision.

I will speak to you again when the evidence is over and the government will speak to you again. I am going to ask you to return a verdict, which is the only evidence supported by the evidence, a lack of evidence.

Now, Judge Cedarbaum said something yesterday that sums up our whole system of justice. She said, The public is served on whatever verdict is supported by the evidence. That is it in a nutshell. In 35 years that I practiced law on both sides of the courtroom, I don't think I ever heard a judge

**A. 236**

Da6lin1

express so properly and succinctly what our system of justice is about. So after you hear all of the evidence and her instructions on the law and you have deliberated, you will know what the verdict ought to be.

Thank you very much for your service and thank you for listening to me.

THE COURT: Before we call the first witness, I would just like to see counsel at the bench for a moment.

(Continued on next page)

Da6lin1

(At the side bar)

THE COURT:  Murder requires the intent to kill.

MR. SKINNER:  Your Honor, when somebody goes in with the intent to kill one person and a bullet travels and strikes another person--

THE COURT:  Accidently without any intention on the part of the shooter?

MR. SKINNER:  Your Honor, I think that is incorrect.

THE COURT:  I would like you to give me any case that has ever held that an accidental shooting under any circumstances is murder.

MR. SKINNER:  Well, we'll look for such case, your Honor.

THE COURT:  Please, I think you should pay close attention to what you said.

MR. SKINNER:  I will proffer to your Honor that I intended to make a statement consistent with the law.  If I was incorrect on the law, I am sure we can cure it with an instruction to the jury.

THE COURT:  I would like to forget it.

MR. SKINNER:  Fair enough.

THE COURT:  Because I think it is misleading.

MR. COHEN:  Can we go off the record?

THE COURT:  Yes.

(Discussion off the record)

Da6lin1

(In open court; jury present)

THE COURT:  Very well.  Who is your first witness?

MR. SKINNER:  Your Honor, the government calls John Filshie.

THE DEPUTY CLERK:  Raise your right hand.

JOHN FILSHIE,

    called as a witness by the Government,

    having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. SKINNER:

Q.  Good morning, Detective Filshie.

A.  Good morning.

Q.  Where do you work?

A.  The 19 precinct detective squad.

Q.  How long have you worked there?

A.  Approximately 10 years.

Q.  The 19 precinct is that part the New York City Police Department?

A.  Yes, it is.

Q.  How long have you been a detective?

A.  Approximately 10 years.

Q.  Were you working for the New York City Police Department in July of 2004?

A.  Yes, I was.

Q.  What was your position back then?

A.   I was a police officer assigned to the detective squad.

Q.   Detective Filshie, were you working on the night of July 30th, 2004?

A.   Yes, I was.

Q.   Did you respond to a call for a shooting at a karaoke bar located 4622 Casnio Boulevard?

A.   Yes, I did.

Q.   Can you just describe for us what you found when you got there?

A.   The karaoke club was in the basement of the location. When we responded to the scene, there was a front door --

THE COURT:  What do you mean it was in the basement? What was on the main floor.

THE WITNESS:  It was a commercial location.  So there were stores on the first floor, but this door that you went into actually went down into a basement location.

THE COURT:  I see.

MR. SKINNER:  Your Honor, may I approach?

THE COURT:  Yes.

BY MR. SKINNER:

Q.   Detective Filshie, I put in front of you documents that we previously marked as exhibits.  Can I ask you to turn first to 200 A and 200 B.

A.   Okay.

Q.   Have you seen these prior to testifying?

Da6lin1                         Filshie – direct

A.   Yes, I have.

Q.   Can you just describe for us what they are?

A.   They are a schematic or a drawing of the karaoke location.

Q.   The karaoke location you responded to that night on July 30th?

A.   Yes.

Q.   Do you they accurately reflect the layout of the karaoke club to the best of your recollection?

A.   Yes, they do.

        MR. SKINNER:  Your Honor, the government offers 200 A and 200 B.

        THE COURT:  Have you given a copy to the other side?

        MR. SKINNER:  Yes, your Honor.

        THE COURT:  I would like the original exhibits handed up to me first.

        MR. SKINNER:  My apologies, your Honor.

        THE COURT:  I find it cumbersome to leaf through the books.

        MR. COHEN:  I will confirm that I have been provided with a copy of that document and I have no objection to it being admit.

        THE COURT:  Very well.  Thank you.

        This was not drawn by you I take it?

        THE WITNESS:  No, ma'am.

        THE COURT:  But there is no objection to the receipt

Da6lin1                          Filshie - direct

of Exhibit 200 A that you have offered?

MR. SKINNER:  I offered A and B.

THE COURT:  Both A and B.  Very well.  Government Exhibits 200 A and 200 B are received in evidence.

(Government's Exhibits 200 A and 200 B received in evidence)

MR. SKINNER:  May we publish 200 B first?

THE COURT:  If that means show it to the jury, yes.

MR. SKINNER:  Can we show it to the jury?

THE COURT:  I like to speak plain English.

MR. SKINNER:  I am a lawyer so that may be difficult, but I will try.

THE COURT:  There are a lot of formalisms in the law which we are gradually giving up.

BY MR. SKINNER:

Q.  Detective Filshie, can you see the screen up there?

A.  Yes, I can.

Q.  Do you have a hard copy of 200 B in front of you as well?

A.  Yes, I do.

Q.  There should be a pointer actually up there as well.  You can use that to indicate spots on the screen.  Can you describe for us where you first entered the club and what you found when you got there?

A.  Okay.  These stairs right here lead from the street level.

MR. SKINNER:  Ms. Chase, can you zoom that back?  We

lost the stairs.

Q. Please continue, Detective Filshie.

A. Sure. The front door of the location like I explained is on street level. When you walk in, the stairs lead down into the basement and that these stairs right here.

Q. And that L-shaped figure that is there, what does that represent?

A. That was the bar in the location.

THE COURT: That is the basement, right?

THE WITNESS: Correct. The entire establishment takes up the basement of the location.

THE COURT: That is down those stairs?

THE WITNESS: These stairs right here.

Q. Do you see the opening there to the left of the bar?

A. Yes.

Q. What was that?

A. That was a doorway into a separate hallway. This is like a common area in the location. It had couches and a loveseat and I believe a TV. Then you walk through this door and there was a separate hallway and then from this hallway there were separate karaoke rooms where you would sit with your private party.

Q. Now, when you responded to the bar was anyone there injured in any way?

A. I don't recall if anyone was still there injured, but there

Da6lin1                          Filshie - direct

was definitely people in the location -- some patrons, numerous
police officers.  I do not recall if anyone was still there
injured.

Q.  Had a crime taken place there?

A.  Yes.

Q.  Where specifically in the club is the crime scene?

A.  This room at the end of the hallway here is where the
actual shooting took place.

Q.  Was that Room No. 3?

A.  Yes, it was.

Q.  From your investigation did you also identify a karaoke
room that was Room No. 8?

A.  Yes.  This room at other end of the hallway was Room No. 8.

Q.  There looks to be stairs near Room No. 8?

A.  Yes.

Q.  Where do those lead to?  Do they go up and down?

A.  Both.  I mean they go up to the street.  But depending on
which way they are going, they go up and down.

Q.  Do they lead to the street level or another level below?

A.  They go to the street level also.  There was a second exit
that went out to street level, but it wasn't marked with an
address or anything like that.

Q.  Detective Filshie, can I now ask you to look at some
photographs that were marked as Government Exhibits 3 A to 3 F?

MR. SKINNER:  Judge, I believe you have a copy in

Da6lin1                          Filshie – direct

front of you as well.  I left them up there.

THE COURT:  Thank you.

THE WITNESS:  I don't have them.  The judge has them.

Q.  Detective Filshie, have you reviewed these photographs prior to testifying today?

A.  Yes, I have.

Q.  Are these photographs that were taken at the karaoke bar on that night?

A.  Yes, they were.

Q.  Did you take the pictures yourself?

A.  No, I did not.

Q.  Do the photographs truly and accurately reflect the crime scene as you found it the night that you responded to this call?

A.  Yes I do.

(Continued on next page)

D4AVLIN2                         Filshie - direct

MR. SKINNER:  Your Honor, the government offers --

THE COURT:  I can understand -- well, you'll tell us what these are pictures of.  Some of them are hard to tell.

Q.  Detective Filshie, without getting into the contents of the pictures, and they aren't in evidence yet, is it accurate to say these are all pictures of different parts of the karaoke club taken on July 30th, 2004?

A.  Yes.

THE COURT:  Well, in any event, they reflect what you saw, whether they were taken -- I take it you didn't take these photographs, right?

THE WITNESS:  I did not take the photographs.

THE COURT:  Right.  So the only question you can answer is whether they are fair and accurate representations of what you saw when you entered the karaoke bar.

Q.  Is that correct, Detective?

A.  Yes, yes, they are.

MR. SKINNER:  Your Honor, the government offers 3A, 3B, 3C, 3D, 3E, and 3F.

THE COURT:  Well, I think we have to know exactly what they are.  The first is a picture of an automobile, isn't that right, or is this the front of the karaoke bar?

Q.  Detective, what's behind the automobile in 3A?

THE COURT:  That's what you are offering, not the car.

MR. SKINNER:  Correct, your Honor.

D4AVLIN2                    Filshie - direct

Q.  Can you just describe for us what's depicted behind the automobile in 3A?

A.  Okay.  That's the street-level entrance to the karaoke club.

Q.  And can you describe for us what's depicted in 3B?

A.  Okay.  That would be that second staircase that leads out of Room No. 8.

THE COURT:  Is this the top or bottom?

THE WITNESS:  That's the top.

THE COURT:  Top of the staircase.

THE WITNESS:  Correct.  That's street-level.

THE COURT:  Which is depicted --

THE WITNESS:  Right there.

THE COURT:  -- on 3A as one of the karaoke rooms in the back, No. 8; is that right?

MR. SKINNER:  Yes, your Honor.  The diagram is actually 200B, but the photo -- well, I'll let Detective Filshie testify as to what it depicts.

BY MR. SKINNER:

Q.  Is it correct, Detective Filshie, that that's a photograph of the doorway at the top of the stairs that leads to Room 8 in the karaoke club?

A.  Yes, it is.

Q.  Is 3C a photograph looking up from the bottom of those same stairs from Room 8?

A.   Correct.  It would be basically a photo from that location right there.

Q.   And is 3D a photograph of part of Room 3 where the crime scene was when you responded to the club?

A.   Yes.

Q.   And is 3E the other part of that karaoke room that shows the television?

A.   Correct.

Q.   And can you just indicate with your pointer what room are we talking about on 200B?  That's the one on the far left of the diagram?

A.   Correct.  That's Room No. 3.

Q.   And is 3F -- can you describe for us what these are?

A.   3F is a picture of Room No. 8.  And the crime scene -- our crime scene unit had --

THE COURT:  Wait, wait.  I don't understand, what is exactly here?  These just look like beer bottles.

Q.   Detective Filshie, can you describe where those beer bottles were and what this is a photograph of?

A.   Okay.  Like I was alluding to, this is Room No. 8, and this was all the beer bottles and glasses that were in that room.  And they were being processed --

THE COURT:  What do you mean all that were in that room?  They were all gathered together in one place?

THE WITNESS:  Exactly how you see them --

THE COURT:  You didn't see them the way they were originally; you saw them in this photograph.

THE WITNESS:  No, I saw beer bottles and glasses in this room.

THE COURT:  I see.  And where did you see them?

THE WITNESS:  In the room.

THE COURT:  No, I understand.  But here they are gathered together.

BY MR. SKINNER:

Q.  Detective Filshie, the beer bottles and glasses are all gathered on the table, and they are all labeled with different numbers; is that correct?

A.  Correct.

Q.  When you were in the karaoke club that night after the crime scene unit had gone through, did you see all these beer bottles and glasses gathered on the table?

A.  Yes, I did.

Q.  Is this a photograph --

THE COURT:  On one table?

THE WITNESS:  Well, this is all the bottles and glasses that were in that room.  And when they gathered them up --

THE COURT:  You don't know that.  Maybe you do.  Did you watch them being gathered up or --

THE WITNESS:  Yes, I did.

D4AVLIN2                        Filshie – direct

THE COURT:  Oh, all right.

When you arrived, there were beer bottles and glasses on different tables, is that right, and they were gathered together on one --

Q.  Detective Filshie --

MR. SKINNER:  Your Honor, if I may.

THE COURT:  Please.

Q.  Did you accompany the crime scene unit as they went through the club that night?

A.  I was there when the crime scene unit was there, yes.

Q.  Were you there when they gathered up glasses and bottles and dusted those glasses and bottles for fingerprints?

A.  Yes, I was.

MR. COHEN:  Objection, Judge.

THE COURT:  Yes, I know.  The witness is the one who should testify.

MR. COHEN:  That's my objection, your Honor.

Q.  Detective Filshie --

THE COURT:  Right.  Please let it come from him.

Q.  What did you observe the crime scene unit do in Room 8 with the glasses and the beer bottles?

A.  Okay.  When the crime scene unit got there, there is only one table in the room.  These are couches, and this is a TV. There were bottles and glasses in the room that were on the floor; the majority of them were on the table already.  But as

D4AVLIN2                         Filshie - direct

they processed them, they placed them on the table so that they could keep a record of them.

Q.   How, if at all, did they label the bottles and the glasses?

A.   Well, you can see on the -- well, your Honor, you can see on the picture that each bottle and the glass is labeled with a number and a letter, coincides.

Q.   And after they've gathered the bottles --

THE COURT:   That is, these signs were put on by the crime scene people; is that right?

THE WITNESS:   Yes.

THE COURT:   That was not in the room before.

THE WITNESS:   Correct.  The ones that say "NYPD" on them --

THE COURT:   Yes.

THE WITNESS:   -- they were brought by our crime scene unit.

Q.   After they had gathered the bottles and the glasses on the beer table, did they take a photograph of them?

A.   Yes, they did.

Q.   Is that what we're seeing in Government's Exhibit 3F?

A.   Yes.

Q.   Based on your observations --

THE COURT:   Well, please, try to let it come from the witness.

Q.   Based on your observation, where did the glasses and the

D4AVLIN2                          Filshie - direct

bottles in 3F come from?

A.   They were all the bottles and glasses that were in that room, in Room No. 8.

THE COURT:  Right.  But did you see them before they were gathered together?

THE WITNESS:  Yes.

THE COURT:  In different places.

THE WITNESS:  Just in that room, in Room No. 8.

Q.   So to be clear --

THE COURT:  Were they on a table or not?

THE WITNESS:  Some were, some weren't.

THE COURT:  I see.

Q.   But just so we're clear, while they may have been in different places, they were all in Room 8; they didn't come from elsewhere in the club?

A.   Correct.

MR. COHEN:  Judge, again, I object to the form of this question.

THE COURT:  Yes.  Objection sustained.

Please let it come from the witness.  And we don't have to sum up after every answer.

Q.   Detective Filshie, where did all of the bottles and glasses in Photograph 3F come from?

A.   The photograph of these bottles and glasses, all these glasses and bottles that are in this picture were in Room No.

D4AVLIN2                         Filshie – direct

8.   Whether they were on the table before they were photographed and processed, or they were on the floor, or on a couch, they were in that room.

MR. SKINNER:  Your Honor, the government again offers 3A, 3B, 3C, 3D, 3E, and 3F.

MR. COHEN:  No objection, Judge.

THE COURT:  Very well.

Government Exhibits 3A, 3B, 3C, 3D, 3E, and 3F are received in evidence.  Without objection.

(Government's Exhibits 3A, 3B, 3C, 3D, 3E, 3F received in evidence)

Q.   Detective Filshie, I'm showing you another copy of two photographs marked as Government Exhibits 4A and 4B.

MR. SKINNER:  Your Honor, you should have the originals of 4A and 4B in front of you.

THE COURT:  Thank you.

Q.   Detective Filshie, have you looked at these photographs before testifying today?

A.   Yes, I have.

Q.   And looking first at Exhibit 4A, can you describe for us what this is a picture of?

THE COURT:  Well, wait, wait, wait.

When did you see this?

THE WITNESS:  Excuse me, your Honor?

THE COURT:  When did you see this photograph?

THE WITNESS:  I was shown the photo by the district attorney.

THE COURT:  I see.

Then what is the question?

MR. SKINNER:  Then I was asking what is the photograph of.

THE COURT:  I don't think that's the appropriate question.

BY MR. SKINNER:

Q.  Detective Filshie, did you take this photograph?

A.  No, I did not.

Q.  But you've looked at it?

A.  Yes, I have.

Q.  And does this photograph accurately reflect a portion of the karaoke club based on your memory of what you saw on July 30th of 2004?

THE COURT:  Of the outside of the karaoke club; is that right?

THE WITNESS:  Yes, your Honor.  It's the entrance from the street level going down the stairs.

Q.  And this picture looks the way you remember the club looking when you responded on that night?

A.  Yes.

Q.  Turning to --

THE COURT:  Was it dark when you responded?

THE WITNESS:  Yes, it was.

THE COURT:  So you couldn't see this as clearly.

THE WITNESS:  If I may go back to the original 3A. It's basically a different angle of Picture 3A, which 3A is a dark photo, and this is just a picture taken during the daylight.

Q.  So it's during daylight --

THE COURT:  Well, they depict different signs.

Q.  Well, if we're looking at --

THE COURT:  Are these both the front of this karaoke club?

Q.  Detective Filshie, can you just please describe for the Court the difference in view of 3A and 4A?

A.  Absolutely.

The first picture in 3A is taken pretty much from a straight-on angle, and it is dark out, it's still late evening, coming into early morning.  And 4A is just taken from a little further to the right, and on an angle looking at the same entrance to the club/bar.

THE COURT:  You don't mean when it's taken; you weren't there when it was taken, were you?  You mean that's what it shows.

THE WITNESS:  It depicts a daylight picture, yes, yes, your Honor.

Q.  And although it's daylight, is it fair to say that it

D4AVLIN2                    Filshie - direct

accurately reflects your recollection of what the entrance to the club looked like?

A.  Yes.

MR. SKINNER:  Your Honor, the government offers 4A.

MR. COHEN:  No objection.

THE COURT:  Very well.  Government Exhibit 4A is received in evidence without objection.

(Government's Exhibit 4A received in evidence)

Q.  And looking at Government Exhibit 4B, is this another photograph --

MR. COHEN:  Objection.

THE COURT:  Is this a fair representation of whatever it's supposed to represent?

MR. COHEN:  Your Honor, respectfully, if the witness can be asked whether he recognizes this and what he recognizes it to be a photograph of.

THE COURT:  Yes.

Do you recognize Exhibit 4B?

THE WITNESS:  Yes, your Honor.

THE COURT:  And what do you recognize it to be?

THE WITNESS:  That is a picture of the bar of the location that I had described looking back towards the entrance that comes down from the street.

THE COURT:  And is the bar pink?

THE WITNESS:  I guess you can call it pink, yes.  The

D4AVLIN2                    Filshie - direct

bar is on the left-hand side of the picture, and the glass door on the right is the entrance to the location with the steps in the back.

THE COURT:  And is the whole area colored pink?

THE WITNESS:  I would guess you would call it pink.

THE COURT:  Don't guess.  We're only asking what you saw.

THE WITNESS:  Yes, the picture -- it is pink in the picture, your Honor.

THE COURT:  No, not what it is in the picture.  Did you see a pink area?

THE WITNESS:  I don't recall what color it was, but if I'm looking at the picture, yes, it was pink.

BY MR. SKINNER:

Q.  Detective Filshie, does the photograph accurately reflect the way the bar looked the night that you responded, to the best of your recollection?

A.  Yes, it does.

MR. SKINNER:  Your Honor, the government offers 4B.

MR. COHEN:  Judge, can I just have one or two voir dire questions?

THE COURT:  Yes, go ahead.

MR. COHEN:  Thanks.

VOIR DIRE EXAMINATION

BY MR. COHEN:

**A. 257**

Q.   Good morning, Detective.

A.   Good morning.

Q.   The photograph that is before you, Exhibit 4B, do you know when that was taken?

A.   The day of the incident.

Q.   You said you responded to the scene at about what time?

A.   I would say approximately 5:30.

Q.   Okay.  And did you learn when you responded about what time the --

          THE COURT:  Excuse me.  You mean 5:30 in the morning; is that right?

          THE WITNESS:  A.m., yes.

          THE COURT:  Okay.

Q.   Did you learn at that point when the alleged incident had occurred?

A.   I don't recall if I was told the exact time of the incident, no, I don't.

Q.   Okay.  Do you know whether or not when this photograph was taken -- withdrawn.

          MR. COHEN:  I have no objection, Judge.

          THE COURT:  Very well.

          Government Exhibits 4A and 4B are received in evidence without objection.

          (Government's Exhibits 4A, 4B received in evidence)

          MR. SKINNER:  Your Honor, now that the photographs are

D4AVLIN2                         Filshie - direct

in evidence, I'd like to show them to the jury.

THE COURT:  Very well.

MR. SKINNER:  Can we start with 3A.

Ms. Chace, can you put that up on the screen.

BY MR. SKINNER:

Q.  And, Detective Filshie, I show -- we've already talked about these photographs at length, but now that the jury can see them, can you just describe for us again what we're looking at here?

A.  Sure.

That entrance right there is the entrance to the actual location.  There's a door here, it's on the street level; and the steps go down into the location.

Q.  Do the steps kind of go down under that canopy portion --

THE COURT:  This is what you see from the street, right?  So you don't see what's below, but that's where you enter to go below.

THE WITNESS:  Correct.

THE COURT:  Okay.

Q.  And, Detective Filshie, do the stairs go down underneath that canopy portion where it says club and bar?

A.  Correct.  The stairs are here, and they go straight down into the location.

Q.  And when we're looking at the diagram, before you pointed out a second set of stairs that led to Room 8; is that right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A. 259**

D4AVLIN2                         Filshie - direct

A.   Correct.

Q.   Is there anything in this photograph relevant to that stairwell?

A.   That stairwell --

THE COURT:  I don't know what that means.

Q.   Is that stairwell shown in any way in this photograph?

A.   Yes, sir.  This door right here is the stairs that lead down into that Room 8.  It's also from street level, and the stairs go down and they go directly into Room No. 8.

THE COURT:  Well, can you enter there?  Is there a door there?

THE WITNESS:  This door right here, this glass door leads right down into the karaoke club also --

THE COURT:  So there are the stairs that go down, go down from that door?

THE WITNESS:  Correct.

THE COURT:  Very well.

MR. SKINNER:  Ms. Chace, can you quickly put 200B back up again so we have the benefit of the diagram to see.

Q.   Detective Filshie, can you just show again where the stairs were.

A.   Correct.  This is the main entrance underneath the canopy. And that other glass door, these are the stairs that lead down directly into Room No. 8.

MR. SKINNER:  Ms. Chace, can you now put up 3B please.

D4AVLIN2                     Filshie - direct

Q.  And, Detective Filshie, what are we looking at here?

A.  This is that glass door I was describing that these stairs go down and lead directly into Karaoke Room No. 8.

MR. SKINNER:  Can we turn to 3C please.

Q.  What are we looking at now?

A.  This is the same set of stairs from downstairs looking up to the street level that go into Room No. 8.

Q.  So would this be the vantage point from Room No. 8?

A.  Correct.

MR. SKINNER:  Can we now turn to 3D please.

Q.  What is this a photograph of?

A.  This is a photograph of the room where the shooting took place.  This is Room No. 3.

THE COURT:  This witness can't testify as to where the shooting took place; he wasn't there.

Q.  Detective Filshie, you testified earlier that you responded to a crime scene; is that right?

A.  Yes.

Q.  And on the diagram you identified the crime scene as Room 3; is that right?

A.  Correct.

Q.  What is this a photograph of?

A.  This is a photograph of Room 3.

Q.  That's where the crime scene was?

A.  Yes.

D4AVLIN2                    Filshie – direct

MR. SKINNER:  Can we now look at 3E.

Q.  And what is this a photograph of?

A.  Also a picture of Room 3, just at a different angle.

MR. SKINNER:  Ms. Chace, can I ask you once again to put 200B up so that I can now ask Detective Filshie to again point out to us where Room 3 was.

A.  This is Room No. 3.

Q.  So am I correct then that the figure at the bottom of that room, is that the television we just saw?

A.  Correct.  That's a photo of that TV right there.

THE COURT:  Right.  And when you say that's No. 3, was there a "3" on the room?

THE WITNESS:  I do not recall if there were numbers on the doors.

THE COURT:  What do you mean by "Room 3" or "Room 8"?

THE WITNESS:  That's what we were told by the owners of the club; that was the room numbers of the rooms.

THE COURT:  But they have no designation on them?

THE WITNESS:  I don't recall if there was numbers on the door.

MR. SKINNER:  And can we now look at 3F.

Q.  And what is this a photograph of?

A.  That's a photograph of the bottles and the glasses that were processed in Room No. 8.

THE COURT:  Well, again, this is not -- you don't know

**A. 262**

D4AVLIN2                          Filshie - direct

what that number comes from, right?  You didn't see a No. 8 or a No. 3; is that correct?

THE WITNESS:  Correct.  There is no number on the door.  We were informed that it's Room No. 8.

BY MR. SKINNER:

Q.  Detective Filshie, are you certain there was no number, or are you testifying you just don't remember whether there was a number?

A.  I do not recall if there were numbers on the door.

THE COURT:  You did not see a number; is that right?

THE WITNESS:  I don't remember if I saw a number or not, your Honor.

THE COURT:  What's your best recollection?  That's what all witnesses have to give, their best recollection.

THE WITNESS:  Like I said, it was eleven years ago; I don't remember if there was a number on the door.

THE COURT:  Well, that's fine.  You have to just tell what is the fact.

THE WITNESS:  The fact is I don't remember.

THE COURT:  That you don't remember one way or the other.

THE WITNESS:  Correct.

THE COURT:  Very well.

Then why are we numbering them?  Is there somebody who knows whether there were numbers on them?

D4AVLIN2                        Filshie - direct

MR. SKINNER:  Well, your Honor, I was going to try to ask him another question about that.

Q.  Despite whether you remember whether there was a number on the door or not, was it your understanding from --

THE COURT:  That's irrelevant.

MR. SKINNER:  Very well, your Honor.

We have nothing further of this witness, your Honor.

THE COURT:  Very well.

Is there any cross-examination?

MR. COHEN:  No.

THE COURT:  Very well.  Thank you.

You may step down.

THE WITNESS:  Thank you, your Honor.

MR. COHEN:  Oh, spoke too soon.

One or two questions.

THE COURT:  Very well.

CROSS-EXAMINATION

BY MR. COHEN:

Q.  Detective, my name is Joel Cohen.  I represent Mr. Lin.

When you arrived, I think you testified it was a number of hours after the alleged offense took place?

A.  Correct.

Q.  Were there civilian witnesses there?

A.  I believe there were, yes.

Q.  Did you interview any of those witnesses?

D4AVLIN2                        Filshie - cross

A.   I did not.

Q.   Did you later participate in the interview of any witnesses

at the 109 squad?

A.   No, I did not.

Q.   And when you arrived, was there any music playing?

A.   Yes, there was.

Q.   And if you recall, in which room was the music playing?

A.   The bar area, there was music being played.

Q.   And do you recall, relatively speaking, what the volume was

of the music?

A.   A volume number or -- it was music playing.  I couldn't

tell you if it was loud, medium -- it was -- the music was on.

Q.   Okay.  What about in the individual rooms, do you recall if

there was music playing in any of those rooms?

A.   I don't recall.

Q.   Thanks.

          MR. COHEN:  I have nothing further, your Honor.

          THE COURT:  All right.  You may step down.

          THE WITNESS:  Thank you.

          (Witness excused)

          MR. SKINNER:  Your Honor, the government calls George

Benedetto.

 GEORGE BENEDETTO,

     called as a witness by the Government,

     having been duly sworn, testified as follows:

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A. 265**

D4AVLIN2                    Filshie - cross

THE DEPUTY CLERK:  Thank you.  Please be seated.

Please state your full name for the record and your last name slowly.

THE WITNESS:  George P. Benedetto, Jr.

B, as in boy, E-N-E-D-E-T-T-O.

THE DEPUTY CLERK:  Thank you.

DIRECT EXAMINATION

BY MR. SKINNER:

Q.  Good morning, Mr. Benedetto.

A.  Good morning.

Q.  Mr. Benedetto, what do you do for work?

A.  I'm currently the director of simulation education at New York Hospital-Queens in Flushing, New York.  I'm also a New York State certified paramedic.

Q.  How long have you been a paramedic?

A.  I've been a paramedic since 1980/'81.

Q.  Were you working as a paramedic back in July of 2004?

A.  Yes, sir.

Q.  And where were you work as a paramedic in July of 2004?

A.  I was assigned to one of the New York Hospital-Queens emergency medical service units assigned to the Flushing, Queens area in New York City.

Q.  Now, during the early morning hours of July 30, 2004, did you respond to a call from a shooting at a karaoke bar on Kessina Boulevard?

A.  Yes, sir.

MR. SKINNER:  I'm showing Mr. Benedetto a copy of Government Exhibit 200B, which is already in evidence.

Q.  Mr. Benedetto, take a look at 200B, and just tell us what that is.

A.  It's a diagram of the karaoke bar that we responded to that night in question.

Q.  Does that accurately reflect your recollection of what the bar looked like?

A.  Yes, sir.  Actually, the bar -- the area was downstairs, like a basement-type environment.  So you're walking down a set of stairs to get to the location.

MR. SKINNER:  Ms. Chace, can you please put 200B up on the screen.

Q.  And, Mr. Benedetto, you should have a little pointer on your desk there.  It's a laser pointer.  You can use that to indicate where -- to indicate places on the diagram.

Now, can you just describe for us where you went when you first got into the karaoke club that night?

A.  Okay.  When we first arrived, we parked our vehicle out here.  There's a set of stairs.  I presume these are the stairs.  We come down here.  These would be the stairs coming down.  You walk in.  This was a bar with some stools over here, and there were some tables and karaoke equipment over here.

Q.  What did you find when you got into the bar area?

A.   When I first arrived, there was a young lady, Asian female, sitting approximately right here, this location.  There were some bottles of liquor.  There was an active karaoke scene, and she was -- I was told she was hurt.  I looked at her, and she had a gunshot wound to her lower leg.

Q.   How did you know it was a gunshot wound?

A.   36 years of paramedic, as a published educator, author, and New York State faculty member, GSW.  It was a wound that had a raised site, which is a gaseous hole.  And there was entry, and blood was oozing out.

Q.   You said she was sitting.  Was she on the floor or was she sitting on something?

A.   She was sitting on a bar stool in approximately right here, this location right here.

Q.   Aside from the gunshot wound, how would you describe her overall condition?

A.   Her condition, she was alert, oriented, able to answer some basic questions, pain, and to respond.  Her mental status was cognizant, alert and oriented, time, place, location.

Q.   Mr. Benedetto, I'll ask you just to slow down a little bit, because the court reporter has to keep up with you.

A.   I'm sorry, sir.

Q.   It's all right.

What, if anything, did you do after you examined this woman that you found in the bar there?

D4AVLIN2                        Benedetto - direct

A.  Initially, we examined her.  We checked her mental status, make sure there's no exit wound.  Then we'd put a dry sterile dressing and secure it.

Q.  What did you do after that?

A.  At that time I was notified by the police officer on the scene there were additional people in a back room that needed attention.

Q.  Where did you go?

A.  We were standing here.  We went through -- this was a doorway into a hallway, and there are rooms over here, private karaoke rooms.

Q.  Do you remember which room you went into that's depicted on the diagram here?

A.  It's been a long time.  Like here or -- it's like a room right over here, here or here.

        MR. SKINNER:  Let me ask Ms. Chace to put up Government Exhibit 3D.

Q.  And I think there's a hard copy in front of you, Mr. Benedetto.  You're also able to see it on the screen.

        Do you recognize that?

A.  One second please.

Q.  That's 3D.  It's up there on the screen.  And you can see that.

A.  Yes.  This is a room, the karaoke room that I referred to.

Q.  Is this the room that you went to after the police officers

told you there were other people who needed attention?

A.  Yes, sir.

Q.  Can you describe for us what you found when you got into the room?

A.  Approximately right here -- if I'm looking at the picture, I'm walking into the room, this would be a doorway, right.  I'm not sure if the door was here or if the picture -- depending direction of the picture, as you're standing, you see the room. And there was a body, a gentleman, and a young female.

Q.  And just describe for us how you found the gentleman. Standing?  Sitting?  Lying?

A.  He was semi -- like lying and crouched on the floor; partially on the couch and on the floor.

Q.  What was his condition?

A.  He was nonresponsive, unconscious.  Based on our assessment, which is a -- we do the vital signs, check for a pulse, both in the carotid artery, which is in the neck, and in the radial wrist, then listened with a stethoscope into the heart.  There were no vital signs present; no signs, symptoms of life.

Q.  And where was the female that you referred to?

A.  I'm sorry, it's hard for me to see without my glasses.

THE COURT:  What female are you talking about?  This is not the female who was on the bar stool.

THE WITNESS:  No, ma'am.

D4AVLIN2                          Benedetto - direct

There was a young female that was in the room with the Asian gentleman, another Asian female. She's approximately in this area, half over here by the table, over by the couch. And she was slumped down onto the couch.

Q. Was she conscious?

A. I don't remember if she was conscious, but I know when we checked for vital signs, she had a viable pulse, because we wound up identifying that she had a gunshot wound to the head, entry wound. We did not see any exit wound on examination or evaluation.

At that time, I asked my partner to get me certain equipment and to get a second team so we can stabilize her and remove her to the hospital.

Q. So of the two people you found when you got into that back room, who did you devote your attention to first?

A. Initially, the gentleman on the floor. We checked his vital signs to find that he did not have a pulse. Then we went to the next room.

Q. And when you checked the vital signs of the defendant -- excuse me, of the man who was on the floor in that room, how did you do that?

A. You check the pulse in the neck.

Q. You can move back from the microphone.

A. I'm sorry. Can you hear me?

Q. Yeah.

D4AVLIN2                         Benedetto - direct

A.   Basically --

MR. COHEN:  Your Honor, I think this was asked and answered.

Q.   Well, did you move the body?

THE COURT:  Well, we've gone through the body of the Asian gentleman which was on the floor.

MR. COHEN:  And that's what he's asking about again, I believe.

THE COURT:  What is the question?

Q.   The question is any time you were in the room, did you move the body of the male?

A.   Yes, we did.

Q.   Where did you move the body to?

A.   Excuse me, sir?

Q.   Where did you move it to?

A.   We put it on the floor, on the floor, basically, to an open area, so that we can lay him out, log-roll him left, right, forward, backward, right, and so that we can address any medical issues that we need to critically.

Q.   And what, if anything, did you do with respect to the female that you found in the room?

A.   The same thing.  She was in a semi-crouched position near the couch between the table and the couch.  We had to move her to be able to immobilize her on a backboard, which is a standard medical apparatus, secure with straps, head

D4AVLIN2                         Benedetto - direct

immobilizer, to remove her to the hospital.

Q.  So after you and the other people got her on the backboard, what, if anything, did you do with respect to the female that you found in that room?

A.  The female was, again, secured to a backboard.  And she's strapped at three locations:  Under the arms, the chest, the legs.  The head is immobilized for cervical safety.  And then she was put on oxygen and bandaged and transported to New York Hospital-Queens, otherwise known as Hospital 31, in an urgent manner.

Q.  And you described for us earlier a woman that you found in the bar area when you first entered the club; is that right?

A.  Yes, sir.

Q.  And what, if anything, did you do with that woman after you'd gone seen the people in this back room?

A.  After I pronounced the gentleman with no signs of life presumed dead, all right, we stabilized a woman that was in the room.  She was handed off to a second EMS team to transport her up to the vehicle.  Then we went back to the woman that was at the bar, and treated her leg and transported her to New York Hospital-Queens.

Q.  So were you one of the people who took her to the hospital in Queens?

A.  Yes, I transported the woman that was shot in the leg to New York Hospital-Queens.

D4AVLIN2                    Benedetto - direct

Q.   And before you left for the hospital with the two women, you say it was your opinion that the man was dead?

A.   Yes, he was dead, in my professional medical opinion.  I have documented -- it would be on his ambulance call report that he had no vital signs present.

Q.   And that was the man whom you described was found in this back karaoke room?

A.   Yes, sir.

Q.   Now, after you got to the hospital, what did you do after that?

A.   At the hospital, we -- they triaged, which means we see a nurse and a doctor.  We explained the situation, the findings. We handed off medical care with a signature to the nurse and the physician.  And we proceeded to decontaminate our vehicle for any type of blood matter.

Q.   Did you go back to the karaoke bar after that?

A.   Yes, sir, I was summoned back to the bar.

Q.   When you say you were summoned back, what do you mean?

A.   I had gotten a phone call from the EMS dispatcher telling me that the unit on the scene --

        MR. COHEN:  Objection.

        Hearsay.

Q.   Who did you get the summons from?

A.   I was notified on the radio, the EMS radio, from the city dispatcher to return to the scene to see the police department.

D4AVLIN2                    Benedetto - direct

Q.  Did you go back to the scene?

A.  Yes, sir.

Q.  Did you talk to the police?

A.  Yes, sir.

MR. SKINNER:  Your Honor, we have no further questions.

Thank you.

THE COURT:  Very well.

Is there any cross-examination?

MR. COHEN:  Briefly, your Honor.

CROSS-EXAMINATION

BY MR. COHEN:

Q.  Good morning, Mr. Benedetto.

A.  Good morning, sir.

Q.  When you initially responded to the karaoke club and entered the premises, were there police officers there?

A.  Yes, sir.

Q.  And do you recall roughly about how many police officers were there when you got there?

A.  Several.  Three, four that I recall, uniformed officers.

Q.  Did you happen to know any of those gentlemen or ladies from your work in the neighborhood?

A.  Just from sight, you know, say hello, bye.  Don't know the names personally.

Q.  Okay.  And upon arriving at the scene, who was the first

D4AVLIN2                          Benedetto - cross

person that you spoke to?

A.   One of the officers on the scene.

Q.   Okay.  And did that officer tell you that there were people seriously wounded in another room?

A.   I came down the stairs.  Typical nice day would be, What do you have?  What's up?

He says, You have a girl here.  Looked at her.  She's shot in the leg.  Then I was looking at the leg, and he said, Come in the back.  We have some more people in the back.

Q.   I think you testified you did a vital signs assessment.

A.   On the patient in the back, yes.

Q.   Let me withdraw that.  I think I actually used the wrong words.

That when you initially saw the Asian female with the gunshot wound in the leg sitting on the bar stool, you made some determination as to her physical and mental condition?

A.   Yes, sir.

Q.   And you did that both by observing her injury, as well as by speaking with her and asking her questions?

A.   Yes, sir.

Q.   And I think you testified that you were able to determine from the questions that you asked that she was cognizant as to time, date, place, and things of that nature?

A.   Yes, sir.

Q.   About how long did that conversation take with this female

D4AVLIN2                        Benedetto - cross

sitting on the bar stool?

A.  Approximately 35 -- 30 to 45 seconds.

Q.  Okay.  And was it at the end of that 30 to 45 seconds that you were advised that there were other people that were perhaps more seriously injured in another location?

A.  Approximately within a minute or two of establishing contact with the first victim, I was notified that there are additional people in the back room, best of my recollection.

Q.  Okay.  And at that point, you responded to the other room?

A.  I followed the officers into the hallway, and they showed me the room.

Q.  Okay.  And I think you testified you tended to the male victim first?

A.  Yes.

Q.  And about how long did you spend tending to the male victim before you made the determination that he was deceased?

A.  Probably about half a minute to a minute.  We checked his pulse.  And if you don't find a pulse, you check both sides of the carotid.  I personally check the carotid, which is the pulse in the neck.  And I check for the rail at the same time to see if I have bilateral pulses or present pulses.  And also I could feel temperature, and I could feel moisture.  And then I also move the individual to see if there's any kind of response or shake or a movement or painful stimulus.

Q.  And I think you testified that you were working with a

D4AVLIN2                    Benedetto - cross

partner that day?

A.   Yes, sir.

Q.   And while you were checking the vitals on the male, what was your partner doing?

A.   He was bringing equipment down.

Q.   Okay.  So after you did your assessment of the lady sitting on the bar stool, and then you determined that the male was deceased in the room, you began to make an assessment of the female?

A.   Yes, sir.

Q.   And at that point she still had a pulse?

A.   At that time she still had a carotid pulse.

Q.   She wasn't responsive in any way; you couldn't speak to her, but she did have signs of life?

A.   Well, I -- and I don't know if other individuals do, but I always speak to someone, see if there's a verbal stimuli.  I don't remember if there was a verbal stimuli.  I do not remember she had any type of sounds response.  But based on the color of the body, their tissue, the warmth or the temperature, which is a warm to touch, and a palpable pulse in the neck, that's enough for us to say initiate, there's life.  Stabilize, treat and transport to the nearest trauma center.

Q.   And do you know if she passed away at the scene, en route to the hospital, or later at the hospital?

A.   She arrived at the hospital in the same condition that we

D4AVLIN2                        Benedetto - cross

found her.  She was evaluated.  I do not know if she passed away.  I didn't follow the case.

Q.  So you weren't the one that pronounced her?

A.  Pronounced her?

Q.  Yes.

A.  No, she was brought to the hospital.  That would then belong to a physician to make that determination.  We exist in the pre-hospital world only.

Q.  And when I say "pronounced," I mean pronounced dead.

A.  Right.  If she was to -- if she became deceased, once she's in the hospital, she is signed off legally to a hospital physician or a nurse, and then we're outside of that realm of control.

Q.  Thanks very much.  I have no further questions.

MR. SKINNER:  No questions, your Honor.

THE COURT:  Very well.  You may step down.

Thank you.

(Witness excused)

THE COURT:  Who's your next witness?

MS. BURNS:  Your Honor, the government calls Guang Yun Zhou.

Your Honor, may we approach briefly?

THE COURT:  Very well.

(Continued on next page)

(At the side bar)

MS. BURNS:  Potentially we have cross that we think is not permissible.  Mr. Zhou has a prior conviction for a misdemeanor offense from 2001.

THE COURT:  What was the offense?

MS. BURNS:  He pled guilty to menacing in the second degree.  That was in New York State court.

THE COURT:  When was that?

MS. BURNS:  In 2001.  Under Rule 609, it's not permitted.  It's not a felony.

THE COURT:  It's not "it's not permitted."  It's not explicitly authorized.

MS. BURNS:  I misspoke, your Honor.

Also, it is not an offense that has any element that goes to truthfulness or honesty.  And in cross-examination by Mr. Cohen, it would be impermissible regarding this offense.  So we just wanted to clarify that before the witness gets on the stand.

THE COURT:  That is, you would like me to preclude Mr. Cohen from mentioning this.

MS. BURNS:  Yes.

MR. COHEN:  Your Honor, as I told the government last night, I agree that cross-examination impeachment by misdemeanor conviction from a remote point in time is impermissible.  But I think that he was arrested for a robbery,

**A. 280**

and either an armed robbery or a second-degree robbery.  I think I have the right to inquire into the underlying fact he spent four months in jail and then was permitted to plead guilty to a misdemeanor.

THE COURT:  The original charge was?

MR. COHEN:  Was robbery, yeah.  And I think that had he led an unblemished life since then, it would be improper for me to impeach him by something he did such a long time ago. But I think the direct evidence will show that he continued to commit crimes, and that I ought to be allowed to inquire into the underlying facts of that incident.

MS. BURNS:  Your Honor, we're talking about an incident --

THE COURT:  Wait just one moment.

What do you mean he continued to commit crimes?

MR. COHEN:  I think that this gentleman continued to associate with people that were guilty of gambling and extortion and assaults and stabbings.

THE COURT:  Aren't you going to bring that out?

MR. COHEN:  Yes.

MS. BURNS:  That doesn't make him guilty of a crime. And he has no other convictions.  And characterizing it as a conviction or being guilty of a crime is improper.

THE COURT:  That's a different issue.  That's not what you're raising.

**A. 281**

D4AVLIN2                    Benedetto - cross

MS. BURNS:  I want to object to both points from Mr. Cohen now.

THE COURT:  Well, he certainly can elicit that he continued to participate in illegal gambling.

MS. BURNS:  Participation and being guilty --

MR. SKINNER:  Your Honor, he wants to impeach improper acts under 608.  608 says you can impeach for acts that go to your character for truthfulness or untruthfulness.  Robbery has nothing to do with your character for truthfulness or untruthfulness.

MS. BURNS:  There's nothing about that offense that goes -- there's no element.

THE COURT:  I would like to see a case that holds that you cannot impeach for robbery because robbery doesn't involve dishonesty.

MS. BURNS:  Your Honor, frankly, the burden here is on Mr. Cohen.

THE COURT:  But, look, let's stay with the one problem --

MS. BURNS:  Okay.

THE COURT:  -- that you've raised, which is whether he can impeach with a misdemeanor.  You can ask him about prior conduct that displays dishonesty, but you cannot use it as a conviction.

MR. COHEN:  I started, your Honor, by saying I would

not ask him about whether he'd been convicted.  I agreed with the government's view that it would be improper to ask him if he'd been convicted of that crime.  But I do think I have the right to ask him about the conduct that led to the conviction. I'm not even going to ask him if he was arrested.

THE COURT:  What is the conduct we're talking about?

MR. COHEN:  That he and another person robbed somebody.

THE COURT:  But that was not established.

MR. COHEN:  Well, he --

THE COURT:  You want to ask him whether he did?

MR. COHEN:  I believe he was indicted for the offense.

THE COURT:  That's different.  There's probable cause.

MR. COHEN:  Yeah.  And he pleaded guilty to a misdemeanor.

THE COURT:  He was actually indicted for robbery?

MR. COHEN:  I think he was.

THE COURT:  Well, I think you have to know that.

MS. BURNS:  It has to be established.

THE COURT:  If he was indicted for robbery, that he's entitled to show; because an indictment is probable cause.  We have it every day.  You always argue it to me.

MS. BURNS:  I agree.

THE COURT:  There's probable cause for believing --

MR. SKINNER:  If he couldn't show actual conviction,

D4AVLIN2                         Benedetto - cross

how is it proper to show the actual indictment?

MR. COHEN:  I'm not seeking to show the indictment either.  I'm simply saying I think it establishes probable cause that he committed the underlying acts.  And because of the way plea bargaining works in state court, he caught a big break.

MS. BURNS:  Obviously, none of that is being presented to the jury.  I don't think there's anything you've represented in the facts that go to honesty or truthfulness.

THE COURT:  I see.  You think robbery has nothing to do with honesty.

MS. BURNS:  There's no proffer from defense counsel as to how it does.  We're not talking about some sort of stealth or other act.  I mean we don't even know what kind of conduct Mr. Cohen is speaking about.  I think we need a proffer from the facts.

THE COURT:  I don't know.  What was the conduct?

MR. COHEN:  Instead of belaboring this point, let's see how the cross goes; let's see how the direct goes.

THE COURT:  I think, right, unless there's something in the direct that really draws it, we should not get into it.

MR. SKINNER:  Your Honor, I think the point is we don't intend to elicit what we think is improper.

THE COURT:  I understand exactly.  And I've ruled that if there's nothing in the examination that raises anything

D4AVLIN2                        Benedetto - cross

related to it, then he won't go into it.

MR. SKINNER:  Very well.  If that's the ruling, that's fine.  Thank you, your Honor.

MR. COHEN:  Judge, can we take a ten-minute break now, five or ten-minute break?

THE COURT:  Actually, we should give the jury a break. What time is it?  I kept them longer than I usually do.

MR. SKINNER:  It is 10 of 12.

(Continued on next page)

(In open court)

THE COURT:  Members of the jury, I kept you longer than I usually do to mid-morning.  It's past mid-morning.  But we're going to take a ten-minute recess at this time.  And then we will continue to hear the evidence.

(Jury excused)

THE COURT:  We will all take a ten-minute recess.

MR. SKINNER:  Thank you, your Honor.

(Recess)

(Continued on next page)

D4AVLIN2                    Benedetto - cross

(In the robing room)

THE COURT:  Mr. Daniels was taking the jury back to the jury room and Juror No. 9 told Anthony that she did not recognize the name yesterday Benedetto, but that then she saw him and she recognized him.  She knows him, who he is.  We looked in our notes and she is a health care executive.  I just want both sides to be aware of this and I will consider any application anybody wants to make.

MR. COHEN:  I would only ask, your Honor, that your Honor voir dire her as to whether she knows him personally and if so how well and whether that would have any impact on her ability to be fair and impartial.

MR. SKINNER:  We don't have any objection to that.

THE COURT:  Very well.  Let's get her in.

Ms. Brown, won't you sit down.  I wanted to find out a little bit more about it.  How do you know him?

JUROR:  Well, New York Hospital Queens is one of our hospitals.  I am there a lot.  I am there on Friday as long as we don't have court because I am working with them on a big project.  I also know George because he worked closely with my colleague's husband Frank Minneo when he was also in EMS there.

THE COURT:  I see.

JUROR:  And my very dear friend is a security guard there also in the emergency department.  So I didn't know that it was New York Hospital Queens that was going be engaged.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A. 287**

D4AVLIN2                          Benedetto - cross

THE COURT:  Nor did I.

JUROR:  I am sorry.  Otherwise, I would have said something and I just didn't recognize the name.

THE COURT:  I understand.  The important question is this:  Is the fact that you know him and that you work closely with people from New York Hospital Queens, would that in any way affect your ability to reach a verdict based solely on the evidence in the case?

JUROR:  I -- my only caveat, and please he don't take this personally, I just didn't feel comfortable, and I know it's your job, when you were questioning his -- George's ability if somebody had life signs, maybe I know how good these people are in terms of trauma cases, so I don't know what bearing that has on the case or not, but I can tell you that that wasn't comfortable and I was just sitting on my hands until I could tell you that I knew George.

THE COURT:  So that is what made you remember that you in fact knew him?

JUROR:  When he walked in I knew.  I thought oh my God, it is New York Hospital Queens.

THE COURT:  I appreciate your candor.  Thank you very much.

JUROR:  Thank you.

MR. COHEN:  If she is not comfortable, I am not comfortable.

D4AVLIN2                        Benedetto - cross

THE COURT:  That's a problem.  Not that he said anything that matters.

MR. SKINNER:  I don't think she said I cannot be impartial.  I think she said basically I don't like the cross-examination.  A lot of people may not like the cross-examination.

THE COURT:  I understand but we don't want her to take her chagrin out on the defendant.

MR. SKINNER:  Of course.  We have five alternates so if there is an application, we will not oppose it.

MR. COHEN:  There is an application.

THE COURT:  I will wait until lunch to excuse her.

MR. COHEN:  Thank you.

THE COURT:  I am not going to do anything about it right now.

MR. SKINNER:  At this rate we may burn through our jurors.

THE COURT:  Let's hope not.  We don't intend to, but I was glad that we had five when I heard it.

THE COURT:  Let's continue.

(Continued on next page)

**A. 289**

D4AVLIN2                    Benedetto - cross

(In open court; jury not present)

THE COURT:  Please be seated.

Let's get the jury.

(In open court; jury present)

THE COURT:  Please be seated.

You may proceed.

THE DEPUTY CLERK:  Please stand and raise your right hand.

GUANG YUN ZHU,

called as a witness by the Government,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. BURNS:

Q.  Good afternoon, Mr. Zhu.

Mr. Zhu, do you go by any other names or nicknames?

A.  My nickname is Yi Pei.

Q.  Can you spell it?

A.  Y-i, P-e-i.

Q.  What year were you born?

A.  '68.

Q.  Where were you born?

A.  In China.

Q.  When did you first try come to the United States?

A.  In '93, but then I got sent back.

Q.  Did you later again try to come to the United States?

D4A6LIN3                    Zhu - direct

A.   Yes.  I came in '96.

Q.   At that time did you come here legally or illegally?

A.   I got a visa to come here into San Francisco.

Q.   Have you been in the United States since 1996?

A.   Yes.

Q.   Are you a citizen of the United States?

A.   No.  I have a A5 card.

Q.   What is an A5 card?

          THE COURT:  Is that we loosely call a green card?

          THE WITNESS:  It is not a green card.

          THE COURT:  I see.  What is it that it permits you to do?

          THE WITNESS:  It allows me to work in the United States.

BY MS. BURNS:

Q.   Do you have an A5 that is current or has it expired?

A.   It had expired over a month ago.

Q.   How did you attain the A5 card?

A.   My wife applied for me.

Q.   Did you do that on your own or did you use a lawyer in some way?

A.   My wife hired an attorney.  It was through an attorney.

Q.   How long does an A5 card last?

A.   The first time that it was issued was good for two years and then thereafter it is just one year.

D4A6LIN3                          Zhu - direct

Q.  To be clear you have applied multiple times for an A5 card?

A.  Yes.  I have renewed my card many times.

Q.  Those times that you renewed your card or make your initial application, did law enforcement in any way assist you with those applications?

A.  No.  I paid the lawyers office to do it myself.

THE COURT:  What is your occupation?

THE WITNESS:  Presently I work in the restaurant.

THE COURT:  You got a work permit for that?

THE WITNESS:  I work in the restaurants.  A5 card would allow me to work in the restaurants.  It is more convenient.

MR. COHEN:  I am sorry.  I didn't hear the last.

THE INTERPRETER:  It is more convenient.

BY MS. BURNS:

Q.  Mr. Zhu, has an order of deportation been entered against you?

THE COURT:  We now call it "removal."

A.  It was --

THE COURT:  He has been ordered removed, is that what you are saying?

THE WITNESS:  Yes.

Q.  Have any promises been made to you by anyone in the government regarding your immigration status in connection with your testimony here today?

**A. 292**

D4A6LIN3                        Zhu - direct

A.   No.

Q.   You've just testified that you work in the restaurant business.  Have you ever owned a business?

A.   Yes.  I had owned a business.

Q.   What kind of business did you own?

A.   I had a restaurant in Brooklyn and I had a restaurant in Florida.

Q.   Have you ever at any time owned a bus business or part of a bus business?

A.   I had.

Q.   When was that?

A.   It was about 10 years ago.

Q.   What was your role in that bus business?

A.   I was a shareholder.

Q.   What does it mean to be a shareholder in a bus business?

A.   I help with the work and I help send out the vehicle.

Q.   Did you receive a portion of the profits for being a shareholder?

A.   Yes.

        THE COURT:  Was this a corporation?

        THE WITNESS:  Yes.

Q.   Do you know someone who goes by the name Ding Pa?

A.   I do.

Q.   Is that a true name or a nickname?

        THE COURT:  Try to let it come from the witness.

D4A6LIN3                    Zhu - direct

A.   That is what other people called him.  Ding Pa is the nickname.

Q.   I am going to ask you to look around and let us know if you see the person you know as Ding Pa in the courtroom today.

A.   Do I point with my hand or do I say it with words?

Q.   If you can say it with words.

     First, do you see him?

A.   I do.

Q.   Tell us where he is and if you can describe what he is wearing?

A.   He is straight ahead in front of me.

     THE COURT:  Which table is he sitting at?

     THE WITNESS:  From here it is the second one, the one in the back.

     MS. BURNS:  May the record reflect that he has identified the defendant, your Honor?

     THE COURT:  Yes.  But let's hear what he is wearing.

     THE WITNESS:  The color, I can't really describe it clearly.  It is gray.

     THE COURT:  Close enough.  We call it khaki.

     THE WITNESS:  Yeah.  It is like gray.

BY MS. BURNS:

Q.   When did you first meet this person that you know as Ding Pa that is also called Mr. Lin?

A.   I met him while gambling.

D4A6LIN3                          Zhu - direct

Q.   Do you remember when you met him?

        THE INTERPRETER:  Can you repeat the question?

Q.   Do you remember when you met him?

A.   When I was gambling.  It was end of '96.

Q.   Where were you gambling that you met Ding Pa?

A.   I was in Manhattan.  The corner of Madison Street and
Market Street.

Q.   Can you describe this location?

A.   The address?  I don't remember the address.

Q.   Can you describe what kind of building it was located in?

A.   It's a building on Madison and Market Streets.  It used to
be the Benda Company.

Q.   When you met Ding Pa were you both gambling?

A.   Yes.

Q.   What games were being played at this gambling parlor on
Madison Street?

A.   13 cards.

        THE COURT:  Does it have a name, the game?

        THE WITNESS:  That's 13 cards.  That's what it is
called.

        THE COURT:  That's what you call it?

        THE WITNESS:  Yes.

Q.   Did you see people working at this gambling parlor?

A.   Yes.

Q.   What did you see them doing?

**A. 295**

D4A6LIN3                    Zhu - direct

A.  They were dealing cards, recording numbers and taking commissions.

Q.  How many people did you see working there?

A.  There was a few.

THE COURT:  What do you mean taking commissions?

THE WITNESS:  For example for every $100 that was bet, $5 would be taken out.

Q.  Who would take it out?

THE COURT:  As a fee, right?

THE WITNESS:  It was a commission.

THE COURT:  A commission for the owner of the gambling parlor?

THE WITNESS:  Yes.

THE COURT:  You were paying to gamble, is that right?

THE WITNESS:  There would be commission taken out if there was a winning.

THE COURT:  I see.  But only if there was a winning?

THE WITNESS:  Yes.

THE COURT:  I see.  How much was the commission?

THE WITNESS:  $5 -- 5 percent.

THE COURT:  $5 from 100, 5 percent commission?

THE WITNESS:  Yes.

BY MS. BURNS:

Q.  At Madison Street who was the owner taking these commissions?

D4A6LIN3                         Zhu - direct

A.   The owner taking the commission was Ding Pa.

Q.   I think I just missed the answer.  How many workers did you see there?

A.   There was a few.  Four, five, five or six workers.

          MR. COHEN:  Your Honor, can we fix a time frame?

          THE COURT:  Yes.  When was this?

          THE WITNESS:  In '96.

          THE COURT:  1996.

Q.   The people you saw working there were they all the same or did they change?

A.   It varied.

Q.   How many people would be gambling when you were there on average?

          THE COURT:  Not would be but were?

          MS. BURNS:  Thank you, your Honor.

Q.   How many people were gambling when you went?

A.   When there was a lot, it was between 20 to 30.  When there was a few, it was between 10 to 20.

          THE COURT:  So this was 17 years ago?

          THE WITNESS:  Yes.

Q.   How often did you go to gamble at Madison Street?

A.   I used to go every two, three days.  Every so often.

Q.   For how long did you go there?

A.   I was gambling there for a pretty long time.

          THE COURT:  How many years?

D4A6LIN3                     Zhu - direct

THE WITNESS:  No.  It would be open for a period of time here and there.  I was going there for about two, three months.  And then after I lost my money, I stopped going.

Q.  Other than take commissions, did you see anything else that made you believe that Ding Pa was running this gambling parlor?

A.  The shareholders would go to him.  Whoever wanted to become a shareholder would have to give him the money.

MR. COHEN:  Objection and move to strike, your Honor.  There is no foundation.

THE COURT:  There is no foundation for what shareholders would have to do.  Objection sustained.

Q.  What is a shareholder in a gambling parlor?

A.  People in the gambling parlor that gamble would get recruited.

Q.  Recruited by whom?

A.  Ding Pa.

Q.  Were you a shareholder in this Madison Street gambling parlor?

A.  Yes.

Q.  How many shareholders were there at the time that you were a shareholder?

A.  There were approximately 20 to 30 people.

MR. COHEN:  I am sorry, 20 to 30?

THE COURT:  That's what he said.

MR. COHEN:  Thank you.

**A. 298**

D4A6LIN3                     Zhu - direct

Q.  What did you receive, if anything, for being a shareholder?

A.  If they made money, then their shareholder would get profit of a few hundred dollars like every three days.

Q.  Did you ever receive any profits?

THE COURT:  You would get a few hundred dollars every few days?

THE WITNESS:  If there was a winning.

Q.  Did you ever receive profits as a shareholder at the Madison Street location?

A.  After I lost money gambling, I stopped.

MR. COHEN:  Move to strike as nonresponsive.

THE COURT:  What you were asked was:  Did you receive money as a shareholder?

THE WITNESS:  What was that?  Can you ask the question again?

THE COURT:  Were you a shareholder?

THE WITNESS:  Yes.

THE COURT:  While you were a shareholder, did you receive any money?

THE WITNESS:  But I lost it in gambling.

THE COURT:  That's not the question.

THE WITNESS:  You asked if I made any money.  Yes, I made money.

BY MS. BURNS:

Q.  Did you gamble at any other gambling parlors?

D4A6LIN3                     Zhu - direct

MR. COHEN:  I am sorry, Ms. Burns.

Ms. Lai, I didn't hear the last answer.

THE INTERPRETER:  Yes, I made money.

MR. COHEN:  Thank you.

Q.  Did you go to gamble at any other gambling parlors with Ding Pa?

A.  Did I go where?

Q.  Did you ever go to gambling parlors other than on Madison Street with Ding Pa?

A.  Yes.  I went to the one on 29th Eldridge Street.

Q.  Is that location in Manhattan?

A.  Yes.

Q.  When did you go there?

A.  It was also the end of '96, '97.  After he stopped in this location, he moved over to the other location.

Q.  Who is the "he" you are referring to?

A.  Ding Pa.

Q.  Was Ding Pa the owner and operator of the Eldridge Street location?

A.  Yes.

Q.  Were you a shareholder in the Eldridge Street location?

A.  I have shares too.

Q.  How many shareholders were in this location?

A.  It was also between 20 to 30 people.

Q.  How often did you go to the Eldridge Street location?