# 14-4133

UNITED STATES COURT OF APPEALS

For the

## SECOND CIRCUIT

UNITED STATES OF AMERICA,

Appellee,

v.

Hao Chao, aka Sealed Defendant 2, aka Little Beijing,

Defendant

and

Xing Lin, aka Sealed Defendant 1, aka Ding Pa,

Defendant-Appellant

On Appeal from the United States District Court
for the Southern District of New York

**APPENDIX**
**Volume 2 of 3 (Pages A-301 to A-600)**

Megan Wolfe Benett, Esq.
750 Third Avenue, 32nd Floor
New York, New York 10017
(212) 973-3406
mbenett@kreindler.com
*Attorney for Defendant Appellant Xing Lin*

# TABLE OF CONTENTS

**Page**

District Court Docket Entries ..........................................................A. 1

Notice of Appeal filed November 3, 2014 .................................A. 22

Initial Indictment filed February 9, 2011 ..................................A. 23

Draft Plea Agreement dated January 10, 2012 ...........................A. 26

Draft Superseding Information ...................................................A. 31

Plea Transcript held before the
Honorable Miriam Goldman Cedarbaum dated
June 27, 2012 ..............................................................................A. 34

Transcript of Conference held before the
Honorable Miriam Goldman Cedarbaum, dated
June 28, 2012 ..............................................................................A. 90

Transcript of Conference held before the
Honorable Miriam Goldman Cedarbaum, dated
July 12, 2012 ..............................................................................A. 101

Second Superceding Indictment filed September 28, 2012 .....A. 115

Transcript of Indictment held before the
Honorable Miriam Goldman Cedarbaum, dated
July 26, 2012 ..............................................................................A. 133

Transcript of Conference held before the
Honorable Miriam Goldman Cedarbaum, dated
October 19, 2012 .......................................................................A. 146

Transcript of Conference held before the
Honorable Miriam Goldman Cedarbaum, dated
January 31, 2013 ..............................................................A. 160

Transcript of Conference held before the
Honorable Miriam Goldman Cedarbaum, dated
April 3,2013 ....................................................................A. 181

Transcript of Trial Proceeding held before the
Honorable Miriam Goldman Cedarbaum, dated
April 9, 2013 ...................................................................A. 201

Transcript of Trial Proceeding held before the
Honorable Miriam Goldman Cedarbaum, dated
April 10, 2013 .................................................................A. 219

Transcript of Trial Proceeding held before the
Honorable Miriam Goldman Cedarbaum, dated
April 11, 2013 .................................................................A. 363

Transcript of Trial Proceeding held before the
Honorable Miriam Goldman Cedarbaum, dated
April 15, 2013 .................................................................A. 500

Transcript of Trial Proceeding held before the
Honorable Miriam Goldman Cedarbaum, dated
April 16, 2013 .................................................................A. 531

Transcript of Trial Proceeding held before the
Honorable Miriam Goldman Cedarbaum, dated
April 17, 2013 .................................................................A. 562

Transcript of Trial Proceeding held before the
Honorable Miriam Goldman Cedarbaum, dated
April 18, 2013 .................................................................A. 596

Transcript of Trial Proceeding held before the
Honorable Miriam Goldman Cedarbaum, dated
April 22, 2013 ........................................................A. 627

Transcript of Trial Proceeding held before the
Honorable Miriam Goldman Cedarbaum, dated
April 23, 2013 ........................................................A. 653

Transcript of Trial Proceeding held before the
Honorable Miriam Goldman Cedarbaum, dated
April 24, 2013 ........................................................A. 688

Transcript of Trial Proceeding held before the
Honorable Miriam Goldman Cedarbaum, dated
April 25, 2013 ........................................................A. 712

Jury Verdict Form dated April 24, 2013 ...................A. 721

Government Sentencing Submission dated
September 15, 2014 ................................................A. 723

Defense Sentencing Submission dated
October 6, 2014 .....................................................A. 734

Government Sentencing Submission dated
October 20, 2014 ...................................................A. 741

Defense Sentencing Submission dated
October 21, 2014 ...................................................A. 744

Transcript of Sentencing dated October
21, 2014 ...............................................................A. 748

D4A6LIN3                      Zhu - direct

A.   I went occasionally.

Q.   What does "occasionally" mean?

A.   Sometimes I would go every two, three days, sometimes every day, sometimes every day.  As a shareholder you have to go in and work every day.

Q.   For how long were you a shareholder and gambler at the Eldridge Street location?

A.   Not for that long.  After I gambled and lost money, I stopped.

Q.   Is that after a period of weeks or months?

A.   I only do it for about three to four weeks.

Q.   Do you know how long Eldridge Street was in operation?

A.   I don't know exactly how long.  Approximately two to three months.

Q.   What kind of games were played there?

A.   Also 13 cards.

Q.   Did you see people working there?

A.   Yes.

Q.   How many people did you see?

A.   People there, a few people they switched every hour.

Q.   What type of work were they doing?

A.   Some took information, other dealings cards.

Q.   How many people were gambling when you went to this location?

A.   As many as 20 to 30 people, but if there weren't that many

D4A6LIN3                    Zhu - direct

people around 10 people.

Q.   How much would you bet?

A.   I bet a few hundred or sometimes if I bet more, over a thousand dollars.

Q.   Directing your attention now to July 29th, 2004.  What were you doing that evening?

A.   I was having dinner in Manhattan that night.

Q.   Who were you having dinner with?

A.   Yita Mayong, Number Four, Chi Xiang, Madan, and Yi Qun.

          MR. COHEN:  M-a-d-a-n.

          THE INTERPRETER:  M-a-d-a-n.

A.   Yi Qun and myself.  And later my older sister came.

Q.   Did you have any alcoholic drinks at dinner, like beer?

A.   During that night we were talking about my niece's wedding.

Q.   Did you drink any alcoholic drinks while you were at dinner?

A.   Yes.  A bottle or two beers.

Q.   After dinner, did you go anywhere?

A.   I went to Flushing to the -- I went to a karaoke bar.

Q.   Do you remember the name of that karaoke bar?

A.   Scent of a Woman Karaoke Bar.

          MR. COHEN:  I am sorry.

          THE INTERPRETER:  Scent of a Woman.

Q.   Approximately what time did you arrive there?

A.   I don't exactly remember but around 11:00.

D4A6LIN3                      Zhu - direct

Q.   Who were you with?

A.   The people who I had dinner with.  My sister's dinner.

Q.   So the other names you mentioned at dinner, those were the same people in your group at Scent of a Woman?

A.   Yes.

Q.   Did you stay for a long time or a short time at Scent of a Woman?

A.   I lasted 15 minutes.  I open a beer and went to another place.

Q.   What was the other place you went to?

A.   Heaven On Earth.

Q.   Where is that located?

A.   In Queens, Flushing.

Q.   What was the name of it?

A.   Heaven On Earth.

Q.   Had you been to Heaven On Earth before?

A.   Yes.

Q.   How many times?

A.   I had been there a few times.

Q.   What kind of place was it?

A.   It was in the basement.

Q.   What did you do there?

A.   Just to hang out.

Q.   Was this any type of club or was there particular activity that you would do there?

D4A6LIN3                    Zhu - direct

A.   No.  We had dinner and all of us just went there to hang out.

THE COURT:  You had dinner there?

THE WITNESS:  No.  We had dinner somewhere else and then after that we went there to hang out.

Q.   To be clear you went to Heaven On Earth to hang out?

A.   Yes.  I had been hanging out at Heaven On Earth a few times.

Q.   When you arrived that night at Heaven On Earth was there security?

A.   Yes.

Q.   What kind of security was there?

A.   An American.

Q.   What was that person doing?

A.   When people go in, he would search people.

Q.   Was that search done with hands or with a device or both?

A.   Both.  Depends.  Sometimes he used his hand and sometimes used a device.

Q.   Before you went there that night was there security on those other occasions?

A.   Yes.

Q.   Who did you go to Heaven On Earth with?

A.   The night when the incident took place.?

Q.   Yes.

A.   The people I had dinner with.

D4A6LIN3                          Zhu - direct

Q.  One of those people you mentioned was Yi Qun, is that correct?

A.  No.  When I was having the dinner in Chinatown, Yi Qun was with me but my sister did not go.

MR. COHEN:  I am sorry?

THE INTERPRETER:  My sister did not go.

A.  My sister did not go.

Q.  Was Yi Qun in your group at Heaven On Earth?

A.  Yes.

Q.  Can you describe your relationship with Yi Qun?

A.  At the end of 1996 and he used to work in a barbershop.

Q.  Were you close with him?

A.  I met him in a barbershop and later we hang out and he became my sister's boyfriend.

Q.  Turning back to Heaven On Earth.  Where did you go once you got inside the club?

THE INTERPRETER:  I am sorry?

Q.  Where did you go once you got inside the club?

A.  Me, when I got to Heaven On Earth?

Q.  Yes.

A.  I went to a room and then I went out to the common area and then I stood there for a while and then I went back to the room.

Q.  What kind of room was this that you went back into?

A.  For example, from here to there.  The door is over there

D4A6LIN3                    Zhu – direct

and chairs and a sofa were over there.

Q.  Was this a private room for your group?

A.  Yes.

Q.  Was there more than one private room in the club?

A.  In the club there were many rooms, but we just had the room to ourselves.

Q.  The room you had to yourselves, who was in that room that night?

MR. COHEN:  Your Honor, can we fix a time?

THE COURT:  What time of night was this?

MR. COHEN:  No.  At what particular point is Ms. Burns inquiring as to.

THE COURT:  When you first went to the room, who was in the room?

MR. COHEN:  Thank you.

THE WITNESS:  When I first went in it was empty.

THE COURT:  Right.  But who went in with you?

THE WITNESS:  Yi Qun, Madan, Yita, Chi Xing, and Mayong, Number Four, and myself.

THE COURT:  So there were five people altogether?

THE WITNESS:  Including myself, Madan, Number Four, Yi Qun, Mayong, Chi Xing, myself.  Seven.

Q.  Those names you just listed are those all men?

A.  Yes.

Q.  Were there any other --

D4A6LIN3                        Zhu - direct

A.   And also later a hostess came.

Q.   One hostess or more than one hostess?

A.   Two hostesses.

Q.   Were those women paid to join you?

A.   Yes.

Q.   Inside the room where were you sitting or standing?

A.   I was sitting in the corner furthest in.

Q.   Were you facing toward the door or away from the door?

A.   I face the door.  Yes, facing the door.

Q.   Where was Yi Qun in the room?

A.   He was next to the entrance.  The door in the same row where I was sitting, but he was more out.

Q.   What do you mean by "more out"?

A.   About three to four seats apart from me.

Q.   What was your group doing inside this private room?

A.   We were singing, drinking, talking.

Q.   Were you drinking any alcohol at this time?

A.   Yes.  We just started drinking beer, a few bottles.

Q.   How many did you have?

A.   Myself that night I had just a bottle or two.

Q.   Did there come a time when anybody else came into your room?

A.   Yes.

Q.   Who came into the room?

A.   Ding Pa and another person.

D4A6LIN3                     Zhu - direct

Q.  Did you recognize the other person?

A.  I did not.

Q.  When Ding Pa came into the room was there music playing?

A.  Well, there were sounds of other people singing.

Q.  What was the volume in the room?

A.  Not really that loud.

          THE COURT:  Not very loud.

Q.  What happened first when Ding Pa and the other man came into the room?

A.  He came in and I stood up and I was about to have a drink with him.  So he just told me to sit down.

Q.  What was your reaction to his saying that?

          MR. COHEN:  Objection.

          THE COURT:  Objection sustained.

Q.  How did you feel when Ding Pa said that to you?

          THE COURT:  Objection sustained.

Q.  After Ding Pa told you to sit down, did he say anything else to you?

A.  He said, Just sit down, it has nothing to do with me.  So at time I get confused and I was scared.

          THE COURT:  No.  That is not the question.

Q.  Other than telling you to sit down and saying this has nothing to do with you, did Ding Pa say anything else to you at this time?

A.  No.  I just heard "shoot."

**A. 308**

D4A6LIN3                    Zhu - direct

Q.  Who said shoot?

A.  Ding Pa.

Q.  Who did Ding Pa say shoot to?

A.  The person in the next room.

Q.  What happened when Ding Pa said shoot to that man?

A.  And then a few shots were fired at Yi Qun.

THE COURT:  At a convenient point we're going to stop for lunch.

Q.  Did you see where this person was aiming that gun?

A.  Aiming at Yi Qun.

Q.  Did you see him aim the gun at anyone else?

A.  At the time I did not really pay that much attention because I was scared.

Q.  What happened to Yi Qun once the shots started being fired?

A.  A few shots had been fired and Ding Pa and him both ran away.  I got scared and people went back and Yi Qun was lying on the ground.

THE COURT:  At a convenient point we're going to stop --

MS. BURNS:  This is a good point.

THE COURT:  -- for the midday recess.

Very well.  Members of the jury, we're going to recess now for lunch and we'll reconvene.  Come back to the courtroom at 20 after 2:00.  I am going to ask Ms. Brown to wait just a moment.

D4A6LIN3                         Zhu – direct

(Jury excused)

THE COURT:  You may step down.

(Continued on next page)

D4A6LIN3                          Zhu - direct

(In open court; jury not present)

THE COURT:  Ms. Brown, I am going to invite you up to the side bar here with the lawyers.

(Continued on next page)

D4A6LIN3                          Zhu - direct

(At the side bar)

THE COURT:  You did not do anything improper.  Please understand that.  Please understand that you did the right thing as soon as you remembered what it was.  For complicated reasons, which have nothing to do with any bad conduct on your part, we're going to excuse you from the jury.

JUROR:  Okay.  Thank you.

THE COURT:  Thank you for your help.

JUROR:  Sorry.

MR. COHEN:  You do not have to apologize to me.  I am grateful that you brought this to the Court.  You didn't do anything.

JUROR:  Catholic school.

MR. COHEN:  From my point of view you should be commended.

JUROR:  Thank you.  I didn't realize.

THE COURT:  I understand that.  This is no reflection on you.  You should always come forward when you remember.  You did the right thing.

MR. COHEN:  New York is a very small place.

THE COURT:  You are free from this case.  Have a pleasant lunch anyhow.

JUROR:  That I will do.

(Luncheon recess)

**A. 312**

D4AVLIN4                         G. Y. Zhou - direct

A F T E R N O O N   S E S S I O N

2:30 P.M.

THE COURT:  Good afternoon.

Please be seated.

MR. SKINNER:  Your Honor, before the jury comes in, can we raise two housekeeping matters?

THE COURT:  Yes.

MR. SKINNER:  First, we've been informed by defense counsel that he thinks his cross-examination of Mr. Zhou may be quite lengthy.  And we have a witness in from out of town, from Georgia, who we think will be pretty brief.  And we were going to suggest, with the Court's permission --

THE COURT:  To interrupt.

MR. SKINNER:  Yeah, at the conclusion of direct, we'll take Mr. Zhou off the stand, call the witness from Georgia, then we'll put Mr. Zhou back on the stand for cross after that.

MR. COHEN:  I have no objection, Judge.

THE COURT:  Fine.

Will you be able to complete that today?

MR. SKINNER:  Oh, yes.  I think the witness from Georgia I don't think will -- the government's direct is all of ten minutes, and I don't anticipate lengthy cross.

MR. COHEN:  If I have cross at all, it will be maybe three or four questions.

THE COURT:  Very well.

**A. 313**

D4AVLIN4                    G. Y. Zhou - direct

MR. SKINNER:  Thank you, your Honor.

THE COURT:  Then let's get the jury.

(Jury present)

THE COURT:  We're going to continue with the same witness.

You may proceed.

MS. BURNS:  Thank you, your Honor.

GUANG YUN ZHOU, resumed.

BY MS. BURNS:

Q.  Mr. Zhou, before we broke, I believe you testified that after the shooting stopped, Yiqun was on the ground in the room; is that correct?

A.  Yes.

Q.  What happened next?

A.  After the shooting, after a few shots were fired, people all ran out.

Q.  Who did you see run out?

A.  Ding Pa and another person.

Q.  What did you do at that time?

A.  The other people, they were --

THE COURT:  No, they did not ask about the other people.  He's asked about himself.  What did you do?

A.  I went out.  I got scared.  I went out and told my sister.

Q.  What did you do, if anything, before you left the room?

A.  I went over to Yiqun, and touch his arm to see if there was

D4AVLIN4                         G. Y. Zhou - direct

any reaction.

Q.  Was there any reaction?

A.  There was no reaction.  I got scared.  So I called a car and went to Chinatown.

Q.  And I think you said that Ding Pa ran out of the room with someone else.  Who was that?

A.  He ran out after the gun went off a few times.

Q.  Did he go with anyone?

A.  Are you talking about Ding Pa?

Q.  Yeah.  Did Ding Pa leave with anyone?

A.  He ran out with the shooter.

Q.  You said you went to see your sister.  Where did you go?

A.  I went to Chinatown.

Q.  What happened next?

A.  I told my sister that Yiqun got shot a few times.

Q.  Did you speak with the police about what happened that night in that karaoke room?

A.  I do not remember whether it was that night or the next day.  I did go to the precinct.

Q.  What precinct did you go to?

A.  109.

Q.  When you were at the precinct, did you see other people who had been at the karaoke club earlier that night?

A.  The people that were in the room?

Q.  Yes.

THE COURT:  Well, wait just a moment.

Did you go to the precinct that night?

THE WITNESS:  I got scared.  I don't remember whether it was that night or not.  I -- it's been a long time.

Q.  Did you go to the precinct within a day after the shooting took place?

A.  Yes.

Q.  While you were at the precinct, did you see people who'd been in the karaoke room during the shooting at the precinct?

A.  The shooter?

THE COURT:  No, that's not what you're being asked.

Q.  Did you see anyone else who had been in the room with you that night at the precinct?

A.  Yes.

Q.  Did you see Ding Pa at the precinct?

A.  No.

Q.  Did you see the man who'd come into the room with Ding Pa?

A.  I did not.

Q.  Before you spoke to the police about -- before you spoke to the police, did you speak with anyone else who was in the room that night?

A.  I did not.  I only talked about why this happened in the room.

Q.  When did you next see --

MR. COHEN:  I move to strike that as unresponsive.

D4AVLIN4                     G. Y. Zhou - direct

THE COURT:  I don't understand the answer.  It had nothing to do with the question.

Q.  Did you speak to the police --

THE COURT:  I do grant the motion to strike.

Q.  While you were at the precinct, did you speak to the police about what had happened in the karaoke room that night?

THE INTERPRETER:  I'm sorry, can you repeat the question?

MS. BURNS:  Sure.

Q.  While you were at the precinct, did you speak to the police about what happened in the karaoke room that night?

A.  Yes.

Q.  Before you did so, did you speak with anybody else who had also been in the room that night?

A.  I did not.

Q.  When did you next see Ding Pa?

A.  Do you mean before the shooting or after the shooting?

Q.  After the shooting, when did you next see Ding Pa?

A.  I did not.

MS. BURNS:  No further questions.

MR. SKINNER:  Your Honor, as we discussed, at this time we'd ask that the witness be permitted to step down so that we could call a witness out of order.

THE COURT:  Very well.

MR. COHEN:  No objection.

D4AVLIN4                        G. Y. Zhou - direct

(Witness excused)

MR. SKINNER:  Your Honor, the government calls Andrew Clark.

ANDREW CLARK,

    called as a witness by the Government,

    having been duly sworn, testified as follows:

THE DEPUTY CLERK:  Thank you.  Please be seated.

Please state your full name for the record.

THE WITNESS:  Detective A. W. Clark, Andrew W. Clark.

THE DEPUTY CLERK:  Spell your last name slowly.

THE WITNESS:  C-L-A-R-K.

THE DEPUTY CLERK:  Thank you.

DIRECT EXAMINATION

BY MR. SKINNER:

Q.  Mr. Clark, where do you work?

A.  For the City of Doraville Police Department, out of DeKalb County, Georgia.

Q.  And how long have you worked for the Doraville Police Department?

A.  Since January 28th, 1998.

Q.  What's your current position there?

A.  I'm a detective.

Q.  How long have you been a detective?

A.  Since 2002.

Q.  Could you just tell us where in Georgia Doraville is

**A. 318**

D4AVLIN4                       Clark – direct

located?

A.   Yes.  We're located within metro Atlanta, the north end of 285/85 area.

Q.   Let me direct your attention back to July of 2004.

Were you a detective in the Doraville Police Department at that time?

A.   Yes, sir, I was.

Q.   Were you working on July 16th of 2004?

A.   Yes, sir, I was.

Q.   Did you arrest anyone that day?

A.   I arrested five subjects, sir.

Q.   Where did those arrests take place?

A.   5150 Buford Highway, Asian Square.

Q.   What kind of building is located there?

A.   It's basically like a strip plaza or a strip mall.

Q.   How did you come to be there?

A.   I was doing an investigation at the time on electronic gambling machines.

Q.   Did you go inside this address?

A.   Yes, sir, I did.

Q.   What did you find once you got inside?

A.   When I walked into the inside of the Hong Kong Employment Agency, I located five individuals.  They were sitting around a gambling table, and there was cash out on the table when they were participating in gambling.

D4AVLIN4                         Clark - direct

Q. What did you do after you went into this place?

A. They seemed surprised to our police presence. We had marked up. We detained the subjects over there, and eventually arrested the subjects during our investigation.

Q. When you were there, did you find any money?

A. Yes, sir, we did.

Q. How much money did you find?

A. $4,500 approximately.

Q. Did you find anything else related to gambling there?

A. Yes, sir, we did.

Q. What did you find?

A. Electronic gambling machines.

Q. When you say electronic gambling machine, what do you mean?

A. They are basically like electronic video poker. They're called Skill Stop. They have different names.

Q. What happened after you placed these five individuals under arrest?

A. We had them transported to the Doraville Police Department.

Q. What happened once you brought them back to the Doraville Police Department?

A. They were booked into the City of Doraville Jail for commercial gambling.

Q. Was one of the people you arrested a man named Xing Lin?

A. Yes, sir, it was.

Q. And did you talk to Mr. Lin that day?

**A. 320**

D4AVLIN4                          Clark - direct

A.   Yes, sir, I did.

Q.   As part of the booking process, did you ask him basic pedigree questions about where he was from?

A.   Yes, sir.

Q.   And did you ask him for a driver's license?

A.   Yes, sir, I did.

        MR. SKINNER:   Your Honor, I'm showing the witness an exhibit we've marked as Government Exhibit 51.

Q.   Detective Clark, can you take a look at 51 for me -- excuse me -- 50.

        MR. SKINNER:   For the record, to be clear, I'm showing the witness an exhibit marked Government Exhibit 50.

Q.   Can you take a look at that for me please?

A.   Yes, sir.

Q.   Do you recognize this?

A.   Yes, sir, I do.

Q.   What is it?

A.   This is the State of Georgia limited permit that Mr. Lin had on his person that presented.

Q.   This is the driver's license that he gave you on the date of his arrest?

A.   That's correct, sir.

        MR. SKINNER:   Your Honor, we offer Government Exhibit 50.

        MR. COHEN:   No objection.

**A. 321**

D4AVLIN4                         Clark - direct

THE COURT:  Very well.  Government Exhibit 50 is received in evidence.

(Government's Exhibit 50 received in evidence)

MR. SKINNER:  Can you show Government Exhibit 50 to the jury.

THE COURT:  Yes, you may.

Q.  And, Detective Clark, as part of the booking process, did you ask Mr. Lin for his phone number?

A.  Yes, sir.

Q.  Did he give you a phone number?

A.  Yes, sir, he did.

Q.  What phone number did he give you?

A.  Off the top of my head, sir, I'm not positive.

MR. SKINNER:  Your Honor, I'm showing the witness a document that's been marked as Government Exhibit 51 for identification purposes.

Q.  Detective Clark, can I ask you, after having looked at this document, if it helps refresh your recollection as to the phone number that Mr. Lin gave you?

A.  Yes, it does, sir.

Q.  And what was that phone number?

A.  The telephone number was 646-996-3991.

MR. SKINNER:  Your Honor, no further questions.

MR. COHEN:  No questions, your Honor.

THE COURT:  Very well.  You may step down.

D4AVLIN4                          Clark – direct

THE WITNESS:  Thank you, your Honor.

(Witness excused)

MR. SKINNER:  Your Honor, the government would recall Mr. Zhou for the purposes of cross-examination.

THE COURT:  Very well.

What is the Chinese language that Mr. Zhou is speaking?

THE INTERPRETER:  The Foochow dialect.

THE COURT:  This is Foochinese.

THE INTERPRETER:  Foochinese.

THE COURT:  Thank you.

 GUANG YUN ZHOU, resumed.

CROSS-EXAMINATION

BY MR. COHEN:

Q.  Mr. Zhou, good afternoon.

A.  How are you?

Q.  Have you and I ever met?

A.  No.

Q.  And we've never had any conversations about this case; correct?

A.  With who?

Q.  You and I.  We've never talked about what you've testified to; correct?

A.  You mean with the prosecutor or with whom?

THE COURT:  The lawyer is now asking him questions.

D4AVLIN4                          Zhou - cross

A.   Oh, no.

Q.   Okay.   You mentioned conversations with the prosecutor.
Have you spoken to the prosecutors about your testimony?

A.   What do you mean?

Q.   I mean have you spoken with Mr. Skinner, Ms. Burns, Agent
Varian, or other people from the government about the testimony
that you would be giving today?

A.   The testimony?   Are you talking about the testimony?

         THE COURT:   Yes.

A.   Yes, I did.

Q.   Okay.   About how many times would you say you've met with
people from the government to talk about what you would be
testifying about?

A.   I do not remember how many times.

         THE COURT:   What's your best recollection?

         MR. COHEN:   Thank you, your Honor.

         THE WITNESS:   I do not remember clearly.   I can't be
exact.

Q.   When was the last time you met with them?

A.   I do not remember which day of the month, but it was a few
days ago.

Q.   Okay.   And would you say -- I know you say you don't recall
exactly how many times you met with them.   Would you say it was
probably somewhere between 10 times and 20 times?

A.   No.

D4AVLIN4                          Zhou - cross

Q.  Less than 10 or more than 20?

A.  I don't know how many times.

Q.  You said that you first came to the United States, I think, in 1993?

A.  I said that the first time I was arrested, right after I left China.  I was in the international water on a ship.

Q.  Okay.  So, in other words, you left China to try to be smuggled into the U.S. and got arrested while you were at sea?

A.  Yes.

Q.  And was that by authorities from China or from the United States or from some other country?

A.  That was in the international water.

Q.  Okay.  But, well, how long had you been at sea before you got arrested?

A.  Between 10 to 20 days.  Their ship was broken down and we were stuck there.

Q.  Okay.  And were you stopped in the middle of the water or at some port?

A.  What to you mean?  Can you repeat that question?

Q.  Yes.  The ship was -- let me put it a different way.  You said there came a time when you got arrested at sea; correct?

A.  Yes.

Q.  Was the ship that you were on stopped dead in the water or were you at someplace of land at the time that you were arrested?

D4AVLIN4                        Zhou - cross

A.  We were in the middle of the sea.

Q.  Okay.  And where were you taken after you were arrested on that occasion?

A.  We were taken to some kind of military base.

THE INTERPRETER:  I'm sorry, your Honor, I just want to clarify something.

A.  After we were arrested, all of us was taken to land.

Q.  And was that land in China or the United States or some other place?

A.  I think it belonged to the U.S.

Q.  And when you got to the land, were the people who were at the land people who spoke English?

A.  Yes.

Q.  Why did you leave China at that time?

A.  My family was persecuted.

Q.  Persecuted?

A.  Back at home, because of my child or my children being born, because of family planning, that was the reason.

Q.  Who was persecuted?

A.  I was.  My wife and I were.  We could not stay home.

Q.  And that was because you had more than one child?

A.  Yes.

Q.  Was there a policy in China that said families could only have one child?

A.  Yes, only one.

**A. 326**

D4AVLIN4                      Zhou - cross

Q.   And how many children do you have -- did you have at the time you left China?

A.   One was already born, the other one was in her stomach.  I had to go into hiding in different places.

Q.   And did your wife go into hiding with you?

A.   Yes.

Q.   And when you left China to come to the U.S., did your wife come with you?

A.   No.

Q.   You left her behind?

A.   She was with her sister.

Q.   How were you persecuted?

          MS. BURNS:  Objection.

          Asked and answered.

          THE COURT:  Overruled.

A.   The family planning people came to the house, fines were levied, and also the house was wrecked.

Q.   The house was?

A.   Wrecked.

Q.   Okay.  And that was it?

A.   Yes.  And after the child was born, there was a fine.

Q.   Okay.  So your wife was not forced to undergo an abortion when your second child was --

          THE COURT:  Expected.

Q.   -- in-utero; correct?

D4AVLIN4                          Zhou - cross

A.   We did not have the child aborted; that's why we went into hiding.

Q.   Okay.  And eventually the child was born and you paid a fine; correct?

A.   Yes.

Q.   Okay.  And how long after your second child was born did you leave China?

A.   About after the child was one year old.  I was still carrying the child in my arms.

Q.   So it was about a year from the time that the child was born until you left; correct?

A.   A little older than a year.

Q.   Okay.  And isn't it true, sir, that the reason you came to the United States was so that you could provide a better living for your wife and children that you left behind in China?

A.   No, because the family planning bureau was looking for me all over the place.

Q.   You were on the run for a year in China?

A.   Is it possible not to answer these questions?

        THE COURT:  No, not possible.

A.   Because it's been many years, and I don't remember some of the things.

Q.   You were on the run for a year in China?

A.   Me?  I was running for over a year.

Q.   Where did you live?

D4AVLIN4                          Zhou - cross

A.   I rented a place elsewhere in Fuzhou.

Q.   You were from Fuzhou; correct?

A.   No, I was in the countryside.  Fuzhou is a city.  It's different.

Q.   So Fuzhou --

THE COURT:  Fuzhou County.

MR. COHEN:  I am going to do it, Judge.

Q.   Fuzhou is a city in Fujian Province; correct?

A.   Fuzhou is a city.  I'm from Longqi.

THE COURT:  The question was that's in Fujian Province also, right?

A.   Yes.

Q.   When you left China, there wasn't very much to do in Longqi in terms of employment; correct?

A.   Longqi?  There were work to do in Longqi.

Q.   When you were arrested at sea and taken to wherever you were taken to, did you ask for political asylum?

A.   After I was arrested, I was locked up for a few days, and then I was sent back.  They didn't ask me questions like that.  Plus, I didn't speak English.

Q.   When you were arrested, was there anybody there able to translate for you between English and Chinese?

A.   Chinese, there were people on the ship that speaks Chinese, but I didn't speak English.  So if they were going to send people back, they were going to send all of us back.

D4AVLIN4                        Zhou - cross

Q.  Did you have a passport with you, a Chinese passport?

A.  No.

Q.  Where were you sent back to?

A.  I was sent back to China.

Q.  To where in China?

A.  I was sent to Xiamen at the time.

Q.  If you didn't speak English and couldn't communicate with any of the people that had you in custody and you had no passport, how is it that you were sent back to a particular place in China?

A.  There were a lot of people on the ship.  There were a few hundred people.  We were all sent back together.

Q.  What happened when you went back to Xiamen?

A.  I was sent to the public security bureau in Fuzhou.

Q.  Because you left China without permission; correct?

A.  It was illegal.

Q.  It was illegal for you to leave China without permission from the government; correct?

A.  What do you mean leave China?

Q.  You left China to come to the United States on a smuggling ship; correct?

A.  Yes.

Q.  That it was a violation of Chinese law to smuggle yourself out of the country; correct?

A.  Yes.

D4AVLIN4                          Zhou – cross

Q.   And is it true, sir, that the reason you were taken to a detention center was because you violated the law by leaving China?

A.   Everybody was sent back, and everybody was sent over there.

        MR. COHEN:  Your Honor, can I have my question read back to the witness, and maybe we could get an answer?

        THE COURT:  You may.

        (Record read)

A.   No, the whole group of people that were sent back went there.

Q.   And was the whole group sent there because they all violated the law by leaving China illegally?

        MS. BURNS:  Objection.

        THE COURT:  Overruled.

A.   Other people was also illegal in doing that.

Q.   How long did you stay at the detention center?

A.   Which one, in China?

Q.   Yes.

A.   My sister lived in Fuzhou.  As soon as I got back, she went to bail me out.

Q.   How long did you spend in the detention center?

A.   I was detained for two, three days.

Q.   And you were released on bail?

A.   As soon as my sister went there, as soon as there was a bail, she came to bail me out.

D4AVLIN4                        Zhou - cross

Q.   And what happened after that to you in China?

A.   Then I was afraid to go back home to the country, where my house was.

Q.   Well, when you got bailed out -- by the way, when you went back to China, did they take your fingerprints to identify who you were?

A.   In China, no, no fingerprinting.

Q.   Did you tell them who you were, where you were from?

A.   No, we were all sent there.  And once they were allowed to be bail, then the bail amount was set, and people were bailed out and released.

Q.   Okay.  But in order for your sister to bail you out and not one of the hundreds of other people that were being held in detention, did you have to provide them with your name?

A.   My name?  Are you talking about my name?

Q.   I'm talking about your name.

A.   Yes.

Q.   You gave them your name, right?

A.   What?  What do you mean?

Q.   Mr. Zhou, when you were taken to the detention center in China, and you got there, and you were being processed in, did anyone ask you what your name was?

A.   Yes, they did ask my name.

Q.   Did you tell them your name?

A.   I did.

D4AVLIN4                       Zhou - cross

Q.   And after you told them your name, were you able to communicate with your sister?

A.   As long as I was able to get bailed out, so my sister came and bail me out.

Q.   And when you were bailed out, was that in Fuzhou City or in Xiamen?

A.   In Fuzhou City.

Q.   In Fuzhou City.

Okay.  And what happened after that?  What did you do?

A.   After a few days, after I was bailed out, and I stay in Fuzhou to visit for a few days before I went to Shanghai to work.

Q.   And how long was it before you again left China to come to the United States?

A.   1996.

Q.   Okay.  So that was about three years after your first attempt to enter this country illegally?

A.   Yes, three years.

Q.   And how did you come the second time?

A.   By visa.

Q.   Was the visa in your name?

A.   In China, the snakehead did it for people over in China.

Q.   When you say "snakehead," you mean somebody whose business it is to smuggle people from China to the United States?

A.   Yes.

D4AVLIN4                    Zhou - cross

Q.  And when a snakehead did this visa for you, was the visa in your own name or someone else's name?

A.  I'm not sure.  I didn't look at it.  I'm not sure whether it was my name or someone else's.  He did everything, including passport.

Q.  And how much did you pay the snakehead to get smuggled out of China?

A.  40,000.

Q.  U.S. dollars?

A.  Yes.

Q.  Now, what happened when you arrived in the United States?

A.  What?  What happened to me when I got to the United States?

Q.  Yes.

A.  I came to San Francisco via visa, and then I came to New York.

Q.  So this phony visa that you had, actually got you into the United States?

A.  I'm not sure, because it was done by the snakehead. Snakehead did it.  He did everything.

Q.  So you paid somebody $40,000 to smuggle you into the United States; correct?

A.  Yes.

Q.  And that person, that snakehead, gave you a fake document; correct?

         MS. BURNS:  Objection.

D4AVLIN4                        Zhou - cross

THE COURT:  Overruled.

A.  I don't know.  After he did it, he just brought me into the United States.

Q.  Well, did you have a visa that was issued by the United States government by getting to the consulate and applying for one?

A.  No, I did not.  Snakehead did it for me.

Q.  Okay.  So is it a fair statement that the fake visa that you bought succeeded in getting you smuggled into the United States?

A.  Snakehead did it for me.

Q.  Do you know is it --

THE COURT:  I think you should move on.  I think you should move on.

MR. COHEN:  Very well, your Honor.

Q.  How did you get from San Francisco to New York?

A.  From San Francisco, by plane.

Q.  By plane.

And how did you get a ticket to get on an airplane?

A.  He did it for me.

Q.  "He" being the snakehead?

A.  I said also snakehead did it for me.

Q.  When you got to New York, did snakehead find you a place to live and a job?

A.  No, I was staying with my older sister and my older

D4AVLIN4                          Zhou - cross

brother.

Q.   They were living in the United States?

A.   After she got married, and then later she came to the United States.

Q.   Were your sister and your brother living in the United States when you got here?

A.   Yes.

Q.   In New York City?

A.   Yes.

Q.   And you came to live with them; correct?

A.   Yes.

Q.   And that was in 1996?

A.   Yes.

Q.   When did you first encounter or meet with any representative of the United States government?

A.   What do you mean?

Q.   Did there come a time that you made some sort of application to stay in the United States?

A.   When I came here?

Q.   Yes, sir.  When you came here in 1996, did you ask the United States government permission to stay in the United States?

A.   So you are talking about hearings?  Court hearings?

Q.   Sir, I'm asking you whether or not at any time you asked the United States government for permission to stay in the

D4AVLIN4                      Zhou - cross

United States, yes or no.

A.   Yes, I went for a hearing.

Q.   You asked for political asylum; correct?

A.   Yes.

Q.   And when you asked for political asylum, you had to answer questions from an asylum officer; correct?

A.   Political asylum, lawyer's office did it for me.

MR. COHEN:   Say again?

THE INTERPRETER:   A lawyer's office did it for me.

Q.   Well, I understood that a snakehead got you here, and the lawyer's office did something else.  But did there come a time that you had to answer questions from an asylum officer?

THE COURT:   I think "immigration officer" may be clearer.

MR. COHEN:   Okay.

A.   Yes.

Q.   Okay.  And do you remember that interview?

A.   When I went for a hearing?

Q.   The first time that you went to see somebody at immigration, was it an interview with an officer or was it a hearing?

A.   Hearing.

Q.   You never had an interview with an immigration officer, just in an office where he asked you questions about when you left China and why and things of that nature?

D4AVLIN4                        Zhou - cross

A.  I did.

Q.  Did what?

A.  Yes, the judge was asking me questions, and the lawyer's office brought me there.

Q.  And did you make false statements during that proceeding?

A.  No, I did not.

Q.  You made no false statements during that proceeding?

A.  No, I did not.  Lawyer's office did it for me.

Q.  Well, sir, at the hearing, was the judge asking questions of you or asking questions of the lawyer's office?

        THE INTERPRETER:  Counsel, could you repeat the question?

        MR. COHEN:  Yes.

Q.  At the hearing, was the judge asking questions of you or asking questions of the lawyer's office?

A.  Yes.

Q.  Yes what?

A.  Could you repeat?

        MR. COHEN:  Judge, I'm going to ask permission to approach the witness.  I'm going to show him the document, ask the translator to translate the highlighted portion, and see if it refreshes his recollection about what happened at this proceeding.

        MS. BURNS:  Judge, I object.  There's been no absence of memory here.  The witness has answered the questions.  And

D4AVLIN4                    Zhou - cross

I'd like to see the document.

MR. COHEN:  Your Honor, respectfully, there's been no presence of memory.

THE COURT:  That's correct.

MS. BURNS:  I believe he's answered the questions.

THE COURT:  He has not answered the question.  His answer was "the lawyer's office did it," when asked whether the judge spoke to him.  That's not an answer.

MS. BURNS:  I don't want to put words in his mouth, he may not be understanding the question, but there's nothing here that says he hasn't remembered something that requires refreshing recollection.

THE COURT:  I think you are incorrect.

MS. BURNS:  May I see the document, Mr. Cohen?

MR. COHEN:  Of course.

THE COURT:  You can ask him again.  You can ask him again if he remembers whether the judge asked him anything.

MR. COHEN:  May I approach, Judge?

THE COURT:  Very well.

But before you do, do you remember the hearing?

THE WITNESS:  No, it's been a long time ago.  I do not remember.

THE COURT:  Very well.

You may refresh the witness's recollection.

MR. COHEN:  Okay.  We'll just deem this as Defendant's

D4AVLIN4                          Zhou - cross

A for identification, I don't think I'm going to offer it.

THE COURT:  No, you're not going to offer it now. It's only used for the purpose of refreshing recollection.

(Continued on next page)

D4a6lin5                    Zhou - cross

MR. COHEN:  May I ask the translator to translate for him certain highlighted portions?

THE COURT:  You may.

BY MR. COHEN:

Q.  Mr. Zhu, now that the translator has translated for you some words on the document, does that refresh your recollection that you made statements or testified at some proceeding at the immigration office?

A.  I do not remember.  Long time ago.  I don't remember it clearly.

Q.  Do you remember telling immigration officers that you assaulted two birth control officers after they recommended that your wife be sterilized because she had already given birth to your second child?

A.  They came to my home and they were saying that they were going to destroy my home.

THE COURT:  Is that what you told the judge?

THE WITNESS:  Yes.

THE COURT:  Let's move on.

Q.  You told the judge that you assaulted them because they recommended your wife be sterilized, correct?

A.  Long time ago.  I don't remember this.

Q.  Did you participate in the pro-democracy movement at Tiananmen Square after June 4th of 1989, sir?

A.  June 4th?  No, I did not go Tiananmen Square.  I was in the

D4a6lin5                         Zhou - cross

village area.

Q.   Did you tell U.S. immigration officials that you were persecuted in China because of your support for the pro-democracy movement?

A.   My lawyer translated for me.  I don't remember this.

Q.   Well, if false statements were made at this hearing, are you saying they were made by your lawyer and not by you?

A.   False statements?  I submitted my own documents.

Q.   In those documents, sir, that you submitted didn't you tell the U.S. immigration office that you were being persecuted for your self-involvement in the pro-democracy movement?

A.   Yes.  At that time when my lawyer did it, but it's been so long I don't remember at this time.

Q.   Did you participate in the pro-democracy movement, or is that something that your lawyer made up?

A.   No.  I did it in the village area.

Q.   How did you participate in the pro-democracy movement?

A.   Demonstrations by students in school.

Q.   Isn't it true, sir, that this story was suggested to you by the representatives at your lawyer's office?

A.   I don't remember.

Q.   Did you talk to other illegal immigrants at that time about the fact that that story was the story everybody told in the early '90s to get political asylum in the United States?

A.   No, I did not.  I don't remember.

D4a6lin5                      Zhou - cross

THE COURT:  I think we should move on.

Q.  What was the result of your application for political asylum in the United States?

A.  What now?

Q.  In 1996 you applied to be allowed to remain here because you were persecuted in China, correct?

A.  Yes.

Q.  In fact in 1998 you were given a decision that said we don't believe you and we're sending you back to China, correct?

MS. BURNS:  Objection.

THE COURT:  Overruled.

A.  I don't know.  I did not know English.

Q.  Did you think that you had permission to stay in the United States since 1998 because you don't know English?

A.  My lawyer translated to me and said that I had lost.

Q.  So you knew that you lost, correct?

A.  My lawyer told me that I lost.

Q.  And did your lawyer tell you that you had an order to leave the United States by a certain date?

A.  No.  I didn't pay notice to that.

Q.  You didn't take notice or pay notice to the fact that you were ordered by this government to leave this country, correct?

A.  I was disappointed once I found out that I lost my case.

Q.  And because you were disappointed, you decided that you were going to disregard an order from the United States

D4a6lin5                        Zhou - cross

government and just stay here, correct?

A.   I did not know.  He didn't say that.

Q.   Sir, you knew that you had been ordered to leave the United States because you lost of your case, right?

A.   I don't remember.  I don't remember whether it was told to me or not.

Q.   Well, did you think --

THE COURT:  I think we should move on.

MR. COHEN:  Judge, can we step up for a moment?

THE COURT:  No.  I would rather move on first.

Q.   When you first came to New York, did you have a job?

A.   Yes.

Q.   What was your job?

A.   Making deliveries by bicycle.

Q.   How long did you do that for?

A.   I worked for a few months.

Q.   And when was it that you started hanging around these gambling parlors in Chinatown?

A.   What did you say?

Q.   I said, When was it that you started hanging around these gambling parlors in Chinatown?

A.   1996.

Q.   That was the same year that you came here, correct?

A.   Yes.

Q.   That is when you were making deliveries on bicycles?

D4a6lin5                        Zhou - cross

A.   Yes.

Q.   And you were making enough money for making deliveries on bicycles to gamble hundreds of dollars?

A.   Sometimes.  If I lost my money, I would ask my brother and my sister to lend me money.

Q.   Your sister is a money lender, isn't she?

A.   I am sorry.

Q.   Your sister is a money lender, isn't she?

A.   Yes.

Q.   She is a loan shark, isn't she?

          MS. BURNS:  Objection.

          THE COURT:  Sustained.

Q.   The sister that you are talking about that lent you money as a money lender, is she the one who had a relationship with Yi Qun?

A.   About this, because I have some brothers and sisters in the United States, I don't really remember.

Q.   How many sisters do you have in the United States?

A.   In the United States?  Four.

Q.   Are they all in New York?

A.   Yes.

Q.   Are they all money lenders?

A.   No.  I am their younger brother.

Q.   Are they all money lenders?

A.   No.  No.  I ask my sister for money after I lost money

**A. 345**

D4a6lin5                    Zhou - cross

gambling.

Q.  You are saying you don't remember if that is the sister that had a relationship with Yi Qun?

A.  I don't remember which one.  I asked every one of them for money, to lend me money.

THE COURT:  That is not the question.

Q.  How many of your sisters lent you money?

A.  I cannot answer those things.

Q.  You can't answer them or you don't want to answer them?

A.  When I worked I earned money and also I was a shareholder and later I got in a bus business.

Q.  Who is taking care of your wife and children and China while you were gambling hundreds of dollars a day in Chinatown?

MS. BURNS:  Objection.

THE COURT:  Overruled.

A.  I sent it back myself.

Q.  You sent money back to them?

A.  Yes.

Q.  What do you think spent more on, gambling in Chinatown or spending money on your family?

THE COURT:  I think you should move on.

Q.  Do you know somebody named Dong Jain?

THE INTERPRETER:  Can I have a spelling?

MR. COHEN:  It is phonetic.

A.  Who is this Dong Jain.

D4a6lin5                     Zhou - cross

Q.   Do you know somebody by the nickname of Cash?

A.   Who is that?  I do not know the name.

          THE COURT:  Do you know someone whose nickname is Cash?

          THE WITNESS:  A person's name?

Q.   Yes.

A.   Also my sister's boyfriend for a period of time.

Q.   That was Dong Jain, also known as Cash, correct?

A.   Yes.

Q.   He is a Dai Lo in Chinatown, right?

A.   That's other people's business.

     May I chose not to answer those questions?

Q.   You may not.

          MR. COHEN:  I am sorry.  It is not my job to tell him.

          THE COURT:  Of course.  Let me explain to the witness that you have sworn that you will tell the truth and answer every question that is put to you.

          THE WITNESS:  Yes.

Q.   So the answer, sir, yes, that Dong Jain is a Dai Lo in Chinatown?

A.   I do not know anything about that.

Q.   Do you know of a bus company called Mingan?

A.   Mingan bus?

Q.   Yes.

A.   I know of one.

D4a6lin5                    Zhou - cross

Q.   Were you involved in that company in any way?

A.   Take the bus.

Q.   Okay.  Were you involved in Mingan in any way?

A.   I was not a shareholder.

Q.   Were you involved in any way with that company?

A.   No.

Q.   Were you ever employed by that company?

A.   No.

Q.   Did you ever sell tickets for that company?

A.   No.

Q.   What was the bus company that you started?

A.   I seem to remember it was called Tianma but it has been
many years.  It's called something.  It is at the tip of my
tongue and I can't seem to remember.

Q.   Do you still own that company?

A.   I don't anymore.  I had sold it many years ago.

Q.   When did you go into the restaurant business?

A.   Quite a few years ago.  Three, four years ago.

Q.   Is that the restaurant you own in Florida?

A.   No.  The one in Brooklyn.

Q.   You also say that you had a restaurant in Florida?

A.   Yes.

Q.   And the restaurant in Florida, by the way is that
restaurant in your name or your wife's name?

A.   Under my wife's name.

D4a6lin5                          Zhou - cross

Q.   Why is it that it is not under your name?

A.   My status had expired at the time.

Q.   In other words you were not legally in the United States, correct?

A.   I was legal but my status had expired, my A5 card.

Q.   What is an A5 card?  Can you explain that to the folks on the jury?

A.   I don't really know about an A5 card.  My wife applied for me.  It makes it easier for me to work in the United States.

Q.   You mean it makes it legal for you to work in the United States, correct?

A.   It's easier to get around, take transportation to different places with this card, with this status.

Q.   Because it has a picture of you on it and it is issued by the United States government with your name?

A.   Yes.

Q.   And once that card expires, you are not good to go in the United States anymore, correct?

A.   When it expired, I had to get it renewed.

Q.   Do you now have a valid A5 card?

A.   It has expired more than a month ago.  I have not renewed it yet.

Q.   Aren't you required to have one in order to work legally?

A.   Every year when it expired, I can renew it at the law office.

Q.  Now, you have an order from the United States government that orders you be removed from the United States, correct?

A.  This was a long time ago.  I don't remember.

Q.  Do you remember testifying two hours ago when the prosecutor was asking you questions and telling this jury that you had an A5 card, it expired a month ago and that you have no status in the United States and you have a removal order?  Do you remember telling this jury you have a removal order when the prosecutor asked you that question?

A.  You had asked me about that before.

Q.  The prosecutor asked you a couple hours ago whether you had a removal order from United States and you said to the jury, Yes, I do.  And he asked you if any promises had been made or she had asked you if any promises had been made to you for your return of your testimony today.  Now do you remember the questions I am asking you about?

MS. BURNS:  Objection to form, your Honor.

THE COURT:  Overruled.  This is cross-examination.

MS. BURNS:  It is compound.  He also is testifying to the witness's testimony.  We can have it read back what he answered on direct.

MR. COHEN:  I am happy to have read back.

THE COURT:  He can ask questions his own way.  Thank you.

This is a good time to take the midafternoon recess.

D4a6lin5                        Zhou - cross

We'll take a five-minute recess.

            (Jury excused)

            MR. SKINNER:  Your Honor, can I ask a quick question? The next witness the government intends to call is one of the witnesses that the Court signed an immunity order for.  He has been here with his attorney all afternoon and before he testifies we just need to handle the housekeeping matter of having him invoke the Fifth Amendment so the order takes effect.  When you come back and outside the presence of the jury, can we have permission to call him for that purpose?

            THE COURT:  Yes.  We'll take an even shorter recess and try to expedite it.

            MR. SKINNER:  Thank you, your Honor.

            THE COURT:  Very well.

            (Recess)

**A. 351**

D4a6lin5                         Zhou - cross

(In the robing room)

MR. KRAKOW:  Good afternoon, your Honor.  I am Robert Krakow and I represent Mr. Chen.

THE COURT:  Where are the questions?

MR. SKINNER:  They are written from my perspective, your Honor.  Sorry.  They are not written from the Court's perspective.  The last time I did this, I asked the questions.

THE COURT:  That is not the way it is usually done, but that is all right.

Mr. Chen, have you been subpoenaed to testify in this case today?

MS. BURNS:  Oh, we need an interpreter.

MR. COHEN:  For the record, I have told Mr. Skinner that for sporadic marijuana use that is not contemporaneous with events that is he going to testify about.  I have no interest in asking him any questions about that at all.

THE COURT:  What are the questions for which this witness seeks immunity, the issues?

MR. SKINNER:  Your Honor, prior to coming in today in our meetings with Mr. Chen, he has advised us of his intention to invoke the Fifth Amendment if questioned in connection with his prior marijuana use and if questioned in connection with the fact that he is in this country illegally.

Is that accurate, Mr. Krakow?

MR. KRAKOW:  That is correct.

D4a6lin5                    Zhou - cross

MR. SKINNER:  I have just been advised by defense counsel that the marijuana is not an issue and he does not intend to question him.

THE COURT:  Why don't you ask him the question he is concerned about and he will tell me he will invoke privilege if is he required to answer.

MR. SKINNER:  Very well.

Mr. Chen, have we met before?

MR. CHEN:  Yes.

MR. SKINNER:  Are you under subpoena it testify in this case?

MR. CHEN:  Yes.

MR. SKINNER:  Have you told me that it is your intention to invoke the Fifth Amendment.

THE COURT:  More important ask him the question and let him invoke the privilege.

MR. SKINNER:  Very well.

Mr. Chen, are you here in the country illegally?

THE COURT:  Now you invoke your privilege.

MR. KRAKOW:  May I confer with Mr. Chen?

THE COURT:  Yes.

MR. KRAKOW:  Refuse to answer.

MR. CHEN:  I refuse to answer this question.

THE COURT:  Why?

MR. CHEN:  I refuse to make any statement that is

D4a6lin5                       Zhou – cross

incriminating to me.

THE COURT:  You are invoking what we call your Fifth Amendment privilege against self-incrimination, is that correct?

MR. CHEN:  Yes.

THE COURT:  You will do that, do I understand, with respect to any question about illegal activity?

MR. CHEN:  Illegal activities?

THE COURT:  But especially the likelihood is that you will be asked whether you are in this country illegally and you will invoke privilege, is that correct?

MR. CHEN:  Yes.

MR. COHEN:  Your Honor, respectfully I think it is more than just the fact that he is here illegally.  His real concern is probably all the false statements he has made to the government in support of his asylum claims and things of those natures.

THE COURT:  We understand that anything that has to do with his presence in the United States he is going to invoke privilege to.

Very well.  In view of the fact that he is invoking privilege, my immunity order should be effectuated.

MR. SKINNER:  Thank you, your Honor.

THE COURT:  Very well.

Now, what is happening?  I don't understand what is

**A. 354**

D4a6lin5                        Zhou - cross

happening with the witness currently on the stand, but I think you better sort that out.  We will continue tomorrow morning.

MR. COHEN:  Your Honor, noon tomorrow.

THE COURT:  Yes.  I will tell the jury that.

MR. COHEN:  Thank you.

MR. SKINNER:  Yes, your Honor.  It is really not that complicated.

MS. BURNS:  We can excuse Mr. Chen for this.

MR. SKINNER:  We had a similar issue with Mr. Zhu when we learned recently that he too had used marijuana in the past, which would potentially expose him to criminal liability.  We talked to Mr. Cohen last night about whether he was going to cross-examine him on that.

THE COURT:  And he will not as I understood.

MR. SKINNER:  In the meantime we had him call and talk to an attorney in case.  It came up and he needed representation.  There really is not and issue with regard to the cross because Mr. Cohen made the representation and that is fine.  Nevertheless, Mr. Zhu did talk to the CJA lawyer on duty to get advise with regard to his legal exposure so we need to have a CJA lawyer appointed.

MS. BURNS:  It is real a formality.  At this point I don't think the testimony is going to even --

THE COURT:  I am not going to have another lawyer monitoring his answers.

D4a6lin5                      Zhou - cross

MR. SKINNER:  Not for this witness.  It is for Mr. Zhu who is on the stand right now.

THE COURT:  I am talking about Mr. Zhu who is in the middle of his testimony.  This is a funny time to bring in a lawyer for him.

MR. SKINNER:  We're not.  He talked to the lawyer this morning.  It is purely for the formality of his getting CJA appointment so he can be compensated for the half hour that he talked to the witness this morning before he testified.

THE COURT:  All he has to do is submit to me a form for compensation for that half hour and I will endorse it.

MR. SKINNER:  We will let him do that.  It is confusing at this point.

THE COURT:  I just don't want him to think that he is going to consult another lawyer on his testimony as we go forward.

MR. COHEN:  When you say "him," the guy who is just here?

THE COURT:  The witness whom you are cross-examining.

MS. BURNS:  With regard to the CJA panel, we wanted to make sure we had done the proper paperwork to ensure he was appointed and could be compensated.

THE COURT:  That is why you gave me the form.

MS. BURNS:  That is all that that was.  It is not to interrupt the proceeding.  We tried not to interrupt the

**A. 356**

D4a6lin5                        Zhou - cross

proceedings.  We tried to send them to magistrate court and they told me, Judge Cedarbaum does these things first.

THE COURT:  They didn't understand what you were talking about.  That's fine.  I have no trouble appointing him on paper for the purpose only of that half hour.

MR. COHEN:  Judge, I have a quick application.

THE COURT:  Yes.

MR. COHEN:  Are you guys ordering the transcript?

MR. SKINNER:  Yes.

MR. COHEN:  My client is without further funds to pay for a transcript.  I am retained in this case.

THE COURT:  You want funds.

MR. COHEN:  Minimally retained.

THE COURT:  You want me to appoint --

MR. COHEN:  Authorize the transcript?

THE COURT:  Right.

MR. COHEN:  I am not seeking appointment.  I just would like if I could get copies at the same time that the government does.

THE COURT:  Very well.  I will do that.

MR. COHEN:  I appreciate that.

THE COURT:  You will have to give me a paper to show that.

MR. COHEN:  I will give you a CJA form.

THE COURT:  Just to authorization the cost of the

transcripts.

MR. COHEN:  Can I fax it over to your Honor?

THE COURT:  I don't know my fax number.  You will find out from my secretary.  You do need permission because we don't like to use the fax machine.  You can drop it off on your way to court.  I like to follow my rules as much as I can.

MR. COHEN:  So do I.

THE COURT:  Good.

MR. SKINNER:  Are we going to continue with the cross-examination?

THE COURT:  I think I am going to release the jury now until tomorrow at noon.

MR. SKINNER:  Very well, your Honor, unless we're really only five minutes.

MR. COHEN:  I have about 10 pages of cross-examination and I am halfway through the second page.

THE COURT:  Try to avoid sarcasm.

MR. COHEN:  I have I guess --

THE COURT:  It is tempting.

MR. COHEN:  -- a lower frustration tolerance level than I used to, but I will.

THE COURT:  You need to improve it.

MR. COHEN:  I will keep it in check, Judge.

THE COURT:  Good.  It is always good practice for lawyers not to have emotional responses.

D4a6lin5                      Zhou - cross

MR. COHEN:  I absolutely agree.

THE COURT:  I will come in and tell the jury about tomorrow.

(Continued on next page)

D4a6lin5                          Zhou - cross

THE COURT:  Please be seated and let's get the jury.

(In open court; jury present)

THE COURT:  Please be seated.  Members of the jury, all of these people are standing in your honor.

We're going to stop taking testimony now and tomorrow we are not going to convene until noon, 12:00.  Please have a very early brunch or whatever you want to call it before you come because we will start to take testimony at noon and we will probably stay later.  Be prepared if necessary to stay until 6:00.  We will take a break.  It will not be continuous, but you should not expect to have lunch during the taking of testimony tomorrow.  It is just for tomorrow.  Then you remember Friday you are off.  So Friday you can do anything else you are interested in, but tomorrow we will convene at noon and be prepared to go through to 6:00 with regular recesses and we'll hear the remainder of this witness's testimony tomorrow.

So have a pleasant evening and as you hear more and more, do not be tempted to discuss it either among yourselves or with anybody else because evidence comes in piece by piece and bit by bit and you have to wait until you have heard it all to begin to form opinions.  Have a pleasant evening and morning.

(Jury excused)

(Continued on next page)

**A. 360**

D4a6lin5                          Zhou - cross

(In open court; jury not present)

MR. COHEN:  Your Honor, I have the CJA form.  Should I give it to the reporter or to your Honor directly?

THE COURT:  Let me take a look.  The reporter will want to know that I have authorized it.

MR. COHEN:  Thank you very much, Judge.

THE COURT:  We'll be in recess until noon tomorrow.  You are all excused.

(Adjourned to April 11, 2013 at 12:00 p.m.)

INDEX OF EXAMINATION

Examination of:                                        Page

JOHN FILSHIE

Direct By Mr. Skinner . . . . . . . . . . . . . .39

Cross By Mr. Cohen . . . . . . . . . . . . . . . .64

GEORGE BENEDETTO

Direct By Mr. Skinner . . . . . . . . . . . . . .66

Cross By Mr. Cohen . . . . . . . . . . . . . . . .75

GUANG YUN ZHU

Direct By Ms. Burns . . . . . . . . . . . . . . .90

ANDREW CLARK

Direct By Mr. Skinner . . . . . . . . . . . . . 118

GUANG YUN ZHOU

Cross By Mr. Cohen . . . . . . . . . . . . . . . 123

GOVERNMENT EXHIBITS

Exhibit No.                                        Received

 200 A and 200 B  . . . . . . . . . . . . . . . .42

 3A, 3B, 3C, 3D, 3E, 3F . . . . . . . . . . . . .53

 4A   . . . . . . . . . . . . . . . . . . . . . .56

 4A, 4B . . . . . . . . . . . . . . . . . . . . .58

 50   . . . . . . . . . . . . . . . . . . . . . 122

D4B6LIN1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

         v.                           11 CR 114 (MGC)

XING LIN,

               Defendant.         JURY TRIAL

------------------------------x

                               New York, N.Y.
                               April 11, 2013
                               12:15 p.m.

Before:

               HON. MIRIAM GOLDMAN CEDARBAUM,

                               District Judge

                      APPEARANCES

PREET BHARARA,
    United States Attorney for the
    Southern District of New York
PETER M. SKINNER
JENNIFER E. BURNS
    Assistant United States Attorneys

JOEL S. COHEN
    Attorney for Defendant

ALSO PRESENT:  BRENDA CHEN, Fuchow Interpreter
                  DANIEL YANG, Fuchow Interpreter
                  LILY LAU, Fuchow Interpreter
                  DANIEL CHAN, Fuchow Interpreter
                  JESSICA CHACE, Paralegal
                  TIMOTHY VARIAN, Special Agent, HSI
                  JIAYING WANG, Legal Assistant

**A. 363**

D4B6LIN1

(Trial resumed)

(In open court; jury not present)

THE COURT:  Is everybody now ready for the jury?

MR. SKINNER:  Yes, your Honor.  Thank you.

THE COURT:  Good.

(Jury present)

THE COURT:  Please be seated.

Good morning, members of the jury.  I appreciate your conscientious treatment of time and we will proceed with two witnesses who are going to be heard before the cross-examination of the witness you heard last yesterday.

You may proceed, Ms. Burns.

MS. BURNS:  Thank you, your Honor.  The government calls Vincent Tranchida.

THE DEPUTY CLERK:  Please raise your right hand.

VINCENT TRANCHIDA,
    called as a witness by the Government,
    having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. BURNS:

Q.  Dr. Tranchida, where do you work?

A.  I am currently employed as a the chief medical examiner of Dane County, Wisconsin.

Q.  How long have you worked as chief at Dane County?

A.  I have been appointed the chief medical examiner of Dane

D4B6LIN1                        Tranchida - direct

County since January 1st of 2011.

Q. What are your current duties and responsibilities?

A. As the chief medical examiner I have administrative duties as well as I perform the typical duties of a medical examiner. That is, I investigate the cause and manner of death in cases where there is a threat to public safety, whether it is criminal activities, civil suits or a threat to public safety from communicable decease.

Q. What was your last position prior to Dane County?

A. Prior to coming to Dane County, I was a senior medical examiner with the Office of Chief Medical Examiner of New York.

Q. How long were you there?

A. I was employed there since June 1st of 2003.

Q. Were your duties there similar or different than what you do now?

A. Similar. I have fewer administrative duties, but essentially I perform investigations into the cause and manner of death.

Q. Can you describe your education background for us?

A. Of course. I did my premedical school training and undergraduate at the University of Michigan in Ann Arbor, Michigan. I did my medical school training at Wayne State University in Detroit, Michigan. I did combined anatomic and clinical pathology residency at the University of Michigan Medical Center. I then decided to specialize in forensic

D4B6LIN1                    Tranchida - direct

pathology at the Office of the Chief Medical Examiner of the City of New York.  While there I further subspecialized forensic and cardiac pathology and forensic neuropathology.

Q.  Doctor, What is pathology?

A.  Pathology is the subspecialty of medicine like pediatrics or radiology.  It comes from two latin words, pathos and logos.

THE COURT:  It is actually Greek.

THE WITNESS:  Very good.

A.  Pathos means pain and suffering and logos means knowledge or study.  So literally it means the knowledge or study of suffering.  It is a subspecialty of medicine that focuses on the diagnosis and interpretation of injuries and illnesses.

Q.  What then is forensic pathology?

A.  Forensic pathology comes from the forensis, which means of the public.  It applies to diseases, injuries and illnesses that affect the public at large.

Q.  What is an autopsy?

A.  An autopsy comes from two words as well.  Auto and opsy. Auto means for oneself and opsy means to see.  It is an examination of decedent both externally and internally to determine what injuries and illnesses are present, whether they are consistent with the clinical history that we have, and whether there is any information that can be learned that may help in the prosecution and investigation of these cases.

Q.  Approximately how many autopsies have you performed?

D4B6LIN1                    Tranchida - direct

A.   At this point several thousand.

Q.   Have you testified previously in court regarding these autopsies?

A.   Yes, I have.

Q.   Have you testified previously as an expert witness?

A.   Yes, I have.

Q.   How many times have you testified as an expert witness?

A.   At this point well over 100.

Q.   In what courts have you testified as an expert witness?

A.   I testified predominately in New York, in Manhattan, in Brooklyn, in Queens.   I have also testified several times in Wisconsin as well.

        MS. BURNS:   Your Honor, the government offers Dr. Tranchida in the field of forensic pathology.

        THE COURT:   We don't do that.   You may proceed.

Q.   Dr. Tranchida, can you describe in more detail the steps that you follow when you perform an autopsy?

A.   Of course.   All throughout the night our office investigators receive information about cases.   They are called in by detectives, by emergency room staff.   Our investigators collect information and throughout the night they generate files for the cases.   The following morning the medical examiners on duty review these files, divide up the work equally and we determine which preliminary testing needs to be done.   In other words, before the autopsy has even begun we can

begin to order testing, such as X rays, toxicology, etc.  Once these tests are done, we then go in and do our external examination of the body.  We're examining the body as is as it is received looking for things like trace evidence, documenting any external injuries, documenting the presence of any identifying features such as scars or tattoos.  We also collect trace evidence at the time and we'll begin to collect the toxicology evidence at this time as well.

Q.  Do you conduct any other type of examination?

A.  We do.  After this is done we then proceed to the internal portion of the examination, which is what most people think about when they think of an autopsy.  It is the surgical examination of the interior aspect of the body to look for injuries or deceases.

Q.  Doctor, directing your attention now to July 31st, 2004. Did you perform an autopsy on that day?

A.  Yes, I did.

Q.  Did you prepare any reports in connection with that autopsy?

A.  Yes, I did.

Q.  What did you prepare?

A.  I prepared an autopsy report, which is a standard report that is generated at the completion of every autopsy that we perform at the Office of Chief Medical Examiner.

Q.  What is the purpose of preparing such a report?

D4B6LIN1                    Tranchida - direct

A.   The purpose of these reports is so that we have a written observation of what was seen at the time of the autopsy.  In other words, we have written testimony so that if the medical examiner who performed the case should happen to get sick, become incapacitated, pass away there is still a written documentation of what was observed, the testimony of what was seen at the time the autopsy.

Q.   Is the report prepared at or near the time that you perform the autopsy?

A.   It is.

        MS. BURNS:  May I approach, your Honor?

Q.   Doctor, I just handed you what is marked as Government Exhibit 12 for identification.  Do you recognize it?

A.   I do.

Q.   What is it?

A.   This is a copy of the file that was generated on the case of Mei Ying Li.

Q.   Did you prepare that?

A.   Yes, I did.  Portions of it.

Q.   Does it contain your signature?

A.   It does.  On page 5 of the autopsy report.

Q.   Does Government Exhibit 12 reflect a true and correct copy of your autopsy report?

A.   Yes, it does.

        MS. BURNS:  Government offers Government Exhibit 12.

D4B6LIN1                         Tranchida - direct

MR. COHEN:  No objection.

THE COURT:  Very well.  Government Exhibit 12 is received in evidence.

(Government's Exhibit 12 received in evidence)

BY MS. BURNS:

Q.  Dr. Tranchida, can you remind us who this report indicates the autopsy was performed on?

A.  This autopsy was performed on decedent Mei Ying Li.

Q.  What were your significant findings in this autopsy?

A.  Significantly the most prominent finding that I found of this autopsy was a penetrating gunshot wound of the head.

Q.  What do you mean by "penetrating gunshot wound"?

A.  When we describe gunshot wounds, we describe them either as penetrating or perforating.  When the projectile goes into the body and stays in the body, we describe that as penetrating. When the projectile goes through the body, through an arm in and out, we describe that as perforating.

Q.  Where did this injury occur specifically on the head?

A.  Specifically Ms. Li had a penetrating gunshot wound that had struck the front of her head right near the right side of her frontal bone of the skull.

Q.  What injuries were caused by this gunshot?

A.  They were quite devastating injuries of the head.  She had fragmentation or breakage of the frontal bone of the skull, the parietal bones, which are the bones at the side of the skull,

and the anterior aspect the base of skull were broken as a

result of this gunshot.  In addition, a portion of the bullet

penetrated into the brain going through the right frontal lobe

into the left frontal lobe and lodging in the back of the left

side of the brain.

Q.  Did you recover that bullet from her brain?

A.  Yes, I did.

Q.  What did you do with it?

A.  The bullet was examined, a mark was placed on the base of

the bullet to identify it and it was submitted as ballistics

evidence.

Q.  From your examination can you determine the direction from

which the bullet was fired?

A.  I can determine the direction that the bullet traveled

through the body.

Q.  What was that?

A.  The bullet traveled from front to back, right to left, and

slightly downwards.

Q.  From your examination can you determine from how far away

the gun would have discharged that bullet?

A.  I can say that the gunshot wound appeared consistent with

having been fired from more than 3 feet away.

Q.  Why is 3 feet the benchmark?

A.  3 feet is a loose benchmark.  From a distance of less than

3 feet, we may have other features besides bullets deposited on

D4B6LIN1                        Tranchida - direct

the skin surface.  In addition to the bullet being fired out of the muzzle of a gun, you also have very hot gas which can seer the skin and then you have burnt and unburnt gunpowder.  Burnt gunpowder is sometimes called fouling and it will look like black ash being deposited on the skin surface.  Unburnt gunpowder are small hot pellets of gunpowder that are fired out and these can cause little pinprick like abrasions on the skin surface as well.

When the gun is fired, the bullet will come out, this hot gas will come out, the burnt gunpowder will come out and the unburnt gunpowder will come out.  Passed the distance of about 3 feet, the only thing that strikes the decedent is the bullet.  Less than 3 feet you will see this burnt gun powder, this unburnt un power and sometimes even seeing on the skin surface.

Q.  Doctor, in your field what does cause of death mean?

A.  The cause of death is the mechanism by which a person dies.

Q.  Based on your autopsy findings, do you have an opinion to a reasonable degree of medical certainty as to the cause of death of Mei Ying Li?

A.  Yes, I do.

Q.  What is it?

A.  To a reasonable degree medical certainty, I believe that the cause of death for Mei Ying Li is a penetrating gunshot wound of head with skull fractures and brain injuries.

D4B6LIN1                    Tranchida - direct

Q.  In your field what does manner of death mean?

A.  Manner of death is the category under which the cause falls.  For example, a gunshot wound to the head can be homicidal, can be suicidal, can be accidental, and the matter tells you which category this falls into.  In this case, this was considered a homicidal manner of death.

Q.  What does that mean?

A.  This was death at the hands of another person.

MS. BURNS:  No further questions.

MR. COHEN:  Your Honor, I have no questions I don't think, but I would like to approach for a moment before the witness leaves the stand.

THE COURT:  Very well.

MR. COHEN:  Thank you.

THE COURT:  You should ask how he diagnoses accidental.

MS. BURNS:  Okay.

MR. COHEN:  Judge, I just took another quick look at the autopsy report and as I indicated I have no objection to it being introduced, but there are portions of it that contain hearsay.

THE COURT:  Those should be excised.

MR. COHEN:  Yeah.

MS. BURNS:  We have no objection.  Mr. Cohen can advise us and we can discuss and prepare something before it

goes to the jury.

THE COURT:  Very well.

MR. SKINNER:  We're not going to show it to the jury right now.

MR. COHEN:  Fine.

THE COURT:  Fine.

BY MS. BURNS:

Q.  Dr. Tranchida, returning to the manner of death.  How do you distinguish between accidental or homicidal when it comes to a gunshot wound?

A.  When it comes to a gunshot wound, there are features of a gunshot wound which can give you an indication as to whether this could have been an accidental gunshot wound or intentional gunshot wound.  Well, let me remedy that.  We don't say.

THE COURT:  You cannot tell that.

THE WITNESS:  Exactly.  Intent is beyond our scope. To be maybe more clear, whether this is an accidental death, at the hands of one's self versus a homicidal death, at the hands of another.

THE COURT:  That is what suicidal means, doesn't it?

THE WITNESS:  Suicidal implies intent.  Suicide we do have to read intent.  The burden of proof is on us to determine whether there is suicidal idolization, whether there is a suicidal history or other suicidal clues present.  The burden of proof is quite heavy for a suicidal determination of manner.

**A. 374**

D4B6LIN1                          Tranchida - direct

For an accidental manner with a gunshot, you want to think of cases, for example, where somebody is cleaning a gun and the gun goes off and it ends their own life.

THE COURT:  You can't tell that from looking at the wound?

THE WITNESS:  Very often we can.

THE COURT:  Sometimes but not always.

THE WITNESS:  Not always, but that is why we do the autopsy to try to make that determination.

THE COURT:  I thought the autopsy is to determine whether the death was caused by the wound.

THE WITNESS:  Not only.  That is why we determine the cause.  The manner becomes just as equally important.

THE COURT:  I understand, but it is much more difficult to tell.

THE WITNESS:  Of course.

THE COURT:  To the extent that it contains any finding with respect to intention it cannot.

THE WITNESS:  A suicide does.  A suicide, for example, we will often find evidence of multiple modalities.  For example, some people take a number of medications as well.  In addition to the --

THE COURT:  Yes.  I was speaking only of gunshot wounds.

THE WITNESS:  Even with a gunshot wounds, sometimes we

**A. 375**

D4B6LIN1                        Tranchida - direct

will see incise wounds of the wrist.  Sometimes--

THE COURT:  That's not the gunshot wound.

THE WITNESS:  Other features of gunshot wounds, which may clear the confusion, there are certain locations that are very characteristic for gunshot wounds.  Underneath the chin, intraoral, at the temple.  The location can become very important.  Just as important and critically so is the range at which the gun is fired.  If somebody is self-shooting themselves by necessity, this implies a range of less than 3 feet because you are shooting yourself with your own hand.

THE COURT:  We're talking about how you can tell that it is accidental.

THE WITNESS:  Exactly.  In this case if we have a gunshot wound of further than 3 feet away, we know that this hasn't been done by oneself to oneself.  This has been done at the hands of somebody else.  This is a long distance gunshot wound.  This was death at the hands of another person and therefore by our medical definition this is a homicide.  By criminal definition, we cannot imply intent.

THE COURT:  That's correct.

THE WITNESS:  That is the distinction.

THE COURT:  Right.  Your views of homicidal has nothing to do with the criminal aspect?

THE WITNESS:  Absolutely.  I think we're in full agreement.

D4B6LIN1                          Tranchida - direct

MS. BURNS:  No further questions.

THE WITNESS:  Thank you.

THE COURT:  Mr. Cohen, you may cross-examine.

MR. COHEN:  I have no questions, your Honor.

THE COURT:  Very well.  Thank you.  You may step down.

THE WITNESS:  Thank you very much.  It has been a pleasure.

(Witness excused)

MR. SKINNER:  Your Honor, the government calls Dr. Henry Nields.

THE COURT:  Very well.

THE DEPUTY CLERK:  Step up.  Raise your right hand.

HENRY NIELDS,

   called as a witness by the Government,

   having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. SKINNER:

Q.  Good afternoon, Dr. Nields.

A.  Good afternoon.

Q.  Dr. Nields, where do you work?

A.  I work at the medical examiner's office in Massachusetts.

Q.  What is your position at that medical examiner's office?

A.  I am currently chief medical examiner.

Q.  Generally speaking what are your duties and responsibilities there?

**A. 377**

D4B6LIN1                    Nields - direct

A.   Well, my responsibilities as medical examiner is to, among other things, perform autopsies to determine cause and manner of death and sudden violent or unexpected deaths and then I have additional administrative responsibilities to oversee the main office in Boston and satellite offices in Worcester and on the Cape.

Q.   How long have you worked for chief medical examiner's office in Massachusetts?

A.   I began working at the medical examiner's office in Massachusetts in 1995.  I worked there from 1995 until 1998. And then I worked as a medical examiner in New York City from 1998 to 2006.  And then as a medical examiner back in Massachusetts since July of 2006.

Q.   For how long have you been the chief medical examiner?

A.   My official appointment was in October of 2009.  I was acting chief for a couple years before that.

Q.   What was your position when you were with the medical examiner's office in New York City?

A.   City medical examiner.

Q.   Were your duties any different when you were in New York City than they are in Massachusetts?

A.   No.  Other than I did not have the administrative responsibilities that I have now.

Q.   Dr. Nields can you describe for us our educational background?

D4B6LIN1                          Nields - direct

A.   I went to medical school at Boston University School of

Medicine.   I did residence training and general pathology at

Beth Israel Hospital in Boston and Boston University Medical

Center and I did the specialty fellowship training in forensic

pathology at the office of the chief medical examiner also in

Boston.

Q.   And, Dr. Nields, did you perform autopsies during your

career?

A.   Yes.

Q.   Roughly how many autopsies have you performed?

A.   Approximately 4300.

Q.   You have testified in court previously?

A.   Yes.

Q.   As an expert?

A.   Yes.

Q.   How many times have you testified as an expert?

A.   Approximately 50 times in New York City and 30 to 40 times

in Massachusetts.

Q.   Let me direct your attention back to July of 2004.   You

were working at that time for the office of the chief medical

examine in New York city?

A.   Yes.

Q.   July 30th of 2004, did you perform an autopsy on a man

identified as Jian King Zhou?

A.   Yes.

D4B6LIN1                        Nields - direct

Q.   Let me ask you to turn to a document that should be in front of you that is marked as Government Exhibit 14.

Do you recognize that?

A.   Yes.

Q.   What is it?

A.   Excuse me.  This is a copy of the file from this case.

Q.   What is contained in the file?

A.   It has my autopsy report, diagrams that I created as part of the autopsy.  It has a neuropathology report.  It has a statement of identification.  It has a medical legal investigator's report and I believe it has a toxicology.

Q.   Did you prepare the autopsy report?

A.   I prepared my autopsy report.

Q.   Is that what is on top?

A.   Yes.

Q.   Was your autopsy report based on your observations as well as the information contained in some of the other reports that are in that file?

A.   Yes.

Q.   Did you prepare the autopsy report around the same time that you prepared the autopsy on Mr. Zhou?

A.   Yes.

Q.   When you performed the autopsy, do you take contemporaneous notes?

A.   Yes.

D4B6LIN1                          Nields - direct

Q.  Did you use those notes in preparing your report?

A.  Yes.

MR. SKINNER:  The government offers Government Exhibit 14.

THE COURT:  What is attached to it has supplemental case information that is not based on the findings of this man.

MR. SKINNER:  We can offer just the autopsy report. That is the first eight pages.

THE COURT:  That's is what you do, is that right?

THE WITNESS:  Yes.

THE COURT:  This reflects what you do?

THE WITNESS:  Yes.

THE COURT:  The first eight pages?

THE WITNESS:  Yes.

BY MR. SKINNER:

Q.  Just to be clear, you prepared the first age pages of this exhibit?

A.  Yes.  There are some notes as well that relate to those first eight pages.

Q.  If we skip the ninth and tenth pages, that would be the pages --

THE COURT:  The casework sheet?

THE WITNESS:  Casework sheet, autopsy notes.

MR. SKINNER:  Your Honor, we can modify the exhibit.

THE COURT:  Fine.  Just to limit to what Dr. Nields

D4B6LIN1                         Nields - direct

observed.

MR. SKINNER:  To be clear for the record what we are offering is the autopsy report prepared by Dr. Nields and signed by Dr. Nields as well as the contemporaneous notes that were prepared by Dr. Nields that follow the --

THE COURT:  Right.  As long as they reflect only what you observed.

MR. COHEN:  Your Honor, I don't have any objection.  I would however like to exclude page 10, which is the forensic toxicology laboratory report.  I have some questions for Dr. Nields about the findings.

THE COURT:  Just a moment.

MR. COHEN:  I don't know that it is number ten, but it is the 10th page sequentially.

THE COURT:  You are talking about toxicology?

MR. COHEN:  Yes, ma'am.  The page at the top is forensic toxicology laboratory.

THE COURT:  That didn't come from Dr. Nields.

MR. COHEN:  No.  But I think to the extent that he has been qualified or is an expert and has indicated that toxicology reports should be done in the course of performing autopsy that there is information in here that is relevant and I would like to ask him about it.  If he is unable to answer the question, then they will not be answered, but I think he probably can.

THE COURT:  Dr. Nields, you are going to be asked to comment on what some of these entries.

I take it that is what you are talking about?

MR. COHEN:  Yes.

THE COURT:  That he is qualified to interpret or translate --

MR. COHEN:  Yes.

THE COURT:  -- some of these entries?

MR. COHEN:  Yes.

THE COURT:  You may ask him that.

MR. COHEN:  Thank you.

THE COURT:  Very well.

Government Exhibit 14 is received in evidence as we discussed.

(Government's Exhibit 14 received in evidence)

MR. SKINNER:  What I will suggest and what we will do is mark the toxicology reports 14 A and we offered 14 A I take it without objection.

MR. COHEN:  Without objection, your Honor.

THE COURT:  Very well.

BY MR. SKINNER:

Q.  Dr. Nields, let me just ask you generally speaking what were your significant findings as a result of the autopsy you performed on Mr. Zhou?

A.  He was a young man, approximately five-foot, seven inches

tall, approximately 143 pounds.  He had multiple gunshot wounds to his body.  With regard to one gunshot wound, the bullet entered the right side.

Q.  Let me interrupt you for one moment, Dr. Nields.

How many gunshot wounds were there in total?

A.  There were six total gunshot wounds.  Some of them may have been, and we can talk about later, reentry wounds.

Q.  We'll talk to them in detail.

A.  There were six total.

Q.  Why don't you now describe for us in general terms, using lay term as much as possible, each of those gunshot wounds, where it was and what your findings were as a result of those?

A.  Yes.  One bullet entered the right side of his chest.  It perforated through the anterior part of his right fourth rib then perforated through his right lung and perforated through the lower edge of the posterior aspects of his right fifth rib and lodged into the soft tissue of the right side of the back.

One bullet entered the left side of his abdomen, perforated through five loops or segments of small intestine, perforated through the right side, right lobe of his liver and exited his right lower back.

One bullet entered the lower lateral left side of his chess in the flank area, perforated through the left seventh and intercostal space, which is a space between the seventh and eighth ribs.  It then perforated through the lower portion of

D4B6LIN1                          Nields - direct

the left chest cavity perforating through the left side of the diaphram, which is a layer of muscle that separates the chest cavity from the abdominal cavity.  It then perforated through the stomach, the left lobe of his liver through the -- it perforated through the diaphram to the posterior aspect of his heart, through the superior venacava, which is a big vein that brings blood back to the heart from the upper part of the body. It then perforated through the upper part of his right lung and then exited the chest cavity through the second intercostal space, the space between the second and third ribs on the right and then exited the back of his right shoulder.

One bullet entered the left side of his back, perforated through the posterior part of his left sixth, fifth, fourth, and third ribs and then penetrated to the lateral aspect of the second vertebral body, second thoracic vertebral body, the part of the thoracic spinal column and so doing injury to the spinal cord, thoracic spinal cord.

There was one bullet that entered the back of his left hand, perforated through the skin and soft tissue of the hand and exited the right hand or wrist on the side where the thumb is.

And then another gunshot wound entered the back of his right forearm and then exited also the back of his right forearm again on the side where the thumb is located.

Q.  Is that all of them?

D4B6LIN1                        Nields – direct

A.   Those are all the gunshot wounds.

Q.   But to summarize for us, how many times was Mr. Zhou struck in the torso with a gunshot, with a bullet?

A.   He was struck four times in the torso.

Q.   How many times was he struck in the hand or the arm?

A.   Once in the left and once on the right.

Q.   Dr. Nields, could you tell from your examination of the wounds on the torso whether the bullets had entered the front of his body or the back of his body?

A.   Yes.  He had two bullets that entered the front his body, one entered the side, and the other, the fourth one or the other one, entered the back.

Q.   And can you just indicate generally speaking the two bullets that entered the front where on the front of the body they hit him?

A.   Approximately this location here.

Q.   On the chest?

A.   On the chest, right side of the chest.  And here, the left side of the abdomen.

Q.   The one that hit him on side of the body, where did that one enter?

A.   This location here.

Q.   The one that struck him in the back, it is hard to point to your own back, but where on the back?

A.   The left side of the back.

D4B6LIN1                          Nields - direct

Q.  Upper back or lower back?

A.  Well, sort of I guess more upper than lower, but not really upper.

Q.  Turning to the wounds to his arms and his hands, based on your examination of those wounds, do you have an opinion to a reasonable degree of medical certainty as to where Mr. Zhou's arms may have been positioned at the time those wounds were caused?

A.  I believe the most consistent with his arms being held across one another.  His left arm forwards of the right and forwards of the right forearm and at the approximate level of the chest.

Q.  Dr. Nields, are you familiar with the term stippling?

A.  Yes.

Q.  Can you tell us what stippling means?

A.  Stippling is pinpoint abrasions that are caused by the impact of gunpowder particles against the surface of the skin, gunpowder particles coming out of muzzle of a gun when it is fired.

Q.  Did you observe any stippling on Mr. Zhou?

A.  Yes.

Q.  Where did you observe the stippling on Mr. Zhou?

A.  I observed stippling to some degree around all of the entrance wounds.  There was more on some than on others, but it was present on all of the entrance wounds.

D4B6LIN1                     Nields - direct

Q.   What conclusions can you conclude, if any, from the stippling that you observed?

A.   I can draw a general conclusion that they were relatively close range.  We refer to gunshot wounds that have stippling as intermediate range gunshot wounds.  In general with most handgun ammunition, you see stippling out to about 18 inches. There are many types of handguns and many different handgun ammunition so it certainly is not a hard and fast number, but it is relatively -- it is within that foot and a half, 2 feet. Roughly that distance.

Q.   Just to be clear that suggests that the gun was fired about a foot and a half to 2 feet away from the person who was hit?

A.   The muzzle of the gun was approximately that distance.

Q.   Now, Dr. Nields, there is a toxicology report that is contained within the files, is that correct?

A.   Yes.

Q.   And I will refer to it as Government Exhibit 14 A, because that is what we'll call it once we get the exhibits.

     For the time being, can you turn to the toxicology report?

A.   Yes.

Q.   Did you prepare this report?

A.   No.  I collected the samples that were tested, but I did not do the testing myself.

Q.   Are you familiar with toxicology reports?

D4B6LIN1                          Nields - direct

A.   Yes.

Q.   What are toxicology reports?

A.   In this case they are used to measure levels of medications and different drugs that may be present in the system at the time of death.

Q.   Based on your review of this report, can you determine whether a toxicology analysis was performed?

THE COURT:   I didn't hear you either.

MR. COHEN:   My fault, Judge, I was coughing.

Q.   Did you take specimens from Mr. Zhou during the autopsy and send them for analysis for toxicology purposes?

A.   Yes.

Q.   Is this a report, an analysis of what was found as a result of that toxicology?

A.   Yes.

Q.   And based on your review of the report, is there anything significant contained in that report?

A.   Well, he had ethanal in his blood and he had a detectable level but immeasurable level of ketamine in his blood.

Q.   What is the significance of the presence of ethanal in the blood?

A.   It suggests that he was drinking alcohol --

Q.   What was the amount --

A.   -- at some point.

Q.   -- of ethanal found in his blood?

D4B6LIN1                        Nields - direct

A.   .09 grams percent.

Q.   Is that what sometimes is referred to in lay speak as somebody's blood alcohol level?

A.   Yes.

Q.   Do you know based upon your work in Massachusetts what for driving purposes the legal limit for drug alcohol level is?

A.   I believe it is .08 percent.

Q.   And is was .09?

A.   Yes.

Q.   You said that ketamine was detected, but not in a significant amount; is that correct?

A.   They were not able to quantitate it.

Q.   Do you know what ketamine is?

A.   It is a -- it was developed as a preanesthetic and has been in some areas become a drug of abuse.

        MR. COHEN:  I am sorry?

        THE WITNESS:  I drug of abuse.

        MR. COHEN:  Thank you.

        THE COURT:  Ketamine and norketamine are roughly the same?

        THE WITNESS:  Norketamine is a break down product.

        THE COURT:  Which comes from ketimine?

        THE WITNESS:  Yes.

BY MR. SKINNER:

Q.   Again, the toxicology lab report indicates that norketamine

D4B6LIN1                        Nields - direct

was detected ketimine --

A.   I am sorry?

Q.   Did the lab report, toxicology lab report indicate norketamine in addition to ketimine was detected?

A.   Yes.  In the urine sample.

Q.   Again, just as detected.  Was any specific amount found?

A.   No.

Q.   Dr. Nields, do you have an opinion to a reasonable degree of medical certainty as to the cause of death of Chan Qin Zhou?

A.   Yes.

Q.   What is that opinion?

A.   A gunshot wounds to his torso.

Q.   Do you have an opinion to a reasonable degree of medical certainty as to the manner of death of Chan Qin Zhou?

A.   Yes.

Q.   What is that opinion?

A.   Homicide.

Q.   When you say homicide, is that the medical definition or the legal definition?

A.   Well, it is the medical examiner definition, death at the hands of another.

Q.   Just to be clear what is the medical examiner's definition of homicide?

A.   It is essentially death at the hands of another.

Q.   As opposed to death at the hands of someone else?

D4B6LIN1                         Nields - direct

A.   Right.

          MR. SKINNER:  We have no further questions of
Dr. Nields.

          THE COURT:  You will doctor these exhibits?

          MR. SKINNER:  Yes, your Honor.  I will consult with
defense counsel after we're finished.

          THE COURT:  Government Exhibit 14 and 14 A are
received in evidence without objection.

          (Government's Exhibits 14 and 14 A received in
evidence)

BY MR. COHEN:

Q.   Good afternoon, Dr. Nields.

A.   Good afternoon.

Q.   I think that either you or Dr. Tranchida before you
testified that part of performing an autopsy is to do an
external examination of the body; correct?

A.   Yes.

Q.   And in the course of performing the autopsy that you
performed here, did you do such an examination?

A.   Yes.

Q.   In doing that examination, did you make note in your notes
and ultimately in your report of the presence of any tattoos
that the deceased had?

A.   I am sorry.  Yes.

Q.   And can you tell the members of the jury whether or not he

D4B6LIN1                    Nields - direct

had any tattoos?

A.   Yes, he did.

Q.   How many?

A.   I counted two.

Q.   Can you describe the tattoos that he had?

A.   I can read from my report if that is okay.

          THE COURT:   Of course.

A.   There is a tattoo of tiger over the right upper chest, the right shoulder and the right upper back.  There is a tattoo of a design banded around the right upper left arm.

Q.   The tattoo with the tiger, you said that he covered the right upper chest, shoulder and upper back?

A.   Yes.

Q.   So would you describe it in relatively terms as a larger tattoo?

A.   It is all relative.  It seems large to me.

Q.   The tattoo of the design branded around the upper left arm, can you describe it in any greater detail?

A.   Not really.  It's a design that went around the arm.

Q.   Do you recall whether or not it was a tattoo of barbed wire?

A.   I believe it was jagged barbed wire.

Q.   Have you ever seen a tattoo like that before?

A.   I have seen similar tattoos, yes.

Q.   Are you familiar with Chinese gang tattoos?

D4B6LIN1                    Nields - direct

A.   No.

Q.   You've never seen Chinese gang tattoos on any other deceased person upon whom you performed an autopsy?

A.   I probably have.  I just don't recognize them as specific for Chinese gangs.

Q.   Would you know the significance of a barbed wire tattoo?

A.   I don't, no.

Q.   Now, I think you had some findings, and these would be on page 6 of your report, that indicated some injuries that were not described in your direct testimony.  I am directing your attention now to Items 2 and 3.

A.   Yes.

Q.   Can you tell us what Item 2 was?

A.   It is an abrasion to the right side of his forehead and there was a contusion or a bruise to the upper part of his head to the right of the midline.

          (Continued on next page)

D4BVLIN2                          Nields – cross

Q.   And can you tell us what the difference is between an abrasion and a contusion?

A.   Abrasion is another word for a scrape of the skin; and a contusion is another word for a bruise.

Q.   And, in fact, did you describe those injuries, in general terms, as blunt impact injuries to the head?

A.   Yes.

Q.   And with respect to the impact of the upper extremities, did you describe those as blunt impact of upper extremities?

A.   Yes.

Q.   And do you believe that those were caused by the gunshot wounds that he received?

A.   I do not believe they were caused directly by the gunshot wounds.

Q.   Do you have an opinion as to whether they were caused indirectly by the gunshot wounds, with a reasonable degree of medical certainty?

A.   I can't be.  It's certainly possible.  It's certainly possible that after falling, after being shot, if he fell, he could have bumped into something.  That's certainly possible.

Q.   Is it also possible that those blunt impact injuries could have been caused by something else?

A.   Yes.

         MR. COHEN:  I have no further questions.

         THE COURT:  Very well.

D4BVLIN2                    Nields - cross

MR. SKINNER:  No further questions, your Honor.

THE COURT:  Thank you.  You may step down.

(Witness excused)

MR. COHEN:  Judge, before we resume with Mr. Zhou, can we take a three-minute break?

THE COURT:  Very well.

MR. COHEN:  Thank you.

THE COURT:  Members of the jury, you may want to stand up and stretch.

(Recess)

THE COURT:  Mr. Zhou, you may be seated.  And you remain under the same oath that you took yesterday to tell the truth, the whole truth, and nothing but the truth.

Very well.

Mr. Cohen, you may cross-examine.

MR. COHEN:  Thank you, your Honor.

 GUANG YUN ZHOU, resumed.

CROSS-EXAMINATION (continued)

BY MR. COHEN:

Q.  Mr. Zhou, when you entered the United States in San Francisco, did you have a passport with you?

A.  It was prepared for me by the snakehead.

Q.  Did you have a passport with you?

A.  No, I did not.

Q.  How is it that you were able to enter the United States if

D4BVLIN2                          G. Y. Zhou - cross

you had no passport with you?

A.   I don't know.  Everything was done by the snakehead.

Q.   Was the snakehead with you when you entered the United States in San Francisco?

A.   No, I hire someone else to do it for me and paid him.

Q.   You hired someone else to do what for you?

A.   Help me to get to the United States.

Q.   And that was the snakehead; correct?

A.   Yes.

Q.   And one of the things the snakehead did to help you get to the United States was he provided you with some documents; correct?

A.   I don't know.  At the time he did everything for me.

Q.   Okay.  But did you fly from China to the United States?

A.   Yes.

Q.   To get on the airplane in China, did you have to show some identification and a passport?

A.   I don't know.  Everything, including the documents, were prepared by him.

Q.   I'm not asking you, Mr. Zhou, about who prepared the documents.  I'm asking you whether or not you needed to have those documents with you and present them to the airline to get on the plane in China.

         MS. BURNS:  Objection, your Honor.

         We covered this yesterday.

THE COURT:  Overruled.  Overruled.

A.  He brought me in.

THE COURT:  He brought you on the airplane?

THE WITNESS:  He walked in with me.

Q.  Into what?

A.  To get on the plane.

Q.  So he was on the airplane with you?

A.  When I was entering, he brought me in.

Q.  Entering the plane or entering the United States?

A.  When I got to San Francisco.

Q.  Okay.  So the snakehead flew with you from China to San Francisco?

A.  From China to Japan, and transferred the flight, and then to San Francisco.

Q.  And the snakehead accompanied you on both of those flights, is that what you're telling us?

A.  There were other people, and I came in with them.

Q.  I'm going to ask you about the other people in a minute. But right now I'm asking you whether or not the snakehead came from China to Japan, and from Japan to San Francisco.

A.  Yes, one came with me.

Q.  One snakehead.

A.  I'm not sure whether he was a snakehead or not, but he was just telling me and let me in.

Q.  Let you into what?

D4BVLIN2                          G. Y. Zhou - cross

A.   To the plane.

Q.   Did you say that there was a group of people who were smuggled in at the same time with you?

A.   One by one.  And I was the first one to be brought in to get on the plane.

Q.   Besides yourself, were there other people smuggled in on the same airplane as you by that same snakehead?

A.   No.  Later on.  Just myself.

Q.   So a few moments ago when you told the jury that there were other people that were smuggled in also, that wasn't quite accurate?

A.   I do not know about this.

Q.   Well, you told the jury a few moments ago that you weren't the only person that was smuggled in by the snakehead at that time; correct?

A.   No, I did not.  I hired a snakehead, and so he could bring me to the United States.

Q.   When you arrived in San Francisco, you got off the airplane; correct?

A.   Yes.

Q.   At that time when you got off the airplane, you had to go and see somebody in a uniform from the United States government before you could actually enter the country; correct?

A.   A uniform -- what kind of uniform?

Q.   A United States government uniform, at customs or

D4BVLIN2                         G. Y. Zhou - cross

immigration.

A.   No, I was in my plainclothes.

Q.   No, sir.  I'm not asking you if you were wearing a uniform, I'm asking whether or not before -- after getting off the plane and before actually entering the United States, did you have to speak to somebody from the U.S. government?

A.   I don't remember this.

Q.   Well, when you got off the airplane, were you alone or was somebody with you?

A.   I went out by myself, and came out with me.

Q.   And what?

A.   Came out with me.

Q.   Who came out with you?

A.   I don't know.  A lady there brought me in.

Q.   Who was the lady that brought you in?

A.   I don't know.  She and I came in, and she brought me in.

Q.   Well, was she somebody who was being smuggled also or was she a snakehead?

A.   Not someone who was trying to smuggle in.

Q.   You paid $40,000 to a snakehead to get smuggled into the U.S., right?

A.   Yes.

Q.   And in return for that, you were given documents to help you get here; correct?

A.   I don't know.  They just got me here, and then I gave them

D4BVLIN2                        G. Y. Zhou - cross

$40,000.

Q.  Didn't you look at whatever it was that they had prepared for you to see what you were getting for your $40,000 to make sure you got here?

A.  I just did not understand it.

Q.  Do you read Chinese?

A.  Chinese?  Yes, I can read a little.

Q.  Okay.  And did you have with you a Chinese passport with your picture in it and somebody else's name?

A.  About this, I do not know.

Q.  You don't know.

A.  No, I do not know.

Q.  And so you also don't know how it is you are able to get on an airplane in the United States and fly from San Francisco to New York.

A.  He or she did it for me, including the purchasing of the plane tickets.

Q.  Do you know somebody named Guo Guang?

        MR. COHEN:  For the reporter, G-O-U, G-U-A-N-G.

Q.  Do you know somebody named Guo Guang?

A.  Who is that?

Q.  I'm asking you if you know somebody named Guo Guang.  Maybe you know him as Chen Huo Guang.

A.  Guo Guang.  I do not know.

Q.  You don't know someone named Guo Guang?

A.  I do not know the true name.  I don't know.

Q.  Well, do you know anybody who goes by the nickname Guo Guang?

A.  Nickname?  I do not know about this.  If I do not see the person, I just do not know.

Q.  Did you have lunch yesterday in Chinatown in a restaurant in between the morning and afternoon sessions of this Court?

THE INTERPRETER:  I'm sorry?

Q.  Did you have lunch yesterday in a restaurant in Chinatown between the morning and afternoon sessions of this Court?

A.  Yes.

Q.  And did you have lunch with two other men?

A.  Me?

Q.  You.

A.  No, I did not.

Q.  You didn't have lunch with two other men yesterday?

A.  Two other men were there eating, but I was just sitting over there, but I did not eat.  And I came in later.

Q.  But you were with the two other men at the table; correct?

A.  I came in and there was no seat, so I just went out.

Q.  So you sat at a table with two other guys, you didn't know who they were, you never seen them before.

A.  I know one of them.

Q.  Who was it?

A.  I later went to this place located on East Broadway to eat.

D4BVLIN2                         G. Y. Zhou - cross

Q. Who was the person that you knew?

A. He or she used -- he used to be in the bus business.

Q. What's his name?

A. His name is Zheng Qian.

Q. Zheng Qian?

A. I was eating. And then I went over because I cannot speak English. I thought maybe he could interpret or translate for me.

Q. Yesterday at the restaurant?

A. No yesterday, no. I went in and sat and went out.

Q. Sir, isn't it true that yesterday you had lunch at a restaurant in Chinatown with Guo Guang and Dong Jai?

A. No, I did not eat. I already ate over here.

Q. Were you at a restaurant yesterday with Guo Guang and Dong Jai?

A. You are talking about when I was in the court here?

Q. I'm talking about in between the morning session and the afternoon session yesterday.

A. I went down to eat with the person up here.

Q. Which person up here?

A. To have lunch.

Q. Which person up here?

A. He was also in business, and he and I know each other.

Q. Is he going to be a witness in this trial?

A. I do not know about this.

Q.   Did you see that boy when you ate lunch yesterday?

A.   Yes, I went down from up here with him.

Q.   You waved at him, right?  He waved at you.

A.   Yes, he greeted me, yes.

Q.   And when he saw you in that restaurant, you were with two other men?

A.   I went in there and I sat there.  And then you can ask this little brother, and then I went out.

Q.   Say that again.

A.   I was eating over here.  As I went in, I went in, and then I did not eat over there, and then I just left.

Q.   Did you ever hear of a bus company called Golden Dragon?

A.   Golden Dragon?  No, I haven't heard.

Q.   Did you ever work for a bus company that operated out of Philadelphia?

A.   No.

Q.   Never?

A.   No, I did not.

Q.   What bus companies have you worked for or owned?

A.   I working for bus company?  I had a bus company myself and I was responsible in ticket sales.

Q.   How long did you operate that company?

A.   Whoever was free, whoever had time, then just went there to work.

Q.   How long a period of time did you operate that company?  A

D4BVLIN2                               G. Y. Zhou - cross

day, a week, a month, a year, two years, how long?

A.  Whoever was free at that time or the time the person would be there working.

Q.  Mr. Zhou, when you were in China, did you use heroin?

THE INTERPRETER:  I'm sorry, counsel.

Q.  When you were in China, did you use heroin?

A.  No.

Q.  When you were in the United States, did you use ketamine or ecstasy?

A.  I choose not to answer this question.

THE COURT:  You have to answer all questions.

A.  No, I did not.  About ketamine.

Q.  Excuse me?

A.  What about the ketamine?

Q.  What about it?  Have you used it?

A.  No, when I was -- when I went to dance, I just had takeeta, takeeta.  So someone else gave me, I don't know.

MR. COHEN:  I wasn't able to hear what he said.

THE COURT:  Is that tequila?

A.  Tequila.

Q.  You know the difference between tequila and ketamine; correct?

A.  I wanted to have a liquor, so I got the tequila myself.

Q.  Have you ever used ketamine, sir?

A.  I don't really remember.

D4BVLIN2                        G. Y. Zhou – cross

Q.  Have you ever used ecstasy?

          MS. BURNS:  Your Honor, may we approach?

          THE COURT:  Very well.

          (Continued on next page)

(At the side bar)

MS. BURNS:  Your Honor, can we get a proffer to the relevance of this line of questioning?

THE COURT:  Just a minute.

MS. BURNS:  Sure.

THE COURT:  This is cross-examination.

MS. BURNS:  Understood.

THE COURT:  The jury is entitled to see the reaction of the witness to questions.  And I take it you're asking because of the findings of the toxicology report.

MR. COHEN:  In part, Judge.  But, in part, it's because of his utter inability to remember anything relevant to this case that he wasn't asked by the government.  And I think I've been told by other witnesses, by other people, that he was a heavy drug user in China in the United States.

THE COURT:  As long as he has a good-faith basis to ask him.

MS. BURNS:  Did we get a time frame on these questions?  "Since you've been in the United States," which we've established has been 17 years now, I think these are just very broad, general questions, not given any constructive time frame or meaning.  It is very prejudicial.

THE COURT:  During the time that he was in this country is what he's being asked.

MS. BURNS:  Seventeen years.

**A. 407**

THE COURT:  I understand.  But you had him testify about a lot of time, too.

MR. COHEN:  I bet a few years -- ketamine on the list, 17 years, you'd remember it.

MS. BURNS:  I'm not a witness, I'm not a drug user; so let's not make this about me.

THE COURT:  The point is he has to have a good-faith basis of what he's asking.

MR. SKINNER:  He has to find out.

THE COURT:  Of course he doesn't have to tell you his good-faith basis, but he has to represent that there is a good-faith basis.

MR. SKINNER:  And he has.  And I think for purposes of this trial, which focuses on a time period from 1996 until 2009, and this witness has only testified to a smaller time period within that, it would be helpful if Mr. Cohen could focus his questions on the time period relevant to the case. Because if he has memory issues from that time period, that's one thing; but if he has drug use from a later period of time, I don't see how it's relevant.

MR. COHEN:  I don't know when his memory issues began or if he actually has memory issues or is just lying.  But whether his memory issues pre- or post-date the homicide, the fact that he has memory issues are relevant for this jury.

MR. SKINNER:  I think that his drug use would affect

D4BVLIN2                          G. Y. Zhou - cross

his ability to perceive something.  And if that's what we're going at, then if you can try and put some time periods on it, that would be helpful.

THE COURT:  I think it's always helpful to put time periods.

MR. COHEN:  Of course, Judge.

THE COURT:  As best you can, absolutely.

MR. COHEN:  I have to start with broad questions and then --

THE COURT:  I understand.

MR. COHEN:  -- move in.

THE COURT:  I understand.

Well, then you should break up the time.

MR. COHEN:  Okay.

THE COURT:  And you could ask him about particular times.

MR. COHEN:  Okay.  Fair enough.

(Continued on next page)

**A. 409**

D4BVLIN2                        G. Y. Zhou - cross

(In open court)

THE COURT:  You may proceed.

MR. COHEN:  Thank you.

BY MR. COHEN:

Q.  A few minutes ago I asked you whether you'd ever used ketamine and ecstasy, and you said -- you asked whether you have to answer those questions; correct?

A.  Yes, I said I don't know.  I don't understand.  I wanted to know if it was necessary to answer the question.

Q.  Did you not want to answer the question?

A.  I don't like to answer questions like that.

Q.  Well, let me ask you first a very broad question, and then I'm going to ask you a couple of specific questions.

Since you came to the United States, have you ever used ketamine, yes or no?

A.  K, I never used K.

Q.  Since you came to the United States -- by the way, when you say "K," that's the slang term for ketamine; correct?

A.  I don't know.  I never touch any of those things.  I hate those things.

Q.  And my question then is about ecstasy.  Have you ever, since you've been in the United States, used ecstasy?

A.  Ecstasy, it's been more than ten years.  I don't remember.

Q.  Well, are you saying that it's been more than ten years since you've used ecstasy?

**A. 410**

A.   No, no, I don't know about that.  I never used it.

Q.   So you've never used ecstasy.

A.   Well, when I used to hang out, I don't know if I did that.
I don't remember.

Q.   When you invested in a gambling parlor -- you talked
yesterday about that you invested and became a shareholder in a
gambling parlor; correct?

A.   Yes.

Q.   How much did you invest to become a shareholder in that
gambling parlor?

A.   I was gambling there.

Q.   How much did you invest to become a shareholder in that
gambling parlor?

A.   $3,000.

Q.   Okay.  And is that the same period of time that you were
delivering orders on a bicycle?

A.   I did make food deliveries on a bike for a few months.

Q.   Where did you get the $3,000 to invest in the gambling
parlor?

A.   At the end of '96, I had money of my own from work.

Q.   From doing the bicycle deliveries?

A.   Yes.  I make some money from delivering food on a bike, and
I made some from gambling, and some I borrowed from others.

Q.   Now, yesterday you talked about the fact that you have
something called an A5 card.  Do you remember that?

D4BVLIN2                        G. Y. Zhou - cross

A.  I have an A5 card.

Q.  Okay.  And I think you also testified that your wife got you an A5 card, right?

A.  My wife petitioned for me.

Q.  Okay.  Is that the same wife that you left behind in China when you got smuggled in here?

A.  Yes.

Q.  When did she come to the United States?

A.  She's been here for more than ten years also.

Q.  Did she come with your children?

A.  She was smuggled here by herself.

Q.  Okay.  And you said she petitioned for you to get the card?

A.  I didn't have any legal status at the time.  She was petitioning for our children, so she petitioned for me, as well.  I was working elsewhere.

Q.  So, in other words, your wife, who was smuggled in after you were, was able to obtain legal status in the United States at the same time that you had been ordered removed from the United States?

A.  I did not know about the removal order in the beginning.  I was only told that I lost my case in court.

Q.  And you were told this by your lawyer?

        THE INTERPRETER:  He said can you repeat that.

Q.  Were you told by your attorney that you lost your case in court?

A.   Yes, I paid an attorney's office to do this.

Q.   Mr. Zhou, my question to you is not whether you paid an attorney, but, rather, whether it was the attorney who told you that you lost your case?

A.   Yes.

Q.   And did the attorney speak Chinese?

A.   The attorney speaks Chinese.

Q.   And when the attorney told you that you lost your case, did he or she also explain that that meant that you had to leave the country?

A.   He or she told me I wasn't aware of it.  I was very disappointed when I heard that I lost, and I left.

Q.   What did it mean to you?  What was your understanding of the fact that you lost your case in immigration court?

A.   I was very sad.

Q.   Because you understood that by losing your case, it meant that you had to leave the United States; correct?

A.   I did not know about leaving the United States.  I didn't pay attention to it.

Q.   Well, the case that we're talking about was a case where you were asking for political asylum in the United States so that you could be legally here; correct?

A.   What do you mean by that?

Q.   You told us yesterday that you asked the government for political asylum because you were persecuted in China because

D4BVLIN2                         G. Y. Zhou - cross

of your participation in the pro-democracy movement, right?

A.  I participated in a student demonstration.

Q.  And you told us yesterday that you were being persecuted in China because you violated the one-child policy; correct?

A.  Yes, I mentioned that yesterday.

Q.  Okay.  And because of those facts, didn't you ask the United States government for permission to say here, because if you went back to China, you would be persecuted again?

A.  Yes.  Correct.  Because I was told I lost, I went elsewhere to work.

Q.  In other words, because you knew that you lost your case, and you had no legal status, you ran and hid so that you wouldn't be deported; correct?

A.  I went to work because I did not have any legal status.

Q.  Because what?

THE INTERPRETER:  Because I did not have any legal status.

Q.  But didn't you say you went away -- you went someplace else because you lost your case?

A.  I went to work.  I went to work because I have to support my children.

MR. COHEN:  Judge, can I have the two answers ago read back?  Maybe I misheard, but I'd like to hear it, and I'd like the jury to hear it.

THE COURT:  He said "I went to work" in response to

D4BVLIN2                        G. Y. Zhou – cross

his losing the case.

   MR. COHEN:  It was a few questions before that.

   THE COURT:  Very well.

   (Record read)

BY MR. COHEN:

Q.  So my question to you is you were told you lost, and you went elsewhere to work because you didn't want to stay here because you were afraid you would be kicked out of the country, correct, and you went to hide someplace else.

A.  No, I have to go away to go to work.  I went away to go elsewhere to work.

Q.  And did the fact that you went to work elsewhere have anything to do with the fact that you lost your case for asylum?

A.  No.  I had to go to work so that I can support my wife and my family.

Q.  Were you working before you lost your immigration case?

A.  I mentioned earlier that I was making deliveries.

Q.  When was it that your wife came to the United States, what year?

A.  She came more than ten years ago.  I do not remember which year.

Q.  Were you still making food deliveries when your wife came to the United States?

A.  I was not making food deliveries when my wife came; I was

D4BVLIN2                              G. Y. Zhou - cross

doing the bus.

Q. Doing what?

THE INTERPRETER: The bus.

Q. Okay. And when you were petitioning for asylum, were you doing the bus or were you doing food deliveries?

A. When I was petitioning, I was making food deliveries. Who was doing it for me?

Q. What's that?

A. Do you mean when my wife was petitioning for me or when I went and petitioned to the government myself?

Q. I'm going to move on.

The night of the shooting at the karaoke place in Queens that you talked about, you were with some other people; correct?

A. Yes. A few of us were in the room.

Q. I'm not talking about -- let's talk about earlier in the evening.

You said, I think, you had dinner in Chinatown with some people to talk about your niece's wedding?

A. Yes, my niece was getting married.

Q. And tell us who was at the dinner.

A. You want me to give each person's name?

Q. Please.

A. Madan, Mayong, Yita, No. 4, Cai Xiang, Yiqun, and myself. Then my sister came at a later time.

D4BVLIN2                          G. Y. Zhou – cross

Q.  Cai Xiang, does he have a nickname?

A.  I only know him as Cai Xiang.

Q.  And how do you know him?

A.  After I came to the United States, I met him while I was hanging out.  I don't remember exactly how I met him, but he was also introduced to me by somebody else.

Q.  And Yiqun was at the dinner, was the person who eventually was shot later on that evening; correct?

A.  Yes.

Q.  And he's the person who you met at a barbershop that later was in a relationship with your sister?

A.  Yes, he became my sister's boyfriend.

Q.  And that whole group of -- by the way, you said somebody there was called No. 4?

A.  Yes.

Q.  That's his name or nickname, "No. 4"?

A.  I only know him as No. 4.  I don't know his exact name.

Q.  And then you went from the Chinatown restaurant to Scent of a Woman for a while?

A.  I went in for about 10 to 20 minutes, about 15 minutes.

Q.  You had something to drink there?

A.  No, I opened a beer, but I didn't drink it.  Then I paid $50, and we left.

Q.  And then you went to the karaoke club, right?

A.  Yes.

Q.  How did you get from Scent of a Woman to the karaoke club?

A.  How did I get to the other place?

Q.  Mm-hmm.

A.  By car.  I think we were in a car, but it's been a while. I believe it was in a car.

Q.  Okay.  And all the men whose names that you just gave us that were at the dinner, did they all go to the karaoke club?

A.  Yes.

Q.  And when you all got to the karaoke club, did you open a room?  In other words, get an empty room that you guys then occupied?

A.  Yes, it was our individual room.

Q.  And when you got there, what did you do?

A.  I went into the room.  We sat in the room.  I at one point went into the general area, and I stood there for a while, and then sat in the room after that.

Q.  What were people doing?

A.  Singing, talking.

Q.  And generally that's what a karaoke club is for, right, it's to go and sing and play?

A.  Yes.  And there were two hostesses that came in.  Then we all sat around playing, drinking, talking.

Q.  Okay.  And the lighting conditions in the room, in the karaoke that evening, were they as bright as the courtroom that we're in now?

**A. 418**

D4BVLIN2                          G. Y. Zhou - cross

A.   No, no, it's not as bright.

Q.   In fact, it was quite dark; correct?

A.   It was okay.  It was not that dark.  We just gotten in not that long ago.

Q.   Well, what does the fact that you had just gotten in have to do with how light or dark it was?

A.   Doesn't have any -- doesn't make any difference.

Q.   Okay.  So is it a fair statement that at the karaoke club that night the lights were pretty dim?

A.   It wasn't very dark.

Q.   I'm sorry?

          THE INTERPRETER:  It was not very dark.

Q.   It wasn't very dark.

          How long at that point, the night that you went out to the dinner and then to the karaoke, how long had you known Yiqun?

A.   I met him at the end of '96.

Q.   Okay.  So if this incident happened in '04, you'd known him for seven or eight years at that point?

A.   I had known him for many years.

Q.   And were you close to him?

A.   He and I was normal.  He was my sister's boyfriend.

Q.   Did you ever refer to him as your brother-in-law?

A.   I just call him by his name.

Q.   Call him what?

D4BVLIN2                          G. Y. Zhou - cross

THE INTERPRETER:  I just call him by his name.

Q.  But when speaking about him to other people, did you ever refer to him as your brother-in-law?

A.  No.

Q.  Never?

A.  No, I did not.  I just call him by his name.

Q.  Okay.  Now, was he a wealthy man?

A.  I don't know whether he's a wealthy man or not.

Q.  Well, did he appear to have money with him most of the time, large amounts of money?

THE INTERPRETER:  I'm sorry, can you repeat the latter part?

Q.  Did you know him to carry large amounts of cash with him?

A.  I couldn't have known.  It's been such a long time.

Q.  Was he somebody who was well-respected and powerful in Chinatown?

A.  I don't know about that.

Q.  You were living in New York at that time, right?

A.  Yes.

Q.  And you don't know whether Yiqun was a powerful, respected, wealthy person in China?

A.  I don't know about that.

Q.  During the seven or eight years that you knew Yiqun, was he ever in prison?

A.  I don't think I'm aware of that.

D4BVLIN2                         G. Y. Zhou - cross

Q.  Does that mean that he's never been in prison or you don't know?

THE INTERPRETER:  I'm sorry, can you repeat the question?

Q.  Does that mean that he was never in prison or that you don't know whether he was in prison or not?

A.  I do not know about that.

MR. COHEN:  Judge, can we approach for a moment?

THE COURT:  Why don't you turn to something else, and you'll come back to that.

MR. COHEN:  Okay.

Q.  You speak the Fuzhou dialect?

A.  Yes.

Q.  And that's -- you were born in Fuzhou; correct?

A.  I was born in the country, in the countryside.

Q.  You were born in Longqi, right?

A.  Yes.

Q.  Okay.  And Longqi is in Fujian Province, right?

A.  Yes.

Q.  And the provincial dialect spoken in Fujian Province is the Fuzhou dialect or the Foochinese dialect; correct?

THE COURT:  It's not a dialect; it's a language.

A.  The Fuzhou dialect, the Fuzhou language was spoken.

Q.  Okay.  And in other provinces in China, people speak different languages and dialects; correct?

D4BVLIN2                          G. Y. Zhou - cross

A.   I am Foochinese.  I understand some dialects or languages from other provinces, and I don't understand some of the others.

(Continued on next page)

D4B6LIN3                           G.Y. Zhou - cross

BY MR. COHEN:

Q. My question was not what you understood. My question was whether or not in other provinces people speak languages?

A. Yes.

Q. For example, there is a province called Wenchou, W-e-n-c-h-o-u, you have heard of Wenchou; correct?

A. Yes.

Q. People in Wenchou speak the Wenchounese dialect, correct?

A. Yes.

Q. And there is a province called Guangzhou, G-u-a-n-g-z-h-o-u; correct?

A. Yes. There is a Guangzhou in China.

Q. And people there speak Guangzhounese or Cantonese; correct?

A. Yes. I believe so.

Q. There are many, many other provinces that have their own languages, right?

A. Yes.

Q. Now, you speak Mandarin also, right?

A. Mandarin, yes.

Q. And is it true that all of the schools in China, regardless of what province they are in, that all of the schools are taught in Mandarin?

A. I think so.

Q. When you went to school in Foochow your teachers taught you in Mandarin; correct?

D4B6LIN3                        G.Y. Zhou - cross

A.   Some were taught in the Foochowese dialect, some were taught in Mandarin.

Q.   Is that how you learned to speak Mandarin by attending primary school in China?

A.   I learned a little bit at the time.

          MR. COHEN:  Judge, can we step up for a moment?

          THE COURT:  Very well.

          Actually, this is a good time for the jury to take a 10-minute recess.  I will excuse the jury, but I am going to hang on to the lawyers.

          (Jury excused)

          (Continued on next page)

D4B6LIN3                        G.Y. Zhou – cross

(In open court; jury not present)

MR. SKINNER:  Should we have the witness step down, your Honor?

THE COURT:  Yes.  You may step down.

If everyone is really gone, I can hear you.

MR. COHEN:  Actually, it is a personal matter, Judge. It doesn't need to be on the record.

THE COURT:  Then I will hear you at the bench.

(Continued on next page)

D4B6LIN3                          G.Y. Zhou - cross

(At the side bar)

MR. COHEN:  I am diabetic and I am getting dizzy.

THE COURT:  You don't have anything with you?

MR. COHEN:  No.

THE COURT:  You go without insulin?

MR. COHEN:  The insulin -- I only take it -- like the juror, the juror the other day, it is long-acting insulin.  I take it at night.  I took it last night, but I haven't eaten. So I need to do something to balance my sugar.

THE COURT:  Do you have someone who can go and get you something.

MR. COHEN:  I just want to run to the cafeteria, 10 minutes.

THE COURT:  Very well.  Go ahead.

MR. COHEN:  That's why I wanted to break.

THE COURT:  That's fine.  We'll tall take a 15-minute recess.

MR. COHEN:  Thank you.

(Recess)

**A. 426**

D4B6LIN3                          G.Y. Zhou - cross

(In open court; jury present)

THE COURT:  You may proceed.

BY MR. COHEN:

Q.  At the karaoke that night, am I right that the way karaoke works is that music is played and people sing along with the music?

A.  Yes.  Some of them were singing.

THE COURT:  Some of the guests, is that right, customers?

THE WITNESS:  Just a few of us in a room.

Q.  Just two?

THE COURT:  Those in the room with him.

MR. COHEN:  Right.

Q.  That night some people in the room were singing along with music, right?

A.  Yes.  People were there singing.

Q.  And were they singing along to music that was being played for from a CD or iPod or something like that over a sound system?

A.  Yes.

Q.  How many people were singing, say, just before you say Mr. Lin came into the room?  How many people were singing?

A.  People were talking, but for singing there was only one microphone.

Q.  And just before you say Mr. Lin came into the room, who had

the microphone?

A.  No.  I don't remember at this time.

Q.  You don't remember who was singing just before Mr. Lin came into the room?

A.  It depends.  Not just one person there singing.

Q.  Well, how many people were singing just before you say Mr. Lin came into the room?

A.  Some of them was singing.  Others drinking and talking.

THE COURT:  You are being asked how many were singing.

A.  Only one was there singing.

Q.  Say it again.

A.  Only one was there singing.

Q.  21?

A.  Only one.

Q.  Only one person was singing.  Who was that person?

A.  Yes.  Only one person singing.

Q.  Who?

A.  That night I am not sure who was sining, but it was Yita.

Q.  Yita?

A.  Yes.

Q.  You were paying attention to what was happening in the room; correct?

A.  I was sitting in the corner.

MR. COHEN:  Can we get the picture of Room No. 8, I think it was, back up on the screen, the photograph?

**A. 428**

Q.  I am going to ask you to take a look at the photograph up there.  Do you recognize that room?

A.  Yes.  This is almost similar to when I was there that night.

Q.  It is the same room; correct?

A.  The shape is like similar to this.

Q.  Can you see in that room where it was that you were standing or seated?

A.  I was sitting in that corner.

        MR. COHEN:  Your Honor, is there a pointer up there?

        THE COURT:  There is.

        MR. COHEN:  May I approach the witness, Judge?

        THE COURT:  Yes.

Q.  This is a pointer and if you push this button, it lights up.  Can you push that button and show where you were sitting?

A.  Right there.

Q.  Indicating what appears to be the far corner of the room.

        I know that you can't see it in the photograph that is up there, but can you describe where in relation to that the door to the room would be?

        THE COURT:  Where it was.

        MR. COHEN:  Of course.  Where it was.  Sorry, your Honor.

A.  The door is on this side.  I could see the door.

Q.  So is it fair to say then that you were sitting kind of

D4B6LIN3                        G.Y. Zhou - cross

opposite where the door is?

A.  I could see the door.  Yes.

Q.  I am asking you whether or not it is true that you were sitting sort of opposite to where the door to the room was?

A.  No, not directly.  I was a little in and there was a door like that.

Q.  Were there people standing between you and the door?

A.  Where?

Q.  Between you and the door were there people standing?

A.  A few of us were sitting over there.

Q.  And in between where the few of you were sitting and the doorway where people came into the room were other people standing and singing?

A.  As I mentioned earlier Yita was singing on this side.

Q.  Which side?

A.  The table, I was sitting over here and he was sitting over here and there and there is a door.

Q.  Was he seated or standing when he was singing?

A.  I noticed he was standing.

Q.  Yita?

A.  Yes.

Q.  And you said there came a time that Mr. Lin and another person came into the room, correct?

A.  Yes.

Q.  That night had you seen Mr. Lin and that other person

D4B6LIN3                      G.Y. Zhou - cross

before?

A.  No.

Q.  The person that came into the room with Mr. Lin, had you ever seen him before?

A.  No.

Q.  What was the first thing that happened when Mr. Lin and this other individual came into the room?

A.  The first thing I did is I stood up and I wanted to toast him and to have a drink with him, but he told me to sit down.

Q.  That was Mr. Lin?

A.  And said it had nothing to do with me.

Q.  Mr. Lin said that?

A.  Yes.

Q.  Across the room?

A.  He was coming in through the door near the tea table.

Q.  He wasn't standing right in front of you?

A.  I was sitting more in.  He was just entered through the door and just stood there.

Q.  When he came in Yita was still singing?

A.  When I stood up and I could hear the singing and I wanted to toast him, to have a toast with him.

Q.  So Yita was still singing when Mr. Lin and this other person walked in?

A.  I did not really take notice of it.  So I stood up and I wanted to have a drink with him.  He told me I had nothing to

**A. 431**

D4B6LIN3                          G.Y. Zhou - cross

do with it and I sat down and I felt very strange about it.

MR. COHEN:  Move to strike the last part of the answer.

THE COURT:  Motion granted.

Q.  How long was it before you say you heard Mr. Lin say something?

A.  As soon as he came in, he told me to sit down so I sat down and I felt my heart, I felt strange.

MR. COHEN:  Move to strike.

A.  And he said, Shoot.

Q.  He said shoot?

A.  Yes.

Q.  And that was all he said was shoot?

A.  And very loud and someone took out a gun and bang, bang, bang.

Q.  You heard him say shoot?

A.  Yes.

Q.  And in what dialect or language did he say shoot?

A.  He only said shoot.

Q.  In what language did he say shoot?

THE COURT:  Did he say it in Chinese?

THE WITNESS:  Shoot was probably Chinese, Foochow.

Q.  Probably Chinese Foochow?

THE COURT:  What was the word he used in Chinese?

THE WITNESS:  He just said shoot.

**A. 432**

THE COURT:  What is the Chinese word?  Did he say it in English or Chinese?

THE WITNESS:  In Chinese, shoot.

Q.  What part of the Chinese language or what Chinese dialect did he say the word shoot in?

A.  Chinese language.  Just shoot.

THE COURT:  What is the word in Chinese?

THE WITNESS:  That's what I heard, shoot.

THE COURT:  He is not answering the question.  What is the Chinese word he said?

THE WITNESS:  Xaing.

Q.  Xaing, That means shoot?

A.  Yes.

Q.  Is that in the Foochow dialect or Foochow language?

A.  Yes.  In Foochow, shoot.

Q.  That is what you remember him saying that night?

A.  Yes.

Q.  Now, after the shooting people left the room, correct?

A.  After the shooting both of them left first and we got scared and then we stayed back and I went out and I touched a dead person to see if there was any reaction.

THE COURT:  What do you mean you went out?

THE WITNESS:  I left the room.

Q.  Did you call the police?

A.  People at the store already reported to the police.

D4B6LIN3                          G.Y. Zhou - cross

Q.   Did you call the police?

A.   No, I did not.  I was scared.

Q.   Did you know that the police would come and want to speak to the people who were there that had seen what happened?

A.   After I got -- I was scared so later I called so I also told my sister about it.

MR. COHEN:  Move to strike that entire answer as nonresponsive and I ask the witness be directed to listen to the question asked and to answer that question.

Q.   This is a yes or no.  Did you know that the police would come and would want to speak to the people who were in the room when the shooting happened?

A.   Could you repeat?

Q.   Sure.  Did you know that the police would come and want to speak to the people who were in the room when the shooting happened?

A.   When I went out and others --

THE COURT:  No.  No.  Not when you went out.  You are being asked did you know.

A.   About the reporting to the police?

Q.   Yes.  Did you know that the police would come and that they would want to speak to the people who were there?

A.   Yes.

Q.   And did you know that you would be one of the people that you would want to speak to?

D4B6LIN3                        G.Y. Zhou - cross

A.  I knew.

THE COURT:  The answer was yes.

Q.  But you left?

A.  I got scared so I ran to Chinatown by myself.

Q.  You ran from Queens to Chinatown?

A.  No.  I went there by Lincoln.

THE COURT:  Are you talking about a car?

THE WITNESS:  I called Lincoln.

Q.  A car service?

A.  Yes.

Q.  You called the car service?

A.  Yes.  I told my sister.

Q.  Did you call a car service from Queens to take you to Manhattan?

A.  Yes.

Q.  And when the car service came, where were you?

A.  At that time I don't really remember.  At that time I got nervous.  I just don't remember.

Q.  Were you close enough to the karaoke to be able to see it?

A.  That night I was nervous.  I did not really pay that much attention.

Q.  Were you the only person that went from Queens to Manhattan in the car service that you say you called?

A.  Yes.

Q.  Nobody else accompanied you?

**A. 435**

D4B6LIN3                         G.Y. Zhou – cross

A.   I did not pay notice to that.  Long time ago.

Q.   Well, you knew at that time whether you were alone in the car service or somebody came with you back to Manhattan, didn't you?

A.   I was alone.

Q.   Do you recall being interviewed eventually within a few days of the incident by a Chinese detective in Queens named Detective Ng?

A.   After the incident I went to precinct 109.

Q.   Sir, this is a yes or no question.  Do you recall speaking to a Chinese detective about what you said happened that night?

A.   Long time ago.  I don't really remember.  I did go to a precinct for them to take notes.

Q.   When you spoke to the detective, he actually was writing things down that you were saying; correct?

A.   He probably did.  I don't know.

Q.   You said you went there so that he could take notes.  He was asking you questions.  Did you see him writing things down?

A.   Of course.  If he was investigating things like that of course he had to write it down.

Q.   Do you remember telling him that you exited from the club and called your sister but got the wrong number?

         THE INTERPRETER:  Wrong number?

Q.   You called your sister but you got the wrong number?

         THE INTERPRETER:  Wrong?

D4B6LIN3                         G.Y. Zhou - cross

MR. COHEN:  Wrong number.  Sorry.

A.  What?

Q.  Do you remember telling the detective that after the shooting you tried to call your sister on the telephone but you got the wrong number?

A.  No.

Q.  Do you remember telling the detective that after you got the wrong number that you and Jian Min Chen got into Ma Si's Lincoln car and went to 108 Madison Street in Chinatown?

Telling the detective after the shooting, you and Jian Min Chen, J-i-a-n, M-i-n, C-h-e-n, got into Ma si's, M-a, S-i, Lincoln car and went to 107 Madison Street in Chinatown, do you remember telling the detective that?

A.  Jian Min, I don't know.  I don't remember.

Q.  Do you know somebody named Jian Min Chen?

A.  I do not know.  I do not know the name.

Q.  Do you know someone named Ma Si?

A.  Ma Si, I do not know.

Q.  You don't know someone named Ma Si?

A.  I do not know Ma Si.

Q.  So after you took this trip to Manhattan to 107 Madison Street, what did you do?

A.  I was nervous and so I told my sister about Yi Qun being shot.

Q.  And then what did you do?

A.  So I went down with my sister.

Q.  Where did you go with your sister?

A.  To Flushing.

Q.  Did you go back to where the club was?

A.  Yes.  It seems I did go there.

Q.  It seems that you were there or you were there?

A.  I went there.

Q.  With your sister?

A.  With my sister.

Q.  How did you get there?

A.  By car.

Q.  Whose car?

A.  This Lincoln.

Q.  Same Lincoln that drove you from Manhattan to Queens?

A.  I got another Lincoln.  Excuse me.  I got another vehicle.

Q.  When you arrived at the place where the shooting had been, you saw a lot of police cars there; correct?

A.  Yes.

Q.  And that was in the early morning hours of July 30th or 29th?

A.  When it happened it was past midnight.

Q.  So July 30th; right?

A.  About the dates, it has been a long time ago.  I don't remember.

Q.  The incident happened at about something like 1:00 or 2:00

D4B6LIN3                         G.Y. Zhou – cross

in the morning; right?

THE INTERPRETER:  I apologize.

Q.  The incident happened about 1:00 or 2:00 in the morning, right?

A.  At the time I was scared so I did not really take a look at the time.

Q.  How long after the shooting did you go to Manhattan?

A.  I was scared and then I went out and I told someone.

Q.  Mr. Zhou, are you having difficulty understanding the interpreter?

MS. BURNS:  Objection.

THE COURT:  No objection.  I am wondering about that, too.

Q.  Are you having difficulty understanding the interpreter?

A.  Just that I am here.  I am very nervous.

Q.  So you understand perfectly the interpreter's Foochowese?

A.  I understand.

Q.  So if I ask you a question, please answer the question that I ask you, okay?

A.  Yes.

Q.  I am asking you this question:  How long was it from the time of the shooting until you got to Manhattan?

A.  At nighttime if there is no traffic pretty quick.

Q.  And how long did you stay in Manhattan before you came back to Queens with your sister?

D4B6LIN3                          G.Y. Zhou – cross

A.  As soon as I got there, I was scared so I told my sister and we called a Lincoln right away.

Q.  How long did it take from the time that you got to your sister's house until you arrived back in Queens?

A.  I don't remember the exact time.

Q.  I am not asking you for the exact time.  Give us your best estimate of how long it took?

A.  From Chinatown to that place over there?

Q.  Yes.

A.  About 20 to 25 minutes.

Q.  Was it still dark out?  Was it still nighttime when you got back to Queens?

A.  Queens, when I went there, there were police vehicles.

THE COURT:  You are being asked was it light out.

A.  It was nighttime.

Q.  When you saw the police vehicles there, did you walk over to them and say, I saw what happened there, I was a witness, I want to tell you what happened?

A.  At that time police did not allow you to approach.

Q.  Did you make an attempt to approach any police officer and say, I was there, you should speak to me, I want to speak to you?

A.  It seems I did not go over.  Long time ago.  I don't remember.

(Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A. 440**

D4BVLIN4                        G. Y. Zhou - cross

BY MR. COHEN:

Q.  You did not approach the police that night; correct?

A.  That night, I think that I went in that night when this happened, but it's been so long, I don't remember.

Q.  You saw a shooting; correct?

A.  Yes.

Q.  You didn't stick around; you went back to Manhattan. Correct?

A.  Yes.

Q.  You picked up your sister and drove back to where the shooting happened; correct?

A.  Yes.

Q.  You didn't speak to any police officer who was there when you got back to the scene; correct?

A.  I'm not aware of it.  I can't remember myself.  I don't know if I said it at a later time.  I don't remember.

Q.  Didn't you just tell the jury that you didn't speak to the police when you went back there with your sister?

A.  No, I said I went down, but it's been such a long time, I don't remember whether I said it or not.

Q.  After you went back to the karaoke place with your sister and saw all the police that were there, what was the next thing you did?

A.  What did I do?  I was scared.  I was --

            THE COURT:  Not what you felt.

D4BVLIN4                        G. Y. Zhou - cross

A.  I was confused.  I didn't know what to do.  And my sister was crying.

THE COURT:  Not what you felt.  What did you do?

THE WITNESS:  I didn't do anything at the time.

Q.  Well, did you stay there?

A.  I stood there, but the police wouldn't let anybody get close.

Q.  And eventually did you leave?

A.  At the end -- I don't remember whether I went to the precinct to give a statement that night or another time.

Q.  I'm not asking you that.  I'm asking you whether you left, simply yes or no.  Did you leave from where you were?

A.  Did I leave the scene?

Q.  Yes.

A.  I did leave.

Q.  Who did you leave with?

A.  I don't remember.  It's been a long time.

Q.  Did you leave with your sister?

A.  I -- it's been such a long time, I don't know if my sister stayed there or I brought her in to give a statement.

Q.  Well, you said your sister was crying and she was very upset; correct?

A.  Yes.

Q.  Her boyfriend had just been killed?

A.  Yes.  On that night.

D4BVLIN4                        G. Y. Zhou – cross

Q.   And you don't remember whether you went back to her apartment to comfort her or whether you parted company; you don't remember what happened then?

A.   I did not say anything about being separated.  I did not go to her apartment.

Q.   By the way, when you went back to the scene where the karaoke was, did you see anybody else on the street that had also been present during the shooting?

A.   The night that it happened.

Q.   When you went back with your sister to Queens on the night it happened and there were police officers on the street, did you see any other people on the street who were there when the shooting happened?

A.   It's been such a long time, I'm not aware of it.  Plus the fact that I was scared at the time.

Q.   Did you see Cai Xiang?

A.   It's been such a long time, I'm not aware of it.  I do not remember.

Q.   So you don't remember whether or not you saw somebody else who was an eyewitness to what happened; is that right?

         THE INTERPRETER:  I'm sorry, can you repeat the question again?

Q.   Are you telling the jury that because it was such a long time ago and you were so scared, you don't remember if when you went back to the scene you saw another person who had been a

D4BVLIN4                         G. Y. Zhou – cross

witness to the shooting?

A.   Can you repeat that?

THE INTERPRETER:  Your Honor, should I just repeat it to him?

THE COURT:  Please.

A.   I don't know if the other people were scared, but I was taking care of my sister at the time.

Q.   Okay.  How did you get to the precinct to speak to the police when you eventually went there?

A.   I really do not remember how I got there that night.

Q.   Did you go by yourself or did you go with someone else?

A.   I don't remember whether I took a car or whether I walked or whether my friend drove me there or something else.  I do not know.  I do not remember now.

Q.   But the precinct you went to was in Flushing, right, the 109th precinct?

A.   Yes.

Q.   And the detective that you spoke to was a heavyset gentleman who spoke Chinese; correct?

A.   I believe so.  I think the person spoke Chinese.

Q.   You didn't have a translator, right?  You just spoke directly to the detective?

A.   I went to the precinct.  A few other people went to the precinct, and we were all in different rooms giving statements.

Q.   Now, between the time of the shooting and the time that you

D4BVLIN4                    G. Y. Zhou - cross

spoke to the police, how many people did you speak to besides your sister about what happened?

A. I did not speak to others.

Q. You remember that now?

A. I took care of my sister at the time because she was very upset. That's why I couldn't talk to anybody else.

Q. If I told you that it was about 22 hours from the time of the shooting until you showed up at the 109th precinct, does that sound about right?

A. I do not remember right now.

Q. How did you know to go to the 109th precinct?

A. I don't remember who told me that night that the people that were present have to go in and give a statement.

Q. I'm sorry, somebody told you that the people who were present had to go give a statement?

A. I don't remember how it came about that I went in to give a statement. It's been a long time. I don't remember.

Q. Well, did you hear that the police were looking to speak to you about what happened because they knew you had been there?

A. I was told that people that were present have to go in to give a statement.

Q. Who told you that?

A. I do not remember.

Q. Was it one of the other people who was present who was also being sought to be questioned by the police?

A.  No, it was either the boss of the karaoke or somebody else. It's been a long time.  I can't even remember that myself.

Q.  And when you spoke to the police, that was some time within about 22 to 24 hours of what you had witnessed; correct?

A.  I don't know how much time had passed.  I did not keep track of it.  I was not aware.

MR. COHEN:  Judge, can I speak to the government for a moment?

THE COURT:  You may.

(Pause)

MR. COHEN:  Let me correct a mistake I made.  I was reading this thing thinking it was military time.

BY MR. COHEN:

Q.  Is it a fair statement then that it was about 10 to 12 hours after the shooting that you spoke Detective Ng?

A.  I don't know.  I did not keep track of it.  I don't know the time.

Q.  At the time that you spoke to Detective Ng, was your memory of what had happened better than it is now?

A.  That night?

Q.  When you spoke to Detective Ng after the incident, after the shooting, was your memory then of the shooting better than it is as you sit here today?

A.  Yes.

Q.  And at that time, did you do your best to describe for

D4BVLIN4                          G. Y. Zhou - cross

Detective Ng exactly what you saw and heard?

A.  I just told the police what exactly happened.

Q.  Did you do your best, when telling the police what happened, to tell them what you saw and what you heard?

A.  I told them everything that I saw.

Q.  When you got to the precinct, the 109th precinct, did you see all the people there that had been present at the shooting?

A.  Everyone was in a separate room.

Q.  When you got to the 109th precinct, did you see people there who had been present at the shooting?  Yes or no.

A.  I did.

Q.  Okay.  And where were they when you saw them?

A.  They were close -- they were in their own room.

Q.  Were all the interview rooms on the second floor?

A.  I didn't pay attention to that at the time.

Q.  Well, are you telling the jury that the doors to the interview rooms were opened while witnesses were being interviewed by detectives and that's how you could see who was there?

THE INTERPRETER:  I'm sorry, can I just ask him to clarify something?

THE COURT:  Sure.

A.  The doors were made of like these metal, like one strip, you know, next to the other, so you kind of see through.  But it's been so long, I don't really remember.

D4BVLIN4                          G. Y. Zhou – cross

Q.  Well, you told the jury that you knew that other people who were witnesses were there because they were in other rooms being interviewed; correct?

A.  They also went to give statements.  We went to the --

Q.  You went together to give the statements; correct?

A.  We did not go together.  I saw them when I went there.

Q.  And you saw them in the lobby waiting to go upstairs to the detective squad; correct?

A.  I do not remember right now whether we were in the neighboring rooms.

Q.  When you were interviewed by Detective Ng in an office, okay, isn't it so that he closed the door so that nobody could see who he was interviewing?

A.  I do not remember the night that I gave the statement.

Q.  Now, the incident that we're talking about, the shooting, happened in July of '04, which is about eight and-a-half years ago, right?

A.  Yes.

Q.  And from that night, about eight and-a-half years ago, when you spoke to Detective Ng, when was the next time you spoke to somebody from law enforcement about what happened that night?

A.  After speaking to Ng and after speaking to law enforcement?

Q.  Yeah.  Well, let's be clear.  You spoke to Detective Ng within a day or so of the shooting; correct?

A.  Yes, I went to speak to him at 109 precinct.

Q.  Okay.  And after that night, when was the next time any police officer or agent or prosecutor spoke to you about what happened that night?

A.  You mean after the arrest this time?

Q.  I'm asking you about how long it was from your interview with Detective Ng until you again spoke to a police officer, agent, or prosecutor about the shooting.

A.  After a few years.

Q.  Several years; correct?

A.  Yes.  I don't remember exactly how many years.

Q.  If I told you it was on June 22nd of 2010, does that sound about right?

A.  I do not remember.  I do not keep track of the time.

Q.  Who was the first person in law enforcement that you spoke to after a few years?

A.  I don't speak English.

Q.  Do you see the people at this table?  Do you see these folks?

A.  I did go in to give statements.

Q.  I'm asking you if you can see the people at this table.

A.  Yes, I can see them.

Q.  Were some of the people at this table or one of the people at this table the next person you spoke to about the shooting after you spoke to Detective Ng eight and-a-half years ago?

A.  You mean when I gave statements to the prosecutor?

D4BVLIN4                        G. Y. Zhou - cross

Q.  Yes, that's what I mean.

A.  Yes, I had given my statement.

Q.  Okay.  And how was it that you knew that you needed to go and speak to the prosecutor and the agents?

A.  I heard that he was arrested, so I went in to give a statement.

Q.  Well, how did you know where to go?

A.  The agent told me to go in to give a statement.

Q.  Oh, you were contacted by one of the agents?

A.  No.  Let me think about this.  Sorry.  The agent did tell me to go in to give a statement.

Q.  Okay.  Was that Agent Varian who sits at the table?

A.  I don't know the name.

Q.  Is it this gentleman here with the short hair?

A.  Yes.

Q.  Okay.  And did he call you on the phone, did he come to your house?  How did he contact you about coming in and give a statement?

A.  I got an interpreter.

Q.  Did Agent Varian come and knock on your door and say, I'd like to speak to you, or did he call you on the phone, or did he send you a telegram?  How did you know that the government wanted to speak with you?

A.  Give me a few minutes.

    I went to look for the person responsible for this.

Q.   You went to look for the person responsible?

A.   I heard that he was arrested.

Q.   You heard that Mr. Lin was arrested?

A.   Yes.  Correct.

Q.   Who did you hear it from?

A.   I heard from friends outside.  They all knew.

Q.   Friends of yours.

A.   People outside said that Ding Pa got arrested.

Q.   And the people that told you that were friends; correct?

A.   Yes.  I heard about it, so I found out.

Q.   Did one of your friends give you the telephone number of Agent Varian?

A.   What do you mean?  Can you explain?

Q.   You heard from people on the outside that Mr. Lin was arrested, that's what you told us; correct?

A.   Yes.

Q.   And when you heard that Mr. Lin was arrested, somehow you got in touch with Special Agent Varian, right?

A.   I asked a friend to help me.

Q.   Which friend?

A.   I can't say the name properly, but it was through another person.

Q.   Say the name improperly and we'll do the best we can.

A.   I asked somebody to look for this person, so I don't really know the name.

D4BVLIN4                          G. Y. Zhou - cross

THE COURT:  Which person?

THE WITNESS:  It was a friend of mine, but he went through his friend's friend.

Q.  Somehow through two or three different parties, you were able to get the name and telephone number for Agent Varian?

A.  The telephone number, but I don't speak English.  So then set a place for me to go to to wait for him, and I went there and went to pick me up.  Someone came to pick me up, and then I went in.

Q.  And the friend that set up this meeting, that person is an informant for the immigration service; correct?

A.  I didn't know that.

Q.  I'm sorry?

A.  I did not know that.

Q.  Do you know it now?

A.  I did not know whether he was doing that or not.

Q.  Well, do you know anybody that has ever told you that they're an informant for the immigration service?

A.  I don't know of them.

Q.  You don't know of anybody who's ever told you that?

A.  If he were an informant, he wouldn't tell me that.

Q.  You know Dong Jai, right?

A.  I didn't mention his name.  I don't know what he did or did not do.

Q.  I'm asking you if you know Dong Jai.

D4BVLIN4                          G. Y. Zhou - cross

A.  I do know Dong Jai.  He's my sister's boyfriend.

Q.  And doesn't he go around Chinatown telling everybody he's a snitch for immigration, and people do things that he wants them to do because they're afraid of him?

A.  No, no, no, I don't know that.

Q.  Are you the only person in Chinatown that doesn't know that?

MS. BURNS:  Objection.

THE COURT:  Objection sustained.

Q.  So eventually there came a time that you met and sat down with Agent Varian and some of the other folks at this table, right?

A.  I went to see the prosecutor to give my statement to talk about what happened in the past, yes.

Q.  And would you say that was around June of 2010?

A.  I do not remember when that was.  I don't remember the exact date.  Plus I went to work.

Q.  Plus what?

A.  Plus I went to work.

MR. SKINNER:  Your Honor, the parties will stipulate that the first time Agent Varian met with the witness was on June 22nd, 2010.

THE COURT:  Very well.

MR. COHEN:  Thank you.

Q.  Now, going back for a moment to 2004, when you met with

D4BVLIN4                         G. Y. Zhou - cross

Detective Ng, that was in an office in the 109th precinct; correct?

A.   Yes, that was in office, yes, in office.

Q.   There were some chairs and a table in the office; correct?

A.   Yes.

Q.   And you sat at the table on one of the chairs, and you and Detective Ng had a conversation, right?

A.   Yes, taking notes and giving statement the night -- what happened during the night.

Q.   Okay.  And then years later, on June 22nd of 2010, when you met with Agent Varian and some of the prosecutors, that was also in an office close to here, right?

A.   Yes, I did, but I don't recall when.

Q.   Don't worry about the day.  We've agreed it was June 22nd, 2010.

A.   I don't remember this.

MS. BURNS:  To be clear, the stipulation was that the first time he met with Agent Varian was June 22nd, 2010, not with anybody else.

THE COURT:  Well, just let me understand.  You're not representing that he met with someone else before that, are you?

MS. BURNS:  No, but I think the question implied that there were prosecutors present.  And I just want to be clear --

MR. COHEN:  Ms. Burns is absolutely correct.

Absolutely correct.

Q.  The first time you met with Agent Varian and another agent, Agent Lee, was on June 22nd of 2010, right?

A.  I don't remember.  I do not know the time.

THE COURT:  Well, it's been agreed.

A.  I don't remember.  I do not remember when.

Q.  I'm not asking you when.  I'm asking you who.

A.  The fact is I do not remember.

Q.  I know.  Everybody knows.

The question is the first meeting you had with somebody from the federal government, it was with Special Agent Varian and another special agent named Lee; correct?

A.  I don't know.  I do not know their names.

Q.  This gentleman, was he --

A.  I do not even know his name.

Q.  I didn't ask you his name.  I asked you if this gentlemen -- and his name is Tim.  Is Tim the agent that you met with?

A.  Yes, yes, he was taking notes, yes.

Q.  Okay.  And was there another agent there also besides Tim?

A.  Yes, two agents were there when I was giving the statements.

Q.  Okay.  And there was also a translator there; correct?

A.  Yes, there was a translator or interpreter.

Q.  Okay.  And the translator who was there was somebody that

spoke a language that you speak; correct?

A.  Yes.

Q.  And you had no difficulty understanding that translator; correct?

A.  Yes.

Q.  And, in fact, do you recall telling Agent Varian and the other agent that as soon as Ding Pa and the unknown male came in, Ding Pa pointed to Yiqun and ordered the unknown male to shoot him.  Do you remember saying that to Agent Varian?

A.  Could you repeat?

Q.  Yes.  You were interviewed by Agent Varian.  Do you remember telling him that as soon as Ding Pa and the unknown male came into the room, Ding Pa pointed to Yiqun and ordered the unknown male to shoot him?

A.  Whatever I have said today, that's what I told the agent.

Q.  Well, that's what we're talking about, sir.  I'm asking you whether or not you told Agent Varian the words that I just spoke.

A.  I said when Ding Pa came in, I wanted to have a toast with him.  And then he just told me to sit down.  And then I stood there for a while.  And then few shots were fired, and then just left.

Q.  That's what you told Agent Varian the first time you met with him in June of 2010, right?

A.  Whatever happened that night, and later on, that's what I

**A. 456**

D4BVLIN4                    G. Y. Zhou - cross

told him.

Q. So you're telling the jury now that on June 22nd of 2010, you told Agent Varian exactly what you testified to today and yesterday?

A. Yes.

Q. Isn't it true that you never told Agent Varian at that first meeting that Ding Pa ever said to you, Sit down. This has nothing to do with you. You never said that to Agent Varian in the first meeting you had with him; isn't that true?

A. But it happened so long ago, I will have to try to remember it very slowly.

Q. Take your time.

A. It happened so long ago, so I have to remember one-by-one.

MR. COHEN: Judge, maybe I can, in the way that I did yesterday, try to refresh the witness's recollection with some notes.

May I approach?

THE COURT: Yes.

MR. COHEN: 3504-1.

A. No, I don't remember. I never said that.

Q. You never said that?

A. It have been so long ago, I have to try to remember it very slowly. I just -- I'll remember it slowly. It's been ten years.

Q. No, it's actually been less than three years since you made

D4BVLIN4                          G. Y. Zhou - cross

this statement.

A.  But it happened so long ago.  And I know this incident, but I have to try to remember it slowly.

THE COURT:  You're being asked what you said to Agent Varian, not what happened long ago.

A.  At that time I did not remember or I said something wrong.

Q.  So do you admit that you did not tell Agent Varian that, as you told the jury, Ding Pa said, Sit down.  This has nothing to do with you.  Do you admit that you did not say that to Agent Varian on June 22nd?

A.  When I was giving a statement, I was trying to remember very slowly.

Q.  Are you saying that you remember it better today than you did three years ago when you spoke to Agent Varian?

A.  Yes, to remember it very slowly.  And the agent told me when I'm in court I should not tell any lies.

THE COURT:  That's not the question.

A.  So I have to remember it very slowly.

Q.  Well, then let's take a trip back to the 109th precinct in July of 2004.

Isn't it true that when you spoke to Detective Ng, you said that you heard Ding Pa say in the Fuzhou dialect, Shoot him.  And then heard bang, bang, bang, bang.  And that you never told -- and you never told Detective Ng that Ding Pa said, Sit down.  This has nothing to do with you.

THE INTERPRETER:  Counsel, could you repeat the question please?

MR. COHEN:  Could I ask the reporter to read it back.

(Record read)

A.  Yes, I said that, yes.  I said Ding Pa told me to sit down.

Q.  You told that to Detective Ng?

A.  I do not even know who this Detective Ng is.

Q.  Okay.  When you went to the precinct the day after the shooting or later on the same day as the shooting, and you spoke to the Chinese detective, sitting in an office where he was taking notes, isn't it true that you never told him that Ding Pa said to you, Sit down.  This has nothing to do with you.

A.  A long time ago, after whatever happened at night.  It happened so long ago, I don't remember whatever happened at the beginning.

Q.  But we agree, sir, that your memory was better the day after the shooting than it was today; correct?

A.  Memory at that time, yes.

Q.  Now, after the first meeting you had with Agent Varian and the other agent, did there come a time about two months later that you met with them again?

A.  When are you talking about, before 2004 or --

Q.  No, no, I'm talking about in 2010, June of 2010.  You said somehow through somebody you got in touch with Special Agent

D4BVLIN4                          G. Y. Zhou – cross

Varian, and you went and had a meeting with him and another

agent.  Right?

A.  Yes.

Q.  Okay.  Now, about two months later, seven or eight weeks

later, you had another meeting that Agent Varian was present

at; correct?

A.  I don't exactly know when was the second meeting, but I did

see him.

Q.  But what?

        THE INTERPRETER:  I do not exactly remember when

during the second meeting, but I did see him.

        THE COURT:  You met him again?

        THE WITNESS:  I don't remember, because at that time I

could not think.  And so I went there to ask something.  So I

wanted to give in more detail.  And that, of course, I should

not lie.

Q.  So you wanted to have that meeting because you wanted to

provide more details?

A.  Yes.

Q.  And you contacted them and said, I'd like to meet with you

again because I want to give you some more details?

A.  Yes.

Q.  How did you contact them?

A.  I knew -- I knew that.  And then somebody else interpreted

or translated for me.

D4B6LIN6                    G.Y. Zhou - cross

BY MR. COHEN:

Q.  So you had somebody reached out to Agent Varian and said you wanted another meeting?

A.  My first time going there and during the second time I knew where I should go to look for him.

Q.  Did you just show up unannounced and say, Here I am to talk to you?

A.  Someone else made a phone call on my behalf.

Q.  Who?

A.  I told someone who speaks English.

Q.  Who?

A.  My friend.

Q.  Who?  What is his name?

A.  Name.

Q.  Name?

A.  Let me try to remember.  I told someone else to make a phone call on my behalf.  Regarding the name, it is so long ago I don't remember.  At that time I was working in a restaurant. His name was in English so I do not know.  His name was English.  I do not really know.

THE COURT:  What was the English name?

THE WITNESS:  He was working in the restaurant.  His English name?  I do not remember his English name.

Q.  But you just asked this guy who had an English name who spoken English call Agent Varian and set up a meeting?

A.   To make a contact for me so I knew how to go there.

Q.   You were interested in having a meeting; correct?

A.   Yes.

Q.   At this meeting Agent Varian was there; right?

A.   Even until now I do not know his English name.  I just know the prosecutor.  I just know the prosecutor.

Q.   Let's agree that this is Agent Varian.  This is Agent Varian.  Do you know who he is?

A.   What is his name?

Q.   Agent Varian.

A.   No.

Q.   You know the prosecutors; right?

A.   Yes.

Q.   Do you know what her name is?

A.   I do not know.  I do not know English.

Q.   Do you know this gentleman?

A.   I went in.  I saw him.

Q.   So at the second meeting where Agent Varian was there, do you remember Ms. Burns if she was there also?

A.   A long time ago.  I did not really pay that much attention whether it was -- whether they were there or not.

Q.   Did you pay attention to the questions they were asking you and the answers you were giving them?

A.   When I go into these places, I am very nervous and scared so I listen to -- to what was said very slowly.

**A. 462**

D4B6LIN6                      G.Y. Zhou - cross

Q.  Are you nervous and scared in a government building because you know you should have been deported from the United States?

A.  No.  I am just scared to go into these places because I don't speak English and other reasons.

Q.  Isn't there always an interpreter there when you met with the prosecutors and with the agents who Foochowese?

A.  Yes.

Q.  And isn't it true that you never have difficulty understanding the interpreters that are there?

A.  I understood.

Q.  Okay.  Isn't it true that at the meeting that you had, not the first one you had with Agent Varian and his partners but the first one you had with Agent Varian and Ms. Burns that when you were asked basically what happened and you said Ding Pa saw Yi Qun and said to the shooter, This is the guy?  Isn't that what you told people at the meeting I am talking about now?

A.  I don't remember what I said.  It was so long ago.  I have to think this through slowly.

Q.  I am trying to refresh his recollection with 3504-2.

        Wait.

        MR. COHEN:  Have you finished, Ms. Lau?

        THE INTERPRETER:  Yes.

Q.  Now I have a question for you.  Does that refresh your recollection that at the meeting you had with Ms. Burns and Agent Varian that you said that Ding Pa saw Yi Qun and said to

D4B6LIN6                         G.Y. Zhou – cross

the shooter, That is the guy, that you didn't know the name of the shooter and that the shooter shot Yi Qun?  Does that refresh your recollection that is what you told the prosecutors and Agent Varian at that meeting?

A.  I do not remember what I said before.  You asked me these questions.  I am very confused now.

Q.  Are my questions confusing you, sir?

A.  Yes.  You are asking me these questions.  I don't know.  I don't speak English.

Q.  I don't speak Fuchow, but I know Ms. Lau who stands next to you speaks very well and you are having no trouble understanding her, are you?

MS. BURNS:  Objection to the form of that, your Honor.

THE COURT:  Let's move on.

Q.  Are you having any difficulty understanding Ms. Lau?

A.  I understand, but when you ask this and that, I get very confused in the head.  Plus I have to think back to things that happened in the past.  I am more and more confused.

THE COURT:  At an appropriate time we're going to take another recess.

MR. COHEN:  This will be such a time.

THE COURT:  We're going to take a 10-minute recess.

(Jury excused)

**A. 464**

(In open court; jury not present)

THE COURT:  How much more do you have?

MR. COHEN:  I would say 15 minutes, but that could be an hour and a half.

THE COURT:  We're coming down the home stretch; is that right?

MR. COHEN:  I hope so.  I certainly thought I would have been done.

THE COURT:  We don't need speeches, just information.

MR. SKINNER:  With the Court's permission can we offer the witness a granola bar or something.  He has no water or anything.

THE COURT:  I haven't prevented anybody from giving anything.

MR. SKINNER:  We typically wouldn't speak to --

THE COURT:  It doesn't have to be you.  Deliver the refreshment.

MS. BURNS:  We need an interpreter to speak to him. We'll take care of that right now.

THE COURT:  You can have the interpreter ask him.

MR. SKINNER:  Better safe than sorry when a government is speaking to a witness who is being cross-examined.

THE COURT:  You and Ms. Burns should not talk to him. You don't need to in order to find out what he would like to eat.

**A. 465**

D4B6LIN6                        G.Y. Zhou - cross

MR. SKINNER:  We don't.  Somebody who helps the government is still going to talk to him.

THE COURT:  Of course.  I understand.

MR. SKINNER:  Thank you, your Honor.

(Recess)

(In open court; jury present)

THE COURT:  Please be seated.

You may proceed.

MR. COHEN:  Thank you, your Honor.

BY MR. COHEN:

Q.  Mr. Zhou, we talked about one meeting you had with Detective Varian back in '04 at the 109th and then meeting you had with Agent Varian and then another meeting you had with Agent Varian and the prosecutors.  I wanted to bring you up to a fourth meeting that you had which took place on December 5th of 2011.

Do you remember that after those meetings that I first described that there came a time around December that you had another meeting?

A.  I don't remember.

Q.  Well, the date is not that important, but do you remember that there were several meetings that you had with the agents and you mentioned the prosecutors?

A.  I don't know who is the prosecutor, but I did have meetings.

Q.  Didn't you say earlier, maybe 20 minutes ago, that you knew who the prosecutors were in the case?

A.  Those two in the front, are they the prosecutors?

Q.  Those folks, yes.  You remember them, right?

A.  Yes.

D4B6LIN6                          G.Y. Zhou - cross

Q.   When you met with them that was in an office near here?

A.   Here.

Q.   It was close to this building?

A.   Yes.

Q.   And there was a translator there, right?

A.   Yes.

Q.   And you remember on another occasion after the meetings we've already talked about when they asked you what happened that night, you said Ding Pa came in with someone and Ding Pa said, Open fire, to the other man and the man opened fired, pointed to Yi Qun.

A.   He came in.  I toasted him and he told me to sit down and after I sat down shortly after that then the shooting started.

          MR. COHEN:  Move to strike all that.  That is not what I asked him.

          THE COURT:  That is not the question.

          THE WITNESS:  Sorry.

Q.   The question is not to tell us what happened that night.  I am asking you whether on the fourth occasion that you met with law enforcement you told them that Ding Pa came in the room with someone and said open fire and the man opened fire.  Did you tell that to the prosecutors?

A.   I do not remember.

Q.   Isn't it true --

A.   I had to think slowly about what I said.  I said Ding Pa

D4B6LIN6                         G.Y. Zhou - cross

said to shoot and then the person next to him took the gun and opened fire.

Q.  So you didn't tell the prosecutors that Ding Pa said open fire, you only told him that he said shoot?

A.  That's what I told the prosecutors.  He came in.  I stood up to have a drink with him --

Q.  Sir, excuse me.  That is not what I am asking you.  I am asking you whether when you spoke to the prosecutors the fourth time the words that you said that Ding Pa said was open fire?

A.  He said shoot, but I don't remember whether I said open fire or shoot.

THE COURT:  Are they different words in Fuchowese.

THE INTERPRETER:  Yes, your Honor.

MR. COHEN:  May I approach witness, your Honor?

THE COURT:  Yes.  But what you have is in English.  So you have to a approach the translator.

MR. COHEN:  May I approach the translator?

THE COURT:  Yes.  3504-4.

A.  Yes.  That's what happened.  As soon as he said shoot, this man pointed at Yi Qun and started shooting at him.

Q.  Well, did Mr. Lin say shoot?  Did he say open fire?  Did he say that is him?  Which did he say?

A.  He said, Shoot.

Q.  He didn't say open fire?

A.  Who said that?

Q.  Did anybody say that?

A.  I do not know.  I don't remember.  I said shoot.

Q.  You said shoot?

A.  I said shoot, but who said this?

Q.  Did you ever tell the prosecutors that Mr. Lin said open fire?

A.  Yes, correct.  He said shoot.  Shoot is open fire.

Q.  Well, did he say shoot or --

THE COURT:  That is why I asked you if they are different words.

MS. BURNS:  I think this has been asked and answered.

THE INTERPRETER:  Your Honor, the words are different, but I don't want to speculate but maybe he is thinking --

THE COURT:  I understand.  That is one of the problems with using words that are translated into English from another language.

MR. COHEN:  It depends on the translator, your Honor.

MS. BURNS:  Objection.

THE COURT:  It is more complicated than that.  It has to do with the idioms of the language.  Let's move on.  We'll discuss that later.

BY MR. COHEN:

Q.  Mr. Zhou, would you agree with me that the words "shoot him" and the words "open fire" are different?

A.  Correct.  Shoot and open fire are different words.

Q.   Right.

A.   But to the Fuchowese people it means the same thing.  To us shooting and open fire it's the same thing.

THE COURT:  What is the word for shoot in Fuchowese?  Let's ask the witness what the word is?

THE WITNESS:  To shoot means you open fire.

THE COURT:  We're not speaking English now.  I want to know the Fuchownese word from the witness for shoot.  He testified about it this morning.

A.   To shoot it means to fire.

THE COURT:  No.  We're not asking that.  What is the word in Fuchowese for shoot?

THE INTERPRETER:  Your Honor, once I translate that then that is the word that he hears already.

THE COURT:  It has already been said earlier today?  Is there one word for shoot in Fuchowese?

THE INTERPRETER:  Yes.  That's more of a question to me than him.  The word to shoot is (unintelligible) and open fire is (unintelligible) two words or two sounds, two syllables or two phonetics instead of one.  It is different.

THE COURT:  Let's move on.

BY MR. COHEN:

Q.   After that meeting that you had with the government, you had another meeting with them in July of 2012 with both of the prosecutors, Agent Varian and Ms. Lau translating, the lady

D4B6LIN6                        G.Y. Zhou - cross

standing next to you last summer; do you remember that?

THE INTERPRETER:  Can you give me the date again?

MR. COHEN:  July 2012.  July 18th, 2012.

A.  I remember.

Q.  Isn't it true that at that meeting for the first time ever you told somebody in law enforcement that Mr. Lin said, Sit down, this has nothing to do with you?  That was the first time that you ever told anybody in law enforcement that Mr. Lin said those words?

A.  Yes.  I said that.  He said sit down, this has nothing to do with you.

Q.  Is it true, sir, that that was the first time that you ever told anybody in law enforcement that Mr. Lin said those words, that you never told anybody before that he said that when you were asked to tell them what happened?

A.  That is because I have to slowly think back.

THE COURT:  We're not asking you why, but the question is is that so?  Is that true that is the first time you said it?

THE WITNESS:  That I said what?  That he told me to sit down and that it has nothing to do with me?

Q.  Correct.

A.  I don't know whether it was the first time, but he did say to me that night that you sit down, this has nothing to do with you.

MR. COHEN:  Judge, I move to strike everything after, I don't know if it was the first time.

MS. BURNS:  Objection.

THE COURT:  Overruled.  The question was it the first time and the answer was I don't know if it was the first time.  He has testified otherwise on that subject.  That was not the question now as to what happened.  The question here was about what he said and when.

Let's move on.

BY MR. COHEN:

Q.  Now, when you testified yesterday you were talking about having some problems with the family planning people in China, correct.

A.  Yesterday what happened.?

MS. BURNS:  Your Honor, we went over this at length.

MR. COHEN:  This is a little different, Judge.

THE COURT:  What is the question?  We don't need the introduction.

MR. COHEN:  I have to lay a foundation.

THE COURT:  I will permit you because you have laid the foundation before.

MR. COHEN:  Okay.

THE COURT:  What is the question?

Q.  Did the family planning people in China destroy your home?

A.  Yes.

**A. 473**

D4B6LIN6                    G.Y. Zhou - cross

Q.  And you testified to that yesterday; correct?

THE COURT:  You don't have to go through that.  What is next?

Q.  Did you also testify yesterday when I asked you about what you told immigration officials here, did you also testify that they came to my home and they were saying they were going to destroy my home?

MS. BURNS:  The record speaks for itself as to what he testified to.

THE COURT:  You want the stenographer to have to go through yesterday's minutes?

MR. COHEN:  These are yesterday's minutes.

THE COURT:  You are reading them?

MR. COHEN:  I have the transcript, your Honor.  Thank you.

THE COURT:  Very well.  Let's move on.  You will argue that when the time comes.

MR. COHEN:  Well Judge, I have no further questions.

THE COURT:  Very well.

MS. BURNS:  We have no redirect, your Honor.

THE COURT:  Very well.  You may step down.

(Witness excused)

THE COURT:  Is there a short witness?

MR. SKINNER:  Your Honor, we have another witness who has been testifying for quite some time.

**A. 474**

THE COURT:  Let's put him on.

MR. SKINNER:  The government calls Huo Guang Chen.

Let's see how he spells it.  I don't always spell it the same way they do.

THE COURT:  I take it he speaks English?

MR. SKINNER:  No.  He speaks through an interpreter, but I think he will be able to as the first witness did give a spelling of his name.

THE COURT:  Thank you.

THE DEPUTY CLERK:  Raise your right hand.

CHEN HUO GUANG,

    called as a witness by the Government,

    having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. SKINNER:

Q.  Good afternoon, Mr. Chen.  Where are you from?

A.  China.

Q.  When did you first come to the United States?

A.  March 1995.

Q.  Are you a citizen of the United States?

A.  No.

Q.  Are you here legally?

A.  Yes.

Q.  Mr. Chin, how were you notified to be in court today?

A.  I received a court subpoena.  A subpoena from court.

D4B6LIN6                          Chen - direct

Q. Are you testifying here today under a court order called an immunity order?

A. Yes.

Q. What do you understand that order to do?

A. The order tells me that I have to be here to testify.

THE COURT: No. That is not what it tells you.

THE WITNESS: That I refuse to answer questions.

THE COURT: It tells you that you will not be prosecuted for any answers that you give. You may have a more accurate description, but that is the effect.

Q. Is it your understanding that because you received an immunity order that you will not be prosecuted for the answers that you give in response to my questions?

A. Yes.

Q. So if you were to admit to committing crimes while testifying today, you couldn't be prosecuted using those admissions?

A. Yes.

Q. Does the immunity order provide you with any protection if you lie today?

A. No.

Q. Does the immunity order provide you for any protection using evidence other than your testimony in court today?

A. No.

(Continued on next page)

**A. 476**

Q.  Mr. Chen, have you met with representatives of the United States government a number of different times prior to testifying today?

A.  Yes.

Q.  And during those meetings, did you tell people from the government about crimes that you committed?

A.  Yes.

Q.  What crimes did you tell the government that you committed?

A.  I smoked marijuana.  I'm an illegal immigrant.

Q.  Did you also tell the government about statements that you had made in an asylum application?

A.  Yes.

Q.  Did you admit that you made some false statements in an asylum application?

A.  Yes.

Q.  With regard to your marijuana use, when is the last time you used marijuana more or less?

A.  Last year, about a year and-a-half ago.

Q.  And has your previous marijuana use affected your memory in any way?

A.  No.

Q.  With regard to your legal status in the country, has anyone from the government made you any promises about your immigration status going forward?

A.  No promise.

D4BVLIN6                          C. H. Guang - direct

Q.   Does your immigration status depend in any way upon your testimony in this trial?

A.   No.

Q.   Now, you testified earlier that you're originally from China; is that correct?

A.   Yes.

Q.   When did you first come to the United States?

A.   March 1995.

Q.   What did you do for work when you first came to the United States?

A.   I was doing odd jobs in a restaurant.

Q.   How long did you work in restaurants?

A.   I work until November 2001.

Q.   What did you start doing for work after that?

A.   I purchased a van, so I drove restaurant workers from New York to Charlotte, North Carolina.

Q.   How long did you work in this business of driving people between Charlotte and New York?

A.   Until May/June 2011.

Q.   And what did you do for work after that?

A.   I was a manager also at another bus company.  I was working there as a manager.

Q.   So you worked in the same industry, just a different job?

A.   Yes.

Q.   Up until 2011, did you own the company or were you one of

**A. 478**

D4BVLIN6                      C. H. Guang - direct

the owners?

A.   Yes.

Q.   After 2011, were you working for someone else?

A.   Yes.

Q.   Now, a moment ago I asked you about an asylum application you filed that contained some false statements.  Do you remember that?

A.   Yes, I remember.

Q.   And when did you file this asylum application?

A.   Around June 2002.

Q.   And what was in the asylum application that wasn't true?

A.   That application was false.

Q.   Do you recall what parts of the application were false?

A.   My story about meeting this person.  Someone else told me his or her story, and it was false.

        MR. COHEN:  I'm sorry, and what?

        THE INTERPRETER:  Someone else told me his or her story, and it was false.

        THE COURT:  What do you mean "his or her"?

        THE WITNESS:  Her.

        THE COURT:  Told you what story?

        THE WITNESS:  She said that her leg was broken, and that she got into an auto accident and broke her leg.  And then she started to believe in Christianity.

Q.   And did you say after meeting this person you converted to

Christianity?

A.  Yes.

Q.  And did you say that you converted to --

            MR. COHEN:  I object to the leading, Judge.

            THE COURT:  Try to let it come from the witness.

            MR. SKINNER:  Yes, your Honor.

Q.  When did you say you had converted to Christianity?

A.  In 2002.

Q.  I know you said it in 2002, but when, according to the application, had you first converted?

A.  2001.  I don't remember the month.

Q.  Did you say in the application that you converted to Christianity while you were still living in China?

A.  Yes.

Q.  What, if anything, did you say in the application about what happened to you in China as a result of your conversion to Christianity?

A.  That I was arrested by police.

Q.  Now, was that true or was it false?

A.  False.

            THE COURT:  There are many Christians in China, aren't there?

            THE WITNESS:  Yes.

Q.  Had you, in fact, converted to Christianity before you left China?

**A. 480**

D4BVLIN6                    C. H. Guang - direct

A.   No, I did not believe in Christianity.

Q.   And had you, in fact, been persecuted in any way while you were in China because you were Christian?

A.   The reason I was arrested, it was not because my practice of Christianity.

Q.   So why did you say in the asylum application that you were Christian and that you had been persecuted because you were Christian?

A.   Because at that time I thought when I applied based on religion, that the United States government would accept.

Q.   Did someone tell you to say that in your asylum application?

A.   Yes, yes, that's what I thought, as well.

Q.   Is that why you did it, because someone told you to do it?

A.   At that time a lot of people were doing it in such way.

Q.   Now, was your asylum application granted?

A.   No.

Q.   Did you receive an order of removal from the United States in approximately 2003?

A.   No, I did not, because I moved to North Carolina.

Q.   Did there ever come a time where you learned that there was an order of removal for you to leave the country?

A.   Until I found out the 21st of last month, March.

Q.   That's just a couple weeks ago?

A.   Yes.

D4BVLIN6                          C. H. Guang – direct

Q.  So up to that point in time, you knew the asylum application had been denied, but you didn't know about the order; is that accurate?

A.  Yes.

Q.  Now, prior to March 21st, had you filed another asylum application?

A.  Yes.

Q.  What was the basis of this second asylum application?

A.  That I opposed the Chinese --

THE COURT:  Dictatorship.

THE INTERPRETER:  May I clarify with the witness, your Honor?

THE COURT:  Right.  One ruler.

THE WITNESS:  One governmental system of China.

THE COURT:  The governmental system that didn't permit people to choose their leader is what we're saying.

BY MR. SKINNER:

Q.  Mr. Chen, is it fair to say that in the second asylum application you claimed that you had been persecuted because of your politics while you were in China?

A.  Yes.

Q.  Now, is it true that you were, in fact, persecuted because of your politics while you were in China?

A.  Yes, I was arrested by police.

Q.  Now, you say you learned on March 21st of this year that

**A. 482**

there was an order requiring you to leave the country; is that right?

A.   Yes.

Q.   And where were you when you learned this?

A.   I was at the INS when I was having an interview.

Q.   Physically where were you, what state?

A.   When I was having an interview in New Jersey in the immigration office.

Q.   And who told you about the order of removal at this immigration office in New Jersey?

A.   The immigration officer there told me.

Q.   What happened after that?

A.   Two immigration officers there took me to a detention facility.

Q.   Did they arrest you?

A.   Yes.

Q.   And what did you do after they arrested you?

A.   I made a phone call to Agent Tim.

Q.   Would that be Agent Varian sitting at the table here?

A.   Yes.

Q.   And did you tell the immigration officers that you were scheduled to testify at this trial?

MR. COHEN:   Leading, Judge.   Objection.

THE COURT:   I think you should try to let it come from the witness.

D4BVLIN6                          C. H. Guang - direct

MR. SKINNER:  I'm trying to shortcut a little bit, but that's fine.

THE COURT:  I understand, but let's not...

Q.  What, if anything, did you tell the immigration officers about any subpoenas you may have had?

A.  I said that I would be -- I would have to come to testify as a witness on April 8th.

Q.  And what did the immigration officers do after you told them that you had to testify at this trial?

A.  Immigration officers called the agent.  And whatever they were saying, I did not understand.

Q.  What happened after they called the agent?

A.  Later I was given three pieces of paper, and I was photographed and fingerprinted.  And I was told to go and report, to report on April 22nd.

Q.  Where were you told to report?

A.  This No. 26, over here.

Q.  You mean 26 Federal Plaza?

A.  Yes.

Q.  The building across the street?

A.  Yes.

Q.  And after you were told to report there, were you released?

A.  No, they gave it to me and said that I must report on April 22nd.

Q.  And after that, did they let you go?

**A. 484**

D4BVLIN6                          C. H. Guang – direct

A.   Yes.

Q.   Do you know what's going to happen to you when you report on April 22nd?

A.   I don't know.  I could be arrested.

Q.   Mr. Chen, do you know a man who goes by the nickname "Ding Pa"?

A.   Yes.

Q.   When did you first meet him?

A.   March/April of 2000.

Q.   Where did you first meet him?

A.   At a gambling parlor in Chinatown.

Q.   And how did you come to meet him at a gambling parlor in Chinatown in 2000?

A.   He was introduced to me by one of my friends.

Q.   What was the name of your friend who introduced you?

A.   Pan Zhen Chao.

Q.   Mr. Chen, can I ask you if you see Ding Pa in the courtroom here today?

A.   Yes.

Q.   What table do you see him sitting at?

         THE INTERPRETER:  I'm sorry?

Q.   What table do you see him sitting at?

A.   When you count, it's the second table.

Q.   What's he wearing?

A.   He's wearing black.

D4BVLIN6                          C. H. Guang - direct

          MR. SKINNER:  Your Honor, can the record reflect the witness has identified the defendant.

          THE COURT:  Yes, the record may so reflect.

Q.  Now, Mr. Chen, you testified that you met the defendant at a gambling parlor; is that right?

A.  Yes.

Q.  Did he own that gambling parlor?

A.  No, it did not belong to him.

Q.  Do you know if he owned any gambling parlors?

A.  Yes, he had.

Q.  How many gambling parlors do you know of that the defendant owned?

A.  As far as I know, he had one gambling parlor.

Q.  Where was it located?

A.  21 Eldridge Street, first floor.

Q.  Did you go there yourself?

A.  I went there alone.

Q.  But you visited this place yourself?

A.  Yes.

Q.  Where on the first floor of 21 Eldridge Street was this gambling parlor located?

A.  The front was a barbershop.  It was in the back.

Q.  So it was in a separate room behind the barbershop?

A.  Yes.

Q.  Could you see the gambling parlor from the street?

D4BVLIN6                        C. H. Guang - direct

A.   No.

Q.   Were there any signs advertising the gambling parlor on the street?

A.   No.

Q.   What kind of gambling took place at 21 Eldridge Street in this back room?

A.   13 cards.

Q.   Is a card game?

A.   Yes.

Q.   Is money bet on the game?

A.   Yes.

Q.   When you were there, how much money did you see being bet on this game?

A.   Each hand you can go up or down about $10,000.

Q.   Is that $10,000 per hand you said?

A.   With four people gambling, you can go up or down about $10,000.

Q.   And how many hands were played per night?

A.   Many hands.

Q.   So is it fair to say that hundreds of thousands of dollars were gambled per night in this gambling parlor?

A.   That's a possibility.

Q.   Now, you said the defendant owned this gambling parlor; is that right?

A.   Yes.

D4BVLIN6                        C. H. Guang – direct

Q.  And how do you know the defendant owned this gambling parlor?

A.  Because he told other people that he opened this gambling parlor, and he had his followers working inside opening the doors.

Q.  Did you see the defendant at the gambling parlor?

A.  Yes.

Q.  Did the defendant do anything while you were watching him that indicated to you he owned the place or he ran it?

A.  Sometimes he would collect the money.

Q.  Would he tell other people what to do?

A.  Yes.

Q.  And was there a commission that was taken out of the bets that were made at this gambling parlor?

A.  Yes.

Q.  How much was the commission?

A.  Generally at five percent.

Q.  Where did the commission go?

A.  The money goes to him.  He collects.  Collected it.

Q.  "Him" meaning the defendant?

A.  Yes.

Q.  What year was it when you first went to this gambling parlor at 21 Eldridge Street?

A.  It was in 2001.

Q.  And what year is it the last time you went, same year or

later?

A.   Later.

Q.   2002, 2003, more or less?  When is the last time you went?

A.   Around October of 2002.

Q.   Now, you say that you saw people working at the gambling parlor; correct?

A.   Yes.

Q.   How many people did you see working there at a time typically?

A.   Six to seven.

Q.   Now, you called the people who worked there followers; is that right?

A.   Yes.

Q.   What's a follower?

A.   Followers are people who do work for him.

Q.   Are you familiar with the term "dailo"?

A.   Yes, I am.

Q.   Was the defendant a dailo?

A.   Yes.

Q.   How do you know the defendant was a dailo?

A.   Because he had followers following him and doing work for him.  And in a gang, when he had followers, he was the dailo.

Q.   Did you see him telling his followers what to do?

A.   Yes.  When people come in, they would open the door, he would tell them to open the door.

THE COURT:  What is the difference between an employee and a follower?

THE WITNESS:  Employee is when you earn a stable salary per day or per month and you file taxes and there's a legitimate shop there.  That's an employee.

Q.  And what's a follower then?

A.  Follower, it's when there's no stable job, you follow him to go and play, to go out to eat, you help him fight.  It's like a gang, an organization.

THE COURT:  What do you mean "help him fight"?  What fighting goes on inside a gambling house?

THE WITNESS:  Sometimes with other people, when they go out and they get upset and at other people, then they would tell -- then they would help fight the other people that they were ordered to fight.

BY MR. SKINNER:

Q.  Mr. Chen, did you see Ding Pa with his followers out in Chinatown here in Manhattan in places other than the gambling parlor on Eldridge Street?

A.  In Chinatown, yes.

Q.  Let me direct your attention, Mr. Chen, to July 16th of 2000.  Do you remember that night?

A.  I do.

Q.  Where were you that night?

A.  I was at a gambling parlor in 21 Orchard Street.

**A. 490**

D4BVLIN6                         C. H. Guang – direct

Q.  Was that here in Manhattan?

A.  Yes.

MR. COHEN:  I'm sorry, 21 what?

THE COURT:  Orchard Street.

MR. COHEN:  Orchard.  Thank you, your Honor.

Q.  And who owned this gambling parlor?

A.  It was my friend, Pan Zhen Chao.

Q.  Is that the same man you testified a few minutes ago first introduced you to the defendant Ding Pa?

A.  Yes.

Q.  Now, did there come a time that night at 21 Orchard Street when you saw the defendant?

A.  Yes.

Q.  Where were you when you saw him?

A.  I was with my friend at 21 Orchard Street.  We were talking.

Q.  This is the gambling parlor; correct?

A.  Yes.

Q.  So did there come a time when Ding Pa came into 21 Orchard Street?

A.  Yes.

Q.  What happened after he came in?

A.  He came in, pulled out a gun, and pointed the gun at my friend Pan Zhen Chao's head.

Q.  What happened after that?

A.   Then he said, I'm going to kill you tonight.

Pan Zhen Chao pleaded with him to let him go.

Q.   Did Ding Pa say anything to Pan about face?

A.   Yes.  He said that Pan Zhen Chao did not give him face.

Q.   What does "face" mean to you?

A.   "Face" is when he make a request to somebody, and someone had to agree with him.  You have to agree and not reject him; otherwise, people won't listen to what he have to say.

Q.   Is it like respect?

A.   It doesn't really have to do with respect; but if I make a request, you have to agree, whether it's reasonable or not.

Q.   Is it power?

A.   Yes.

Q.   What happened after Pan started begging for his life that night?

A.   He said, I will let you go tonight, but you have to give me face in the future.

Then he shot at the ground, fired one shot, and left.

Q.   After he left, after firing that shot, what happened after that?

A.   Then Pan called the police and the police came.

MR. SKINNER:  Your Honor, at this point, the government would like to read into evidence a stipulation between the parties.

THE COURT:  Very well.

MR. SKINNER:  "It is hereby stipulated and agreed between the parties that Government Exhibit 40 contains one deformed bullet that was found on July 16th, 2000 by the New York City Police Department at the scene of a shooting that occurred at 21 Orchard Street, New York, New York.  The bullet was found lodged in the ceiling at the scene of the shooting.

"It is further stipulated and agreed that this stipulation and Government Exhibit 40 may be received in evidence at trial."

The government now offers Exhibit 106 and Exhibit 40.

MR. COHEN:  No objection.

THE COURT:  Very well.

Government Exhibit 6 and Government Exhibit 40 are received in evidence.

(Government's Exhibits 40, 106 received in evidence)

MR. COHEN:  Six or 106?

MR. SKINNER:  106, your Honor.

THE COURT:  Thank you.  106.

BY MR. SKINNER:

Q.  Mr. Chen, let me direct your attention to 2001.  I believe you testified earlier that you started a business around this time; is that right?

A.  Yes.

Q.  And when in 2001 did you start the business, the beginning of the year, the end of the year?

D4BVLIN6                         C. H. Guang - direct

A.  It was November 2001.

Q.  And just remind us please what kind of business this was?

A.  It was to drive the workers from the restaurants in New York to Charlotte, North Carolina.

Q.  So was it a bus business?

A.  Yes.

Q.  When you first started, did you have a big bus or a smaller vehicle?

A.  It was a small 15-passenger vehicle.

        THE COURT:  You called it a van when you testified about it before.

        THE WITNESS:  Yes, it was a van.

Q.  How many vans did you have when you first started?

A.  I had two.

Q.  Did you start this business by yourself or with anyone else?

A.  I did it with my friend who was the partner, Chen Jia Chuan, C-H-E-N, J-I-A, C-H-U-A-N.

        MR. COHEN:  I'm sorry, what was the first --

        THE INTERPRETER:  I'm sorry, D-I-N-G, J-I-A, C-H-U-A-N.

        MR. COHEN:  Thank you.

        THE INTERPRETER:  Sorry.

Q.  So your partner's name is Ding Chuan, is that right?

A.  Yeah, some people call him by that name.

D4BVLIN6                         C. H. Guang - direct

Q.  Is that his nickname?

A.  That is not his nickname.  That's his name.

Q.  So what did you and your partner each do at the bus business or the van business, whatever it was, at this point in time?

A.  We drove.

Q.  Drove the vans?

A.  Yes.

Q.  Now, did there come a time when the defendant, Ding Pa, got involved in this business?

A.  Yes.

Q.  And when was that that Ding Pa got involved?

A.  It was around May/June of '02.

Q.  So a couple of months after you first started at the end of '01?

A.  Yes, about half a year.

Q.  Now, how did the defendant come to get involved in your business?

A.  Because I got news that a big bus company was going to go the same route that I was driving.  And I was afraid that he would be competition to my business.

Q.  At this point in time, did you know that the defendant was a dailo?

A.  I did.

Q.  And this is after that incident with the gunshot at Orchard

**A. 495**

Street that you told us about before, right?

A.  Yes.

Q.  So after learning about this possible competition, what did you do?

A.  My partner Ding Jia Chuan and the defendant had a very good relationship.  So he approach him about talking to the other boss about not coming in to compete.

Q.  Was this a joint decision of yours and your partner's to go talk to the defendant?

A.  Yes.

Q.  And why did you choose the defendant to go?

A.  Because the other person in Chinatown also get a lot of face from other people, and the owner of the other bus company and him were good friends.  So that person would give him face.

Q.  What, if anything, did you think the defendant would be able to do for you?

A.  He would be able to convince the boss of the other company not to come in.

Q.  You wanted to scare the other boss away?

        THE COURT:  That was not the testimony of the witness.  Please don't lead.  Let it come from the witness.

        MR. SKINNER:  Sorry, your Honor.  I tried to put it in a question.

        THE COURT:  That doesn't make it less leading.

        MR. SKINNER:  Fair enough.

**A. 496**

D4BVLIN6                    C. H. Guang - direct

Q.  What, if anything, did you offer the defendant if he were to help you?

A.  My partner and I discussed to give him one-third of the share of the company.

Q.  Did you actually offer him one-third of your company?

A.  Yes.

Q.  And at the time you made this offer to him, why did you think the defendant might be able to convince the rival bus company to go away?

        MR. COHEN:  Objection.

        THE COURT:  Objection sustained.

Q.  At the time you made this offer, why did you make this offer --

        THE COURT:  Objection sustained.

Q.  What happened after you made this offer to the defendant?

A.  The other bus company agreed not to come in to compete.

Q.  Did the other bus company ever run any buses on the route from Chinatown to North Carolina?

A.  No.

        THE COURT:  I think this is an appropriate point at which to adjourn for the day.

        MR. SKINNER:  This is fine, your Honor.

        THE COURT:  Very well.

        Members of the jury, remember, we are not going to sit tomorrow.  We will reconvene on Monday morning.  We will start

D4BVLIN6

taking testimony at 10 o'clock in the morning.  And those who come by 9:30 will have coffee and muffins.

Have a pleasant weekend.  And as the more you hear, the more you must resist the temptation to discuss what you see and hear.

Have a pleasant weekend.

(Jury excused)

THE COURT:  Very well.

We will reconvene at 10 o'clock Monday morning.

MR. SKINNER:  Thank you, your Honor.

Have a pleasant weekend.

THE COURT:  Same to all of you.

MR. SKINNER:  Thanks for the long day.

THE COURT:  We accomplished something.

MS. BURNS:  Yes.

(Adjourned to April 15, 2013 at 10 o'clock a.m.)

**A. 498**

INDEX OF EXAMINATION

Examination of:                                        Page

VINCENT TRANCHIDA

Direct By Ms. Burns . . . . . . . . . . . . . 164

HENRY NIELDS

Direct By Mr. Skinner . . . . . . . . . . . 177

GUANG YUN ZHOU

Cross By Mr. Cohen . . . . . . . . . . . . . . 196

CHEN HUO GUANG

Direct By Mr. Skinner . . . . . . . . . . . . 275

GOVERNMENT EXHIBITS

Exhibit No.                                        Received

 12     . . . . . . . . . . . . . . . . . . . 170

 14     . . . . . . . . . . . . . . . . . . 183

 14 and 14 A   . . . . . . . . . . . . . . . 192

 40, 106   . . . . . . . . . . . . . . . . 293

# In The Matter Of:

*UNITED STATES OF AMERICA, v*
*XING LIN,*

*April 15, 2013*

*SOUTHERN DISTRICT REPORTERS*
*500 PEARL STREET*
*NEW YORK, NY 10007*
*212 805-0330*

Original File D4FVLINF.txt
**Min-U-Script® with Word Index**

**A. 500**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

         v.                    11 CR 114 (MGC)

XING LIN,

              Defendant.           JURY TRIAL
------------------------------x
                          New York, N.Y.
                          April 15, 2013
                          10:13 a.m.

Before:

          HON. MIRIAM GOLDMAN CEDARBAUM,

                          District Judge

                 APPEARANCES

PREET BHARARA,
     United States Attorney for the
     Southern District of New York
PETER M. SKINNER
JENNIFER E. BURNS
     Assistant United States Attorneys

JOEL S. COHEN
     Attorney for Defendant

ALSO PRESENT:   BRENDA CHEN, Fuchow Interpreter
                DANIEL YANG, Fuchow Interpreter
                LILY LAU, Fuchow Interpreter
                DANIEL CHAN, Fuchow Interpreter
                JESSICA CHACE, Paralegal
                TIMOTHY VARIAN, Special Agent, HSI
                JIAYING WANG, Legal Assistant

(Trial resumed)

(In open court; jury not present)

THE COURT: I assume the defense has gotten the letter from the government, which I just received.

MR. COHEN: Yes, your Honor, I just received it, as well.

THE COURT: What I would like to see is a case in which the only person murdered is a third person; that is, that the person who is aimed at is the one who was killed, although by mistake. This is an entirely different scenario.

MR. SKINNER: Your Honor, New York v. Diaz is that case.

THE COURT: A bullet went through one into another?

MR. SKINNER: No, that was -- I thought you said you wanted a case where the only person murdered was that person.

THE COURT: Was the third person that you referred to; that is, where the person intended was killed, and by accident the bullet hit someone else, in addition, not in substitution.

MR. SKINNER: Your Honor, we can continue to search for that case.

THE COURT: I would like to see that because that's a very different scenario.

MR. SKINNER: Well, I think it's --

THE COURT: I don't want to argue it at great length now.

MR. SKINNER: Very well.

THE COURT: But I consider that a different matter.

MR. SKINNER: I, of course, looked for a factual scenario identical to ours, and didn't find it. But I will continue to look for one.

THE COURT: Please. Because there is a big difference between shooting the wrong person and having the bullet accidentally go through the right person and hit another. That's a different scenario.

MR. SKINNER: It's a different scenario.

THE COURT: I don't want to argue it at length now, but I think it's not at all clear that these cases apply to that.

So in those cases, whoever was shooting thought he was shooting the right person. Here, the right person was shot.

MR. SKINNER: But, your Honor, there's plenty of cases --

THE COURT: I would like to see the closest factual case that you -- factually most similar, because cases are not collections of sentences; they are facts.

MR. SKINNER: And there are cases, and I can get them for your Honor, where the intended victim was also shot. The classic example is the drive-by shooting where the intended victim is sitting on a porch, another person is sitting next to him, and they are both shot. And I know I read one case with

those exact facts, and I'll get that for your Honor. I don't know if I'm going to find a case where the bullet went through one person and hit another.

THE COURT: I understand. But I'm interested in where the bullet hit the wrong person.

MR. SKINNER: I will get you some more cases.

THE COURT: Good. Where the aim was at the right person and -- well, in our case the right person was also shot.

MR. SKINNER: And there's certainly cases where the right person was shot and the wrong person. And in those scenarios --

THE COURT: Well, I'd like to see those cases.

MR. SKINNER: You can have it. Okay.

THE COURT: It's not such a common occurrence.

MR. SKINNER: It's not common, but it certainly does happen.

THE COURT: But I would like to get as close as we can --

MR. SKINNER: Very well, your Honor.

THE COURT: -- to the factual issue.

All right. Let's get the jury in.

MR. COHEN: Your Honor?

THE COURT: Yes.

MR. COHEN: I don't know if your Honor was made aware that on Saturday, The Times carried an article about this

trial. And the article, which was in the A Section, I think on Page A15, as well as on the online edition, was essentially cut-and-pasted from the government's 404(b) motion. It was hardly a balanced article, and it presented in the guise of news and fact --

THE COURT: So you want me to instruct the jury not to read the newspaper about anything relating to this case.

MR. COHEN: I do. But beyond that, your Honor, because of the tone of the article and because it really was so one-sided, I would ask that your Honor ask whether any of them has read it, initially telling them that there's nothing wrong if they had, but encouraging them to be candid. And then if anyone says they had, to individually question that juror as to what, if any, impact it had on them. And finally, your Honor, to instruct --

THE COURT: I would like to see the article. I did not --

MR. COHEN: I'm sorry, I actually --

THE COURT: I did not read the Saturday Times except for a few specific things.

MR. COHEN: I can pull it up on my laptop. I emailed it to Mr. Daniels. But I can pull it up on my laptop. He may have it, I don't know.

THE COURT: Do we have it? All right. Let me see it. I cannot control the newspapers. I would not try.

MR. COHEN: Of course, your Honor. Nor would any of us want to live in a country where you could. But it's a concern --

THE COURT: I am sure that it is covered in the Chinese press. I don't know if you've read those articles, but I've seen --

MR. COHEN: I have read --

THE COURT: -- reporters from the Chinese press in the courtroom.

MR. COHEN: I have read them and I have to say, this is one of the rare instances where the Chinese press actually got it right, more so than The Times did.

THE COURT: Well, they understood the language of the witnesses.

MR. SKINNER: Your Honor, I think it's fair to say that there's been press coverage in multiple venues about the trial.

THE COURT: I'm sure that's true.

MR. SKINNER: And the Court instructed the jury not to be reading outside sources.

THE COURT: Right. But I will remind them --

MR. SKINNER: I think that's fair.

THE COURT: -- that they are not to read anything they see about this trial.

MR. COHEN: And as I was saying, your Honor, because

of the tone of the article, I would ask for an instruction that anything that jurors may have seen in this article is not to be taken as fact, and the government still has --

THE COURT: Well, I will be happy to advise them anyhow that anything they read or see outside of the courtroom is not evidence, and they may not take it into consideration.

(Pause)

THE COURT: I don't even know where this comes from. It doesn't come from the trial.

MR. COHEN: Your Honor, literally it's a cut-and-paste of the government's 404(b) motion.

MR. SKINNER: I think he's referring to our enterprise motion.

MR. COHEN: I'm sorry, their enterprise evidence motion.

MR. SKINNER: And I don't think that it's a cut-and-paste, but the terminology "Victim 2" certainly comes from that motion.

THE COURT: That's not a good thing.

But I do not control -- nor do I seek to control -- the press. But I do want the jury not to read how does the press even know or believe that the prosecutor intends to call somebody as a witness.

MR. COHEN: It was in the enterprise motion, Judge.

MR. SKINNER: You had asked us, your Honor, to proffer

the basis for how we intended to prove the things included in the enterprise motion. And we said in the enterprise motion we intend to call Victim 2.

THE COURT: I see.

MR. SKINNER: And, of course, that's on public docket, which is how The Times got it.

THE COURT: Of course. Of course. Everything that's filed with the Court is -- unless it's sealed, is public docket.

MR. COHEN: Judge, I'm not criticizing anybody. I'm just acting out of concern that --

THE COURT: Of course.

MR. COHEN: -- my client have a fair trial. I'm not criticizing the government for filing the motion; I'm not criticizing the paper for printing the article, although I think it could have been a little more balanced. I'm simply looking to protect Mr. Lin's right to a fair trial.

THE COURT: Is this somebody in the court press office? I'm not familiar with the name.

MR. SKINNER: I don't believe he is, your Honor.

THE COURT: I don't think so either, because I know most of the reporters.

MR. SKINNER: He's not The Times regular correspondent stationed here.

THE COURT: Right. I don't recognize the name.

MR. COHEN: Although there has been a Times reporter here every day.

THE COURT: That's a different matter. The Times has people who are in this courthouse in the pressroom everyday.

MR. COHEN: Right.

THE COURT: That's what I'm asking, whether he's one of those, because I'm not familiar with the man.

MR. SKINNER: I don't believe he is.

THE COURT: Very well.

Let's get the jury.

(Jury present)

THE COURT: Before we start taking testimony, I would just like to remind you that you should not read anything about this trial outside of court. And that means any newspaper article, any magazine article, or any other writing about this case.

Now, I'm told that -- and it doesn't surprise me, newspapers always look for copy, they always want to write about what is happening.

I would like to know if any of you has read any article about this case.

Yes.

JUROR: I did, in Saturday's Times.

THE COURT: Saturday's Times. Thank you.

Well, I now urge you -- and, indeed, I instruct you --

that you may not read anything about this case in a newspaper. That is not evidence. That is not based on evidence. It is entirely outside of what you may consider in trying this case. So you should resist.

If you see any reference to this trial in a newspaper, you should turn away from that column throughout the trial. It may be tempting, but resist the temptation, because you are then reading things that are not part of the evidence in this case, and may not be considered by the jury in reaching a verdict.

The opinion of reporters who do not know the evidence and are not part of this case should never be considered. But, in any event, the best way to protect your minds from being influenced in the slightest by anything outside this courtroom and considering anything that is not evidence before you in the case means that you have to consciously avoid reading any newspaper article or magazine article that is about this case.

Very well. We will proceed with the witness.

MR. SKINNER: Thank you, your Honor.

CHEN HUO GUANG, resumed.

DIRECT EXAMINATION (continued)

BY MR. SKINNER:

Q. Good morning, Mr. Chen.

Now, you last testified before this Court on Thursday of last week, which I believe was April 11th; is that right?

A. Yes.

Q. Now, was April 11th the first day last week that you came to this courthouse in connection with your subpoena to testify?

A. My first day here was April 9th, but I did not testify.

Q. Were you also here on April 10th?

A. Yes.

Q. And when you were here on April 10th, did you see a man named Guang Zhou in the courthouse?

A. I bump into him downstairs of this courthouse.

Q. Did you know Mr. Zhou before coming to the courthouse that day?

A. I did.

Q. How long have you known him?

A. More than ten years.

Q. How do you know him?

A. Someone had introduced him to me in Chinatown. I don't exactly remember how I met him.

Q. Before coming to court last week, did you know that Mr. Zhou was going to be testifying as a witness in this case?

A. I did not.

Q. And when you were in court last week, did you talk to Mr. Zhou about the testimony you were going to give in this case?

A. I did not.

Q. Have you ever spoken to Mr. Zhou about the testimony that

you are going to give in this case?

A. No.

Q. Has he ever talked to you about the testimony that he was going to give in this case?

A. No.

Q. Let me direct your attention back to April 10th of last week, which was Wednesday. You were in court that day waiting to testify; is that right?

A. Yes.

Q. And did you go outside the courthouse for lunch that day?

A. Yes.

Q. Where did you go?

A. I was in Chinatown.

Q. Did you have lunch with anyone else?

A. I went to lunch by myself.

Q. Did you see anyone else during that lunch?

A. Yes.

Q. Who else did you see during the lunch?

A. My boss, name Dan Jian.

Q. Does he also go by the nickname "Cash"?

A. Yes.

Q. Who got there first, you or Cash?

A. I got there first. And then I called him on the phone.

Q. And when Cash got there, did you talk about your testimony in the case?

**A. 503**

A. No, I did not. I spoke to him about the buses in his company.

Q. And did anybody else join you after Cash got there?

A. Yes, a little while later, Zhou Guang Yun came.

Q. That's the same Mr. Zhou that you ran into at the courthouse?

A. Yes.

Q. Did you tell him to meet you for lunch?

A. I did not. But when he got there, I said, Why don't you sit and have lunch. That was just matter of courtesy. He answer, and said he ate already.

Q. After he got there, did you talk to him about your testimony in the case?

A. No.

Q. Did he talk to you about his testimony in the case?

A. No.

Q. Now, you say that Cash is your boss; is that right?

A. Yes.

Q. How long have you worked for him?

A. Started in September of 2011.

Q. And what do you do for him?

A. I help him manage the drivers at the company, and also hire people to fix the vehicles when it breaks down.

Q. How long have you known Cash?

A. Also for more than ten years.

Q. Now, am I correct that you've met with people who worked for the U.S. government prior to testifying today?

A. Yes.

Q. And did you meet with the government more than once?

A. Yes.

Q. And how were those meetings arranged?

A. Sometimes, say for at today's meeting, we would make a day for the next meeting. Sometimes the agent will call Cash, and Cash would notify me, because I don't speak English.

Q. Am I right --

MR. COHEN: I'm sorry, I didn't hear that last answer.

THE COURT: The witness said that sometimes Cash would tell him, because the agents would call Cash.

MR. COHEN: Thank you.

THE COURT: Because he does not speak English. The witness, that is, Mr. Chen.

MR. COHEN: I understand. Thank you.

BY MR. SKINNER:

Q. Am I correct that the first time you met with the prosecutors in this case was in approximately December of 2011?

A. Yes, it was approximately that date.

Q. And was Mr. Jian, or Cash, the intermediary between you and the government in setting up that meeting?

A. Yes.

Q. Is Mr. Jian what's called an informant?

A. That's what the people in Chinatown say.

Q. Do you know that for certain?

A. I am certain.

Q. And did Mr. Jian ever tell you what you were supposed to testify about?

A. No.

Q. Now, Mr. Chen, do you recall at the end of your testimony on Thursday you were telling the jury about when you went to the defendant for help with the competition that you were facing on your route?

A. Yes.

Q. And am I correct that you testified that the defendant agreed to help you?

A. Yes.

Q. And that the competition then went away?

A. Yes.

Q. I think you may have covered this on Thursday, can you just remind us what, if anything, had you offered to the defendant in exchange for his assistance?

A. I agreed to give him one-third of the share of this company.

Q. And after your competition went away, what contact, if any, did you have with the defendant after that?

A. Every month when we split up the money, I would give him the money, and he would call me when he needed money.

Q. In what form would you give the money?

A. Cash.

Q. Where would you typically meet him and give him cash?

A. At a bus stop where the bus takes off.

Q. Where is that?

A. On Allen Street, what used to be the Hong Kong Supermarket.

Q. That's here in Manhattan?

A. Yes, in Chinatown, Manhattan Chinatown.

THE COURT: Not on South Street?

THE WITNESS: Not on South Street. This was the intersection of East Broadway and Allen Street.

Q. And how much money would you typically give the defendant, more or less?

A. Sometimes 3,000, sometimes $4,000, depends on the business. If the business is good, then I give him more.

THE COURT: Isn't Allen Street called Pike Slip where it intersects with East Broadway? Becomes Allen Street after Division Street.

THE WITNESS: Yes.

THE COURT: So where you met him was at the intersection of Pike Slip and East Broadway; is that right?

THE WITNESS: Yes.

BY MR. SKINNER:

Q. And that's here in the Chinatown neighborhood of Manhattan; is that right?

THE INTERPRETER: Could you repeat?

MR. SKINNER: And is that here in the Chinatown neighborhood of Manhattan?

A. Yes.

Q. So you would give the defendant a third share of your company, am I understanding you correctly?

A. Yes.

Q. Did you enter into a contract with the defendant?

A. No.

Q. Did you give him shares on a piece of paper?

A. No.

Q. Did he pay you any money for his shares?

A. No.

Q. Aside from talking to your competition, did he do any work at all for the bus company?

A. Nothing else.

Q. And what did you think would happen if you didn't pay the defendant --

MR. COHEN: Objection.

THE COURT: Objection sustained.

MR. SKINNER: Your Honor, can we approach for one minute?

THE COURT: Not right now. Let's approach before this witness's testimony is over.

MR. SKINNER: Very well.

BY MR. SKINNER:

Q. Mr. Chen, let me ask you, do you know a man named Yi Feng?

A. I know.

Q. And who is he?

A. He was one of the dailos in the gang in Chinatown.

Q. Was that in the early 2000s, during the period of time that we've been talking about?

A. No, not in the 2000s.

Q. When was he a dailo in Chinatown?

A. Around 2002 to 2003.

Q. Did the defendant ever tell you about a dispute that he had with Yi Feng?

A. Yes.

Q. Where were you the first time you talked to the defendant about this dispute that he had with Yi Feng?

A. When the defendant was in the hospital and I went there to visit him.

Q. And when was this, more or less?

A. Around June or July of 2003.

Q. 2003?

A. 2002. Around June or July of 2002.

Q. And what did he tell you when you talked to him about this dispute with Yi Feng?

A. That he said Yi Feng owned similar type of gambling parlor as his. So a lot of gamblers went to gambler at Yi Feng's

gambling parlor. So he went to Yi Feng's gambling parlor and open -- and fired shots. After he fired shots, and when we was coming back from Yi Feng's, and then while he was coming back in front of his own gambling parlor located on 21 Eldridge Street, he was stabbed by Yi Feng's kids.

Q. And "kid," is that another word for follower?

A. Yes.

Q. Is this stabbing, is that how Ding Pa ended up in the hospital?

A. Yes.

Q. Now, why was it that you went to visit him in the hospital?

A. Because I had to go there to see him. It's a courtesy, and also face.

Q. Now, did there come a time when the defendant got out of the hospital?

A. As far as I remember, about three, four, or five days.

Q. And did he stay in New York after he got out of the hospital?

A. Yes, he stay for a few months.

Q. And after a few months, where, if anywhere, did he go?

A. He moved to Atlanta, Georgia.

Q. Now, after the defendant moved to Atlanta, did you continue to see him in New York City?

A. Yes, he came back to New York very often.

Q. And did you continue to pay him one-third of the shares of

your profits after he moved to Atlanta?

A. Yes.

Q. Mr. Chen, do you know a man who goes by the name Yiqun?

A. Yes.

Q. How well do you know Yiqun?

A. Pretty good friend.

Q. Did Yiqun have any relationship with Yi Feng, the dailo whose gambling parlor had been shot up by the defendant?

A. He and Yi Feng were friends.

Q. After the defendant got into this dispute with Yi Feng, did he ever talk to you about Yiqun?

A. He said Yiqun was almost beat up by him while he was in the barbershop around East Broadway.

Q. Did he say why he tried to beat up Yiqun?

A. He said he will find a reason to beat up anyone who was in good relationship with Yi Feng.

Q. Mr. Chen, did there ever come a time when Ding Pa asked you to get him a cell phone?

A. Yes.

Q. Was that before or after he moved to Atlanta?

A. As far as I remember, after he moved.

Q. And what did he say?

A. He said he wanted me to help him to get a phone similar to walkie-talkie.

Q. What do you mean by "similar to walkie-talkie"?

A. So you don't have to talk on the phone, all you have to do is just push a button and talk to the other party.

Q. Is that what's known sometimes as a push-to-connect feature?

A. Yes.

THE COURT: Or was that a different Chinese word?

THE WITNESS: In English, the name of the phone company is Nextel.

THE COURT: But is it the same word for walkie-talkie as -- what was the other word you used?

MR. SKINNER: Push-to-connect.

THE COURT: Push-to-connect.

THE WITNESS: It has two functions. Also can use as a phone and also --

THE COURT: No, no. I want to know how you say it in Chinese, "walkie-talkie."

THE WITNESS: Walkie-talkie.

THE COURT: I understand, Mr. Interpreter. I'm trying to understand what the push to --

MR. SKINNER: Push-to-connect.

THE COURT: -- to connect, how you say that in Chinese.

MR. SKINNER: Perhaps we could ask the interpreter to give us the exact Chinese word the witness is using.

THE COURT: Fine.

Are there two different words in Chinese, one for walkie-talkie and one for push-to-connect?

THE INTERPRETER: Yes, there are two different terms.

THE COURT: Different words.

THE INTERPRETER: Yes.

THE COURT: Okay. Thank you.

BY MR. SKINNER:

Q. How do you know the company that provided this kind of a phone was Nextel?

A. Because I also used the same phone.

Q. Did you use those phones with your bus drivers?

A. Usually around that time period, drivers and business people in Chinatown, 80 percent of them were using this.

THE COURT: And which was that, which word?

THE WITNESS: Using this walkie-talkie.

Q. And what did you do after the defendant asked you for this walkie-talkie phone?

A. I told my ex-wife to add another phone --

MR. COHEN: Objection.

THE COURT: Objection sustained. It's not responsive.

Q. Did you get Ding Pa one of these phones?

A. Yes.

Q. Did you put it under your own name?

A. No, under my ex-wife's name.

Q. What's your ex-wife's name?

A. Loh Kit Mun.

Q. And who paid the bill for this phone?

A. I deducted money every month from his one-third share.

Q. So, Mr. Chen, can you just remind us when it was, more or less, that you started paying the defendant one-third of the profits from the company?

A. Since May or June of 2002.

Q. Did there come a time after that when the defendant demanded a larger share of your business?

A. Around June or July of 2003.

Q. How did the defendant let you know he wanted a larger share?

A. He told me on the phone that he wanted an additional ten percent.

Q. Where were you when you got that phone call?

A. I was in New York Chinatown.

Q. What did the defendant say to you?

A. He said he had to provide housing, food, for his followers, entertainment, and he didn't have enough money. And he requested bus company to give him additional ten percent.

Q. And how did you feel when he asked you --

MR. COHEN: Objection.

THE COURT: Objection sustained.

MR. SKINNER: Again, I'd like to approach on this at some point.

THE COURT: This is a different one, but yes.

MR. SKINNER: Same issue.

THE COURT: Not really. But, in any event, when you finish this line of questioning, I will see you at the sidebar.

MR. SKINNER: Thank you, your Honor.

BY MR. SKINNER:

Q. What did you say when the defendant asked you for an extra ten percent of the company?

A. He said he already had had a discussion with another shareholder.

MR. COHEN: Objection.

THE COURT: Objection sustained.

Q. Mr. Chen, what did you say to the defendant?

A. I expressed disagreement.

Q. What happened after you expressed disagreement?

A. He said that he did not want me to be part of the business and part of the shareholders.

Q. And what happened after he told you that he didn't want you to be part of the business anymore?

A. I went to Yiqun. I told Yiqun to speak to my --

MR. COHEN: Objection.

THE COURT: Objection sustained.

Q. So after the defendant said this, you went to Yiqun?

A. Yes.

Q. Did you go to Yiqun for help?

A. Yes, I asked him for his help.

Q. Now, I know Yiqun is a friend of yours, but who was he in Chinatown?

A. He had a very good relationship with people in Chinatown, also with people at the gambling parlors.

Q. Was he a dailo?

A. As far as I know, at the time since when I started, first started knowing him, I did not notice that he had followers.

THE COURT: You didn't notice, is that what you said? All right.

Q. Well, to the best of your knowledge, was he a dailo with followers or something else?

A. Dailo is the leader of a gang.

Q. Was he a dailo?

A. No.

Q. Was he friends with dailos?

A. Yes.

Q. He was friends with Yi Feng; correct?

A. Yes.

Q. Was he friends with other dailos in Chinatown?

A. Yes, one or two, but I'm not so sure about this.

Q. Now, what happened after you went to Yiqun for help?

A. Yiqun made a phone call to my fellow -- my fellow shareholders, and told them not to --

MR. COHEN: Objection.

THE COURT: Objection sustained.

Q. Were you kicked out of the bus company after you went to Yiqun for help?

A. No.

Q. Now, when is the next time after this that you saw Ding Pa?

A. Next day in the morning.

Q. And where did you see him?

A. He called me and told me to go to Corona Park in Queens to have a talk.

Q. Did you go?

A. Yes.

Q. Were you with anyone else?

A. I went there. And Ding Pa was there, and there were about two to three followers there. Two followers.

Q. What happened after you got there?

A. At that time he told me that I did not agree to give him the additional ten percent, that means I did not give him face; and that his followers -- and his followers had guns with themselves every day. And also he told me that I must reply today and to make him a decision.

Q. So Ding Pa told you that his followers had guns, or you knew in some other way that his followers had guns?

A. He said it first. And then later I also looked at his -- took a look at his followers.

Q. And when you looked at the followers, what did you see?

A. And his follower pulled his shirt.

Q. Just describe --

THE COURT: Are you talking about a follower?

THE WITNESS: Yes.

THE COURT: What follower?

BY THE WITNESS:

Q. Did you know the name of this follower?

A. I do not know.

Q. And you testified that at this meeting in Corona Park, the defendant was with two of his followers; is that right?

A. Yes.

Q. And one of these followers pulled his shirt?

A. Yes.

Q. Describe for us what you mean by pulling his shirt.

A. My understanding was that the follower was trying to show me that he had a gun.

MR. COHEN: Move to strike, Judge.

THE COURT: Excuse me?

MR. COHEN: Move to strike. His understanding --

THE COURT: Yes, yes, yes.

Q. Just describe for us what you saw what he did.

THE COURT: Right. I grant the motion to strike. What is the question? Why don't you show us what he did. What did you see?

THE WITNESS: Went like this. And pressed over here with his hand, like that.

Q. So he pressed on his shirt in the area of his hip; is that right?

A. Yes.

Q. And what happened after Ding Pa said you had to give him an answer that day?

A. So I call my partner, Ding Jia Quan, and to have a discussion with him.

Q. I jumped ahead a little, a little fast. Forgot to ask you, did you actually see a gun on Ding Pa's follower?

A. No, I did not.

Q. What did you tell Ding Pa after you talked to your partner?

A. Both of us had a discussion, that we agreed to pay him additional $2,000 a month.

Q. So what did you say to Ding Pa?

A. After a discussion, and I want to give you $2,000, additional $2,000 per month, is that okay with you?

Q. And what did Ding Pa say?

A. He accepted it.

Q. Around the time that all of this was happening, did you sell shares in your company to anyone else?

A. We -- Ding Jia Quan and I, we sold additional ten percent each of our shares to Yiqun.

Q. And that's the same man that you had gone to for help as

D4FVLIN    C. H. Guang - direct    Page 328

you explained a moment ago?

A. Yes.

Q. And what, if anything, did you tell Yiqun about the extra $2,000 you agreed to pay Ding Pa?

MR. COHEN: Objection.

THE COURT: Objection sustained.

MR. SKINNER: Your Honor I was going to move on to a new topic at this point. Can we get a sidebar?

THE COURT: Yes. I will see you at the sidebar.

(Continued on next page)

D4F6LIN2    Chen - direct    Page 329

(At the side bar)

THE COURT: Generally speaking the operation of witnesses is not admissible evidence. What makes this different?

MR. SKINNER: Because the witness was extorted by the defendant and the witness's subject of fear is one of the elements of the offense and one of the things we'll have to prove.

THE COURT: You'll have to prove that what the defendant told him would cause a person to be afraid, not that this particular person was afraid.

MR. SKINNER: Your Honor, I thought that we were actually going to have to prove that particular defendant was afraid and the best way to get that is from the witness himself.

THE COURT: I understand that is what you thought. My understanding of extortion is threaten something that would frighten a person.

MR. SKINNER: Your Honor, if the Court is going to be instructing the jury that what we need to prove is that what was said is the kind of thing that would have caused fear, then I agree.

THE COURT: Isn't the question whether the defendant intended to frighten the person is he talking to, not whether that person was in fact frightened because people have

D4F6LIN2    Chen - direct    Page 330

different fear thresholds?

MR. SKINNER: I think the defendant's intent is certainly at issue. I also think the victim's subject of state of mind is relevant and properly admissible where the issue is whether or not he was actually afraid.

THE COURT: I would like some authority on that.

MR. SKINNER: It is part of the jury instructions that we proposed.

THE COURT: Well, it may be. You may have proposed it, but I need to know the source, the legal source of that proposal.

MR. SKINNER: We would have to go back to the instruction. I believe the legal source cites Sand and additional cases.

THE COURT: It is an authoritative case that I would like, that it doesn't matter whether an ordinary person would be caused to be afraid. It only matters whether the person it was said to became afraid.

MR. SKINNER: I am just arguing that where we have the victim of the extortion, the victim's subject state of mind is relevant and admissible where the question is whether or not the defendant caused fear.

THE COURT: I would like to see a case on the essential elements of extortion.

MR. SKINNER: Very well, your Honor. So we'll see if

D4F6LIN2    Chen - direct    Page 331

I can find that.

THE COURT: Unless you are prepared to agree.

MR. COHEN: No, I don't agree at all. In fact, the witness's testimony was that they offered my client the shares of the company in return for his assistance in dealing with a purported competitor. He has proffered to the government, although it hasn't been brought out by Mr. Skinner, the reason they went to him is because he had a good relationship with the purported competitor and they thought they could work things out. Given all that it doesn't appear that we have an extortionate situation here.

MR. SKINNER: Well, I think putting aside that --

THE COURT: Well, I am not hearing what a jury can draw from the testimony. I am interested only in the essential elements of extortion. You can have a hypersensitive person who is fearful and that may or may not be extortion. It's not only extortion that requires putting someone in fear. It is true hyperbole as well and it is not normally an element as to whether that particular thing put the who was spoken to in fear but whether it was calculated to do so.

MR. SKINNER: I think it is actually both whether it was calculated to and whether it in fact did and we will look for a case.

THE COURT: It is your position that unless you can show that the person to whom the demand was made was actually

put in fear that it is not extortion.

MR. SKINNER: I think the person needs to be in fear and that needs to be why he turned over the money.

MS. BURNS: I think it is objective and subjective.

THE COURT: It's very important.

MS. BURNS: It is.

THE COURT: We're dealing with another language, different words.

MR. SKINNER: Fair enough.

THE COURT: It is very difficult to sort out what is really being said.

MR. SKINNER: Put aside the previous witness, I think this witness has been very clear and there hasn't been any issues at all.

THE COURT: He is answering much more directly if that is what you are saying. Yes and no comes more trippingly to his tongue than the other witness.

MR. SKINNER: Your Honor, we'll look for a case.

THE COURT: Good.

MR. SKINNER: If it is something properly before the jury, we can address it before he is finished or we can recall him and answer those question.

THE COURT: Fine.

MR. SKINNER: The only other thing I wanted to raise was with regard to what he said to Yi Qun. I am guessing the

basis of the objection is hearsay.

THE COURT: Sure it is.

MR. SKINNER: We're not offering it for the truth of what was said.

THE COURT: What are you offering it for?

MR. SKINNER: To show everyone's state of mind. To show Yi Qun's state of mind?

THE COURT: How does it show Yi Qun's state of mind, what he said to Yi Qun?

MR. SKINNER: Certainly if he didn't tell Yi Qun about the $2,000 then that explains why Yi Qun didn't say anything until a year later when he found about it.

THE COURT: Then what you would want to know is whether he told Yi Qun about the $2,000.

MR. SKINNER: That is what I was trying to ask.

THE COURT: No. You asked what he said.

MR. COHEN: Judge, I would just ask that you speak to the juror.

THE COURT: I am going to do that. I am going to excuse the jury and if you stay around, I am going to ask that juror to stay for a moment.

MR. COHEN: Thank you.

(Continued on next page)

(In open court; jury present)

THE COURT: Members of the jury, this is a convenient time to take a midmorning recess. I will excuse all of you for a midmorning recess.

I am going to ask Mr. Textly to stay.

(Continued on next page)

(At the side bar)

THE COURT: I think I probably did not instruct specifically enough about staying away from newspapers, but I take it that you did read this on Saturday.

JUROR: I did, yes.

THE COURT: I know it is difficult to figure out what the impact was on your mind, but what kind of credence do you give to a newspaper article about something?

JUROR: It was just curiosity to read about the case that I was involved with.

THE COURT: I understand the temptation to read, but after you read it --

JUROR: Do I think it will affect my opinion in the case?

THE COURT: Well, that is hard to tell. Really you are the one who most knows what the impact was on you.

JUROR: It had minor impact on me. I don't think it would have an impact on my decision in terms of the case.

THE COURT: That is, can you put what that reporter said out of your mind?

JUROR: I believe so.

THE COURT: Very well. Do you have any questions?

MR. COHEN: No.

MR. SKINNER: No, your Honor. Thank you.

THE COURT: I am going to instruct you to please

resist.

JUROR: I will.  It is my weekend routine.

THE COURT: I understand and it is not easy to resist; but when you look at any newspaper if you see anything that refers to a trial, skip it even if it means throwing your net too widely --

JUROR: Okay.

THE COURT: -- during the course of this trial.

JUROR: Yes, your Honor.

THE COURT: It is very important that it is only the evidence in the courtroom that should be considered by you.

JUROR: I understand.

MR. COHEN: Your Honor, I am sure it goes without saying, but can you instruct the juror not to discuss this with any of the other jurors?

THE COURT: Yes.  Please do not discuss with any other juror our conversation.

JUROR: Okay.

MR. COHEN: Or anything about the article.

JUROR: Okay.

THE COURT: It is not easy I know and I know you don't want to be discourteous to anybody, but you can tell them that the Court instructed you not to discuss the article.

JUROR: Yes.  Okay.

THE COURT: Which is indeed what I am doing.

JUROR: Okay, your Honor.

THE COURT: Very well.  Thank you.

MR. SKINNER: Thank you, Judge.

THE COURT: We'll all take a five-minute recess.

MR. SKINNER: Can we have 10, Judge?

THE COURT: Yes.  10 minutes.

(Recess)

(In open court; jury present)

THE COURT: You pay proceed.

MR. SKINNER: Thank you, your Honor.

BY MR. SKINNER:

Q. Mr. Chen, prior to this meeting in Corona Park, you had been paying the defendant one-third of your profits, correct?

A. Yes.

Q. You were making those payments in cash?

A. Yes.

Q. How often were you paying him one-third of your profits?

A. I did it every month.

Q. Now, after the meeting in Corona Park, you agreed to give him an additional $2,000, is that right?

A. Yes.

Q. Was that in addition to the one-third payment, one-third of the profits?

A. Yes.

Q. So from that point on you would pay a third of the profits plus $2,000?

A. Yes.

Q. Was that also in cash?

A. Yes, they were.

Q. How often did you make those payments after the meeting in Corona Park?

A. The next month.

Q. Every month?

A. Every month.

Q. Did you tell Yi Qun about the extra $2,000 payments?

A. I did not tell him.

Q. Why not?

MR. COHEN: Objection.

THE COURT: Objection sustained.

Q. Mr. Chen, did there ever come a time when Yi Qun learned about the payments to the defendant?

A. He learned of it later on.

Q. When did he learn about the extra $2,000 payments?

A. In June of '04.

Q. How did he learn about the extra $2,000 payments in June of '04?

A. Before that I told him that every month I set aside $2,000 for the company's cash flow.  At that time he asked me how much money was set aside for the company's company flow.  Then I told him that the $2,000 every month was paid to Ding Pa.

Q. What happened after you told Yi Qun about the $2,000 payments to Ding Pa?

A. Yi Qun said not to pay anymore, that he did not agree to do that.  So I called him and told him that after I paid him for June, I would not be making anymore payments to him afterwards because the shareholder would not agree to do that.

Q. You called who?

A. I called Ding Pa.

Q. What was Ding Pa's reaction when you told him that you were going to stop the extra $2,000 payments?

A. He started yelling at me over the phone. He said I know who it is that did not agree to it.

Q. What else did he say if anything?

A. He said since there is no face here, there will be an opportunity for me to find this person. But he did not state who this person was.

Q. So he didn't say who the shareholder was?

A. No. He just said that he knew who this person was.

Q. Did you pay Ding Pa the extra $2,000 in June of 2004?

A. Yes.

Q. Did you pay Ding Pa the extra $2,000 in July of 2004?

A. No.

Q. Did there come a time in July of 2004 when you learned that Yi Qun was dead?

A. Yes.

Q. Where were you when you learned this piece of news?

A. I was driving a truck from New York to North Carolina. It was 6:00 in the morning.

Q. How soon after Yi Qun's death was it?

A. I believe one to two hours later.

Q. What did you do with that Nextel phone you got for Ding Pa after you learned about Yi Qun's death?

THE INTERPRETER: Can you repeat that?

Q. What did you do with the Nextel phone you had gotten for Ding Pa after you learned about Yi Qun's death?

A. I told my wife to stop service on that phone after one to two days.

Q. Did you speak with Ding Pa after you learned that Yi Qun was dead?

A. A few days later he made a phone call to me.

Q. A few days after what?

A. It was around one week after Yi Qun's death.

Q. And what is the first thing he said to you during this phone call?

A. He just said it is me. You don't need to say the name.

Q. Did you recognize the voice?

A. I did.

Q. Whose voice did you recognize it as?

A. It was Ding Pa's voice.

Q. Did it come through under a particular phone number?

A. It didn't come through.

Q. After Ding Pa said no names, what did he say after that?

A. I asked him why he killed Yi Qun.

Q. What did he say?

A. He said the northerner misheard him, misunderstood his meaning.

Q. Did he say what he told the northerner?

A. He said to the northerner, Get rid of him.

Q. Did he say what language he spoke to the northerner?

A. He said to the northerner in a dialect or language, which he understood which was Mandarin.

Q. Meaning he said he spoke Mandarin?

A. Yes.

Q. Did he say what he meant when he said, "Get rid of him"?

MR. COHEN: Objection.

MR. SKINNER: Did he say what he meant, your Honor.

MR. COHEN: Withdrawn.

A. When I asked him, he said that it was to shoot Yi Qun on his arms or legs.

Q. What did he say happened if he said?

A. He said the northerner misheard or misunderstood him and shot him on his body, shot Yi Qun on his body.

Q. During this phone call with Ding Pa, did you talk about any payments?

A. Yes. He said to pay his wife every month.

Q. Did he say where he was?

A. He did not.

Q. Did he say anything during the phone call about whether he still had followers in New York?

A. Yes. He said if there is anything just give them a call. There is still a lot of kids, a lot of people that follow him nearby.

Q. Did he tell you anything else during this phone call?

A. Because we didn't talk on the phone for a long period of time, I only asked him why he shot Yi Qun and then he talked about paying the money to his wife every month.

Q. After you got this phone call from Ding Pa, did you go to the police?

A. No.

Q. Why not?

A. Because I was afraid that he had not been arrested and he still had a lot of followers nearby so I was afraid to go to the police.

Q. Eventually you did tell people from the government about this phone call with Ding Pa, correct?

A. Yes.

Q. You told the prosecutors in this case about it in about December of 2011, correct?

A. Yes.

Q. So what, if anything, changed between 2004 and 2011 that caused you to tell the government about that phone call?

A. Because around 2011 I read the newspaper and I learned that he got arrested.

Q. Now, you say that during this phone call with Ding Pa in 2004 he told you to keep making the payments to his wife, is that right?

A. Yes.

Q. Did you make the payments to his wife?

A. Yes.

Q. How often did you make payments to his wife?

A. I paid every month.

Q. How much did you pay?

A. Sometimes 6,000. Sometimes 7,000. It depends on the business.

Q. Was it a third of the profits still?

A. Yes.

Q. For how long did you make these monthly payments of a third of the profits?

A. Until November of '09.

Q. How would you pay the money to Ding Pa's wife?

A. Sometimes I would put it into the bank account. Sometimes I would give it to the bus driver that drives from New York to Atlanta.

Q. Did you ever pay her yourself?

A. Yes. Sometimes I would go to Atlanta and I would bring the money with me.

Q. When you say you put it into the bank account, you mean you deposited the money into a bank account?

A. Yes.

Q. How did you know what account to deposit the money into?

A. His wife gave me the name of the account, number of the account and her name.

Q. What was the bank that the account was at?

A. Bank of America.

Q. What was Ding Pa's wife's name?

A. Xiu Juan Lin.

MR. SKINNER: Your Honor, at this time I would like to read a stipulation into the record.

THE COURT: Very well.

MR. SKINNER: The parties stipulate and agree that if called as a witness a records custodian of a Bank of America would testify as follows: Government Exhibit 20, the printout bank account records for Xiu Juan Lin 3146 Chandley Dunley Road, Suite 206, Atlanta, Georgia, and Government Exhibit 20 was retrieved from the computer archive system of Bank of America. The records reflected on Government Exhibit 20 were created by a person with knowledge of or created from information transmitted by a person with knowledge of the information shown or created at or near the time the information became available to Bank of America and was created and maintained by Bank of America as part of his regularly conducted business activities.

Your Honor, the government would now offer Government Exhibit 104 and Government Exhibit 20.

MR. COHEN: No objection.

THE COURT: Very well. Government Exhibits 104 and 20 are received in evidence.

(Government's Exhibits 104 and 20 received in evidence)

MR. SKINNER: Thank you, your Honor. I would like to show the jury one or two pages from Government Exhibit 20.

THE COURT: You may.

MR. SKINNER: Ms. Chace, can you please call up first page 437. Can we zoom in there on the bottom part of this document?

BY MR. SKINNER:

Q. Mr. Chen, can you describe for us when you would deposit money into the bank account how you would go about doing it?

A. Are you talking about this one?

Q. Well, just the question first then we'll talk about what is on the document.

A. I bring the money to the bank, I fill out a deposit slip, I give it to the teller, and tell the teller to deposit it into that bank account.

Q. Would you have to give your name and identifying information?

A. Yes. The bank's requirement is that if it exceeds four, $5,000 then they would ask me for my name and ID and then they would write down the ID.

MR. SKINNER: Ms. Chace, can you zoom back out so we can see the full document first?

Q. I am not sure if you can see this, Mr. Chen, but do you

recognize what this is?

A. That's my name and my license number.

Q. What is the document itself?

A. That's the deposit slip.

Q. And just describe for us where your name and driver's license number appear on the deposit slip?

A. Under the bank account number 7900.

MR. SKINNER: Your Honor, with the Court's permission I am going to hand the witness a pointer.

THE COURT: Yes, please.

Can you enlarge these numbers?

MR. SKINNER: Yes.

Q. Can you now using this pointer indicate where your name and driver's license number are?

A. That's the name. That's the driver's license number.

MR. SKINNER: Ms. Chace, can you zoom in on the license number so it is easier for us to see.

A. That's the license expiration date. That's the deposit date.

Q. Where was your driver's license from at this point in time?

A. North Carolina.

MR. SKINNER: Ms. Chace, can you zoom back out again?

Q. How much was the deposit for in this particular instance?

A. 7900.

Q. $7,900?

A. Yes.

Q. That was in cash?

A. They were always cash.

Q. Was that one in cash?

A. Sorry?

Q. Was this particular one in cash?

A. Yes.

MR. SKINNER: Ms. Chace, can you go to the next page? Can you zoom in on the left half of that deposit ticket?

Q. Mr. Chen, do you see where it says -- I'll have it translated for you -- Albemarle Road?

A. Yes.

Q. Do you recognize that name?

A. I do.

Q. Why is Albemarle Road?

A. In Charlotte, North Carolina.

MR. SKINNER: Ms. Chace, can we turn to page 422 of the same Government Exhibit 20?

Try 443. Can you zoom in on the whole ticket?

Q. Mr. Chen, do you recognize this?

A. Yes, I recognize.

Q. What is it?

A. This is a deposit slip.

Q. Does your name appear anywhere on the deposit slip?

A. Yes.

Q. Can you just use the pointer and show us where your name appears?

MR. SKINNER: Ms. Chace, can you zoom in on that portion of the document again?

Q. Is that your name you are indicating right there?

A. Yes.

Q. What is underneath it?

A. License number.

Q. What is underneath that?

A. Expiration date of the license.

MR. COHEN: Ms. Chace, can you zoom back out again, please? Pull in on the whole deposit slip again.

Q. What is the name on the account that you were making the deposit into?

A. Lin Xiu Juan.

Q. Can you show us where that appears on the deposit slip?

Who again is Xiu Juan Lin.

A. Ding Pa's wife.

Q. How much is this deposit for?

A. 6,000.

Q. What is the date of the deposit?

A. May 27, 2009.

MR. SKINNER: Ms. Chace, can you turn to 444? Can you zoom in on the entirety of the deposit slip?

Q. Mr. Chen, is this another deposit slip for an account in

the name of Xiu Juan lin?

A. Yes.

Q. Do you see your name and identifying information anywhere on the deposit slip?

A. Yes.

Q. Can you show us where that is?

A. That's my name. That's my license number.

Q. How much was this deposit for?

A. 5,000.

Q. When was this one made?

A. July 22, 2009.

MR. SKINNER: Ms. Chace, can you turn to 474, please. Can we zoom in on this one again?

Q. Is this another deposit slip to an account in the name of Lin Xiu Juan?

A. Yes.

Q. Do you see your identifying information anywhere on this deposit slip?

A. Right there.

Q. How much was this deposit for?

A. 7,000.

Q. What was the date on this deposit?

A. October 9th, 2009.

Q. Mr. Chen, to the best of your recollection do you recall making the deposits that correspond to the deposit slips that

we have just looked at?

A. What about the deposit?

Q. Did you make these deposits?

A. Yes.

Q. Did you ever have anybody else make deposits into the defendant's wife's bank account?

A. Yes. I told my wife Lon Kit Mun to deposit on my behalf.

MR. SKINNER: Ms. Chace, can we turn to page 389?

Q. Mr. Chen, do you see your wife's name and identifying information anywhere on this deposit slip?

A. Yes.

Q. Can you point that out to us with a pointer?

A. That's her name. That's her license number.

MR. SKINNER: Your Honor, I apologize for the interruption, but can we a brief side bar?

THE COURT: Very well.

(Continued on next page)

(At the side bar)

MR. SKINNER: Your Honor, while we were on the break, we did some quick research on the issue we were discussing before and we found one case that we think supports our proposition.

THE COURT: Why don't you hand it up and I will read it.

MR. SKINNER: I don't have the case itself. I wanted to ask that since we're nearing the end of our examination of Mr. Chen with the Court's permission I will not ask anymore questions about his subjective state of mind. I have a feeling Mr. Cohen's cross will bring us to lunch and then we can over lunch get you copies of the cases and bring them with us and if the Court is pursuaded then --

THE COURT: I will give you an opportunity.

MR. SKINNER: Thank you.

THE COURT: Very well.

(Continued on next page)

THE COURT: Are you talking about his bus company?

MR. SKINNER: Yes, your Honor.

Q. Did Ding Pa do any work at all for your bus company after 2002?

A. No.

MR. SKINNER: No further questions, your Honor.

THE COURT: Very well, you may cross-examine.

CROSS-EXAMINATION

BY MR. COHEN:

Q. Is it Mr. Chen or is it Mr. Wong?

A. Chen.

Q. Okay. Mr. Chen, good afternoon.

You and I have never met, have we?

A. No.

Q. We've never talked about this case on the telephone or in any other way, correct?

A. Yes.

(Continued on next page)

(In open court; jury present)

BY MR. SKINNER:

Q. Mr. Chen, after you talked to the defendant on the telephone a week after Yi Qun's death, did you ever see him again prior to coming to court in this case?

A. No.

Q. To the best of your knowledge during the period of time that you continued to make these payments to the defendant's wife was he ever in Chinatown, Manhattan?

A. Who is in Chinatown?

Q. Ding Pa?

THE COURT: The question is did you ever see him in Chinatown.

Q. Did you ever see him in Chinatown?

A. No.

Q. Was he doing work during this period of time for the bus company?

A. No.

Q. Was his wife doing any work for the bus company?

A. No.

Q. Had Ding Pa done anything at all for the bus company after he got rid of your competition?

MR. COHEN: Objection.

THE COURT: Objection sustained.

Q. Did Ding Pa do any work?

Q. Now, I think you indicated that you had met numerous times with the prosecutors and people from the government, right?

A. Yes.

Q. And the first time that you met with those prosecutors, that meeting was arranged by somebody named Dan Jian?

A. Yes.

Q. And Dan Jian was somebody you referred to as your boss; correct?

A. After October 2011, I started working for him.

Q. Okay. And when you testified a little while ago, you referred to him as your boss; correct?

A. Yes, yes, until now.

Q. And I think you said for more than ten years.

A. Yes.

Q. And have you lived in or around the Chinatown area for many years?

A. When I first came to the United States, I lived in Chinatown from 1995 until 2002.

Q. And since then have you not lived in Chinatown?

A. From 2002 until 2008, I moved to Charlotte, North Carolina.

Q. Okay. Are you back in New York now? You don't have to tell us where, but are you back in New York now?

A. Yes.

Q. And is it a fair statement that you're in frequent contact with people in the Chinatown community?

A. Sometimes told them to come out to have dinner or parties.
Q. Is it a fair statement, sir, that you are frequently in contact with people in the Chinatown community, yes or no?
A. Not having frequent contact.
Q. You do not have frequent contact with people in the Chinatown community; correct?
A. Not that often.
Q. Okay. You've testified that since 2011, you worked for Dan Jian.
THE INTERPRETER: I'm sorry?
Q. You testified that since 2011, you worked for Dan Jian; correct?
A. After October.
Q. Of 2011?
A. Yes.
Q. And was that in New York City?
A. Yes.
Q. In Chinatown?
A. Yes.
Q. And how often would you work for Dan Jian?
A. I work for him every day.
Q. So since at least 2011, you've worked for Dan Jian every day in Chinatown, but you're telling the jury that you're not frequently in touch with people from the Chinatown community; is that right?

A. I don't have any contact with him.
THE COURT: I must have missed --
A. If they have parties or dinners, then they would invite me. I know those people from the association, but I just do not have that much contact with them.
THE COURT: Where do you live now?
THE WITNESS: I live in Brooklyn.
THE COURT: And is that since 2011?
THE WITNESS: I started living in Brooklyn since 2010.
THE COURT: Thank you.
Q. Mr. Chen, are you having any difficulty understanding the interpreter?
A. No, no difficulties.
Q. Are you having any difficulty understanding the question that I'm asking you?
A. Just that when you are asking about the community contact, what aspect are you referring to? To my understanding, "community contact" means people from association and also from people abroad.
Q. I'm just talking about people who live in Chinatown, people who work in Chinatown.
A. But as far as I understand, the community contact is not the people from Chinatown who live in Chinatown.
Q. What do you understand "community" to mean?
A. Community is area within Chinatown.

THE COURT: Is a particular area you think?
I think he's trying to explain he didn't understand your question.
A. To my understanding, the community contact is people in Chinatown who are more -- who are well-known, and people who I know.
MR. SKINNER: Perhaps defense counsel can just ask if he talks regularly to people who live in Chinatown so we don't have that issue with the terminology.
MR. COHEN: That's fine. I'll adopt that question.
THE COURT: I'm not sure the interpreter heard you.
THE INTERPRETER: Could you repeat?
Q. Do you speak regularly to people who live and work in Chinatown?
A. Chinatown? Yes, that's my work. They drive every day, so I have to talk to them. I'm responsible for ticket sales, so many, many tens of numbers of people came to me and speak to me.
THE COURT: What you're being asked is are there people in Chinatown who are friends of yours or whom you speak to regularly?
THE WITNESS: Yes.
Q. Okay. And is it a fair statement that Dan Jian, your boss, is somebody who's well-known in that community?
A. You can say that.

Q. It's not for me to say that. I'm asking if you would say that.
A. Yes.
Q. And what is his reputation in your community?
A. To me, just that a lot of people know him. He and I are friends, and no one would talk in front of me about him.
Q. Because he's a powerful person in Chinatown; correct?
A. I think -- to me, I think cannot say this way, in this way. I do not understand what you mean, in what aspect that you mean "power."
Q. He's somebody who has face in Chinatown; correct?
A. Can say that.
Q. Can you say that?
A. Yes.
Q. Would most people in Chinatown say that, in your opinion?
A. I think he's a person who has face, but I cannot represent that's what other people are thinking.
Q. He's somebody who commands respect in Chinatown; correct?
A. I can say it like this.
Q. And he's somebody that you know to be an informant for the immigration service; correct?
A. Do not know.
Q. Excuse me?
A. Do not know. I do not know.
Q. You don't know?

Q. Didn't you tell the jury on direct examination that you knew that Dan Jian was an informant for the immigration service?

A. He is an informant, but I just do not know that he is an informant for immigration.

Q. Oh, so you know that he's an informant, you just don't know what government agency he informs to.

A. Yes.

Q. And he's told you that he's an informant; correct?

A. No, he did not tell me. But almost everyone in Chinatown knows that he is an informant. This is not a difficult question to understand.

Q. And everyone in Chinatown knows he's an informant because he's told everybody that he's an informant; correct?

A. I do not know. I do not know whether he has told other people.

Q. So it was through this informant, Dan Jian, you first came to have a meeting with the government; correct?

A. Yes.

Q. And when you went to meet with the government, you knew that they were interested in speaking to you about Ding Pa; correct?

A. Yes.

Q. And you knew that because Dan Jian told you that they wanted to talk to you about Ding Pa; correct?

A. First time -- I may describe to you why the first time when I decided to talk about this case.

Q. I'm asking you, sir, did you know that they wanted to talk to you about Mr. Lin because Dan Jian told you they wanted to talk to you about Mr. Lin? That's a yes or no, sir.

A. But I think the question I'm going to answer is different from when this -- when this thing happened.

MR. COHEN: Your Honor, I ask the witness be directed to answer the question that I ask him, not the question that he would prefer to answer.

THE COURT: Right. Please.

MR. SKINNER: Objection.

THE COURT: Listen carefully to the interpreter.

MR. SKINNER: I'd ask the defense counsel to give an opportunity to answer before he interjects.

THE COURT: We don't need speeches from either counsel.

BY MR. COHEN:

Q. I'll ask the question again, sir, and then I'm going to ask you two questions: First I'm going to ask you if you understand the question, and then I'm going to ask you to answer it. Okay?

When you went to meet with the government, you knew that they wanted to talk to you about Mr. Lin because Dan Jian told you that.

Q. Now, do you understand that question?

A. Yes.

Q. Now, can you answer that question?

A. Yes.

Q. Okay. And you had conversations before you met with the government with Dan Jian about Mr. Lin; correct?

A. Yes.

Q. And you had conversations with other people in Chinatown about Mr. Lin before you went to meet with the government; correct?

A. No, they are not.

Q. Never?

A. No.

Q. What was the name of the bus company that you owned that you started, I think, in 2001 with the two vans?

A. Hua Yun.

Q. And does that have an English translation?

THE INTERPRETER: Chinese Transportation.

MR. COHEN: The interpreter answers that's what it meant, Chinese Transportation?

THE INTERPRETER: Yes.

Q. Okay. Now, eventually there came a time that you owned other bus companies, too; correct?

A. 2004.

Q. What was the name of that company?

A. Sky Express.

Q. Sky Express. You owned that company by yourself or with other people?

A. Four partners.

Q. And was there a written partnership agreement?

A. Yes.

Q. And were you one of the people whose names was on that agreement?

A. No, my wife's name was on there.

Q. And, in fact, the reason your wife's name was on it was because you had no legal status in the United States; correct?

A. Yes.

Q. So in an effort to conceal the true ownership of the company from the government, you had your wife sign instead of yourself; correct?

MR. SKINNER: Objection.

THE COURT: Overruled.

A. I do not understand.

Q. The reason that you've put your shares of the company in your wife's name was to conceal from the government the fact that one of the owners was an illegal alien; correct?

A. I was an illegal immigrant.

Q. And that's the reason that you put the company in your wife's name, because you wanted to conceal from the government the fact that an illegal immigrant owned that company; correct?

D4FVLIN3    C. H. Guang - cross    Page 364

A. I do not have any work card and I could not register.

Q. And is it for those reasons, sir, that you put the company in your wife's name?

A. Yes.

Q. How many people were killed in accidents in buses operated by Sky Express while you owned it?

MR. SKINNER: Objection, your Honor.

THE COURT: Objection sustained.

Q. While you owned Sky Express, were there fatal accidents involving Sky Express?

MR. SKINNER: Objection, your Honor.

THE COURT: Objection sustained.

I have just sustained an objection to that, Mr. Cohen.

MR. COHEN: I'll move on, Judge.

Q. Is Sky Express still in business?

A. No.

Q. What happened?

MR. SKINNER: Objection, your Honor.

THE COURT: Overruled.

A. There was an accident when the bus flipped in May of 2009.

Q. And was it after that accident that the government shut the company down?

THE COURT: Objection sustained.

Let's move on.

Q. When did you first come to the United States?

D4FVLIN3    C. H. Guang - cross    Page 365

A. March 1995.

Q. And how did you get here?

A. Smuggled in.

Q. Where did you enter the United States?

A. California.

Q. And did there come a time after you entered the United States that you applied for political asylum?

A. In 2002.

Q. And, by the way, when you entered the United States, were you carrying any identification documents with you?

A. No.

Q. Did you ever use the name Wu Han Min?

A. No.

Q. Your name is Huo Guang Chen; correct?

A. Yes.

Q. And you say that you've never used the name Han Min Wu?

A. No.

MR. COHEN: Your Honor, may I approach the witness?

THE COURT: Very well.

Q. Let me show you a document, 3503-11, ask you to take a look at it, tell me if you recognize it.

MR. SKINNER: Can I see it?

MR. COHEN: Of course.

Q. Now, I know you don't read English, but I'm going to show you the entire document, ask you if you recognize it.

D4FVLIN3    C. H. Guang - cross    Page 366

Do you recognize that signature?

A. That's my signature.

Q. Recognize that photograph?

A. Yes.

Q. Okay. I'm going to ask the interpreter to read this name to you, and ask if it refreshes your recollection that you used the name Wu Han Min.

A. No, I never used it.

Q. And you say that when you entered the United States, you had no documents with you.

A. Correct.

Q. By the way, does it sound about right that you filed your petition for asylum in April of 2002?

A. 2012?

Q. Two, 2002.

A. I don't remember whether it was in April or May of 2002. I did apply for one in California.

Q. Okay. And you told us, I think, that you came here in when?

A. March of '95.

Q. Okay. After you left China in March of '95, between then and 2002, did you return to China?

A. No.

Q. So when you wrote on this document that you last entered the United States on March 19th of 2002, that was a lie;

D4FVLIN3    C. H. Guang - cross    Page 367

correct?

A. Yes.

Q. Because, in fact, you left China seven years before that; correct?

A. Yes.

Q. And when you wrote on this document that your religion was Christianity, that was also a lie; correct?

A. Yes.

Q. Because you were not a Christian, were you?

A. Yes.

Q. And did someone help you prepare this document?

A. At that time, I asked a law firm in California to help me fill it out.

Q. And were there people at the law firm that understood Chinese?

A. Yes.

Q. By the way, what city were you born in in China?

A. In Fuzhou.

Q. Fuzhou City?

A. Fuzhou City, Changle County.

Q. And is it true that you filed a lengthy, several-pages statement as to why you were seeking asylum in the United States?

A. Yes.

Q. Now, in that statement, is it true that you told them that

you were born in Chang Sha City in Hunan Province?

A. That was on my fake document.

Q. On what?

A. On my fake document.

Q. What fake documents were those, sir?

A. My birthplace at Hunan Chang Sha.

Q. What fake documents did you have that contained that information?

A. At that time, I had a friend that could help me obtain a household registration account and identification from Hunan City with a photo, and that's why I did that.

Q. So you had documents in your possession that were fraudulent; correct?

A. Yes, a friend of mine gave it to me.

Q. And what the friend of yours gave you were fraudulent documents that had your pictures on them; correct?

A. Yes.

Q. Do you have those documents still?

A. No, I submitted them all to immigration when I went to court.

Q. And what name was on those documents?

A. It was my name.

Q. It didn't have the name Han Min Wu on it?

A. No.

Q. So if that name wound up on your asylum application, you

wouldn't have any knowledge of how it got there; correct?

A. Right.

Q. Now, in your asylum application, you claimed that you had been converted to Christianity in China, right?

A. Yes.

Q. And you told them in your application that you met a wonderful young woman with an amazing story; correct?

A. These were stories that I made up myself.

Q. I understand that. But I want you to tell the jury exactly what the stories were that you made up, so that's why I'm asking you these questions.

And, by the way, the reason you made these stories up was because you wanted to get a benefit from the United States government, right?

A. If they accepted the stories, then they would accept my political asylum application and allow me to stay in the United States.

Q. And the benefit that you wanted to get from the government was the ability to stay in the United States; correct?

A. Yes.

Q. And it didn't matter to you what lies you told, as long as you could stay in the United States; correct?

A. Aside from this application, I did not make any lies or tell any lies other than that to stay in the United States.

Q. We're going to get to that. But right now what I'm asking

you is whether you were willing to tell any lie in this application that you thought would work as long as it helped you stay in the United States, is that true, sir?

A. Yes.

Q. And you told the government in this application that this wonderful young woman told you about how God saved human beings; correct? Right?

A. I don't really remember the specific that was written in there.

Q. It was written for you.

A. I was there with someone else to make up the story.

Q. Well, didn't you just tell the jury that you made up the story?

A. More or less. I was there with someone else. I would say it, and then the person would add to it.

Q. So, in other words, you and another person got together to make up this story?

A. Yes.

Q. And you don't remember quite all the details in this story because it was all lies, right?

A. Yes.

THE COURT: We're going to stop at an appropriate moment.

MR. COHEN: I'm sorry, your Honor?

THE COURT: We're going to stop for the lunch recess.

MR. COHEN: Oh, okay.

THE COURT: If this is an appropriate moment.

MR. COHEN: This would be a fine time, Judge.

THE COURT: Very well.

Members of the jury, we're going to take a break now for lunch. And we're going to come back at 2:15.

Have a pleasant lunch.

(Jury excused)

THE COURT: We will all take a lunch recess at this time and reconvene at 2:15.

MR. SKINNER: Thank you, your Honor.

MR. COHEN: Your Honor, may I again remain in the courtroom to work?

THE COURT: It was all right yesterday?

MR. COHEN: Yes.

THE COURT: Fine.

MR. COHEN: Thank you.

THE COURT: Although I really prefer that you use the lawyer's lounge. Very well. You may stay in the courtroom.

MR. COHEN: Thank you.

(Luncheon recess)

(Continued on next page)

AFTERNOON SESSION
2:15 p.m.

THE COURT: Good afternoon. Let's get the jury.

(In open court; jury present)

THE COURT: You may all be seated. Members of the jury, we will continue with the testimony.

You may proceed, Mr. Cohen.

MR. COHEN: Thank you, Judge.

BY MR. COHEN:

Q. Mr. Chen, before we broke for lunch I was asking you some questions about the first application you filed for political asylum. Do you remember that?

A. I do.

Q. I asked you a specific question and you said you didn't quite recall what you had put into it, into the application, correct?

A. Yes.

MR.C: I am going to, with your Honor's permission, ask the interpreter to translate for him this document and then I am going to ask him some questions.

THE COURT: You are in effect showing him the document to refresh his recollection, is that what you are doing?

MR. COHEN: Yes, ma'am.

THE COURT: Very well.

BY MR. COHEN:

Q. Mr. Chen, having heard what Ms. Lau read to you? Does that refresh your recollection with regard to some of the story that you told the government in your first asylum application?

A. I remember a little bit. It's more, less the content of that.

Q. Well, what Ms. Lau just read to you, that is the story you told to the government in this document, correct?

A. Yes. I more, less have a recollection of that.

Q. Well, you told them for example that you met this wonderful young woman, correct?

A. Yes.

Q. And she told you that she believed in God and you told her that you didn't, correct?

A. Yes. That's what is written on the story.

Q. Is that your story that you and this other person concocted together, correct?

A. Yes.

Q. And you said suddenly she lifted up the leg of her pants and you were shocked to see that she had an artificial leg, correct.

A. Yes.

Q. She told you it was God that saved her and gave her the strength for life, correct?

A. Yes.

Q. Under her guidance you joined a youth fellowship and were

baptized and saved and that God brought new life to you, correct?

A. Yes.

Q. Is one word of that true?

A. From what I remember there wasn't any.

Q. Is there any question in your mind that not a single word of that was true?

A. Correct.

Q. You also told them that you became a member of a secret church?

A. Correct. Yes.

Q. And that you bought a desktop copier so you could make copies of religious material to spread the gospel, correct?

A. I do not remember that.

MR. COHEN: Your Honor, may I approach again?

THE COURT: Yes.

Q. Mr. Chen, did what Ms. Lau just read you refresh your recollection as to some of the other statements you made in your asylum application in 2002?

A. Yes. Somewhat.

Q. Well, do you remember saying that you bought a desktop copier to copy Christian materials for the church?

A. Yes.

Q. And that you had secret meetings to spread the gospel among youth?

A. Yes. I remember I wrote that.

Q. And that you had to keep the meeting secret because the Hunan police had been repressing secret religious groups?

A. Yes.

Q. On Christmas Eve of 2001 at such a meeting a new member who was an undercover cop let the police in to ambush you; do you remember saying that?

A. If it was written there, then that is what I said.

Q. And that you were arrested?

A. Yes.

Q. Every single word of that is a lie, correct?

A. Yes.

Q. You didn't even live in Hunan province, correct?

A. I was not.

Q. On Christmas Eve of 2001 you were in the United States and not China, correct?

A. Correct.

Q. If I went through every single word on the second lengthy page of this document, would there be anything in it that was true?

A. This was a story that I made up so there wasn't anything that was true.

Q. It was all lies, right?

A. If I did not remember incorrectly then they were lies.

Q. Because you remember that everything that you said was a

lie, correct?

MR. SKINNER: Asked and answered, your Honor.

THE COURT: Overruled.

A. Can you repeat the question?

Q. Because you remember that everything you put into that story was a lie, correct?

A. Yes.

Q. Now, there came a time that you learned that your asylum application had been turned down, had been rejected by the government, correct?

A. Yes.

Q. When was that?

A. It was around October of 2002. I don't remember exactly when.

Q. And once you knew that your application had been turned down, you knew you had to leave the United States, right?

A. After it was turned down, I moved from California to New York, hired an attorney to go to court but I did not go to court at the end.

Q. You hired an attorney to go to court to appeal the decision that your application was rejected?

A. Yes.

Q. That attorney actually filed papers on your behalf in court to appeal that decision, right?

A. Yes.

Q. Now, but you never went to court?

A. Only when I first moved over here I went in to make an appearance in court.

Q. But you never went back after that?

A. I did not go back.

Q. Was that because if you went back you would be taken into custody and sent back to China?

A. At that time it was the attorney who told me I did not have to go to court because the Court case was canceled. I don't know what it was about, but I did not go back to court.

Q. The attorney told you that the Court case was canceled and that it was over?

A. At that time I did not understand what he meant. He said you lost your case. You don't have to go back in.

Q. You understood what you meant when he said you lost your case, right?

A. By guessing and by asking other people I knew what he meant.

Q. By what?

A. By guessing and by asking other people I knew what he meant.

Q. And you knew that by guessing and asking other people you knew that it meant that you had no status in the United States, right?

A. Yes. I didn't have any legal status to begin with.

Q. But you also didn't have any legal status after you made this application for asylum and went to court and you lost, correct?

A. Correct.

Q. And that is why when it came time to put shares of a bus company onto a contract and put a name on the contract, you used your wife's name because you didn't want anyone to find you because you were here illegally, correct?

A. Using my wife's name and the fact that I don't have legal status is two different things. Because I don't have a social security number, I could not fill out the shareholders form.

Q. Because you knew that you had no status and you were not supposed to be in the United States, correct?

A. Yes.

Q. You knew you weren't supposed to be working and earning money in the United States, correct?

A. Yes.

Q. Now, by the way eventually after you started this small company and eventually became a shareholder in Sky Express, there came a time that you and your parters owned 33 large buses, correct?

A. Yes.

Q. And it was a successful business from which you made a lot of money, correct?

A. After I expanded it, I borrowed money to expand the

company. Before I started making money, the vehicle flipped over.

Q. There came a time when with 33 buses running up and down the east coast and elsewhere you were making a lot of money, correct?

A. I had not started making money.

Q. Did you ever start making money, sir?

A. I had not started making money. The parters had just put everything in place. Just put in the money that was borrowed and then their vehicle flipped over. For each ticket from New York to Charlotte, North Carolina it is a 12 hours ride. The bus ticket was only $30 each. How could I make any money from that?

Q. Was the most money you made in any one year from your work in the bus business?

A. Without counting my own salary approximately $5,000 a month.

Q. With counting your own salary?

A. My salary was one to $2,000 for answering the phone calls inside.

Q. A week? A month?

A. Per month.

Q. So you were making roughly six, $7,000 a month?

A. Yes.

Q. You never made more than that?

A. That's the average. Sometimes when the business was bad I didn't even make any money.

Q. Did you file income tax returns?

A. I filed personal income taxes for two to three years.

Q. Two to three years?

A. But I did not file it here.

Q. Where did you file it?

A. I filed it for the grocery store.

Q. You owned a grocery store?

A. I opened a grocery store with someone else in Charlotte.

Q. In North Carolina?

A. Yes.

Q. So you paid taxes on the money that you made at the grocery store?

A. I didn't make any money from there.

Q. Sir, did you ever pay any taxes on the money you made from the bus company?

A. From what I remember I did not pay taxes.

Q. Did you file returns?

A. No.

Q. Now, in 2012 you filed another asylum application, right?

A. Yes.

Q. And I think you told us this morning that everything in that 2012 application was true, is that right?

A. Yes.

Q. Are you sure about that?

A. Yes.

Q. Now, you testified last week or this morning that you are testifying under a grant of immunity, right?

A. Yes.

Q. What is the reason that you wanted to have immunity before you agreed to testify in this case?

MR. SKINNER: Objection, your Honor.

THE COURT: Overruled.

A. Because I smoked marijuana and also this incident related to the bus being flipped over.

Q. Is it a fair statement that one of the reasons that you wanted immunity was because you were afraid that you might be prosecuted for some of the things you talk about when you testify?

A. Yes.

Q. In fact, is it a fair statement that the false statements you made on your immigration application were a much greater concern to you than the fact that you smoked marijuana needing an immunity agreement, correct?

A. About this immigration matter I found out that I was ordered to be deported on March 21, 2013.

Q. That is not what I asked you. I am asking you whether the lies that you told on your application in 2002 was of greater concern to you than the fact that you smoked marijuana when you

asked the government for an immunity agreement?

A. At that time I did not just remember that I had immigration case in 2002. I only remember that I smoked marijuana a year -- a little over a year ago.

Q. So you didn't even remember that in 2002 you filled out this lengthy elaborate application for political asylum? You didn't even remember that?

A. I remembered, but I just did not know that I was ordered deported.

Q. Didn't you just say that you didn't remember filling out an asylum application in 2002?

A. But my understanding of remembering and whether I knew is different.

Q. How much marijuana have you smoked?

MR. SKINNER: Objection, your Honor.

THE COURT: Objection sustained. That is stricken.

Q. When you filled out this application in 2002, you knew that all of it was fraudulent, right?

A. Yes.

Q. Did you know that you can go to federal prison for five years for filing a fraudulent immigration application?

MR. SKINNER: Objection to the tone of the question and the beating on the podium.

THE COURT: Just a moment. Just a moment. I think you can just rephrase it.

MR. COHEN: Of course.

THE COURT: For how many years you go, but it is a crime is what you are saying.

Q. Do you know, sir, that it is a felony to make false statements on an asylum application?

A. I knew.

Q. Do you know, sir, that once you've made false statements on an asylum application, you can never get asylum in the United States?

A. Yes.

Q. And then you filed this second asylum application, right?

A. Yes.

Q. Again you claim that you were being persecuted by the Chinese government, correct?

A. Yes.

Q. But this time you didn't go with the Christianity story because it didn't work the first time, correct?

A. Because the story happened to me.

Q. Well, is it true that when you used your persecution because you are a Christian that it didn't work?

A. When?

Q. When? In 2002.

A. Which one are you talking about?

Q. The application for the asylum when you said to the United States, Please let me stay here. I am a persecuted Christian

and I cannot go back to China.

A. Yes. That is what I wrote.

Q. And it didn't work, right, because your application was denied?

A. Yes.

Q. So in 2012 when you filed another application you came up with a different reason for being persecuted, correct?

A. Yes.

Q. This time you said you were being persecuted because of your belief in democracy and your support for the Chinese Democratic Party, correct?

A. Yes.

Q. You didn't make any false statements on this application, right?

A. Yes.

Q. Did someone help you fill this application out?

A. Yes. I hired people from the service agency to fill it out for me.

Q. The people you hired spoke Chinese, right?

A. Yes.

Q. Now, didn't you say in this document that you had never been in any immigration proceedings before?

A. No. I did not include that in there.

Q. Are you sure about that?

A. Yes. I said I did not have any hearing.

Q. Somebody translated this for you, correct?

A. Yes.

MR. COHEN: Can I approach the witness, Judge?

THE COURT: You may.

Q. So do you remember now this form asks you whether you have ever been in immigration court proceedings before?

A. Yes. I remember they asked.

Q. In fact, you said you hadn't been in any immigration court proceedings before, right?

A. Yes.

Q. That was a lie, wasn't it?

A. Yes.

Q. Didn't you say on this document that you never committed a crime in the United States?

A. Yes, I did.

Q. That was a lie, wasn't it?

A. If you consider the two 2002 case as a crime, then yes.

Q. That isn't the only crime you committed, is it?

A. No. I did not commit any crime.

Q. You didn't commit any other crime?

A. No.

Q. Not paying your income taxes, is that a crime, sir?

A. According to this, yes, it's a crime.

Q. Possessing and using drugs, is that a crime?

A. Yes. Smoking marijuana is a crime.

Q. So when you said on this document just a year or two ago that you never committed a crime in the United States, that was a lie also, wasn't it?

A. If you consider that then so this is also false.

Q. And it asked you, didn't it, this document to provide information about your employment during the last five years, correct?

A. Yes.

Q. And you told them on this form that between 1995 and 2010 you were a ticket seller for Ming Ong Incorporated, correct?

A. No. They filled it out wrong. Later I told them to change it and they did. The one, the original one was filled out. It was wrongly filled out.

Q. So there is another one besides this one that was filled out later?

A. About this 95 to 2010 ticket sales I had told the service agent people that they had filled it out wrong.

Q. Okay. Did you disclose on this document the fact that you had been an owner or shareholder in several bus companies?

A. No.

Q. So by leaving that information out that was another lie, correct?

A. So then if the lawyer considers it, then it is a lie?

Q. I am not asking what the lawyer considers. I am asking you, sir, whether by leaving out information about what you've

done for your employment, isn't that lying to the government?

A. Yes.

Q. Now, in this application you said that you couldn't go back to China because you participated in the Chinese Democratic Party, correct?

A. Yes.

Q. And that you had done that before you left to come to the United States?

A. Yes.

Q. Is that true?

A. Yes.

Q. So, sir, my question is if you had a legitimate truthful reason to seek political asylum in the United States in 2002, why did you make up this entirely false story?

A. Before 2002 I had not encountered the CDP and I did not know about it. I was working in a restaurant out of state.

Q. Did you tell the United States Immigration Service that in China in November 1994 you were distributing pro-democracy flyers and you got arrested by the police?

A. Yes.

Q. And that you were held by the police and beaten and tortured and forced to confess?

A. Yes.

Q. And that you promised you would never participate in antigovernment activities again?

A. Yes.

Q. Well, if all of that was true, if in fact you were persecuted in China because of your belief in democracy, why didn't you just tell the truth in your application instead of making up this elaborate set of lies?

A. What lies?

Q. All the lies you told in 2002 about preaching the gospel and discovering God.

A. In 2002 I did not even hear there was such organization as China Democracy Party.

Q. I didn't use the words Chinese Democracy Party in my question, sir. I am asking you whether it was true that in 1994 you got arrested in China for participating in a democratic movement why didn't you just put that on your 2002 application?

A. Because it had been to my own village or hometown and that was the story I made up, but they did not connect with each other.

Q. My question that I am asking you, sir, is why if you had a legitimate fear of persecution because of your political activities you didn't just tell that to the United States in 2002? Why did you make up a full set of pages and pages of lies?

A. I don't remember what I -- what was my thinking back then. But at the time people around me such as friends and relatives,

they all had religion as a basis for asylum. So it would be easier for them to go to court to have asylum hearings so I made up this story.

Q. So it was because other people told you that you would have a better chance if you lied that you made up this story?

A. Not really telling me that it would be a high chance if I told a lie. It would be easier if I make up a religious claim that the judge would easily accept my claim or taking sympathy upon my situation.

Q. In other words that lying to the government would get you the ability to stay in the United States, correct?

A. I do not understand.

Q. Aren't you telling the jury that you believed that your best way to stay in the country was to lie to the government?

A. To make up a story hoping that a judge will be more sympathetic to me.

Q. Sir, this is a question that can be answered yes or no. Is it true that you thought that the best chance you had to stay in the United States was to lie to the government?

A. What do you mean the high chance in lying to the government? I never thought that to be this big. I was only trying to make up a story.

(Continued on next page)

Q. Right. And the story you made up was a lie, right?

A. Yes.

Q. And you told that lie to the government in order to convince them to let you stay in the United States; correct?

A. Yes.

Q. And I ask you again, because you haven't answered me, why is it that if you had a legitimate fear of persecution in China because of your politics, why did you go with a story that was completely false?

MR. SKINNER: Objection to the form of the question.

THE COURT: The witness hasn't yet answered that question.

MR. SKINNER: I think he's tried to answer it a number of times.

THE COURT: Well, I think the questioner is entitled to an answer to his question.

A. Because at the time people around me, such as friends, they told me that if I apply based on religion, it would be much easier. At the time I did not encounter this in the United States, so I could not apply -- cannot apply based on this democratic party persecution.

Q. But you told the jury that you were persecuted in 1994 because you participated in some sort of democratic movement; correct?

A. Yes.

Q. And you're telling us now that that was the truth; correct?

A. Yes.

Q. So isn't it so that when given a choice between lying and telling the truth, you'd do whichever one you think is going to work best for you?

A. What do you mean? I do not understand.

Q. You didn't understand my question, sir?

A. I'm just confused by your question, about what two things that I choose.

Q. I'm asking you --

THE COURT: I think at this point you should move to something else. You can come back later.

Q. How many meetings have you had with the government to prepare for your testimony here today, approximately?

A. Seven to eight times.

Q. And how many of those meetings were arranged by Cash, by Dan Jian?

A. Six to seven times.

Q. And you testified that in March, you went to an immigration office in -- I think you said in Philadelphia or in New Jersey?

A. New Jersey.

Q. Okay. And what was the purpose of you going there that day?

A. Immigration asylum interview.

Q. And that was based on the second application that you

filed; correct?

A. Yes.

Q. What happened when you got there?

A. I got there, I went in, and immigration officers show me the 2002 application and told me that I had been ordered deported.

Q. And what was the next thing that happened?

A. And then I was arrested and taken to immigration detention facility.

Q. They put handcuffs on you, right?

A. Yes.

Q. They said you're not going home, you're coming with us, and you're going to be deported, right?

A. No, they just told me to follow them. That agent told me that I should not worry about it, that they would not send me back by plane.

Q. That they wouldn't send you back by plane?

A. That's what he told me.

Q. Were you able to communicate with this agent?

A. There was an interpreter during the interview.

Q. And during the interview was when they told you that you had a removal order, and you were taken into custody. Is that when you told them that you needed to call Agent Tim?

A. They handcuffed me and took me to the immigration detention facility, when I was signing and fingerprinting. And I asked

them to let me make a phone call.

Q. And who did you call?

A. I gave the officer -- the agents a business card. I told them that if they could make a phone call for me to the agent. So immigration officer there made the phone call to the agent.

Q. And you told them, didn't you, that you were going to testify for the government in a criminal trial in New York, right?

A. He did not seem like that, but later the agent told them. I did not know what he was saying. After a while, I signed it, and then they gave me three pieces of paper and told me to report on April 22nd to Building No. 26.

Q. Did you tell them that you were going to be a witness in a federal criminal trial on April 8th?

A. No, I did not. I did not understand it.

Q. Didn't you say there was an interpreter there?

A. Interpreter had left. I was taken somewhere else.

MR. COHEN: Judge, can I take a moment?

THE COURT: Yes.

MR. COHEN: Thank you.

Judge, would this be an appropriate time to take a brief recess, and I can get some things organized?

THE COURT: Very well. We'll take the mid-afternoon break at this time.

(Jury excused)

THE COURT: You may step down.

(Witness excused)

THE COURT: How much more do you have, Mr. Cohen?

MR. COHEN: I would say less than half an hour, depending on the answers.

THE COURT: Very well.

We'll all take a five-minute recess.

(Recess)

THE COURT: Okay. Let's get the jury.

MR. SKINNER: Your Honor, may I ask, outside the presence of the jury --

THE COURT: Yes.

MR. SKINNER: -- if we're going to be permitted on redirect to get any questions about the witness's subjective state of mind?

THE COURT: I haven't had an opportunity to read the pounds of paper you gave me.

MR. SKINNER: Very well, your Honor.

THE COURT: You'll have to put that over till the morning.

MR. SKINNER: That's fine.

(Jury present)

THE COURT: You may proceed, Mr. Cohen.

MR. COHEN: Thank you, your Honor.

BY MR. COHEN:

Q. Mr. Chen, I'd like to draw your attention to March 21st, when you were at the immigration office.

After you were taken into custody, did you advise the agents who arrested you that you needed to be a witness here and asked them to call Agent Varian?

A. I only gave the agent -- the agent's business card. I asked him to help me call him to tell him that I got arrested. I couldn't really speak very much English, but he understood.

Q. Did you say there was a translator there or the translator left already?

A. The interpreter was at the court appearance. And as soon as I was taken by immigration agents and put in the vehicle, that interpreter left.

Q. So you were actually brought before an immigration judge on that day and appeared in court?

THE INTERPRETER: I'm sorry, can you repeat the question?

Q. So you were actually brought before an immigration judge that day and appeared in court?

A. I did not see the immigration judge. I was at the immigration detention center, I believe.

Q. Didn't you just tell us that you were in immigration court?

A. Well, the first time when I went in to make an appearance for an interview, then I was handcuffed right away.

Q. I'm sorry, were you finished?

A. Then I was taken to another place which I understood it to be a detention center, but I don't really know.

Q. Okay. So at which of those places was the interpreter?

A. At the first place for the interview.

Q. And was it at the interview that you were taken into custody?

A. Yes.

Q. And was it as soon as you were taken into custody that you gave Agent Varian's card to the agents that took you into custody?

A. At another place I gave it to the agent who took me to custody, at the second place.

Q. And there was no interpreter there?

A. No interpreter.

Q. So, to your knowledge -- well, did they ask you any questions in English about why you had a special agent's card from the Customs and Immigration Service?

A. Based on my understanding, he probably did. But I gave him my -- I'm sorry, I gave him the business card and told him to call the agent. He called, but I didn't really understand what they said to each other.

Q. So after he called Agent Varian, what happened?

A. He said he would help me type up three pieces of papers. He photographed me, took my photograph, fingerprinted me, and then gave me three pieces of paper, and told me to report to

immigration on April 22nd.

Q. And then what happened?

A. And then he called a taxi for me to -- he told me to call a taxi myself and told me to go home.

Q. So after this agent had a conversation with Agent Varian, you were released from custody, right?

A. Yes.

Q. You didn't have to see a judge, did you?

A. I did not.

Q. You didn't have to post bail to be released, did you?

A. No.

Q. There was just a phone call between the agent and Varian, you filled out some papers, and told you to come back, and sent you off in a taxi; is that your testimony?

THE COURT: I think you can move on. We've all heard the testimony.

Q. You testified that no promises had been made to you about your immigration status; correct?

A. There was none.

Q. Nobody has promised you that in return for your testimony here, you'd be able to stay in the United States; correct?

A. No one.

Q. But you know that you're never going to get political asylum in this country; correct?

A. Yes.

Q. You know that you're not going to get it because you've submitted two fraudulent applications for asylum; correct?

A. I do not know what the results will be. I do not know what the reason will be. But I feel that the chance of getting legal status here would be very, very low.

Q. Well, I'm not talking about political asylum now; I'm asking you whether you believe that there is some way you might be able to remain in the United States.

A. Right now there isn't very much that I can do to stay in the U.S.

Q. Well, do you know which agency of the United States government decides who stays in the United States and who doesn't stay?

A. Immigration?

Q. Yeah. And do you know which agency Agent Tim Varian works for?

A. Federal FBI?

Q. Do you really believe that?

A. I really cannot answer this question.

Q. You don't know that he's an immigration agent?

A. I did not.

Q. You know though that all of your meetings with him and with the government were arranged by your boss, right?

A. When you say "my boss," who do you mean? The government's meeting -- what government's meeting? I don't understand.

Q. You met with the prosecutors and with Agent Varian numerous times, right?

A. Yes.

Q. And you told us that most of those meetings were set up by Cash, by Dan Jian.

A. Yes.

Q. And you also told us that after you were put in handcuffs and taken to a detention center because you were ordered removed, one phone call to Agent Varian got you released; correct?

A. Yes.

Q. Now, when you first asked Mr. Lin to join your bus company, you then were partners with somebody you called Ding Chuan?

A. Yes.

Q. And Ding Chuan was somebody that you knew for a while; correct?

A. Yes.

Q. And, to your knowledge, did Ding Chuan know Mr. Lin?

A. Yes, he knew him.

Q. Were they from the same village?

A. They had a pretty good relationship, too.

Q. They had a good relationship, right?

A. Yes.

Q. And were they from the same village?

A. No.

Q. Okay. But besides having a good relationship with Ding Chuan, did you understand that Mr. Lin had a good relationship with the person that wanted to compete with you on your route?

THE INTERPRETER: I'm sorry, can you repeat the question again? I'm sorry.

Q. Besides knowing that Mr. Lin had a good relationship with Ding Chuan, did you also know that Mr. Lin had a good relationship with the person who wanted to compete with you on your bus route?

A. Yes.

Q. In fact, I think you testified the other day that your understanding was that the owner of the other company and Mr. Lin were good friends; correct?

A. Yes.

Q. And the reason that you selected Mr. Lin to mediate this dispute or this potential dispute was because he and the owner of the other company were good friends; correct? They gave each other face.

A. Yes.

Q. Now, Mr. Skinner asked you some questions earlier about whether Mr. Lin had ever performed any other service for your company besides dealing with this competitor; correct?

A. No.

Q. Well, do you remember that the prosecutor asked you that question?

A. He did ask.

Q. Okay. And do you remember saying that no, Mr. Lin never performed any other service?

A. I answer that.

Q. Okay. And let me ask you this: Did you ever ask Mr. Lin to perform another service for the company other than that which you asked him to do?

A. No.

Q. You said that when you became partners, you and Ding Chuan and Mr. Lin, that there was no written contract, right?

A. Correct.

Q. You remember going to a lawyer's office in Chinatown with Ding Chuan and yourself and Mr. Lin's wife and signing a partnership agreement or a contract about that company?

A. I did not go to sign it.

Q. Who did go?

A. I do not remember. There wasn't any application of a company. From what I remember, there wasn't an application for a company.

Q. I'm not talking about an application for a company. I'm talking about a partnership agreement or a shareholders' agreement.

A. No, I did not go.

Q. Did your wife go to sign such a contract, since her name was the one that was on the company?

A. No.

Q. When you asked Mr. Lin to become a one-third shareholder of the company, did you ask him to make a financial contribution or to invest money in the company?

A. At that time there was talk about that, but I did not take any money.

Q. Did you ask him for money?

A. No.

Q. When you say there was talk about it, did he, in fact, offer to invest money in the company?

A. I don't remember. I just know that I did not take any money.

Q. When you went to visit him in the hospital after he had been stabbed, do you know how long he had been in the hospital?

A. I think he was there for two, three days already.

Q. And after those two or three days, do you know how much longer he stayed there?

A. Approximately three, four days. I don't know exactly how many days.

Q. How did he look?

THE INTERPRETER: I'm sorry?

Q. How did he look?

A. His mind was clear; he was able to talk.

Q. How did he look?

A. His face was very pale, and he was lying in bed wearing a

patient's outfit.

Q. Was he in the intensive care unit?

A. I don't remember.

Q. Did he appear to be in significant pain?

A. He looked like he was in pain, why wouldn't he be?

Q. Do you know that he was stabbed many times in that incident?

A. I think two, three times.

Q. And that was by somebody named Yi Feng?

A. Someone that's follow Yi Feng.

Q. Yi Feng was a dailo?

A. Yes.

Q. Now, eventually there came a time that you invited Yiqun to join your company by you and Ding Chuan each selling him some shares; correct?

A. Yes.

Q. And did he pay you for those shares or did you just give them to him?

A. He paid me.

Q. And Yiqun, I think you've told the government, had helped other bus companies in the past with their competitors; correct?

A. I did not say that.

Q. You don't recall saying that?

A. I definitely didn't tell you.

Q. I'm sorry?

A. I definitely did not tell you.

Q. I know you didn't tell me. I'm talking about what you told them.

A. Told who?

Q. The prosecutors.

A. I said he has face, and that people in Chinatown listen to him. And he could mediate.

Q. Why did he have face?

A. Because he treats people very nice, and people like to be his friends and like to hang out with him.

Q. During the time that you knew him, was he ever in prison?

A. I do not remember. I don't know.

Q. During the time you knew him, did he ever associate with members of the Tung Lung gang?

A. I do not know. That has to do with him and a long, long time ago.

Q. So a long, long time ago he associated with people in the Tung Lung gang?

A. I do not know.

Q. You just said it was a long time ago. Was it a long time ago that he associated with members of the Tung Lung?

A. No, I do not know whether he associate with the Tung Lung. I don't understand the question you asking me.

Q. Well, when you just said that was a long time ago, what

were you referring to?

A. You asked me if he hung out with the Tung Lung people from the time that I met Yiqun. I know that he was very nice and friendly to his friends.

Q. You didn't answer my question about whether or not you knew him to associate with the Tung Lung.

A. I do not know. I don't know who are considered the Tung Lung people and whatnot.

Q. Did he hang out with gangsters?

A. He hangs out with a lot of people. Some people gamble in the gambling parlor, and some people he had dinner with outside.

Q. Did he hang out with gangsters?

A. He and Yi Feng were friends. Does that consider them hanging out with one another?

Q. I don't know. I don't know Yi Feng. But besides Yi Feng, was he friendly with other dailos?

A. When you ask me about other dailo, I don't know who else is qualified to be a dailo.

Q. Was Yiqun a loan shark?

A. I heard that he did some loan-sharking, but that's his lifestyle. That is a very common way of making a living in Chinatown for these people that hang out.

Q. Loaning money at loan-shark rates is a common way to make a living, is that what you're telling us?

A. Yes.

Q. Now, did you ever see any tattoos that he couldn't have?

A. I don't remember whether I did or not.

Q. Do you recall that he had a very large pirate tattoo?

A. I do not remember.

Q. Do you recall that he had a tattoo of jaggy barbed wire around his bicep?

A. I do not remember.

Q. Now, you said -- I think you testified earlier that there came a time that after Yiqun joined the company, that he said stop paying Mr. Lin an extra $2,000 a month.

A. It was about one year after he joined the company.

Q. Okay. And what happened one year after he joined the company?

A. Nothing happened, except in June of 2004, he asked me how much money was set aside for the company.

Q. And eventually, Yiqun said, Don't pay Mr. Lin the extra $2,000; correct?

A. He wouldn't agree to pay. He said there's no reason to pay.

Q. Okay. And did you communicate that to Mr. Lin in some way?

A. Yes, I called him to tell him.

Q. Okay. And was he angry?

A. He was angry.

Q. Did he say that he would beat up Yiqun the next time he saw

him?

A. He didn't say that. At that time this is what he said: I know which person did not agree to pay this money. He said that since he doesn't give me face, and I won't be courteous of him the next time.

(Continued on next page)

BY MR. COHEN:

Q. You don't recall telling the government at a meeting, and this is 3503-4, on July 23rd of 2012 that Ding Pa was upset and said that Yi Qun thinks he is just a big shot, I will beat him up the next time I see him? You don't remember telling the government that?

A. He did curse out someone. But when he said the next time I see him, I will not be courteous to him, it is more, less that is what it means.

Q. Now, I am now asking what it means. I am asking you whether on July 23rd you told the government that Ding Pa was upset, said he thinks is he just a big shot, I will beat him up the next time I see him? Do you remember telling the government that?

A. Are you saying that Ding Pa was saying this about Yi Qun or Yi Qun saying this about Ding Pa?

Q. I am asking you, sir, whether you told the government that Ding Pa was upset after you told him that you weren't going to give him the extra $2,000 a month and that Ding Pa said that Yi Qun thinks is he a big shot I will beat him up the next time I see him?

A. I only said that Ding Pa was upset and he said why if he thinks he is a big shot. He didn't state the name. Next time I see him, I will give him problems. He did not tell me Yi Qun's name.

Q. I want to show you a document. I am going to ask the interpreter to translate a very small portion of it, and ask you, sir, if it refreshes your memory about exactly what you told the government.

MR. COHEN: May I, Judge?

THE COURT: Go ahead.

Q. So, have you had a chance to listen to the interpreter translate that?

A. Yes.

Q. Does that refresh your recollection as to what you told the government on July the 23rd when you met with them regarding what Ding Pa said about Yi Qun?

A. I think what I've said today and when I said it on July 23rd is almost the same meaning. But if you want to be that exact every time when I speak to the government, there will always be something a little different. It is almost impossible for me to remember everything that I said.

Q. Is that because it is harder to remember a story than it is to remember the truth, sir?

MR. SKINNER: Objection, Judge.

THE COURT: Overruled.

A. About this, the story from the truth I think has nothing to do with each other.

THE COURT: Let's move on.

Q. You say that after the shooting of Yi Qun you heard about

it, right?

A. Yes.

Q. And that at some point you had a conversation with Mr. Lin about it?

A. In about a few days. Four, five days. In a week.

Q. And that was when you say Mr. Lin called you?

A. Yes.

Q. Now, at that point you had already heard that Yi Qun was dead, right?

A. Yes.

Q. And there were rumors and stories going on around the community or out in Chinatown about what had happened?

A. Yes.

Q. And you say that you asked Mr. Lin what happened and basically he told you that this kid from the north misunderstood something that he said, correct?

A. Yes.

Q. And that he didn't mean for this kid from the north to kill Yi Qun or anybody else, correct?

A. Oh, he meant to shoot Yi Qun in his arms or legs.

Q. So in other words he was telling you that he did not intend that Yi Qun would be killed, correct?

A. That's what he told me. But whatever he was thinking himself -- that is what he meant, that is what he told me.

Q. We can believe your testimony here word for word because

you've been so truthful with the government in the past, correct?

THE COURT: Objection sustained.

What is the next question?

MR. COHEN: I have no further questions, Judge.

THE COURT: This is a good time to recess for the day. We will reconvene tomorrow morning at the same time, 10:00. Those you who do come at 9:30 will have coffee and muffins. You have all been very prompt and I commend you for it. So I will see you tomorrow morning at 10:00. Have a pleasant evening. Please do not be tempted to look at anything that reference to this trial if you should come upon such a thing. Very well.

(Jury excused)

D4F6LIN6        Chen - cross                    Page 412

(In open court; jury not present).

THE COURT: You may step down.

How long do you anticipate redirect will take?

MR. SKINNER: Five to 10 minutes, your Honor.

THE COURT: Very well.  Who is your next witness?

MR. SKINNER: Qun Li.

THE COURT: Thank you.

MR. SKINNER: Your Honor, I should add that if you review the cases and you are going to give us leeway --

THE COURT: Of course.  I understand that.

MR. SKINNER: Even then it will not be particularly long.

THE COURT: Very well.

MS. BURNS: Thank you, your Honor.

THE COURT: You are all excused.

MR. SKINNER: Thank you, your Honor.

THE COURT: Case is adjourned until tomorrow morning.

(Adjourned to April 16, 2013 at 10:00 a.m.)

---

Page 413

INDEX OF EXAMINATION

| Examination of: | Page |
|---|---|
| CHEN HUO GUANG | |
| Direct By Mr. Skinner . . . . . . . . . . . . | 309 |
| Cross By Mr. Cohen . . . . . . . . . . . . . . | 354 |

GOVERNMENT EXHIBITS

| Exhibit No. | Received |
|---|---|
| 104 and 20    . . . . . . . . . . . . . . . . | 346 |

**A. 529**

**In The Matter Of:**

*UNITED STATES OF AMERICA, v*
*XING LIN,*

*April 16, 2013*

*SOUTHERN DISTRICT REPORTERS*
*500 PEARL STREET*
*NEW YORK, NY 10007*
*212 805-0330*

Original File D4GVLINF.txt
**Min-U-Script® with Word Index**

A. 530

D4g6lin1                                           Page 414

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

            v.                    11 CR 114 (MGC)

XING LIN,

            Defendant.              JURY TRIAL
------------------------------x
                              New York, N.Y.
                              April 16, 2013
                              10:15 a.m.

Before:
              HON. MIRIAM GOLDMAN CEDARBAUM,

                              District Judge

                    APPEARANCES

PREET BHARARA,
    United States Attorney for the
    Southern District of New York
PETER M. SKINNER
JENNIFER E. BURNS
    Assistant United States Attorneys

JOEL S. COHEN
    Attorney for Defendant

ALSO PRESENT:   BRENDA CHEN, Fuchow Interpreter
                DANIEL YANG, Fuchow Interpreter
                LILY LAU, Fuchow Interpreter
                DANIEL CHAN, Fuchow Interpreter
                JESSICA CHACE, Paralegal
                TIMOTHY VARIAN, Special Agent, HSI
                JIAYING WANG, Legal Assistant

---

D4g6lin1                                           Page 415

(Trial resumed)

(In open court; jury not present)

MR. COHEN: Before the jury comes in, your Honor, I had indicated yesterday that I had completed my cross-examination. In reviewing my notes and getting a copy of the transcript last night, I realized there are five or six questions that I neglected to ask.

THE COURT: Very well. You may proceed. The government may redirect.

MR. COHEN: Of course.

THE COURT: Actually, before the jury comes in, I will also talk to counsel for minute.

(Continued on next page)

---

D4g6lin1                                           Page 416

(At the side bar)

THE COURT: I will permit one question about how did you feel about one of those things.

MR. SKINNER: I am sorry, your Honor?

THE COURT: That is what you asked me to consider.

MR. SKINNER: Yes.

THE COURT: That is what you gave me material on. I don't think anything you gave me is really dispositive, but it doesn't matter. I will permit him to ask him how he felt, which is the question I sustained an objection on.

MR. SKINNER: I think I asked a question about how he felt about a couple different things that happened.

THE COURT: That may be. I need to know what they are.

MR. SKINNER: The first was how he felt when he received the phone call from Ding Pa insisting on another 10 percent of the company. The second is how he felt when he was at Corona Park, Queens, and the individual touched his shirt. He didn't see a gun, but he touched his shirt.

THE COURT: I think you can ask it once.

MR. SKINNER: Okay.

THE COURT: The rest of it is not so difficult for the jury to deduct because the real problem is whether the things that were said were done instill fear. That is not an esoteric concept.

---

D4g6lin1                                           Page 417

MR. SKINNER: No. We do not dispute that defense will be able to argue at the end of the day that if this wasn't a reasonable fear, he wasn't extorted. As we indicated we think the case law is clear that the subjective state of mind is relevant.

THE COURT: I don't think the defendant is going to argue that. I think he has better things to try.

MR. SKINNER: He can, which would address the issue of the Court's concern that a victim might be particularly sensitive.

THE COURT: I would be very surprised if the closings turned on whether this man was really worried.

MR. COHEN: My secret is out, Judge.

MR. SKINNER: I think the most important thing for us is the Corona Park incident so we'll focus on that.

THE COURT: Why don't you use that then.

(Continued on next page)

**A. 531**

(In open court; jury present)

THE COURT: Good morning, members of the jury. We're going to continue to hear a little bit more from the witness that you listened to yesterday afternoon. You may be seated.

You may proceed, Mr. Cohen.

MR. COHEN: Thank you, your Honor.

HUO GUANG CHEN, resumed.

CROSS-EXAMINATION (continued)

BY MR. COHEN:

Q. Good morning. You testified yesterday that prior to coming to court over the last number of months that you had meetings with the government; correct?

A. Yes.

Q. At some of those meetings you told them things that you said happened; right?

A. About what things happened?

Q. In some of those meetings, sir, you gave them information about things you say you had heard or seen or done; correct?

THE COURT: He is talking about the government.

A. What things are you referring to? About the case?

Q. About the case.

A. Yes.

Q. And in some of those meetings you talked about with the prosecutors what questions they would be asking you, correct, in court?

to eat in Chinatown and called Cash also called Dong Jain and asked him to meet you there; correct?

A. Yes. I wanted to talk to him.

Q. And that restaurant was at 20 East Broadway?

A. I don't remember what number the restaurant is, but I know it is located on East Broadway. It is called -- the name of the restaurant is called Number Three Snack Shop.

Q. Had you been there before?

A. I always had my lunch there.

Q. And had you been there with Cash before?

A. I was eating there a lot.

Q. Had you been there with Cash before?

A. Very often.

Q. Had you been there with Yi Pei before?

A. Who is Yi Pei.

Q. You said that when you testified that another person came and joined you at the table; correct?

A. Yes.

Q. What was that person's name?

A. Yi Pei.

Q. 30 seconds ago when I asked you if you had been there with Yi Pei, you asked me who Yi Pei was; correct?

A. Yi Pei and Yi Ped is a little different. I thought it was two different people.

Q. You misunderstood the interpreter?

A. Yes.

Q. They reviewed the questions they would ask you in court; correct?

A. You are asking about when the government asked me questions?

Q. I am asking you, sir, whether when you were meeting with the government before this trial the prosecutors reviewed with you the questions they would ask you in this courtroom, yes or no?

A. Yes.

Q. Did they also review with you questions that they thought that I might ask you?

A. Not that many questions. So whatever this lawyer asks, that's his problem.

Q. That's what they told you, whatever I ask you, that's my problem?

A. That's how I feel. That is the lawyer's problem.

THE COURT: He is giving you his state of mind.

MR. COHEN: I accept it, Judge. I believe it.

Q. You testified that you had gone to a restaurant recently during this trial and I think that you had called Cash to meet you at the restaurant?

A. On April 10th or 11th or on the 10th.

Q. Whatever date it was, whether it was the 10th or the 11th, there was a day when you were waiting to testify that you went

A. Yes.

Q. Had you been there with Yi Pei before?

A. No.

Q. Never?

A. No.

Q. You said that you didn't call Yi Pei that day to meet you at the restaurant; correct?

A. No.

Q. Do you know whether after you called Dong Jain before he called Yi Pei to meet you at the restaurant?

A. I do not know. I do not know.

Q. As far as you know it was just a coincidence that Yi Pei happened to walk into the restaurant during the trial and sit down with you; correct?

A. Let me explain to you how did it happen on that day, how Yi Pei entered.

Q. I am not asking for an explanation. I am asking you to answer my question.

Do you think it was a coincidence that he just happened to appear that day?

A. I do not know. I did not call Yi Pei. You have to ask Yi Pei about it. I did not know he would be there.

Q. You said by the way when he came you invited him to sit at your table and he had already eaten; correct?

A. Yes.

Q. When you asked Mr. Lin to assist your company because you were afraid that someone was going to compete with you, do you recall that decision and the conversation you had about it?

A. Yes. The person was about to have -- to begin the conversation.

Q. Had that person competed with you, what would it have meant to you financially?

A. Probably perhaps my company was a smaller -- very small company, could be run out of business.

Q. In fact, you and Ding Cheng your partner made a decision that it would be more economically good for you to have Mr. Lin be a part of the company than to risk losing it; correct?

A. Yes.

Q. Now, you are from Fuchow province; right?

THE COURT: Fujian.

MR. COHEN: Fujian. Thank you, your Honor.

Q. Fujian province; correct?

A. Yes.

Q. Is it true that Fujian province is in the southern most province of China?

A. Yes.

Q. Have you ever heard people from Fuchow refer to other people from China as northerners before?

A. People from northern part of China is called northerners.

Q. When you say the northern part of China, are you referring

to provinces other than Fujian that are to the north of Fujian province?

A. More north, Beijing is also more north. It divides from the Yangtze River north and south.

Q. Would somebody for instance who was from Beijing be considered a northerner by people from Fujian?

A. Person from Beijing?

Q. Yes.

THE COURT: You are being asked if a person from Beijing is a northerner.

A. No. Personally I would call this person just a person from Beijing.

Q. I understand that is what you would personally call them, but is Beijing north of Fujian?

A. Yes. According to geographic location in China.

Q. And how long would it take to travel by car or by train from Fujian province to Beijing?

A. I don't know. I never tried that.

Q. It is a long trip though; correct?

A. Yes. But as far as I understand this -- as far as I understand, 10 years ago that may be the case but now with the high speed train about five to six hours.

Q. But even though there is a high speed train that has cut the travel time, Beijing is still north of Fujian; right?

MR. SKINNER: Objection, relevance.

THE COURT: Overruled. This is cross-examination. I have no idea of the relevance.

MR. SKINNER: Shouldn't we have some idea of the relevance before it is permitted?

THE COURT: Not if we move on.

MR. COHEN: It's my last question.

THE COURT: In any event is Beijing north of the Yangtze River?

THE WITNESS: Yes.

MR. COHEN: Thank you, your Honor.

THE WITNESS: To the north.

REDIRECT EXAMINATION

BY MR. SKINNER:

Q. Good morning, Mr. Chen.

Do you remember during the questioning from Mr. Cohen, the defendant's lawyer, being asked a number of questions about the initial asylum application you put in this 2002.

A. Yes.

Q. Do you recall being asked whether on that asylum application you used the name Hao Min Wu?

A. No.

Q. Did you sign that application with your own name, Huo Guang Chen?

A. Yes.

Q. Did you affix a photograph of yourself to that application?

A. Yes.

Q. You were asked yesterday about the chances that you can remain in the United States going forward. Do you remember that?

A. Very slim.

Q. And you have to go back to 26 Federal Plaza on April 22nd; is that correct?

A. Yes.

MR. COHEN: Your Honor, I know this is redirect, but I do have an objection to the constant leading.

THE COURT: Let it come from the witness.

Q. Do you know what is going to happen when you go back to 26 Federal Plaza on April 22nd?

A. I do not know what will happen, but I must report to that place.

Q. Could you be removed from the country after that?

A. There was such possibility.

Q. Mr. Chen, you are testifying here today pursuant to an immunity order; correct?

A. Yes.

Q. Did anyone promise you anything in exchange for that immunity order?

A. No one.

Q. Did anyone say if you testify a certain way, you will get immunity?

A.  No.  No one.

Q.  Do you have any kind of contract or written agreement with the government in connection with --

THE COURT:  I think you should move on.

Q.  Mr. Chen, you testified about a meeting that you had with the defendant in Corona Park.  Do you remember that?

A.  Yes.

Q.  At this meeting what, if anything, did the defendant ask of you?

A.  Asked me to give him an answer.  Whether I would agree to that additional 10 percent share.  Otherwise he wouldn't -- he would not have a face in front of his followers.

Q.  At this meeting what, if anything, did the defendant say about guns?

MR. COHEN:  Objection.  This was asked and answered yesterday.

THE COURT:  I agree but I will permit as a foundation for what follows.  Very well.  You may proceed.

Q.  At the meeting what, if anything, did the defendant say about guns?

A.  He said in those few days his followers always had guns with themselves and his follower pressed in this area and I thought he might have a gun on him.

Q.  How did you feel at this meeting, Mr. Chen?

A.  I was scared.  If I was not scared, then I did not need to

call my partner to have a discussion with him about --

MR. COHEN:  Objection.  Move to strike.

THE COURT:  That's enough.  Let's move on.

Q.  Just so we're clear as to some portion of the answer --

THE COURT:  The answer is very clear.  The witness said he was scared and if he hadn't been scared he wouldn't have called his partner.

MR. SKINNER:  Is that still part of the record, your Honor?

THE COURT:  Everything is part of the record.

MR. SKINNER:  As long as it is not stricken.  No further questions, your Honor.

THE COURT:  Very well.  You may step down.

MR. COHEN:  Your Honor, I have a little bit of recross.

THE COURT:  Okay.  This means you have to ask questions about redirect.

MR. COHEN:  Thank you, Judge.  I think I remember that.

RECROSS-EXAMINATION

BY MR. COHEN:

Q.  Now, you have to report to 26 Federal Plaza on April 22nd; correct?

A.  Yes.

Q.  And you've said that nobody has promised you anything about

whether you can stay here or not; correct?

A.  No one.

Q.  Do you intend on April 22nd to make the people that you meet with aware of the fact that you cooperated with the government and testified at this trial?

MR. SKINNER:  Objection to form.

THE COURT:  Overruled.  This is recross.

MR. SKINNER:  I object to the "cooperate with the government," your Honor.

MR. COHEN:  I will change the word, Judge.

Q.  Do you intend to make the people that you meet with on April 22nd aware of the fact that you testified on behalf of the government at this trial?

A.  I do not know what I would be saying at the time.

Q.  When you were taken into immigration custody on March 21st you gave Special Agent Varian's; correct?

A.  Yes.

Q.  And a telephone call was made and the handcuffs came off; correct?

MR. SKINNER:  Objection.  Beyond the scope of redirect.

MR. COHEN:  It is well within the last question that I asked that I didn't get a straight answer to.

THE COURT:  We're not going to have speeches.  You may proceed.

A.  Even when I was I switched to another location, even before the phone call was made they already took off the handcuffs.

Q.  A phone call was made while you were in immigration detention; correct?

A.  Yes.

Q.  That phone was made by the agent who had you in custody to Agent Varian because he gave them his card; right?

A.  Yes.

Q.  After that phone call you were released from immigration detention, correct, without seeing a judge?

A.  No.

Q.  That is what happened; right?

A.  Yes.  I was given three pieces of paper and I was told to report on April 22nd.

Q.  But you were released; right?

A.  Yes.

Q.  And you were released after you had Agent Varian's card and gave it to the agents that had you in custody; right?

A.  He made a phone call.

Q.  So is it your understanding that even though you have an order to be removed from the United States that agents have the ability to release you if they want to?

MR. SKINNER:  Objection, your Honor.

THE COURT:  Overruled.

A.  I do not know.

Q. Isn't that what happened?

THE COURT: Please. We're not going to have an argument. The witness has answered. Let's move on.

Q. You said that in this meeting in Corona Park that Mr. Lin told you that the people with him had guns?

A. Yes.

Q. And in relation to when Mr. Lin was stabbed by Yi Feng's followers, was that meeting in Corona Park before that or after that?

A. Before the meeting.

Q. Didn't Mr. Lin tell you at that meeting, did he say anything about the fact that people with him had guns because he was fearful of being attacked by Yi Feng?

A. I did not say that.

Q. You didn't say that?

A. As far as I remember he did not say that.

Q. When you said a few moments ago on redirect, I think your words were, These past few days these kids are carrying guns; right?

A. He said every day when they go out, they have guns on themselves.

Q. Is that what you said before?

A. What do you mean "before"?

Q. Five minutes ago when you were being asked questions by Mr. Skinner is that what you said?

MR. SKINNER: Objection. There is a record.

THE COURT: I will permit the examiner to plumb the witness's recollection.

THE INTERPRETER: Counsel, can you repeat the question?

THE COURT: Yes.

MR. COHEN: Can I ask the reporter to read it back?

(Record read)

A. I said whenever his followers went out, they had -- every day they had guns with themselves.

MR. COHEN: Your Honor, I will let the record stand and I would offer in evidence Mr. Chen's first asylum application. It contains the name Hao Win Wu.

THE COURT: Sorry.

MR. COHEN: I would like to offer in evidence the document that the government referred to which was Mr. Chen's first immigration asylum application.

THE COURT: What is the exhibit number?

MR. COHEN: It would be Defendant's Exhibit A and it was 3510.

MR. SKINNER: 3503-11.

MR. COHEN: 3503-11.

THE COURT: I would like to see it, please.

MR. SKINNER: I have a copy, your Honor. May I approach?

THE COURT: Thank you. Please.

Very well, I will receive Defendant's Exhibit A in evidence.

MR. SKINNER: Your Honor, can the record please note our objection?

THE COURT: Yes.

MR. COHEN: No further questions, your Honor. Thank you.

THE COURT: I think you should put a sticker on it.

MR. COHEN: Of course.

(Defendant's Exhibit A received in evidence)

THE COURT: All of this is part of it?

MR. COHEN: It is all part of it, yes.

MR. SKINNER: Your Honor, now that this document is in evidence, I regret we have one more further question.

THE COURT: Is this now re, redirect?

MR. SKINNER: I think that is correct, your Honor.

REDIRECT EXAMINATION

BY MR. SKINNER:

Q. Mr. Chen, I am going to show you a document that has been marked as Defense Exhibit A. Do you see a handwritten section on that front of that piece of paper?

A. Yes.

Q. Am I correct that the rest of the front of that paper is typed?

A. This one is handwritten and that one is typed up.

Q. The handwriting at line six, is that your handwriting?

A. No.

MR. SKINNER: No further questions, your Honor.

MR. COHEN: One.

THE COURT: I didn't look all the way through it. Is there any other handwriting?

MR. COHEN: That is what I wanted to take a look at.

RECROSS-EXAMINATION

BY MR. COHEN:

Q. The handwriting over here --

THE COURT: You have to identify what "here" is.

MR. COHEN: The pages are not actually numbered, Judge.

MR. SKINNER: I believe he is referring to the fifth page of the document, which is the signature page.

MR. COHEN: Right.

Q. The fifth page of the document, that handwriting, is that your handwriting?

A. Yes.

Q. Your signature?

A. Yes.

MR. COHEN: I am done. Thank you, Judge.

MR. SKINNER: We have nothing further.

THE COURT: Very well. You may step down.

(Witness excused)

THE COURT: Who is next?

MS. BURNS: Your Honor, the government calls Qun Li.

THE DEPUTY CLERK: Raise your right hand.

QUN LI,

called as a witness by the Government,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. BURNS:

Q.  Good morning, sir.  Where were you born?

A.  China, Fuchow.

Q.  When did you come to the United States?

A.  1993.

Q.  Did you come here legally or illegally?

A.  Illegally.

Q.  Can you describe how it is you came to the United States at that time?

A.  I entered Miami using a fraudulent passport.

Q.  What mode of transportation did you use?

A.  Plane.

Q.  How did you obtain the fraudulent passport?

A.  It was arranged by snakehead.

Q.  What is a snakehead?

A.  People who specialize in smuggling people.

Q.  Did you pay this person for this passport?

A.  Yes.

Q.  How much did you pay?

A.  A little over 10,000.

Q.  What, if anything, did you do with this fraudulent passport?

A.  This fraudulent passport after I got on the plane and snakehead told me to tear it up.

Q.  Did you tear it up?

A.  I tore it up and flushed it down the toilet.

Q.  When did you do that?

A.  1993.

Q.  What happened when you arrived in Miami?

THE COURT: When was that?

Q.  When exactly did you arrive in Miami?

A.  1993, but I do not remember the month.

Q.  What happened when you arrived?

A.  When I arrived I was arrested by the immigration at the airport.

Q.  Were you then placed in immigration custody?

A.  Yes.

Q.  How long did you spend in immigration custody at that time?

A.  About five to six months.

Q.  How were you released?

A.  When I apply for political asylum, I was bonded out with $10,000.

Q.  After you were released, where did you go?

A.  I came to New York.

Q.  When did you file the application for political asylum you just mentioned?

A.  I applied for it when I was in immigration jail.

Q.  What was the basis of your asylum application?

A.  For political asylum for the June 4th movement.

MR. COHEN: I am sorry.  For the what?

THE INTERPRETER: June 4th movement.

Q.  What did you say about the June 4th movement in that application?

A.  I said that I was listening to the Voice of America.

Q.  Are those statements true?

A.  No.

Q.  Did you understand that you were required to be truthful on that application?

A.  Yes.

Q.  Did you ever obtain asylum?

A.  No.

Q.  Have you been convicted of a crime?

A.  Yes.

Q.  Did you plead guilty or go to trial?

A.  I pled guilty.

Q.  What crime or crimes did you plead guilty to?

A.  Extortion and jumping bail.

Q.  Was that in federal court or state court?

A.  In the federal court.

Q.  In this court?

A.  Yes.

Q.  Turning first to the extortion offense.  When did you first commit extortion?

A.  That was in '05, '06.

Q.  Did you commit that extortion alone or with others?

A.  With others.

Q.  Who were you extorting?

A.  The drivers of -- the mini bus driver that drives from Manhattan, Chinatown to Brooklyn.

Q.  What is it that you were demanding from those bus drivers?

A.  I demanded $400 of protection money from them every month.

Q.  For how many months did you make these demands?

A.  I got it for over one year.

Q.  Did you make threats in collecting this money?

A.  Yes.

Q.  Did you use physical violence to collect this money?

A.  Yes.

Q.  Do you yourself or other people use physical violence?

A.  Other people.

Q.  You testified that you also pled guilty to bail jumping.  What did you do that made you guilty of bail jumping?

A.  After I was bailed out from court I fled.

Q. Did you understand that you were required to come to court after you were arrested?

A. I did.

Q. You didn't do so?

A. Correct.

Q. Where did you go?

A. I went to Canada.

Q. When was that?

A. '06.

Q. While you were in Canada, did you file any applications for status there?

A. Yes.

Q. What kind of application did you file?

A. Applied for political asylum based on religion.

Q. What was the nature of your religion claim?

A. I said that I was a Christian in China and I was persecuted by the government.

Q. Was that true?

A. No.

Q. Did you obtain any legal status while you were in Canada?

A. No.

Q. Other than the passport that you had when you arrived in Miami, have you ever had any false identification documents?

A. Yes. I was using a fake -- fake ones in Canada.

Q. Fake what?

A. I used fake documents to apply for political asylum with fake names.

Q. Before you pled guilty, did you meet with representatives of the government?

A. Yes.

Q. When did those meetings take place?

A. In '09.

Q. Approximately how many meetings did you have with representatives of the government before you pled guilty?

A. I met with them about 10 times.

Q. What happened generally at those meetings?

A. I was asked questions, to give statements.

Q. Did you continue to meet with representatives of the government after you pled guilty?

A. Yes.

Q. Did you meet with representatives of the government including prosecutors before testifying here today?

A. Yes.

Q. During all of those meetings did you see people taking notes?

A. Yes.

Q. Have you ever reviewed those notes?

A. No.

Q. Did you plead guilty pursuant to a written agreement between yourself and the government?

A. Yes.

Q. What kind of agreement did you plead guilty to?

A. I pled to bail jumping and extortion.

Q. Is your plea agreement what we call a cooperation agreement?

A. Yes.

Q. What is your understanding of your obligations under that agreement?

MR. COHEN: Your Honor, I have an objection. That cooperation agreement, the terms of it were fulfilled. He received what he received and I don't believe that it any longer exists.

MS. BURNS: I think it is relevant to why he is testifying here today, your Honor. We can discuss it at side bar if you like.

THE COURT: No. I think it is relevant.

Q. What was your understanding of what you were obligated to do under that agreement?

A. I have to be honest and tell the truth about everything that I did.

Q. Are you required to meet with the government when asked?

A. Yes.

Q. What did the government do as part of that agreement?

A. The government didn't do anything for me.

Q. Did the government write a letter on your behalf prior to

your sentencing?

A. Oh, yes. They wrote a letter for me to ask for leniency.

Q. Who did that letter go to?

A. It was given to the judge.

Q. The judge who sentenced you?

A. Yes.

Q. When were you sentenced, sir?

A. It was February of 2012.

Q. Before your sentencing what was your understanding of the maximum sentence that you faced?

A. I pled to three different counts. It came out to 70.

MR. COHEN: It came out to what?

THE INTERPRETER: 70.

Q. 70 years?

A. Yes.

Q. What sentence did you receive?

A. When I was sentenced, I was sentenced to time served.

Q. How long had you been in jail at that time?

A. I had served four years approximately.

Q. You were also sentenced to a term of supervised release?

A. Yes. Three years supervised release.

Q. Are you still on supervised release?

A. Yes.

Q. When were you released from custody?

A. After I was given a federal sentence, I went to

immigration.

Q. Immigration custody?

A. Yes.

Q. Are you still in immigration custody?

A. No.

Q. How were you released from immigration custody?

A. FBI agent wrote a letter for me to get out.

Q. So you were released from immigration with the assistance of law enforcement?

A. Yes.

Q. Do you currently have legal status here?

A. Yes.  It is a one-year card for me to work.

Q. How did you obtain this one-year card?

A. It was also through a federal agent.

Q. Through the FBI?

A. Yes.

Q. What is your understanding of what you have to do with the FBI, if anything, now?

A. Yes.  I have to help them with whatever they ask me to do for them.

Q. You said this was a one-year card.  So does it need to be renewed?

A. Yes.

Q. Other than the bail jumping, extortion that you already told us about, have you committed other crimes?

A. Yes.

Q. What crimes have you committed?

A. I went to out of state.  I went to Virginia to someone's house to steal money.

Q. Did you in fact steal money there?

A. Yes.

Q. How much did you take?

A. I did not get any money.  My friend did.  But he ran away first and I got arrested.

Q. When did that take place?

A. I think it was either in '99 or 2000.

Q. You said it was in a house.  Did you go inside that house?

A. Yes.

Q. Was anyone home?

A. No one.

Q. What other crimes have you committed?

A. Nothing else.

Q. Have you been involved in drug dealing, different drug distribution?

A. Yes.

Q. When was that?

A. In 2000 and 2001.

Q. What drugs were you involved with at that time?

A. Marijuana and Ecstasy pills.

Q. Basically what did you do?

A. Basically it was the Dai Lo from my gang that was doing this.

Q. What was your involvement on behalf of your Dai Lo?

A. I sold Ecstasy pills for him at these places.

Q. What is a Dai Lo?

A. Dai Lo is like the boss in a gang.

Q. You said that you had a Dai Lo; is that right?

A. Yes.

Q. Who was that?

A. Ahzhong.

MR. COHEN: I am sorry.

THE INTERPRETER: Ahzhong, A-h-z-h-o-n-g.

MR. COHEN: Thank you.

Q. What does the term "follower" or "kid" mean?

A. These are kids that work by following the Dai Lo.

Q. Were you a follower of Ahzhong?

A. Yes.

Q. When was that?

A. It was in 2000 when I followed him.

Q. At that time were other people following Ahzhong?

A. Yes.  More than 10 people.

Q. At that time were those 10 people always the same or did they change?

A. There was changes.

Q. Did you receive anything, any benefits for being a

follower?

A. Yes.

Q. What did you receive?

A. He paid for my rent, food, and gave me spending money.

Q. For how long did you follow Ahzhong?

A. For about three years.

Q. Did you work for him in any capacity?

A. Yes.

Q. What did you do?

A. I helped him collect money when he was running the mini bus.

Q. How did you help him collect money?

A. I threatened the drivers for him.

Q. How did you threaten them?

A. I would go over to the drivers, kick the door and say, "How come you haven't paid the money yet?  It's been so late."

Q. Were you doing this at the direction of anyone?

A. Yes.

Q. Who is that?

A. My Dai Lo, Ahzhong.

Q. As a follower what were your responsibilities and obligations to Ahzhong?

A. I had to listen to him and do what he asked me to do.

Q. What things did he ask you to do?

A. He would ask me to go get money from people or if anything

comes up to go out and fight for him.

Q. Did you in fact get into fights on behalf of the Dai Lo?

A. Yes.

Q. Were these physical fights?

A. Yes.

Q. How often did you get into physical fights on behalf of your Dai Lo?

A. I helped him with it three times.

Q. Did you ever bring weapons to those fights?

A. Yes.

Q. What weapons did you bring?

A. I brought gun.

Q. Did you ever use that gun in the fight on behalf of your Dai Lo?

A. No.

Q. Did you ever get into a fight that your Dai Lo didn't approve of?

A. No.

Q. Why not?

A. Because if anything happened without my Dai Lo being aware of it, I could cause a lot of problems.

(Continued on next page)

A. When I was doing the bus, I had the followers collect money, threaten drivers, and beat up drivers.

Q. Are you familiar with the term face?

A. Yes, I do.

Q. What does that mean to you?

A. Respect.

Q. As a dailo, was it important for you to have face?

A. Yes.

Q. When you followed Ah Zhong, was it important for him to have face?

A. Yes.

Q. What happens if a dailo loses face?

MR. COHEN: Objection.

Q. In your experience.

MR. COHEN: Form.

THE COURT: Well, have you ever known a dailo who lost face?

THE WITNESS: No.

THE COURT: Then let's move on.

MS. BURNS: Yes, Judge.

Q. To be clear, you said that you would not get into a fight unless your dailo approved it?

MR. COHEN: Asked and answered.

Q. Would you ever refuse to do anything -- let me just rephrase. Would you ever refuse to do something a dailo asked

Q. How would that cause problems?

A. Because if I get involved with a fight with other gang or other high-ranking people from the gang, that fight could become a really big one.

Q. While you were a follower, were you aware of other dailos in Chinatown?

A. Yes.

Q. Who were they?

A. Ah Feng Loban.

Q. Any others?

A. Ah Zhong.

Q. Did you see each of those dailos you mentioned with followers?

A. Yes.

Q. Have you ever been a dailo?

A. Yes.

Q. When was that?

A. In '05.

Q. For how long were you a dailo?

A. For one to two years.

Q. Did you have followers?

A. Yes.

Q. How many did you have?

A. I had four to five.

Q. What types of things did your followers do on your behalf?

you to?

A. No.

Q. Why not?

A. Because I have to follow him to hang out with him, to make a living with him.

Q. As a follower, would you ever do anything a dailo didn't approve of?

A. No.

Q. Why not?

A. Because if I don't listen to the dailo, then I would not be able to hang out with him.

Q. You mentioned an individual named Ding Pa as one of the dailos you knew in Chinatown; is that right?

A. Yes.

Q. Do you see that person in court today?

A. Yes.

Q. Can you describe where he is and something he's wearing?

A. He is sitting on the second row in the middle.

MS. BURNS: Let the record reflect that he's identified the defendant, your Honor.

THE COURT: The record may so reflect.

MS. BURNS: Thank you.

Q. And do you know him as Ding Pa? Is that a true name or a nickname?

A. No, nickname.

Q. When did you first meet the defendant?
A. In 1996.
Q. Where did you meet him?
A. I met him in the restaurant located on 8th Avenue and 36th Street, midtown Manhattan.
Q. What happened, if anything, at that restaurant?
A. Three or four friends that were there having lunch.
Q. What happened next?
A. And Ding Pa and three of them came in, and we ran into each other.
Q. What happened when you ran into Ding Pa?
A. As soon as he saw me there, he came over to my table and picked up a soy sauce bottle and wanted to hit me with it, and said, I'm going to kill you today.
Q. What happened next?
A. And my friend stood up and pulled him away.
Q. And what happened after your friends pulled him away?
A. So I left first.
Q. What did Ding Pa say other than, I'm going to kill you today?
A. Nothing else. And other people broke it up and I left first.
Q. What was your understanding of why he said that to you at the time?
      MR. COHEN: Objection.

      THE COURT: Objection sustained.
Q. Did there come another time that you had an encounter with Ding Pa?
A. Yes.
Q. When was that?
A. In 2000.
Q. Where was that?
A. In Flushing, Chi Chong Tin or Seventh Heaven Karaoke Bar.
Q. Were you there alone or with other people?
A. It was my dailo's birthday party, so I was over there.
Q. And what happened there?
A. I was hanging out in my individual room, about 10 to 20 people hanging out in that room. And we saw Ding Pa came in and talking to a friend. And I did not know what they were talking about, but they did not look too happy.
      MR. COHEN: Objection. Move to strike.
Q. Who was Ding Pa speaking to?
      MR. COHEN: Your Honor.
      THE COURT: Just a moment. Just a moment. When was this?
      THE WITNESS: Around 2000.
      THE COURT: Objection sustained. Let's move on.
Q. What did you see Ding Pa do when he came into the room?
A. He came in alone, and he was talking to a friend that he knew.

Q. What happened after that?
A. Whatever they were talking to each other, but didn't look too happy.
      MR. COHEN: Judge.
      THE COURT: Objection sustained. That's stricken.
      MS. BURNS: Understood.
Q. What did you see Ding Pa do while in that room?
A. Ding Pa went out.
Q. What happened next?
A. And then he brought two people in.
Q. Who is "he," just to be clear?
A. Ding Pa.
Q. What happened when Ding Pa and the other two people came in? What did you see and hear?
A. He was pointing at the person who he had a conversation earlier and said, Beat him up for me.
Q. What happened once Ding Pa said, Beat him up for me?
A. When I saw Ding Pa and two people walking in, my friends and I were there trying to break it up.
Q. What were you trying to break up?
A. When they were about to engage in a fight, and I tried to break it up. And I said, Today's my dailo's birthday. Do not cause any trouble here.
Q. Who was trying to get into the fight?
A. Ding Pa.

Q. What were the people that he had brought into the room doing?
A. Ding Pa came in and was trying to beat him up.
      MR. COHEN: Objection. Move to strike.
      THE COURT: Counsel, it's just too vague. Objection sustained.
Q. Once Ding Pa said, Beat him up, what did the men who had come into the room with him do?
A. He wanted to charge over and to beat him up.
      MR. COHEN: Objection. I move to strike.
      THE COURT: Objection sustained. What did he do?
Q. Could you just say what the men did.
A. He came in, Ding Pa pointed and said, Beat him up for me.
      THE COURT: We've been through that.
Q. And did this fight end?
      MR. COHEN: Objection. There was no testimony there was a fight.
      THE COURT: Yes, I think at this point we're going to take the mid-morning recess. You may all be excused for ten minutes.
      (Jury excused)
      THE COURT: You may step down.
      (Witness excused)
      THE COURT: I would just like to point out that the

testimony should come from the witness, not from the lawyer. There is a great deal of leading. And I think you're tempted, because it's being translated into a foreign language, and people are tempted to lead when the witness is speaking a foreign language. But you should resist that temptation.

MS. BURNS: I will do my best going forward, your Honor.

THE COURT: Very well.

We will all take a ten-minute recess.

MR. SKINNER: Thank you, your Honor.

(Recess)

(Jury present)

THE COURT: All right. You may proceed.

MS. BURNS: Thank you, your Honor.

BY MS. BURNS:

Q. Mr. Li, after you saw Ding Pa in Flushing, did you see him again?

A. Yes.

Q. When was that?

A. I see him also in 2000.

Q. Where was that?

A. The restaurant located --

THE COURT: That was 13 years ago, right?

THE WITNESS: Yes.

Q. Where did you see him?

A. In a restaurant located on 8th Avenue in Brooklyn.

Q. Were you alone there or with other people?

A. I was with my friends, my dailo, and we're having dinner there.

Q. What happened when you saw Ding Pa?

A. Ding Pa came and saw me there.

Q. Was he alone or with other people?

A. About three people.

Q. What happened after he came in?

A. He came in and saw me there and went back out.

Q. Did there come a time that he spoke to you?

THE COURT: I thought he left the restaurant is what was said.

Q. Did he come back into the restaurant after that?

A. No, he was at the door. And a friend of mine came in and told me to leave right away.

MR. COHEN: Objection.

THE COURT: Objection sustained. That's stricken.

Q. After Ding Pa left, what did you do?

THE COURT: When I strike something, members of the jury, it means you ought to totally wipe it out of your mind. Forget it. It is not part of the evidence in this case.

What is the question?

Q. Yes. After Ding Pa left, what did you do?

A. A friend of mine came in and told me --

Q. Sir --

THE COURT: He may not say that.

MS. BURNS: I understand that.

THE COURT: That's not the question.

Q. What did you do? Just tell us what you did after Ding Pa left.

A. I don't understand.

THE COURT: Did you do anything?

THE WITNESS: Yes.

Q. What did you do? Just describe what you did.

A. I went to the door.

Q. Where did you go?

A. And when I got to the door of the restaurant, Ding Pa told me don't leave yet, don't leave.

Q. What happened after Ding Pa said that to you?

THE COURT: That is, you followed him to the door?

THE WITNESS: No, he was at the door. Later, a friend of mine told me to leave, so I went to the door.

Q. Sir, don't describe what other people said unless you're asked.

I think, to clarify, what the judge was asking is when Ding Pa went to the door, did you go to the door at the same time or at another time?

A. About two to three minutes later.

Q. And what happened once you went to the door?

A. He told me not to leave.

Q. Ding Pa said that?

A. Yes.

Q. Did he say anything else at that time?

A. He said don't leave. Don't leave -- don't leave tonight.

Q. What did you do next?

A. And I asked him why.

Q. What did he say to you?

A. I said, You're a dick.

And so he punched me. I punched him back.

Q. What happened next?

A. And then my friends and my dailo pull me away.

Q. Did you see Ding Pa after this encounter in Brooklyn?

A. Yes.

Q. Where was that?

A. In Chinatown.

Q. When was that?

A. Around 2000 or 2001.

Q. How long after you saw him in Brooklyn did you see him in Chinatown this day?

A. About a day or two.

Q. What happened when you encountered Ding Pa?

A. I was walking on Eldridge Street, and --

THE COURT: On what street?

THE INTERPRETER: Eldridge Street.

A. And just passed a door.

Q. What happened next?

A. I was at the entrance to the barbershop.

Q. What happened at that entrance?

A. I don't know when, Ding Pa just grabbed me from behind on my shoulder and wanted to pull me into the barbershop.

Q. What, if anything, did he say to you at that time?

A. He said to people inside, Yiqun is here.

Q. What happened once the defendant said that?

A. So I hang onto the door. I wanted to go out, to run out. I could not, because he grabbed my clothes. I saw a screwdriver stuck in the door.

Q. What did you do with that screwdriver?

A. I pulled it out and stabbed him.

Q. You stabbed Ding Pa?

A. Yes.

Q. What did you do once you stabbed him?

A. He released his grasp, so I ran away.

THE COURT: What do you mean you saw a screwdriver in the door?

THE WITNESS: Because a lot of people smoked in the barbershop, so they had to leave the door open. So they stuck the screwdriver at the door so it would be opened.

Q. While you were in Canada, did you see Ding Pa?

A. Yes.

Q. Where did you see him?

A. In July 2006, when I got there, it was the first day when I got there.

Q. While you're in Canada, did you work with Ding Pa?

A. Yes, when I first got there, snakeheads picked me up.

Q. While you were in Canada, did you at any time work with Ding Pa?

A. Yes.

Q. And where did you work?

A. At a gambling parlor.

MS. BURNS: No further questions, your Honor.

THE COURT: Very well. You may cross-examine.

MR. COHEN: Thank you, your Honor.

CROSS-EXAMINATION

BY MR. COHEN:

Q. Mr. Li, you and I have never met, have we?

A. What?

Q. Have you and I ever met?

A. No.

Q. Have we ever had any conversations about your testimony, about what you've told the jury?

A. No.

Q. When you were arrested in 2006, you were charged with extortion initially?

A. Yes.

Q. And that's because you and other people were forcing drivers at a minivan company to pay you protection money every month; correct?

A. Yes.

Q. And at the time you were doing that, in fact, other people had just been arrested before you began extorting the bus drivers for doing the same thing to the same bus drivers; correct?

A. Yes.

Q. And you and your dailo and your friends decided that you would just step into the shoes of the people who had just been locked up because the drivers were afraid; correct?

A. Yes.

Q. And when you got arrested, you were arrested with other people, true?

A. Yes.

Q. Were you related to any of the people that you were arrested with?

A. Some were my friends and some followed me.

Q. Were any of them members of your actual family?

A. No.

Q. How many people altogether were arrested besides yourself at the same time as you?

A. As far as I know, five.

Q. So it was altogether five or five plus you?

A. No, in total five.

Q. And how many drivers were you collecting money from every month?

A. At first, 250; later, increased, raised slowly to 400.

Q. How many drivers were you collecting money from? Not how much money were you collecting, but how many drivers were you collecting money from?

A. At the peak? Around a little over 40 people.

Q. And besides this money that you were collecting from drivers, were you making any other illegal money at that time?

A. I was making around over 3,000 to 4,000.

Q. Besides the money that you were extorting from the drivers, were you making any other illegal money?

A. No.

Q. So it's your testimony that you were making between three and $4,000 a month?

A. Yes.

Q. But that was at a different time from when you were selling ecstasy and marijuana?

A. Different time.

Q. Okay. Now, when you were arrested, you were brought to this courthouse; correct?

A. Yes.

Q. And one of the first things that happened after you got to this courthouse is that you appeared before a magistrate judge,

right, to determine whether you could be released on bail?

A. Yes.

Q. And you were asked to fill out a piece of paper to disclose your financial assets in order to see whether you qualify to get a free lawyer from the court; correct?

A. I don't really remember. It seems I did.

Q. Well, do you remember having to fill out a piece of paper with blue and white lettering on it that asked where you worked, how much money you made, where you lived, and things like that? Do you remember that?

A. I don't really remember.

Q. Well, did you tell the Court that you couldn't afford to hire your own attorney?

A. Yes.

Q. Do you remember one of the first things that happened when you appeared before the magistrate was they asked you to raise your right hand and swear that the assets that you put down on this piece of paper were the only assets you had, and you were swearing to telling the truth?

A. Yes.

Q. And had you disclosed on this document and you had disclosed to the Court you were earning about $52,000 a year?

A. No.

Q. So is it a fair statement that within a couple of hours of arriving in this courthouse, one of the first things you did

was take an oath to tell the truth, and you lied?

A. No. When I was first arrested, I was in there and the lawyer came to see me.

Q. Right. And you were asked could you afford to hire your own attorney; correct?

A. Yes.

Q. And you were asked to disclose what your income was; correct?

A. No, he just came in and said he or she will be my lawyer, representing me. He or she said that if I could afford it, then I could hire one myself.

Q. And, in fact, the court appointed an attorney for you, right?

A. Yes.

Q. And that attorney was Winston Lee?

A. Yes.

Q. And you never had to pay for Mr. Lee's services; correct?

A. Yes.

Q. And he continued to represent you from that day that you appeared in court until February of 2012, when you got sentenced; correct?

A. Yes.

Q. And you never had to pay Mr. Lee for his services because the Court paid him; correct?

A. Yes.

Q. Now, at the hearing that you first appeared at, where you first met Mr. Lee, did the judge set bail conditions for you?

A. Yes.

Q. What were your bail conditions?

A. Cash, $5,000, and 75,000 bond.

Q. And in order for you to be released, what did you have to do?

A. $5,000 cash, and also with three people or sponsors who have legal status.

Q. And were you released?

A. Yes.

Q. Who put up the $5,000 in cash?

A. My friend and my younger sister.

Q. And who are the three people that signed the bond?

A. My friend of friends, and also my sister-in-law.

Q. And these were people that were close to you; correct?

A. Yes.

Q. People that cared about you, right?

A. Yes.

Q. And people that trusted that if they put themselves on the line for $75,000, that you would come back to court when you were supposed to; correct?

A. Yes.

Q. Now, you said there came a time that you decided that you would no longer come to court in this case, right?

A. Yes.

Q. And that's because you were afraid, once you started to see what some of the evidence was against you, that if you went to trial, you would lose and go to prison; correct?

A. Yes.

Q. And when you got released, there was a bond that you had to sign before you got out. Remember that?

A. Yes.

Q. And in the bond when you signed it, you promised the Court that you would come back to court when you were supposed to; correct?

A. Yes.

Q. But, instead, you decided to leave the country, right?

A. Yes.

Q. You decided that you would betray the trust of the people that signed your bond, and leave them on the hook for $75,000; correct?

A. No, but they didn't have to pay 75,000.

Q. Sir, was it your understanding that by signing that bond, those people agree that they would owe the government $75,000 if you didn't come back to court. Did you understand that?

A. I did not understand that at the time.

Q. What did you understand it meant for people to sign a bond guaranteeing 75,000 to the Court that you would return? What did you understand it to be?

A. My understanding at that time was just the $5,000 bond.

Q. Well, when you were released on bond, was there an interpreter in court?

A. Yes.

Q. And did you have any difficulty understanding the interpreter?

A. No.

Q. And did the interpreter translate for you that the judge was telling you and the other people that signed that if you failed to appear, you and those people would owe the government $75,000.

THE INTERPRETER: Counsel, could you repeat the question?

MR. COHEN: Yes. I'll try.

Q. Did the interpreter at your bail hearing translate for you that the judge said that if you did not appear in court, you would and the other people that signed the bond would owe the government $75,000?

A. I don't really remember.

Q. And when you signed the bond at the clerk's office, was there an interpreter there?

A. Yes, I remember.

Q. And did you understand that interpreter?

A. I don't really remember whether he or she told me everything, but it was very brief.

Q. Well, didn't the clerk tell you and didn't the translator translate that by signing this bond and being released, you were agreeing that if you failed to come back to court, you and the cosigners owed the government $75,000?

A. Yes.

Q. So you knew that?

A. I knew.

Q. And you decided that rather than face going to prison possibly, you would betray the trust of the people that signed for you and run away to Canada; correct?

A. At that time when I was trying to run away, but regarding to the government, I told my wife that, if necessary, we had to sell our house to pay the government.

Q. You owned a house?

A. In China.

Q. Did you disclose when you were telling the Court that you couldn't afford a lawyer you owned a house in China?

A. Yes. Who doesn't have house in China.

Q. Did you tell the Court when you were asked about your assets that you owned a house in China?

A. Yes.

Q. You did.

A. Yes.

Q. And you told your wife that you could pay the people back the $75,000 by selling that house in China?

A. Yes.

Q. And then you managed to make arrangements to get yourself smuggled from the United States into Canada; correct?

A. Yes.

Q. And you did that by going to some alien smuggler and paying a fee to get smuggled into Canada?

A. Yes.

Q. How much was the fee?

A. 3,500.

Q. $3500?

A. Yes.

Q. And is it a fair statement then that you somehow illegally entered Canada?

A. Yes.

Q. And when you illegally entered Canada, there came a time that you applied for political asylum, right?

A. Yes.

Q. But you didn't tell them my name is Qin Li, and I'm wanted in the United States, did you?

A. Yes.

Q. What name did you give them?

A. Xu Li.

Q. And is there a person that you know with that name?

A. Yes.

Q. Who is that person?

A. My younger brother.

Q. And did you have some documents belonging to your younger brother that you used to try to fool the government in Canada?

A. Yes.

Q. How did you get them?

A. I asked someone to send it to me.

Q. You asked your mother to send them to you; correct?

A. Yes.

Q. And you explained to your mother that you had jumped bail in the United States, snuck into Canada, and needed those documents to try to fool the Canadian government; correct?

A. Yes.

Q. And, in fact, your mom sent you in Canada the identification documents belonging to your brother, right?

A. Yes.

Q. And what did you do once you received those documents? What did you do with them?

A. I handed it over to the attorney.

Q. What attorney was that?

A. I do not remember the name of the attorney.

Q. Well, this was an attorney that you hired in Canada?

A. Yes.

Q. And you hired the attorney in order to seek political asylum in Canada; correct?

A. Yes.

D4GVLIN2      L. Qin - cross      Page 470

Q. And, by the way, you had to pay that attorney, right? You didn't get that attorney by lying to a court; correct?

MS. BURNS: Objection to the form, your Honor.

THE COURT: Let's move on.

(Continued on next page)

D4G6LIN3      Li - cross      Page 471

BY MR. COHEN:

Q. Did you pay that attorney?

A. No.

Q. How did you get the services of that attorney for free?

A. Because when I applied for political asylum, I applied as a refugee.

Q. So you told them you were a poor refugee and you got the Canadian government to give you a free lawyer too, correct?

A. Yes.

Q. When did you tell them that you had left China?

A. I say it was 2006.

Q. That was actually the same year that you ran away from the United States; correct?

A. Yes.

Q. And did you tell them how it was that you entered Canada?

A. Yes. I said I flew on a plane from Beijing.

Q. That was a lie; right?

A. Yes.

Q. Then you told them the story about being a persecuted Christian; right?

A. Yes.

Q. What did you tell them about the nature of your persecution as a Christian?

A. I said that the Chinese government did not permit underground churches.

D4G6LIN3      Li - cross      Page 472

Q. Did you tell them that you belonged to an underground church?

A. Yes.

Q. Did you tell them that because you participated in this underground church that you had been arrested by the Chinese authorities?

A. That the authorities wanted to arrest me so I fled and came here.

Q. And you told them that the authorities wanted to arrest you because you belonged to an underground church; correct?

A. Yes.

Q. And those were all lies, weren't they?

A. Yes.

Q. Did you obtain any financial benefits from the Canadian government?

A. Yes. They issue refugee funds.

Q. What are refugee funds?

A. Canada takes in all these refugees.

Q. Does it do something to provide for the welfare of these refugees so that they don't go hungry?

A. Yes.

Q. And the funds that you referred to as refugee funds is that money that you received from the Canadian government because you had convinced them that you were a poor refugee?

A. When you apply, you have to apply as a refugee and anyone

D4G6LIN3      Li - cross      Page 473

that apply for political asylum would get that.

Q. And because you applied for political asylum, you got money from the Canadian government; right?

A. Yes.

Q. Based on the lies that you put in your application?

A. Yes.

Q. And how much money did you get from the Canadian government?

A. I got 530-something a month.

Q. For how long?

A. I got it for over a year.

Q. So did you ever tell them by the way I don't need this money because I am working at a gambling parlor so give it to someone who really deserves it?

A. No.

Q. When you submitted this application to the Canadian government for political asylum, you had to swear everything in it was true; correct?

A. Yes.

Q. Just like you had to swear when you got released from custody that you would come back to court in this building; right?

A. Yes.

Q. Just like you swore to tell the truth an hour ago in this courtroom; correct?

A. Yes.

Q. How did you wind up back in the United States?

A. I got arrested by the government in Canada.

Q. Did you get arrested there for committing a crime in Canada?

A. No.

Q. What did you get arrested for?

A. I was arrested because I jumped bail. I was arrested for a case here in the U.S.

Q. That was the extortion case that you were released from this courthouse in; correct?

A. Yes.

Q. You were arrested by Canadian police; correct?

A. Yes.

Q. Do you know how it is that the Canadian police knew who you were and that you were wanted in the United States?

A. There was a photo from the U.S.

Q. Well, is it true, sir, that one of the people you left on the hook for $75,000 snitched you out and told the government where you were and where you could be found?

A. I do not know about that.

Q. Did you ever sell your house in China to pay back those people so they wouldn't have to owe the government $75,000?

A. No.

Q. Did you ever make any payments to those people for money

that they owed the government?

A. No. They did not tell my wife so my wife did not tell me.

Q. The question was whether or not you ever paid any of them any of the money that they wound up owing the government?

A. No.

Q. You spent some time in custody in Canada before coming back to the U.S., correct?

A. Yes.

Q. How long were you in custody in Canada?

A. Almost 11 months.

Q. During those 11 months, did you learn anything about what had happened to the people who were arrested with you?

A. No one was arrested with me.

Q. I am talking about the people that were arrested with you in New York?

A. No.

Q. You didn't know what had happened to those people, whether they had been convicted or acquitted or anything like that?

A. There had not been a trial when I was arrested.

Q. How long was it from the time that you got to Canada until you were arrested in Canada?

A. I think it was over a year.

Q. And then you spent another 11 months or so in custody in Canada before being returned to the U.S.?

A. Yes.

Q. So altogether from the time that you jumped bail until the time that you came back to the United States, it was almost two years, correct?

A. Yes.

Q. And at any time during those two years did you learn what had happened to the people who you were arrested with in New York and charged with extortion?

A. I didn't hear about it.

Q. So you had no clue as to what happened to them?

A. Correct.

Q. These were your close friends?

A. Those that were arrested?

Q. Yes.

A. Yes.

Q. While you were in Canada did you speak to people in the United States from time to time?

A. I spoke to my wife.

Q. Besides your wife did you speak to other people?

A. My younger sister and others.

Q. And you never had any conversations with your wife or your younger sister about what had happened to the people that you were arrested with?

MS. BURNS: Objection. Asked and answered, your Honor.

THE COURT: I will permit it once more.

A. I rarely asked.

Q. But you did ask?

A. In the beginning I asked. I did not ask toward the end.

Q. During the time you were in custody in Canada, did you have any contact with Winston Lee your court appointed attorney?

A. Yes. I asked a friend to contact him.

Q. Did you personally have contact with Mr. Lee?

A. No.

Q. Did you speak to him on the phone?

A. I called him once. People in the office answered.

Q. And the friend that you asked to contact him, did you give that friend any message for Mr. Lee?

A. Yes.

Q. Did you tell that friend to tell Mr. Lee to let the government know that when you came back you wanted to make a deal with them and cooperate?

A. Yes.

Q. By the way when you got arrested in New York initially and charged with extortion, did they bring you to the 5th precinct?

A. No. I was arrested in the 5th precinct.

Q. In the precinct house, the station house, the 5th precinct?

A. Yes.

Q. What were you doing there?

A. TLC notified the mini bus for a meeting.

Q. And you went to the 5th precinct, correct?

A. Yes.

Q. And the meeting turned out to be the place that you got arrested?

A. Yes.

Q. And when you got arrested, you made a statement to a detective or to an FBI agent; right?

A. Yes.

Q. Was it a truthful statement?

A. Yes.

Q. Did you leave anything out important?

A. No.

Q. So eventually you were brought back to the United States; right?

A. Yes.

Q. And were you brought before a judge or magistrate judge in this courthouse when you came back?

A. Yes.

Q. And at that time you were not released on bail, correct?

A. Yes.

Q. You went into custody; right?

A. Yes.

Q. And you stayed in custody for about four years you said?

A. Yes.

Q. And during those four years you met many, many times with the prosecutors; right?

A. Yes.

Q. You said there was a time when you went to Virginia to rob someone's house?

A. Yes.

Q. And when was that?

A. That was in '99 or 2000.

Q. And you went with another person?

A. Yes.

Q. You drove from New York to Virginia to commit this burglary?

A. Yes.

Q. And when you got to this person's home, how did you get in?

A. We could open the door to get in.

Q. Say it again.

A. We could open the door to get?

Q. The door was unlocked?

A. Yes. The front door was not locked.

Q. You didn't have permission from the person to go in and take their property, did you?

A. Correct.

Q. Did you know whose house it was?

A. I did. It was a house that belonged to Fuchownese person.

Q. Did you know who the Fuchownese person was?

A. No. I do not know.

Q. Did you have any personal dispute with this Fuchownese

person whose house you were robbing?

A. No.

Q. How long were you in the house?

A. Only for a few minutes.

Q. What did you take?

A. I didn't take anything. I don't know what he took, but he got in the car, drove away first. And then I went out, waited for a long time and then I got arrested.

Q. You got arrested and charged with braking and entering into this person's home?

A. Yes.

Q. You didn't take anything while you were there?

A. There was nothing worth taking. There was nothing of value.

Q. So is it your testimony then that neither of you took anything and you left the house?

A. No. I do not know what my friend took because the two of us weren't together.

Q. The two of you went out together or were not together?

THE INTERPRETER: Were not together.

Q. Who left first?

A. My friend left first.

Q. What did you do after your friend left?

A. I was looking and searching around in the room and I call out his name. He didn't make any noises.

Q. He being the friend that you broke into the house with?

A. Yes.

Q. Now, eventually that day you were arrested; right?

A. Yes.

Q. And was your friend arrested as well?

A. No.

Q. Were you taken to jail?

A. Yes.

Q. And were you released on bail immediately?

A. Yes.

Q. How long did you stay in jail before you were released on bail?

A. I didn't get bailed out, but I went to court and then the judge let me out.

Q. How long did you spend in jail from the time you got arrested until the time you were released on bail in Virginia?

A. About over a month.

Q. And when you were released on bail, who paid the bail?

A. There was no bail. I didn't have to pay money.

Q. Was the case dismissed?

A. Yes.

THE COURT: At a convenient point we're going to stop for the lunch recess.

MR. COHEN: This will be fine, your Honor.

THE COURT: Very well. We'll stop now and reconvene

at 2:15.  Have a pleasant lunch.

(Jury excused)

(In open court; jury not present)

THE COURT: You may step down.

MS. BURNS: Judge, will you instruct the witness to be back before 2:15 so we're ready to go?

THE COURT: Yes.

MS. BURNS: Thank you.

THE COURT: Very well.  How much more cross-examination do you have?

MR. COHEN: Half an hour maybe.

THE COURT: Very well.  We have a long recess for lunch.

MS. BURNS: Thank you, Judge.

(Luncheon recess)

A F T E R N O O N   S E S S I O N

2:30 p.m.

THE COURT: Good afternoon.  Let's get the jury.

(In open court; jury present)

THE COURT: Good afternoon, members of the jury.  Let's all be seated.  We're going to proceed.

BY MR. COHEN:

Q. Mr. Li, this morning I asked you some questions about whether you had signed a statement declaring what your assets were in order to obtain a free lawyer from the court when you were arrested back in '06.

Do you remember my asking you that?

A. Yes.

Q. You said you didn't remember signing it, correct?

A. I don't remember it because when I went in and when I first got to jail and a lawyer came to me and spoke to me.

MR. COHEN: Judge, may I approach the witness?

THE COURT: Yes.

MR. COHEN: I have shown these to the government, your Honor.  It is going to be marked Defendant Exhibit B.

Q. Mr. Li, please take a look at this document particularly at the bottom line where it has the signature.  Do you recognize that signature?

A. I do.

Q. Whose signature is it?

A. I signed it.

Q. And do you recall what date you signed it?

A. I don't.

Q. I will draw your attention to the date right over there.  Take a look at it.  Does that refresh your recollection that you signed it on May 3, 2006?

A. I do.

Q. That is the date that you were arrested and brought to this court for extortion along with other people; correct?

A. Yes.

Q. And I know the document is in English.  You don't read English, do you?

A. I can't.

Q. Do you recall your attorney or one of the clerks asking you with the interpreter where you worked and what your income was and you giving them answers that you wrote down?

A. I do.

Q. And you told them that you worked at the Kessle Car Service?

A. Yes.

Q. And actually Kessler Car Service was the company whose drivers you were extorting, right?

A. Yes.

MR. COHEN: Judge, I would like to offer this as Defendant's Exhibit B.

MS. BURNS: No objection.

THE COURT: Very well. Defendant's Exhibit B is received in evidence without objection.

(Defendant's Exhibit B received in evidence)

BY MR. COHEN:

Q. You testified this morning the government asked you I think when you first met Mr. Lin, correct?

A. Yes.

Q. And your answer was that you met him at a restaurant in the West 30s when he and some kids came in and spoke harshly to you?

A. Yes.

Q. But that wasn't the first time you met him, was it?

A. Yes.

Q. It was the first time you met him, or you had met him before?

A. That was my first time meeting him.

Q. Didn't you and he work in the same garment factory?

A. Work in the garment factory. I don't remember whether I worked in the garment factory.

Q. Did you ever work in the garment factory?

A. Yes.

Q. Did Mr. Lin work in the same garment factory?

A. Garment factory, I don't know. I don't remember.

Q. Did your wife work at the garment factory?

A. Yes.

Q. Did Mr. Lin's wife work at the garment factory?

A. Yes.

Q. And didn't you tell the government that there was some sort of dispute between your wife and Mr. Lin's wife about your children and his children?

A. I just did not know what they were saying. Just that my wife came home crying.

Q. Didn't you tell the government that there was some sort of dispute between your wife and Mr. Lin's wife?

A. It seems like.

THE INTERPRETER: Your Honor, may the interpreter clarify with the witness?

THE COURT: You are not sure what he said?

THE INTERPRETER: Yes.

THE COURT: You may ask him again.

THE WITNESS: It had something to do because at that time my wife still did not give birth. Probably something to do with that.

THE COURT: With what?

THE INTERPRETER: Something to do with that.

THE COURT: With what?

THE WITNESS: That my wife at that time still did not give birth.

THE COURT: Oh, you had no children. Is that what you

are saying?

THE WITNESS: Yes.

BY MR. COHEN:

Q. You met with the government on July 26th of 2012. Do you remember that?

A. Yes.

Q. On that date there was an interpreter there; right?

A. Yes.

Q. Agent Varian, Ms. Burns, Mr. Skinner; right?

A. Yes.

Q. And do you remember telling them at that meeting that you first met Ding Pa in 1995 or 1996 at a gambling parlor?

A. No.

Q. Do you remember telling them that the gambling parlor was in midtown on 31st Street?

A. Yes.

Q. Do you remember telling them that your wives were involved in a disagreement, they had met at work, it was something about the children didn't get along although they were friendly at first; do you remember that?

A. Yes.

Q. And that you called Ding Pa's house?

A. Yes.

Q. And that he got angry at you and scolded you?

A. Yes.

Q. So the first time that you met Mr. Lin is not at a restaurant when he came in and started yelling at you, it was earlier than that; correct?

A. Prior to that I did not know that Ding Pa and his wife were husband and wife relationship.

Q. That is not what I asked you. I asked you if when this morning the government asked when you first met Ding Pa and you described that incident with the soy sauce model, actually that was not the first time you had met him; correct?

A. That was my first time meeting him and regarding contact.

Q. You entered into a cooperation agreement with the government after you were brought back from Canada, correct?

A. Yes.

Q. And you met with them I think you said about 10 time before they entered into an agreement with you?

A. Yes.

Q. And in the agreement you were obligated to do certain things; right?

A. Yes.

Q. You told us you're obligated to testify, to be truthful, to meet with them; right?

A. Yes.

Q. And in return they would write a letter to the judge to ask for leniency; right?

A. I signed this agreement hoping that I could reduce my

sentence.

Q. And in fact the sentence that you faced, the maximum sentence you faced when you pled guilty was 70 years in prison; correct?

A. Yes.

Q. In fact you testified at a trial in this courthouse before today in a different trial at a different time; correct?

A. I do not understand.

Q. This is not the first time that you have sat in the witness stand in this courthouse; correct?

A. Yes.

Q. You testified against other people; correct?

A. Yes.

Q. And after you testified against those people there came a time that you yourself had to be sentenced by the judge who was assigned to your case; right?

A. Yes.

Q. At trial when you were asked questions about your cooperation agreement, you told the jury that you were facing 70 years in prison; right?

A. I pled guilty to 70 years.

Q. When you testified at the trial and were asked questions about your cooperation agreement, you told the jury that you were facing a sentence of 70 years; correct?

A. Yes.

Q. And then there came a time that you were sentenced; right?

A. Yes.

Q. And the government did write a letter as you said under their obligations under the agreement to the judge who sentenced you; right?

A. Yes.

Q. And you didn't get 70 years, did you?

A. No.

Q. You got released that day; right?

A. Yes.

Q. Now, the government in the agreement said, We're not making you any promises about what your sentence is going to be; correct?

A. Yes.

Q. But the sentence you got was time served?

A. Yes.

Q. And then because you had been convicted of a felony and because you had been illegally in the United States, you were sent to immigration custody; right?

A. Yes.

Q. Had you ever applied for political asylum in the United States?

A. Yes.

Q. And what was the basis for your asylum application here?

A. Based on political persecution.

Q. Political persecution?

A. Yes.

Q. Not because you were a persecuted Christian like you told them in Canada, here it was political persecution?

A. Political persecution refers to June 4th persecution.

Q. Oh, and none of that was true; correct?

A. Yes.

Q. And you were denied asylum in the United States; correct?

A. Yes.

Q. And because you had been denied asylum and because you were convicted of a felony, you went to immigration jail when you got released from MCC; right?

A. MCC, what is that?

Q. What jail were you in before you went to immigration custody?

A. Before I went to immigration I was at this federal prison in Chinatown.

Q. That is MCC, correct, Metropolitan Correction Center?

A. Yes.

Q. You were there for four years?

A. No. I was not there for four years. According to Canada that is four years.

Q. So how much time did you spend at the MCC?

A. A little over two years.

Q. You knew that place was called the MCC, correct?

A. Yes.

Q. So why did you ask me what is MCC when I asked you how long you were there?

MS. BURNS: Objection.

THE COURT: Overruled.

A. Because I thought you were talking about the immigration custody. I thought it was name of the immigration detention.

THE COURT: Let's move on.

MR. COHEN: I am moving on, Judge.

Q. What I am asking you, sir, is eventually after spending a couple years at the MCC, you went to an immigration detention center; right?

MS. BURNS: Asked and answered.

MR. COHEN: It is a foundation question.

MS. BURNS: I think we established that he went into immigration custody.

THE COURT: We don't have speeches. We just object. After you were released on sentence of time served, where did you go?

THE WITNESS: I was sent to New Jersey immigration detention facility.

BY MR. COHEN:

Q. Was it your understanding that the reason you went to an immigration detention center in New Jersey is because you were going to be removed from the United States?

A. Yes. That is what I thought.
Q. In fact, one of the conditions of your sentence was that you cooperate with the immigration authorities of the United States; correct?
A. No.
Q. The judge who sentenced you is Judge Chin; correct?
A. Yes.
Q. And when he sentenced you, he sentenced you to time served plus three years' supervised release, true?
A. Yes.
Q. One of the conditions of your supervised release was that you have to report to a Probation officer, true?
A. Yes.
Q. And when you were sentenced by Judge Chin after you were sentenced, do you recall being given a list of the conditions of your supervised release?
A. After I was sentenced I was not given any documents and I just went out.
Q. You didn't sign a document indicating that your conditions of sentence were explained to you?
A. Yes.
Q. You did?
A. Yes.
Q. One of those conditions was you cooperate with the U.S. immigration authorities; correct?

A. Cooperate with the U.S. immigration? I do not understand about cooperation with U.S. immigration.
Q. In any event you went to an immigration detention center in New Jersey; correct?
A. Yes.
Q. How long did you stay the at immigration center?
A. About five months.
Q. And during those five months was it your understanding that you were awaiting removal to China?
A. Yes.
Q. And how was it that you were not removed to China?
A. Later an FBI agent came in and wrote me a letter on my behalf and he brought me up.
Q. So even though you had been ordered removed from the United States by an immigration Judge, an FBI agent was able to get you released; right?
A. He wrote a letter on my behalf, but I do not know what it was and I was able to get out.
     (Continued on next page)

Q. Was that Agent Brian Wittenberg?
A. No, not Agent Wittenberg.
Q. Was it Agent O'Brien?
A. I don't really know the name of the agent.
Q. But you do know that an agent wrote a letter for you; correct?
A. Yes.
Q. Now, had you had meetings with that agent between the time that you were sentenced and the time that he wrote a letter for you?
A. No.
Q. Had you had meetings with any representative of the FBI or federal law enforcement between the time you got sentenced and the time you got released?
A. Yes.
Q. And at those meetings, did you reach an understanding that if the FBI got you released from immigration custody, that you would do some things that they wanted you to do?
A. Yes.
Q. And, in fact, you testified that you now have legal status in the United States; correct?
A. Yes, I worked one-year card.
Q. And that work authorization was something that you got because the FBI helped you get it; correct?
A. Yes.

Q. And without that assistance from the FBI, you would not have been released from custody; correct?
A. Yes.
Q. And without continuing to do what the FBI wants you to do, you wouldn't be able to continue to renew the card that allows you to work legally in the United States; correct?
A. Yes.
Q. When does that come up for renewal?
     THE INTERPRETER: I'm sorry?
     MR. COHEN: When does that card come up for renewal?
A. July 21.
Q. You said there was a time that you stabbed Mr. Lin; correct?
A. Yes.
Q. Do you remember what month that was in?
A. Don't remember.
Q. Remember if the weather was warm or cold?
A. Don't remember.
Q. And was that after the incident at -- the incident that you described earlier when you said that you called him a dick and he punched you?
A. I did not say anything about dick.
Q. Do you remember testifying this morning?
A. No.
Q. You don't remember testifying this morning?

A. No.

Q. Did I mishear you or did you say this morning that when Mr. Lin said don't leave tonight, and you said why, you called him a dick?

THE INTERPRETER: Call him a dick?

MR. COHEN: Yeah.

THE INTERPRETER: Okay.

A. I said why.

Q. You didn't call him any name?

A. I said Ding Pa, what happened?

Q. You said Ding Pa, what happened?

A. Yes.

Q. So the incident where you stabbed him, was that within a couple of days after that?

A. Yes, after one to two days later.

Q. And did you know that he hung out on Eldridge Street?

A. Did not know.

MR. COHEN: I have no further questions, your Honor.

THE COURT: Very well.

MS. BURNS: Just briefly, your Honor.

REDIRECT EXAMINATION
BY MS. BURNS:

Q. The incident where you ended up stabbing Ding Pa, where did that take place?

A. It was at 20-something Eldridge Street, next to the

barbershop.

Q. What did Ding Pa do once he came up behind you?

A. He grabbed my shoulder and pulled me into the gambling parlor. The gambling parlor was behind the barbershop.

Q. Were there other people inside?

A. I couldn't see clearly, but there were a lot of people sitting inside.

Q. What did Ding Pa say to those people, if anything?

A. He said, Qin Li is here.

Q. And what did you do when he was trying to pull you into the gambling parlor?

A. I was planning to run away.

Q. Why?

A. Because I saw him there all of a sudden. I got scared.

Q. And where on Ding Pa's body did you hit him with that screwdriver?

A. I don't know. I didn't look. I just went like this and stabbed him.

MR. COHEN: I'm sorry, I didn't see the gesture.

A. I grabbed and I stabbed like that.

Q. Moving toward his lower body?

A. Yes.

MS. BURNS: No further questions.

Thank you.

THE COURT: Very well.

RECROSS EXAMINATION
BY MR. COHEN:

Q. Did you leave the screwdriver stuck in his leg?

A. No.

Q. Did you take it with you?

A. I stabbed him, I then held in my hand, and then I went to the front and threw it out.

Q. You said that there was a gambling parlor there at the barbershop?

A. I heard later on that the gambling parlor was inside.

Q. But you didn't know that before?

A. I did not.

Q. Thanks.

THE COURT: All right. You may step down.

(Witness excused)

MR. COHEN: Judge, could we approach for a moment?

THE COURT: Very well. But who's the next witness?

MR. COHEN: That's what we're approaching about.

THE COURT: I see.

(Continued on next page)

(At the side bar)

MR. COHEN: Judge, the government advised me after lunch that they are actually calling a witness out of turn.

MR. SKINNER: That's not right.

MS. BURNS: That's not accurate. We're still continuing to go with Mr. --

THE COURT: Please don't interrupt. You'll have your opportunity.

MS. BURNS: Okay. Thanks, Judge.

THE COURT: I listen to everybody.

MS. BURNS: We're eager. I apologize.

MR. COHEN: The next witness was supposed to be somebody named Cai Xiang, who is somebody that would have taken us through the day and into tomorrow.

The government advised me after lunch that Mr. Xiang is in Philadelphia attending the funeral of his brother. I don't have an objection to them calling somebody other than Mr. Xiang, who would be a lengthy witness, but I'm not prepared to cross-examine any other witness today, because I clearly thought that between this guy and Cai Xiang, we would be into tomorrow. So I'm saying I'm not prepared to go forward with cross-examination.

THE COURT: How lengthy is this direct?

MR. SKINNER: First of all -- and there very well may have been a misunderstanding between us and Mr. Cohen in the

benefit of the doubt. But we've been saying -- we've been trying to give him crucial witnesses. We've been telling him that we can't make any promises, but this is our best expectation, what we've been saying consistently. The next group of witnesses included Allen Chen, Song Di Xiang, Cai Xiang, and a fourth witness.

We have intended to call Mr. Allen next for the duration. We never intended to call Cai Xiang immediately after Mr. Qin. And I don't think that this really is a surprise to Mr. Cohen that Mr. Allen is coming up next. If he's not prepared to cross these witnesses, I don't really know what to say. We've been telling him as much as we can and giving him as much notice as we can. And he's had the 3500 since January.

THE COURT: I understand. The question is this: Since he let you take some witness out of turn --

MR. SKINNER: It's not out of --

THE COURT: Suppose -- no, no. I'm not suggesting that you can't put the witness on. But maybe you can make an arrangement that he will cross-examine tomorrow, or do you not have anybody after this?

MR. SKINNER: Well, he's right that we had we thought Cai Xiang was going to go after Mr. Chen. But we learned during lunch that Mr. Xiang's brother passed away, and he's in Philadelphia as a result. And I think we have two other people

who are going to be here.

I mean if Mr. Cohen wants to do it that way, efficiently use the jury's time, we're prepared to go direct, direct, direct, I guess, but that sounds kind of unorthodox.

THE COURT: Well, but I think the two of them anyhow, you could go direct, direct and have the two cross-examined tomorrow.

MR. SKINNER: Mr. Cohen, are you now prepared to cross Allen Chen?

THE COURT: Everybody is willing to cooperate.

MR. COHEN: As I said, I thought Cai Xiang was next. It's true that the government has told me, generally speaking, who they intended to call. I thought my last email exchange they indicated that after Mr. Li, it would be Mr. Xiang.

THE COURT: All right. Well, we know that. That's water over the damn.

MR. COHEN: Pardon, Judge?

THE COURT: That's water over the damn.

MR. SKINNER: Exactly.

THE COURT: The question is what is the best way to proceed.

MR. SKINNER: Are you now prepared to cross him?

THE COURT: And if you are not prepared to cross-examine this witness coming up next, you can do it tomorrow.

MR. COHEN: That was going to be my request, Judge. Either that we do the whole thing tomorrow, or that they could do their direct today and I would do the cross tomorrow.

THE COURT: Fine.

MR. SKINNER: Let's at least do the direct today.

THE COURT: Excuse me?

MR. SKINNER: Let's please do the direct today; he's been here for a long time.

THE COURT: Yes, that's what we're going to do.

MR. SKINNER: And then hopefully after that, these other people will be here. And we'll see what we do with that.

MR. COHEN: Great.

THE COURT: That's fine. It's always worth looking for constructive solutions to problems.

MR. SKINNER: Thanks, Judge.

(Continued on next page)

(In open court)

THE COURT: Who is your next witness?

MR. SKINNER: Allen Chen.

ALLEN HUI CHEN,
    called as a witness by the Government,
    having been duly sworn, testified as follows:

THE DEPUTY CLERK: Please be seated.

Please state your full name for the record, and spell your last name slowly.

THE WITNESS: Allen Hui Chen. A-L-L-E-N, H-U-I, C-H-E-N.

THE DEPUTY CLERK: Thank you.

DIRECT EXAMINATION
BY MR. SKINNER:

Q. Good afternoon, Mr. Chen.

A. Yes.

Q. Where are you from?

A. From Toronto, Canada.

Q. Where were you born originally?

A. From China.

Q. Where do you have citizenship?

A. I'm a Canadian citizen.

Q. Where do you live now?

A. China. Most of my time spent in China, sometimes in Canada.

Q. And when did you first go to Canada?

A. 2004.

Q. When did you become a Canadian citizen?

A. April of '08.

Q. Mr. Chen, prior to testifying today, have you met with prosecutors and agents who work for the United States government?

A. Yes, I met with them twice.

Q. And how did you know where to go and what time to be there?

A. My cousin contacted me.

Q. What's your cousin's name?

A. Ah Qian.

Q. Does he also go by the name Cash?

A. Yes.

Q. Now --

THE COURT: Is that a nickname?

THE WITNESS: I believe that is his English name, but I'm not really sure.

Q. When you say he's your cousin, do you mean you're part of the same family?

A. Yes, he is my paternal aunt's son.

Q. Mr. Chen, do you know a man who goes by the nickname Ding Pa?

A. I do.

Q. Do you know his true name?

A. I do not know.

Q. When did you first meet Ding Pa?

A. There's an English name that some people call him by, name Ah Mark.

Q. When did you first meet Ding Pa?

A. 2005.

Q. Where did you meet him?

A. At one of my relatives' home.

Q. How did you come to meet him at your relative's home?

A. He was having dinner there, and I saw him when I walked in.

Q. Were you introduced?

A. Not really. We sat at the same table for dinner, and then we chitchatted.

Q. And after that initial night, were there other occasions where you ran into Ding Pa or saw him?

A. Yes, once in a while when I went out, I saw him.

Q. Do you see --

A. But we did not talk.

Q. Do you see Ding Pa here in court today?

A. Is that the one sitting over there?

Q. I'm asking you, do you see him? Do you recognize him or not?

A. Oh, the one inside wearing a suit? Yes, the one sitting in the middle.

Q. Can you describe what table he's sitting at and what he's

wearing?

A. He's at the second table. He's sitting next to the man wearing glasses.

MR. SKINNER: Your Honor, can the record reflect that the witness has identified the defendant.

THE COURT: It may.

Q. Now, Mr. Chen, during the time you lived in Canada, did you ever run a gambling parlor?

A. Yes.

Q. How many gambling parlors did you run?

A. I had one in '07.

Q. And how many others did you have?

A. That was closed. And then I opened another one July 2010.

Q. So there are a total of two?

A. Yes.

Q. Let's talk about the first one. Where was that one located?

A. It was in Scarborough, in Toronto, Scarborough.

Q. Are you saying Scarborough?

A. Yes.

Q. Is that part of Toronto?

A. Yes, it's in Toronto.

Q. And this first gambling parlor, that was in 2007, did I hear you right before?

A. Yes, it was '07.

Q. What kind of gambling took place there?

A. It was mahjong and card games.

Q. How many people gamble there at a time?

A. Ten to 20 people.

Q. And did you or anybody else who worked there have a permit from the Canadian government to run that gambling parlor?

A. Yes, it was an organized -- it was an association. We had made an application for an association, and a few of us got together to do this.

Q. And did you earn any income from running this gambling parlor or helping run the gambling parlor?

A. I do not -- I did not rely on this income, because these are people from my village that hang out in that place.

Q. Did you earn some money from it?

A. Yes, just a salary.

Q. Was that your primary source of income back in 2007?

A. I have my own business in China.

Q. So you had other sources of income in addition to the gambling parlor?

A. Yes.

THE COURT: Did you not own the gambling casino in Canada? Because you said you got a salary.

THE WITNESS: A lot of my friends got together to do this.

Q. So were there multiple owners of the gambling parlor?

A. Yes, there were workers that had nothing to do after work, so they would all hang out over there. And these were people from my village.

THE COURT: Your village in China?

THE WITNESS: Yes, those people that were in Canada.

Q. Let's turn to the second gambling parlor.

THE COURT: Excuse me. What was your village?

THE WITNESS: In Changle, Fuzhou.

Q. Mr. Chen, let's turn now to the second gambling parlor. Where was this located?

A. It was also in Scarborough, Toronto. The street name is Finch and Midland.

Q. Finch and Midland?

A. Yes.

Q. And what kind of gambling took place at this gambling parlor?

A. The same as the previous one.

Q. That's mahjong and cards?

A. Yes.

Q. How big was this one?

A. This one was a little bit bigger than the original one.

Q. How many people would gamble there at a time?

A. When there was a lot of people, it was between 20 to 30.

Q. Who owned this one?

A. It was also my friend and a few of my friends and I, we got

together to do it.

Q. Did you have a permit for this one?

A. Yes.

Q. Did you earn any money from running this gambling parlor?

A. Yes, I earned some salary.

Q. Did you have other sources of income, as well?

A. I had family business in China.

Q. And you said -- correct me if I'm wrong, I think you said this one started in about July 2010?

A. I didn't hear it clearly.

Q. When did you start this second gambling parlor?

A. It was end of July 2010.

Q. Did Ding Pa own or operate any gambling parlors in Toronto?

A. Yes.

Q. And where was Ding Pa's gambling parlor located?

A. It was also near Finch and Midland.

Q. So near the second gambling parlor that you started?

A. It was about 100 meters away.

Q. When did you first learn that Ding Pa had a gambling parlor on Midland and Finch?

A. I do not remember exactly when, but it was open for a long time.

Q. Was it open before you started your gambling parlor in July 2010 in the same area?

A. Yes.

Q. Did you ever go into Ding Pa's gambling parlor on Midland and Finch?

A. Yes.

Q. What kind of gambling took place there?

A. Gambling pai gao.

Q. Pai gao?

A. Pai gao.

Q. Anything else?

A. And poker.

Q. Poker?

A. Yes.

Q. Now, how do you know that this was Ding Pa's gambling parlor?

A. My friend gambled and we went in together.

Q. What did you see, if anything, that gave you the impression that Ding Pa had some position of authority there?

A. He gave money to other people, he was directing other people what to do verbally. They were gambling using the chip. He was giving them, other people, chips.

Q. Mr. Chen, let me direct your attention back to the second gambling parlor, the one on Midland and Finch that you and your friends operated.

Did Ding Pa ever come into this gambling parlor after you opened it in July of 2010?

A. Yes. It was approximately one month later he came in.

Q. And what time of day was it -- well, one month later than what?

A. After it was open.

Q. So one month after it opened in July of 2010?

A. Yes.

Q. And what time of day was it when Ding Pa came in?

A. Around 8, 9 o'clock at night.

Q. Were you alone or were there other people there?

A. Yes, there were other people there playing cards and mahjong.

Q. And what happened after Ding Pa came in?

A. He came in with four, five other people. He even brought in his girlfriend.

Q. Did he say anything after he came in?

A. He came in with a bad attitude. He started dragging the chairs around.

Q. What do you mean "dragging the chairs around"?

A. He came in with an attitude. And he started touching things and moving the tables.

Q. What about the people that came with him, what did they do?

A. They did the same thing that he did.

Q. What did your customers do?

A. Some of the customer got scared, got up, and left.

Q. How long was Ding Pa there?

A. Around half an hour.

Q. During the period of time that he was there, did he say anything to you?

A. He didn't say anything until he left. He was about to leave.

Q. When he was about to leave, what did he say?

A. He said, you know, do your business. But his tone was not very good.

Q. And then he left after that?

A. Yes.

Q. Did he come back in again after that night?

A. Yes, he came back in after 10 to 20 days later.

Q. And what happened the next time he came in?

A. The second time he came in, he came in with like 10 to 20 people.

Q. What time of day was it?

A. It was about 10 o'clock at night.

Q. Were there other people in the gambling parlor other than yourself when he came in?

A. Yes, there were people playing cards.

Q. And what did Ding Pa do after he came in?

A. When he came in, he did the same thing he did last time. He start moving things around.

Q. What about the people he was with, what did they do?

A. They all followed him and did the same thing.

Q. And when you say "moving things around," can you just

describe for us what they were moving and how they were moving it?

A. For example, they pretend to drop things on the floor. They were causing trouble.

THE COURT: Who is that causing trouble?

THE WITNESS: Some of the stuff they were taking, smash it up for me.

Q. What kinds of things did they smash?

A. Like sometimes there was stuff on the table, they would take -- or push it to the side.

Q. What kinds of things? Glasses or...

A. Sometimes they were cups on the table. Sometimes when people were playing cards, he would start moving the tables and people would then get up and walk away.

Q. And what were the people that were with him doing while he was doing these things?

A. They were all doing the same thing. They would come in and slam the doors.

Q. And how long were they there?

A. Around 40 minutes.

Q. Did Ding Pa ever ask for anything from you from that night?

A. Yes.

Q. What did he ask for?

A. He said, I have to let him become a shareholder.

Q. How did he say that? What did he say?

A. He said, I want to become part of -- or want to become one of the share.

Q. And what did you say after he asked to become a shareholder?

A. I said, I have a lot of shareholders already, and this is not my focus. I said, There are a lot of people playing here, but I'm not trying to make money from these people. I said, You might see a lot of people here, but we don't charge a lot of money. It's just a little bit -- just to play.

Q. Did he ask for anything else after you said that you weren't going to make him a shareholder?

A. Then, after a while, he came over and said, Then you got to pay me $20,000.

Q. What did you say after he demanded $20,000?

A. What did I say?

Q. Yes.

A. I said I did not even make that much in a given month, and just basically making basic salary.

Q. What did Ding Pa say to that?

A. He didn't say anything. He just came over and smashed things, and he said in a threatening way --

MR. COHEN: Objection.

THE COURT: What did he say?

THE WITNESS: In a very bad tone --

THE COURT: No, no. First say what did he say.

THE WITNESS: What?
You just do your business.

Q. What happened after that?

A. After that, just hit a door, and then ten people left.

Q. Now, after that night, did you see Ding Pa again after that?

A. Yes.

Q. And when is the next time you saw him after that?

A. December 19, 2010, in the morning.

Q. Where did you see him that night?

THE COURT: Morning.

MR. SKINNER: Sorry, your Honor. Morning.

A. In this club.

THE COURT: Do people gamble there in the morning?

THE WITNESS: Around 12 o'clock on the morning of the 19th.

Q. So the early morning hours of the 19th.

A. Yes.

Q. And you were in a club?

A. Yes.

Q. And where was this club located?

A. In downtown.

Q. Downtown Toronto?

A. Yes.

Q. How long --

THE COURT: Is this a different club?

THE WITNESS: This is a big dancing place. People drink.

Q. Was this your gambling parlor or was this a different place?

A. No, this is for people to hang out, a place for people to hang out.

Q. And how long had you been there before you saw Ding Pa?

A. He was there first.

Q. How long after you got there was it before you saw him?

A. When I first went in, I went to the smoking zone or area.

Q. What did you see in the smoke area?

A. As soon as I walked in to the smoking area, I saw more than ten people over there smoking.

Q. Did you see Ding Pa at some point?

A. Yes, I saw him at the smoking area.

Q. So this is the smoking area that you went to when you first went into the club?

A. Yes.

Q. Now, at that point, when you first saw Ding Pa, had you had any alcohol to drink at any point that night?

A. No, I did not. When I first went in there, I went straight to the smoking area.

Q. What happened when you saw Ding Pa in the smoking area?

A. I went to the center where people were dancing.

Q. What happened after that?

A. As soon as I went in, more than 10 to 20 people follow me.

Q. Was Ding Pa one of those people?

A. Yes, and surrounded me.

Q. If I'm understanding you right, they followed you onto the dance floor of the club?

A. Because the dancing place was very close to the smoking area.

Q. Is that where they followed you, onto the dance floor?

A. As soon as I left the smoking area, they started following me.

Q. Where did you go, Mr. Chen, to the dance floor or someplace else?

A. Dancing floor.

Q. And what happened after Ding Pa and these other people and you all got onto the dance floor?

A. People surrounded me.

Q. What happened after you were surrounded?

A. And from the back, my head was struck.

Q. What happened after that?

A. After I was struck on my head, I started becoming dizzy, and then more people came over, started beating me.

Q. All the people that were around you, is that --

A. I was on the ground, and then they started kicking me.

Q. Who was kicking you?

A. I was semi-conscious. I did not know. Then I had a cut in my eye.

Q. What, if anything, did you hear Ding Pa say either before or during this beating?

A. I could hear a very loud, "Beat him to death."

Q. How long were you beat?

A. I do not know how long. At the time it was pretty long.

Q. How did the beatings stop?

A. Security came in.

Q. What happened after security came in?

A. And took me to security office.

Q. What happened to the people that were on the dance floor that were beating you?

A. Nothing happened to them. They just left.

Q. What happened after you went into that security office?

A. My eye was bleeding, and blood was all over my body, and I was injured.

Q. Did you stay there or did you go someplace else?

A. Security used alcohol and washed my eye.

Q. And where did you go after that?

A. At the time a friend of mine drove a car from the garage and picked me up.

Q. So you got into your friend's car?

A. Yes.

Q. Did you see Ding Pa that night?

A. Before the car engine started, he came over and pointed me with his hand.

Q. Did you say anything?

A. And said, "I want you dead."

Q. What happened after that?

A. So my friend just drove away, and took me to the hospital.

Q. What happened at the hospital?

A. They checked out my brain, CT, and I suffered a cut inside of my eye, and about 45 stitches were needed.

Q. Did you have any other injuries other than that?

A. My brain and my head was swollen, also my back. My face was swollen. And also they check brain with CT.

Q. Were you checked into the hospital or were you released that night?

A. I was there for a few hours. And then a friend of mine drove me home.

Q. Now, after that night at the club, did you keep running that gambling parlor on Midland and Finch?

A. No, after, when I recovered, fully recovered, I went to China.

MR. SKINNER: Nothing further, your Honor.

THE COURT: Very well.

We're going to postpone cross-examination until tomorrow. So who is your next witness?

MR. SKINNER: Your Honor, the next witness I believe

is going to be Song Di Xiang.

This might be a good time for a break, if that's okay with the Court.

THE COURT: Very well. We will take a ten-minute recess.

(Jury excused)

THE COURT: You may step down.

(Witness excused)

THE COURT: We will take a ten-minute recess.

MR. SKINNER: Thank you, your Honor.

(Recess)

(Continued on next page)

(In open court; jury present)

MR. SKINNER: Your Honor, the government calls Song Di Xiang. He is already in the witness stand.

THE DEPUTY CLERK: Please stand and raise your right hand.

SONG DI XIANG,
    called as a witness by the Government,
    having been duly sworn, testified as follows:

DIRECT EXAMINATION

THE INTERPRETER: Your Honor, his name is Song Di Xiang. He didn't spell it. I will spell for phonetically.

THE COURT: What is the English that the prosecution reads as the name?

MR. SKINNER: First name S-o-n-g. Middle name, D-i. Last name, X-i-a-n-g.

THE COURT: Very well.

BY MR. SKINNER:

Q. Good afternoon, Mr. Xiang.

A. Good afternoon.

Q. Mr. Xiang, where are you from?

A. From China.

Q. When did you first come to the United States?

A. I came into the United States in '94.

Q. Are you a citizen of the United States?

A. No. I don't have any status here.

Q. Are you here legally?

A. I was smuggled in and then I got bonded out there.

Q. So you have no legal status here in the United States?

A. I do not.

Q. Does your legal status in the United States depend on your testimony in this trial?

A. No.

Q. Have you been promised any kind of immigration benefit for your testimony at this trial?

A. No. No.

Q. Mr. Xiang, have you ever been stabbed?

A. I don't have any legal status so I am afraid of getting beaten up.

MR. COHEN: Afraid of what?

THE INTERPRETER: Afraid of getting beaten up.

Q. Well, the next question I had asked is whether you had ever been stabbed?

A. Yes. I was stabbed.

Q. Where were you at the time that you got stabbed?

A. It was in a restaurant in Manhattan.

Q. Was that restaurant on Division Street?

THE COURT: Try not to lead.

A. Yes.

Q. Do you know what year it was?

A. I do not remember what year it was.

THE COURT: About how long ago?

THE WITNESS: Around nine to 10 years ago.

Q. What time of day was it?

A. It was 9:00 something, 10:00.

MR. SKINNER: Your Honor, may I approach?

THE COURT: Yes.

Is that in the evening or the morning, 9:00 or 10:00?

THE WITNESS: Nighttime.

Q. Mr. Xiang, I have placed in front of you a document marked as Government Exhibit 33. I am going to ask you to take a moment to look at that?

A. That is a door going inside.

Q. Let me ask you first do you recognize what you are looking at?

A. I do.

Q. What is it?

A. That is the restaurant and this is the common area.

Q. Is this a diagram of the restaurant?

A. Yes.

Q. Is this the restaurant that you were in when you were stabbed?

A. Yes, it is.

Q. Does this diagram accurately reflect how the restaurant was laid out at the time of your stabbing?

A. Yes. This is what it looked like.

MR. SKINNER: Your Honor, the government offers Exhibit 33.

THE COURT: I think you should delve a little more. It is too hard to tell from the blank lines what the restaurant looked like.

Q. Mr. Xiang, can you describe for us how the restaurant was laid out?

A. This is what it looks like.

THE COURT: Where did you go into the restaurant?

THE WITNESS: I walk in from here.

THE COURT: Where is "here"?

THE WITNESS: There is a door here. That is the counter.

THE COURT: I see. There is a counter inside the restaurant after you get in?

THE WITNESS: Yes. I went into buy rice.

THE COURT: I see. They sell food as well as serve at tables; is that right? Did you sit down and order rice or did you go to the counter?

THE WITNESS: I was intending to go in to buy rice and then I saw Guo Li.

THE COURT: Wait just a minute. You have to concentrate on the question. Did you sit down at a table to order rice or did you go to the counter to order rice?

THE WITNESS: To the counter.

THE COURT: They sell rice without your sitting down?

THE WITNESS: Yes.

BY MR. SKINNER:

Q. In this restaurant when you first walk in, what kind of room do you go into?

A. Well, when I walked in I saw Guo Li at the opening when I went into buy rice.

Q. When you walk in, do you walk into the dining room?

A. Yes. I walked into the dining room.

Q. Are there tables in this dining room?

A. Yes.

Q. Is that what the round circles are on the diagram?

A. Yes. These are all tables.

Q. Is there a back room behind a dining room?

A. Yes.

Q. How do you get to the back room to that dining room?

A. I went to the counter to buy rice and then I ran into him. So I went into the back to have a drink.

THE COURT: This is nonresponsive to the question.

MR. SKINNER: I am trying, your Honor.

Q. Mr. Xiang, before we get to actually what you did, let's just talk about the layout of the restaurant. Putting aside what you did that night, how would one get to the back room in the restaurant?

A. Well, I was walking down the street and then I got to the

restaurant. I was hungry. I was going to go into the restaurant to buy rice.

Q. So Mr. Xiang, after you got into the restaurant, what did you do?

A. I got to the restaurant. I was going to buy rice.

Q. Where did you go inside the restaurant?

A. There was a long line at the restaurant so he just gestured for me to go inside.

Q. Who is he?

A. Li was standing over there and I saw him.

Q. At this point were you standing in the dining room?

A. Yes.

Q. Where was Guo Li standing?

A. Guo Li was standing here by the door.

THE COURT: Who is Guo Li?

THE WITNESS: Guo Li was someone that cut hairs, a barber.

THE COURT: He was a barber.

Q. Is that someone you knew before you went into the restaurant that night?

A. I knew him before, yes, from getting haircuts.

Q. What did you do after you saw Guo Li?

A. Guo Li called to me and said, "Come in. Come in. Get something to eat."

Q. So where did you go if anywhere?

A. They were all Chinese people so I went over to get a drink. I got a glass and I saw this person. Din Pa. Din Pa.

Q. Before we get there, just tell us where in the restaurant you went, if you stay in the dining room or if you went someplace else?

A. I didn't go anywhere else. I was standing here and then he gestured for me to go to the door.

Q. Did you leave the dining room and go into a back room?

A. I was at -- there was a lot of people outside so I went over there by the opening. He told me to come and get something to eat, but I didn't get anything to eat.

Q. Mr. Xiang, let me ask you for the time being to ignore the diagram that is in front of you. Describe for us where you went with Guo Li before he gestured to you?

A. I went to the opening -- I went to the restaurant and he told me to go over there to have something to eat.

Q. Did you go with Guo Li someplace?

A. No. He said have a drink and then I said, Oh, this guy looked like a thug.

MR. COHEN: Objection. Move to strike that.

THE COURT: The answer is totally unresponsive.

Q. Did you have a drink?

MR. COHEN: Is it stricken, your Honor?

THE COURT: It is stricken.

Q. Did you have a drink with Guo Li in the restaurant?

A. No.

Q. Did you get something to eat in the restaurant?

A. There were a lot of plates of food on the table. When I walked in, they were almost finished and some people had already left.

Q. When you walked in where?

A. When I get into the back, the first table by the door.

Q. So there was another room in the restaurant that was in the back of the restaurant?

A. Yes. Two tables.

Q. Is it this back room that you went into with Guo Li?

A. He was at the door at the second room in the restaurant.

Q. Listen to the question. The question was: Is it the back room that you went into with Guo Li?

A. I did not walk in with him. He called to me and say, "Come in. Come in. Let's have a drink."

Q. After he called to you, did you go into the back room?

A. Yes. I went over there.

Q. Looking at Government Exhibit 33, is that the portion of the diagram at the top that has the two circles?

A. Yes. This one with the two tables.

Q. Is the back room separated from the front room by a staircase?

A. Yes. That is the stairwell.

    MR. SKINNER: Your Honor, the government offers

Government Exhibit 33.

    MR. COHEN: No objection.

    THE COURT: If there is no objection, I will take it.

    (Government's Exhibit 33 received in evidence)

    THE COURT: Let me explain to the witness it is not easy to be a witness. You have to listen to the question. You cannot just say what you think you are supposed to say. You have to listen to the words and then think about what those words are and answer those words.

    What is the question?

    MR. SKINNER: Can we put Government Exhibit 33 up to show the jury?

    THE COURT: If you are going to ask the witness questions that will help the jury see what we are talking about.

    MR. SKINNER: That is what we're hoping to do.

    THE COURT: Well you haven't been very successful.

    MR. SKINNER: Well, we just got the chart in. Let's see where it goes from here.

    THE COURT: My purpose is to assist the tryers of fact in hearing the facts.

    MR. SKINNER: Can we turn that chart around?

    THE COURT: You should stand it in the perpendicular fashion.

    MR. SKINNER: We can use this.

    THE COURT: You should really put it with the entrance on the front with front at the bottom. That's it.

BY MR. SKINNER:

Q. Mr. Xiang, can I you ask you to look up at the screen, please. Do you see the diagram that is up on the screen that is marked as Government Exhibit 33, yes or no?

A. Yes. That's the one, yes. With the two tables in the back.

Q. Do you see where I am indicting with the little green dot?

    THE COURT: Try not to lead. Ask what is that.

Q. What is that?

A. That's the dining room.

Q. What part of the dining room is this?

A. That's the entrance going in. That's the side.

Q. What part of the dining room is this right here?

A. The door.

Q. What is right here where the dot is?

A. That's the counter.

Q. What are these right here that I am pointing to now?

A. These are tables.

Q. What is out here on the other side of the dining room?

A. Where you are shining?

Q. Yes.

A. That's the street.

Q. What is back here where I am pointing now?

A. Tables.

Q. Is this the back room?

A. Yes.

Q. What is this right here?

A. That's the stairs.

Q. Now, if you use this pointer and if you push this bottom, can you show us where you went when you first went into the restaurant? You may need to stand up.

A. I walked in here to get to here to buy things.

Q. Is this where you were standing when you said earlier you were going to buy rice?

A. I was standing there and then I saw that the line was very long so then I went in there.

Q. Let's take it one step at a time. You testified a little earlier that after you went to the counter, you saw a man named Guo Li. Can you show us where Guo Li was standing when you first saw him?

A. He was here. He was here and this is the door going in.

Q. Where did you go if you can show us with the pointer after Guo Li gestured to you?

A. I walked into this table. These were three Fuchownese people and they said, "Let's have a drink."

Q. You can put the pointer down, Mr. Xiang.

A. And that person was sitting here. Sitting here. He was sitting here and he wouldn't let me leave and then he picked up

D4G6LIN5          Xiang - direct          Page 534

the telephone.

Q. We're going to take this one step at a time?

THE COURT: We're getting close to the end of the afternoon.

MR. SKINNER: Your Honor, this shouldn't take too long. We'll try. If we don't wrap up, we'll start up again tomorrow morning. I don't think there is much more left.

Q. You can put the pointer down, Mr. Xiang.

After you got into that back room, describe for us what you saw when you got in there?

A. I went into the room, right.

Q. Tell us what you saw.

A. The back room.

Q. Who was in there?

A. There was only that room in the back and when I went inside Guo Li told me to have a drink. I was here.

Q. Were there people in the back room when you got into the back room?

A. Yes. There were people. They were eating there. I don't know these people.

Q. Did you say anything to these people?

A. No. No, I didn't say anything.

Q. Did any of them say anything to you?

A. No. I said have a drink and then I said he looked like a thug and then I didn't eat.

---

D4G6LIN5          Xiang - direct          Page 535

Q. Who did you say he looks like a thug?

THE COURT: Whom did he say it too? Are we having a freestyle speaking?

Whom did you see that you spoke to?

THE WITNESS: I didn't speak to anyone. I went in to have a drink.

THE COURT: How could you say something? I think we're going to adjourn at this point and we'll continue in the morning. I would like to see counsel briefly.

Members of the jury, we will reconvene tomorrow at 10:00 in the morning.

(Jury excused)

(Adjourned to April 17, 2013 at 10:00 a.m.)

---

Page 536

INDEX OF EXAMINATION

Examination of:                              Page

HUO GUANG CHEN

Cross By Mr. Cohen . . . . . . . . . . . . . . . 418

Redirect By Mr. Skinner . . . . . . . . . . . 424

Recross By Mr. Cohen . . . . . . . . . . . . .427.

Redirect By Mr. Skinner . . . . . . . . . . . 432

Recross By Mr. Cohen . . . . . . . . . . . . . 433

QUN LI

Direct By Ms. Burns . . . . . . . . . . . . . 434

Cross By Mr. Cohen . . . . . . . . . . . . . . 459

Redirect By Ms. Burns . . . . . . . . . . . . 498

Recross By Mr. Cohen . . . . . . . . . . . . . 500

ALLEN HUI CHEN

Direct By Mr. Skinner . . . . . . . . . . . . 505

SONG DI XIANG

Direct The Interpreter . . . . . . . . . . . . 523

GOVERNMENT EXHIBITS

Exhibit No.                              Received

  33   . . . . . . . . . . . . . . . . . . . . 531

DEFENDANT EXHIBITS

Exhibit No.                              Received

  A   . . . . . . . . . . . . . . . . . . . . . 432

  B   . . . . . . . . . . . . . . . . . . . . . 486

**In The Matter Of:**

*UNITED STATES OF AMERICA, v*
*XING LIN,*

*April 17, 2013*

*SOUTHERN DISTRICT REPORTERS*
*500 PEARL STREET*
*NEW YORK, NY 10007*
*212 805-0330*

Original File D4HVLINF.txt
**Min-U-Script® with Word Index**

A. 562

D4HVLIN1                                                     Page 537

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

                  v.                    11 CR 114 (MGC)

XING LIN,

                  Defendant.            JURY TRIAL

------------------------------x
                                        New York, N.Y.
                                        April 17, 2013
                                        10:25 a.m.

Before:

            HON. MIRIAM GOLDMAN CEDARBAUM,

                                        District Judge

                      APPEARANCES

PREET BHARARA,
      United States Attorney for the
      Southern District of New York
PETER M. SKINNER
JENNIFER E. BURNS
      Assistant United States Attorneys

JOEL S. COHEN
      Attorney for Defendant

ALSO PRESENT:   BRENDA CHEN, Fuchow Interpreter
                DANIEL YANG, Fuchow Interpreter
                LILY LAU, Fuchow Interpreter
                DANIEL CHAN, Fuchow Interpreter
                JESSICA CHACE, Paralegal
                TIMOTHY VARIAN, Special Agent, HSI
                JIAYING WANG, Legal Assistant

---

D4HVLIN1                                                     Page 538

(Trial resumed)

(In open court; jury not present)

THE COURT: Let's get the jury. This morning the jury is not as prompt as it has been previously.

MR. COHEN: Your Honor, there was a very long security line downstairs.

THE COURT: They don't send the jurors up?

MR. COHEN: I don't know if they do, but if they don't, I'm sure that's the reason, because it took me more than 20 minutes to pass.

THE COURT: Really.

MR. COHEN: Yes.

THE COURT: Okay. Well, let's move forward.

(Jury present)

THE COURT: Good morning, members of the jury. I understand there was a very long security line downstairs. Were any of you held up?

THE JURY: No.

THE COURT: Were you able to come through promptly?

JUROR: Yes.

THE COURT: Good.

We're going to continue with the same witness we started with yesterday.

MR. SKINNER: Thank you, your Honor.

---

D4HVLIN1                                                     Page 539

SONG DI XIANG, resumed.

DIRECT EXAMINATION (continued)

BY MR. SKINNER:

Q. Good morning Mr. Xiang.

Let me direct your attention back to when you first went in that back room in the restaurant on Division Street.

Please describe what you did when you went into that room.

A. When I went in, I just went in and I was at the counter there of the restaurant.

Q. And after you were at the counter, you went into the back room. What did you do then?

A. Guo Li told me to come over.

Q. What happened after that?

A. I had a cup of drink, and I wanted to have drink with those people, but I did not.

Q. When you say "those people," where were those people located?

A. Those people were over there at those two tables over there. And one of the people was sitting inside there, and I said, He looks like a thug.

MR. SKINNER: Can we put up Government Exhibit 33.

Q. And, Mr. Xiang, you have the laser pointer in front of you. Can you use the pointer to show us where the people were sitting?

---

D4HVLIN1                    S. D. Xiang - direct             Page 540

A. People were sitting over there.

Q. And when you said he looks like a thug, did you say that to someone in particular or is that something you just said out loud to yourself?

A. I was talking to myself, and I said, Looks like a thug.

Q. What happened after you said that?

A. I was over there.

MR. COHEN: Your Honor, I'm sorry. Can we have a clarification? Did he say it out loud or is it something that he thought?

THE COURT: That's a good question.

Q. Mr. Xiang, did you speak the words "he looks like a thug" out loud or did you think that to yourself?

A. Yes, I said it, Looks like a thug. And he called people in.

THE COURT: Well, just a moment.

You saw a particular person and you said that person looks like a thug?

THE WITNESS: I just came in and I had a cup of drink, but I didn't drink it. And I said, Looks like a thug.

THE COURT: Whom did you say it to?

THE WITNESS: A lot of people were there. And I said, Looks like a thug. I did not want to have the drink.

THE COURT: You didn't want to have a drink with the people at the table, is that what you say?

THE WITNESS: Did not want to have the drink.

THE COURT: I see. You didn't want to join them for a drink.

THE WITNESS: And then people called in and I got stabbed.

Q. So let's walk back through that in pieces.

THE COURT: Yes, but try not to lead the witness please.

MR. SKINNER: I will do my best, your Honor. Can you just translate what I said?

THE INTERPRETER: Could you repeat?

Q. I just want to walk through that in pieces.
After you said, "He looks like a thug," what happened right after that?

A. I did not have -- want -- I did not want to have a drink with him, so started to argue.

THE COURT: About the drink?

THE WITNESS: Yes. I said, He looks like a thug, and did not want to have drink with him.

Q. And then you started arguing with someone; is that right?

A. And I said, Don't you dare beating me up. This is the United States.

Q. The person that you were talking to at this point, can you describe for us what he looked like?

A. The person I spoke to?

Q. Yes. Was he Chinese?

A. Chinese.

Q. Was he tall or short?

A. Tall.

Q. Did he have long hair or short hair?

A. Pretty long, and I talk about that.

Q. So after this argument, what, if anything, happened after that?

A. After the argument, called the phone, and told people to come in.

Q. And what happened after he said to people "come in" on the phone?

A. As soon as people came in, I got stabbed by knife. This is where I got stabbed at first.

Q. Where on your body were you stabbed? If you could just show the jury.

A. This is the first stab. So I was holding it, and then I was leaning on the wall.

Q. When you say you were holding it, what are you referring to?

A. The second person was trying to stab me, so I was holding onto the knife.

Q. Did that cut your hand?

A. I was holding his hand, and then the tip of the knife made the cut. So I stepped back and then I rolled down.

Q. You can sit down.
The people who stabbed you, do you know who they were?

THE COURT: I thought one person stabbed you.

Q. Let's establish that.
How many people were involved in the stabbing?

THE COURT: That's too vague.

A. Two people were stabbing me.

THE COURT: Who?

THE WITNESS: Two people were stabbing me.

THE COURT: Each person had a separate knife?

THE WITNESS: Yeah, two people were stabbing me using knives.

Q. And they each had their own knife?

A. Yes. After I got stabbed, and then I rolled down.

Q. The two people who stabbed you, where did they come from?

A. They were running in from outside. They did not allow me to leave.

Q. Can you use the laser pointer to show us where in the restaurant you were at the time that you got stabbed?

A. I was over there. And then I fell and rolled down.

Q. When you say you rolled down, you mean you rolled down the stairs that are indicated by those lines on the diagram?

A. Over here. I leaned and then rolled down.

Q. Now, the person that you got in the argument with who used the telephone, prior to that night, had you ever seen that

person before?

A. No.

Q. And have you seen that person since?

A. No.

Q. Do you think you'd recognize that person if you saw him again?

A. Yes, I recognize him.

Q. Let me ask you then to look around the courtroom and tell us if you see that person in the courtroom here today? And you can stand up if you need to.

A. Over there.

Q. Can you describe where the person is sitting and what he's wearing?

A. He's wearing black.

Q. What table is he sitting at, the first table or the second table?

A. Second table.

MR. SKINNER: Can the record reflect that the witness has identified the defendant?

THE COURT: Well, the record can reflect whom he pointed at, but I don't want to call that identification.

MR. SKINNER: In court today, so the record is clear, who he at least gestured at.

THE COURT: Yes, the witness pointed at the defendant. I don't consider -- well, I don't want to get drawn into

whether that was an identification.

MR. SKINNER: We'll put aside the legalities of the word, but the record is clear who he identified.

BY MR. SKINNER:

Q. Now, after you rolled down the stairs -- you can sit down. After you rolled down the stairs --

THE COURT: He hasn't yet said that he rolled down the stairs. He said he rolled. We haven't yet found out whether he actually rolled on down the stairs.

MR. SKINNER: I'm sorry, your Honor, I thought he testified to that a minute ago.

THE COURT: That's what you put in your question; but it's not clear what the answer of the witness was.

Q. Well, what happened to you after you were stabbed, Mr. Xiang?

A. U.S. police came over, and I put up my hands, and then police told me to go to the hospital.

Q. Before the police got there, what happened to you immediately after you were stabbed?

A. I got scared and I pressed my -- I used my hands and pressed over here.

Q. Where were you at that point?

A. After I got stabbed, and then I rolled down there.

Q. You rolled down where?

A. I rolled down the restaurant.

Q. What did you --

THE COURT: All right. Let's move on.

Q. Where did you end up?

A. I rolled down there in the basement. There was a small room.

Q. And after that happened, that's when the police came?

A. Police came to save me.

Q. Did you go to the hospital that night?

A. Yes, I went to the hospital to be rescued.

Q. Mr. Xiang, can you tell us how much education you've had?

A. Up to second grade.

Q. Can you read or write in either the Chinese language or the English language?

A. I forget my Chinese.

Q. So can you read or write?

A. I cannot write, because I was afraid that I didn't have status or I was afraid to talk about him.

MR. COHEN: I don't know what that was in response to.

THE COURT: I don't know either.

MR. SKINNER: We join in the defendant's motion to strike the last statement, by the way.

THE COURT: Very well. The last statement is stricken.

And you remember, members of the jury, what I explained when I strike something. You forget it entirely; you

wipe it out of your minds.

MR. SKINNER: We have no further questions, your Honor.

THE COURT: Very well.

All right. You may cross-examine.

MR. COHEN: Thank you.

CROSS-EXAMINATION

BY MR. COHEN:

Q. Good morning, Mr. Xiang.

You can sit.

Good morning.

I'm going to ask you some questions. If you don't understand the questions I ask you, let me know, and I'll try to put it in a different way, okay? Okay? Sir?

THE COURT: You have to say something for this lady.

A. Yes.

Q. Now, have you and I ever met before?

A. No.

Q. Have we ever had a conversation on the telephone or any other way about what you just testified to?

A. No.

Q. So I think you testified that the restaurant that you went to the night of this incident was on Division Street?

A. Yes.

Q. And had you been to that restaurant before?

A. No, I had not been there before.

Q. That was the first time you ever went to that restaurant?

A. Yes.

Q. And were you working at that time?

A. Worked. Worked.

Q. What were you doing?

A. Different things, including construction.

Q. And on that day had you worked?

A. I worked that day, but I got off work early, and so went there to hang out.

Q. What time did you get off work?

A. I was doing part-time work on that day. Around 3 to 4 o'clock. Around a little past 5.

Q. Well, was it 3, 4, was it a little past 5? Can you be a little specific about what time you got off work.

A. Around 5 o'clock.

Q. Okay. And I think you've testified that the incident at the restaurant happened and that you had gotten there between 9 and 10 o'clock at night; correct?

A. Between 9 and 10. Past 9 o'clock.

Q. Okay. So what did you do from the time that you left work until the time that you went to the restaurant?

A. I did not really do anything. I was just hanging out, hanging out over there.

Q. Well, if you left work at 5, and you got to the restaurant

A. 565

at 9, where were you during the four hours in between the time you left work and the time you got to the restaurant?

A. I did not really do anything; I just changed my clothes.

Q. Did you go home?

THE COURT: Where did you do that?

THE WITNESS: In my own apartment.

Q. And did you walk to your apartment?

A. Yes, I went in and changed.

Q. And did you stay at your apartment until the time that you went to the restaurant on Division Street?

A. No, I went out. I went out there to hang out.

Q. Where did you go to hang out?

A. Somewhere nearby.

Q. Where?

A. Market Street.

Q. What kind of place on Market Street did you go to hang out in?

A. Just were there, try to get fresh air at the corner of Market Street.

Q. So did you just stand on the corner or did you go into a club or an association? What did you do?

A. No, no.

Q. So you just stayed out on the street?

A. I was over there, and for a while. And this was a gambling parlor over there. I went in for a very short time, and I came

out.

Q. Okay. Did you have any alcoholic beverages to drink between -- before you arrived at the restaurant on Division Street?

A. I had a drink, and I was hungry at that time.

Q. How many drinks did you have?

A. I had two bottles of Lobo.

THE COURT: What is that?

Q. Is that beer?

A. It looks like a beer.

Q. Okay. Where did you have the two bottles of beer?

A. On Market Street. And then after that I went to go over there to buy rice.

Q. Now, do you know a person by the name of Ah Chu or Jack Chu?

A. Yes, Jack Chu I know.

Q. And who is Jack Chu?

A. I don't know. He was there gambling.

Q. Sir, sir, sir --

A. And he was there sometimes hanging out.

Q. Who is Jack Chu?

A. Jack Chu owned a gambling parlor.

Q. And he's a dailo; correct?

A. People called him dailo.

Q. People call him dailo because he is a dailo; correct?

A. I don't know whether he was dailo. I was just there hanging out. People over there said that I was following him and to hang out with him, but I did not.

Q. So you're telling the jury that people thought that you were a follower of Jack Chu, but, in fact, you were not a follower of Jack Chu?

A. I was not. I believe in myself. I would just hang out very often around that place.

Q. And around Mr. Chu?

A. Yes. I did not care what other people said and didn't bother me.

Q. It didn't bother you that people thought you were a follower of Jack Chu; correct?

A. Yeah, following him, but I did not.

Q. Was he a friend of yours?

A. No.

Q. But you spent a lot of time with him?

A. No.

Q. Well, when you got to the restaurant on Division Street, was Mr. Chu there?

A. Didn't see him.

Q. Did you see any of his other -- any of his followers?

A. I did not see.

Q. Do you know who his followers were; correct?

A. I did not know.

Q. So you didn't know who any of his followers were?

A. Did not know.

Q. What was the name of the restaurant that you were at?

A. Did not know the name.

Q. Do you know the address?

A. Just went to this place where I was trying to buy rice.

Q. This place that you'd never been to before.

A. Never been there before.

Q. Did you know the name of the place?

A. Did not know.

Q. You knew somebody by the name of Guo Li; correct?

A. Yes.

Q. And Guo Li, I think you said, was a barber; he cut your hair?

A. Yes.

Q. And when you got to the restaurant on Division Street, you saw Mr. Guo Li there, is that right, sir?

A. Yes.

Q. And what was it that Mr. Li said to you?

A. Just did not really say anything; just that let's have a drink, let's have a drink.

Q. Okay. And what did you do?

A. I said have a drink. I was supposed to have a drink.

Q. I'm sorry?

THE INTERPRETER: I was supposed to have a drink.

Q. You were supposed to have a drink?

A. And looks like a thug. Started drinking.

Q. Now, you knew people in Chinatown that looked like thugs; correct?

A. Yes.

Q. Did Mr. Chu look like a thug?

A. Mr. Chu?

Q. Mm-hmm.

A. I did not see him that night.

Q. I didn't ask you that, sir. I asked you whether when you saw him, he was somebody you would think looked like a thug.

A. Looked like one, but people always called him dailo.

Q. But you didn't avoid contact with Mr. Chu, even though he looked like a thug, did you?

A. He was in a gambling parlor. I did not really feel that he was a thug, but he was always there in the parlor.

Q. Didn't you just tell us a moment ago that you thought Mr. Chu looked like a thug?

A. No, he -- he was not a thug.

Q. Did you tell us a moment ago, sir, that Mr. Chu looked like a thug?

A. Jack Chu, are you talking about Jack Chu?

Q. That's who we're talking about.

A. He had a gambling parlor. And he was there, and people went in.

Q. Now, did you ever see Jack Chu with a gun?

A. No.

Q. Did you ever see any of his followers with guns?

A. Did not see.

Q. On the night that you had this incident on Division Street, did you hear any gunshots?

A. No, I fell down. I rolled down there.

Q. And at no time during that evening did you hear gunshots in that place?

A. No, I rolled down there and I got scared.

Q. You've heard gunshots before, haven't you?

A. No.

Q. In your lifetime you've never heard a gunshot?

A. No.

Q. Were you interviewed by the police after this incident?

A. No, no. No, not when I left the hospital.

Q. At any time, sir, did the police come to interview -- to visit you either at the hospital or elsewhere and ask you questions about what happened at the restaurant on Division Street?

A. No.

Q. Do you know a detective by the name of Ming Li?

A. I don't know. I don't know who he is.

Q. Well, what hospital were you taken to, do you know?

A. Midtown Hospital.

Q. Were you kept there for a couple days? Did they just treat you and release you? What happened?

A. Yes, they told me to leave the hospital after two to three days.

Q. So you stayed in the hospital for two or three days?

A. Yes.

Q. And while you were at the hospital, you're telling the jury that no police officer came to speak with you?

A. Police came.

Q. Okay. Did you speak to the police?

A. No, I did not really say anything.

Q. Well, did they ask you questions about what happened?

A. No, just that someone looked like a reporter went there.

MR. COHEN: Say again?

THE INTERPRETER: Someone who looked like a reporter was there.

Q. Well, didn't you just tell the jury a second ago that the police came to the hospital?

A. Police came to the hospital.

Q. And when they came to the hospital, they came to see you; correct?

A. Yes, came to see me, to ask me questions.

Q. And when they came to speak to you and ask you questions, did they either have a translator with them or did one of the detectives speak Chinese?

A. Speaking Chinese?

Q. Yes, sir.

THE COURT: Did the police speak Chinese?

MR. COHEN: Yes.

THE WITNESS: No, did not speak Chinese.

THE COURT: Who spoke Chinese?

THE WITNESS: This person who looked like a reporter or has something to do with a newspaper came in.

BY MR. COHEN:

Q. Did you speak to that person?

A. I spoke to him or her for a while, and this, that.

Q. Did you ever work at Jack Chu's gambling parlor?

A. Yes.

Q. What did you do?

A. I was working over there, and also gambled.

Q. And when you say you worked there, what did you do?

A. Didn't really do anything. Just cleaning.

Q. How long was it, do you think, from the time that you were injured until an ambulance came to take you away?

A. When I was working at Jack Chu's?

Q. No, sir. When you were stabbed on Division Street, how long was it from the time that you got stabbed until the ambulance came to take you away?

A. When I went to work at his place, I did not work there. I was beaten up. I just went home.

Q. Mr. Xiang, try to listen to the question I'm asking. And if you don't understand it, please tell me.

You've told the jury that you went to buy rice on Division Street. Did you have an argument with somebody there?

A. Just went into the restaurant to try to buy the rice.

Q. And then you went to the back room; correct?

A. In the back, as soon as I entered the -- walk into the door, there's a table.

Q. And you sat down at a table, right?

A. I did not sit down, because I wanted to have a drink, just like that.

Q. And you never sat down at the table?

A. No. People stood up, and some of them already left.

Q. Who are the people that left?

A. I do not know who were those people. They just left. What I meant was, looks like a thug, just don't want to have a drink.

Q. Did you say to somebody, You look like a thug, I don't want to have a drink with you?

A. No. No, I just said to myself.

Q. You thought that to yourself or you said it out loud so that people could hear you?

A. No. I just said it to myself as I usually did. Look like a thug; don't want to have a drink.

Q. What I'm asking you, sir, what I'm asking you is did you

say out loud, with words, He looks like a thug, or did you just think to yourself, Gee, that guy looks like a thug; I don't want to drink with him. Which was it?

A. Looked very fierce, and I just didn't want to have a drink. Then started scolding or cursing with each other. And I said, This is the United States.

Q. What was the first thing -- withdrawn.

So you never said out loud to anybody, You look like a thug, or he looks like a thug; correct?

A. I did not really say it very loud. I just said, Look like a thug.

Q. Did you say it at all? Did you say words like I'm saying words now, or did you think it just in your head?

A. I did say it. I did.

(Continued on next page)

BY MR. COHEN:

Q. You did say it?

A. I said this person looks very -- this person looks fierce and I do not want to have a drink.

Q. Which did you say? Did you say that he looked fierce or did you say that he looks like a thug?

A. Fierce and looks like a thug.

Q. So now you say you said both?

A. No, not both. I said he looked like a thug. I did not want to have a drink with him. As soon as I said that, he called and people came in.

Q. Who did you say that to?

MR. SKINNER: Your Honor, asked and answered.

THE COURT: It has not been answered yet.

A. And I said this is the United States. So he called outside and said, Come in. Stab.

Q. Who did you say he looks like a thug to?

A. It was drinking over here and he was in there and I said I did not want to have a drink with him.

Q. Who invited you to have a drink?

A. Guo Li. Guo Li said, Come in and have a drink.

Q. Where was Guo Li when he invited you in for a drink?

A. He was in there.

Q. In the back room?

A. Yes. And I was here.

Q. And did you go into the back room?

A. I went inside and I was at the table that was by the entrance.

Q. How many people were in the room when you went in there?

A. There were more than 10 people inside.

Q. Did you know any of them besides Guo Li?

A. No.

Q. What were the words that Guo Li used when he invited you in for a drink?

A. He didn't say much. He just said, Come in. Come in. Come inside.

Q. Then what did you say?

A. I said, It is okay. I said, I am very hungry. I want to buy some rice. Then he said, Just come in. And I was holding a glass of alcohol and as a Fuchowese person, I greet other people.

Q. What is that? As a Fuchowese people you?

A. I greet other people.

Q. Okay. You drink with other people too; correct?

A. They didn't really drink because people were starting to get up to leave. Some people went outside already.

Q. What did you do with the glass that you were holding?

A. I was holding a glass and I said, Oh, everyone, let's have a drink.

Q. I am sorry?

A. Everyone, let's have a drink.

Q. So you invited the whole room to have a drink with you?

A. I was standing by the door and I said, Oh, everybody, let's have a drink.

Q. So when you say "everybody," are you saying that you invited everyone in the room to have a drink with you?

A. I asked them to have a drink, but when I went inside the room, some people were getting up and some people had went outside already.

Q. You were drunk when that incident happened, weren't you?

A. I had some to drink myself.

Q. I understand that. But you were drunk when that incident happened, weren't you?

A. I was not drunk.

Q. You were feeling perfectly normal?

A. I was pretty normal. I would drink and then go home.

Q. Isn't it so, sir, that what happened when you were inviting people in the room to drink with you, somebody said that they didn't want to drink with you and you slammed a glass down on the table in front of them?

A. No.

Q. Isn't it true, sir, that that person smacked you in the face?

A. No. No.

Q. Isn't it true that one of Jack Chu's followers then took

out a gun and shot that person?

THE INTERPRETER: Can you repeat that question?

Q. Isn't it true one of the Jack Chu's followers in the restaurant took out a gun and shot that person?

A. I don't know any of that.

Q. You didn't see somebody get shot?

A. No.

Q. You didn't hear gunshots in that establishment at that time?

A. No.

Q. No gunshots?

A. No. I was --

MR. COHEN: There is no question before the witness, your Honor.

THE COURT: Very well.

Q. By the way do you have legal status in the United States?

A. I do not have any legal status.

Q. Did you apply for asylum or ever try to adjust your status here so you could be legal?

A. No. I went to court before.

Q. When you went to court before was that because you were asking the government for asylum or because they wanted to deport you?

A. No deportation. After I was bonded out with over $10,000, then I've always gone to court with the attorney.

Q. What year did you come into the United States?

A. I came to the U.S. in '93, '94.

Q. 19 to 20 years ago?

A. I have been going to each and every one of the court dates.

Q. When was the last time that you went to court?

A. I cannot remember the last time I went to court. It was a long time ago.

Q. Was it, say, within the last 10 years?

A. More than 10 years ago.

Q. And at some point the last time you went to court, weren't you told that you were not going to get status in the United States?

A. I went to court, but I did not win and I always go to court.

Q. But when you didn't win, did you understand that to mean that the United States was not going to allow you to stay here?

A. I say because I did not do anything illegal here. I don't have any ID or anything.

Q. When you say you didn't do anything illegal here, did you enter the country legally or illegally?

A. I came in and then after I came in I was bonded out.

Q. When you say you were bonded out, do you mean you were bounded out of immigration custody?

A. Yes.

Q. Were you in immigration custody because you were arrested

for coming into the country illegally?

A. But after I came in every time I was told to go to court, I went to court.

MR. COHEN: Move to strike it. It is not responsive and I am going to ask the question again.

May it be stricken, Judge?

THE COURT: Very well. The answer is stricken and you should say it even more slowly.

MR. COHEN: I will.

Q. Is it true, sir, that the reason you were in immigration custody was because you entered the country illegally and you were arrested?

A. No. When I came in, I was in jail and I was bonded out.

Q. Why were you in jail?

A. Because I was smuggled in and everyone gets bonded out.

Q. When you say you were smuggled in, you mean smuggled illegally from China to the United States?

A. When I was smuggled in back then I was locked up and also beaten up.

Q. Were you locked up because you were smuggled illegally from China into the United States?

A. No. I was smuggled in from China on a ship.

Q. Was that legal or illegal?

A. That is illegal. That is illegal and a whole group of people got arrested.

Q. How did you know that you had to come to court to testify in this trial?

A. Come here to testify?

Q. Yes.

A. To come in here to testify?

Q. Yes.

A. Because I was beaten up.

Q. Sir, there is no question.

You testified that sometime before today you met with the prosecutors in this case; correct?

A. Yes. I met with the attorneys and judge.

Q. And who?

A. Judge.

Q. You met with the judge?

A. No. Just by coming in here this time.

Q. When you say you met with the attorney, do you mean one of the people at this table?

A. No. I didn't see them.

Q. Well, did you ever meet with this gentleman before?

A. This man, yes.

Q. And this lady?

A. Yes. The first row. The first row.

Q. That was back in January that you met with them?

A. January?

Q. When was it?

A. Just this time.

Q. You didn't meet with them back in January?

A. January, no.

Q. Three months ago?

A. Yes. I met with this row of people.

Q. On January 28th of 2013?

A. I do not remember clearly, but I met with these judges.

Q. When you say the judges, do you mean the prosecutors?

A. The prosecutors on the first row.

Q. And I know you met with them in the last couple days, but did you also meet with them a few months ago?

A. No. I did not meet them a few months ago.

Q. When was the first time you ever met with them?

A. I don't remember whether it was in March or in February. I don't remember that clearly, but it was in the last month or so.

Q. Sometime earlier than within the last couple days, you did have a meeting with them; right?

A. Yes. In the last two, three months.

Q. How was that meeting arranged?

A. What do you mean how was it arranged?

Q. Well, did they invite you to the meeting? Did somebody ask you to go to the meeting? How was it that you came to wind up in their office a few months ago?

A. No. When I went into for the meeting, the federal police

asked me to go in to help with the investigation.

Q. Where did the federal police come to find you?

A. I was at Yi Dong Plaza.

Q. And did you expect them to meet you there? Did you arrange to meet them there? Was it unexpected?

A. No. I did not know. I didn't know any of that. I didn't know and I was called to come in and then I met with these people.

Q. Do you work for a bus company now?

THE INTERPRETER: I am sorry, your Honor. I just want to clarify something.

A. Not a bus company, but a small mini bus company. I would stand on the side and help people, you know, get the car, with their luggages.

Q. And have you worked for other bus companies in the past?

A. No. Never.

Q. What is the name of the bus company that you work for?

A. It is called Chang Jian Company Long River, but it is a combinations of three companies together and it is the same thing and I just help out by calling the vehicle over because these vehicles are waiting on line.

Q. So you are like a dispatcher for the company?

A. Yes. The three company are combined together to wait on line.

Q. Is this in Manhattan, Brooklyn or Flushing?

A. It goes to Brooklyn.

Q. From Chinatown in Manhattan?

A. Yes. From Chinatown to Brooklyn.

Q. How long have you worked for the company?

A. I worked there for over one year. One to two years.

Q. Who owns it?

A. It's three companies together, Chang Jian.

Q. What are the other companies?

A. One is called Hong Kong. The other one is Hua Tung.

Q. Do you know who owns those companies?

A. It's a private and everyone gets -- waits on line. Each company has a dispatcher standing there helping people load their luggages.

Q. Do you know who owns the company?

A. I don't really know. I was just hired to do this.

Q. Do you know someone named Dan Jian?

A. Dan Jian, no. Dan Jian?

Q. Yes.

A. Dan Jian is from the other bus. He and I don't have any -- he does the big bus.

Q. You know who he is; correct?

A. I know that he does buses out there, the big buses.

Q. You know who he is; correct?

A. Yes. I know him. I heard about him. There are a lot of people in Chinatown that knows him.

Q. Do people know that he works for the government.

A. I don't know. I heard that he helps the government.

MR. COHEN: I have no further questions, your Honor.

THE COURT: Very well. I take it there is no redirect; is that correct?

MR. SKINNER: I am thinking real slowly, your Honor.

THE COURT: Actually, this is a good time to take the midmorning recess. We'll take a 10-minute recess.

MR. SKINNER: Thank you your Honor.

(Jury excused)

THE COURT: Very well. We'll all take a 10-minute recess.

(Recess)

(In open court; jury present)

THE COURT: Please be seated.

You may proceed.

MR. SKINNER: Thank you, your Honor. We have some very brief redirect.

THE COURT: Very well.

REDIRECT EXAMINATION

BY MR. SKINNER:

Q. When you had met with me in the past, has Dong Jain told you where and when to meet me?

A. No.

MR. SKINNER: Nothing further, your Honor.

THE COURT: Very well.

MR. COHEN: No further questions, your Honor.

THE COURT: You may step down.

(Witness excused)

THE COURT: Who is your next witness? We have another witness who hasn't been cross-examined.

MR. SKINNER: We do. Mr. Allen Chen. We're going to bring him back for cross-examination. But before he takes the stand, we ask to read some stipulations into the record.

THE COURT: Very well.

MR. SKINNER: I am reading from the stipulation that has been mark as Government Exhibit 110.

It has been stipulated and agreed between the parties that if called as a witness Ming Li would testify as follows: In November 2003 I was a detective employed by the New York City Police Department. I am presently retired from the New York City Police Department. On November 14th, 2003, I responded to a call concerning a shooting and stabbing that took place at a restaurant located at 31 Division Street, New York, New York. At approximately 9:00 p.m. I interviewed the shooting victim, Xing Lin at the hospital. Mr. Lin had been shot in the right leg while at 31 Division Street earlier that evening.

Government Exhibit 34 is a report that I wrote after interviewing Xing Lin that memorializes what Xing Lin told me

on November 14th, 2003. Although both were interviewed by the police, neither the shooting victim nor the stabbing victim were arrested in connection with the incident after 31 Division Street on November 3014, 2003.

The government would now offer Exhibits 110 and 34.

THE COURT: I take it this is by agreement?

MR. COHEN: It is by agreement, your Honor. I would ask that the police report that is now received in evidence also be read as part of the stipulation.

MR. SKINNER: That is what I intended to do.

THE COURT: That is received in evidence. What is the number of that?

MR. SKINNER: 34, and the testimonial stipulation was 110.

THE COURT: Thank you. Government Exhibit 110 and 34 are received in evidence.

(Government's Exhibits 110 and 34 received in evidence)

MR. SKINNER: I would like to read to the jury one paragraph of paragraph 34 that is the report in reference to 110.

On November 14th, 2003 at 2100 hours the undersigned along with FBI Special Agent Ray Yuen went to Bellevue Hospital to reinterview the victim at bedside. The victim Xing Lin states during late last night he and his friend went over to 31

Division Street to have a dinner with some close associates. Mr. Lin admitted he had a dispute with the stabbing victim, a photo was shown to him during the first interview over an ego matter. Mr. Lin claims that he then saw a friend of the victim pull out a black automatic handgun and fire one shot at the ceiling. Immediately he started running out of the room. Suddenly, he feels a burning sensation on his right leg. The next thing he noticed an undercover police officer came running into the restaurant and said, Police. Mr. Lin denied stabbing the victim. However, he admitted he was face-to-face with the stabbing victim when the dispute occurred. The undersigned left a business card behind and advised the victim when he was discharged from the hospital he should come into the precinct and review photos and do canvasses.

Your Honor, we have one other stipulation to read. Government Exhibit 107. It is stipulated and agreed by and among the parties that Government Exhibit 31 contains two deformed bullets that were found on November 14th, 2003, by the New York City Police Department at the scene of the shooting that occurred at a restaurant located at 31 Division Street, New York, New York. The bullets were found on the floor at the scene of the shooting.

Government Exhibit 32 contains one deformed bullet that was found under November 14th, 2003 by the New York City Police Department at the scene of the shooting that occurred at

a restaurant located at 31 Division Street, New York, New York. The bullet was found lodged in the ceiling at the scene of the shooting. It is further stipulated and agreed that this Stipulation, Government Exhibits 31 and 32 will be received in evidence at trial.

The government offers 107, 31 and 32.

THE COURT: Those are by agreement?

MR. COHEN: By agreement, your Honor.

THE COURT: Government Exhibit 107, 31 and 32 are received in evidence.

(Government's Exhibits 107, 31, 32 received in evidence)

MR. SKINNER: At this time we would recall Allen Chen for purposes of cross-examination.

THE COURT: Very well.

Mr. Chin, you remain under, the same oath that you took yesterday to tell the truth, the whole truth, and nothing but the truth.

THE WITNESS: Yes.

THE COURT: Very well. You may be seated. If you pull your chair forward, you will be more comfortable. So you can speak into the microphone without straining.

You may proceed.

MR. COHEN: Thank you, your Honor.

RECROSS EXAMINATION

BY MR. COHEN:

Q. Mr. Chen, good morning.

When did you first immigrate from China to Canada?

A. 2004.

Q. Did you legally enter Canada?

A. Yes.

Q. How?

A. My ex-wife.

THE COURT: If you could speak a little more loudly, it would be good.

A. My voice is a little horse.

THE COURT: I see.

MR. COHEN: Is that the interpreter speaking or the witness speaking?

THE COURT: The witness.

A. My ex-wife applied for me.

Q. Applied for you to be able to immigrate?

A. Yes.

THE COURT: Was she a citizen of Canada?

THE WITNESS: She emigrated there and it was after she applied for me and I went in before we got a divorce.

THE COURT: But what I asked is was she a Canadian citizen at the time?

THE WITNESS: No. She immigrated and she didn't become a citizen until '07.

THE COURT: I see. So it was not the fact that you were married to her that played any role in your becoming a citizen; is that right?

THE WITNESS: No.

THE COURT: Very well.

BY MR. COHEN:

Q. Do you know whether she emigrated legally to Canada?

A. We got married in China. That was before.

Q. Sir, please listen to the question and try to answer that question. I will ask you it again.

Do you know whether she legally immigrated from China to Canada?

A. She went there and I believe she applied as a refugee.

Q. Was she smuggled into Canada, sir?

A. She went there as a visitor.

Q. Did she overstay?

A. No. She just applied as a refugee.

Q. When you first arrived in Canada, what did you do for a living?

A. I went to school. I studied ESL.

Q. And you speak some English?

A. I speak a little.

Q. And eventually did you begin to work while in Canada?

A. Yes.

Q. What did you do?

A. I made deliveries before.

Q. For a restaurant?

A. At a company delivering noodles.

Q. I think you testified that eventually you became involved in a gambling parlor?

A. It was an association.

Q. When you say an association, do you mean a group that was put together by people from the same village or for the same area in China to socialize together?

A. Yes.

Q. And did the association have a name?

A. Yes. Fu Chang.

THE COURT: How do you spell that?

THE INTERPRETER: F-u-c-h-a-n-g.

Q. Is that in the village that you are from, Fuchang?

A. No. That was sort of an abbreviated name that we came up with to make the application.

Q. Who is the village that you are from?

A. Chang Le.

Q. Is that a village or is that a county?

A. It's a city.

Q. Now, the first gambling parlor that you opened, who did you open it with?

A. With three, four other people.

Q. Were you each equal shareholders?

| D4h6lin | Chen - cross | Page 577 |
|---|---|---|

A. Yes.

Q. And I think you testified that had been in 2007; correct?

A. Yes.

Q. Now, in 2010 you opened another gambling parlor; correct?

A. Yes.

Q. Was this with the same group of people?

A. There were one or two people that were different.

Q. How many people altogether opened the parlor?

A. About four.

Q. Was everybody an equal shareholder?

A. Yes.

Q. How did the gambling parlor make money? How did the owners make money?

A. I did not hear you clearly.

Q. I am sorry?

THE COURT: He didn't understand.

Q. You said that you earned some money if the gambling parlor. You were paid a salary?

A. Yes.

(Continued on next page)

| D4HVLIN3 | A. Chen - cross | Page 578 |
|---|---|---|

Q. Where did the money come from to pay your salary?

A. The card players were paid some money, some commission. These are all people from the same village. They would pay money for the expenses.

Q. And what was the commission that the house collected on the money that was bet?

A. It's up to those people. These were people that had nothing to do after they got off from work.

Q. So they would decide themselves how much commission they have to pay?

A. Yes.

Q. Didn't the house have a standard commission that it charged people that bet money?

A. Yes, but it's an association for people from the same village to hang out.

Q. But aren't most gambling parlors in Chinatown based around village associations?

A. Usually, yes.

Q. And doesn't each village association at their gambling parlor charge standard commission of about five percent?

A. No, that's not it.

Q. Well, you tell me what was the -- is there a standard commission that's generally charged by gambling parlors?

A. Mine was not. Mine was an association. People go in to play cards. It's almost like a form of donation.

| D4HVLIN3 | A. Chen - cross | Page 579 |
|---|---|---|

Q. Was there a standard donation that people would make?

A. That's left up to them. We don't rely on that. We set this up for people to come in. Some people come in and play chess. It's not necessary that they will come in and play cards.

Q. So it was a chess club?

A. What?

Q. Was it a chess club?

A. No, they play Chinese chess.

Q. And that's a game that's often played for money; correct?

A. No, that's for entertainment.

THE COURT: No gambling for chess?

THE WITNESS: No.

Q. Well, you referred to the establishment yesterday as a gambling parlor; correct?

A. I said an association.

Q. At any time yesterday during your testimony, did you say that in 2007 and again in 2010 you opened gambling parlors?

A. I've always said "association."

Q. You did use the word "association" yesterday; correct?

A. Yes.

Q. Did you also use the word "gambling parlor" yesterday?

A. I did not use "gambling parlor."

Q. Do you remember, sir, being asked this question -- or these series of questions, and giving these answers? And I'm reading

| D4HVLIN3 | A. Chen - cross | Page 580 |
|---|---|---|

from Page 508 of the trial transcript. I'm going to read you some questions and answers, and then I'm going to ask you whether you recall giving this testimony.

Question, Line 7, Page 508: "Now, Mr. Chen, during the time that you lived in Canada, did you ever run a gambling parlor?

"A. Yes."

THE INTERPRETER: Can you repeat that?

Q. (Reading)

"Q. Now, Mr. Chen, during the time that you lived in Canada, did you ever run a gambling parlor?

"A. Yes."

Do you remember yesterday being asked that question and giving that answer?

Sir, it's a yes or a no. Do you remember being asked that question and giving that answer?

A. That's what I answer, yes.

Q. Okay. And do you remember being asked this question and giving this answer, Line 10, same page:

"How many gambling parlors did you run?

"A. I said one in '07."

"Q. And how many others did you have?

"A. That one was closed, and then I opened another one July 2010."

Do you remember being asked those questions and giving

those answers?

THE INTERPRETER: I'm sorry, can I see the --

MR. COHEN: I'm sorry.

THE COURT: Yes, it will be much easier for the interpreter if she could actually read the question.

MR. COHEN: Absolutely.

THE INTERPRETER: Thank you.

A. Yes.

Q. You were asked those questions and you did give those answers?

A. Yes.

Q. Do you remember being asked this question and giving this answer, Lines 18 to 20:

"Q. So you had other sources of income in addition to the gambling parlor?

"A. Yes."

A. Yes.

Q. You indicated that there came a time that you were in a club and you were assaulted by other people. Do you remember that?

A. Yes.

Q. And you told the jury that you got about 45 stitches?

MR. SKINNER: Objection, your Honor.

THE COURT: Overruled.

Q. Did you tell the jury you got about 45 stitches?

A. No, I said four to five stitches.

MR. COHEN: May I have a moment to speak with Mr. Skinner?

(Pause)

MR. COHEN: There appears to be a typo, your Honor.

THE COURT: Very well.

MR. COHEN: And we'll move on.

Q. So it was actually about four stitches or five stitches that you had; correct?

A. Yes.

Q. Now, what was the club where this occurred?

THE INTERPRETER: I'm sorry?

MR. COHEN: What was the name of the club where this occurred?

A. The name in English is Government.

Q. Government.

Is it a club that's generally frequented by Chinese immigrants?

A. No, it's one of the biggest in Toronto, and a lot of people go there.

Q. It's a well-known club; correct?

A. Yes, dancing.

Q. And do you go there often?

A. No, they open only once a week on Saturday.

Q. Do you go there frequently on Saturdays?

A. No.

Q. Do you use drugs, sir?

A. No.

Q. You've never used ecstasy?

A. No.

Q. You've ever used ketamine?

A. No.

Q. You've never used methamphetamine?

THE INTERPRETER: Interpreter has difficulty with the term.

MR. COHEN: Crystal meth.

THE INTERPRETER: Crystal?

MR. COHEN: Crystal meth.

THE INTERPRETER: May I have a minute with fellow interpreters?

THE COURT: It may not have a different name in Chinese if it's a standard name, a trade name.

A. No.

Q. Isn't it true, sir, that businesses, your association or your gambling parlors fell off because people didn't want to be around you because of your drug use?

A. I do not understand.

Q. Isn't it true that you lost business at your clubs because people didn't want to be around you because you were known to be a drug user?

A. No, no such thing.

Q. How much was your basic salary at the second gambling parlor?

A. Salary, around 1500.

Q. $1500 a month?

A. Yes.

Q. Or a week?

A. Per month.

Q. And I think you said you had a business in China also.

A. Yes.

Q. What business was that?

A. Steel factory. It's a family business.

Q. You and your family own a steel factory in China?

A. Yes. I invested it.

THE COURT: You mean you started it?

THE WITNESS: Just my family is in China; they put capitals together.

Q. Is your family in China wealthy?

A. Average.

Q. Well, average in China is generally pretty poor, isn't it?

A. Just that we had money.

Q. More money than the average Chinese citizen?

A. Yes.

Q. Now, you testified that you made arrangements or arrangements were made for you to meet with the government

through a cousin of yours?

A. Yes.

Q. And when you say "cousin," this is an actual member of your family, not just a fellow villager; correct?

A. Not really. Just cousins. Not very close.

Q. Well, do you and this cousin have the same grandparents?

A. No.

Q. How are you related to this man?

A. My cousin's cousin.

Q. Your cousin's cousin.

A. Yes.

Q. Do you remember yesterday being asked this question with respect to your cousin, and giving this answer -- or these answers.

I haven't asked you a question.

A. In China --

Q. I haven't asked you a question, sir.

Remember being asked these questions and giving these answers.

A. Yes.

Q. Question, Page 506, Line 19: "When you say he's your cousin, do you mean you're part of the same family? "A. Yes, he is my paternal aunt's -- "

THE COURT: Wait, wait.

MR. COHEN: I'm sorry. We'll do it right here, and

I'll read it.

Q. (Reading)

"Q. When you say he's your cousin, do you mean you're part of the same family?

"A. Yes, he is my paternal aunt's son."

Do you remember, sir, that I asked you that -- that the government asked you that --

A. Yes.

Q. -- question, and you gave that answer?

A. Yes.

Q. And what's this cousin's name?

A. Cash Chin.

Q. Is he also known as Dan Jian?

A. Yes.

Q. And how was it you came to speak to Dan Jian about you coming to the United States to testify in this case?

A. Last year I came here to visit.

Q. And did you visit with Dan Jian?

A. Yes, we ate together.

Q. And not going into what was said, did you have a conversation with Dan Jian about the things that you've testified to?

A. No.

Q. So you went to eat. Was that the only time you saw him? Was that the only time you saw him during your visit to New

York?

A. No, I came here to visit on Christmas of 2011.

Q. When was the first time you had a conversation with him about you being a witness at this trial?

A. It was last year.

Q. When last year?

A. Last year in 2012, around November or December, but I do not exactly remember the time.

Q. But somehow during the course of this conversation, arrangements were made so that you would meet with the prosecutors; correct?

A. Yes.

Q. Now, did you learn that among other things, Mr. Lin is charged with a murder?

A. About this, I heard about this in Canada.

Q. Did you know, sir -- and I'm not asking you to go into details. Did you know that Mr. Lin was charged with murder?

A. Did not know.

Q. Didn't you just say you heard about it in Canada?

A. I wasn't sure. I only heard it from other people.

Q. Did you hear that a person was killed, someone called Yiqun?

A. Did not know. It has nothing to do with me. I will not go out of my way to hear that.

Q. Without going out of your way to hear it, was Yiqun

somebody that you knew?

A. I do not know.

Q. You did not know this person?

A. No.

Q. But did your cousin, Dan Jian, ask you if you would be willing to come to the United States and testify in this trial?

A. Yes.

Q. And who paid for you to come from Canada to the United States?

A. The government paid for it.

Q. The United States government?

A. Yes.

Q. Now, apart from the incidents that you've described yesterday at your gambling parlor and at this nightclub, were there other times that you saw Mr. Lin in Canada?

A. I usually, when I go out to eat, would run into him, once or twice.

Q. And did you know him to be somebody who drank too much?

THE INTERPRETER: Somebody who drank too much?

MR. COHEN: Drank too much.

A. I did not know about that.

Q. Did you know him to be somebody who frequently got into fights with people?

A. I didn't see it, but I did hear about it.

Q. You never saw him get into a fight with other people?

A. No.

MR. COHEN: May I approach the witness, Judge?

THE COURT: Very well.

MR. COHEN: This is 3536. And it's the fourth page. It's not numbered.

Q. Let me show you a document. I'm going to ask the interpreter to read you a portion of it, translate it into Chinese, and ask if it refreshes your recollection.

Does that refresh your recollection, sir, that when you met with the government, that you told them that you saw Ding Pa get into fights many times? That's a yes or a no.

A. Yes, I forgot about that.

Q. Sir --

A. And I just say I did not have that much sleep.

Q. So what is it you forgot about? You forgot about the fact that you saw him get into many fights, and today you said you just heard about it, or did you forget about this was the story you told the government and it's different from the story you told the jury?

A. About the fight, that seeing him, the fights.

Q. So just now when you said you hadn't seen it, you only heard about it, that wasn't quite accurate, was it?

A. From last night until now, I had -- I've had only two hours of sleep. And I was always on the phone between here and China. It's been like that for a few days, and I am very

tired.

Q. So it's because you're tired that your testimony was not consistent with the story that you've told the government; is that correct?

A. I have forgotten a little bit.

MR. COHEN: Done, Judge. I'm finished.

THE COURT: Oh, very well.

All right. I take it there's no redirect.

MR. SKINNER: No, your Honor. Thank you.

THE COURT: Very well. You may step down.

(Witness excused)

THE COURT: Who's next?

MS. BURNS: Your Honor, the government calls Shun Qing Chen.

SHUN QING CHEN,
    called as a witness by the Government,
    having been duly sworn, testified as follows:

THE DEPUTY CLERK: Please be seated.

Please state your name for the record and spell your last name slowly.

THE WITNESS: My last name is C-H-E-N.

THE COURT: What is your first name?

THE WITNESS: Chen Shun Qing. C-H-E-N is the last name, S-H-U-N, Q-I-N-G.

THE COURT: You may proceed.

MS. BURNS: Thank you, your Honor.

DIRECT EXAMINATION

BY MS. BURNS:

Q. Good morning, Mr. Chen. Do you use any nicknames?

A. Yes.

Q. What are they?

A. Cousin.

Q. Where were you born?

A. China.

Q. When did you come to the United States?

A. '96 or '97.

Q. Did you come here legally or illegally?

A. Illegally.

Q. Describe how it is you came here illegally.

A. I was smuggled in by plane.

Q. Did you pay someone to help you?

A. Yes.

Q. How much did you pay?

A. Around 30,000.

Q. Where did you arrive in the United States?

A. New York.

Q. When you were smuggled, did you receive any fake documents?

A. Yes.

Q. What kind of documents did you receive?

A. I don't understand. Do you mean when I came here?

Q. Yes.

A. Fake visa.

Q. Do you currently have any legal status here in the United States?

A. No.

Q. Has an order of removal or deportation been ordered against you?

A. No.

Q. Have you ever been convicted of a crime?

A. Yes.

Q. Did you plead guilty or go to trial?

A. Pled guilty.

Q. What did you plead guilty to?

A. Extortion.

Q. Was that in federal court or state court?

A. Federal court.

Q. In this federal court?

A. Yes.

Q. When did you commit extortion?

A. In 2008.

Q. For how long did you commit extortion?

A. I was sentenced to 30 months, and was jailed for two and-a-half years.

Q. We'll get to that.

This extortion offense you committed, for how long

were you committing it?  Is it over a period of months or years?

A.  2006 to 2008.

Q.  Did you commit that offense alone or with other people?

A.  A group.

Q.  Who were you extorting?

A.  Bus company.

Q.  What were you extorting from the bus company?

A.  Money.

Q.  How much money were you asking them for?

A.  $4,000 a month.

Q.  Did you make any threats to get that money?

A.  No.

Q.  Did you ever threaten with words?

A.  No.

Q.  Did you or anyone else that you committed this offense with threaten with words to get this money?

A.  Other people, maybe they did.

THE COURT: That's not the question.  The question is did you.

THE WITNESS: I did not.

Q.  Did other people that you were working with make threats to the bus drivers?

A.  Yes, got into arguments.

Q.  Were those verbal or physical or both?

A.  Verbally.

Q.  Did you get the money that you were demanding?

A.  Yes.

Q.  Approximately how much did you get?

A.  For a period of two years, about 70,000.

Q.  Before you pled guilty to extortion, did you meet with representatives of the government?

A.  Yes.

Q.  Why did you have those meetings?

A.  Because they want -- they asked me if -- they came to me and said if I wanted to talk to them.

Q.  What were you hoping to get, if anything, by meeting with the government?

A.  To reduce sentence.

Q.  Would that be part of a cooperation agreement?

A.  Yes.

Q.  And did you enter into a cooperation agreement with the government?

A.  No.

Q.  Do you know why not?

A.  I don't know.

Q.  And you mentioned your sentence before.  Can you just state again what you were sentenced to?

A.  Sentenced to 30 months.

Q.  30 months in jail?

A.  Yes.

Q.  Were you also sentenced to a term of what we call supervised release?

A.  Yes.

Q.  And how long of a term of supervised release were you sentenced to?

A.  Three years.

Q.  As part of your sentence, were you ordered to pay restitution?

A.  Yes.

Q.  How much were you ordered to pay back to the bus drivers?

A.  The paper says 81,000.

Q.  When were you released from jail?

A.  2010.

Q.  Is that when you were released?

A.  Yes.

Q.  What happened when you were released?  Where did you go?

A.  I came to New York after I was released, and then I was detained by immigration for two to three months, and then I got out.

Q.  How did you get out of immigration custody?

A.  After three months of detention, the immigration, and then I was just released.  Happened to a lot of people like that.

Q.  How is it that you were released from immigration custody?

A.  From immigration?  I had helped out immigration and did

some things for them.

Q.  Did immigration officers or agents help secure your release from immigration custody?

A.  I think so.

Q.  And what happened after you were released?  Did you continue to have contact with the law enforcement agents?

A.  Yes.

THE COURT: At an appropriate time, we're going to take the lunch recess.

MS. BURNS: Just two more questions on this.

THE COURT: Fine.

Q.  Did you obtain any benefit from these law enforcement agents?

A.  No.

Q.  Did you secure status in any way after your release from immigration custody?

A.  Yes, one-year card.

Q.  What kind of a one-year card?

A.  Just work card.

MS. BURNS: Now is an appropriate time, your Honor.

THE COURT: Very well.

We will take the lunch recess now, and we will reconvene at 2:15.

Have a pleasant lunch.

(Jury excused)

D4HVLIN3          S. Q. Chen - direct          Page 597

THE COURT: You may step down.

(Witness excused)

THE COURT: We will all take a lunch recess.

MR. SKINNER: Thank you, your Honor.

(Luncheon recess)

(Continued on next page)

D4h6lin4          Shun Qing Chen - direct          Page 598

AFTERNOON SESSION

2:15 p.m.

(In open court; jury present)

THE COURT: Good afternoon. Please be seated. You may proceed.

MS. BURNS: Thank you, your Honor.

BY MS. BURNS:

Q. Mr. Chen, before we broke you had testified when you were released from immigration custody that was with the assistance of officers of immigration or agents of immigration?

A. Yes.

Q. Did those agents secure a benefit on your behalf that allowed you to stay in the country?

A. Yes.

Q. How long did that last?

A. A long time. '04, '05.

Q. When you were released from immigration custody recently, that is the time frame we're talking about right now?

A. Yes. One year.

Q. Was that card expired?

A. Expired already.

Q. Is that called a deferred action?

A. Yes.

Q. Have deferred actions been obtained for you prior to your arrest in 2008?

D4h6lin4          Shun Qing Chen - direct          Page 599

A. Yes.

Q. Who obtained those for you?

A. It was Anthony. It was an immigration agent.

Q. To obtain those deferred actions, did you agree to do anything with law enforcement?

A. Yes.

Q. What did you agree to do?

A. To obtain information.

Q. Did you in fact provide information to law enforcement?

A. Yes.

Q. Do you currently have legal status?

A. What do you mean by legal status?

Q. Right now do you have any permission to be in the country?

A. No.

Q. Have any promises been made to you by anyone in the government regarding your status here in connection with your testimony?

A. No.

Q. Before testifying today have you met with the government, the prosecutors and agents?

A. Yes.

Q. How is it that you came to start meeting with the government about your testimony here?

A. What do you mean by that? Can you repeat it?

Q. Sure. How did you come to start meeting with the

D4h6lin4          Shun Qing Chen - direct          Page 600

government about your testimony here today?

A. It was my friend.

Q. Who is your friend?

A. Dan Jian.

Q. Why did you go to that person to speak to the government?

A. We were talking and then he knew I hung out with this person.

Q. What person?

THE COURT: Who knew?

THE WITNESS: Most people knew. A lot of people knew.

Q. Who were you speaking with?

THE COURT: Knew what?

THE WITNESS: Knew that I hang out with him.

THE COURT: With whom?

THE WITNESS: With Ding Pa.

Q. This person that you were speaking with, why did you speak with him particularly about Ding Pa?

A. Because during that period of time we hung out together a lot.

Q. Did this person have a relationship?

MR. COHEN: Your Honor, I object and move to strike that it is not responsive to the question that was asked.

MS. BURNS: No objection to that.

THE COURT: Very well. The answer is stricken.

Q. The person you were speaking with, did they have any

relationship with law enforcement?

A. He also worked for the agent, for the immigration agents.

Q. Did that person set up meeting between you and the government?

A. Yes.

THE COURT: Who also knew a person who --

Q. What is this person's name that arranged the meeting between you and the government that brought you in before you testified?

A. Dan Jian.

Q. Does that person have a nickname?

A. Yes.

Q. What is it?

A. Cash.

Q. During the meetings that you had with the government were people taking notes?

A. Yes.

Q. Have you ever seen, reviewed those notes?

A. No.

Q. Are you familiar with the term Dai Lo?

A. Yes, I am.

Q. What does it mean?

A. Dai Lo is kid or followers that follow him and someone with a ranking.

Q. What is a follower? What do they do?

A. I met him at the gambling parlor.

Q. Where was that?

A. In Chinatown.

Q. Do you know the location?

A. I do.

Q. What was it?

A. At 21 Eldridge Street.

Q. When did you meet him?

A. I don't remember. It was around that time, but I don't remember exactly.

THE COURT: What time?

THE WITNESS: In '02.

Q. As a follower of the defendant, what were your responsibilities to him?

A. I didn't have any responsibilities.

Q. What types of things did you do for the defendant, if anything?

A. I went out with him to look for people to participate in fights.

Q. Did you work in any way for the defendant?

A. What do you mean? I didn't understand.

Q. Did you work anywhere for the defendant?

A. Yes. I was with him doing gambling parlors.

Q. Where did you work at the gambling parlor for the defendant?

A. What do they do? They do gamble parlors and they fight.

Q. Have you ever been a follower?

A. Yes.

Q. When was that?

A. On '01, '02, '03. But it was a long time ago.

Q. Who did you follow?

A. I was with Ding Pa.

Q. Do you see Ding Pa in the courtroom today?

A. Yes.

Q. Can you describe where he is and something that he is wearing?

A. He is over there.

Q. A little bit more about where he is.

A. He is sitting over there.

Q. At which table?

A. The second table.

Q. In what seat?

A. The second one.

Q. Can you say what he is wearing?

A. Wearing a black garment.

MS. BURNS: May the record reflect that he has identified the defendant, your Honor?

THE COURT: It may.

MS. BURNS: Thank you.

Q. How did you meet the defendant?

A. At 21 Eldridge Street.

Q. What did you do there?

A. I was a shareholder.

Q. How many shares did you have?

A. I had one share.

Q. How many other shareholders were there at the time that you were a shareholder?

A. There were a lot of shareholders.

Q. How many is a lot?

A. Over 20 shares.

Q. Did you receive any money for being a shareholder in the gambling parlor?

A. Yes.

Q. How much did you receive?

A. 2,000. Around 2,000 a week.

Q. For how many weeks did you receive $2,000?

A. I don't remember. It was about two, three months or three, four months.

Q. You go to this gambling parlor?

A. Yes.

Q. How often?

A. Very often. I used to be there every day.

Q. What games are played there?

A. 13 cards.

Q. Were people working there that were not just being

shareholders but doing something else?

A. Yes.

Q. What were they doing?

A. Some were dealers, some were guarding the door, some were charging commissions, passing out cards.

Q. When you were there, how many people were playing cards?

A. There were only four people holding the cards, but there were a lot of people betting.

Q. How many people were betting?

A. 20 to 30 people.

Q. Who operated this gambling parlor?

A. Ding Pa.

Q. At the time that you followed Ding Pa, did he have other followers?

A. Yes. A few people that I knew.

Q. What were their names?

A. YI Guang, Jiaki.

THE COURT: How do you spell Jiaki?

THE INTERPRETER: J-i-a-k-i.

THE COURT: Thank you.

A. Yi Wan. Vietnamese boy, but I don't know what his name is.

Q. That was his nickname?

A. Yes.

Q. Any other names that you remember?

A. I think his name is Jimmy, but I don't remember. That was

a long time ago.

Q. Are these people you named all the people that were following Ding Pa at that time?

A. Yes.

Q. Is there any structure or order to the followers while you were a follower?

A. Those people hung out with him before I did.

Q. By "the people," you mean followers of Ding Pa?

A. Yes.

Q. At the time you were a follower were there other people whose names we have not heard that were followers?

A. I don't remember. There was, but I don't remember.

Q. How many other people were there even if you can't remember their names?

A. There was between 10 to 20 people following him at the time.

Q. What did you receive from Ding Pa, if anything, in exchange for being his follower?

A. He gave me shares and also told me to look after the gambling parlor.

Q. Did you get any other type of benefit or compensation?

A. Dinner, drinks, and hanging out at the KTV.

Q. Do he pay for your housing?

A. No. He didn't pay for my housing.

Q. Where did you live at that time?

A. I was living with my family at the time.

Q. Were you paid any money by Ding Pa on top of the money you made as a shareholder?

A. Once in a while when I went out to play.

Q. I am sorry to?

A. To play.

Q. Thank you.

You testified that one of the things you did was to get into fights. How many fights did you get into on behalf of Ding Pa?

A. One time.

Q. Was that a verbal fight or a physical fight?

A. Physical fights.

Q. When was that?

A. I do not remember when that was, but it was also between '01 to '03. I don't remember exactly when.

Q. When you were following Ding Pa, did you know any other Dai Los in Chinatown?

A. Yes.

Q. Can you name them?

A. There was a lot of Dai Lo in Chinatown at the time.

Q. What were some of their names?

A. Yi Feng was one of them at the time. Yi Sheng was one of the Dai Lo, Jie Qiu. There was a lot. I can't remember all of them right now.

Q. Directing your attention now to September of 2002, is there a time that you got injured?

A. Yes.

Q. How were you injured?

A. I went with Ding Pa to a fight and then I got beaten up.

Q. Let's just walk through that. Did this happen during the day or in the evening?

A. In the evening.

Q. Where were you that evening?

A. At the beginning Ding Pa told me to go down. I we down and I was at Hung Moon 88.

Q. What is Hung Moon 88?

A. It's a restaurant.

Q. Who were you with?

A. With a lot of people, a whole table of kids. There were a lot of people.

Q. When you say "kids," who are you referring to?

A. The people that followed Ding Pa that hung out with me.

Q. Was Ding Pa also at this restaurant?

A. Yes.

Q. While you were at dinner, did you have any alcoholic drinks?

A. Yes.

Q. What did you have?

A. I had beer.

Q. How many?
A. Five, six beer.
Q. Had you used any drugs that day?
A. Yes.
Q. What did you use?
A. Marijuana.
Q. Did you have any conversations with Ding Pa while you were at dinner?
A. At that time I don't remember.  It was a long time ago.
Q. Did you have any weapon with you that night?
A. Yes.
Q. What did you have?
A. A gun.
Q. How did you get that gun?
A. A friend Andia gave it to me.
Q. Who is Andia?
A. Andia was a friend of mine and a friend of Ding Pa.
Q. Did you see whether anybody else in that group that night had a weapon that night?
A. At that time I did not see anyone with weapons, but Ding Pa told me that Jimmy was carrying a bag and there were a lot of tools inside the bags, inside the bag.
Q. Who is Jimmy?
A. Vietnamese boy.
Q. Was he a follower of Ding Pa?

A. Yes.
Q. What did you understand Ding Pa to mean by "tools"?
    MR. COHEN: Objection.
    THE COURT: Objection sustained.
Q. Did you see what was inside that bag?
A. I did not see.
Q. What happened, if anything, after dinner?
A. After dinner Ding Pa said, Let's go to East Broadway number 47, Rong Xian.
    MR. COHEN: Sorry.  R-o-n-g.
    THE INTERPRETER: X-i-a-n.
Q. What was at that location?
A. Also a restaurant.
Q. Did you go there?
A. Yes.  I also went there.
Q. How many people went there?
A. Four to five to six people.
Q. Does that include Ding Pa?
A. Yes.
Q. What did Ding Pa say, if anything, about why you were going to that location?
A. He wanted to go to look for someone.
Q. Did he say who he was looking for?
A. Don't remember, but I know that he went there to look for a person.

Q. What happened when you arrived?
A. When I got there he went in and he was talking to people and it seemed he was talking to those people he knew and then after a while he came out.
Q. Just to be clear who is the "he" was talking to people?
A. Ding Pa was in the restaurant talking to a lot of people there, by I do not know who those people are.
Q. What happened next?
A. And then he came out and then he said, Let's go to East Broadway, another place, 100 something.
Q. What was located on East Broadway?
A. East Broadway, it was a gambling parlor.
Q. Do you know who owned the gambling parlor?
A. It seems it belonged to Yi Feng's group.
Q. Who made the plan to go to this gambling parlor?
A. Ding Pa.
Q. What did Ding Pa say, if anything, about why he wanted go to the gambling parlor that night?
A. It seems that he said he wanted go there to be a shareholder.
Q. What happened when you arrived?
A. I got there and then he argue with security from the other group.
Q. Did you recognize the people that were working security?
A. Yes.  Yes.  We just knew each other, but didn't really know

that well.  And when we met, we just knew each other.
Q. Who did you recognize it to be?
A. The group of people and also a group of people so we just knew them in Chinatown.
Q. What did you know them as?
A. Just a group of people.  So a gang.
Q. What gang were they with?
A. I do not know what gang, but they have been arrested in the past.
Q. What happened after Ding Pa was arguing with these people?
A. After the argument, people all ran away and then I followed.  So I came down.  So I thought everything was fine and then I was on east Broadway and went to Allan Street.
Q. While you were still inside, did you hear any noises?
A. Yes.  I heard people running.
Q. Where did you go once you left?
A. I came down and went to Allan Street.  So another group came from over there.
Q. Came from where?
A. They came from Allan Street.  I was walking up there and they were coming down.
Q. What happened?
A. They came down and I was stabbed.
Q. Where on your body were you stabbed?
A. Here.

Q. Can you tell us where it is you are pointing to?
A. Over here.
Q. On your left side?
A. This is left?  This left.
Q. Were you stabbed once or more than once?
A. I was stabbed once.
Q. Did you go to the hospital?
A. Yes.
Q. How long were in the hospital?
A. One week.
Q. What did you do with the gun that you had that night?
A. I don't know.  I am not sure whether it was taken by China Boy or Andia.
Q. Were both of those people people who had been at East Broadway?
    THE INTERPRETER: Sorry.
Q. Were both of those people people who had been at East Broadway with you?
A. Yes.
    THE COURT: Try not to lead.
    MS. BURNS: I will, your Honor.
Q. After you were stabbed, did you speak to Ding Pa about the fact that you got stabbed?
A. If I had spoken to Ding Pa, yes.  Ding Pa spoke to me.
Q. What did he say to you, if anything, about the fact that

you got stabbed?
A. I said we got stabbed and let's go and beat them up.
    THE COURT: Who said that?
    THE WITNESS: Ding Pa.
Q. Did he say anything else to you at that time?
A. And also he said he was also beaten up.  Ding Pa was also stabbed.
Q. Did you go and look for people as he had said to do?
A. Yes.
Q. Who did you look for in connection with your stabbing?
A. No.  I did not go out to look for.
Q. Just to be clear, you did not go look for the people that stabbed you with Ding Pa?
A. Yes.
Q. Did you continue to be a follower after you were stabbed?
A. No.
Q. Did you continue to get paid from your shareholder at the gambling parlor after that?
A. No.
Q. While you were a follower, other than the night you described, did you ever see Ding Pa with guns?
A. Yes.
Q. How many times?
A. Once or twice.
Q. Where did you see him with guns?

A. At his home.
Q. How many guns did he have?
A. The night when I went over there I saw three guns.
Q. Which night are you speaking of?
A. Long time ago.  I don't remember.
Q. What happened on that night you saw him with three guns?
A. He told me and other people to take guns out and to go out to look for people.
Q. What did he say about the people you were looking for?
A. I don't know.
Q. What did he say, if anything, about why he wanted to look for these people?
A. People with whom he had fights, I am not sure.
Q. On that night was did Ding Pa say anything that night about why he wanted you to go look for people?
    THE COURT: What night are we talking about?
    MS. BURNS: He testified there was one night that he saw Ding Pa with three guns in his home.
Q. Is that correct?
A. Yes.
Q. On that night did Ding Pa ask you to go out and look for people?
A. Yes.
Q. What did he say, if anything, that night about why he wanted to go look for people?

A. Don't remember.
Q. You testified generally that you would go out with Ding Pa and look for people, is that right?
A. Yes.  Once or twice.
Q. What people were you looking for?
    MR. COHEN: Objection.  Asked and answered numerous times.
    THE COURT: Overruled.
    Were you looking for any particular people?
    THE WITNESS: Yes.  I went out to look for him, to look for Lo Bei.
Q. Who is Lo Bei?
A. Also in the society and also a person in Chinatown.
Q. What do you mean by that?
A. Also a person in a gang or gambling and also the gambling, but I do not really know this person that well.
Q. What happened when you went to look for Lo Bei with Ding Pa?
A. Nothing happened.
Q. Did you find him?
A. No.
Q. Did you take any weapons with you when you went to look for Lo Bei?
A. I don't remember.  Brought a gun.
Q. You don't remember?

A. It seems I brought a gun.

MR. COHEN: Move to strike that, Judge, seems like.

THE COURT: Motion granted.

Q. Did you bring one?

A. When we went out to look for Lo Bei, yes, I brought a gun.

MS. BURNS: One moment.

No further questions.

CROSS-EXAMINATION

BY MR. COHEN:

Q. So a minute ago you didn't remember if you brought a gun and then 30 seconds later you remembered that you brought a gun?

A. Because at the time I always carry gun because there are arguments. There were a lot of times where there were arguments.

Q. A minute ago you told the jury you didn't remember if you had a gun and then Ms. Burns asked you another question and then you said, yes, I had a gun. Is that what happened?

A. I don't remember.

Q. A minute before that you were asked who you were looking for and you said you didn't remember but then the next question you were asked and you said, Oh, it was Lo Bei; is that right?

A. Because that was a long time ago.

Q. But it was only about five seconds between the time you didn't remember and the time you did, right?

A. Yes.

Q. Now, you testified that you came to the United States illegally; is that right?

A. Yes.

Q. But that there came a time that you agreed to do some work for Homeland Security or the Immigration Service?

A. Yes.

Q. And do you remember when that was?

A. In 2005.

Q. Well, would it refresh your recollection that it was between December 15th of '04 and April 15th of '07, does that sound about right?

A. Yes.

Q. And there was an ICE agent or two that you were working with at that time?

A. Yes.

Q. And that you said his name was Anthony?

A. Yes.

Q. That was Anthony Jones, right?

A. Yes.

Q. And Anthony had a partner that you also worked with?

A. I do not understand.

Q. Well, besides Anthony did you know any other ICE agents?

A. At that time I knew a lot of them.

Q. A lot of them?

A. Yes.

Q. And you had agreed to do something for these agents; correct?

A. Yes.

Q. And one of the things you were supposed to do is provide them with information; correct?

A. Yes.

Q. Did any of these agents ever tell you that it was okay for you and other people to commit extortion while you were working for ICE?

A. No. I could not.

Q. But in fact is it true that during the time period that you were supposed to be doing stuff for ICE, you were out extorting bus driver's?

A. At first this is with someone else, yeah, but I did commit the crime.

Q. I am sorry?

A. I did commit the crime.

Q. And you committed crime while you were supposed to be working with ICE, correct?

THE COURT: You have to translate ICE.

Q. With the Immigration Service?

A. I don't know.

Q. Well, would it refresh your recollection if I told you that you pled guilty in committing extortion between 2006 and 2008?

A. Yes.

Q. So is it a fair statement then that while you were supposed to be assisting law enforcement, you actually were out breaking the law?

A. But it was related to bus. I used the wrong method of doing it. I did not know it was going to be extortion.

Q. You didn't know that you were committing extortion?

A. At that time I thought what I did was not extortion. But after I was arrested, I knew that it was extortion.

Q. What were you doing to get money from these bus drivers or bus companies?

A. In the past before that I also partnered with them in the company.

Q. What were you doing to get money from these bus drivers or bus companies?

A. I asked them to give me $4,000 per month.

Q. In return for that $4,000 a month, what were you doing for them?

A. I didn't do anything.

Q. So how did you convince them that they should give you $4,000 a month for not doing anything?

A. Before that he and I were partners.

Q. Before that what?

A. He and I were partners.

Q. Who were partners? You and who?

A. The bus from the other side. It used to be only one route that he and I had a business. So the other side said forget about me, let him do it. So I gave mine to him. So I didn't do it no more and he said he would give me $4,000 per month.

Q. Who is the "he" that we're talking about here?

A. The bus owner.

Q. What was the bus owner's name?

A. Ahjui.

Q. And is it true that Ahjui and another bus company were having some sort of price war to compete with one another?

A. Yes.

Q. Did they cut their prices down from $30 a trip to $5 a trip to try to put each other out of business?

A. Yes.

Q. And that you would go with your co-defendant Chen Jian Quo and other people, other followers and grab passengers from one bus company and give them to the other bus company, isn't that what happen happened?

A. Yes.

Q. Isn't it true after the price wars started, you told this bus company owner that if he gave you a third of his profits that everything would be okay?

THE INTERPRETER: Counsel, can you repeat the question?

Q. Isn't it true that you and Chen Jian Quo told this bus

company owner that if he gave you a third of his profits that everything would be okay.

A. Yes.

Q. And isn't it true that you told them that if you had to ask him again things wouldn't be so easy for him?

A. What do you mean? I do not understand.

Q. Didn't you say to this victim that unless he agreed to your demand that you had to ask again it wouldn't be so easy for him the next time?

A. I don't remember.

Q. Do you remember hearing him over the next couple months and telling him to be careful otherwise he was going to be messed with?

A. Me.

Q. You?

A. Yes.

Q. You do remember that?

A. Yes.

Q. Do you remember having a meeting with the victim?

A. Yes.

Q. And telling him he would have to pay 35 percent of the profits and the payments should be made every Thursday?

A. It seems like it.

Q. Did you also tell him that to make sure you got all your money, you have to hire one of your followers to keep the books

to make sure you got your cut?

A. No. I did not say that.

Q. Did your codefendant Chen Jian Quo say that?

A. I do not know.

Q. Well, in fact didn't the victim have to hire one of your associates to do his financial records?

A. No.

Q. In fact didn't you meet with the victim every week in Chinatown and collect about $5,500 a month from him?

THE INTERPRETER: Every month or every week, counsel?

Q. You met him once a week and altogether collected about $5,500 a month?

A. Yes.

Q. Do you remember saying that you should go to a law office and make a contract with the notary stamp on it where he would agree to these terms so everything looked like it was legal?

A. Yes.

(Continued on next page)

Q. And at some point the victim said, I can't afford to pay you all this money, can we go down to $4,000 a month.

A. Yes.

Q. But you didn't know, did you, that the victim had gone to federal law enforcement and that these meetings were being recorded, did you?

A. He or she did tell me.

Q. He or she did tell you what?

A. He or she told me that --

THE COURT: Well, which is it, he or she?

THE WITNESS: A man. The partner who sue me, Ah Jui.

Q. Well, he didn't sue you, did he, he got you arrested; correct?

A. Yes.

Q. And did you later learn that the payments that you were extorting from him were being given to him by the FBI to give to you?

A. I didn't know that.

Q. Yeah, but did you later learn that these meetings were recorded after you got arrested? Did you learn that these transactions were recorded and videotaped?

A. Yes.

Q. And then, once you realized that the evidence against you was -- withdrawn.

And, by the way, you're still telling this jury that

while you were harassing this guy and stealing his passengers and threatening him, that you didn't know there was anything illegal or wrong about that?

A. Yes, it was illegal.

Q. I'm sorry?

THE INTERPRETER: Yes, it was illegal.

Q. Are you still telling them that at the time you were doing it, you thought it was okay?

A. But I did admit.

Q. You said a little while ago that while you were doing this, you didn't realize it was wrong; it was only after you got arrested that you realized it was wrong. Do you remember saying that to the jury?

A. Yes.

Q. And is it true that while you were doing it, threatening this guy and taking his money, that you didn't know it was wrong, you thought it was perfectly okay? Is that true?

A. No, not okay to do it.

Q. I'm sorry?

THE INTERPRETER: Not okay to do it.

Q. And you knew at the time that it wasn't okay to do it; correct?

THE INTERPRETER: I'm sorry, can you repeat the question?

MR. COHEN: Yes.

Q. You knew at the time that you were doing it that it was not okay to do it.

A. At the time, I don't know if I knew, I -- I don't understand what you're saying. You're asking me at that time what about that?

Q. I'm asking you, you told the jury that you didn't realize that what you were doing was wrong until after you got arrested, and then you understood that you had been breaking the law; is that right?

A. Yes. Correct.

Q. And are you still telling the jury that while you were doing all these things, threatening people, grabbing passengers, and things like that, are you still telling them that while you were doing that, you thought that was perfectly okay?

A. But I was not the one who was grabbing.

Q. Who was what?

A. Who was grabbing.

Q. No, you were just benefiting from the fact that other people were doing that; correct?

A. Yes.

Q. People that followed you and associated with you; correct?

A. Following me, you mean my friends?

Q. The people who were doing the grabbing, the people who were doing the dirty work for you, they were people who were doing

that because you told them to do it; correct?

A. I did not tell them to do it.

Q. Did you know, sir, that people were doing these things on your behalf?

A. I did not know.

Q. You pled guilty to extortion, right?

A. Yes.

Q. When you pled guilty to extortion, the judge said, Tell me in your own words what you did that was wrong, right?

A. Yes.

Q. And you told him in your own words what you did that was wrong, right?

A. Yes.

Q. And he asked you at the time -- he said to you when you pled guilty at the time that you did these things, did you know they were wrong, right?

A. Yes.

Q. And you told him yes, I knew they were wrong; correct?

A. Yes.

Q. And you were under oath, by the way, when you pled guilty you swore to tell the truth in a courtroom that looked just like this one; correct?

A. Yes.

Q. And you swore to tell the truth when you came in here today; correct?

A. Yes.

Q. And you told the judge when you pled guilty that you knew you were doing something wrong, right?

A. Yes.

Q. And you just told the jury that as far as you knew, you weren't doing anything wrong; correct?

A. Yes.

Q. So were you lying then or are you lying now?

MS. BURNS: Objection.

THE COURT: Overruled.

A. I was saying that I didn't know before that what I was doing was wrong, that thing, until after I was arrested that I knew that I was -- what I was doing was wrong.

Q. That's what you told the judge when you pled guilty?

A. No, I wasn't. At that time the indictment was read to me, and then he asked me is that the case, I said yes, I plead guilty.

Q. Did you tell the judge when you pled guilty --

THE COURT: I think you should sit down.

MS. BURNS: Can we approach, your Honor, on this issue?

MR. COHEN: I'm sorry?

THE COURT: Well, let him finish his examination.

BY MR. COHEN:

Q. Do you remember, sir, that when you pled guilty, the judge

asked you to tell him in your own words what you did that makes you guilty of the offense, and you said: "I entered into an agreement with my friends to extort a bus company for money." Remember being asked that question and giving that answer?

A. Yes.

Q. And do you remember the judge asking you: "And did you do this by threatening to harm this individual if he didn't give you the money," and that you said yes?

A. Yes.

Q. Now, after you got arrested by the FBI, didn't you try to contact Anthony Jones, the ICE agent that you had been working for?

A. At that time, yes.

Q. And didn't you ask Anthony Jones to tell the FBI that you were working for them?

A. No, that was not it.

Q. What did you want Anthony Jones to do?

A. I wanted him to find out about my case, what it was about.

Q. You had a lawyer; correct?

A. Yes.

Q. Did you have a lawyer that you hired privately or a lawyer that was appointed for you by the court?

A. Appointed by the court.

Q. When you had your lawyer appointed by the court and you first came to court, did you say that you couldn't afford to

hire your own attorney?

A. Yes.

Q. Did you disclose that you were making $5500 a month in untaxed money through this scheme that you had going?

A. What was it? Can you explain?

Q. Sure.

When you were first arrested for extortion, you were brought to this courthouse; correct?

A. Yes.

Q. And some people interviewed you to see if you could be released on bail and asked you a bunch of questions; correct?

A. Yes.

Q. And one of the things you were asked is whether or not you can afford to hire an attorney; correct?

A. Yes.

Q. And you were asked to fill out a form to disclose the assets that you had?

A. Yes.

Q. And when you went into the courtroom, the judge asked you to raise your hand and swear to the truth of what was in the form; correct?

A. Yes.

Q. And you swore that whatever you put in the form was all that you had, right?

A. Yes.

Q. But that was a lie, wasn't it?

A. I didn't have no money at the time.

Q. Well, didn't they ask you what money you had been earning, how much money you would earn?

A. I didn't have a job at the time.

Q. Did they ask you how much money you had earned in the previous 12 months?

A. Yes, I was asked.

Q. And did you disclose to them that you had been making close to 5,000 or a little more than $5,000 a month that you weren't paying taxes on? Did you tell them about that?

A. At that time I was not the only person that got the 4,000.

Q. Okay. How many people were splitting the money?

A. Myself, my partner, and the drivers.

Q. The drivers?

A. Yes.

Q. What drivers?

A. When I was doing this bus route, there were other people that were partners there.

Q. How much of this extorted money did you receive every week? You personally.

A. Per month?

Q. Per week, per month, any way you want to answer it.

A. It was three, $4,000 a month, but that was split up among many people.

Q. But first he was paying $5500 a month, right?

A. At first they were paying 55,000 -- $5500. I don't remember that.

Q. In any case, the affidavit that you filled out, was it completely truthful about how much money you had made in the last year?

A. Within a year?

MR. COHEN: I'll move on, Judge.

THE COURT: I think this is a good time to take a mid-afternoon recess.

MR. COHEN: Thank you.

THE COURT: We'll take a ten-minute recess.

(Jury excused)

THE COURT: You may step down.

(Witness excused)

THE COURT: I will see counsel at the sidebar.

(Continued on next page)

(At the side bar)

MS. BURNS: Judge, I was reviewing the plea transcript during Mr. Cohen's questioning again. And nowhere in there was he asked, Did you know at the time what you were doing was wrong, which is a standard question.

THE COURT: It's certainly what I ask.

MS. BURNS: I hear you.

MR. COHEN: She's right. And I assumed that it had been asked. And as I -- I have it on my screen. And as I scrolled down and saw that it wasn't there, I then --

THE COURT: Changed the question.

MR. COHEN: -- I didn't ask any longer whether he'd been asked that question. But it was really in good faith. I thought -- I mean it's always asked.

MS. BURNS: It was beyond asked. It was characterized as a prior lie to the Court. So we'd ask that we be able to offer his entire transcript to show the absence of that statement and absence of what Mr. Cohen has characterized as a lie under oath.

MR. COHEN: Well, I think that makes it look like I've done something improper, when --

THE COURT: Well, it's more complicated than that, because basically the issue was whether he told the truth when he pled. And are you telling me that he never represented that he knew it was wrong?

MS. BURNS: He was never asked that during --

THE COURT: Forget whether he was asked that. What did he say he did?

MS. BURNS: As Mr. Cohen asked him, that he said that he entered into an agreement with his friends to extort a bus company for the money. He obtained money from an individual with that bus company. He did it by threatening to harm the individual if he didn't give the money. He had an agreement with others that that would occur. That this took place in January 2006 through October 2008. And the bus company operated some point its route in Manhattan. And that was the entire factual --

THE COURT: All right. Well, I will advise the jury that apparently he was not asked that particular question.

MR. SKINNER: I think that will rectify it, your Honor.

MS. BURNS: Thank you, your Honor.

THE COURT: But I am not going to stop cross-examination on the issue of whether, in fact, he did know that it was wrong at the time.

MS. BURNS: I think he's answered that several times.

THE COURT: Well, I think it could be made clearer.

MR. COHEN: Your Honor, I would ask that when your Honor instructs the jury that he wasn't asked that question, that your Honor also instruct them that that is generally a

standard question that's asked when people plead guilty, otherwise it looks like --

MS. BURNS: I think the issue is whether he was asked.

MR. SKINNER: Joel, you dug hour hole here.

MR. COHEN: I dug my hole inadvertently and not in bad faith.

MS. BURNS: You've had this transcript for two months.

MR. COHEN: So I did it in bad faith?

MS. BURNS: I'm not saying that, but I think it's unnecessary to advise the jury about standard questions, when the issue is what he was asked, what he answered, and what he said under oath.

MR. COHEN: And I think that if you believe that I did it -- made that mistake in good faith --

THE COURT: Please, I'm not going to have all of this colloquy.

MR. COHEN: Judge, I think it's only fair that --

THE COURT: I will say that you made a mistake.

MR. SKINNER: I think you're better off saying nothing.

MS. BURNS: I think the first option was better.

MR. SKINNER: Yeah.

MR. COHEN: I really think that and would ask that you say that that's a standard question that's asked, and it wasn't asked in this instance.

THE COURT: I understand. But you had this document in front of you, Mr. Cohen. You have to be careful.

MR. COHEN: Judge, I have it on a computer screen. And I was tabbing up trying to catch up to where it was.

MS. BURNS: You've had this in your possession for two months; so I don't think that it was an inadvertent question.

MR. COHEN: So you think I did it on purpose.

THE COURT: Nobody is suggesting that.

MS. BURNS: We all know that question is normally asked. I didn't notice that it wasn't until I went back and looked at these questions, as well. But you're the one asking the questions.

MR. SKINNER: It's not a question of fairness.

THE COURT: You may ask the witness whether at the time he did it he knew it was wrong.

MR. COHEN: Right.

THE COURT: But whether he was asked that question by the judge, which you made a big point of, is a different matter.

MR. COHEN: Let me be the one that cleans up my own mistake. And I'll go back through the record with him and establish that he actually wasn't asked that question.

MS. BURNS: Frankly, I think it would be clearer and cleaner coming from your Honor.

THE COURT: Well, that may be. But as long as it's

communicated.

MS. BURNS: And if it's not, can we revisit this issue?

THE COURT: Of course, of course. But if that's the only problem in this case --

MS. BURNS: Oh, no, but the witness has been characterized as lying under oath before. And I think that needs to be rectified where it hasn't -- not on that issue.

Well, but you said that you're lying before or you're lying now. That was your question. That's a strong question to ask to a jury when there is nothing in this record of his prior plea that he lied in response to that question and I think that has to be rectified. And we're not being unreasonable, I don't think.

THE COURT: I think that you should say that you misread the transcript or whatever you want to say, and that he never said that.

MR. COHEN: I will.

MR. SKINNER: He was never asked it.

THE COURT: That he was, in fact, never asked that question. And let's move on.

MR. COHEN: Or how about --

THE COURT: But I have no objection to you asking him whether he knew at the time he did it, that it was wrong.

MR. COHEN: Right.

THE COURT: There's no question about that.

MR. COHEN: A clean way to do it, if the government didn't think I was playing dirty, would be to stipulate that he was never asked that.

THE COURT: Well, they would prefer that it be made a little clearer.

MR. COHEN: I'm going to make it clear.

THE COURT: On the heels of the question.

MR. COHEN: Yeah.

THE COURT: I'm surprised, too, because --

MS. BURNS: I think we all were. It is a common question.

THE COURT: Well, it's because -- it's because there is --

MS. BURNS: Under Rule 11.

THE COURT: -- a mental component of all criminal conduct.

MS. BURNS: It's subjective belief.

THE COURT: You cannot -- right. You have to willfully and knowingly do something.

MR. COHEN: Which is why, Judge, I think the fair thing to do --

THE COURT: I understand.

MR. COHEN: -- is to instruct the jury.

THE COURT: No, but you did make such a point of it.

So whether it is or it isn't doesn't matter.

MR. COHEN: How about I clean it up, I fold up my sword, and then you instruct the jury that it is --

THE COURT: I know you're asking me that, but that's not the point. You can tell him, if you want, that you have now reread it more carefully, and that question, in fact, was not asked.

MR. COHEN: Okay. Fair enough.

MR. SKINNER: One other issue while we're up here.

THE COURT: Which is the fact. I believe in truth-telling.

MR. SKINNER: The record is pretty clear on that fact.

The next witness the government intends to call, if we get to him this afternoon or not, is the other witness that the Court signed an immunity order for. And his defense attorney is here so that he can invoke the Fifth and thereby bring into effect the immunity order.

THE COURT: Fine.

I should do that out of the presence of the jury.

MR. SKINNER: Yeah, either right before they come back or right afterwards. I don't know what the Court's preference is. Maybe right afterwards, since we've had a lengthy colloquy already in the break.

THE COURT: Well, is he here now?

MR. SKINNER: He's right back there.

THE COURT: Oh, fine. I will hear him now.

MR. SKINNER: Unfortunately, I don't have questions written out for your Honor, but I can tell you what he would invoke the Fifth with regard to so you know what questions to ask.

THE COURT: It's my recollection, if it's accurate, that he either used or sold marijuana. I can't remember which.

MR. SKINNER: I'll double-check. I don't believe it's marijuana.

MR. COHEN: The other guy was.

THE COURT: The other one, that's the other one. All right.

MR. SKINNER: It's the individual who had a mahjong parlor in Brooklyn in 2008, within the last five years, that would fall within the scope of Section 1955. And he also is in the country illegally. And those were the two things that were at issue.

MR. COHEN: Did he also file a false asylum application?

MR. SKINNER: I honestly don't remember.

THE COURT: What about his having a mahjong parlor in Brooklyn? How is that incriminating?

MR. SKINNER: Because he ran a gambling parlor in violation of federal law and New York State law.

THE COURT: Okay. He ran an unlicensed gambling

establishment.

MS. BURNS: Yes.

MR. SKINNER: Yes.

THE COURT: Is the point.

MR. SKINNER: Yes, your Honor.

THE COURT: All right.

MR. SKINNER: And we can bring him in right now if you want to.

THE COURT: Right. We might as well, having taken this much time.

MR. SKINNER: Thank you, your Honor.

(In open court)

CAI XIANG LI,
    called as a witness by the Court,
    having been duly sworn, testified as follows:

THE DEPUTY CLERK: Please state your full name for the record.

THE WITNESS: Li Cai Xiang. L-I is last name; first name, C-A-I, space, X-I-A-N-G.

THE DEPUTY CLERK: Thank you.

EXAMINATION
BY THE COURT:

Q. Mr. Li, did you run a gambling -- an unlicensed gambling parlor in Brooklyn?

A. Yes.

MR. SKINNER: I thought he intended to invoke the Fifth.

MR. MARVINNY: Your Honor, may I consult with him?

THE COURT: Please.

(Pause)

BY THE COURT:

Q. Let me ask you that question again; I gather you didn't understand it.

Did you run an unlicensed gambling parlor in Brooklyn?

A. I cannot answer the questions as per my attorney's instruction.

Q. Well, you have to -- your attorney instructed you. You have to tell me why, what is the basis of that instruction? Is it because the answer -- you are invoking your constitutional privilege against self-incrimination, because if you answered the question, you would be admitting a crime?

A. Yes.

Q. Very well.

THE COURT: The other one is marijuana?

MR. SKINNER: No, your Honor, it was just the gambling parlor, and being in the country illegally, and false statements, if there are any.

THE COURT: Oh, thank you. Yes.

BY THE COURT:

Q. When did you enter the United States?

MR. MARVINNY: Your Honor, may I consult with him?

THE COURT: Yes, but that's not the question he should invoke privilege to; it's the next question.

MR. MARVINNY: I understand.

May I consult with him?

THE COURT: Yes.

MR. MARVINNY: Thank you.

(Pause)

THE COURT: Off the record.

(Off record)

A. I came in '93.

Q. 1993. And did you enter this country legally?

A. I cannot answer your question.

Q. Why?

A. If I don't get immunity.

Q. Are you telling me that you are invoking your constitutional privilege not to incriminate yourself?

A. Yes.

Q. Very well.

MR. SKINNER: Your Honor, the order that was signed by the Court --

THE COURT: Now takes effect.

MR. SKINNER: -- now takes effect.

And, for the record, the order was signed on April 8, 2013 and copy then provided to defense counsel.

MR. COHEN: Which I received.

THE COURT: Very well.

MR. SKINNER: Thank you, your Honor.

THE COURT: All right.

BY THE COURT:

Q. And you understand that entering the United States illegally is a crime?

A. Yes.

THE COURT: Very well.

MR. SKINNER: Thank you, your Honor. Appreciate you taking this out of time -- or out of order.

THE COURT: All right.

Now we'll all take a five-minute recess and then we'll resume.

(Recess)

THE COURT: You may proceed.

SHUN QING CHEN, resumed.

CROSS-EXAMINATION (continued)

BY MR. COHEN:

Q. Mr. Chen, you testified earlier that you had been ordered to repay $81,000 in restitution, do you recall that?

A. Yes.

Q. And that was a condition of your sentence; correct?

A. Yes, a fine.

Q. It wasn't actually a fine; you were ordered to pay

restitution to the drivers and people who lost money as a result of what you did. Correct?

A. Yes.

Q. Is that right?

A. Yes.

Q. How much of that money have you paid back?

A. $60 per month.

Q. So how long have you been making these 60-dollar-a-month payments?

A. I have been making the payment.

Q. How many payments have you made since you've been released from custody?

A. I paid every month, except for last month. I pay once every two to three months.

Q. The order was that you pay every month; correct?

A. Monthly. Sometimes I pay earlier, sometimes I waited a month.

Q. Now, is it true that over a period of about two years that you made over $70,000 from your extortionate activity?

A. Yes.

Q. And so would that be about $35,000 a year?

A. No, I was not the only one who took that amount.

Q. Well, this morning the prosecutor asked you whether you had -- I don't recall the exact question, but it was something about how much money you had made, and your answer was that you

got $70,000 over a two-year period. Do you remember being asked a question like that and giving that answer?

A. I don't remember.

Q. Well, do you remember telling the jury earlier today in response to a question from the government that you got $70,000 over two years?

MS. BURNS: Objection. Asked and answered.

THE COURT: It has not been answered.

A. They told me that I should repay this person 70,000; but, in fact, I did not take that much.

Q. Well, sir, they told you to pay back 81,000. But what I'm asking you now is whether you told the jury earlier today when you were being asked questions by the prosecutor that you had gotten $70,000 over a period of two years, yes or no.

A. Could you repeat?

MR. COHEN: It's getting late in the day. Can I ask the reporter to read it back please.

THE COURT: Yes.

(Record read)

A. Yes.

MR. COHEN: Now, Judge, with your permission, I just want to straighten something out, and I'd like to revisit some questions and answers I asked a little earlier.

Q. I want to take you back, sir, to the day you pled guilty. And I'm going to ask you if you recall being asked these

questions and giving these answers --

THE COURT: We've been through that. You have only one specific thing to go back over.

MR. COHEN: Well, I'd like to lay a foundation, if I might.

THE COURT: Well, I think you've already laid the foundation earlier.

MR. COHEN: Well, the issue is --

THE COURT: We're not going to have an argument about it.

MR. COHEN: Judge, can we step up?

THE COURT: No.

MR. COHEN: I'd like to move on and come back to this before the witness is excused.

THE COURT: Very well.

MR. COHEN: Thank you.

BY MR. COHEN:

Q. Now, after you served -- oh, so after you got arrested, you met with the government on a number of occasions; correct?

A. Yes.

Q. And you hoped to get from them an agreement that would get you leniency at your sentencing?

A. Yes.

Q. But, in fact, it didn't work out, and you were sentenced to a period of 30 months in jail?

A. Yes.

Q. And you served, I think you said, 24 months?

A. Yes, yes, 24 months.

Q. And is it true that from -- where did you serve your sentence?

A. Pennsylvania.

Q. Okay. And that was in a federal corrections facility?

A. Yes.

Q. And is it true that immediately upon being released from that facility, your custody was transferred to a new immigration detention center?

A. Yes.

Q. And did you spend several months there?

A. Yes.

Q. And during that time that you were there, did you understand that the reason you were there was because you were being processed to be deported to China?

A. I knew.

Q. And, by the way, had you ever --

A. Everyone was like that.

Q. I'm sorry?

A. Everyone was like that.

Q. In other words, everybody at the detention center was waiting to be deported to some country or other; correct?

A. Yes.

Q. Had you ever applied for political asylum in the United States?

A. No.

Q. Did you ever make an attempt after you came to the United States to adjust your status so that you could somehow be here legally?

A. My family petitioned for me.

Q. And when you say your family, are you talking about your mom and dad?

A. My father.

Q. Okay. And in order to petition, of course, he was here legally in the United States, right?

A. Also illegally. But he was in the process of political asylum.

Q. So he was seeking political asylum. And while doing that, he petitioned for you to be able to stay here legally?

A. One-year card, working card.

Q. Your dad got you a one-year working card?

A. Yes.

(Continued on next page)

BY MR. COHEN:

Q. When was that?

A. A long time ago. '99, '97, or '98. I don't remember. It was a long time ago.

Q. Is that called an A5 card?

A. No. C8 card.

Q. C8 is a labor authorization; correct?

A. Yes.

THE COURT: That is a right to work here?

MR. COHEN: Yes, it is.

Q. So did there come a time that you learned that there was an order that you would be removed from the United States?

A. Yes.

Q. How long had you known about that order?

A. After I finished my jail time, then I knew about it.

Q. So while you were working as an informant for the Immigration Service before you went to jail, you didn't know there was an order for you to be removed?

A. At that time no. At that time I still had a one-year card.

Q. I see. So was it because of your conviction for extortion that a final order of removal was issued?

A. Yes.

Q. And how was it that you came to be released from immigration custody?

A. Immigration agent got me out.

Q. Well, was that Anthony Jones?

A. Yes.

Q. And Anthony Jones was the same agent you were working for while you were out committing these extortions; correct?

A. At that time was that it? I have to remember. I have to try to remember. Yes, at that time.

Q. Did you contact Agent Jones while you were in immigration detention and offer to work for him if he would get you released?

A. Yes.

Q. And did he come to see you at the immigration facility?

A. No.

Q. You just spoke to him on the phone?

A. Yes.

Q. And did you have somebody to translate for you when you spoke to him?

A. No.

Q. Does he speak Chinese?

A. I could understand a little.

Q. And you were able to communicate to him that if he would only get you released then you would come and work for him again; correct?

A. Yes.

Q. And if you know, what did he do?

A. What did he do? Getting information, etc.

Q. No. No. What did Agent Jones do that resulted in your being released, if you know?

A. He applied with the Court to apply CI. I do not know what happened.

Q. CI means confidential informant?

A. Yes.

Q. Did you go before a judge with Agent Jones and get released because you were a confidential informant?

A. No.

Q. So you don't actually know whether he saw a judge to get you released or whether he had you released on his own authority; correct?

A. I don't know.

Q. Well, I think you said that when the government asked you earlier about how you had been released, I think you said something like you were just released, it happened to a lot of people like that. Do you remember giving that answer?

A. Yes.

Q. So are you saying that a lot of people at the detention center were calling up agents and saying they would work for them if they would only get released?

A. I do not know.

Q. Well, you were the one that said that it happened to a lot of people like that. Can you tell the jury what you meant?

A. A lot of people when their time was up, so they just got

released after three months of detention. They got released.

Q. At the detention center these were not people who were serving sentences, they were people awaiting deportation?

A. Yes.

Q. When you testified earlier when the government was asking you questions, you said you think immigration got you released. Do you remember that?

A. I do not understand.

Q. Do you have any doubt that the reason that you got out of immigration custody and the reason that you are not back in China now is that Agent Jones or some other immigration agent had you released? Do you have any doubt about that?

A. I don't know.

Q. Why do you think you got released from ICE custody, immigration custody?

A. Some people were detained for two to three months and they got released automatically.

Q. That is not what happened to you, is it?

A. Yes.

Q. Is that what happened to you, you just automatically got released?

A. I don't know.

    THE COURT: Let's move on.

Q. How did you find out that once you were released you were obligated to do some things for the Immigration Service?

A. Because when I got released, I had to sign this document agreeing to helping them do things.

Q. And did you sign that at the detention center or someplace else?

A. Detention. When I got out of detention.

Q. So what was the first place that you went after you were released from the detention facility?

A. First place I went to? They transfer me to the immigration over here.

Q. When you say "over here," you mean at 26 Federal Plaza?

A. No. Another one.

Q. In New Jersey?

A. Not in New Jersey. Over there. I do not remember the street.

Q. Varick Street?

A. But I know how to get there.

Q. Varick Street in lower Manhattan?

A. Where is Varick Street? I don't know.

Q. Where did you sign this paper that said you were going to be a confidential informant?

A. It was on 20 something Street. On 26th Street.

Q. Was that at the office of Department of Homeland Security or Immigration?

A. Yes.

Q. About when was that?

A. I do not remember. It was when I first got out.

Q. Well, when did you first get out?

A. I got out in February or March of 2011. No, 2010. No, I got the out in March of 2011. I don't remember.

Q. And after getting released, did you go home to live with your family?

A. Yes.

Q. And after you got released, did the immigration agents get you some sort of card that would enable you to remain in the United States and to work here for a year?

A. Yes.

Q. And have you been working?

A. I did.

Q. I beg your pardon?

A. I did.

Q. Are you working now?

A. Am I working? Like a job or what kind of work are you talking about?

Q. Well, like a job. Do you have a job?

A. Yes. Once in a while I work at the nail salon.

Q. Who owns the nail salon?

A. My family opened it.

Q. But you only work there once in a while?

A. Yes.

Q. What do you do the rest of the time?

A. Sometimes I take care of a child.

Q. You hang out?

A. I also go out to hang out when I have time.

Q. Gamble?

A. Once in a while.

Q. Gamble away the money that you are supposed to be making to make restitution payments?

    MS. BURNS: Objection.

    THE COURT: Objection sustained.

Q. The card that they gave you that enabled you to stay here and have permission to be here was only good for one year; correct?

A. Yes.

Q. And when that year was up was the card renewed?

A. But I haven't gotten a new one yet.

Q. When that card expired was that card renewed?

A. Yes. It has to be renewed every year.

Q. Well, do you have one now?

A. No. It has expired.

Q. It expired?

A. Yes.

Q. Did Immigration Service tell you whether they were going to renew it or not?

    THE INTERPRETER: Can you repeat the question?

Q. Did the Immigration Service tell you whether they would

Q. renew it or not?
A. I do not remember. I don't think it was mentioned.
Q. Well, you testified earlier that you have no permission to be in the United States; right?
A. Yes.
Q. You are not supposed to be here; correct?
A. I do not know.
Q. Well, if you don't have permission to be here, doesn't that mean, sir, you are not supposed to be here?
A. Here? Here in the United States or in court?
Q. I mean in the United States of America.
A. Yes.
Q. Yes, that you are not supposed to be here?
A. Yes.
Q. But you are here; correct?
A. Yes.
Q. Of course you haven't been promised by the prosecutors or by immigration about whether you would be able to stay here, have you?
A. Yes.
Q. Yes, you have or no, you haven't?
A. I was not promised that I could stay.
Q. Did you ever discuss with them whether they would allow you to stay?
A. No, I did not discuss it.

Q. You want to stay, don't you?
A. I do.
Q. Don't you think, sir, that by testifying at this trial that it will increase the chances that they will allow you to stay here?
A. Yes.
Q. When you got stabbed was it on Allan Street?
A. Yes.
Q. Was Mr. Lin stabbed that night also?
A. I do not know.
Q. Didn't you testify earlier that when you got stabbed, Mr. Lin was stabbed also?
A. But at that time I did not see whether he was stabbed or not. He said he got beaten up also and that he went to the hospital, too.
Q. Well, did you later learn that he was stabbed several times and spent several days at least in the hospital? Did you learn that later?
A. No. I heard that he was in the hospital also, but I do not know how long he was in the hospital.
Q. Did you learn that he was in the hospital because he had been stabbed, sir?
A. Yes.
Q. You are here because arrangements were made for you to meet with the prosecutors by Cash?

A. Yes.
Q. And Cash is somebody that you know who is also an informant for the Immigration Service; correct?
A. Yes.
Q. How do you know that Cash is an informant for the Immigration Service?
A. When I became an informant, he was the one that helped me do it.
Q. So Cash recruited you into the service of the immigration authorities?
A. Yes.
Q. And from time to time you and Cash would talk to each other about what you were doing for the agents you were working for?
A. I did not tell him if we were working together then I would talk to him. Otherwise, I wouldn't.
Q. What does Cash do for a living?
A. He does buses. I know that he does buses.
Q. When you say "he does buses," in fact he owned the bus company; correct?
A. Yes.
Q. And did he own more than one bus company?
A. I do not know.
Q. Well, have you ever heard of Ming Ong?
A. Yes, I have. It is being investigated by the government.
Q. And Cash owns Ming Ong; correct?

A. Yes.
Q. Were you ever paid any money or reimbursed for any expenses by the Immigration Service?
A. No.
Q. By the way earlier you mentioned that there was some other Dai Los in Chinatown that you knew. Do you recall that?
A. Yes.
Q. Do you remember mentioning Yi Feng?
A. Yes, I remember.
Q. Yi Jian?
A. Yes.
Q. Yi Jian, that is Yi Pei's brother; correct?
A. Yes.
Q. You know Yi Pei, don't you?
A. I know of him, but we didn't hang out together.
Q. But you know who he is; right?
A. Yes.
Q. You knew he was a witness at this trial; correct?
A. I am not sure.
Q. I am sorry?
A. I am not sure.
Q. You are not sure?
A. Right.
Q. Do you know Guo Wong?
A. I know Guo Wong.

Q. You know he was a witness at this trial; correct?

A. I heard about it.

MR. COHEN: Judge, would this be a good time to perhaps --

THE COURT: Yes. We can stop taking evidence for the day.

MS. BURNS: Can we approach, your Honor?

THE COURT: Yes. I think counsel should do what we discussed.

MR. COHEN: That is what I wanted to discuss.

THE COURT: We should do it right now.

MR. COHEN: I need to discuss with you how we're going to do it.

THE COURT: I already discussed it.

MR. COHEN: Perhaps I misunderstood.

THE COURT: Well, I guess you did. I will see you at the side bar.

(Continued on next page)

(At the side bar)

THE COURT: Now that you have reviewed the record more carefully he was not asked that question.

MR. COHEN: Okay. I didn't realize you wanted me to do it in a testimonial way. I am happy to do that. I thought I was going to be able to ask him some questions and say that I had --

THE COURT: I don't see the point of prolonging it. I think you should say it and get it over with.

MR. COHEN: Just so I understand because I do not want to be rebuked in front of the jury.

THE COURT: I would not do that.

MR. COHEN: Well, you got very close, Judge.

THE COURT: True. Within limits.

MR. COHEN: Within limits. May I just say that when I was asking him questions earlier I misspoke about the fact whether he was aware of what he was doing was wrong and I reviewed it and discovered that question was not asked.

THE COURT: That's all.

MR. COHEN: Is that okay with you guys?

MS. BURNS: Let get it done.

(Continued on next page)

(In open court; jury present)

MR. COHEN: Judge, with your permission I would like to note for the record for the benefit of the jury that earlier during my cross-examination of this witness that I asked him whether when he pled guilty and the judge asked him what he had done to make him guilty. I also asked the witness and suggested to the jury that he had been asked whether he knew at the time that he was doing it that what he was doing was illegal. Having reviewed the transcript I see that all the judge did ask him what he did at the time that made him guilty. The judge did not ask him whether he knew at the time that it was illegal. That is not in the record.

THE COURT: Very well.

We will now adjourn until tomorrow morning at 10:00. Have a pleasant evening.

(Jury excused)

(Continued on next page)

(In open court; jury not present)

THE COURT: You may step down.

MS. BURNS: Judge, I don't know if Ms. Lau was able to translate that.

Was that translated what Mr. Cohen said?

THE INTERPRETER: No.

MS. BURNS: Can it be before he goes?

THE COURT: Very well. The witness understands English quite well.

MR. SKINNER: For scheduling purposes we have four witnesses remaining.

THE COURT: How many?

MR. SKINNER: Four. One will probably be on the stand for I think a fair amount of time, but not all day barring lengthy cross. One is quite short. He is a ballistics witness. The other two I think are on the shorter side. There is a possibility we close tomorrow. We thought we were going to close tomorrow. Although, things took a little longer than we expected. So if not tomorrow, definitely on Monday.

THE COURT: Very well. Thank you.

MR. SKINNER: Rest I should say, not close.

MS. BURNS: Definitely not closing.

THE COURT: Of course not.

MR. SKINNER: Thank you, your Honor.

THE COURT: This is your witness who is most

D4H6LIN6        Shun Qing Chen - cross        Page 665

knowledgeable of English.  I have been listening closely to the translator and the witnesses and this witness is the most knowledgeable in English of all the witnesses I have heard in the trial.  He is very intelligent.

MR. SKINNER: He is also young and has been here for a while.

THE COURT: And has been here for a while, right.

(Adjourned to April 17, 2013 at 10:00 a.m.)

Page 666

INDEX OF EXAMINATION

Examination of:                                    Page

SONG DI XIANG

Direct By Mr. Skinner  . . . . . . . . . . . . 539

Cross By Mr. Cohen . . . . . . . . . . . . . . 547

Redirect By Mr. Skinner  . . . . . . . . . . 569

Recross By Mr. Cohen . . . . . . . . . . . . 574

SHUN QING CHEN

Direct By Ms. Burns . . . . . . . . . . . . . 591

Cross By Mr. Cohen . . . . . . . . . . . . . . 617

CAI XIANG LI

Direct By The Court  . . . . . . . . . . . . . 641

SHUN QING CHEN

Cross By Mr. Cohen . . . . . . . . . . . . . . 644

GOVERNMENT EXHIBITS

Exhibit No.                                Received

110 and 34    . . . . . . . . . . . . . . . . 571

107, 31, 32   . . . . . . . . . . . . . . . . 573

**In The Matter Of:**

*UNITED STATES OF AMERICA, v*
*XING LIN,*

*April 18, 2013*

*SOUTHERN DISTRICT REPORTERS*
*500 PEARL STREET*
*NEW YORK, NY 10007*
*212 805-0330*

Original File d4i6linf.txt
**Min-U-Script® with Word Index**

A. 596

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

                    v.                    11 CR 114 (MGC)

XING LIN,

                    Defendant.            JURY TRIAL

------------------------------x

                                         New York, N.Y.
                                         April 18, 2013
                                         10:20 a.m.


Before:

            HON. MIRIAM GOLDMAN CEDARBAUM,

                                         District Judge


                    APPEARANCES


PREET BHARARA,
     United States Attorney for the
     Southern District of New York
PETER M. SKINNER
JENNIFER E. BURNS
     Assistant United States Attorneys

JOEL S. COHEN
     Attorney for Defendant

ALSO PRESENT:   BRENDA CHEN, Fuchow Interpreter
                DANIEL YANG, Fuchow Interpreter
                LILY LAU, Fuchow Interpreter
                DANIEL CHAN, Fuchow Interpreter
                JESSICA CHACE, Paralegal
                TIMOTHY VARIAN, Special Agent, HSI
                JIAYING WANG, Legal Assistant

(Trial resumed)

(In open court; jury not present)

THE COURT: Good morning. Please be seated. We now have a full jury and we should bring them in.

(In open court; jury present)

THE COURT: Good morning, members of the jury. We're going to continue with the same witness that we heard yesterday afternoon. You may all be seated.

CROSS-EXAMINATION (cont'd)

BY MR. COHEN:

Q. Mr. Chen, on the evening that you were stabbed, do you recall that incident?

A. Yes. Pretty much I do remember.

Q. Do you know somebody by the name of Ahsui?

A. Yes.

Q. Who is Ahsui?

A. Also a member of Chinatown gang.

Q. And he followed Yi Feng?

A. Yes.

Q. And is it fair to say that you saw Ahsui that night?

A. Yes, that night.

THE COURT: What night are you talking about?

MR. COHEN: I am sorry, your Honor. The night that he was stabbed.

Q. Did you see him that night?

A. Yes.

Q. Where did you see him?

A. At the gambling parlor.

Q. And which gambling parlor was that?

A. East Broadway. I am not sure whether it was 107 or 103.

Q. And when you saw him at the gambling parlor, you had a gun; correct?

A. Yes.

Q. And in fact you fired a gun that night; correct?

A. That night I don't remember.

Q. You don't remember, sir, whether you fired a gun that night?

A. I don't remember.

Q. Did you frequently fire guns?

A. Not really. Sometimes I went for target shooting.

Q. Well, were you target shooting that night?

A. No.

Q. Isn't it so that you fired a shot and that is what gave rise to the incident where you later got stabbed?

A. No. First he went in. Ding Pa had an argument with them.

Q. But when was it that you were there with the gun?

A. I went in and he was there arguing so I just stood there.

Q. Who is there arguing?

A. Him, Ding Pa, was arguing.

Q. Before you got there did you know that Ding Pa was arguing

with him?

A. I went up with him.

Q. I am sorry?

A. I went up with him.

Q. Before you got there, did you know that --

THE COURT: Whom did you go with, Ahsui or Ding Pa? He said he went with him.

THE WITNESS: I went up with Ding Pa.

Q. Describe the circumstances under which you left the gambling parlor?

A. After the argument Ahsui went down. So everyone at the gambling parlor after they saw the argument, they all ran down.

THE COURT: Down where?

THE WITNESS: I went downstairs. No. Other people went downstairs. At that time after I had drinks and I was a little dizzy so I took out a gun, but I am not sure whether it was Andia or China Boy who took the gun. So Ding Pa and I went down. So those people went down together and got to Allan Street.

BY MR. COHEN:

Q. Excuse me. When you say people went down, what are you referring to? Where did they go?

A. I went with them and Ding Pa went do the street across. I was on Allan Street. So a group of people from the other side rushed over and I got stabbed.

Q. In fact you were stabbed once or more than once?
A. I was stabbed once. And then when I got to the hospital, they opened it up here. This area.
Q. When you were stabbed, did you fall down in the street?
A. Yes, I fell.
Q. Did somebody come to try to help you?
A. At that time it seems there was a person who I knew who drove a Lincoln also from my village.
Q. Wasn't it Ding Pa who came and helped you get up to your feet when you had been stabbed?
A. No, he did not.
Q. Do you remember that as you were getting to your feet after being stabbed that several vans drove up?
A. I don't remember.
Q. And that people jumped out of those vans and assaulted Ding Pa?
A. At that time I did not see it. I could have possibly fallen down on the ground.
Q. Now, have you ever used drugs?
A. Yes. In the past.
Q. And what drugs have you used in the past?
A. I smoked marijuana.
Q. And what else?
A. And ketimine.
Q. Did you say ketimine?

THE COURT: Yes.
Q. Please tell the jury what ketimine is.
A. Also kind of drug.
Q. Is it an illegal drug?
A. Yes.
Q. And what about Ecstasy, you have done that also; correct?
A. Yes. When I went to hang out, yes, I used it once or twice.
Q. When is it that we're talking about that you were using these drugs?
A. When I was out there hanging out with a group of people.
Q. So that was before you got arrested for extortion; correct?
A. Yes.
Q. It was before you pled guilty to extortion in this courthouse; correct?
A. Yes.
Q. Now, do you remember, sir, that after you pled guilty, the judge ordered what is called a presentence report?
A. Yes.
Q. And do you remember the judge saying or being told that the presentence report was being done to assist the judge in knowing your background so he would know how to sentence you?
A. Yes.
Q. Do you remember that sometime after this but before you got sentenced you were actually interviewed by a Probation officer

who asked you a lot of questions and then prepared a report for the judge?
A. Yes.
Q. And do you remember being told that when you were interviewed by the Probation officer that all your answers had to be truthful?
A. Yes.
Q. Were you told that if you gave an untruthful answer, it can be either another federal crime or a reason to raise your sentence for obstructing justice?
A. Yes.
Q. And during that interview you were asked whether you used any illegal drugs or controlled substances; correct?
A. Yes.
Q. What was your answer?
A. At that time I answered and said I used.
Q. You answered and said that you used drugs?
A. Yes.
Q. Are you sure about that?
A. I am sure.
Q. Isn't it true that what happened was that you denied ever using any form of controlled substance but told them that occasionally you drank?
A. I told them that I used drugs. And they also asked me and I said after I got arrested, I stopped using it.

MR. COHEN: Your Honor, I would respectfully offer in evidence paragraph 42 of the defendant's presentence report.
MS. BURNS: Objection.
THE COURT: I would like to see it.
MR. COHEN: Of course. May I bring it up, Judge?
THE COURT: Yes.
Have You shown it to the government?
MR. COHEN: They gave it to me, but sure.
MR. SKINNER: We have a copy, Judge.
THE COURT: Very well.
Objection overruled.
MR. COHEN: Your Honor, I will reduce this to a written document, but as that paragraph is now in evidence, may I read it to the jury?
THE COURT: What do you mean you will reduce it? You will transfer it to a paper, is that what you mean?
MR. COHEN: Yes.
THE COURT: Very well.
MR. COHEN: Paragraph 42: "Chen stated that he has never used any form of controlled substance. He reportedly drinks alcoholic beverages occasionally."
I have nothing further, your Honor.
THE COURT: Very well.
Is there any redirect?
MS. BURNS: One moment, your Honor.

D4I6LIN1      Shun Qing Chen - cross      Page 675

MR. COHEN: Your Honor, that will be Defendant's Exhibit C.

THE COURT: Very well. Defendant's Exhibit C is received in evidence.

(Defendant's Exhibit C received in evidence)

MS. BURNS: We have no further questions, your Honor.

THE COURT: Very well. You may step down.

(Witness excused)

MR. SKINNER: Your Honor, the government calls Cai Xiang Li.

THE COURT: How do you spell that?

MR. SKINNER: C-a-i, X-i-a-n-g, L-i.

CAI XIANG LI,
    called as a witness by the Government,
    having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. SKINNER:

Q. Good morning, Mr. Li.

Where are you from?

A. China.

Q. When did you first come to the United States?

A. 1993.

Q. Are you a citizen of the United States?

A. No.

Q. Are you in the country legally?

---

D4I6LIN1      Cai Xiang Li - direct      Page 677

A. No.

Q. Have you been promised anything in exchange for your testimony today?

A. No.

Q. Has anyone told you how to testify today, what to say?

A. No.

Q. A few years back did you own a gambling parlor in Brooklyn?

A. Mahjong parlor.

Q. Can you tell the jury what Mahjong is?

A. It's pieces of Mahjong.

Q. Is it a game?

THE COURT: It's a game?

THE WITNESS: Yes.

Q. Is it a game that people bet on?

A. Yes. Four players.

Q. Did you own a place where people came to play?

A. Yes.

Q. How long did you own that establishment?

A. I had it for a few months.

Q. Did you earn any money off the bets that people placed?

A. Yes. I took commission. Yes, I made some money.

Q. Now, Mr. Li, do you know a man that goes by the name Ding Pa?

A. Yes.

Q. And do you know that person's real name?

---

D4I6LIN1      Cai Xiang Li - direct      Page 676

A. Yes.

Q. Were you subpoenad to testify today?

A. Yes.

Q. Have you received what is called an immunity order in connection with your testimony today?

A. Yes. I received a subpoena from the court.

Q. Are you also testifying today under what is called an immunity order?

A. Immunity, what is it?

Q. Have you received immunity from the Court prior to testifying today?

A. You mean the agreement?

Q. Do you have protection for your testimony today?

A. Yes.

Q. Has the Court told you that you can't be prosecuted in connection with what you testify about today?

A. Yes.

Q. But can you be prosecuted if you lie during your testimony today?

A. Yes.

Q. Does your legal status in the United States depend on in any way your testimony here today?

A. No.

Q. Are you receiving any immigration benefit as a result of testifying today?

---

D4I6LIN1      Cai Xiang Li - direct      Page 678

A. I do not know.

Q. When did you first meet Ding Pa?

A. '96. '95 or '96.

Q. Where did you first meet him?

A. In Chinatown.

Q. Do you see Ding Pa in the Court here today?

A. Yes.

Q. Can you just please describe where he is sitting and what he is wearing?

A. He is sitting there in the middle.

Q. Which table is he at, the first one or the second one?

A. He is sitting in the table where four people are sitting over there.

Q. What color shirt does he have on?

A. Black.

Q. Is that a shirt? How far in is he from the left of the table?

A. Second person.

MR. SKINNER: Your Honor, may the record reflect that the witness has identified the defendant?

THE COURT: It may.

Q. You testified a moment ago that you met the defendant in Chinatown; is that right?

A. Yes.

Q. Where in Chinatown were you when you met him?

A. 122 Madison Street in Chinatown.

Q. What was located at 122 Madison Street?

A. Gambling parlor. Also a Mahjong parlor.

Q. And were you in this Mahjong parlor when you met the defendant?

A. Yes.

Q. And on what floor of 122 Madison was the Mahjong parlor located on?

A. Second floor.

Q. During the time that you knew the defendant, did he own any other gambling parlors in Chinatown?

A. He had that gambling parlor and later he moved it to a floor -- to a lower floor.

Q. In the same building at 124 Madison?

A. First floor.

Q. And then did you have any other ones outside of 122 Madison?

A. Also one at Eldridge Street, but I do not know the number.

Q. Let's talk first about the Mahjong parlor at 124 Madison. Now, that is where you first met the defendant?

A. Yes.

Q. Do you know how long the defendant had a Mahjong parlor at this location?

A. It was in business for about a month. A few months to a year.

Q. A few months to a year?

A. Yes. Almost.

Q. Did you gamble there?

A. Yes.

Q. How many tables were there?

A. When it was on the second floor, about four to five tables.

Q. How many people play a Mahjong game at a time?

A. Four.

Q. Did you also come to work there after a while?

A. I was there hanging out.

Q. Did you ever do any work there?

A. Yes.

Q. What did you do?

A. If there were enough players, I just tried to fill in as a player.

Q. You have to have four players to play the game?

A. Yes.

Q. If a group showed up of three, you would fill in?

A. Yes.

Q. Did you ever do anything else for work at this Mahjong parlor?

A. Yes. Pouring, serving tea. Pouring out tea for people.

Q. Did you serve alcoholic drinks as well?

A. Yes.

Q. Now, you say the defendant owned this Mahjong parlor. How

do you know that?

A. I know. I was in there.

Q. What did you see him doing that indicated to you that he owned it?

A. He rented a place and also he collected money and took commission.

Q. You worked there as well; right?

A. Yes.

Q. Did you view him as your boss?

A. I was working there. I viewed him as a partner.

Q. Did he tell you what to do?

A. If there weren't enough players, I had to fill in.

Q. Did he give you instructions on what to do when you were there?

A. Not enough players to fill in and to serve tea and also order for people.

THE COURT: That was not responsive to the question.

Q. It is not clear. Are those things he told you to do, or are those things you just did on your own?

A. Sometimes he told me to do those things and if he was not there then, I did them on my own.

Q. I think you mentioned a moment ago that he collected a commission; is that right?

A. Yes.

Q. What is a commission?

A. If you play the game of Mahjong, for example, you would collect $5 for one round, one round of Mahjong.

Q. $5 per person or $5 for the four people playing the game?

A. Per person.

Q. And long does a typical Mahjong game last?

A. About half an hour.

Q. Let's turn to the second gambling parlor you mentioned. There was a second one that was on the first floor of the same building on Madison Street; is that right?

A. Yes.

Q. Now, at what point in time was it that the defendant had a gambling parlor on the first floor of 122 Madison Street?

A. After a few months after operation of business upstairs and then moved downstairs.

Q. And so this would still be in the 1996, 1997 time period? Can you fix the years if at all possible?

A. I do not exactly know when is the fixed year, but around '95 or '96.

Q. Would it be fair to say that it would be a couple months after you first met the defendant that operations moved to the first floor?

A. Yes.

Q. What kind of gambling took place on the first floor of 122 Madison Street?

A. 13 cards, card games.