# 14-4133

UNITED STATES COURT OF APPEALS

For the

## SECOND CIRCUIT

UNITED STATES OF AMERICA,

Appellee,

v.

Hao Chao, aka Sealed Defendant 2, aka Little Beijing,

Defendant

and

Xing Lin, aka Sealed Defendant 1, aka Ding Pa,

Defendant-Appellant

On Appeal from the United States District Court
for the Southern District of New York

**APPENDIX**
**Volume 3 of 3 (Pages A-601 to A-749)**

Megan Wolfe Benett, Esq.
750 Third Avenue, 32nd Floor
New York, New York 10017
(212) 973-3406
mbenett@kreindler.com
*Attorney for Defendant Appellant Xing Lin*

# TABLE OF CONTENTS

**Page**

District Court Docket Entries ..........................................................A. 1

Notice of Appeal filed November 3, 2014 .................................A. 22

Initial Indictment filed February 9, 2011 ..................................A. 23

Draft Plea Agreement dated January 10, 2012 ...........................A. 26

Draft Superseding Information ...................................................A. 31

Plea Transcript held before the
Honorable Miriam Goldman Cedarbaum dated
June 27, 2012 ............................................................................A. 34

Transcript of Conference held before the
Honorable Miriam Goldman Cedarbaum, dated
June 28, 2012 ............................................................................A. 90

Transcript of Conference held before the
Honorable Miriam Goldman Cedarbaum, dated
July 12, 2012 ............................................................................A. 101

Second Superceding Indictment filed September 28, 2012 .....A. 115

Transcript of Indictment held before the
Honorable Miriam Goldman Cedarbaum, dated
July 26, 2012 ............................................................................A. 133

Transcript of Conference held before the
Honorable Miriam Goldman Cedarbaum, dated
October 19, 2012 ......................................................................A. 146

Transcript of Conference held before the
Honorable Miriam Goldman Cedarbaum, dated
January 31, 2013 ................................................................A. 160

Transcript of Conference held before the
Honorable Miriam Goldman Cedarbaum, dated
April 3,2013 ......................................................................A. 181

Transcript of Trial Proceeding held before the
Honorable Miriam Goldman Cedarbaum, dated
April 9, 2013 .....................................................................A. 201

Transcript of Trial Proceeding held before the
Honorable Miriam Goldman Cedarbaum, dated
April 10, 2013 ...................................................................A. 219

Transcript of Trial Proceeding held before the
Honorable Miriam Goldman Cedarbaum, dated
April 11, 2013 ...................................................................A. 363

Transcript of Trial Proceeding held before the
Honorable Miriam Goldman Cedarbaum, dated
April 15, 2013 ...................................................................A. 500

Transcript of Trial Proceeding held before the
Honorable Miriam Goldman Cedarbaum, dated
April 16, 2013 ...................................................................A. 531

Transcript of Trial Proceeding held before the
Honorable Miriam Goldman Cedarbaum, dated
April 17, 2013 ...................................................................A. 562

Transcript of Trial Proceeding held before the
Honorable Miriam Goldman Cedarbaum, dated
April 18, 2013 ...................................................................A. 596

Transcript of Trial Proceeding held before the
Honorable Miriam Goldman Cedarbaum, dated
April 22, 2013 ........................................................................A. 627

Transcript of Trial Proceeding held before the
Honorable Miriam Goldman Cedarbaum, dated
April 23, 2013 ........................................................................A. 653

Transcript of Trial Proceeding held before the
Honorable Miriam Goldman Cedarbaum, dated
April 24, 2013 ........................................................................A. 688

Transcript of Trial Proceeding held before the
Honorable Miriam Goldman Cedarbaum, dated
April 25, 2013 ........................................................................A. 712

Jury Verdict Form dated April 24, 2013 ...................................A. 721

Government Sentencing Submission dated
September 15, 2014 ................................................................A. 723

Defense Sentencing Submission dated
October 6, 2014 .....................................................................A. 734

Government Sentencing Submission dated
October 20, 2014 ...................................................................A. 741

Defense Sentencing Submission dated
October 21, 2014 ...................................................................A. 744

Transcript of Sentencing dated October
21, 2014 .................................................................................A. 748

Q. Is that a card game where you bet money?

A. Yes.

Q. And did you bet money at this gambling parlor on the first floor of 122 Madison Street?

A. Yes.

THE COURT: 13 cards is what the game is called?

THE WITNESS: Yes. Well, one dealer, three players, and people standing on the side can make bets.

Q. So there is four people playing the game, but other people also betting on the game?

A. One dealer.

THE COURT: The dealer did not play; is that right?

THE WITNESS: He is the dealer and the players bet against him.

Q. So is the dealer a player in the game or not?

A. Yes.

Q. So there is a dealer plus three players and then other people in the room are making bets on the hand as well?

A. Yes.

Q. Now, at 122 Madison Street how many people in total would typically be gambling at a time?

A. As many as 20 to 30 people.

Q. How much money was being bet at a time?

A. At a time the maximum amount would be over 10,000.

Q. Now, you say that the defendant owned this gambling parlor

as well; is that right?

A. Yes.

Q. How do you know that he owned it?

A. He was responsible for everything and if people wanted to have shares in his parlor, they must pay him. He collected money.

Q. So he would collect money from the people that were gambling?

A. For example, if people didn't have the money to gamble, they would go to him for money.

THE COURT: He would lend money is what you are saying?

THE WITNESS: Yes.

Q. Did you have any kind of book or paper where he kept track of who owed what?

A. Yes.

Q. And you mentioned a moment ago that there were shareholders as well; is that right?

A. Yes.

Q. Now, who were the shareholders?

A. Shareholders were the people who gambled over there and if they wanted to be a shareholder, they must pay 5,000 each.

Q. Would the shareholders earn any money from the game?

A. Yes.

Q. How much would the shareholders make?

A. For example, the lead shareholder would collect 2,000 out of 10,000 then they split up the rest of it.

Q. Were you a shareholder?

A. Yes.

Q. How long were you a shareholder in the gambling parlor at 122 Madison Street?

A. I was the shareholder for a few months. Three to four months.

Q. How often would you get paid in connection with being a shareholder in that game?

A. Sometimes a week and sometimes three days.

Q. How much would you usually get?

A. I am not definite. Sometimes a thousand. Sometimes two to three thousand.

Q. How many other shareholders were there if you know?

A. About 20 shareholders.

Q. Were there people working at this gambling parlor on the first floor of 122 Madison Street?

A. Yes.

Q. How many people would work there at a time?

A. Five to six.

Q. Was there a commission charged for the games of 13 cards that were paid there?

A. Yes.

Q. What was the commission?

A. 5 percent. $5 for every $100.

Q. How long does it take to play one hand of 13 cards?

A. About five minutes.

Q. Let's turn to the third gambling parlor that you mentioned earlier. You said that one was located on Eldridge Street; is that right?

A. Yes.

Q. Where in the building was the gambling parlor on Eldridge Street located?

A. I do not remember the number of the building, but it was behind the barbershop. It is like a half basement.

Q. So you had to go through a barbershop in order to get into the gambling parlor; is that right?

A. Yes.

Q. Were there signs on the outside advertising that there was a gambling parlor on the outside?

A. The front is a barbershop.

Q. Were there any signs out there indicating that there was a gambling parlor behind the barbershop?

A. No signs.

Q. What about at Madison Street, 122 Madison, were there any signs on that building indicating that there were gambling parlors inside?

A. No. No.

Q. Turning back to Eldridge Street. During what time period

roughly was this gambling parlor in operation?

A. It opened up around 3:00, 4:00 in the morning.

Q. What year was it in operation?

A. I do not remember very clearly what year. It was approximately '95, '96.

Q. Was it before or after or at the same time that there were gamble parlors located at 122 Madison?

A. It was not the same time. Eldridge Street was after Madison.

Q. Was the gambling parlor at Eldridge Street around for more than a month?

A. It was after Madison Street. After Madison Street then Eldridge Street was opened.

Q. With regard to how long it was operating was it operating for more than a month?

A. Yes.

Q. More than a year?

A. No.

Q. What kind of gambling took place at the gambling parlor on Eldridge Street?

A. It was also 13 cards.

Q. Did you gamble at the gambling parlor on Eldridge Street?

A. Yes. I gambled there once.

Q. Were you a shareholder at that gambling parlor?

A. No.

Q. When you were there, how many workers did you see, if any?

A. I saw four to five people.

Q. I think you mentioned a moment ago that the defendant owned this gambling parlor. Can you explain to us how you know that?

A. When I went -- when I was there, when other people needed money, he was the one who would back them up on the money.

Q. Is that similar to the way things were on the first floor of 122 Madison Street?

A. Yes.

Q. How many people did you see gambling at the gambling parlor on Eldridge Street?

A. As many as 20 to 30 people or 10 to 20 people.

(Continued on next page)

Q. And was there a commission charged at this gambling parlor?

A. Yes, it was also five percent commission.

Q. And how much money was bet at this gaming parlor?

A. $12,000 at the most.

Q. Mr. Li, are you familiar with the term "dailo"?

A. Dailo, yes, I'm familiar with that.

Q. What is a dailo?

A. Dailo is a person who hang out and have kids that follow him.

Q. And what do the followers do?

A. The kids help him watch over the gambling parlor or help out at the gambling parlor.

Q. What's the relationship between a dailo and the kids or followers?

A. The dailo is the person who would tell the kids what to do, and they would do it.

Q. Now, what, if anything, did you see or hear that led you to believe that the defendant was a dailo?

A. For example, people work for him and watch over the parlor for him.

Q. Did you see him out in Chinatown with his followers?

A. Yes.

Q. Do you know who any of his followers are?

A. I knew a few of them.

Q. Can you give us their names please?

A. Yin Gon.

THE INTERPRETER: Y-I-N, G-O-N.

MR. COHEN: I'm sorry, the spelling?

THE INTERPRETER: Y-I-N, G-O-N. Yin Gon.

A. I don't really know the other -- the names of the others.

Q. Do they have nicknames?

A. I don't know if they have nicknames, but this was the name.

Q. Did there ever come a time when you saw either the defendant or his followers use violence against someone in Chinatown?

A. I saw it once.

Q. And where were you when you saw this?

A. It was at 109 East Broadway at a barbershop on the first floor.

Q. What time of day was it?

A. Approximately 9, 10 o'clock.

Q. What year was it, do you know?

A. I do not remember which year that was.

Q. About how long ago was it, five years ago? Ten years ago?

A. Before now?

Q. Yeah, how long ago from now?

A. At least more than ten years ago.

Q. Do you know who owned this barbershop?

A. This barbershop was owned by Guo Li.

Q. What were you doing in his barbershop late at night?

A. I was playing cards.
Q. Were you gambling?
A. Yes.
Q. Was the gambling taking place in the barbershop or someplace else in the building?
A. In a room behind the barbershop, in a small room.
Q. Did there come a time that night when you saw the defendant, Ding Pa?
A. Yes.
Q. Where were you when you first saw him?
A. The first time I saw him, I was sitting on the chair in the barbershop outside.
Q. And what did you see the defendant do?
THE INTERPRETER: I'm sorry, can you repeat the question?
Q. What did you see the defendant do after you saw him?
A. He went in with three, four people to beat up on this person named Yi Qiu.
Q. So you first saw the defendant when you were in the front in the barbershop; is that right?
A. Yes.
Q. And he was with other people?
A. Yes.
Q. Did the defendant stay in the front in the barbershop or did he go someplace else after he came in?

A. When he went in, he went to the back room and grabbed Yi Qiu and brought him out.
Q. You weren't in the back room, you were in the front room, right?
A. I was in the front room. I was in the barbershop sitting on the chair.
Q. So focusing on what you saw, you saw him leave the barbershop and go in the back room?
A. Yes.
Q. And then you saw him come back?
MR. COHEN: Objection to all this narrative, Judge.
THE COURT: Yes. Please do not lead.
Q. After Ding Pa went into the back room, just describe for us the next thing you saw.
THE COURT: Were you in the back room?
THE WITNESS: I was in the front at the time.
Q. So after you saw him leave the front room and go into the back room, just describe for us the next thing you saw.
A. He dragged Yi Qiu to the front, to the barbershop.
Q. Did he go into the back room by himself or with the other people that he'd come in with?
A. He went to the back with the other people that came in with him.
Q. And when he came back into the front room with Yi Qiu, was he by himself or with those other people?

A. He came out with three, four people.
Q. How long was he in the back room?
A. A little while. As soon as he went in, he came out with Yi Qiu, dragging him.
Q. Now, what happened after he dragged Yi Qiu back into the front room?
A. A few people surrounded Yi Qiu and beat him up.
Q. And who were those people who surrounded Yi Qiu?
A. The names I don't know. I only know of one named Loba.
Q. Was Ding Pa one of those people?
A. Yes.
Q. And were the other people ones that came in with Ding Pa or were they different people?
A. The one that came in with him.
Q. Now, how did Ding Pa and the people that he came in with beat Yi Qiu?
A. With their fists, punching; and feet, kicking.
Q. How long did they beat Yi Qiu?
A. For a little while.
Q. For a little while. Five minutes? Ten minutes? Thirty seconds? Can you give us some time frame?
A. He was punched like a dozen times or so before they left.
Q. And what did they do after they were finished beating Yi Qiu?
A. They left.

Q. What happened after they left?
A. After they left, I went and asked Yi Qiu why they beat up on him.
Q. What did he say?
MR. COHEN: Objection.
THE COURT: Objection sustained.
MR. SKINNER: Your Honor, can we be heard on that at the sidebar?
THE COURT: Yes, but not right now. You should finish this line, and then I'll hear you.
Q. What was Yi Qiu's condition after the beating?
A. He was bleeding from the mouth, and his face was all bruised up.
Q. And how long after the beating was it -- without telling me what was said, how long after the beating was it when you asked Yi Qiu what happened?
A. About five minutes later.
Q. And what happened -- well, did you take Yi Qiu to the hospital that night?
A. No.
Q. Did you call the police?
A. No.
Q. Why not?
MR. COHEN: Objection.
THE COURT: Objection sustained.

MR. SKINNER: Your Honor, I was going to move on to a different line of questioning. We can come back to my question about what was said later.

THE COURT: Yes.

BY MR. SKINNER:

Q. Mr. Li, did there ever come a time when you saw the defendant, Ding Pa, physically injured in some way?

A. I saw it once.

Q. When was that?

A. I don't remember which year.

Q. Can you roughly estimate how long ago from now it was?

A. It was approximately '01, '02, 2001, 2002. I'm not really sure.

Q. Where were you?

A. I was on the street at the time.

Q. Where on the street? What street?

A. I was on Allen Street.

Q. Is that here in Manhattan?

A. It was intersections of Allen and Grand Street.

Q. Is that here in Manhattan?

A. Yes.

Q. What time of day it was?

A. What time? It was nighttime, around 8, 9 o'clock.

Q. And what did you see?

A. I saw Ding Pa being beat up by someone, and he was lying

there on the ground. It was by intersections of Allen Street and Grand Street.

Q. Did you actually see him being beat up, or did you just see him on the ground afterward?

A. I did not see him being beaten up; I saw him on the ground after he was beaten up.

Q. From where you were standing, did it look to you like he was hurt?

A. Yes, he was hurt.

Q. And from where you were standing at that point in time, could you tell how he was hurt?

A. I couldn't see very clearly; I only saw him lying there.

Q. Was there anybody else lying on the ground in the same general area?

A. There was another person, Cousin.

Q. And who was Cousin?

A. Cousin was with Ding Pa.

Q. Was he one of Ding Pa's followers?

A. Yes.

Q. And what was Cousin's condition?

A. He was also lying there after being beaten up.

Q. Did he ever talk to either Ding Pa or Cousin about how they had gotten injured?

A. No, I didn't talk to them.

Q. Mr. Li, let me direct your attention to the night of July

29th, 2004. Did you go out that night?

A. Yes.

Q. Where did you start the night out?

A. I went to dinner first.

Q. Did you go to dinner alone or with other people?

A. I went with other people.

Q. Where did you go to dinner?

A. I went to this place on Market Street called Zhong Hing.

Q. Is that a restaurant?

A. Yes.

Q. And is that here in Manhattan?

A. Yes, in Chinatown.

Q. Who were you with?

A. I was with Yiqun, Madan, No. 4, Mayong, Yita, Yipei. These people.

Q. So how many is that, including yourself?

A. Seven people.

Q. How long were you at dinner?

A. For about one to two hours.

Q. One of the people that you were with was somebody named Yiqun; is that right?

A. Yes.

Q. How do you know Yiqun?

A. I knew Yiqun from Chinatown.

Q. Was he a friend of yours?

A. Yes.

Q. Now, during the time that you were at dinner, were you drinking?

A. Yes.

Q. What were you drinking?

A. I was drinking Heineken.

Q. So beer?

A. Yes.

Q. How many beers did you have during dinner?

A. Each person had two beers.

Q. That includes you?

A. Yes.

Q. What, if anything, did you do after you finished dinner?

A. After dinner, we went to hang out.

Q. Who went to hang out?

A. Myself, the seven people all went.

Q. Where did you go?

A. The first place we went to was a place on College Point, it's a club called The Scent of a Woman.

Q. College Point. What borough was that in?

A. I don't know what borough that is; I just know that the nightclub's name is called Scent of a Woman.

Q. Do you know the name of the neighborhood that it was in?

A. I just know that the name of the club is called Scent of a Woman, and the place is on College Point.

D4IVLIN2    C. X. Li - direct    Page 699

Q. How long were you at Scent of a Woman?
A. For about ten minutes.
Q. Did you have anything to drink at this place?
A. No drinks, just had a plate of fruits and then we left.
Q. What did you do after you left?
A. After we left, we went to a place on Kessina Boulevard, it's called Heaven on Earth. We went there to hang out.
Q. And when you got to this place on Kessina Boulevard, what did you do?
A. I went in and I got a room. I got a private room.
Q. What did you do after you got the room?
A. We went in to hang out.
Q. Who went in to hang out?
A. Madan, No. 4, Mayong, Yipei, Yita, Yiqun, and myself.
Q. Is that basically the same group that you were out with for dinner earlier that night?
A. Yes.
THE COURT: We're going to stop at a convenient place for a mid-morning recess.
MR. SKINNER: This is as convenient as any, Judge.
THE COURT: Very well.
Then we will take a ten-minute recess at this time.
(Jury excused)
THE COURT: You may step down.
(Witness excused)

D4IVLIN2    C. X. Li - direct    Page 700

THE COURT: I will hear you now.
MR. SKINNER: Your Honor, I think that it is an exception to the hearsay rule as either a present-sense impression under 803(1), or excited utterance under 803(2).
Under both theories, for largely the same reason, the man had just been beaten, and in the immediate aftermath he explained how this condition came about.
THE COURT: If he was really so shaken, he could not have been explaining things.
MR. SKINNER: Well --
THE COURT: I sustain the objection.
MR. SKINNER: Your Honor, if that were the case --
THE COURT: He would have had to have calmed down in order to speak.
MR. SKINNER: If that were the case, there would never be anything that fit the exception.
THE COURT: That's not correct. And it depends on the circumstances.
MR. SKINNER: I think --
THE COURT: That is the most common such utterance, is in connection with a dying declaration.
MR. SKINNER: That's a separate exception to hearsay.
THE COURT: Well, but it's based upon it, essentially.
MR. SKINNER: It's a statement relating --
THE COURT: Well, in any event, I sustain the

D4IVLIN2    C. X. Li - direct    Page 701

objection.
MR. SKINNER: Judge, it's a statement relating to a startling event or condition.
THE COURT: Please. I'm very familiar with that exception. And I don't think it applies in this case.
MR. SKINNER: I think under the Court's reasoning, there would not be a circumstance --
THE COURT: All you're doing is telling me that you disagree. And I understand, because you've made the application. But I sustain the objection.
MR. SKINNER: Well --
THE COURT: I do not think that the exception applies properly in this case.
MR. SKINNER: And, Judge, I was doing more than just saying I disagreed; I was hoping to persuade you --
THE COURT: I understand.
MR. SKINNER: -- otherwise.
THE COURT: I understand.
I am very familiar with the excited utterance rule. And I do not think that this constitutes the kind of excited utterance that qualifies an out-of-court statement for admission.
Very well. We will all take a ten-minute recess.
The indicia of reliability, which is what we're talking about, were not present in this case, at least they

D4IVLIN2    C. X. Li - direct    Page 702

weren't established.
(Recess)
THE COURT: All right. You may proceed.
MR. SKINNER: Thank you, your Honor.
BY MR. SKINNER:
Q. Now, Mr. Li, before we took our break, I think you had testified that after getting to the club, you got a private room; is that right?
A. Yes.
Q. And then you and the group that you were with went into the private room together; is that right?
A. Yes.
Q. I'm going to hand you a pointer, a laser pointer. You press this button, you can point on the diagram. Can you just show us where on the diagram that's up on the screen you went, if you see the place you went on that diagram?
A. Here.
Q. Is that where you came in?
A. Yes.
Q. Where did you go after you first went in?
A. I went in a private room.
Q. Can you show us where the private room was located, if you see it.
Now, what happened after you and your group got into the private room?

A. We took out some drinks and had drinks, singing.
Q. Was this a karaoke club?
A. Yes.
Q. Was it the same group the whole time or did other people join you?
A. I sat there for about half an hour, and then a person walked in.
        (Continued on next page)

BY MR. SKINNER:
Q. Who came in?
A. Quo Li.
Q. Is this the same person who opened the barbershop who you told us about earlier?
A. Yes.
Q. Other than Guo Li, did any women ever join you in the room?
A. Yes.
Q. How many women came into the room?
A. Three.
Q. Who were they?
A. They were the hostesses.
Q. Did they work for the club?
A. Yes.
Q. What happened after Guo Li came into the nightclub -- excuse me, into the private room?
A. When Guo Li came into the private room and had a few cups alcoholic drinks and after a few cups of alcoholic drinks and Guo Li told me -- Guo Li told me --
        MR. COHEN: Objection.
A. Told me --
        MR. COHEN: Objection.
        MR. SKINNER: It is not being offered for the truth, your Honor, but for the witness's state of mind.
        THE COURT: The witness's state of mind of what

somebody else said?
        MR. SKINNER: It is not being offered for the truth, I. Will leave it at that.
        THE COURT: Well, we'll discuss it at the side bar. Let's turn to something else.
BY MR. SKINNER:
Q. How many glasses of alcohol did you drink with Guo Li?
A. Guo Li came in and had two to three glasses.
Q. What kind of alcohol?
A. Beers.
Q. What did you do after Guo Li came in other than drinking the glasses of alcohol?
A. Guo Li told me that --
        MR. COHEN: Objection.
        THE COURT: Objection sustained.
Q. Did Guo Li stay in the room?
A. Guo Li came in and after he had alcoholic --
Q. Don't tell us what Guo Li said. The question was: Did Guo Li stay in the room?
A. He went out.
Q. What did you do after Guo Li went out?
A. I went out with Guo Li.
Q. Where did you go?
A. I went to Ding Pa's room.
Q. Can you show us with the laser pointer where?

        THE COURT: Did I understand that Ding Pa was also there in another room; is that what you are saying?
        THE WITNESS: Yes.
Q. Did you go to look for Ding Pa?
A. Yes.
Q. How much time had passed since the last time you had seen Ding Pa before this night?
A. Guo Li and I went to Ding Pa's room.
        THE COURT: He didn't hear the question.
Q. The question was: How much time had passed since you had last seen Ding Pa?
A. At this time when I was walking out with Guo Li, I still did not see Ding Pa.
Q. Before that night when was the last time that you had seen him?
A. When I saw him in that room over there in the hallway.
Q. Mr. Li, before the night of July 29th, 2004, when is the last time you had seen Ding Pa?
A. Not inside the nightclub?
Q. Yes. At a different time, a date earlier, when is the last time you had seen him?
A. Last time I hadn't seen him for about a year or two and I hadn't met him.
Q. So when you left the private room with Guo Li, you were going to try to find Ding Pa in the club?

A. Yes.

Q. Now, can you use the laser pointer and show us where you went?

A. I went here.

Q. What happened when you got there?

A. Guo Li and I went to Ding Pa's room. We open the door and went in and did not see Ding Pa in there.

MR. SKINNER: Your Honor, just so we have a record where he was pointing, can the record reflect that he has pointed to the private room on the right that has the staircase leading into it.

THE COURT: Yes. In or out.

MR. SKINNER: In or out.

THE COURT: It doesn't matter. It has a staircase adjoining it.

BY MR. SKINNER:

Q. So what happened after that?

A. So I went into Ding Pa's room and did not see him there so I left the room. So I got out of the room and the door and I saw Ding Pa.

THE COURT: At which door?

THE WITNESS: Over here. I was over here where I saw Ding Pa.

Q. Were you in the hallway outside the room you had just been in before?

A. Yes.

Q. When you saw Ding Pa was he alone or with someone else?

A. Two people.

Q. Two people in total or was it Ding Pa plus two people?

A. No. In total two people including Ding Pa.

THE COURT: So Ding Pa had someone else with him, is that what you are saying?

THE WITNESS: Yes.

Q. Was he with a man or a woman?

A. Man.

Q. Had you ever seen this man before?

A. No.

Q. Was he Chinese?

A. Yes.

Q. What happened when you saw Ding Pa and this other man in the hallway?

A. Ding Pa just walked past me by my shoulder.

Q. What, if anything, happened after that?

A. He walked past by my shoulder and then I shouted ding Pa's name and I shouted, Ding Pa, and he ignore me and he looked very serious and he continued on to the direction of my room.

MR. COHEN: Judge, move to strike the "he looked very serious" part.

THE COURT: You will be able to cross-examine. I don't even know what it means. Let's move on.

Q. Did the other man go with Ding Pa?

A. Yes.

Q. How fast were they walking?

A. Very fast.

Q. After they walked past you, what did you do?

A. I followed him.

Q. Followed them where?

A. Followed to that room. It was the door over there.

THE COURT: The door over where?

MR. SKINNER: He just showed with the laser pointer, your Honor.

A. He was standing to the door to the bathroom. He went into my room.

Q. So you followed him down the hallway?

A. Yes.

Q. And where did you see him go?

A. He went straight to my room.

Q. Where did you end up standing? You can show us with the laser pointer.

A. I was standing at the bathroom over there and just the door to the room.

Q. So can you show us with the laser pointer what room is the bathroom?

A. The bathroom was to the door of my room.

MR. SKINNER: Can the record reflect that he was just

indicating the small room to the immediate right to the private room you had gone into earlier?

THE COURT: You were standing at the bathroom; is that what you said?

THE WITNESS: The bathroom. The door to the room.

Q. Were you in the hallway or were you in the bathroom?

A. Hallway. I stood outside of the door to my room.

Q. Were you also standing outside the door of the bathroom?

A. Yes.

Q. You saw Ding Pa go into the private room that you had been in earlier that night?

MR. COHEN: Your Honor, continuing objection to the narrative. The witness is testifying.

MR. SKINNER: I was trying to draw back where we were.

THE COURT: I understand. Try not to lead.

Q. Where did you see Ding Pa go?

A. To my room.

Q. Did he go in alone or with someone else?

A. Two people.

Q. Was he with the other man that he was with in the hallway?

A. Yes.

Q. You had followed Ding Pa and that man down the hallway to the private room; is that right?

A. Yes.

Q. How fast were they walking during that period of time?

MR. COHEN: Asked and answered.

THE COURT: The witness testified before that he was walking fast. Ding Pa was walking fast. Let's move on.

Q. Were either of them weaving?

THE COURT: You have to translate that word. Did either one look inebriated is what I take it you are asking.

MR. SKINNER: Sure. Judge, that is fine.

Can you translate it?

THE INTERPRETER: What is the word?

THE COURT: Did either one look as if he was influenced by alcohol?

THE WITNESS: No.

Q. What happened after the two men went into the room?

A. Went into the room and I saw the sounds of gun -- I heard the sounds of gun in that nightclub to the door there was a -- there is a window and I looked through it. There were sparks.

Q. After Ding Pa and the other man went into the room, did the door to the room open or did it stay closed?

A. Closed.

Q. How hard was it closed?

A. When he was going to my room and I was trying to get in as well and then he shut the door behind him and I was outside.

Q. Was it lightly closed? Was it slammed shut? Can you describe what kind of force was used to shut the door?

A. Pretty hard and slammed the door.

Q. What did you do after you heard the sounds of a gun and saw the flashes?

A. So I went to this area where the bar is and I said to the boss that people were fighting over there and I said, "There were sounds of gun. Should we report it to the police?"

Q. Can you show us with the laser pointer where it is that you went?

A. I walked through there and there is a bar and I stood over there.

MR. SKINNER: Can the record reflect that he was standing by the curbed portion of the bar of the common room.

THE COURT: Is that on the same floor?

Q. Is that on the same floor?

A. Yes, same floor.

THE COURT: That is the bar upstairs?

THE WITNESS: No. On the same floor. This is the stairs going down. It was over there. You must go through this bar before going to that room. There was a door.

THE COURT: You may proceed.

Q. Are the bar and the karaoke rooms all on the same floor?

A. Same floor.

Q. You went into the common area of the bar; is that right?

A. Yes.

Q. From where you were standing, could you see back into the hallway where the private rooms were located?

A. Which private room?

THE COURT: All the private rooms.

MR. SKINNER: Can I see the laser pointer for one second?

Q. From where you ended up standing, could you see back into that hallway?

A. Where I was standing at the bar?

Q. Yes.

A. I could not see the ones over there, but I could see two or three rooms over here.

Q. Could you see into that area that I am gesturing to right now?

A. Yes.

Q. And do you see this little opening just to the left of the bar?

A. There is a door. It was a circular door but not closed.

Q. When you say not closed was there an actual door there or was it opened?

A. It was not closed. It was just opened.

Q. After you got back into the common room, what happened after that?

A. I told the boss there that there were sounds of gun and should we report it to the police.

Q. What did you do after that?

A. I stood there on the corner for a few seconds and then Ding

Pa and the other person came out of the room very quickly and ran out, but I do not know what direction they were running to.

Q. Using the laser pointer show us on the diagram where you saw them?

A. I was over there. I looked through there and both of them running out very quickly.

Q. Just point on the diagram, please, where Ding Pa was when you saw him when you were standing in the common room?

A. Ding Pa was running. Two of them running quickly from --

THE COURT: Where did you see them? Where were they when you looked is what you are being asked.

THE WITNESS: They were running in the hallway.

Q. So you saw them in the hallway?

THE COURT: Where did you see them in the hallway?

THE WITNESS: I was over there.

THE COURT: Not where you were. Where were they?

THE WITNESS: They were running through this hallway.

Q. Can I see the laser pointer for a second?

You were standing around here; is that right?

A. A little over. A little over.

THE COURT: I think he was saying that he was a little closer.

Q. Show us where you were. You can stand up if that makes it easier.

Now, where was Ding Pa and the other man in the

hallway?

A. He was running like that, running out. When I saw him, he was over there but I did not know where he was running to.

Q. Did he run out into the common room of the bar?

A. No. At that time I was not clear headed. I did not know what direction he was running to.

Q. The question was: Did he run into the common area of the room, yes or no?

A. I don't know whether he did or not. I was not clear headed, but I did not know what direction.

THE COURT: Let's move on.

Q. Mr. Li, I am not asking where he was running to. I am asking where you saw him?

THE COURT: You really have to move on because he is obviously hung up on this point. So you can come back to it.

MR. SKINNER: We're very near the end, Judge.

THE COURT: Okay. But he seems to be unable to focus on what you are asking.

BY MR. SKINNER:

Q. Mr. Li, you saw Ding Pa in the hallway where the private rooms were located; is that right?

A. Yes.

Q. You don't know where he went; is that right?

A. I did not know what direction he was running towards.

Q. But from where you were standing in the common room at any

time did you see him come into that common area?

A. I don't know whether -- at that time I was not clear headed. My head was not so clear. I did not know whether he was running through the common area or other directions.

Q. You had had some alcohol to drink that night; correct?

A. Yes. Beers.

Q. About how many beers had you had to drink at that point?

A. For people there?

Q. How much had you had to drink that night?

A. I had two to three bottles.

Q. Is that in addition to the two beers that you had at the restaurant that night?

A. Additional two to three bottles.

Q. So in total you had about four to five beers to drink that night?

THE COURT: Sounded more like six.

A. Yes. About four.

THE COURT: He said two in one place and three in the other.

MR. SKINNER: So that would be five.

THE COURT: Five.

THE WITNESS: Four to five approximately.

Q. Now, what did you do next after you went into the common area of the bar?

A. I told the boss there to report to the police.

Q. What happened after that?

A. After that I just saw Ding Pa and another man ran out quickly, but I did not know what direction they were running to.

Q. After you saw that, what did you do after that?

A. I went out there and I was trying to get a car so I could go home.

Q. You went out on the street?

A. Yes. I went out on the road, the street to try to get a car to go home.

Q. Before you left, did you go back into the private room that you had been in before?

A. No.

Q. Did you talk to any of the people that were in that private room that you left behind?

A. No. I was out there on the street.

Q. How long did you wait in the bar before you went out on the street?

A. For a very short time and then I left. After the sounds of the gun and I went out there to stay there.

Q. So you didn't wait a very long time?

A. No. I did not wait a long time.

Q. Were you able to get a car?

A. Yes.

Q. Where did you go?

A. I went home.

Q. How long were you at home?

A. So as soon as I got home, the boss called me.

Q. The boss who?

A. The nightclub boss.

Q. The person that you reported the shots to?

A. Yes.

Q. How far did you live from the karaoke bar?

A. What do you mean?

Q. How far? 10 minutes away? 20 minutes away?

A. How far was I living from there? Five minutes.

Q. So what did you do after you got home and got this call from the person who opened the bar?

A. And the boss told me that, please --

MR. COHEN: Objection.

THE COURT: Objection sustained.

Q. The question, Mr. Li, is what did you do, not what the boss told you.

What did you do?

A. I came back.

Q. Went back where?

A. To the entrance of the nightclub on the street.

Q. Were there police there?

A. Yes.

Q. Did you talk to the police?

A. At that time I did not speak to the police. But later when I was brought to the police station, I spoke to the police.

Q. Did you go to the police station that same night?

A. Yes.

Q. Did you give a statement to the police that night?

A. Yes.

Q. Before you gave your statement to the police, did you talk to anyone else about what you had seen or heard at the club that night?

A. No.

Q. Have you seen Ding Pa since that night?

A. No.

MR. SKINNER: Nothing further, your Honor.

THE COURT: Very well. You may cross-examine.

CROSS-EXAMINATION

BY MR. COHEN:

Q. Is it Mr. Li or Mr. Xiang?

A. Li.

Q. Mr. Li, good afternoon.

Have we ever met?

A. Have we met? I don't think so. Maybe yesterday. Yes, we met yesterday.

Q. We saw each other yesterday; right?

A. Yes. Yes, I saw you.

Q. We haven't spoken about this case, have we?

A. No.

Q. How long ago did you come to the United States?

A. In '93.

Q. About 20 years ago?

A. Yes. More, less.

Q. And have you lived in the United States for these past 20 years?

A. Yes.

Q. How old are you?

A. I was born in '68.

Q. So you are about 44, 45 years old?

A. Around 45, 46.

Q. Do you know how old you are, sir?

THE COURT: We reckon age differently.

A. I was born in '68 so I am 45, 46.

Q. And since you've been in the United States, have you had any legitimate jobs other than what you've described as working at gambling parlors?

A. Yes. I worked.

Q. What have you done?

A. I worked in the garment factory.

Q. When was that?

A. Since I came in I was working in the garment factory in '93 and '94.

Q. Since 1994 have you had a legitimate job?

A. No. In '95, '96 I work in the gambling parlor and I was shareholder.

Q. Now, let's go back to the gambling parlor that you talked about that was on Madison Street. I think you said 122 Madison. Do you remember that?

A. Yes.

Q. Do you know somebody named Ahjun?

A. Ahjun?

Q. Yes.

A. Who is Ahjun? I don't know.

MR. COHEN: Can I have a moment, Judge?

THE COURT: Yes.

Q. Do you know somebody known as Jung Di, J-u-n-g, D-i?

A. Yes, I do. He went back to China already.

Q. But what I am asking you, sir, is simply whether you know who he is?

A. He is Jung Di.

Q. Do people also call him Ahjun?

A. Ahjun, I don't know. Everyone called him Jung Di.

Q. Did Jung Di have anything to do with the gambling parlor at Madison Street?

A. Yes. Yes.

Q. What was his relationship to the gambling parlor on Madison Street?

A. He had shares in the Madison Street gambling parlor. He

and Ding Pa were partners.

Q. Did he have shares in the first parlor you mentioned, the second one or both?

A. Only the one downstairs. Not the one upstairs. He didn't have any part to do with the one on the second floor. There was one on the first floor.

Q. When someone became a shareholder in a gambling parlor, did that mean that basically they were becoming partners with the other shareholders?

A. The head guy would be responsible for the money and backing up the money. Their commission will go to the head guy. The head guy would make more money.

Q. My question, sir, is whether or not when someone became a shareholder in a gambling parlor, they basically became partners with the other shareholders in the gambling parlor?

A. Yes. The people on the bottom were the shareholders and he would be the head guy.

MR. COHEN: Judge, that is simply not responsive.

THE COURT: He is not being asked who is the head guy. He is being asked whether all the people who owned shares were partners of each other.

A. Yes.

Q. Was it possible for one shareholder to own more than one share in a gambling parlor?

A. Only the head guy.

**A. 610**

Q. Sir?

A. Would have more than one share.

MR. SKINNER: Objection.

THE COURT: The answer was that the only one who could own more than one share was the head guy, the others could not.

MR. COHEN: Judge, I would like to explore that a little bit more. I am not sure that is the answer.

THE COURT: Of course.

Q. Mr. Li, I am going to ask you a question that I think can be answered yes or no. Do you think you can do that?

A. Yes.

Q. Was it possible for a person who was a shareholder in a gambling parlor to own more than one share?

A. Yes.

Q. And you said that share could be obtained by being purchased; correct?

A. Purchased shares, no.

Q. Instead of purchase maybe I should use the word "investment." How did you become a shareholder in the gambling parlor?

A. I invested.

Q. Okay.

A. Each person put in $5,000.

Q. And if you had wanted to put in $10,000, is it a fact that you would have had two shares?

A. No.

Q. Didn't you just tell us a moment ago that a person could have more than one share in a gambling parlor?

A. Aside from the head guy, nobody else can.

Q. So what you are telling the jury is that only the head guy could have more than one share, no other shareholder could purchase or invest and get more than one share; is that right?

A. They can't.

Q. Did you testify when you were being asked questions by the prosecutor that you were legally in the United States?

A. I do not have any legal status.

Q. When you were asked this morning by Mr. Skinner whether you were here legally, did you say you were or were not?

MR. SKINNER: Objection, Judge.

MR. COHEN: That's my question.

THE COURT: Well, he testified that he was here illegally.

MR. COHEN: I misheard. I thought he said legally. I will move on.

Q. Have you ever been convicted of a crime?

MR. SKINNER: Objection, Judge.

We would like to be heard at the side bar.

(Continued on next page)

(At the side bar)

THE COURT: What is the objection if there is a good faith basis for the question?

MR. SKINNER: The objection is that the only conviction I am aware of is more than 10 years old and evidence of the conviction is not permissible under 609.

MR. COHEN: Judge, the conviction was for possession of a loaded firearm. He was placed on probation. He violated probation by failing to appear and then he was resentenced to prison. I think that it goes to the fact that he is in the United States now, despite the fact that he has not only entered the country illegally and was evidentially denied the right to stay here, but further as an aggregated felon it would be --

MR. SKINNER: Can you please ask him to keep his voice down.

MR. COHEN: -- as an aggravated felon would be subject to removal and should have been removed and I think it goes to his bias to please the government and for that reason I think that despite the fact that the conviction is more than 10 years old that it should be fair game for cross-examination.

THE COURT: Well, it is a close question.

MR. SKINNER: Can I say one further thing?

THE COURT: Yes.

MR. SKINNER: 609 has a clear rule that if the

defendant intends to impeach with the use of a conviction, he is to provided prior written notice so we have a chance to --

THE COURT: That is something else.

MR. SKINNER: We wrote Mr. Cohen and said, We haven't received notice.

THE COURT: Be calm.

MR. SKINNER: Fair enough.

THE COURT: That's essential for a lawyer.

MR. COHEN: Judge, I think I made it clear to the government.

THE COURT: Did you give that notice that is required?

MR. COHEN: I would have to look at my e-mails. I don't know that I specifically wrote a letter to them saying that I would.

THE COURT: What is your best recollection?

MR. COHEN: I don't remember. I would have to take a look. I have the e-mails. It is not a hard for thing for me to look up.

THE COURT: I think you should do it now before you ask the question. You should not have asked it until you have looked it up.

MR. COHEN: I can move on.

THE COURT: Please do. Very well.

(Continued on next page)

(In open court; jury present)

BY MR. COHEN:

Q. Mr. Li, did you make an attempt at some point to obtain legal status in the United States?

A. You mean -- no.

Q. Didn't you go to immigration court and ask an immigration judge to allow you to stay here even though you were subject to removal?

A. You mean the immigration judge?

Q. That's what I mean.

A. Yes.

Q. You did?

A. Yes.

Q. Were you seeking political asylum?

A. Yes.

Q. What was the basis under which you sought political asylum?

A. When I came in I went to the law office to apply for political asylum.

Q. Say it again.

A. When I came in I went to the law office to apply for political asylum.

Q. And in order to get political asylum, you had to tell the United States government what the reason was that you were seeking political asylum; correct?

A. Yes.

Q. You had to tell them that you feared some sort of persecution if you went back to China; correct?

A. Yes.

Q. You had to justify remaining in the United States for some other legitimate reason that they would consider reason to allow you to stay here; correct?

A. Yes.

Q. So did you tell them that there was some basis that upon which you would be persecuted if you went back to China?

A. Yes.

Q. What basis did you tell them would result in your persecution if you went back to China?

A. Back then when I was home, I beat up on the people from the sterilization team.

Q. You beat up on people from the sterilization committee, did you say?

A. Yes.

Q. And when you said the sterilization committee, do you mean the family planning people?

A. Yes.

Q. And was it true that you beat up on people from the family planning committee?

A. Yes.

Q. Do you know some of the people that have been witnesses in this case?

A. The witnesses in this case?

Q. Yes, sir.

A. I know the people who testified in this case, but I don't know whether they came in or not.

Q. You know Yi Pei; correct?

A. Yes.

Q. You know Quo Guang?

A. I do not know Quo Guang.

Q. Who are the other people that you know that are witnesses in this trial?

A. I know Yi Pei, Mi Jung, Number Four, Yita, and those people from that night.

Q. Did you mention someone Mi Jung, did you say?

A. Yes.

Q. Who is Mi Jung?

A. He was also present on the night when this incident happened.

Q. Have you seen him recently?

A. Yes.

Q. Where did you seen him?

A. Chinatown.

Q. You have seen him in Chinatown. When was the last time you saw him in Chinatown?

A. A few days ago.

Q. And when you saw him a few days ago, did you speak to him

about this case?

A. No.

Q. Does Mi Jung have a nickname?

A. Mi Jung doesn't have a nickname. Everyone calls him Mi Jung. Some people call him Mustache Uncle.

Q. And is Mi Jung someone who was present at the Heaven On Earth club the night on this incident?

THE INTERPRETER: Can you repeat that question?

Q. Is Mi Jung someone who was present at the Heaven On Earth club the night of this incident?

A. Yes.

Q. He was?

A. He was in the room.

Q. He was in the room?

A. Yes.

Q. And you mentioned somebody named Number Four?

A. Yes.

Q. Do you have any idea how this guy got to be called Number Four?

A. I don't know. Everyone calls him Number Four.

Q. Do you know him by any other name?

A. I do not know.

Q. When was the last time you saw Number Four?

A. More than 10 days ago.

Q. So within, say, the last month or so?

D4I6LIN3          Cai Xiang Li - cross          Page 731

A. Yes.

Q. Is he somebody who was also in the room at the time of the shooting incident?

A. Yes.

Q. Now, was there somebody there also name Ma Dong?

A. Yes.

Q. And was Ma Dong in the room at the time of the shooting incident?

A. Yes.

Q. And when was the last time you saw Ma Dong?

A. Long time ago.

Q. Roughly how long?

A. A few months ago.

Q. It was sometime within the last year or so?

A. Yes.

Q. Now, was there also a fellow there that is known by the nickname Tall Guy or Tall Man?

A. Yita.

Q. Yita, that is Tall Guy?

A. Yita was sent back to China.

Q. Do you know somebody by the name of Chen Jian?

A. Chen Jian?

Q. Yes. Do you know somebody named Chen Jian?

A. I don't know a Chen Jian.

Q. Do you know somebody that goes by the nickname Tall Man?

D4I6LIN3          Cai Xiang Li - cross          Page 732

A. No. Not without seeing the same.

Q. Well, do you remember that the first time that you met with Special Agent Varian, the gentleman here, was on June 14th of 2010?

A. 2010.

Q. Yes, 2010.

A. When I saw someone from immigration.

Q. This gentleman. I am talking about this gentleman here. Do you remember the first time you met him?

A. The first time I met him?

Q. Yes.

A. The first time I met him was a few months ago.

Q. You didn't see him back in June of 2010?

A. I saw somebody else in 2010. It wasn't him. I saw him a few months ago.

Q. In 2010 you met with a couple of agents from immigration; right?

A. Yes.

Q. One of them was an Asian agent named John Lee, Special Agent Lee?

A. Asian? Is he Fuchowese?

Q. I don't know, sir. I never met him.

A. I met with an immigration agent. I did.

Q. And we're talking about around June of 2010?

A. Yes.

D4I6LIN3          Cai Xiang Li - cross          Page 733

Q. And at that meeting --

A. I do not remember which year. I don't remember exactly which date. I don't remember the date.

Q. I am not asking you the specific date. I am just asking you if it was generally around almost three years ago.

A. Yes. I met with the immigration.

Q. And the first time that you met with these agents, did you discuss the incidents that you just testified about?

A. Yes.

Q. And where was that meeting? Where did it take place?

A. It was on the 10th floor in immigration.

Q. And when you say "immigration," you mean the building on 26th street?

A. No. It is here. The old one in Chinatown.

Q. At 26 Federal Plaza?

A. Yes. Yes. On the 10th floor. The first time I met him was on the 10th floor.

Q. And by the way you weren't in immigration custody at that time, were you?

A. No.

Q. How was it that you came to be present at the 10th floor of 26 Federal Plaza on the date that you met with these agents?

A. Fuchowese person named Dan Jian who found me and he took me to the 10th floor.

Q. Had you known Dan Jian before that?

D4I6LIN3          Cai Xiang Li - cross          Page 734

A. Yes.

Q. How did you know him?

A. I met him in Chinatown.

Q. Where?

A. In Chinatown.

Q. Did you meet him at a restaurant? Did you meet him at a Buddhist temple? Did you meet him at a gambling parlor? Where did you meet him?

MR. SKINNER: Objection, your Honor.

THE COURT: Overruled.

A. I met him in the gambling parlor while I was gambling in Chinatown.

Q. Did he have shares in that gambling parlor?

A. No. No.

Q. Did he have shares in any gambling parlor as far as you know?

A. I do not know.

Q. Did you testify that he came to look for you and asked you to come and meet with the immigration agents?

A. Yes.

Q. And on the day that you met with immigration agents, did Dan Jian go with you?

A. Yes.

Q. Besides bringing you to that meeting, did Dan Jian bring somebody else to that meeting that day to meet with the agents?

A. I do not know.

Q. Well, are you saying that you don't know or that you don't remember.

A. I went by myself. I don't know if he brought other people.

Q. So you have a recollection that when you went to meet with the agents, it was just yourself and Dan Jian?

A. Yes. I was in a room by myself. I don't know if there were other people.

Q. Well, when you entered the building at 26 Federal Plaza, did you enter the building with Dan Jian?

A. He took me to the entrance where I have to go through the body search and then the agent came down to pick me up.

Q. When you entered the building, when you walked from the street into the building, was Dan Jian with you?

A. Yes. We went together. He took me to the entrance where I met with the agent.

Q. And then you and the agent went up and met in a private office; correct?

A. Yes.

Q. Now, did you know from having spoken with Dan Jian that you were going to be asked about Ding Pa?

A. I did.

Q. Because Dan Jian told you that this was about Ding Pa; correct?

A. Yes.

Q. And Dan Jian told you that the agents would want to speak to you about things that Dan Jian -- withdrawn.

MR. COHEN: Judge, this would be a good time to break.

THE COURT: Members of the jury, we'll take our lunch recess and return at 2:15. Have a pleasant lunch.

(Jury excused)

(Continued on next page)

(In open court; jury not present)

THE COURT: Very well. We'll all take a lunch recess at this time.

MR. SKINNER: Thank you, your Honor.

THE COURT: Return at 2:15.

MS. BURNS: Thank you.

(Luncheon recess)

AFTERNOON SESSION

2:50 P.M.

THE COURT: Let's get the jury.

(Jury present)

THE COURT: You may proceed.

BY MR. COHEN:

Q. Mr. Li, this morning I asked you whether you knew somebody by the name of Cheng Yong, also known as Tall Guy or Tall Man. Do you remember that?

A. No.

Q. You don't remember me asking you that question this morning?

THE COURT: I think he means he didn't know that person.

MR. COHEN: Oh, okay. I'll try to clarify, your Honor.

Q. Sir, do you remember this morning I asked you a question about whether you knew somebody named Tall Guy or Tall Man or Cheng Yong? Do you remember I asked you that question?

A. No.

THE COURT: You're being asked if you remember that you were asked that question.

THE WITNESS: Yes.

Q. Okay. And do you remember when I asked you that question if you said that you didn't know who this person was?

D4IVLIN4    C. X. Li - cross    Page 739

A. Yes.

Q. Can you tell us then who the people were that went with you from the restaurant in Chinatown out to Queens on the night of the shooting.

A. Yiqun.

Q. Okay. Who else?

A. Madan.

Q. Who else?

A. No. 4.

Q. Who else?

A. Mayong, Yita, Yipei, and myself.

Q. Did you say that one of the people was Mayong?

A. Yes.

Q. Is he also called Tall Guy?

A. I haven't heard people call him Tall Guy.

MR. COHEN: May I approach the witness, your Honor?

THE COURT: Yes.

MR. COHEN: I show him 3501.

THE WITNESS: I just know him as Mayong.

Q. I'm going to show you a document. I'm going to ask the interpreter to interpret part of it for you in Chinese, not for you to say it out loud, and then I'm going to ask you a question.

I want to ask you a couple questions.

Do you remember earlier today when we were talking

D4IVLIN4    C. X. Li - cross    Page 740

about the fact that you had a meeting with some agents from immigration that was arranged by Dan Jian?

A. Yes.

Q. And do you remember that at that meeting, one of the agents was taking notes, writing down the things that you said?

A. Yes.

Q. And do you remember, among other things, being asked at that meeting to tell -- by the agent to say who was it that had gone to Heaven on Earth in the summer of 2004 with you?

A. Yes.

Q. And now that you've seen this document and had it translated for you, does it refresh your recollection that when you gave the agent a list of the people that went with you, that one of them's names was Cheng Yong?

A. Cheng Yong, I don't remember.

Q. Well, do you know somebody named Cheng Yong?

A. I don't remember. I do not know. Don't remember.

Q. Do you know Yipei; correct?

A. I know Yipei.

Q. By the way, after the shooting at the club, when was the next time you saw Yipei?

A. Yipei, I saw him a few days ago.

Q. Sir, listen to my question carefully, okay?

After the shooting on July 29th of 2004, when was the next time after that that you saw Yipei?

D4IVLIN4    C. X. Li - cross    Page 741

A. And then two to three days later I saw Yipei.

Q. Well, do you remember when you left the Heaven on Earth club that night?

A. Yes.

Q. After you left the club and before you left the area to go someplace else, did you see Yipei?

A. No, I did not. I left.

Q. Did you go with Guo Gong that night to see Yiqun's girlfriend?

A. Who is Guo Gong?

Q. I'm sorry. Did you go with Yipei to see Yiqun's girlfriend?

A. I was at the door to the club, nightclub, and also Yiqun's girlfriend came also to the door.

Q. But did you go to Madison Street in Manhattan to see Yiqun's girlfriend?

A. No.

Q. When you walked out into the hallway to go down the hall to have a drink with Ding Pa, you were with Guo Li?

A. Yes.

Q. And you walked down the hallway -- tell me if I'm pointing in the right place -- down this hallway from this room to this room?

A. Yes.

Q. And were there people in the hallway when you went from

D4IVLIN4    C. X. Li - cross    Page 742

this room to this room?

A. When I was walking over there, no one.

Q. Was there -- this room that I'm pointing at now, is that separate from the room that Ding Pa was in?

A. Ding Pa, whether he was in that room or that room, I do not really know, because there was no number.

Q. So you're now saying that you're not sure whether he was in this room or this room?

A. Not sure which room he was.

Q. Now --

A. I do not really remember because there was no number.

Q. Okay. You said that when you saw Ding Pa in the hallway, he was with another person; correct?

A. Yes.

Q. And I think you also testified that you had never seen that person before; correct?

A. Yes, that person I never seen.

Q. Never saw him before?

A. No.

Q. You'd never seen him in any other club?

A. No.

Q. And when you saw him, you didn't know his name?

A. Did not.

Q. Well, can you explain to the jury how it is that when you met with the agents in 2010, you told them that you saw Ding Pa

A. 615

with Beijing Junior or Little Beijing.

A. People call him Little Beijing. But when I saw him, I wasn't sure whether he was from Beijing or from Fuzhou.

Q. Okay. You said people called --

A. But people out there called him Little Beijing.

Q. Well --

A. But I did not recognize him.

Q. When people out there called him Little Beijing, was that before the shooting or after the shooting?

A. After the shooting. People said that the person who went --

Q. Just a second. I'm only asking you whether it was before the shooting or after the shooting.

A. After the shooting.

Q. So is it a fair statement that after the shooting, you discussed with other people things about the shooting that you hadn't seen?

Sir, this is a yes or no.

A. People in the street --

Q. Is it true that after the shooting, you had conversations with people about things that you had not seen?

A. Yes.

Q. And when you sat down with the agents and you said you saw Ding Pa with Peking Junior or Little Beijing, you didn't bother telling them that you didn't know who this guy was or that you

learned his name from other people, did you?

MR. SKINNER: Objection.

THE COURT: Just "you didn't." We can strike "bother" from it.

MR. COHEN: Okay.

THE INTERPRETER: Counsel, could you repeat the question.

THE COURT: You're being asked did you tell the agent that you didn't know Little Beijing.

THE WITNESS: Yes.

Q. Sure about that?

A. It's a long time ago. Perhaps I did say it or I didn't. I probably don't remember it too well because it's been eight to nine years ago.

Q. But even though you don't remember it too well, you were perfectly prepared to tell this jury a minute ago that you did tell them that, right?

MR. SKINNER: Objection, your Honor.

THE COURT: Overruled.

A. The truth. I'm just telling the truth to whatever I saw. If I didn't see anything then I should not say.

Q. Now, I want to talk to you about when you assaulted the family planning people in China. This is something that you told an immigration judge?

A. Yes.

Q. And it's something that you swore to the truth of?

A. I told the judge that I was persecuted in China.

Q. And you swore that that was the truth; correct?

A. Of course, in China, of course, that I suffered persecution in China, which I told the judge.

THE COURT: No, you were asked if you took an oath to tell the truth before you told the judge that.

THE WITNESS: Yes, I swore to tell the truth.

Q. Do you know whether the family planning people in China are frequently assaulted?

MR. SKINNER: Objection. Relevance.

MR. COHEN: Subject to connection.

THE COURT: I'll take it subject to connection.

A. Sometimes, but they always came to your home to take you for sterilizations or fights.

Q. Have you talked to any of the witnesses in this case about the false statements that they made in order to try to get political asylum?

MR. SKINNER: Objection. Relevance.

THE COURT: I'll sustain the objection for other reasons. Let's move on.

Q. When was the last time you appeared in immigration court?

A. When was the last time I appeared in immigration court? I do not remember.

Q. Well, when was the last time you were in immigration

custody?

A. Last time when I was detained?

Q. Yes.

A. I do not remember which year. I was detained in New Jersey.

Q. And you don't recall exactly what year it was? Can you tell us about how long ago it was?

A. I don't know. The '90s. I don't remember.

Q. You haven't been in immigration --

A. But it's after September 11.

Q. Okay. And how was it that you were released?

A. I hired a lawyer, and I was bonded out for 25,000.

Q. Who paid the 25,000?

A. My friends and relatives paid it.

Q. And did there come a time that you learned that you were ordered to -- that you had a final order of removal from the United States?

A. Yes, I was ordered removed, but I did not know when.

Q. Well, didn't you tell the government when you met with them that you were ordered removed in 1997?

A. Yes, I was ordered to be removed in 1997.

Q. And you understand that being ordered removed meant that you were ordered to leave the United States; correct?

A. Yes.

Q. And, in fact, isn't it true that instead of being deported,

you were offered the privilege of self-deporting; in other words, going back to China on your own without having to go into custody. Isn't that correct?

A. Yes.

Q. And you understood that that meant that because you had to leave instead of staying in jail and having the government put you on a plane, that you were promising them that you would make your own arrangements and leave the country by a certain date; correct?

A. Yes.

Q. But you didn't leave on that date; correct?

A. No.

Q. You broke the promise that you made to whether it was an immigration judge or -- was it a judge that you promised you would leave the country by a certain date?

A. I did not leave. I did not depart.

Q. Okay. But to whom did you make the promise that you would leave voluntarily if you weren't kept in custody?

A. I did not promise to anyone, but they just told me to pay $1,000 in New Jersey.

Q. But didn't you just tell us a minute or two ago in response to a question I asked you that instead of being sent back by the government, that you were going to be allowed to make your own arrangements to return to China, and you had to do so by a certain date?

A. They said I had to have a hearing again in court. And if I lost the case in court, then I must leave.

Q. And you lost the case in court; correct?

A. Yes.

Q. And after you lost the case in court, instead of taking you into custody, the judge said that they would allow you to self-deport, to remove yourself from the United States, right or wrong?

A. I'm not sure whether that's what the judge was saying. After I lost the case in court, I did not go back again to see judge.

Q. Well, how were you notified that you lost the case in court?

A. I went in for the hearing. So the day when I lost my case, I went home and ever since I never saw the judge again.

Q. But did you know that once you lost your hearing, that you were supposed to leave the country?

A. But I did not know. After I lost my case in court, I never had any contact again with a judge.

Q. Well, did you have contact with your attorney?

A. Lawyer? No, not anymore.

Q. Well, then how -- no.

Sir, after you appeared in court, how did you learn that you lost your case?

A. After I lost my case, I went to a lawyer's office. I paid.

And then after that, I did not see the judge or lawyer again.

Q. When you went to the lawyer's office, did he tell you that you had lost your case?

A. He or she told me.

Q. And did he or she also tell you that that meant that you had to leave the United States by a certain date?

A. The lawyer did not tell me that. Lawyer only told me that I lost my case.

Q. And did you ask the lawyer, Well, what does that mean, that I've lost my case?

MR. SKINNER: Objection.

THE COURT: Overruled.

There is reason that the witness is having difficulty understanding --

MR. SKINNER: Can I just speak to --

THE COURT: -- what he's being asked.

MR. SKINNER: Can I speak to --

THE COURT: And he has to respond.

MR. SKINNER: Can I just have a moment to speak with Mr. Cohen?

THE COURT: Very well.

(Pause)

MR. COHEN: Your Honor, we have a joint application to approach the bench.

THE COURT: Very well.

(At the side bar)

THE COURT: The interpreter keeps saying "he or she."

MR. COHEN: That's because there's no pronounced in Chinese --

THE COURT: Well, then he should ask the witness does he mean he or she.

MR. SKINNER: That happens all the time.

THE COURT: I agree. You don't hear it from Lily Lau. She does not say that.

MR. SKINNER: I don't disagree with your Honor. It's confusing. And it could probably be clarified with a follow-up question, Was your attorney a man or a woman.

THE COURT: Right. Which Lau does always. I'm listening carefully. There are different degrees of understanding of all these interpreters, and it's a problem.

MR. SKINNER: The reason we asked to approach -- and I'm not trying to make problems here -- but I think the types of questions that is being asked of the witness, he's coming close to potentially going into a realm of attorney-client privilege. And there should be a mechanism for the witness to at least understand that he has a privilege, and it's his to either waive or invoke.

THE COURT: What is his privilege?

MR. SKINNER: He was talking to his attorney and seeking legal advice as to whether or not he should leave the

country.

THE COURT: That wasn't being asked. That has nothing to do with what was being asked. He was not. He was asked how he found out that he was ordered deported.

MR. SKINNER: Which I think was fine, but then --

THE COURT: That's not a privilege issue.

MS. BURNS: Next question.

MR. SKINNER: The follow-up question --

THE COURT: What was the question?

MR. SKINNER: I thought that he was then saying, And what did he tell you you had to do.

THE COURT: The judge, not the --

MR. COHEN: No, no, he's right. He said that it was his attorney that told him that he had to leave the country, not the judge.

MR. SKINNER: I think the question is, What did your attorney tell you you had to do.

If we leave it to, What did they tell you about whether you won or lost the problem -- and, again, I'm not trying to create a problem -- but I do think that -- he doesn't have his attorney here.

THE COURT: Do you really believe his lawyer told him he didn't have to leave the country?

MR. SKINNER: I don't know what he said.

MS. BURNS: I don't know.

THE COURT: Well, in any event, let's move on.

MR. SKINNER: All right.

(Continued on next page)

(In open court)

BY MR. COHEN:

Q. So, Mr. Li, is it your testimony that after losing your application for asylum and to remain in the United States, you did not understand that you were supposed to leave the country?

A. Because I lost, I definitely could not stay remaining in the United States.

Q. And you knew that, right?

A. Yes.

Q. And yet you're still here; correct?

A. Yes.

Q. And you're still the subject of an order of removal from the United States; correct?

A. Yes.

Q. Did Dan Jian tell you that if you came in and you helped the government here and you helped immigration, that that might somehow help you to remain in the United States?

MR. SKINNER: Objection.

THE COURT: Overruled.

MR. SKINNER: What Dong Jai told him?

MR. COHEN: In sum and substance.

THE COURT: Yes, what Dong Jai told him, because it's not being offered for any purpose other than impeachment.

Q. Did you understand my question, sir?

THE COURT: Well, first, let me -- just a moment.

Is Dong Jai supposed to be an agent of the immigration department?

MR. COHEN: I'm not sure "agent" is the correct word.

THE COURT: An informant.

MR. COHEN: Yes.

THE COURT: Some kind of contact with the immigration department.

MR. COHEN: Yes.

THE COURT: Very well. All right. Then I will permit it.

A. No.

Q. Did anybody suggest to you that by talking to the government and testifying at this trial, that it might help you to remain in the United States?

A. No.

Q. Are you hopeful that --

THE COURT: Well, I think you've followed it long enough. Let's move on.

MR. COHEN: I think I --

THE COURT: I think you have exhausted the subject.

MR. COHEN: Okay.

BY MR. COHEN:

Q. When you left the private room that your group had occupied, were people singing?

A. Yes.

Q. And when people were singing in karaoke, was there a microphone?

A. Yes.

Q. And would the person who was singing generally be holding the microphone and singing into it?

A. Yes.

Q. And did the microphone amplify, in other words, make louder, the voice of the person or people that were singing?

A. Microphone is something that the person who sings holds. And the voice is being adjusted by the computer.

Q. Okay. But as a result of singing into the microphone, would the microphone and the equipment that it worked with make the person's voice louder?

A. Yes.

Q. And when you referred to the computer, is that a computerized sound system that plays music or plays the music to songs that people can then sing along with?

A. Yes.

Q. And when you left the room that you were in to walk down to -- down the hallway, was there someone singing and music playing in your room?

A. Yes.

Q. Can you describe the door that separated that room from the hallway?

A. You're talking about the door between the room and the

hallway?

Q. I am.

A. On the door, there is a mirror -- I'm sorry, a glass that's the size of these papers, a little bit bigger than the size of these papers, that you can look through to see inside.

Q. And what was the -- do you know what the door was made out of?

A. The door is made out of wood.

Q. Just an ordinary wooden door; correct?

A. It's a wooden door. I can't tell whether it's an ordinary door. I don't know whether it's a good wood door or not.

Q. Was it a soundproof door? When you closed the door, did it block out all the sound that was coming from inside the room?

A. There's a muffle sound that you can hear from the outside. It's not completely soundproof.

Q. So it is diminished somewhat, but not 100 percent.

A. Correct.

Q. And when you walked down to the other room that Ding Pa was in, were people there also singing along to music?

A. No, there was only one person sitting inside.

Q. Who was that?

A. I do not know who that person is.

Q. You described an incident earlier today where you saw Ding Pa lying on the street at a different time.

THE INTERPRETER: Sorry. Can you repeat the question

again?

Q. Earlier today you described an incident where you saw Ding Pa lying on the street at a different time.

A. Yes.

Q. And did you tell the jury this morning that Ding Pa had been beaten on that occasion?

A. Did I tell who?

Q. These people, the jury, when you testified this morning, did you say --

A. I did, I did.

Q. You said he had been beaten; correct?

A. Yes.

Q. But when you met with the government on numerous occasions, you told them that he had been stabbed during that incident, right?

A. Yes, he -- he told other people that he was stabbed by knives, but I saw him only -- I only saw him lying there in Chinatown.

Q. The question I'm asking you is not about what happened, it's about what you told the government. And I'm asking you whether you told the government when you met with them that Ding Pa had been stabbed.

A. Yes.

Q. When you were in the karaoke and walked back toward the door, you said that somebody shut the door; correct?

A. What do you mean?

Q. When you testified that after you walked down the hallway, and then you followed Ding Pa and this other fellow back toward your room, you said that somebody slammed the door.

A. Not slammed, just shut, pushed shut.

Q. Were you able to see who it was that pushed the door shut?

A. After the two of them went inside, the door was pushed shut. I was standing outside, so I couldn't see.

Q. So this morning when you said --

A. I was already --

Q. I'm sorry.

A. I was already blocked out from the entrance.

Q. So this morning when you said he closed the door, you actually don't know who closed the door, do you?

A. Yes, I was walking behind them. And then after they went in, the door was pushed shut. I was on the other side of the door.

Q. So when you testified this morning that he closed the door, you actually did not know who it was that closed the door; correct?

A. Yes. After he went inside, I was shut out from the door.

Q. I'm not sure that was responsive, and it may be that I asked the question in an inartful way.

MR. SKINNER: I think we've all gotten the point.

THE COURT: Well, that may be, but someone should

explain to the witness what the question is.

Q. What I'm asking you, sir, is whether you know who it was that closed the door.

A. I do not know.

Q. That's a yes or a no.

A. After --

THE COURT: The answer is I do not know who closed the door.

MR. COHEN: Thank you.

Q. From the time that the door closed, until you heard "boom, boom, boom," how much time passed?

A. When I looked --

THE COURT: You're being asked about the amount of time. You're not being asked about what you saw.

MR. COHEN: Thank you.

THE WITNESS: How much time? Only a few seconds.

Q. Would you say it was basically immediate?

A. Well, in any case, it was a few seconds. It happened very quickly.

Q. How about to the time that you saw Ding Pa and this other fellow walking down the hallway, had you seen the other person do anything at the club?

THE INTERPRETER: Have you saw -- I'm sorry, the second part.

Q. Had you seen the other person do anything at the club?

A. Did I see who?

Q. Little Beijing.

MR. SKINNER: Objection, your Honor.

THE COURT: Overruled.

A. I only saw him walking with Ding Pa. I only saw him walking with Ding Pa. I didn't see anybody else in the hallway.

Q. I didn't ask whether you saw anyone else in the hallway at this time. I'm asking you whether you saw the person who was walking with Ding Pa do anything or say anything.

A. No.

MR. COHEN: I don't have anything else, your Honor.

THE COURT: Very well.

MR. SKINNER: Nothing further, your Honor.

THE COURT: Very well.

Then we're going to take the mid-afternoon recess at this time. We're going to take a five-minute recess.

(Jury excused)

THE COURT: You may step down.

(Witness excused)

THE COURT: Who is your next witness?

MS. BURNS: Salvatore Lacova.

MR. SKINNER: We are going to read a few stipulations, as well, your Honor.

THE COURT: Fine.

MS. BURNS: Thank you.

THE COURT: We will reconvene in five minutes.

MS. BURNS: Thank you.

MR. SKINNER: Thank you, your Honor.

(Recess)

(Continued on next page)

(In open court; jury present)

THE COURT: Who is your next witness?

MS. BURNS: Our next witness is Salvatore LaCova. While he is taking the stand, may I read a stipulation, your Honor?

THE COURT: Very well.

MS. WANG: It is hereby stipulated and agreed by the parties that, One, Government Exhibit 8 contains five shell casings that were found on July 30th, 2004 by the New York City Police Department at the scene of a shooting that occurred at a karaoke club located at 4622 Kissena Boulevard, Queens, New York.

Government Exhibit 9 contains two deformed bullets that were found on July 30th, 2004 by Dr. Henry Nields of the Office of the Chief Medical Examiner, City of New York. Dr. Nields found both bullets in the body of Chan Qin Zhou during the autopsy of Mr. Zhou.

Government Exhibit 10 contains one deformed bullet that was found on July 31st, 2004 by Dr. Vincent Tranchida of the Office of the Chief Medical Examiner, City of New York. Dr. Tranchida found the bullet of body Mei Ying Li during the autopsy of Ms. Li.

It is further stipulated and agreed that this stipulation, which is Government Exhibit 105, and Government Exhibits 8, 9 and 10 may be received in evidence at trial, and

we offer Government Exhibit 105, 8, 9 and 10 at this time, your Honor.

THE COURT: Very well. Government Exhibits 105, 8, 9, and 10 are received in evidence by stipulation.

(Government's Exhibits 105, 8, 9, and 10 received in evidence)

MS. BURNS: Thank you your Honor.

SALVATORE LACOVA,
called as a witness by the Government,
having been duly sworn, testified as follows:

DIRECT EXAMINATION
BY MS. BURNS:

Q. Where do you work?

A. I work for the firearms analysis section of the forensic investigations division of the New York City Police Department crime laboratory.

Q. How long have you been with the NYPD?

A. Approximately 19 and a half years.

Q. What is your current rank or title?

A. I am a detective.

Q. How long have you been a detective?

A. Since 2003.

Q. And how long have you been with the firearms analysis section?

A. Approximately seven years.

Q. What type of work is performed in that section of the NYPD?

A. At the firearms analysis section we perform operability on firearms -- well, identification and operability on firearms and ammunition. We have a serial number restoration section where we can raise defaced serial numbers. We have a microscopy section where we use a comparison microscope to identify fired ballistic evidence, which includes fired bullets, cartridge casings and bullet fragments.

Q. Do you work in a particular section?

A. Currently I work in the microscopy section. However, I am a firearms -- I do firearms analysis as well.

Q. What types of ballistics evidence do you examine in the microscopic section?

A. We examine fired bullets and cartridge casings and bullet fragments.

Q. Is evidence maintained at the lab?

A. We have an evidence control section. When evidence is brought to the -- when firearms evidence is brought to the lab, it first goes through evidence control. Evidence control gives it a unique firearms identification case number for each individual piece of evidence and it is stored in the evidence control room until an examiner is assigned a case from a supervisor where he will remove the evidence from the evidence control room, inventory it and he will use an electronic scriber, he or she, to give each piece of evidence its unique

not only case number but also an item number. And then when the examination is finished, it gets stored back in the evidence control room.

Q. What training have you received in firearms analysis and ballistics?

A. When I first got to the firearms analysis section, I received a seven-month training program for firearms operability and identification, which also encompassed ammunition. We learned and worked on all types of firearms -- revolvers semiautomatic pistols, rifles, shotguns of all actions, which would be single action or outbreak, single barrel shotguns, machine guns, submachine guns. We also received training from the ATF, which be Alcohol Tobacco and Firearms in their IBIS system, which is the Integrated Ballistic Identification System and we received training from firearms manufacturers themselves such as Colt, Glock, Springfield Armory, Remington, just to name a few, Kahr Arms.

Q. Have you received training in the field of microscopic comparison?

A. Yes, I have. I received a 19-month training program. The program -- both programs are administered by a forensic consultant hired by the New York City Police Department. He utilizes the AFTE training manual. AFTE is the Association of Firearms and Toolmark Examiners. It is an international organization. It has approximately a thousand members and it

is made up in 40 countries.

We utilize a comparison microscope to do our examinations of microscopy. The comparison microscope is two compound microscopes. It is joined together with one set of binoculars, which allows us to look at two pieces of evidence side by side at the same time.

I have also received training in shooting scenes reconstruction and consecutively matching striations.

Q. What are the some of the things that you do or you can determine when you perform a microscopic comparison of two or more pieces of ammunition?

A. We would be able to determine if in the case of cartridge casings they came from a common sourse or from multiple sources. And in the case of bullets it would virtually be the same thing.

Q. What is a cartridge casing?

A. A cartridge casing is a component of a complete unit of ammunition. So a complete unit of ammunition consists of four components. It has cartridge casing, which is a metallic container that holds all the three pieces together. There is a primer, which is seated at the base of the cartridge casing and that when struck causes an explosion. Then there is gunpowder or propellant, which is inside of the primer -- inside of the cartridge casing and when the primer is struck, a flame goes into the cartridge casing and ignites the powder and that

buildup -- there is pressure that is built up in the cartridge casing and the bullet, which is seated at the mouth the cartridge casing, which will be the fourth component, is then forced off of the cartridge casing down the barrel and out of the weapon.

Q. Is a cartridge casing the same thing as a shell casing?

A. Yes.

Q. Where are cartridges stored before they are fired or expelled from the gun?

A. It depends on the action of the weapon. If you had a revolver, they would be stored in the cylinder. If there was a semiautomatic or automatic weapon, they would be stored in a magazine.

Q. What happens to a bullet when a gun is fired?

A. Well, when a cartridge casing is loaded into the chamber, let's say it is a semiautomatic situation, what happens is the cartridge cases are loaded onto a magazine, the magazine has four components. It has a magazine body, a floor plate, a magazine spring and a follower. So each cartridge or unit of ammunition has to be manually loaded on top of this magazine and the magazine has to be inserted into a weapon. In the case of a semiautomatic pistol, it is in the grip.

What would happen then is the shooter would have to cock this weapon by grabbing the top of the slide or top portion of the weapon and they would pull it rearward. This

does a couple things. It cocks the weapon and it opens the action. So if there is any shell casings in the chamber or even live ammunition, it would extract and eject them. Once you let it go, it will strip a unit of ammunition off the top of the magazine and feed it into the chamber. When the weapon is fired by pulling the trigger rearward, a firing pin strikes the primer, which is pressure sensitive, causing an explosion, which ignites the gunpowder and the pressure is built up into the cartridge casing. When enough built up in that cartridge casing, the bullet is then forced down the barrel and out of the weapon. The extra energy from that chain reaction causes that slide to move rearward on its own. The extraction ejects that spent cartridge casing from the weapon and it cocks the weapon and then it automatically closes, which takes a new unit of ammunition off the top of the magazine and locks the slide into place so the weapon is ready to be fired again.

Q. To be clear in the process you just described, what happens to the cartridge casing ultimately?

A. In the case of a semiautomatic weapon, it would be extracted and ejected from the weapon.

Q. When someone speaks about the caliber of a firearm, what does that mean?

A. Caliber is the internal dimensions of the inside of a barrel. It is measured from the land area to the land area or the groove to groove and it is measured of hundreds of an inch.

Q. What is the land area?

A. The land area in a firearm is the high spot in the barrel and then there is a groove in the barrel, which is the low spot. Those lands and grooves are put there by the manufacturer using cutting tools. They are actually taking material from the barrel during the manufacturing process. What the lands and grooves do is they give the bullet when it is inside the barrel it causes it to spin and when it leaves the firearm that gives it its accuracy and stability in flight. During the manufacturing process, its microscopic striations that occur during this manufacturing process and that is what we utilize to make our identifications on bullets, not on cartridge cases.

Q. So is every gun barrel unique with respect to the striations that the inside of barrel leaves on the bullet?

A. Well, at the end of our training, we take what is called a validation study. We're given 10 consecutive -- we're not given the barrels. There are 10 consecutive barrels that are manufactured by Ruger firearms. So they are made in the same plant virtually at the same time one after another with the same tools, same cutting instruments and the same materials. Then there are two test fires fired from each of those barrels. Those are knowns and then we have 15 unknowns. In order to successfully complete our course, we have to match the unknowns to the known barrels. You have to match that in order to

graduate our program.

So with the theory of uniqueness if we have 10 consecutively made barrels, one after another from the same cutting tools, and the idea is that the cutting tools change from barrel to barrel on the microscopic level. On the regular level the barrels are virtually identical, meaning they are all the same length. From land area to land area is the same width. The same number of lands and grooves are cut into the barrel. On the microscopic area we're able to determine which bullets were fired from which barrel.

Q. When comparing two bullets, what are you looking for to determine whether they were fired from the same gun?

A. We're looking for groups of or patterns of striations. Striations are essentially scratches. What happens is the bullet starts out slightly larger than the barrel. If we pull the bullet and pull it off of its cartridge casing and remove the barrel from the weapon, we couldn't drop the bullet down the barrel. The bullet is slightly larger than the barrel and when it is forced down the barrel, it seals in the barrel. If it was smaller than the barrel what would happen is the energy would surround the bullet and calculate it and actually go forward of the bullet and then you wouldn't have the same velocity and the same accuracy as you have if the bullet is slightly larger.

What happens is also because the bullet is larger, it

picks up those microscopic striations from the barrel and they are actually the opposite on the bullet. It is a mirror image. So the high spot in the barrel, which we call the land, is the low spot in the bullet. So if you looked at bullet, you could see high spots and low spots. The low spots are lands even though it is the high spot on the barrel and high spot on the barrel is the groove. So it is the opposite. So what we look at is we're looking at patterns of striations. So we're looking at their width, their length, spacial relationship to one another in different parts of the barrel.

Q. Can you perform that same --

A. Sorry. Different parts of the bullets.

Q. Can you perform that same type of comparison analysis on cartridge casings?

A. Well, cartridge casings are -- they are impressed striations. So now when we're talking about bullets, we're using -- if we would say that the barrel on a bullet is one tool that leaves unique identifications to the bullet, the cartridge case is striking the slide of the -- the slide of the firearm and there are a number of different tools that are working on this cartridge casing. So we have a breech case impression, which are striations but they are impressed now. So instead of when the bullet goes through the barrel, those striations -- scratches through it. The cartridge case hits a flat surface on the back of the firearm and then now we have

what are called impressions.

Also the firing pin strikes the primer, which is a different part of the cartridge case. That is actually pressed in by the manufacturer. That firing pin doesn't hit it once like a type key on a typewriter. It is kind of like a tuning fork. It is on a spring. So it hits, it rebounds and it hits again. As the cartridge case is being pulled from the chamber, it is kind of chasing that firing pin back into what is called an aperture. The aperture is another part that is cut into the breech case of the firearm. It is like a round whole where the firing pin protrudes from.

So in the case of cartridge cases, just on that breech face area, normally we may have three different tools acting on that cartridge case. Plus there is extraction and ejection. There is an extractor claw, which grabs like a ring cut into the cartridge case so it gets in there and it helps pull the cartridge from the weapon. That is another tool. We don't utilize that for identification. Then there is ejector. So when the cartridge case is coming out of the chamber, there is another piece of metal that hits the back part of the flat area of the cartridge case and that also helps it to eject out of the firearm. We use those things as landmarks. We don't really use them for identification. For identification on cartridge cases, generally we are using firing pin and breech face impressions.

Q. Detective, did you conduct examinations of any evidence in connection with this case?

A. Yes, I did.

Q. When did you do that?

A. I did that on March 4th, 2013.

Q. Some of the evidence you reviewed was that from 2004?

A. Yes, it was.

Q. Did you analyze it back in 2004 or recently?

A. No, recently. In March of 2013.

Q. Did you prepare any reports in connection with your examination?

A. Yes, I did.

MS. BURNS: May I approach, your Honor?

THE COURT: Yes.

Q. Detective, I am showing you what has just been marked for identification as Government Exhibits 15 through 18. Do you recognize them?

A. Yes, I do.

Q. What are they?

A. This is a report that I prepared shortly after my examination or kind of -- you can't do it at the same time, but during my examination at the end of my examination.

Q. Would having those reports in front of you help you if you need to refresh your memory today when testifying?

A. Yes, they would.

Q. What types of ballistics evidence did you analyze in connection with this case?

A. I analyzed fired cartridge casings and deformed bullets.

Q. I am now going to hand you what is already in evidence as Government Exhibits 8, 9 and 10. Turning first to Government Exhibit 8, have you seen that before?

A. Yes, I have.

Q. How do you recognize it?

A. This is an evidence envelope that contains five 40 caliber cartridge casings that I examined during this case. I recognize it because it has my initials on the back as well as it has been sealed with an evidence seal, which we do before we close our case.

Q. Government Exhibit 9, how do you recognize that?

A. Government Exhibit 9 is two 40 caliber bullets that I examined in regards to this case, 40 caliber class bullets. I also recognize it because I was the last person to perform the microscopic examination and on the back we'll put our -- the date that we performed it, our initials and then we'll sign it with blue evidence tape.

Q. Finally Government Exhibit 10, do you recognize it?

A. Yes, I do. Once again this is one deformed 40 caliber class bullet and I did the examination in conjunction with the other two bullets from this case and I recognize my handwriting

and my initials and my initials on this blue evidence tape.

Q. You just use the expression "deformed bullet." What does that mean?

A. Well, when a bullet starts out, it generally has -- it is in its pure state. Once it engages the rifling and it is forced down the barrel, it picks up deformities from being forced down the barrel. So once a bullet engages rifling, we call it deformed. When it hits something harder than itself, it may become further deformed or fragmented. But as soon as it engages rifling, it changes its original state so it is deformed.

Q. Did you conduct an examination of the five shell casings in Exhibit 8?

A. Yes, I did.

Q. What did your examination entail?

A. I utilized the comparison microscope. Again, we have two compound zoom lenses that allows us to go up to 102 times on that microscope. I am able to examine two pieces of evidence, or in this particular case two cartridges at the same time. And in this particular case here I had five cartridges to examine, but only two at a time.

Q. Did you draw any conclusions based on your examination of those five shell casings?

A. I did. All five shell casings were fired from the same firearm.

Q. How did you reach that conclusion? What did you base it on?

A. Positive agreement of both firing pin impressions and breech face impressions.

Q. Did you do any analysis of Government Exhibit 9, which were the two bullets that were recovered by the medical examiner?

A. Yes, I did.

Q. What did you do?

A. Well, I took -- this case was previously examined in 2004. I was asked to reexamine the case. So I took all new weights and base measurements of the firearm. I counted the rifling and then I performed the microscopic examination against the two bullets and then the third bullet.

Q. What conclusions did you draw in comparing the two bullets -- did you compare the two bullets to the five shell casings?

A. Well, we cannot make comparisons from bullets to shell casings. Although, when a bullet is on a shell casing if we manually pulled it off, there might be some microscopic striations on that built. Once it engages the rifling, those microscopic striations get wiped off or destroyed so we don't make -- we don't make identifications from cartridges to bullets. We do bullet to bullets and cartridges to cartridges.

Q. Did you compare the bullets in Exhibit 9 to those in Exhibit 10?

A. Yes, I did.

Q. What conclusions did you draw, if any?

A. My conclusion was inclusive on the bullets, which were marked RF7, RF8 in Exhibit 8 -- 9, I am sorry, and RF6 in Exhibit 10.

Q. What does inconclusive mean in this context?

A. Inconclusive means that although they exhibit the same class characteristics, meaning that they are all the same caliber class, being 40 caliber class, and they have the same number of lands and grooves on the bullets and the spacial relationship from land to land and groove to groove are identical, there wasn't enough individual striations and patterns of individual striations for me to say that they were either fired from the same firearm or that they were fired from different firearms.

Q. What was the caliber class of those bullets?

A. They were 40 caliber class.

Q. Did you determine the caliber class of the cartrige casings?

A. They were 40 caliber cartridge casings.

MS. BURNS: No further questions, your Honor.

MR. COHEN: No questions, your Honor.

THE COURT: Very well. Thank you. You may step down.

THE WITNESS: Thank you, your Honor. Have a nice day.

(Witness excused)

THE COURT: It's late in the day to start a new witness, unless it is a short witness.

MR. SKINNER: I think the witness is not the longest, not the shortest. Medium length. We have a series of stipulations.

THE COURT: Very well.

MR. SKINNER: Maybe we can take care of that now.

THE COURT: Very well.

MR. SKINNER: We'll start with Government Exhibit 103, which is a stipulation that states that it is hereby stipulated and agreed by and between the parties that on July 30th, 2004, at 2001 Infinity QX4 that was beige in color with Georgia license plate 9129-ARD was parked on Kissena Boulevard approximately 100 feet from the front of the karaoke club located at 4622 Kissena Boulevard. The Q X4 was seized by the New York City Police Department on July 30th, 2004 at approximately 2:00 p.m. and was later searched by the NYPD pursuant to a search warrant.

Government Exhibit 6 contains photographs of the QX4 taken by the NYPD at an NYPD garage.

Government Exhibit 7 contains documents that were found by the NYPD in the QX4 during that search.

It is further stipulated and agreed that this stipulation, Government Exhibit 103, and Government Exhibit 6 and 7 may be received in evidence at trial.

The government offers Government Exhibits 103, 6, and 7.

THE COURT: Six is the photos, is that correct?

MS. BURNS: That's correct.

THE COURT: What are the other two?

MS. BURNS: 103 is the stipulation and 7 are documents that were found during the search of the QX4.

THE COURT: Government Exhibits 103, 6 and 7 are received in evidence pursuant to Government Exhibit 103.

(Government's Exhibits 103, 6 and 7 received in evidence)

MS. BURNS: Thank you, your Honor. May we just show those to the jury on the screen?

THE COURT: Yes, you may.

MS. BURNS: Ms. Chase, if we can start with Government Exhibit 6A and 6B. If you can zoom in on that license, please.

Then turning to Government Exhibit 7, if you could just zoom in on the photos at the top. Just so it is clear that is just one page of what is contained in Government Exhibit 7 and it is copies of the materials that are in this envelope, which contains all of the materials of Government Exhibit 7, which are now in evidence.

Thank you.

The next stipulation is Government Exhibit 108. It is hereby stipulated and agreed between the parties that

Government Exhibit 11 -- let me back up. That if called to testify, the record custodian for Sprint would testify as follows: Government Exhibit 11 is comprised of telephone records that contain details of calls made to and from the telephone number 646-996-3991. The account for the telephone assigned call number 646-996-3991 was in the name Loh Kit Mun.

The records reflected in Government Exhibit 11 were created by persons with knowledge of or created from information transmitted by persons with knowledge of the information shown or created at or near the information became available and were created and maintained by Sprint as part of its regularly conducted business activities. It is further stipulated and agreed that this stipulation, Government Exhibit 108 and Government Exhibit 11 may be received in evidence at trial.

The government offers Exhibits 108 and 11.

THE COURT: Government Exhibits 108 and Government Exhibit 11 are received in evidence.

(Government's Exhibits 108 and 11 received in evidence)

MS. BURNS: Then we have Government Exhibit 111. It is hereby stipulated and agreed between the parties that if called to testify the record custodian for Sprint would testify as follows: Government Exhibit 13 is comprised of telephone records that contain details of calls made to and from the

mobile telephone with call number 917-337-1318. The account for telephone assigned call number 917-337-1318 was in the name Heng De Oh Yeng.

The records reflected in Government Exhibit 13 are created by persons with knowledge of or created from information transmitted by persons with knowledge of the information shown or created at or near the time the information became available and were created and maintained by Sprint as its regularly conducted business activities.

It is further stipulated and agreed that this stipulation, Government Exhibit 111 and Government Exhibit 13, may be received in evidence at trial.

The government offers Exhibits 111 and 13.

THE COURT: Government Exhibits 111 and Government Exhibit 13 are received in evidence.

(Government's Exhibits 111 and 13 received in evidence)

MS. BURNS: Thank you, your Honor.

THE COURT: Very well. Members of the jury, it is so close to the end of the day that we're going to adjourn now and you remember that Friday we do not take evidence. So you are excused for tomorrow and we will continue the trial at 10:00 on Monday morning. Once again if you arrive at 9:30, you will get coffee and muffins. I've been told that you could use coffee in the afternoon, which I will try to arrange for as well, but

don't forget you will have three days away, which means that the temptation will be very great to talk to other people about what you are seeing and hearing. Please resist that temptation until you have heard all of the evidence and the closing arguments and my instructions on the law and have retired to deliberate and reach a verdict.

Have a very pleasant three-day weekend?

THE DEPUTY CLERK: All rise.

(Jury excused)

(Continued on next page)

D4I6LIN5          LaCova - direct          Page 783

(In open court; jury not present)

THE COURT: We had a request from one of the jurors for a letter to the Family Court in New Rochelle where she is supposed to appear next week explaining why she cannot appear next week, but she will be expected the following week and I have written such a letter but she is the one who has the fax number of the court. I do not so we're giving her my letter.

This matter is adjourned until Monday morning at 10:00.

MR. SKINNER: Your Honor, at this point our expectation is just two remaining witnesses so we would fully expect to rest on Monday.

THE COURT: Good.

MR. SKINNER: Subject to the length of cross.

THE COURT: Very good.

MR. SKINNER: If there is any changes on that of course we'll let Mr. Cohen know immediately.

THE COURT: Very good.

MR. COHEN: Judge, I will be in touch with the government tomorrow and over the weekend about whether there is going to be a defense case and if so whether any issues may arise.

THE COURT: Very well.

MR. COHEN: If I know tomorrow, I will notify the Court as well.

D4I6LIN5          LaCova - direct          Page 784

THE COURT: Thank you.

MR. SKINNER: Thank you, Judge.

(Adjourned to Monday, April 22, 2013 at 10:00 a.m.)

Page 785

INDEX OF EXAMINATION

Examination of:                                    Page

SHUN QING CHE

Cross By Mr. Cohen . . . . . . . . . . . . . . . 669

CAI XIANG LI

Direct By Mr. Skinner . . . . . . . . . . . . 676

Cross By Mr. Cohen . . . . . . . . . . . . . . 720

SALVATORE LACOVA

Direct By Ms. Burns . . . . . . . . . . . . . 764

GOVERNMENT EXHIBITS

Exhibit No.                                    Received

105, 8, 9, and 10    . . . . . . . . . . . . 764

103, 6 and 7    . . . . . . . . . . . . . . 780

108 and 11    . . . . . . . . . . . . . . . 781

111 and 13    . . . . . . . . . . . . . . . 782

DEFENDANT EXHIBITS

Exhibit No.                                    Received

C   . . . . . . . . . . . . . . . . . . . . 676

# In The Matter Of:

*UNITED STATES OF AMERICA, v*
*XING LIN*

*April 22, 2013*

*SOUTHERN DISTRICT REPORTERS*
*500 PEARL STREET*
*NEW YORK, NY 10007*
*212 805-0330*

Original File D4MVLINF.txt
**Min-U-Script® with Word Index**

**A. 627**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                    11 CR 114 (MGC)

XING LIN,

              Defendant.          JURY TRIAL

------------------------------x

                              New York, N.Y.
                              April 22, 2013
                              10:30 a.m.

Before:

              HON. MIRIAM GOLDMAN CEDARBAUM,

                              District Judge

                  APPEARANCES

PREET BHARARA,
     United States Attorney for the
     Southern District of New York
PETER M. SKINNER
JENNIFER E. BURNS
     Assistant United States Attorneys

JOEL S. COHEN
     Attorney for Defendant

ALSO PRESENT:   BRENDA CHEN, Fuchow Interpreter
                DANIEL YANG, Fuchow Interpreter
                LILY LAU, Fuchow Interpreter
                DANIEL CHAN, Fuchow Interpreter
                JESSICA CHACE, Paralegal
                TIMOTHY VARIAN, Special Agent, HSI
                JIAYING WANG, Legal Assistant

So you can move the chair even more. That's it. That will be more comfortable.

All right. You may proceed.

MS. BURNS: Thank you, your Honor.

DIRECT EXAMINATION

BY MS. BURNS:

Q. Mr. Oh-Yang, where were you born?

A. China.

Q. And when did you first come to the United States?

A. 1992.

Q. Did you come here legally or illegally?

A. Illegally.

Q. Describe how you came to the United States illegally.

A. I paid snakeheads, and then first I arrived in Hong Kong, and then to Thailand, Thailand. And at first I used my own passport to travel to Thailand.

THE COURT: Was that by boat?

THE WITNESS: By plane.

A. And then snakehead gave me another passport.

Q. Was that passport in your own name or someone else's name?

A. My picture with someone else's name.

Q. How much did you pay the snakehead?

A. 32,000.

Q. Where in the United States did you ultimately arrive?

A. I arrived in Los Angeles.

(Trial resumed)

(In open court; jury not present)

THE COURT: All right. Let's get the jury.

(Jury present)

THE COURT: Good morning, members of the jury. Who is our first witness today?

MS. BURNS: Your Honor, the government calls Heng De Oh-Yang.

THE COURT: Very well.

HENG DE OH-YANG,

   called as a witness by the Government,

   having been duly sworn, testified as follows:

THE DEPUTY CLERK: Thank you. Please be seated.

State your full name for the record, and spell your name slowly please.

But you have to speak a little louder. I have to be able to hear you.

THE WITNESS: (In English) Heng De Oh-Yang, H-E-N-G, D-E, O-H, Y-A-N-G.

THE DEPUTY CLERK: Thank you.

THE COURT: Thank you. I see you know some English.

THE WITNESS: Just a little.

THE COURT: Good. Very well.

If you move your chair closer to the microphone, you'll be more comfortable, so you don't have to lean forward.

Q. What happened when you arrived in Los Angeles?

A. And I didn't have a passport with me, and I was arrested.

Q. Did you spend time in immigration custody?

A. Yes. Later I was detained in a immigration detention facility.

Q. How long were you there?

A. I was there for two months.

Q. And how did you get released?

A. I applied for political asylum based on one-child policy, and I won my case in court.

Q. Do you have legal status?

A. Yes.

Q. What's your status now?

A. U.S. citizen.

Q. When did you become a citizen?

A. In 2000.

Q. Have you previously been convicted of a crime?

A. Yes.

Q. Did you plead guilty or go to trial?

A. I went to a trial.

Q. Was that in state court or federal court?

A. Federal court.

Q. This federal courthouse?

A. Yes.

Q. And what crime or crimes were you convicted of?

D4MVLIN1    Heng De Oh-Yang - direct    Page 790

A. Extortion.

Q. Who was extorted?

A. At that time I established a bus company. And also I collect money from drivers.

Q. How much money were you collecting from the bus drivers?

A. Between $250 and $400.

Q. And approximately how many drivers were you collecting this money from?

A. Over 40 drivers.

Q. And when was it that you were committing this offense?

A. I was arrested in 2006.

Q. And so for how long prior to your arrest had you been engaged in collecting money from these bus drivers?

A. I started doing it in 2004.

THE COURT: Was this your bus company?

THE WITNESS: No, not my own. No, I was just a manager there.

Q. Did you commit this offense alone or with other people?

A. Many other people were also arrested.

Q. And did you or the others make any threats to get this money?

A. Yes.

Q. Have you been sentenced for this crime?

A. Yes.

Q. When were you sentenced?

D4MVLIN1    Heng De Oh-Yang - direct    Page 791

A. 2007.

Q. What sentence did you receive?

A. Fifty months in jail, and three years probation.

Q. Have you completed serving the jail time?

A. Yes.

Q. Are you still on your term of probation?

A. Yes.

Q. As part of your sentence, were you ordered to pay restitution?

A. Yes.

Q. How much were you ordered to pay?

A. 100 -- 119,000.

Q. Have you been making those payments?

A. Yes.

Q. Do you know someone named Dan Jian or Cash?

A. I know this person, but I do not have any contact with this individual.

Q. Did that person have anything to do with you testifying here today?

A. No.

Q. Do you know someone named Ding Pa?

A. I know.

Q. When did you meet him?

A. I met him in 1995.

Q. Where was that?

D4MVLIN1    Heng De Oh-Yang - direct    Page 792

A. In midtown Manhattan.

Q. Do you see the person you know as Ding Pa in the courtroom here today?

A. Yes.

Q. Can you tell us where he is in the courtroom and describe what he's wearing.

A. He's over there wearing a suit.

Q. Can you be more specific about where?

A. He's sitting over there, second person over there. He's wearing a suit.

THE COURT: Where is "over there"?

THE WITNESS: Second row, second person.

MS. BURNS: May the record reflect that he identified the defendant, your Honor?

THE COURT: Very well.

MS. BURNS: Thank you.

BY MS. BURNS:

Q. At the time you met the defendant, what type of relationship did you have?

A. We're friends.

Q. Would you spend time together?

A. Once or twice I went to hang out at his house.

Q. And after 1994, did you and the defendant remain in contact?

A. '94. I met him in 1995.

D4MVLIN1    Heng De Oh-Yang - direct    Page 793

Q. After 1995, did you stay in contact with the defendant?

A. Yes, we were in contact after 1995.

Q. I direct your attention now to the time period of 2002/2003. Were you in contact with the defendant at that time?

A. From 1998 until 2002, I did not have any contact with him because I was working at a restaurant.

Q. Where was that restaurant?

A. I owned my restaurant in New Jersey.

Q. After 2002, what kind of contact did you have with the defendant, if any?

A. After 2002, I sold my restaurant and did not work anymore. I went to Chinatown and I started driving taxi. So when he met me and I gave him my business card.

Q. Was that your business card for your taxi driving?

A. Yes.

Q. Did you ever drive the defendant as part of your taxi service?

A. Yes.

Q. Where would you pick him up when you drove him?

A. From his house to Chinatown I picked him up once. I picked him up from airport and drove him to Chinatown twice.

Q. At the airport, do you know where he was coming from?

A. He said he was coming from Atlanta.

Q. Those times you picked him up in the airport, was he alone

or with other people?

A. He was alone.

Q. And when you picked him up in the airport, where did you take him?

A. Took him to Chinatown.

Q. How did the defendant contact you to arrange for these rides?

A. He always call my phone.

Q. What type of phone did he call you on?

A. My cell phone.

Q. Other than at this time, other than driving the defendant, did you do anything else for him?

A. One occasion he called my phone. His house in Brooklyn where he lived was burglarized. And want me to go over there to pick up a bag. He told me inside this bag there was money, but I am not sure whether he told me it was 5,000 or $10,000.

Q. Did you go pick up that bag?

A. Yes.

Q. And what did you do with it?

A. I picked it up and I left it in my home.

Q. Did you return it to the defendant?

A. Yes, when he came up from down there and I returned it to him.

Q. Directing your attention now to July 30th of 2004. Did you have contact with the defendant that day?

A. Yes.

Q. What contact did you have?

A. One morning he call me.

Q. Did you say in the morning?

A. Yes.

Q. About what time?

A. I do not exactly remember the time, but it was very early in the morning.

Q. Did he call you one time or more than one time?

A. I looked at the phone, and it showed that many calls were made.

Q. Did you speak to the defendant that morning?

A. Yes.

Q. What did he say to you during that conversation?

A. I received a phone call, and he said something happened to him. And wanted me to drive to Flushing, and to pick him up and to drive him to the place where he left a car that he wanted to pick up.

Q. Did the defendant tell you where in Flushing he wanted to go?

A. At first he just said just go there, but did not really tell me where.

Q. Did you go to Flushing that day?

A. Yes.

Q. What happened when you arrived?

A. When I got there, I was not familiar with the streets or roads in Flushing, so I was -- it took me a long time to find it. So I just circling around and just drove around. I stopped on the street and waited for him.

Q. Did you see the defendant?

A. Did not see.

Q. What happened next?

A. And then after a very short time, another person call me.

Q. And what did that person say?

MR. COHEN: Objection.

THE COURT: Objection sustained.

MS. BURNS: Can we approach, your Honor?

THE COURT: Not right now, no. We'll get to that later.

Q. Based on your conversation with this person, what did you do?

A. And then two people got into my car and show me the directions where I should drive.

Q. Did you recognize those two people?

A. I did not recognize.

Q. Where did they direct you to go?

A. They just directed me and to the streets where they want to go, that place.

Q. Did you arrive at the place they wanted to go to?

A. Yes.

Q. And what happened when you arrived?

A. When I got there, and I parked my car on the other side in the parking lot.

Q. The other side of what?

A. There's a parking lot. And on the other side, I saw surrounded with yellow tapes with a lot of police there.

Q. What happened once you saw the men -- you and the men saw -- or you saw the police and the tape?

A. And those two people told me to drive --

MR. COHEN: Objection.

Withdrawn.

THE COURT: Go ahead. You may answer.

A. And drove around the back, and to go to the street on the side.

Q. What street was that?

THE COURT: The people were still in your cab?

THE WITNESS: Yes.

Q. And when you arrived and you saw the police tape, what street was that?

A. I do not know the name of the street, but just the house there and so the yellow tapes.

Q. And again, with these men in your car, where did you go?

A. And then goes two people got out of the car and pointed at another vehicle over there and said that was the vehicle.

Q. What did the vehicle they pointed at look like?

A. To my recollection, it looked like a jeep.

Q. Do you recall what color it was?

A. No, it was long time ago. I do not really remember.

Q. And what happened once the two men said that that was the car?

A. Because the car was very close to the yellow tape, it was the second car to the tape, one of them said --

MR. COHEN: Objection.

A. -- go.

THE COURT: What's the question?

Q. What happened once the men pointed out the car?

A. So one of them, because there were a lot of police and he was afraid to go out to pick up the car --

MR. COHEN: Objection. Move to strike.

MS. BURNS: May we approach, your Honor?

THE COURT: No.

Did he tell you he was afraid?

THE WITNESS: Two of them stood in front of my car. And I heard it.

Q. What did you hear?

A. And one of them said, Let's go.

Q. What did you do next?

A. And then he came back to my car. And so I ask him, Where do you two want to go?

And then he asked me the question, he asked me where I

was going to go. And I say I lived on 8th Avenue. I must go back to 8th Avenue.

Q. Where did you take these two men, if anywhere, that day?

A. Later they said they also want to go to 8th Avenue. So they were in my car, and I took them to 8th Avenue.

Q. In Brooklyn or Manhattan?

A. In Brooklyn.

Q. When you testified that the car was a jeep, was it like -- was it a Jeep model or something that looked like a jeep?

A. Not really complete -- did not really look completely like jeep, but little taller. To my recollection, the color of the vehicle was very similar to white.

Q. Did you speak with the police about the events you've just testified about back in 2004?

A. I did tell the police, but except that when I was picking up those two people in the vehicle, I did not tell them.

Q. Do you recall the telephone number that you were using that night that you received the calls from the defendant and the others on?

A. Yes, I remember.

Q. What was it?

A. 917-337-1318.

MS. BURNS: I'm going to ask Ms. Chace to pull up Government Exhibit 11. And this is in evidence already. These are the phone records for 646-996-3991. Can you turn to the

last page, please. If you can highlight an entry at 6:50 a.m. on July 30, 2004.

Q. Mr. Oh-Yang do you see --

MS. BURNS: And if you can highlight that entry for us to make it a little easier for us to see.

Q. Mr. Oh-Yang, do you see that entry that's highlighted?

A. Yes.

Q. And is that the telephone number that you were using that night, the one that ends in 1318?

A. Yes.

Q. And the entry on July 30th at 6:51 a.m., is that also your telephone number?

A. Yes.

Q. And finally, on July 30, 10:03 a.m., is that also your telephone number listed there?

A. Yes.

Q. One moment.

MS. BURNS: Your Honor, may we approach now just on that one issue? I'm at the end of my questions.

THE COURT: Very well.

(Continued on next page)

(At the side bar)

MS. BURNS: Your Honor, the statements we're seeking to introduce, we're seeking to introduce them as co-conspirator statements. These individuals were sent by the defendant to go pick up the car --

THE COURT: How is it established that they were sent by the defendant?

MS. BURNS: I thought I had, sorry.

THE COURT: Excuse me?

MS. BURNS: Then can I ask a couple questions on what it was they said to this witness?

THE COURT: Wait just a moment. Just a moment.

He has testified that he received a call from two persons, not from the defendant. He had a conversation with the defendant, a separate conversation.

MS. BURNS: Right.

THE COURT: But he received a call from two persons unidentified who asked him to take them somewhere, he didn't know where; they directed him.

MS. BURNS: Right.

THE COURT: And they took him to a car which he described as close to the tapes.

MS. BURNS: Right.

THE COURT: I think you have to connect him to -- better --

MS. BURNS: Okay.

THE COURT: -- if you want him to be a co-conspirator.

MS. BURNS: All right. So what I seek to ask then is what did these individuals say to you about --

THE COURT: No, you can't establish it by what they said. You need to have something better than that.

MR. SKINNER: I think we can proffer in advance what they would say as a basis for the fact that they were co-conspirators. And you can rule on that basis on the proffer. I think also if you look at the overall --

THE COURT: What makes them co-conspirators is not their statements.

MS. BURNS: What they said to this witness in the car, that Ding Pa asked them to go get the car because he had been in a fight the night before.

THE COURT: Suppose they said that. Suppose they said that to him. How does the jury possibly evaluate that that makes them co-conspirators?

MR. SKINNER: Your Honor, we know that --

THE COURT: Well, what is the connection that you're going to establish, apart from their own statements about things?

MS. BURNS: He had the conversation with the defendant, and the defendant told him to go to Flushing. The defendant is not the one that got the car; these other two

people did. And those two people --

THE COURT: Wait just a moment.

He said he got a call from these two people.

MS. BURNS: Once he got to Flushing.

THE COURT: Not from the defendant.

MS. BURNS: He spoke to the defendant before he went to Flushing; and then once he got to Flushing, he got another call.

THE COURT: He spoke to the defendant. He went to Brooklyn to get him.

MS. BURNS: No, that's not what he said.

Sorry.

He spoke to the defendant early in the morning, those 6:30 a.m. calls. The defendant asked him to go to Flushing to get the car. He went to Flushing, and we established that he did not, in fact, see the defendant when he got there.

THE COURT: Do we have them telling him to get that car?

MS. BURNS: I'm sorry?

THE COURT: Are you establishing from the mouths of these people that they wanted to get that car?

MS. BURNS: Yes.

MR. SKINNER: And they've already testified, your Honor, that they went to the location where the police were located, pointed out a light-colored SUV, like a jeep, went out

of the car, said that's the car. Then, when they saw the police, said, Let's go.

THE COURT: You have to connect that to the defendant.

MR. SKINNER: And then you connect him with the date and time of the phone records we just put in. And I think there's a clear inference that they were sent at the direction of the defendant, even without their confirm --

THE COURT: I don't think there is that inference. But, in any event, you can ask the jury to infer anything that logic permits. But to have that establish that they were co-conspirators, we're talking about a conspiracy to do other things.

MR. SKINNER: I think that evidence establishes --

THE COURT: It's a very thin connection.

MR. SKINNER: It's certainly --

THE COURT: And I will have to think about it.

MR. SKINNER: What we have already --

THE COURT: I need to hear the other evidence. I have listened carefully to all the other evidence, and I haven't heard anything yet about these two people.

Is there going to be any further evidence about these two people?

MS. BURNS: No.

MR. SKINNER: We don't even know who they were, your Honor.

MS. BURNS: He said he didn't recognize them. Obviously it's our theory that they were sent.

THE COURT: It's your theory, but that's not evidence.

MS. BURNS: They're to assist the defendant. They identified the car, and then that was their purpose for being there.

THE COURT: You don't know for whom they were doing it.

MS. BURNS: I was trying to get out those questions.

MR. SKINNER: They say --

MS. BURNS: Yes, exactly.

MR. SKINNER: -- clearly on whose behalf they were doing it.

MR. COHEN: That doesn't make them co-conspirators in the charged conspiracy. I mean they could just be two people that said, Hey, go get my car. That doesn't make them co-conspirators in the conspiracy that's been charged.

MR. SKINNER: There's an allegation that the defendant ran a gang. I think there's certainly inference that these were two of his followers that came out to get the car.

THE COURT: That's a very big strain.

MR. SKINNER: I actually don't think it's all that big a strain, but --

THE COURT: But, in any event, I don't think you can get it from their mouths, from what you've told me. I haven't

D4MVLIN1          Heng De Oh-Yang - direct          Page 806

heard that either of them said that he was there on behalf of --

MR. SKINNER: Well, you wouldn't permit the question, your Honor.

THE COURT: Well, I would like to know what the answer would have been.

MR. SKINNER: We're proffering it.

THE COURT: What is it?

MS. BURNS: I believe, if asked what did the defendant say to you --

THE COURT: Not what did the defendant say to you.

MS. BURNS: Just to establish it.

THE COURT: But they have to have volunteered.

MR. SKINNER: What would the two people have said to this witness.

MS. BURNS: They would have said Ding Pa told them to come get this car because he was in a fight last night.

THE COURT: And how does that make them co-conspirators?

MS. BURNS: They're sent on his behalf to get a car that's left at the scene of a crime.

THE COURT: How does that make them co-conspirators to the crime? We're talking about a crime.

MR. SKINNER: Your Honor, they clearly have --

THE COURT: Does everything that he does make anybody

D4MVLIN1          Heng De Oh-Yang - direct          Page 807

who deals with him a co-conspirator?

MS. BURNS: I think followers are for sure.

THE COURT: I think you need better evidence that they are his followers. They may have been helping him that night; that doesn't make them co-conspirators.

MR. SKINNER: Certainly makes them accessories after the fact.

THE COURT: But that's a different issue.

MR. SKINNER: It's still a statement made amongst the perpetrators of the crime in furtherance of the crime, akin to a statement from the defendant himself.

MR. COHEN: Except that there's no evidence --

THE COURT: It's a big strain.

MR. COHEN: -- that those two people are acting in furtherance of a crime. There's no evidence that they even knew that a crime had been convicted prior to the time that they arrived and saw yellow crime-scene tape.

MR. SKINNER: The best evidence they knew a crime had been convicted was when they showed up and saw the police. They didn't get the car; they turned around and left.

THE COURT: I'm sorry?

MR. SKINNER: The best evidence of their knowledge that a crime had been committed is that when they arrived and saw the car and saw the police nearby, they turned around and left; they didn't get the car. So clearly they knew something

D4MVLIN1          Heng De Oh-Yang - direct          Page 808

was wrong, and they didn't want to attract the police's attention.

THE COURT: They knew something was wrong. That doesn't make them co-conspirators.

MS. BURNS: Their statement that they were there --

THE COURT: It's just too big a strain. I'm sorry.

(Continued on next page)

D4MVLIN1          Heng De Oh-Yang - direct          Page 809

(In open court)

MS. BURNS: We have no further questions at this time, thank you.

THE COURT: Very well.

(Continued on next page)

A. 633

THE COURT: You may cross-examine.

CROSS-EXAMINATION

BY MR. COHEN:

Q. Is it Mr. Oh Yang?

A. Yes.

Q. Good morning, sir?

A. Thank you.

Q. Mr. Yang, you and I have never met, have we?

A. No.

Q. We never had a conversation or otherwise about this case, have we?

A. No.

Q. Did you testify that there came a time that you established a bus company?

A. Yes.

Q. When was that?

A. That was in 2004.

Q. And were you an owner of the company?

A. No.

Q. Well, what does it mean to establish a bus company if you are not an owner of it?

A. Well, this is what happened: The company was not established under my name, but I have 30 percent of the shares.

Q. Why wasn't it established under your name?

A. Because at the time somebody else owned 70 percent of the

share, therefore his name was placed under the company's name.

Q. So is it a fair say then that you were a partial owner of the company?

A. Yes.

Q. And you were a manager of the company?

A. Yes.

Q. Was your wife also an owner of the company?

A. Yes.

Q. And was she also charged in this crime?

A. Yes.

Q. Where is she now?

A. She is still in jail.

Q. She is still in prison?

A. Yes.

Q. She received a longer sentence than you did; correct?

A. Yes.

Q. She also went to trial; correct?

A. Yes.

Q. Now, you testified that you knew somebody named Cash?

A. I know of him, but we have no contact with one another.

Q. Well, did you testify on direct examination that you knew him or that you knew of him?

A. I know of this person, but we have no contact with one another.

Q. When you say you have no contact, you mean you don't see

each other very often or that you never had any contact with him?

A. I never had face-to-face contact with him. I have seen this person before.

Q. You know that he owns a bus company or bus companies in Chinatown?

A. I am not really sure about that.

Q. Have you ever heard of a bus company called Ming Ong?

A. Ming Ong? Right now I don't know. It's been a long time. I don't know.

Q. Sir, have you ever heard of a bus company called Ming Ong?

A. I don't believe so.

Q. Well, when you said that you had heard about or knew of this person named Cash, what do you know about him?

A. Because at the time when I was driving I was always in Chinatown.

Q. Okay.

A. And I parked my vehicles on Market Street, which is in front of the Yi Dong plaza. He used to walk by a lot and someone would point him out and say, That is Cash. That is why I know that that person is Cash.

Q. Was he a person that you would say was well known in Chinatown?

A. Yes. I believe that he is one of.

Q. Is it a fact, sir, that it was well known that he was an

informant for the government?

A. I have never head of that.

Q. You never heard that from anyone?

A. No.

Q. Now, following your conviction -- by the way you said you were convicted for extortion?

A. Yes.

Q. In the course of that extortion, people were, drivers were threatened with violence, were actually hurt in order to get them to pay up this fee every month?

A. Yes.

Q. And did you personally threaten or do violence to any of these drivers to get them to pay?

A. No.

Q. Other people did that either with your knowledge or on your behalf?

A. I didn't know about that.

Q. You didn't know that these drivers were being threatened in order to collect money?

A. I did not know.

Q. In fact --

A. I never knew that they faced that.

Q. That what, sir?

A. Never knew that they faced that.

Q. In fact when you got sentenced, the judge asked you if you

had anything to say; correct?

A. Yes.

Q. Is that right?

A. Yes.

Q. And you told them basically that anything that you had done you did for the drivers to get them benefits; correct?

A. Yes.

Q. But in fact the benefit of the 250 to $400 a month was not a benefit to the drivers, it was a hardship and an expense to the drivers; correct?

A. Yes. It is an expense.

Q. It was a hardship to them; right? These guys worked hard to earn those few dollars, didn't they?

A. You can say that.

Q. Well, would you say that?

A. But that was not what I was thinking at the time because of what we did, the drivers were able to get pretty good income.

Q. They were able to what?

A. Get pretty good income.

Q. You were able to get a better income than they were, weren't you?

A. Yes, I suppose so.

Q. Now, do you know somebody named Jian Li?

A. Jian Li or Li Qun.

Q. How about Li Qun?

A. Yes.

Q. Was Li Qun one of the people who was arrested in the same case that you and your wife were?

A. Yes.

Q. Now, do you recall that there came a time that Li Qun was supposed to be in court and he didn't show up?

A. Yes.

Q. And do you know where he was?

A. I did not know.

Q. Did you ever learn that he had fled the country and had gone to Canada?

A. I knew he fled when I went to court.

Q. Did you learn that he was eventually arrested and brought back to the United States?

A. No. I did not hear of that because I was in jail at the time.

Q. You have had no contact with him since that; right?

A. No.

Q. You haven't heard anything about what happened to him in terms of his sentencing in this case -- in your case rather?

THE INTERPRETER: Can you repeat the question?

Q. You never heard anything about what happened to him when he was sentenced in your case?

A. I did not hear about it.

Q. Was he related to you or related to your wife in any way?

A. He and my wife are from the same village so he always address her as older sister.

Q. Is that common in Chinese culture to address people from your village as older sister or as older brother?

A. Yes.

MR. COHEN: I have no further questions, your Honor. Thank you, Mr. Yang.

MS. BURNS: No further questions, Judge. Thank you.

THE COURT: Very well. You may step down.

(Witness excused)

THE COURT: Who is your next witness?

MS. BURNS: The government called Cheng Yong.

THE DEPUTY CLERK: Raise your right hand.

CHENG YONG,
    called as a witness by the Government,
    having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. BURNS:

Q. Good morning, sir. Do you go by any other names?

A. Yes.

Q. What is it?

A. Ma Yong.

Q. Where were you born?

A. In China.

Q. When did you come to the United States?

A. In '87.

Q. Did you come here legally or illegally?

A. Illegally.

Q. Describe how it is that you came to the United States at that time?

A. I went from Hong Kong to Mexico.

Q. Was that by plane or boat?

A. By plane.

Q. From Mexico where did you go?

A. I went to Los Angeles and then from there I flew to New York.

Q. Did anyone assist you in getting here at that time?

A. Yes.

Q. Who was that?

A. The smuggler.

Q. Did you pay a smuggler?

A. Yes.

Q. How much did you pay the smuggler?

A. $17,000.

Q. Did the smuggler provide you with any documents to use when you arrived in the United States?

A. No.

Q. What happened when you arrived in Los Angeles?

A. I was held in a small area, a room.

Q. What happened next?

A. Then I was driven to the airport and I flew over here.
Q. Flew to New York?
A. Yes.
Q. Have you ever applied for legal status here?
A. Yes.
Q. What was the basis of your application?
A. I applied as a student for the June 4th.
Q. Was that application truthful in every respect?
A. No.
Q. Do you currently have any legal status?
      THE INTERPRETER: I am sorry?
Q. Do you currently have a legal status?
A. No.
Q. Has an order of removal been entered against you?
A. Yes.
Q. Have you ever had any kind of temporary status or what is called a deferred action?
A. I had an ID.
Q. How was that obtained?
      THE COURT: If you could speak a little louder, I would hear him more clearly.
A. Immigration issue a one-year card.
Q. Did anyone in law enforcement assist you in obtaining that card?
A. Yes.

Q. What did you have to do, if anything, to obtain that card?
A. What do you mean by that?
Q. Did you have to do anything with law enforcement to obtain or to keep that card?
A. Yes.
Q. What did you do?
A. I had to help with this case.
Q. When did you have this status?
A. In '06 I believe.
Q. Did you provide information to law enforcement about things other than this case?
A. Yes.
Q. Has that status expired?
A. It has expired.
Q. Have any promises been made to you by anyone in the government regarding your immigration status in connection with your testimony here today?
A. No.
Q. Do you know someone named Dong Jai, Cash?
A. Yes.
Q. How long have you known him?
A. I have known him for many years. Five, six years.
Q. How do you know him?
A. I met him in Chinatown.
Q. What do you know about him? What does he do for work?

A. I don't really know much. He helped do work for the government.
Q. Did he play a role in your coming to testify here today?
A. No.
Q. Did he in any way coordinate with the government and you before you testified?
A. No.
Q. Did he help to arrange meetings with the government?
A. In the past he did.
Q. Have you ever owned a business?
      THE INTERPRETER: I am sorry?
Q. Have you ever owned a business?
A. Yes. Bus.
Q. When did you own a bus business?
A. I believe it was in '07.
Q. For how long did you own this business?
A. Up until the present. I am still doing it.
Q. What is it that you do with the bus company?
A. I don't do anything.
Q. Are you a shareholder or what is your role?
A. I just invested in the company. I am a shareholder.
Q. Do you receive any money from being a shareholder?
A. Yes.
Q. Are you still receiving money as a shareholder?
A. Yes.

Q. Have you ever owned any other type of business?
A. I don't have any other business.
Q. Have you ever been a shareholder in any other type of business?
A. Yes. I had a mahjong parlor before.
Q. When was that?
A. About 10 years ago.
Q. For how long did you operate this mahjong parlor?
A. I had it for six to seven years.
Q. While you had the mahjong parlor, did you receive any profits as a shareholder in that mahjong parlor?
A. Yes.
Q. Approximately how much did you receive?
A. About $120 to $130 a day.
Q. Was that mahjong parlor operated legally or illegally?
A. Illegally.
Q. Do you know someone who goes by the name Ding Pa?
A. Yes.
Q. When did you meet him?
A. In '01 or '02.
Q. Do you see that person here in the courtroom today?
A. Yes.
Q. Can you tell us where he is and describe what he is wearing?
A. He is sitting across from me wearing a suit.

Q. At which table?
A. The second table.
Q. Where is he seated at that second table?
A. The second seat.
Q. Second seat from me?
A. From the side of the table over to the second seat.
Q. I think you said he is wearing a suit?
A. Yes.
Q. What color?
A. What color is that? I really don't know what color that it is. It looks like it is black.
    MS. BURNS: May the record reflect that he has identified the defendant?
    THE COURT: Yes.
Q. Where is it that you met the defendant?
A. In a gambling parlor in Chinatown.
Q. Where in Chinatown?
A. On Eldridge Street.
Q. Did you see the defendant there one time or more than one time?
A. Many times.
Q. What did you see him doing?
A. He was helping out in the gambling parlor watching the place.
Q. What exactly was he doing to help out?

A. If anything arises out of gambling, he will come forward to take care of it.
Q. Were you a shareholder in this gambling parlor?
A. I was not a shareholder.
Q. Can you describe the building where this gambling parlor was located on Eldridge Street?
A. The first floor was a barbershop and the second floor was a gambling parlor.
Q. What game or games were played there?
A. 13 cards.
Q. How often did you go there?
A. I went in there occasionally.
Q. What does occasionally mean?
A. Every two, three days.
Q. Over how long a period did you go?
A. About two, three months.
Q. Do you know how long this gambling parlor on Eldridge was opened?
A. It was open for a few months.
Q. When you gambled how many other people were also gambling?
A. There were a lot of people.
Q. How many approximately?
A. About 20, 30 people.
Q. How much did you bet on a hand?
A. Sometimes 3,000, sometimes 2000.

Q. That's per hand or per game?
A. Yes.
Q. Did you see people working there?
A. Yes.
Q. What did you see them doing?
A. They were working security.
Q. How many people did you see working?
A. There were five to six people.
Q. Are you familiar with the term Dai Lo?
A. Yes, I am.
Q. What does it mean?
A. The head of a few people. The head person of a few people.
Q. What are those few people called if anything?
A. Yes.
Q. Do they have a name?
A. The names.
Q. What do you refer to them as?
    THE COURT: The word.
A. I didn't hear of any.
Q. Are you familiar with the name follower or kid?
A. Yes.
Q. What does that mean?
A. In a gang.
Q. The Dai Lo is the head of what?
A. The head of a gang.

Q. Do you know of any Dai Lo's in Chinatown at the time we're discussing when you would go to the gambling parlor?
A. Yes.
Q. Who were they?
A. Ding Pa and others.
Q. Based on what you saw, what led you to believe that Ding Pa was a Dai Lo?
A. He took care of everything.
Q. What do you mean by that?
A. The fights and others. He would be the one to step forward to do the talking.
Q. Did you see Ding Pa with any followers?
A. Yes, I did.
Q. Do you know their names?
A. I know of two or three.
Q. Can you tell us what they are?
A. Li Qui, Foo Chow, Yi Quang.
Q. Any others?
A. There were others, but I do not remember the names of those people.
Q. Approximately how many in total? How many followers did you see Ding Pa with?
A. About six to seven.
Q. Directing your attention now to July 29th of 2004. What were you doing that evening?

A. I was hanging out at the nightclub.
Q. Where did your evening begin?
A. I was in Chinatown. I had dinner there first before we went to Flushing.
Q. Where did you have dinner?
A. In Zhong Hing.
Q. Who were you with?
A. With six, seven or eight people.
Q. Can you tell us who they were?
A. Madan, Number Four, Yi Pei, Chi Xiang, Yi Qun, Yita.
Q. Anyone else?
A. And myself. I was there.
Q. Did you have any alcoholic drinks at dinner?
A. No.
Q. After dinner did you go anywhere?
A. I went to the nightclub in Flushing.
Q. Do you remember the name?
A. Yes.
Q. What was it?
A. Heaven On Earth.
Q. Approximately what time did you get there?
A. Around 12:00.
Q. Did you go there alone or with other people?
A. With a whole group of people.
Q. Was it the same group of people you had dinner with?

A. Yes.
Q. And while you were there, did you have anything alcoholic to drink?
A. No.
Q. Had you been to this club before this night?
A. Yes.
Q. What kind of club was it?
A. For singing and hanging out.
Q. And how many times had you been there before that night?
A. I went there for quite a few times.
Q. When you arrived in July of 2004 was there any security?
A. Yes.
Q. What kind of security was there?
A. It was a really big black man.
Q. What was that person doing?
A. He was searching a body at the entrance.
Q. Where was the entrance?
A. The entrance was when you go down from the sidewalk.
Q. Was the entrance at street level or below street level?
A. Below street level.
Q. The other times you had been at this time was there security at that time?
A. Yes.
Q. You said it was below street level. Did you have to use any stairs to get there?

A. Yes.
Q. Just to take those stairs from the street level down to the club?
A. Yes.
Q. You mentioned someone named Yi Qun as part of your group that night. What kind of relationship did you have with Yi Qun?
A. I didn't have any relationship with him.
Q. Were you close or friendly?
A. I would nod my head to him whenever I see him.
   THE COURT: At an appropriate time we'll take the midmorning recess.
   MS. BURNS: This will be perfect.
   THE COURT: Very well. We'll take a 10-minute recess.
   THE DEPUTY CLERK: All rise.
   (Jury excused)

   (In open court; jury not present)
   THE COURT: Is this your last witness?
   MS. BURNS: Yes, your Honor.
   THE COURT: We'll all take a 10-minute recess.
   (Recess)
   THE COURT: Do I understand that you have more?
   MS. BURNS: Oh, yes. May I proceed?
   THE COURT: Please proceed.
BY MS. BURNS:
Q. Before the break you testified that you had seen Ding Pa with followers. When was it that you saw him with followers? What time period?
A. Around 2001, 2002, 2003.
Q. Turning back to July of 2004. Where did you go once you were inside this nightclub?
A. I went to a room.
Q. What kind of room?
A. Narrow and long, the room.
Q. Was this a private room or a room for everyone in the club?
A. Private.
   THE COURT: Whose room was it?
   THE INTERPRETER: I am sorry, your Honor.
   THE COURT: Whose room was it? Whose private room?
   THE WITNESS: We ordered the room for us to hang out over there.

Q. When you say "we" who do you mean?

A. People who went there to hang out in the group.

Q. Did this club have a main area or a bar area?

A. Yes.

Q. Did you spend any time in that main area that night?

A. I went to the room and then I stood in the common area for a while.

Q. What did you do while you were in the common area?

A. Singing.

Q. Who did you see, if anyone, while you were there?

A. I saw Quo Li.

Q. Who is Guo Li?

A. Also a person involved in bus business and also gambling parlor.

Q. How long have you known Guo Li?

A. I had met him for about two to three years.

Q. Do you know where the gambling parlor he was involved in was?

A. East Broadway, 109.

THE COURT: I am sorry.

THE WITNESS: 109 East Broadway.

THE COURT: What is 109 East Broadway?

Q. What is located there?

A. It's a house but the gambling parlor was located on the third floor.

Q. What did you do after you spent time in the common area? Where did you go?

A. I went back to the room.

Q. Who was in that private room?

A. Me, Yi Pei, Cai Xing, Madan.

Q. Anyone else in your room at that time?

A. Number Four, Yita.

Q. These were people that you had gone to dinner with?

A. Yes.

Q. Was Yi Qun also in your private room?

A. Yes.

Q. These names you all mentioned, were they all men?

A. Yes.

Q. Were there any women in your private room that night?

A. Yes. Two hostesses.

MS. WANG: At this time I ask Ms. Chase to display Government Exhibit D that is in evidence.

May I approach, your Honor?

THE COURT: Yes.

Q. Mr. Yong, there is a picture up on the screen. Do you recognize it?

A. Yes.

Q. What does it look like?

A. This is a room where I hang out.

Q. When?

A. The incident that took place that night.

Q. Using this pointer can you indicate for the jury where it was that you were in the room that night?

THE COURT: What night?

Q. This is the night in July 2004, this room is where you were?

THE COURT: That is not what he has been talking about. He has been talking about 109 East Broadway.

MS. BURNS: Sorry, your Honor. We had jumped back into the club in question.

THE COURT: I don't know how anybody would know it.

Q. To be clear when we discussed you were sitting in the main area and went into a private room, where was that?

A. Heaven on Earth.

Q. Where was that located?

A. In flushing.

THE COURT: That was not in Chinatown?

THE WITNESS: No.

(Continued on next page)

Q. That main room was where you saw Guo Li?

A. Yes.

Q. And the private room we were talking about that you were in with Yiqun and others, that's what this picture is of?

A. Yes.

Q. If you can now point out to us where it was you were in the room that night.

A. I was sitting where the paper is.

Q. Over on the couch back there?

A. Yes.

Q. And where was Yiqun?

A. Yiqun was standing over there singing.

Q. And where would the door have been?

THE COURT: Over where?

THE WITNESS: He was sitting over there.

THE COURT: Was there a microphone there?

THE WITNESS: Yes.

BY THE COURT:

Q. And there's not a door depicted here, but where was the door to the room?

A. There's a door when you enter.

Q. Indicating opposite to where you were that night?

A. Yes.

Q. Okay. You can have a seat.

There are some beer bottles in that photo. Did you

have any beers that night?

A. No, I did not drink.

Q. And what happened once you got inside the private room?

A. He came in.

Q. Who's "he"?

A. Ding Pa and a kid.

Q. Prior to them coming in, did anybody else come join your room that night?

A. Yes.

Q. Who was that?

A. Guo Li.

Q. What happened when Guo Li came into the room?

A. He came in and had drinks with people there, and then he left.

Q. For how long did he stay?

A. Very short time after he had drinks.

Q. What happened after Guo Li left?

A. After Guo Li left, Ding Pa and the kid came in.

Q. Did you recognize this person with Ding Pa?

A. No.

Q. About how long was it after Guo Li left that Ding Pa came in?

A. About around ten minutes they left.

Q. Do you recall what Ding Pa and this other man were wearing?

A. Wearing a hat. Wearing a hat. Just wearing regular

clothes.

Q. What was the lighting like inside the room?

A. Half dim.

Q. At the time Ding Pa came in, was there music on?

A. Yes, Yiqun was there singing.

Q. What was the volume at that time?

A. It was not too loud.

Q. Once Ding Pa came in, was the door open or closed?

A. He opened the door, he came in, and he shut the door.

Q. What happened next?

A. Yiqun was standing over there in the front. As soon as he came in, he throw away the microphone.

Q. Yiqun threw the microphone?

A. Yes.

Q. What did you see Yiqun do?

A. Yiqun looked scared.

MR. COHEN: Move to strike.

THE COURT: I will strike.

Why don't you ask him rather what facial -- well, what it is that -- what do you mean by that? What is it that he looked like? Scared is your interpretation. What about his face made you think he was scared?

THE WITNESS: He was surprised.

THE COURT: Well, I'm going to strike -- I'm going to sustain the objection.

BY MS. BURNS:

Q. What did you see Yiqun do, if anything?

A. He wanted to --

THE COURT: Not what he wanted.

Q. What did you see? Just describe what you saw him do.

A. He threw away the mike, the microphone, and then he open up his arms.

Q. What happened next?

A. Ding Pa say, "Shoot." And the kid opened fire.

Q. What happened next?

A. Yiqun was shot. He rolled down from the table.

Q. Did you see where this other person was aiming when he fired the shots?

A. In Yiqun's chest.

Q. Did you see if he was aiming anywhere else?

A. No, I did not.

Q. What happened once Yiqun fell down?

A. And then he fell and rolled in front of me.

Q. What did you see next?

A. The kid stood on a table, and boom, boom, and emptied the guns with the bullets.

Q. In which direction did he empty that gun?

A. On -- he was on the ground, lying on the ground, and on Yiqun's body.

Q. At that time was Yiqun facing face up or face down?

A. He was just lying face down.

Q. Did the shooting stop?

A. After the bullets -- the bullets emptied from the gun, and just left.

Q. What did you hear that made you think that the bullets were empty?

A. Trigger was pulled in front of me, and the click, and then there was no more bullets.

Q. What did you see Ding Pa and this other man do next?

A. Open the door and ran out.

Q. What did you see other people do next?

A. Other people also ran out.

Q. What did you do?

A. I went out and told the boss there to report to the police.

Q. Other than Yiqun, was anyone else in that room injured?

A. Yes. Two hostesses were also shot, were also shot. One got killed and one was injured.

Q. And where were they in that room, if you can point?

A. Are you talking about the two ladies?

Q. Yes.

A. The one got killed, was sitting over there; the one injured, over there.

Q. Where were you again?

A. I was sitting over there.

Q. Did you speak with the police that night?

You can have a seat.

A. Yes.

Q. Where did you speak with them?

A. The police station.

Q. Before you spoke to the police, did you speak with anybody else in the room about what happened that night?

A. No.

Q. While you were at the precinct, did you see other people who'd been at the karaoke club there?

A. Yes. It was bright in the morning. I saw.

Q. Did you see the defendant at the precinct?

A. No.

Q. Did you see the man who'd come into the room with the defendant at the precinct?

A. No.

MS. BURNS: No further questions.

THE COURT: Very well.

You may cross-examine.

CROSS-EXAMINATION

BY MR. COHEN:

Q. Is it Mr. Cheng or Mr. Yong?

A. Mr. Cheng.

Q. Okay. Mr. Cheng, good afternoon.

Have we ever met, sir?

A. No.

Q. Have we ever had a conversation on the phone or otherwise about this case?

A. No.

Q. Have you met with the people at the government's table?

A. Yes.

Q. How many times would you say you met with the people at the government's table to discuss your testimony at this trial?

A. About two to three times.

Q. I'm talking about -- withdrawn.

When do you think the first time was that you met either -- do you know who Agent Varian is, the gentleman with the short hair?

A. Yes.

Q. Do you remember meeting him for the first time around June of 2010?

A. I do not remember when.

Q. Well, it was several years ago; correct?

A. Yes.

Q. Now, at that time, were you working as some sort of confidential source or confidential informant for the immigration service?

A. Yes.

Q. How was it that you came to be a confidential source for the immigration service?

A. Nothing.

Q. Well, did you receive an invitation from the immigration service to come to their office to talk about working for them?

A. Yes.

Q. Who was it that invited you to meet with the immigration service?

A. Person -- persons in Chinatown.

Q. And what was the name of that person?

A. Dong Jai.

Q. Now, is Dong Jai the same person that you referred to as Cash?

A. Yes.

Q. How was it that Cash came to invite you to meet with people from the immigration service?

A. So the deportation would be postponed.

Q. I understand that you hoped that your deportation would be postponed for working with them.

But my question, sir, is how are the arrangements made between you and Cash for you to go and meet with the agents from the immigration service?

A. Just arresting people in Chinatown, just arresting people.

Q. I'm sorry, can you repeat that?

THE INTERPRETER: Arresting people in Chinatown. Just arresting people.

Q. Who was arresting people in Chinatown?

A. People from immigration office.

Q. And were you afraid that you might be one of the people who would be arrested in Chinatown?

A. No.

Q. You had a deportation order; correct?

You were in the United States illegally; correct?

THE REPORTER: I'm sorry, I didn't hear an answer.

THE COURT: The answer I thought was yes. It was "mm-hmm," which is not -- doesn't help. It has to be yes or no.

I haven't heard the answer.

THE WITNESS: Oh, I do not know what you were asking.

THE COURT: How do you say yes in your Chinese language?

THE INTERPRETER: Say.

THE COURT: That's the way you say yes, "say"?

THE INTERPRETER: Yes.

THE COURT: Very well.

BY MR. COHEN:

Q. Did you know that at any time because you had a removal order, that you could be arrested in Chinatown?

A. Did not know.

Q. Well, did you testify that the reason that you went to assist the immigration service is because you wanted to avoid being sent back to China?

A. Yes.

Q. So is it a fair statement that you did have some concern that you would be sent back to China, unless you found some way to stay here?

A. Did not really.

Q. Did not really what, sir?

A. Did not really concern about it.

Q. Well, if you weren't concerned about it, why did you enter into a relationship with the immigration service?

A. I was doing it voluntarily.

Q. The reason you did it voluntarily was so that you would receive a benefit; correct?

A. Yes.

Q. And the benefit that you were receiving was that you got what you called a deferred action on your removal; correct?

A. Yes.

Q. And did you understand that deferred action meant that as long as you did what they wanted, they would allow you to stay here?

A. Yes.

Q. Is there an answer?

THE COURT: "Yes" was the answer.

MR. COHEN: Okay.

Q. Now, at the time that you were working as a source for the immigration service, were you also operating this illegal gambling parlor?

A. No.

Q. Well, when did you start being a source for immigration?

A. In '05.

Q. When did you stop operating the gambling parlor?

A. In 2000.

Q. You stopped operating the gambling parlor in 2000?

A. Yes.

Q. You said that you got some sort of temporary status in 2006; correct?

A. Yes.

Q. And was that shortly after you began your relationship with the immigration service?

A. Yes.

Q. And was Agent Varian the agent that you reported to at immigration?

A. Yes.

Q. Were there other agents, as well?

A. Yes.

Q. Now, you said that you had applied for political asylum in the United States at some earlier time; correct?

A. I did.

Q. And when was it that you made that application?

A. I do not remember which year that was. I think it was sometime in the '90s.

Q. And what story did you tell in your asylum application?

A. What story did I tell. It was the attorney who did it for me.

Q. I'm sorry?

THE INTERPRETER: What story did I tell?

Q. Yes.

THE INTERPRETER: It was the attorney who did it for me.

Q. Well, you had an immigration attorney?

A. Yes.

Q. And you met with the attorney to talk about what claim you would make in order to get asylum; correct?

A. Yes.

Q. And did the attorney ask you what persecution you had suffered in China?

A. I was not asked.

Q. Well, did you understand that in order to obtain asylum in the United States, you had to claim that you had been persecuted in some way in China?

A. I did.

Q. And did you become familiar with the story that was written to assist you in claiming asylum?

A. It was never shown to me.

Q. I beg your pardon?

THE INTERPRETER: It was never shown to me.

Q. So, in other words -- well, withdrawn.

Did there come a time that you went to an interview or a hearing at the immigration service?

A. Yes.

Q. And weren't you asked at that hearing or at that interview to explain why you feared returning to China?

A. Yes.

Q. And when you appeared for that interview or hearing, didn't you swear to tell the truth?

A. Yes.

Q. And at that time, didn't you tell the interviewing person or the judge that the reason you feared returning to China was because of your political pro-democracy activities?

A. Yes.

Q. So at some point, you did become familiar with the false statements that were made on your behalf; correct?

A. Yes.

Q. And you adopted those statements as your own story; correct?

A. Yes.

Q. It wasn't the immigration attorney who swore to tell the truth at the interview or hearing, it was you; correct?

A. Yes.

Q. So you can't blame the lies that you told on your attorney, can you?

MS. BURNS: Objection.

THE COURT: Objection sustained.

Let's move on.

Q. So how was it that Dan Jian recruited you to become an informant for the immigration service?

A. He had a conversation with me.

Q. Did he tell you that he was an informant for the immigration service?

A. Yes.

Q. Had you already known that?

A. I did not know.

Q. Okay. What did he tell you -- what benefit did he tell you you could receive if you worked for the immigration service?

A. He didn't say.

Q. Well, did he tell you that you would receive money?

MS. BURNS: Objection.

THE COURT: Overruled.

A. No.

Q. Did he tell you that they would be able to help you remain in the United States?

MS. BURNS: Objection.

THE COURT: Overruled.

A. He didn't say that either. He didn't say any of that.

Q. So why did you go?

A. I went in to do other things, not for his thing.

MR. COHEN: I'm not sure that was responsive, Judge,

and I'd ask that it be stricken and I'll ask the question again.

MS. BURNS: He was asked why, and he answered.

THE COURT: Well, what are the other things he wanted to do.

MS. BURNS: I think that's a fair question, but I don't think the question should be stricken.

BY MR. COHEN:

Q. What other things did you go to do for the immigration service?

A. To become an informant.

Q. Okay. What benefit did you expect to receive from becoming an informant?

A. Not any kind of benefits.

Q. So you didn't expect to receive any benefit at all?

A. No.

Q. Did you hope to receive a benefit?

A. No, I wanted to do it; it was voluntary.

Q. In fact, not only you wanted to do it, you were anxious to do it; correct?

A. I wasn't anxious.

Q. Did Cash tell you what benefits he got --

MS. BURNS: Objection.

Q. -- from becoming an informant?

THE COURT: Objection sustained.

You can ask him whether Cash told him of any particular benefit for him.

MR. COHEN: For this gentleman?

THE COURT: Yes.

Q. Did Cash tell you of any particular benefit that you might receive in return for working for the immigration service?

A. No.

Q. You testified that back in an earlier time, that you knew people who were dailos in Chinatown.

A. Yes.

Q. When the government asked you to tell us who those dailos were, the only one you could remember was Mr. Lin; correct?

A. Yes.

Q. Do you know Yi Feng?

A. I do.

Q. He was a dailo?

A. Yes.

Q. Did you know Yi Xiang?

THE INTERPRETER: I'm sorry, Yi?

MR. COHEN: Yi Xiang.

THE INTERPRETER: Can you spell it for me?

MR. COHEN: Y-I, X-I-A-N-G.

A. I did.

Q. He was Yi Pei's brother; correct?

A. Yes.

Q. Did you know that he was a dailo?

A. I did not.

Q. You didn't know that?

A. No.

Q. You talked about somebody named No. 4.

A. Yes.

Q. Did you know this fellow?

THE INTERPRETER: I'm sorry?

Q. Did you know this guy?

A. I did.

Q. Did you know him by any name other than No. 4?

A. He had an English name. I don't know what it is.

Q. Do you know why he was called No. 4?

A. I don't know.

Q. Now, you testified today that you had no relationship with Yiqun; correct?

A. Yes.

Q. You would just nod to him once in a while?

A. Yes.

Q. By the way, when did your deferred action of your removal occur?

A. I do not remember. It was in the '90s.

Q. In the '90s?

A. You mean the removal?

Q. Let's talk about that.

The removal order was issued in 1996; correct?

A. Yes.

Q. And you were ordered removed in 1996; correct?

A. What do you mean by being ordered removed? I don't understand.

Q. Well, you went to see an immigration judge, right?

A. Yes.

Q. And you went there because you were asking for something called cancellation of removal, right?

A. No.

Q. Why did you go see the immigration judge?

A. I went to see the immigration judge for my case.

Q. And your case was that you had been ordered deported; correct?

A. Yes.

Q. And when you went there to make an application to the judge, what you asked for was a suspension of deportation; correct?

A. I only went to court that time, and I didn't see the judge anymore after that.

Q. Well, let me direct your attention to the year 1997, and ask if you recall you were ordered deported in that year, but given the privilege of voluntary departure, and told that you had to leave the United States by December 16th, 1997?

A. Yes.

Q. You remember that, right?

A. I do.

Q. And then you filed an appeal of that order telling you that you had to leave by 1997; correct?

A. Yes.

Q. And in 1999, that appeal was denied, and you were ordered to leave the United States; correct?

A. Yes.

Q. Did you leave the United States?

A. No.

Q. From then on, you understood that you had no status to be here; correct?

A. Yes.

Q. And how long after that did you enter into a relationship with the immigration service?

A. What do you mean?

Q. Well, how long after 1999 did you become an informant for the immigration service?

A. In '05.

Q. So during the time -- during the about six years from 1995, 1995 -- I'm sorry, 1999 until 2005, did you have any contact with the immigration service?

A. No.

Q. Had you been ordered to report to them on any regular basis?

A. No.

Q. Now, you said that there was a time that you were gambling at a gambling parlor on Eldridge Street; correct?

A. Yes.

Q. You went there a few times a week?

A. Yes.

Q. And you would bet sometimes between two and $3,000 a hand or a game?

A. Yes.

Q. What were you doing for a living at that time?

A. I was working in the restaurant.

Q. And were you earning the kind of money at the restaurant that enabled you to bet between two and $3,000 a hand or a game several times a week?

A. There were a few of us, four or five of us, that we got together.

Q. Okay. So when you said that you bet two or $3,000 per hand, did you mean that you and four or five other people would bet $2,000 or $3,000 a hand with money that was pooled together?

A. Yes.

Q. Now, you testified that you met a group of people in Chinatown on the evening of July 29th, 2004, and after that you went to the Heaven On Earth Club in Flushing.

A. Yes.

Q. And that you had been to that club many times before?

A. Yes.

Q. Had you seen Ding Pa there before?

A. No.

Q. Had you seen the other person that you said was with Ding Pa there before?

A. No.

Q. Besides the people whose names that you mentioned that were present in the private room, was anybody else there on that night?

A. Those few people that I mentioned before.

Q. Okay. And you said there were a couple of females that were there that worked for the club?

A. Yes.

Q. Was there anybody in the room that you didn't know?

A. Anyone I didn't know?

Q. Yes.

A. There was no one that I didn't know.

Q. Okay. Do you know somebody named Drifter, who goes by the nickname "Drifter"?

A. I do not know.

Q. I think you testified that when Ding Pa came into the room, he came with another person.

A. Yeah.

Q. You didn't recognize that guy?

D4MVLIN3 Cheng Yong - cross Page 854

A. I did not recognize that kid.
Q. You've never seen him before?
A. No.
Q. And you testified that somebody opened and shut the door. Do you know who it was that opened and shut the door?
A. I do not know.
Q. So you didn't see who it was that opened or shut the door?
A. No.
Q. You just know that the door opened, Ding Pa and somebody else came in, and the door shut?
A. Yes.
Q. Do you know if the door closed automatically or whether it had to be pulled shut?
A. You have to close it in order to have it close.
Q. Now, you said that when Ding Pa and the other person came into the room, that Yiqun threw the microphone. Remember that?
A. He threw it on the ground.
Q. Well, did he testify that he threw it -- withdrawn. Are you saying that he threw it on the ground?
A. Yes.
Q. He didn't throw it at Ding Pa.
A. No.
Q. He didn't throw it at the other guy.
A. No.
Q. You've never told anybody that he threw it at Ding Pa or

D4MVLIN3 Cheng Yong - cross Page 855

the other guy, have you?
A. No.
Q. Because that didn't happen; correct?
A. No.
Q. Now, how long after Ding Pa and the other person entered the room did Yiqun throw the microphone on the floor?
A. Right after they came in; right after he saw them, he threw it down.
Q. And were you able to -- withdrawn. At that point, up until that moment, Yiqun had been singing; correct?
A. Yes.
Q. That's why he had the microphone in his hand, because he was using it to sing along with the music that was playing; correct?
A. Yes.
Q. It wasn't Yita that was singing at the time that Ding Pa came into the room, was it?
A. They were both singing.
Q. Now, you're saying that it was Yita and Yiqun that were singing?
A. Yita was sitting on the sofa, and Yiqun was standing in front of the TV and singing.
Q. Didn't you testify on direct examination that when Ding Pa and the other person came into the room, that Yiqun was the

D4MVLIN3 Cheng Yong - cross Page 856

person who was standing and singing?
A. That's correct. He was standing in front of the TV singing.
Q. And that's what you told the jury; correct?
A. Yes.
Q. And you saw that, right?
A. Yes.
Q. You heard it, right?
A. What do you mean I heard it?
Q. You heard Yiqun singing, right?
A. Yes.
Q. Yita was sitting on the couch, right?
A. Yes.
Q. Did Yiqun stop singing when Ding Pa entered the room?
A. Yes.
Q. Was there a lot of noise at that time in the room after Yiqun stopped singing?
A. There was no sound.
Q. No sound; correct?
A. Right.
Q. Nobody was speaking; correct?
A. No.
Q. Nobody said anything; correct?
A. Only Ding Pa, who came in, said a sentence; nobody else talked.

D4MVLIN3 Cheng Yong - cross Page 857

Q. And what Ding Pa said was, according to your direct testimony, "Shoot," right?
A. Yes.
Q. And then you heard him say that.
A. Yes.
Q. You heard him say that in Chinese?
A. Yes.
Q. In what dialect?
A. He spoke in Foochinese.
Q. And you understood Foochinese, correct, because you grew up in Fuzhou; correct?
A. Yes.
Q. Now, how long had you known Ding Pa up until that point?
A. I've known him for two, three years.
Q. And did you know him as somebody who frequently got into fights with people?
A. Yes.
Q. Did you know him as somebody that was always getting into trouble with people?
A. Yes.
Q. Did you know him as somebody that drank too much?
A. Yes.
Q. And you know that because you saw -- it happened, right, you saw those things happen.
A. Yes.

A. 645

Q. Did you know Yiqun's girlfriend?

A. I did.

Q. Did you know her longer than you knew Yiqun?

A. Yes.

Q. She's Yi Pei's sister; correct?

A. Yes.

Q. She's Yi Xiang's sister; correct?

A. I don't know whether she's the older sister or the younger sister, but they're siblings.

Q. So, in other words, Yi Pei, Yi Xiang, and Yiqun's girlfriend are all blood siblings, right?

A. Yes.

MR. COHEN: Judge, can we take a lunch break now?

THE COURT: Very well.

How much more do you have, Mr. Cohen?

MR. COHEN: Half an hour.

THE COURT: Very well.

Members of the jury, we will reconvene at 2:15.

(Jury excused)

THE COURT: You may step down.

(Witness excused)

THE COURT: Very well.

If indeed we finish the evidence --

MR. COHEN: I'm sorry, your Honor?

THE COURT: If indeed we finish the evidence by 3

o'clock -- but I'm not putting any pressure on you, we don't have to -- I will plan to give you a proposed charge, my proposed charge, at the end of the day. And we will then hold a charge conference tomorrow morning. If it goes a little later, I'll have to figure out exactly -- we will clearly hold a charge conference tomorrow, but exactly when and how, I will advise you.

MR. COHEN: And, your Honor, then summations will be on Wednesday?

THE COURT: Yes. Yes. Because we'll have -- well, yes, you won't sum up before Wednesday. I may instruct the jury before then; it depends on the timing. Very well. But you will have a copy of my proposed charge, and by the end of the charge conference, you will know exactly what I'm going to charge, because I intend to give the jury a copy of my charge.

MR. COHEN: Of course.

THE COURT: It's my usual practice to give them a copy of both the indictment and the charge.

MR. COHEN: Judge Korman gives the jury the indictment, the charge, and redacted transcripts with all the objections taken out. And I've seen juries deliberate four, five days, not ask a single question, come out with a verdict. And I think it's a great and efficient way to do things.

THE COURT: Right. But I prefer, if the jury needs something read back, that they advise me of it and we will read

it back.

MR. COHEN: Of course. It's outside the box, I think, the way Judge Korman does it, but it seems to work.

THE COURT: There are many, many different practices, in both this Court and the Brooklyn court -- and the Eastern District.

Very well. We all like to think our practices are the most efficient.

We'll now take the lunch recess.

MR. SKINNER: Thank you, Judge.

MS. BURNS: Thank you.

(Luncheon recess)

(Continued on next page)

AFTERNOON SESSION
2:15 p.m.

(In open court; jury present)

MR. COHEN: May I inquire?

THE COURT: Yes. You may proceed.

MR. COHEN: Thank you.

BY MR. COHEN:

Q. Do you recall, sir, that you met with Detective Scalli, Detective Ed Scalli on July 2, 2009 and signed a written statement about this case?

A. When in July?

Q. July 2, 2009.

A. July 2, 2009, yes.

Q. And when you met with Detective Scalli, there was a police officer named Police Officer Yam who was present who translated for you from English to Chinese and back?

A. I don't remember. I don't remember.

Q. Well, you don't speak English well enough to have met him without a translator; correct?

A. Yes.

Q. I take it that Detective Scalli doesn't speak Chinese; correct?

A. I do not know who this person Scalli is.

MR. COHEN: Could I ask Detective Scalli to stand for a second?

THE COURT: Yes.

Q. Do you see this person in the back row?

A. Yes.

Q. Have you ever seen him before?

A. If I seen him? Yes, I did.

Q. Do you remember that he is the gentleman that you met with on July 2nd of 2009?

A. Don't really remember.

MR. COHEN: May I speak to the government for a moment?

(Pause)

MR. COHEN: Your Honor, there is an agreement between the parties that a meeting took place between Detective Scalli and this witness on July 2, 2009.

MR. SKINNER: Correct, your Honor.

THE COURT: Very well.

Q. Do you recall when you met with Detective Scalli the meeting lasted about 50 minutes, nearly an hour?

THE INTERPRETER: 50?

MR. COHEN: Five, zero.

A. Where? I don't remember.

Q. Well, do you remember where it was that you met Detective Scalli?

A. I don't remember.

Q. Do you remember in the course of speaking to Detective

Scalli he asked you questions about Yi Qun?

A. I don't remember and I do not know what his name is.

Q. You don't know whose name?

A. English name of this police officer.

Q. Instead of calling him Detective Scalli, let's speak about the gentleman in the back row, okay?

Was there an answer?

A. Yes.

THE COURT: Mr. Interpreter, you have to say it loud for everyone.

A. Yes.

Q. Do you recall that when you spoke to the gentleman in the back row and he asked you questions about what happened here that you referred to Yi Qun as your friend in the written statement that you gave four times?

A. No. I don't remember.

Q. Do you recall that in the written statement you gave to the gentleman in the back row that you said that when Ding Pa came into the room he said that he told the second guy whose name was Little Beijing, "That is the guy. Take him out"? Do you remember making that statement to the gentleman in the back row?

A. Yes.

Q. Did you say you did or did not recall referring to Yi Qun as your friend four times?

A. I don't remember.

MR. COHEN: May I approach the witness, your Honor, and show him Exhibit D, which is 3502-14?

THE COURT: Yes.

MR. COHEN: I ask the interpreter to translate for the witness starting from here through here.

Q. Have you had a chance to listen to the interpreter translate this written statement into Fuchownese?

A. Yes.

Q. By the way do you see a signature on here that you recognize?

A. That's my signature.

Q. Now that you've had a chance to hear this translated into your language, does it refresh your recollection that when you were interviewed by the gentleman in the back row on four occasions you referred to Yi Qun as your friend?

A. Yes.

Q. You do; right?

A. Yes.

Q. Now, do you recall that you met with agents from the government at another time about 11 months after that on June the 14th of 2010?

A. Yes.

Q. Did I say June 14th or 4th.

MS. BURNS: It is June 4th.

Q. Do you recall being asked questions about the shootings at the karaoke?

A. I remember.

Q. Do you recall on that date when you were asked what Ding Pa said your answer was that he ordered Little Beijing to "Finish him"?

THE INTERPRETER: Counsel, can you repeat the question?

MR. COHEN: Yes.

Q. Do you recall that when you met with the government on that date and you were asked a question about what Ding Pa had said, your answer was that he said to Little Beijing, "Finish him"?

A. Yes.

Q. Now, you met with the government again on December the 5th of 2011. Do you recall that?

A. December of 2011.

Q. Yes. December 5th, 2011.

A. Don't remember.

MR. COHEN: Your Honor, we have an agreement between the parties that this witness was interviewed by the government on December 5th, 2011 and it is 3502-5.

Q. Sir, do you recall meeting with the government at some time other than the meetings I have discussed with you so far about this incident?

A. I don't try to remember.

Q. I am sorry?

A. I don't try to remember.

Q. I am asking you now to try to remember.

A. Don't remember.

Q. Listen, there is an agreement between the government and us that you met with them on December the 5th of 2011. Do you understand that? It doesn't matter if you remember the date because it is not an issue.

MS. BURNS: Is there a question?

MR. COHEN: The question is coming.

Q. Do you remember telling the government at a meeting that with respect to the 2004 shooting you were drinking at the club with seven or eight people and that you had one beer?

A. I did not have any beer.

MR. COHEN: May I approach, your Honor?

THE COURT: Yes.

MR. COHEN: Showing the witness 3502-5. If you can translate his name and that highlighted sentence. Actually, this one and this one.

A. No. I didn't have any beer.

Q. When you met with the government on each occasion was somebody taking notes?

A. I think yes.

Q. Do you recall that when you were asked on that occasion what Ding Pa had supposedly said to this other person you said

Ding Pa said, Do him in?

THE INTERPRETER: Do him in?

MR. COHEN: Do him in.

Q. No. I not say, Do him in.

MR. COHEN: May I approach, your Honor?

THE COURT: Yes.

MR. COHEN: Translate this.

A. Who is the person about I said about do him in? I didn't say that.

Q. Well, the question I am asking you is do you recall telling the government that when you were asked what Ding Pa said, you said that Ding Pa said, Do him in?

A. No. I didn't say that.

Q. Do you recall being interviewed on another date by the government, and this would be July 17th of 2012, and being asked on that date what Ding Pa said and answering he said, Get rid of him in Fuchownese?

A. "Get rid of him" and "shoot" in Fuchow means the same.

Q. Well, that is what you say. I am asking you, sir, whether you said the words today to the jury that he said, Shoot, but you told the government on July 17th of 2012 that he said, Get rid of him.

A. Yes.

Q. You told the government that, right, when they asked you today you said, Shoot, but when they asked you back then you

said, Get rid of him; correct?

A. Yes.

Q. Now, on another occasion you were interviewed by the government, and this is July 22nd, 3502-4, do you recall on that date telling the government that you knew Ding Pa and Little Beijing beforehand from Chinatown?

A. Only knew Ding Pa but did not know this Little Beijing.

Q. I am not asking you, sir, whether you knew him or not. I am asking you whether you told the government on July the 22nd of 2012 that you knew Ding Pa and Little Beijing before from Chinatown? Did you tell that to the government?

A. I don't remember. It seems I did not say that.

MR. COHEN: May I approach the witness, your Honor?

THE COURT: Very well.

Q. I will show you a portion of what appears to be 3502-4 and ask that the translator translate starting from here to the end of the page.

Have you had a chance to have that translated into Fuchownese?

A. Yes.

Q. Does it refresh your recollection on that date you told the government that you knew both Ding Pa and Little Beijing beforehand from Chinatown?

A. Did not know. I did not say that.

Q. You didn't tell that to the government?

A. No.

Q. Do you recall on that date telling the government that when you were asked about the shootings at the Heaven On Earth club you said Ding Pa said to Little Beijing, This is the guy. Go for it. Do it. Get rid of him?

THE INTERPRETER: Can I use that?

MR. COHEN: Sure.

A. It seems I did not say that. Don't remember.

Q. It seemed that you did not say that, or you didn't say that?

A. I did not say that. I did not.

Q. How much time passed from the moment that Mr. Lin and Little Beijing entered the room until the first shot was fired?

A. As soon as they came in, this is a very short time a shot was fired.

Q. Seconds?

A. As soon as I saw him drop the microphone and just started shooting.

Q. The first words that you heard spoken in this quiet room after Ding Pa and this other fellow answered were the first words that you testified were "shoot"?

A. Yes.

Q. Do you expect, sir, that your testimony on behalf of the government is going to assist you in remaining in the United States?

D4M6LIN4 Yong - cross Page 870

A. Yes.

MR. COHEN: I have no further questions.

MS. BURNS: Can I have one minute, your Honor?

THE COURT: Very well.

(Pause)

REDIRECT EXAMINATION

BY MR. SKINNER:

Q. Mr. Cheng, do you still have that deferred action status today?

A. Yes.

Q. You still have deferred action or a card that let's you stay?

A. The government gave me a card before.

Q. Has that card expired?

A. It is good every year, but it actually expired.

Q. Are you receiving any immigration benefits as you sit here today?

A. No.

Q. The man that came into the room with Ding Pa, you did not know who he was at the time of the shooting; is that correct?

MR. COHEN: Objection to leading.

MS. BURNS: Just trying to move it along.

THE COURT: I understand but we're not moving it along right now. We're finishing the evidence.

Q. At the time of the shooting did you know that man that came

D4M6LIN4 Yong - redirect Page 871

into the room with Ding Pa?

A. I did not know.

Q. At the time of the shooting, did you know his name?

A. No.

Q. Did there come a time later that you learned a name that he went by?

A. I heard from other people that he was called Little Beijing.

Q. Did you learn that after the shooting?

A. Yes, after the shooting.

Q. When you spoke to the police that night of the shooting in 2004, what did you say that Ding Pa said when he came into the room?

A. I said to the police he said, Get rid of him. Shoot.

MS. BURNS: No further questions.

THE COURT: Very well.

RECROSS-EXAMINATION

BY MR. COHEN:

Q. You said that there came a time after the night of the shootings that you learned this other fellow's name?

A. Yes.

Q. And you said you learned it from other people?

A. Yes.

Q. Was it Dan Jian from whom you learned it?

A. No.

D4M6LIN4 Cheng - recross Page 872

Q. Do you remember telling the government on July 17th of 2012 that although you didn't know Little Beijing by name on the night of the shooting, you knew that he used to Yi Sil, also known as Brother Yi Sil and that he had a fierce reputation? Do you remember telling the government that?

THE INTERPRETER: I am sorry. The second part?

MR. COHEN: Sure. Where do you want me to start? I will start from the beginning.

MS. BURNS: Objection, Judge. Beyond the scope of the redirect.

MR. COHEN: No, it's not.

THE COURT: Why don't you just repeat the question.

Q. Do you remember in that meeting that you had with the government that although you didn't know Little Beijing's name before the night of the shooting that you knew him as somebody that used to follow Brother Yi Sil and that he had a fierce reputation?

THE INTERPRETER: I used to follow brothers.

MR. COHEN: Yes.

THE COURT: I will permit it.

THE INTERPRETER: What is the other name, Yi Sil?

MR. COHEN: Brother Yi Sil.

A. Yes. I said that.

Q. You said that; right?

A. Yes.

D4M6LIN4 Cheng - recross Page 873

Q. That is because you recognized Little Beijing as somebody you had seen before even if you didn't know his name; correct?

A. No. Didn't see him.

Q. Did you tell the government that you heard that he used to follow Brother Yi Sil and he had a fierce reputation?

A. Yes.

Q. Now, the government asked you whether you were receiving any immigration benefit in return for your testimony; correct?

A. No.

Q. No, you are not receiving any benefit?

A. No.

Q. Well, you have an order to be deported from the United States; right?

MS. BURNS: Objection.

THE COURT: Overruled.

A. It is a removal order.

Q. You have an order to be removed; correct?

A. Yes.

Q. You haven't been removed, have you?

A. No.

Q. Do you consider that a benefit?

A. No.

MR. COHEN: I'm done.

THE COURT: Do I understand the government now rests?

MR. SKINNER: No, your Honor. We have one stipulation

to read.

MS. BURNS: Can we excuse the witness?

THE COURT: You may step down.

(Witness excused).

MR. SKINNER: Your Honor, at this time we have a stipulation to read. It is stipulated and agreed by and among the parties that Government Exhibit 1 is a photograph of Chan Qin Zhou, also known as Yi Qun, the victim of the shooting that occurred that on July 30, 2004 at a karaoke club located at 46-22 Kissena Boulevard, Queens, New York.

Government Exhibit 2 is a photograph Mei Ying Li, a victim of a shooting that occurred on July 30th, 2004, at a karaoke club located at 46-22 Kissena Boulevard, Queens, New York. It is further stipulated and agreed that this stipulation, which has been marked as Government Exhibit 101 and Government Exhibits 1 and 2 may be received in evidence at trial.

We offer 101, 1 and 2.

THE COURT: I would like to see them. Government Exhibits 1 and 2 are received in evidence.

MR. SKINNER: And Government Exhibit 101, your Honor.

THE COURT: That's the stipulation?

MR. SKINNER: Yes, your Honor.

THE COURT: Very well. 101 as well.

(Government's Exhibits 101, 1 and 2 received in

evidence)

MR. SKINNER: May we show Government Exhibit 1 to the jury, please?

THE COURT: Very well.

MR. SKINNER: Now may we show Government Exhibit 2?

THE COURT: Very well.

MR. SKINNER: The government rests.

THE COURT: Very well.

Is the defendant resting at this time?

MR. COHEN: No, your Honor. Does your Honor want to hear some legal argument at this time, or shall we proceed and hear the argument later?

THE COURT: By all means proceed.

MR. COHEN: May I confer with the government for a moment?

THE COURT: Very well.

MR. COHEN: Your Honor, there is a stipulation that has not been reduced to a writing between government and the defense counsel and the defendant that each of the notes that I read to the witness to refresh his recollection, this witness, Mr. Cheng Yong, the witness who just testified were reflected in notes taken at meetings with representatives of the government.

THE COURT: Right. The words appeared in those documents?

MR. COHEN: Yes. Now I have three stipulations to read into evidence, which will be published to the jury at a later time.

THE COURT: What do you mean at a later time?

MR. COHEN: One of them is fully formalized and two have to be edited, but they can be read now.

THE COURT: Why can they not be edited now?

MR. COHEN: They have been edited, Judge. They are not just going to be shown.

MR. SKINNER: We have agreed on the substance of the statements, but there are some corrections made in hand and he wants to fix the typing.

MR. COHEN: Exactly.

THE COURT: Very well.

MR. COHEN: This is Defendant's Exhibit E, a stipulation. It reads: It is hereby stipulated and agreed by and among the parties that if Keith Ng were called as witness he would testify as follows:

One, in July of 2004 I was employed as a detective by the New York City Police Department. I was assigned to the Queens Robbery Squad and I am currently retired from the police department.

Two, on July 30th, 2004 I was assigned to assist in the investigation of a shooting homicide which occurred at the Heaven On Earth club on Kissena Boulevard in Queens County.

Three, on that date I was present at the 109th precinct detective unit. At approximately 11:20 a.m. i interviewed Guang Yun Zhu in connection with this investigation. I conducted the interview in Mandarin, which I speak and understand. Prior to the interviewing Mr. Zhu, I interviewed a number of other people who were present at the Heaven On Earth club at the time of the shooting, including Cheng Yong at 8:20 a.m. and Cai Jian Li at 8:50 a.m.

Four, I took notes during this interview which I then used to prepare a police report known as a DD-5. A DD-5 is a report used to note statements made by witnesses who were interviewed by New York Police Department detectives.

Five, on July 31st, 2004 I prepared a DD-5 concerning my July 30th, 2004 interview of Mr. Zhou. The DD-5 indicates that Mr. Zhou stated that he had been present inside VIP Room No. 3 at the Heaven on Earth club with a group of friends, including Yi Qun. Around 1:00 a.m. a person he identified as Din Pak, which I recorded with a phonetic spelling in the DD-5, entered the room with an unknown Chinese male.

Six, the report indicates that Mr. Zhu further stated that he heard Din Pak say, Shoot him, in Fuchow dialect and that he then heard bang, bang, bang, bang. About four shots. My DD-5 does not indicate that Mr. Zhu state that he said anything to Din Pak prior to the shooting or that Din Pak said anything to Mr. Zhu prior to the shooting.

Eight, my notes and DD-5 are not a verbatim transcript of my interview with Quang Yun Zhu and I did not review them with Mr. Zhou.

It is further stated and agreed this stipulation may be received in evidence at trial.

Defendant's Exhibit F, another stipulation, a little bit shorter. It is hereby stipulated by and between the parties that if Tim Varian were called as a witness at trial, he would testify as follows:

One, I am a special agent employed by the United States Department of Homeland Security office of Homeland Security investigations.

Two, on or about June 10th, 2010 I was assigned to investigate the incidents that are subject of this trial.

Three, on July 19th, 2012; July 23rd, 2012; January 25th, 2013; and April 1st, 2013 I was present at and participated in the interviews of Huo Guang Chen in connection with this investigation. Some of those interviews were attended by other law enforcement agents and federal prosecutors.

Four, according to the notes taken at the interview of Huo Guang Chen. On July 23rd, 2012 Mr. Chen stated in sum and substance that Ding Pa was upset and said that Yi Qun thinks he is just a big shot and he would beat him up the next time he saw him. Those notes and reports are not a verbatim transcript

MR. COHEN: And finally, Defendant's Exhibit G, another brief stipulation.

It is hereby stipulated by and between the parties that if Tim Varian were called as a witness at this trial, he would testify as follows:

One. I am a special agent employed by the United States Department of Homeland Security, Office of Homeland Security Investigations.

Two. On or about June 10th, 2010, I was assigned to investigate the incidents that are the subject of this trial.

Three. On June 22nd, 2010, August 13th, 2010, December 15th, 2010; and December 5th, 2010, July 18th, 2012, and July 19th, 2012, I was present at and participated in the interviews of Guang Yun Zhou, in connection with this investigation. The shootings at the Heaven On Earth Club were discussed at each of these interviews. Some of these interviews were attended by other law enforcement agents and federal prosecutors.

Four. Notes were taken at each of the interviews, sometimes by me, sometimes by others present. My notes have been reduced to official reports of investigation, which are official records of interviews maintained by the Office of Homeland Security Investigations.

Five. Relative to the shootings on July 30th, 2004, at the Heaven On Earth Club, the first time any notes taken at

of what was said at the interviews and were not reviewed by the witness. It is further stipulated and agreed that this stipulation may be received in evidence at trial.

(Continued on next page)

these interviews or any report thereof indicate that Mr. Zhou mentioned that he stood up to drink with the defendant, and that the defendant stated, "Sit down, this has nothing to do with you," was in an interview conducted on July 18th, 2012.

Six. These notes and reports are not a verbatim transcript of what was said at the interviews, were not reviewed by the witness.

It is further stipulated and agreed that this stipulation may be received in evidence at trial.

Thank you, your Honor.

At this time, the defendant respectfully -- your Honor, after conferring with Mr. Skinner, just note that with regard to my previous statement with respect to Cheng Yong, the witness who just testified, that the statements that I read from that have been stipulated to were not reviewed by Mr. Yong, and were not a verbatim transcript of his interviews with law enforcement.

And at this time, your Honor, we respectfully rest.

THE COURT: Very well.

MR. COHEN: Oh, the stips are all offered. I'm sorry, Judge, the stips are all offered.

THE COURT: All right.

And what are their exhibit numbers?

MR. COHEN: They are E, F, and G, I believe. E, F, and G.

D4MVLIN5                                              Page 882

THE COURT: Defendant's Exhibits E, F, and G are received in evidence by stipulation.

(Defendant's Exhibits E, F, G received in evidence)

THE COURT: Very well.

Members of the jury, we've now completed the evidence in the case. But before I can give you the case to deliberate on, I have to confer with the lawyers about my charge, which means I will have to have a conference with them tomorrow morning. And then I will charge you probably tomorrow afternoon, after having a conference in the morning.

And the lawyers will make their closing arguments after I instruct you on the law, which will probably be Wednesday morning. These are guesses, but they are pretty close to what will happen.

And you will then retire to deliberate after you have heard both my instructions on the law and the closing arguments of the lawyers.

But tomorrow you will not be participants until the afternoon, because the morning will be given over to a charge conference with the lawyers. So you should come tomorrow at 2:30 in the afternoon. I'm trying to gauge whether my instructions will go more than our usual amount of time. But be prepared to hear all of my instructions; that is, even if it takes a little bit more time than 5 o'clock, just so you are forewarned.

D4MVLIN5                                              Page 883

But you are excused for the morning tomorrow so that I can confer with the lawyers about my instructions.

Have a pleasant evening, and I will -- we will reconvene at 2:30 tomorrow.

Very well.

And, once again, you're getting very close to hearing all of the closing things in the case, so please suspend all judgment until the time comes for you to deliberate and discuss the case together.

Have a pleasant evening.

(Jury excused)

THE COURT: I hope to have a proposed charge and a verdict form by 6 o'clock this evening, which you may pick up from my chambers.

MR. SKINNER: Thank you, your Honor.

THE COURT: And we will convene tomorrow morning at 10 o'clock.

MS. BURNS: 10 o'clock? Thank you, Judge.

THE COURT: Very well.

MS. BURNS: Have a good night.

MR. COHEN: Judge, can we give ourselves a break and make it 10:15? No harm in asking.

THE COURT: Well, I have no problem with that.

MR. COHEN: We'll work efficiently, as we always do.

MS. BURNS: We'll be here at 10.

D4MVLIN5                                              Page 884

THE COURT: Well, there's no point. If we're going to convene at 10:15, you don't have to be here at 10.

MS. BURNS: All right then.

THE COURT: Very well.

This matter is adjourned till 10:15 tomorrow morning.

MR. SKINNER: Thank you, your Honor.

(Adjourned to April 23, 2013 at 10:15 a.m.)

* * *

Page 885

INDEX OF EXAMINATION

Examination of:                                         Page

HENG DE OH-YANG

Direct By Ms. Burns . . . . . . . . . . . . . 788

Cross By Mr. Cohen . . . . . . . . . . . . . . 810

CHENG YONG

Direct By Ms. Burns . . . . . . . . . . . . . 816

Cross By Mr. Cohen . . . . . . . . . . . . . . 838

Redirect By Mr. Skinner . . . . . . . . . . . 870

Recross By Mr. Cohen . . . . . . . . . . . . . 871

GOVERNMENT EXHIBITS

Exhibit No.                                         Received

101, 1 and 2    . . . . . . . . . . . . . . . . 874

DEFENDANT EXHIBITS

Exhibit No.                                         Received

E, F, G  . . . . . . . . . . . . . . . . . . . . 882

**In The Matter Of:**

*UNITED STATES OF AMERICA, v*
*XING LIN,*

*April 23, 2013*

*SOUTHERN DISTRICT REPORTERS*
*500 PEARL STREET*
*NEW YORK, NY 10007*
*212 805-0330*

Original File D4NVLINF.txt
**Min-U-Script® with Word Index**

**A. 653**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

          v.                          11 CR 114 (MGC)

XING LIN,

                    Defendant.             JURY TRIAL

------------------------------x

                                   New York, N.Y.
                                   April 23, 2013
                                       10:00 a.m.

Before:

          HON. MIRIAM GOLDMAN CEDARBAUM,

                              District Judge

                    APPEARANCES

PREET BHARARA,
     United States Attorney for the
     Southern District of New York
PETER M. SKINNER
JENNIFER E. BURNS
     Assistant United States Attorneys

JOEL S. COHEN
     Attorney for Defendant

ALSO PRESENT:  BRENDA CHEN, Fuchow Interpreter
               DANIEL YANG, Fuchow Interpreter
               LILY LAU, Fuchow Interpreter
               DANIEL CHAN, Fuchow Interpreter
               JESSICA CHACE, Paralegal
               TIMOTHY VARIAN, Special Agent, HSI
               JIAYING WANG, Legal Assistant

(In robing room; defendant not present)

THE COURT: Now, what we're going to do is go page by page through my draft and if anyone has an objection to something, please raise it and I will consider it. We can start with page one. Is there anything on page one? Page two? Page three? Page four?

MR. SKINNER: We don't have anything until 12, your Honor.

THE COURT: Very well. Mr. Cohen, is the same true for you?

MR. COHEN: I think so. Let me check.

MR. SKINNER: Sorry, your Honor. We do have something on 10.

MS. BURNS: Just on page 10 in the second paragraph, the second sentence "The government need not prove that the debt collected was unlawful," it is not a debt here that is being collected.

THE COURT: You are not arguing any extortion over debt? You alleged it in the indictment.

MR. SKINNER: It was one thing we wanted to cover with your Honor. We had alleged extortion to collection of credit as Racketeering Act Six.

THE COURT: But there is no evidence on that. I was going to bring that to your attention.

MS. BURNS: We noticed that in the charge as well.

MR. SKINNER: I will tell the Court where we were coming from. There is testimony of a beating that occurred in a barbershop in front of a gambling parlor and we had gotten to the point where the witness had said after the beating -- I asked him what happened and the Court sustained defense counsel's objection to the hearsay of that statement. We'll proffer what he would have reported is that he explained I owed the guy money from a gambling debt and that is why this happened, which is why we had Racketeering Act Six, but since that didn't come in --

THE COURT: But he didn't use him as a witness.

MR. SKINNER: Since that statement didn't come in, there is no evidence of it and we intend to redact that racketeering act out of the indictment and I know there is no explanation of it.

THE COURT: Please. There were a number of redactions in the indictment.

MR. SKINNER: I will keep track what we need to take out, but that is one thing.

THE COURT: We'll take out this whole paragraph; right?

MS. BURNS: I think just that sentence, Judge.

THE COURT: What debt was collected?

MS. BURNS: Well, this is for Count Four, this is the extortion, substantive extortion.

THE COURT: Well, I understand. If it is not an element of Count Four, we should take it out.

MR. SKINNER: But an element of Count Four, element of extortion is the threat of force or violence.

THE COURT: I understand. That is elsewhere in the first paragraph. It is not necessary that it be in the second paragraph. We speak of force or violence in the first paragraph.

MS. BURNS: I think that second paragraph is relevant to the facts.

THE COURT: What information in the second paragraph is missing from the first? What sentence is not covered by the first paragraph?

MR. SKINNER: It is really the violence being directed at a third person.

THE COURT: Then I can add that simply to the first paragraph.

MR. SKINNER: That's fine, your Honor.

MS. BURNS: Okay.

THE COURT: Do we have any economic harm here?

MR. SKINNER: Absolutely.

THE COURT: What is that?

MR. SKINNER: Mr. Chen's business. We'll be arguing to the jury that he was both afraid of the physical harm as well as the harm to the business if he didn't continue with the

ongoing payments.

THE COURT: What business are we talking about?

MR. SKINNER: Huo Guang Chen's bus company business, that he was afraid that if he did not, and particularly after there was a demand for the increase in shares in 2003 in which he declined to give him and then when threatened in Corona Park agreed to give him the extra $2,000 a month, that if he did not continue those payments he was afraid both what would happen to him physically as well as what would happen to his business if he no longer had Ding Pa.

THE COURT: Who testified to that?

MR. SKINNER: Huo Guang Chen.

THE COURT: That he was afraid for his business? I don't recall such evidence, but it doesn't matter. I am going to charge as I have here the force of violence might be aimed at a third person or causing economic harm. I will add that as the final sentence of the first paragraph.

MR. COHEN: Judge, can I go to the Rule 29 motion?

THE COURT: Yes, but I would rather first go through the charge.

MR. COHEN: If your Honor dismisses some of the counts, then we would have to --

THE COURT: They will have to remove certain things from the indictment. The indictment has to be edited because there are some things that have not been proven. So you should

keep track of those by all means. We'll get to that. We will remove the first three sentences. We'll keep the last sentence on page 10 and add it to the first paragraph.

MS. BURNS: Thank you.

THE COURT: Now you want to go to page 12; right?

MR. SKINNER: Yes, your Honor.

THE COURT: That is the fourth element you are talking about?

MR. SKINNER: Well, it happens a couple of times in here, but where you reference the effect on interstate commerce.

THE COURT: It is complicated because you really do not have a lot of affects on interstate commerce.

MR. SKINNER: Well, I strongly disagree on that front, your Honor. Huo Guang Chen's bus company --

THE COURT: The bus company counts, yes, but not the other things.

MR. SKINNER: We have two requirements for interstate commerce, the extortion and the RICO. The bus company provides it for both. There is no other count that requires --

THE COURT: What is the extortion that affects the interstate running of his buses?

MR. SKINNER: Your Honor, he is required to pay a third of his profits every month plus $2,000 out of the operating funds of the business.

THE COURT: Who is required?

MR. SKINNER: Huo Guang Chen.

THE COURT: You are talking about Chen's business?

MR. SKINNER: Chen's bus company business.

THE COURT: Is that the only person extorted here?

MS. BURNS: He and the other owner.

MR. SKINNER: He and Yi Qun who is the murdered victim.

THE COURT: What is Yi Qun's relation to the bus company?

MR. SKINNER: He owned shares in it.

THE COURT: We have so many people in this case that owned shares in companies.

MR. SKINNER: Well, we have three people who owned shares in this bus company.

THE COURT: Which of the three was threatened?

MR. SKINNER: Yi Qun and Chen were both -- well, Chen was the one most expressly threatened.

THE COURT: Chen is the only one about whom there is evidence of threat.

MR. SKINNER: And Yi Qun was killed.

THE COURT: That is a different matter. That is murder.

MR. SKINNER: It is murder in aid of the underlying extortion.

THE COURT: That's the only reason for that murder?

MR. SKINNER: There are two reason on the record that we know about that he cut the payments off in July of 2004.

THE COURT: Right. He told him not to pay the money.

MR. SKINNER: So Yi Qun the murder victim told Chen not to pay the money. Chen told Ding Pa, I've been told by another shareholder not to pay the money. Ding Pa said, I know who that guy is, and he threatened him. He then stopped paying the money.

THE COURT: So it is only extortion. It is not RICO.

MR. SKINNER: I am sorry, your Honor?

THE COURT: The murder is only in aid of extortion.

MR. SKINNER: And it is also second degree murder under New York State law as part of the RICO. It is still part of the enterprise because it is part of his gang's operations to extort people and get money for the gang to pay the followers. Chen testified that when Ding Pa called him on the phone to demand more money and he expressly said, I need this money to pay the expenses of my followers, I have to pay for housing, I have to pay for drinks, I need more money and that is why you need to give me more shares in the company.

THE COURT: All of the interstate commerce here is the bus company?

MR. SKINNER: Yes, your Honor.

THE COURT: Yes. That is the only interstate

| D4N6LIN1 | Charge conference | Page 894 |
| --- | --- | --- |

commerce.

MR. SKINNER: What I was going to argue is there is also an effect on foreign commerce given the payments that were made while the defendant was in Canada.

THE COURT: They were not made to him. They were made to his wife. In this country, not in Canada.

MR. SKINNER: I have two arguments for how that would affect commerce in Canada. The Court can reject them. I want to have a record of it.

THE COURT: Fine. Go ahead.

MR. SKINNER: Made the payments to his wife in Canada.

THE COURT: Not in Canada. His wife was not in Canada.

MR. SKINNER: His wife was in the United States. His wife received the money in the United States.

THE COURT: There is no evidence that she sent it anywhere.

MR. SKINNER: Well, I think there is an inference, and I know the Court doesn't necessarily agree, but I think there is a reasonable inference to argue to the jury that given that the money consistently ended up in Ding Pa's pocket before the murder that now that he is gone --

THE COURT: You don't know that it ended up in his pocket.

MR. SKINNER: It is an inference.

| D4N6LIN1 | Charge conference | Page 895 |
| --- | --- | --- |

THE COURT: He may have turned it over to his wife. There is no basis to believe that his wife was sending the money. He had another business in Canada.

MR. SKINNER: I think it is an inference.

THE COURT: I don't think it is a rational inference.

MR. SKINNER: The other argument is to the extent that his wife is collecting money in the United States that can have an effect on commerce in Canada in one of two ways.

THE COURT: How?

MR. SKINNER: Well, if she is sending it up there, which you don't buy, but if he then doesn't need to send her money from Canada in order to support her, he has more money to spend up in Canada.

THE COURT: Having more money in Canada is not interstate commerce.

MR. SKINNER: It is foreign commerce.

THE COURT: It is not foreign commerce. These are too strained inferences.

MR. SKINNER: I think I made my argument. I don't have a much better one to make than that. So it is what it is.

THE COURT: I have taken foreign commerce out as you saw.

MR. SKINNER: I saw.

THE COURT: I don't think there has been any proof for foreign commerce.

| D4N6LIN1 | Charge conference | Page 896 |
| --- | --- | --- |

MR. SKINNER: For reasons noted the government objects.

THE COURT: He lived in Canada and he ran a business in Canada.

MR. SKINNER: The payments monthly, thousands of dollars to his wife affected commerce in Canada because it affected the money that he had to spend up there.

THE COURT: If he spent it up there, I have no reason to believe that his wife didn't need the money.

MR. SKINNER: He lived there for years. So even if his wife --

THE COURT: You could have put in evidence that she went to Canada, she brought him money, that she whatever. You had a lot of people who purported to know him and you didn't have a single shred of evidence that the wife sent money to him in Canada. It is a very remote inference and we don't really deal with possibility. It is a possibility, not a probability. We try, especially in criminal cases, to deal with possibility but to stay with probabilities.

MR. SKINNER: All right.

THE COURT: Very well. Now we're on page 12. You have no problem with my interstate commerce charges?

MR. SKINNER: No. Interstate is fine.

THE COURT: I deliberately took out foreign because I don't think there is any real evidence here of foreign

| D4N6LIN1 | Charge conference | Page 897 |
| --- | --- | --- |

commerce.

MR. SKINNER: Should we take foreign out of the indictment as well?

THE COURT: Yes. It is interstate or foreign commence and I would strike off foreign commerce.

MR. SKINNER: So far we're taking out the extortionate collection of credit.

THE COURT: Yes.

MR. SKINNER: And references to foreign commerce.

MS. BURNS: We previously said we would redact the overt acts in the extortion count.

THE COURT: Correct. You don't have anything on aiding and abetting extortion. You have extortion.

MR. SKINNER: Your Honor, if you have extortion --

THE COURT: The indictment does not mention aiding and abetting extortion if you look at the language of the indictment, the unredacted indictment.

MR. SKINNER: Well, your Honor, I disagree with that. We have aiding and abetting, the use of the gun which was done in furtherance of the extortion. So it is all aiding and abetting the underlying extortion. We also have the extortion, but if we have the greater there is no reason we don't have the lesser.

THE COURT: There is nothing in the text of the indictment that mentions aiding and abetting extortion. The

language of the indictment is only extortion. You have other references in the indictment to aiding and abetting but that is not one of them.

MR. SKINNER: Which extortion, your Honor, Count Four?

THE COURT: Count Four. You cite the Section 2 of the federal statute at the end, but you do not recite anything that constitutes aiding and betting.

MR. SKINNER: I think the law is clear that we don't have to. Aiding and abetting is always included within the scope of the charge.

THE COURT: Give me a citation.

MR. SKINNER: All right.

THE COURT: And the request to charge do not seek any instructions on the law of attempt. If you can find me any request to charge on the law of contempt, I would be interested.

MR. SKINNER: We can definitely do that. We don't have it in our request to charge.

THE COURT: Now, earlier in the case turning to the conspiracy to commit extortion, we agree that the law does not require an overt act, that statute, and you have allegations of an overt act, which shouldn't be there. You said you were going to remove them from the indictment.

MS. BURNS: Yes. We will.

MR. SKINNER: We have a proposed redacted indictment.

THE COURT: Good.

MR. SKINNER: We also removed references to Hao Chao, "Little Beijing," because he is not part of the trial. We'll take out the additional things that need to come out and we'll bring that up in advance of the closing today so it will be ready for review and able to go to the jury tomorrow.

THE COURT: Very well. Now, the indictment also charges a violation of Article 20 under the New York Penal Law, but you don't request in your request to charge anything about aiding and abetting state murder.

MR. SKINNER: We'll get a proposed charge on aiding and abetting state murder, your Honor.

THE COURT: Well, it is a little late in the day.

MR. SKINNER: He certainly aided and abetted state murder. I don't think we should lose out if we inadvertently omitted it.

THE COURT: You have two different laws for murder.

MR. SKINNER: It is important that we have both, your Honor.

THE COURT: Why?

MR. SKINNER: Because the federal murder requires that the jury find that the murder is in aid of extortion whereas the state law murder does not. So if the jury is convinced that the murder was done in a premeditated fashion but is not convinced, that it was directly linked to the extortion, we

still have the murder under state law. That is why it is very important that we have both.

THE COURT: It is charged in the racketeering act.

MR. SKINNER: Correct, your Honor. It is not charged substantively. We couldn't charge it substantively. It is charged in the racketeering act.

THE COURT: Racketeering Act One is limited in the indictment to violation of state law.

MR. SKINNER: Correct.

THE COURT: So Racketeering Act One of the federal law can't go.

MR. SKINNER: That's right.

MS. BURNS: Right.

MR. SKINNER: Because the federal law is not a RICO predicate.

THE COURT: Correct.

MR. SKINNER: But the state law is.

THE COURT: Now, when it comes to Racketeering Act Two, which is extortion, what you cite as the New York law on extortion is grand larceny. Extortion is not mentioned in that statute. It is grand larceny in the second degree and it requires theft, not just extortion.

MR. SKINNER: Your Honor, we agree not to have the state law extortion. I don't think it is necessary.

THE COURT: That's correct. I agree. It is very

confusing because it is not extortion. What the state calls grand larceny in the second degree, you call extortion. If you read the state extortion statute, it requires theft and it is the opposite of what extortion normally is when it is not stolen at all. The party gives their own property by concent because of fear.

MR. SKINNER: Your Honor, I am not going to waste all of our time with the response. The reason that we include the state law extortion is that state law extortion doesn't have an interstate commerce requirement, but we have that.

THE COURT: That may be, but the evidence you are offering does not fall within grand larceny in the second degree.

MR. SKINNER: We agree to take it out so it doesn't matter.

THE COURT: That's fine. The indictment also charges aiding and abetting in violation of federal gambling law, but it is not mentioned in your request to charges and I can't find any evidence of it. That is there is outright violation of federal gambling law. It wasn't aiding and abetting.

MR. SKINNER: Sure, your Honor. Again, any time that you have multiple people participating in a crime and the crime is committed, you are also going to have aiding and abetting that same crime.

THE COURT: You have not requested aiding and abetting

gambling.

MR. SKINNER: That's fine.  We don't need it.

THE COURT: Good.

MR. SKINNER: At this point frankly, although as a prosecutor I am reluctant to drop any theory of argument, it is complicated enough for the jury.  So let's keep it pruned down.

THE COURT: You are well advised not to make it more complicated.

MR. SKINNER: Let's keep it pruned down.  We'll redact that down as well.

THE COURT: That's fine.  I am just looking to try to make it easier for the jury here.  I agree with you that it is complicated enough for the jury without dangling things that they cannot attach to anything.

MS. BURNS: Your Honor's charge did bring it together.

THE COURT: Well, I was trying to stick as well as we could to the actual evidence.

MR. SKINNER: Any other comments on the indictment, your Honor?

THE COURT: Yes.  Racketeering Act Six.

MR. SKINNER: That's one we agreed to take out.

THE COURT: You are taking it out.  That's fine.  The charges that we agreed to in Count Two should really be applied to Count One as well.

MS. BURNS: Right.

MR. SKINNER: Correct, your Honor.

THE COURT: When it comes to using, possessing, and carrying, using is the only conduct that is proven.  Possession is controversial subject and I don't know why you need it since this is clearly used.  Carrying, he didn't carry.  Why isn't enough to charge using?

MR. SKINNER: We had possessing and carrying because the legal definition of both possessing and carrying will include construction possession.

THE COURT: Well, that is still a controversial subject.  I know Congress changed the law, but it is still very controversial as to what that means.

MR. SKINNER: This is a 924(j) where we alleged that a murder occurred so we have to prove that it was used, not merely that it was possessed or carried.

THE COURT: No.  That is what I have told you.  That is exactly what I want you to do is take out possessing and carrying and speak about using.  The closer to the evidence you are, the better off you are anyhow frankly.  You are less likely to confuse the jury as to what it is that they have heard.  It is using that they have heard.

Now we're on page 12.  Who has anything from page 12 on?

MR. COHEN: My first issue is at page 51.

MR. SKINNER: We have one thing before that, your

Honor.

THE COURT: What is that?

MR. SKINNER: In Count Three on the murder.

THE COURT: Give me a page number.

MR. SKINNER: I think it is page 48.

THE COURT: We're jumping a long way.  That's good.

MR. COHEN: You did a great job, Judge.

MR. SKINNER: Your Honor, actually before that, the fourth element.

THE COURT: What page?

MR. SKINNER: Page 48.

THE COURT: Count Three, fourth element.

MR. SKINNER: We have to prove that murder occurred within the definition of Section 1111.  That section includes both first degree murder and second degree murder under federal law.  Your definition of murder is limited just to first degree, which requires both malice and premeditation.  We need only prove second degree murder, which requires malice but no premeditation.  So my suggestion would be that we define murder with the second degree murder definition, alternatively that we make clear to the jury that they can find first or second degree and also that we explain to them what premeditation means.  I think the easer and cleaner way is to say all you need find is second degree murder.  This is what second degree murder is.

THE COURT: What is it that you don't want them to have to prove?

MR. SKINNER: Premeditation.

THE COURT: How is premeditation any different from willfully and knowingly?  The premeditation that is required for murder is not a very big standard.  It's really knowingly and willfully.  The word malice, all of those words, are the same.  It means that you know what you are doing and you intend to do it.

MR. SKINNER: The premeditation means --

THE COURT: The minute before it happens.

MR. SKINNER: It is done with planning and deliberation.

THE COURT: It is premeditated even if you think of it the minute before.

MR. SKINNER: I don't disagree with you.  First of all, we're not obligated to prove planning and deliberation no matter how long before the the murder happened so long as we prove that it occurred with malice.  If we are going to include premeditation in there, we should explain what premeditation is so they don't think there had to be a day's long plan here before they effectuated the murder.

THE COURT: So you want to say any kind of willful, deliberate and malicious killing and premeditated, is that right?

MR. SKINNER: I want to say any time he acted with malice aforethought and take out premeditated.

THE COURT: What do you think malice aforethought is? It is premeditated. If you are going to say aforethought, you have premeditation.

MR. SKINNER: It is not the same exact thing, your Honor.

THE COURT: You are attributing such subtly to words.

MR. SKINNER: Well, I think premeditation is a loaded word.

THE COURT: In the law malice means basically what all that premeditation requires, which is that you intend to do it the minute before you do it. It doesn't have to match the definition.

MR. SKINNER: Your Honor, I respectfully disagree.

THE COURT: I would like you to read some New York State murder cases.

MR. SKINNER: First of all, this is federal murder. Malice is a state of mind that would cause a person to act without regard to the life of another, whereas premeditation is planning or deliberation.

THE COURT: Where do you get that?

MR. SKINNER: From Sand.

THE COURT: Judge Sand is a very old and good friend of mine. First of all, he didn't write everything in that

book.

MR. SKINNER: United States v. Velasquez, 246 F.3d 204 quoting Sand's definition.

THE COURT: Quoting his definition.

MR. SKINNER: Malice and premeditation are different things, your Honor.

THE COURT: Malice is a state of mind required for all crimes. It means knowingly, willfully and intentionally. Literally malice means with a bad purpose.

MR. SKINNER: Your Honor, yes, I agree. Malice means that you have to act consciously with the intent to kill the other person. Premeditation is not only did you have the intent to kill them but there was advanced planning and deliberation.

THE COURT: What evidence is there in this case that there was advanced planning.

MR. SKINNER: That they walked down that hallway with purpose, that when they got in there, they told the guy to sit down this doesn't concern you, and that they shot him. I think it is there, but I don't think that we should have to prove it and I don't think that we should be held --

THE COURT: If you are going to charge it, you have to prove it.

MR. SKINNER: I don't want premeditated in the charge. I am suggesting it should come out. All they should be told is

that we have to prove that he acted consciously.

THE COURT: You want willful, deliberate, malicious killing; is that right?

MR. SKINNER: And an explanation that they had to act with the intent kill with the other person but not with planning.

THE COURT: I tell them that all crimes require intent.

MR. SKINNER: Yes, your Honor. I want the definition of murder to be as it says here, The unlawful killing of a human being with malice. Then it goes on to say first degree murder includes premeditated killing.

THE COURT: Well, it includes it. It doesn't say it is limited to it.

MR. SKINNER: Well, the point is that second degree murder is any murder that is not first degree. So we shouldn't have to prove premeditation because all we have to prove is that he acted consciously and with the intent to kill.

THE COURT: I think malice aforethought is premeditation personally.

MR. SKINNER: I think the law is clear that it is different. I think it is going to confuse the jury.

THE COURT: I don't think it is clear at all what the differences are of these things. That is neither here nor there. You are asking me to take out premeditated. What is it

that you are objecting to, the word premeditated, right?

MR. SKINNER: I am asking you to take out the first sentence of the second paragraph. We don't have to prove this was first degree murder, we only need prove it was second degree murder.

THE COURT: Well, we have murder is the unlawful killing of a human being with malice aforethought. You are happy with that?

MR. SKINNER: That's fine. That is how the statute defines what murder is and I want to lose the first sentence of the next paragraph.

THE COURT: How is that different from the second sentence?

MR. SKINNER: Because it adds premeditated killing.

THE COURT: Well, then I would be inclined to take out the first two sentences and just leave it also it includes murder perpetrated from a premeditated design and so on. It also includes.

MR. SKINNER: Your Honor, I don't feel as strongly about the second sentence.

THE COURT: I think that is what malice aforethought means.

MR. SKINNER: The second sentence is really addressing felony murder, which would be the murder of the waitress.

THE COURT: So you want me to take out the whole

paragraph.

MR. SKINNER: I want you to take out the first sentence of that paragraph.

THE COURT: Well, I don't think I need the rest if we're just going to stay with the unlawful killing of a human being with malice aforethought.

MR. COHEN: I agree.

MR. SKINNER: I think the jury should understand that the reason the indictment says that the waitress was murdered is that the murder includes a murder committed in perpetration of another murder as the Court has in the second sentence of that paragraph.

THE COURT: Where is that?

MR. SKINNER: The second sentence of the paragraph.

THE COURT: I see.

MR. SKINNER: We can add that second sentence.

THE COURT: To the first paragraph.

MR. SKINNER: That's fine. I think the rest we can take out.

THE COURT: I don't see any harm in that.

MR. COHEN: Your Honor, just to be clear what is coming out?

THE COURT: We're going to leave the first paragraph and add to it "it includes murder that is committed in the perpetration of or attempt to perpetrate any murder."

Now why are these in quotations? I don't usually put quotation marks in charges.

MR. SKINNER: That is from the language of the statute.

MR. COHEN: Your Honor, so you are taking out the last sentence?

THE COURT: Yes. We're going to take out the last sentence.

MR. COHEN: And add that middle sentence to the first paragraph?

THE COURT: Right. We'll add "it includes murder that is committed in the perpetration of or attempt to perpetrate any murder." We'll put that sentence at the end of the first paragraph.

MR. COHEN: Right.

THE COURT: The others go out.

MR. SKINNER: That addresses the government's concerns, your Honor. Thank you very much, your Honor.

MR. COHEN: So, your Honor, starting at the last sentence of page 50 and continuing into page --

THE COURT: Wait. Let me get there. Page 50 is the next concern.

MR. COHEN: That's my concern.

THE COURT: You are the next one expressed here.

MR. COHEN: It says, To determine whether the

defendant aided or abetted the commission of Count Three, ask yourself these questions.

THE COURT: Wait just a moment. Page 50?

MR. COHEN: Yes, ma'am. The last line.

THE COURT: These are my old questions on aiding and abetting.

MR. COHEN: Do they have to answer each of these questions affirmatively, any of these questions affirmatively in order to find aiding and abetting?

THE COURT: No. If the answers to these questions, that means the three questions, are yes.

MR. COHEN: Okay.

THE COURT: If you like I will add, If the answers to these three questions are yes.

MR. COHEN: Or to each of these questions.

THE COURT: All right.

MR. SKINNER: No objection, your Honor.

THE COURT: At one time I think I did have of these three. If the answers to each of these questions is yes -- answers are.

MR. COHEN: If the answers to each of, and then these questions.

THE COURT: Right. Then the defendant is an aider and abettor.

MR. SKINNER: Your Honor, I would suggest a change.

MR. COHEN: I also ask that if the answer to any of these questions is no, then the defendant is not an aider and abettor.

THE COURT: All right.

MR. COHEN: I think that is balanced.

THE COURT: I have no problem with that. I think I told you I have no pride of authorship. I just want to get it right. If the answers or if the answer to any of these questions is no --

MR. COHEN: Right.

THE COURT: -- the defendant is not an aider or abettor.

MR. COHEN: On page 52.

MR. SKINNER: Before we get there, I had another suggested change on page 50. The paragraph that begins "In order to aid or abet."

MR. COHEN: It is the second full paragraph.

MR. SKINNER: Page 50.

THE COURT: Yes. In order to aid or abet to commit a crime, it is necessary --

MR. SKINNER: We have no problem with the language there. It is correct. I think it is a little confusing for the jury. Aiding and abetting is a difficult legal concept. We had offered an example in our proposed charge, and I think we all agree that it tracks the facts of what happened here.

THE COURT: That's what is the problem with it. I don't like to comment on the evidence if I am not marshaling the facts, which I used to do once upon a time.

MR. SKINNER: That makes sense then.

THE COURT: Most of us used to once upon the time.

MR. SKINNER: I will give notice to the Court and defense counsel that we very well likely will say in our closing if you find that the defendant directed another person to use a gun, then he aided and abetted.

THE COURT: Yes. Did the defendant associate himself with the criminal venture.

MR. SKINNER: I was going to suggest including the example. I understand why your Honor did not. That's fine.

THE COURT: Right.

MR. SKINNER: 52.

MR. COHEN: Yes. Under theory of defense.

THE COURT: Yes. What page?

MR. COHEN: 52.

THE COURT: Now, you have not submitted any requests, Mr. Cohen.

MR. COHEN: Right.

THE COURT: What is your request?

MR. COHEN: The one request that I had to do had to do with mere presence and having looked at Judge Sand's charge on that and anticipating that your Honor --

THE COURT: I love how you call it Judge Sand. I think of it that way myself, but it is not. There are several editors of those volumes.

MR. COHEN: So, Judge, the theory of the defense and what the defendant --

THE COURT: What is the theory?

MR. COHEN: That the government's witnesses are not credible, that they all operate with a bias toward the government, and that the proof fails to establish a pattern of racketeering activity.

MR. SKINNER: So there is nothing that we need for an instruction because I didn't do any.

MR. COHEN: That's the theory of the defense, that the witnesses all testified?

MR. SKINNER: We don't have a theory of the prosecution charge.

THE COURT: No. We're required to give a theory of the defense, but a theory of the defense is not that the witnesses are not telling the truth.

MR. SKINNER: Mere presence is included multiple times elsewhere I believe in here.

MR. COHEN: I am not asking it to be put in here. I am just saying that my theory is covered.

THE COURT: By the charges generally.

MR. COHEN: Yes.

THE COURT: That's fine. I will take it out. I put it in only because we are required if the defendant has put forward a theory explaining what happened, I charge it. I tell the jury that the defendant contends that such and such whatever, but there has to be something.

MR. COHEN: With respect to the extortion charge, the defendant's theory is that, and I intent to sum up on this, Huo Guang Chen and his partner Ding Chen were seeking to eliminate competition and made a business decision to invite my client to become a shareholder in their company hoping that he would either through his goodwill or fierce --

THE COURT: You should write that down and that I will give as a theory of defense.

MR. SKINNER: Your Honor, I don't think that is proper. That's closing.

THE COURT: That is what theory of defense means.

MR. SKINNER: That is closing argument.

THE COURT: I understand. That's basically what theory of defense is if you look at the cases that say the defendant has a theory of defense, he is entitled to have you charge it.

MR. SKINNER: Your Honor, there is no legal instruction component of that. All he is saying again is that we haven't satisfied the elements of extortion because we haven't established that the money was paid over out of fear or

threat. That is fine. He can argue that. That is not a theory of defense that requires an imprimatur of the Court.

THE COURT: This has nothing to do with an imprimatur. Read the Second Circuit cases with the obligation to charge the theory of defense. My problem here is that you didn't give me a theory of defense.

MR. COHEN: I will do that posthaste.

MR. SKINNER: Where the case requires a legal instruction on the defendants theory, it is if the defense theory incorporates a different part, a different legal concept that the jury needs to be instructed on.

THE COURT: Give me a case that says that.

MR. SKINNER: It is not simply that the government hasn't satisfied the elements.

THE COURT: No. No. He is trying to offer a different theory of the facts.

MR. SKINNER: There is no affirmative defense to extortion of I didn't do it. The government hasn't met its burden.

THE COURT: I understand. What he is trying to argue is that the evidence shows that these people wanted -- what is it that you do want to say?

MR. COHEN: That they asked Mr. Lin to become a part of the company, that they offered him a third of their profit without even his asking for it.

THE COURT: You are going to argue that to the jury.

MR. COHEN: I understand, Judge.

THE COURT: That is not a theory. I theory would be looking at the evidence a different way, not thinking up how you might explain it if you had evidence to explain it. It needs to be based on some evidence.

MR. COHEN: It can be based on --

THE COURT: You are speculating and you are entitled to speculate, but I don't have to charge your speculation.

MR. COHEN: Your Honor, I am not speculating. I am stating that the witness testified that he and his partner made a business decision to offer my client a third of their profits in return for his ability to mediate with possible competitors.

THE COURT: You will argue that as something the jury should draw from the evidence.

MR. COHEN: Okay.

THE COURT: I don't think that is on this record that that constitutes a theory of a defense, but in any event you didn't request it.

Is there anything further?

MR. COHEN: Yes.

THE COURT: Yes.

MS. BURNS: I have one small point on 57.

THE COURT: Yes.

MS. BURNS: Very small. The first paragraph

discussing witnesses, he or she testified. We had no female witnesses. We can strike that.

THE COURT: Thank you very much. I hate he or she. I usually take it out anyhow. I usually say the facts about which the witness testified.

MR. SKINNER: The next thing we had is on the immunity instruction, 60 and 61.

THE COURT: I thought that was your request.

MR. SKINNER: The only thing, there is some extra language in here that doesn't need to be there. It references at the bottom of the page similarly the government is permitted to enter into nonprosecution agreements. There were no nonprosecution agreements in this case.

MR. COHEN: This is on page 60.

MR. SKINNER: Bottom 60 top of 61. I think that sentence can be stricken.

MR. COHEN: You can also deal with that by inserting the language whether formal or otherwise.

MS. BURNS: No.

MR. SKINNER: A nonprosecution agreement is a written contract. It is a formal thing.

THE COURT: It comes very close to what is being argued here.

MR. SKINNER: He can argue it, but the witnesses were clear, nobody here has been offered a nonprosecution agreement.

THE COURT: I think I would just put a period after "who has been granted immunity." The government is entitled to call as a witness a person who has been granted immunity and end it there.

MR. SKINNER: I think the last sentence is proper. You may convict a defendant on the basis of such a witness's testimony alone. It serves as a necessary counterbalance to what comes afterwards, which is the defense side of this about how you have to scrutinize that testimony. I think the better course is just to strike the sentence that references nonprosecution agreement.

MR. COHEN: The one that starts similarly?

MR. SKINNER: I think we just need to delete that one sentence and everything else tracks fine. It does come up again. The internal flaw is in the first sentence of the first full paragraph on 61, "or has been given a written nonprosecution agreement by the government," that should be stricken.

MR. COHEN: I agree with that.

THE COURT: Yes.

MR. SKINNER: The rest of it is fine.

MS. BURNS: Just go to go back to 16. We had a him or her there as well.

THE COURT: I don't like him or her ever.

MR. COHEN: Where is that?

MS. BURNS: 60.

MR. SKINNER: On page 61, 62 and 63 we didn't ultimately end up calling anybody who is a cooperating witness.

MR. COHEN: That was something I was going to address as well.

MR. SKINNER: Or accomplice. I think that whole thing can be taken out.

MR. COHEN: The whole accomplice and cooperating witnesses?

THE COURT: I thought these were cooperating witnesses.

MR. SKINNER: There is one person who in the past had a cooperation agreement, but he has been sentenced and done his time and is no longer cooperating. We thought we would have a cooperating witness testifying, but it is not the case. I don't think it is necessary.

THE COURT: Well, then I would just change the last part of page 62, "You should ask yourselves whether each witness would benefit more by lying or by telling the truth."

(Continued on next page)

MR. SKINNER: Inserting that paragraph at the end of the.

THE COURT: Leaving it on Page 62 at the end --

MS. BURNS: Taking out.

MR. SKINNER: I mean taking out the preceding paragraphs up to that point?

THE COURT: Yes.

MR. SKINNER: I think that probably flows after the description of the immunity witnesses, and just a general instruction on each witness. I'm sure Mr. Cohen is going to be arguing that they are getting a benefit, so --

THE COURT: All right. I'm going to take out "accomplice" and "cooperating witnesses" as a title, and move to "you should ask yourselves whether each witness would benefit more by lying or by telling the truth."

MR. SKINNER: So the preceding --

THE COURT: So those are good guides to assessing credibility.

MR. SKINNER: All right.

Are you going to add a new title, like "credibility of witnesses" or --

THE COURT: No. I'm talking about credibility throughout here.

MR. SKINNER: So it's just going to follow directly.

THE COURT: Yes.

MR. SKINNER: As part of the instruction on immunity.

THE COURT: Correct.

Such testimony should be -- then I would go to the next.

MR. SKINNER: After such testimony, you should ask yourself --

THE COURT: -- whether each witness would benefit more by lying or telling the truth, which I think you have to do in assessing credibility in most criminal cases.

MR. SKINNER: No dispute, your Honor.

THE COURT: We will take out the very last paragraph, which refers to "accomplice" and "cooperating witnesses."

You saw that I put into the verdict form questions which will make it possible to know whether the case has to be retried, that is, the proved and not proved for each of the racketeering acts.

MR. SKINNER: Yes, your Honor.

THE COURT: Because it's impossible to tell afterward otherwise.

MR. SKINNER: No. And it's important to know, because whether or not the murder or racketeering act is proved will control the maximum sentence for that particular count. If it's not, it's 20 years; if it is, it's life.

THE COURT: Right. But I'm really trying to help the Court of Appeals.

MR. SKINNER: I wholeheartedly agree that it's always good to expressly ask which racketeering acts were proved or not proved.

THE COURT: Yes.

MR. SKINNER: And I think, if we get there, and there's an issue, the jury can be instructed that they don't have to answer -- they can leave them blank.

THE COURT: I don't want that. I've never had a problem. When you cannot tell which of the bases a jury decided on, I have always asked them, only after they have found the defendant guilty, if they do, as to anything that could cause confusion if part of it is overturned.

MR. SKINNER: Your Honor, I think, look, we're not there, so we can worry about this later, if we get there. But if they find each of the -- if they find Racketeering Acts 2, 3, and 4, but can't agree on Racketeering Act 1, which is the murder, then the RICO conspiracy and the RICO substantive will be proven.

THE COURT: I'm not talking about those. It has happened in the past, not in my cases, happily, that the Court of Appeals has overturned a verdict because they could not tell what the jury decided on the basis of. And I want to avoid that, if possible.

MR. SKINNER: And all I'm saying is if the jury comes back to us at some point and says, We agree on everything, but

we're hopelessly deadlocked on whether Racketeering Act 1 was proven, then we can get a partial verdict.

THE COURT: I always take partial verdicts.

MR. SKINNER: That's fine.

THE COURT: It's your office that told me not long ago that I don't have the power to do it.

MR. SKINNER: I don't know who said that.

THE COURT: And I told the young assistant to please tell his supervisor if he wants to tell me that, he should come to court and say it himself.

MR. SKINNER: The supervisor probably did not. But I don't know.

THE COURT: But I thought -- this should be off the record.

(Off record)

MS. BURNS: Your Honor, I just had one comment on the verdict sheet. And it might just be my own reading of it, but as to Racketeering Act 2, the way it reads, "Extortion of individuals who owned and operated a bus company, in violation of federal law." To me it sounds like the bus company is operated in violation of federal law. And certainly we've heard a lot about bus companies in this trial.

THE COURT: I'm sorry. Just tell me where you are.

MS. BURNS: Oh, sorry. On Racketeering Act 2.

MR. COHEN: On page 1 of the verdict sheet.

MS. BURNS: Subparagraph A. Which reads: "Extortion of individuals who owned and operated a bus company, in violation of federal law," that clause at the answer makes it sound like the bus company was operated in violation of federal law. In light of all the testimony we've had here about these bus company operations, and people who have either been convicted or pled guilty about them, I just want to be clear, the extortion is in violation of federal law, not the bus company. It's a small reading, but it's just --

MR. SKINNER: So we propose changing --

THE COURT: Do you want to just take out "in violation of federal law."

MS. BURNS: I guess, since we don't have both the state and the federal in the charge --

MR. SKINNER: That's fine.

MS. BURNS: That works. That's actually cleaner.

MR. SKINNER: From both A and B on racketeering.

THE COURT: "Extortion of individuals who owned and operated a bus company."

MR. SKINNER: That's fine.

MS. BURNS: Thank you.

THE COURT: We have that throughout.

MR. SKINNER: Or it's necessary to distinguish between state and federal, that's fine. That's the only time we found it confusing.

MR. COHEN: It may be less confusing to take out "violation of federal law."

MR. SKINNER: On Racketeering Act 2, I agree.

THE COURT: That's what I will do. I'll take out "in violation of federal law" throughout.

MR. SKINNER: Maybe we should take it out of 3, 4, and 5, as well.

THE COURT: That's what I'm now looking at, yes.

MR. SKINNER: Each of those are both state and federal violations.

THE COURT: The one thing I didn't learn from this trial is how to play 13 cards.

MR. SKINNER: I know. I'm still trying to learn. I can look it up on the Internet.

I did have one or two other things on the charge, your Honor.

THE COURT: Yes. Just a moment. Let me just mark this first.

Very well. What is that?

MR. SKINNER: I don't think it's ripe yet, but depending upon defense arguments in summation, I think an uncalled-witness instruction may be appropriate. We provided a proposed instruction, conditional --

THE COURT: Why should I charge that.

MR. SKINNER: I don't think you need to yet, your

Honor. It depends on the closing arguments. I'm just letting defense know, as well as the Court, that if in the cross-examination of, I think it was --

THE COURT: Let me see your proposal, because you're quite right. In truth, there were a number of witnesses to the killing.

MR. SKINNER: There were that, yes. And there was also -- during the course of cross-examination, it was elicited that one of our witnesses saw two of the other people in the room of the killing in Chinatown in the last few weeks. And if defense is going to be arguing that you didn't hear from those people, so therefore there's some kind of negative inference that should be drawn against the government, then I think an uncalled-witness instruction --

THE COURT: They are not going to say a negative inference should be drawn, but he's going to argue to the jury why were they not called.

MR. SKINNER: Exactly. And that is, you're suggesting --

THE COURT: The jury is not prohibited from thinking about that.

MR. SKINNER: But they should be instructed that the witnesses are equally available to both sides. And, frankly, it might be easier for defense to find these guys in Chinatown than it is for us.

THE COURT: Well, I can't tell them that.

MR. SKINNER: But the instruction just explains that all witnesses --

THE COURT: Why would it be easier for the defense to find them?

MR. SKINNER: Because they're not Tim Varian.

THE COURT: Nobody wants to testify in a case like this, let's not kid ourselves.

MR. COHEN: Well, that's not true, Judge. I mean clearly all these witnesses were more than happy to testify.

MS. BURNS: They didn't look more than happy.

MR. SKINNER: They were found and subpoenaed, and I think their demeanor indicated that quite a few of them were not happy to be testifying.

The question is are they available to both sides, and they are. And if there's argument being made --

THE COURT: Well, I'm not sure I want to charge that.

MR. SKINNER: I don't think you have to at this point. It depends on what Mr. Cohen says in closing.

MR. COHEN: I'll tell you now that I'm certainly going to argue that Cash is a witness the government should have called.

MR. SKINNER: And that clearly he is equally available to both sides.

THE COURT: Come on.

D4NVLIN2                                         Page 930

MR. COHEN: He's an agent of the government.

THE COURT: It's been testified that he works for the government.

MR. SKINNER: It's also been testified where he works, where his bus company is. If the defense wanted to call him as a witness to see what he had to say --

THE COURT: You may want to argue that, but I don't think that it's right to say that he is equally available.

MR. SKINNER: Well, your Honor, how is he not?

THE COURT: But, in any event, I don't intend to charge on the subject at all.

MR. SKINNER: Well, then we object strongly on that.

THE COURT: Well, you'll make your objection after the closing arguments at the sidebar.

MR. SKINNER: Okay.

THE COURT: I have considered what you've argued, and I think you are right with respect to witnesses who are equally available. I don't think you are correct with respect to witnesses who are government agents; correct?

MR. SKINNER: Well, then we'll see how Mr. Cohen argues it in closing.

THE COURT: I'm sure he will make a point of the fact that Cash was a government agent.

MR. SKINNER: All right.

And we'll argue that he knew where Cash was, and he

D4NVLIN2                                         Page 931

could have brought him in himself.

THE COURT: You can argue that, but I'm not going to instruct the jury that that's the same thing.

MR. SKINNER: But if he makes arguments that these people, No. 4 and Madan, who Cai Xiang says he saw in Chinatown a week ago, to our surprise as much as anybody else's, because we've been looking hard for these guys for two months, then I think under those circumstances the instruction is appropriate.

THE COURT: We'll see. I'm not going to speculate about what's going to happen. But I'm not going to charge the jury that he had equal access to somebody who was a government agent. And I don't think it's a realistic argument. And I think you probably don't either.

MR. SKINNER: You don't hear me objecting, do you?

THE COURT: No.

All right. Does that cover everything?

MR. COHEN: Except for my Rule 29 motion.

MR. SKINNER: And we have two --

THE COURT: I'll hear the Rule 29 motion.

MR. SKINNER: We also -- I mean two other --

THE COURT: Yes.

MR. SKINNER: Two other things that we had sought to have included that are not there.

THE COURT: Yes. And what are those?

MR. SKINNER: One is the Pinkerton instruction.

D4NVLIN2                                         Page 932

THE COURT: Well, I have denied the Pinkerton --

MR. SKINNER: We just want to preserve our objection on the record.

THE COURT: Of course. I understand that I have discretion; and I choose to exercise my discretion not to charge Pinkerton in a case where the facts are totally different from Pinkerton.

MR. SKINNER: We had also sought an instruction with regard to consciousness of guilt as evidence from flight. That hasn't been included.

THE COURT: Are you talking about going up to Canada?

MR. SKINNER: Well, I'm talking really about running out of the room, whereas everybody else stayed and went to the police precinct, or at least went back to the police precinct that night. And then, of course, the flight continued, and he eventually ended up in Canada.

But the real consciousness of guilt that we'll be arguing is he didn't go to that precinct that night to explain what happened; he fled.

THE COURT: All right. Well, you'll argue that. I'm not going to charge on it.

MR. SKINNER: All right. Just preserving our objection in not having it.

THE COURT: Very well.

I try to comment as little as possible on the

D4NVLIN2                                         Page 933

evidence, now that we no longer marshal the evidence. There was a time, you know, when all federal judges marshaled the evidence at the end of a trial.

MR. SKINNER: Really?

THE COURT: Yes.

MR. SKINNER: So there were three closings?

THE COURT: The judge marshaled the evidence in the charge.

MR. SKINNER: Yeah.

THE COURT: Yes.

MR. SKINNER: So the charge conferences must have been pretty heated then.

THE COURT: Everybody is always arguing for his own position --

MR. SKINNER: Sure, sure.

THE COURT: -- at all conferences. I have a long memory.

MR. COHEN: Can I be heard on my Rule 29 motion?

THE COURT: Yes. You want to make a Rule 29 motion?

MR. COHEN: Judge, my motion is to dismiss Counts Four and Five, the extortion and extortion conspiracy, in that in the evidence viewed in the light most favorable to the government, the evidence fails to prove that my client engaged in extortionate conduct in that he was invited into this company by one of the government's witnesses and his partner.

D4NVLIN2                                    Page 934

He did not ask for, but was, rather, offered a third of the profits.

At a later time, when he said he wanted more money, there was an initial refusal, and a counteroffer was made, which he accepted; that when he was on the telephone with the witness Guang Chen, Guo Gong, and Chen -- the government argues that his statement to Chen that he still had kids in New York or followers in New York, was meant as a threat, the detail of what he said was that "I still have kids in New York; if anything, call them," which sounds to me as if he is saying, "if you have problems with anybody else, call my kids."

So if you look at the testimony, it states not that he was making a threat, but rather an offer of continued assistance.

THE COURT: You're going to argue that to the jury.

MR. COHEN: I am going to argue that.

THE COURT: Sure.

MR. SKINNER: And obviously, Judge, we would argue that -- and I think this is more than enough to put the issue as an issue of fact to the jury, that in July of 2003, when the defendant came to Guo Guang Chen and demanded an additional piece of the company, and then, when he refused, threatened him at gunpoint, that that clearly then was extortion in use of a threat.

THE COURT: He didn't threaten at gunpoint; the people

D4NVLIN2                                    Page 935

who were with him.

MR. SKINNER: He referenced the guns with the people that he was with.

THE COURT: He was not carrying a gun.

MR. SKINNER: And then, of course, Mr. Cohen can put his own spin on it, but we will be arguing that the reference to the followers in New York was clearly intended to scare Guo Gong Chen and let him know that even though Ding Pa was gone, there were people that can get to him no matter how he chose to phrase it. That's an issue of fact for the jury to resolve.

THE COURT: All right.

I reserve decision.

MR. SKINNER: Thank you, your Honor.

THE COURT: We'll see what the jury does.

MR. COHEN: 2:30, Judge?

THE COURT: 2:30.

MR. SKINNER: Thank you, your Honor.

MS. BURNS: Thank you, your Honor.

MR. COHEN: Thank you.

MR. SKINNER: And I complement you on a very trimmed-down racketeering charge. We'll be showing it to the rest of the organized crime unit as a model.

MS. BURNS: It was no small feat.

(Recess)

D4NVLIN2                                    Page 936

AFTERNOON SESSION
2:40 P.M.

THE COURT: Let's get in the jury.

(Jury present)

THE COURT: Members of the jury, all of the evidence has been offered and received, and now is the time that the lawyers are going to argue on behalf of their clients. And the first closing argument will be made on behalf of the government by Peter Skinner; is that right?

MS. BURNS: By me.

THE COURT: Or are you doing it?

MS. BURNS: I am, your Honor.

THE COURT: Okay. That's fine. I just needed to know. By Ms. Jennifer Burns.

You may proceed.

MS. BURNS: Thank you, your Honor.

On a summer night in 2004, Mei Ying Li went to work. She was 31 years old. And she worked that night at a karaoke club in Flushing named Heaven On Earth. That's where she was around midnight serving drinks, taking care of a group of customers. They were having a good time in one of the karaoke rooms in that basement club.

All of a sudden, two men burst into that room. The singing stopped. The singer threw down his microphone.

One man said, Shoot.

D4NVLIN2          Summation - Ms. Burns          Page 937

The other man took out a gun, and began shooting at that singer.

Mei Ying Li crouched down, hoping to avoid the gunfire. She made a wrong move, because the shooter leapt up onto the table, and kept firing, shooting down toward the man who had been singing, emptying that gun until the clicks were heard that there were no bullets left. And one of those shots went into Mei Ying Li's head, killing her.

Mei Ying Li, who had nothing to do with these two men that came into the room, she was just working in a bar that night, and she died. And the reason she's dead, ladies and gentlemen, is because that man right there, the defendant, Ding Pa, felt disrespected, because he wanted to show that he was a big man in Chinatown, that he had face. And he wanted to keep face. And when he ordered "shoot," that meant that Mei Ying Li would not go home that night; she'd never get to see what her life had in store, all because Ding Pa had to show how tough he was.

Good afternoon, ladies and gentlemen.

The evidence is all in. And it establishes overwhelmingly that the defendant led a criminal organization, a gang; that he was a dailo, the leader of that gang. He had followers, he made decisions, he made money, he gave orders, and those orders were followed.

Now, you learned about his gang from people that saw

it in action; you learned about it from an insider; and also from another witness who himself had been both a follower and a dailo. And you know from that testimony that the rules of a gang are basic, and they are clear.

Face is essential. It cannot be lost. Without it, the defendant was nothing. And the dailo's orders, those given by the defendant, they are to be followed. No exceptions.

This is a case about a long pattern of crime and violent activity: Gambling, assaults, stabbing, guns, extortion, and most significantly, murder, all committed by the defendant, all done with the help of those followers, all why this defendant is guilty as charged.

I'm going to walk through with you today in turn the things that the defendant did that make him guilty. So I'm going to start with the gambling, then a series of acts of violence that he committed, then the extortion of the bus company owners, and finally, we'll go through the murder in detail.

First to the gambling.

Part of the defendant's organization was to own and run gambling parlors. He had three of them in Chinatown: Two on Madison Street, and one on Eldridge Street. You heard about the one on Eldridge Street from five of the witnesses: Guang Zhou, Cai Xiang Li, Huo Guang Chen, Shun Qing Chen, and Cheng Yong.

There, 13 cards -- or what we call tien len -- was played; thousands of dollars a night were bet; the gambling parlor had many shareholders and many workers, and it was many gamblers, and it was up and running for more than 30 days.

You also heard from Zhou and Xiang Li about the 13-card gambling parlor on Madison Street. And that testimony mirrored what you heard about Eldridge Street: Thousands of dollars a bet; multiple shareholders, multiple workers, and running for more than 30 days.

And the third gambling parlor -- that was the mahjong parlor you heard about from Cai Xiang Li -- same thing: Thousands dollars bet, many shareholders and workers, and it was up and running for more than 30 days.

And what was common to all of those gambling parlors, they were run by the defendant. He decided who would be shareholders; he collected the commissions; and he gave any profits to those shareholders. There's no meaningful dispute about the existence and operation of those gambling parlors and the defendant's involvement in them.

Now, you've heard during the course of the trial about a pattern of violence committed by the defendant, spanning from about 1996 until 2010, 14 years of violent acts committed just to maintain the defendant's reputation; to keep face.

So, as I said, we're going to talk about the murder separately, but right now, we're going to review those

incidents in a little detail.

And it starts with Qun Li. Multiple incidents there, all about face.

The first, in 1996. Qun Li was in a restaurant. The defendant came in, he saw Qun Li, he picked up a bottle, and he said, I am going to kill you today.

Then, there was the karaoke club in 2000. That night, the defendant walked into a room, he was angry with somebody there, so he went out, he got his followers, he came back, he pointed to that man, and he said, Beat him up. What did his followers do? Exactly what he asked. They went to beat that man up. And it was only stopped because Qun Li and the others broke up the fight.

Ding Pa again came after Qun Li in Brooklyn, that time in a restaurant. And when Qun Li tried to leave, the defendant told him not to. And they had a fight on the street where they exchanged punches.

The final encounter then was on the streets of Chinatown, just a couple of days later, in 2000. This time, the defendant tried to take Qun Li by surprise. He came up behind him on Eldridge Street, as Qun Li was walking alone. He tried to get his followers to help, yelling Li Qun is here, but Qun Li, he acted quickly, and he grabbed that screwdriver that had been holding the door open, pushed behind him, and hit the defendant with it, saving his own life and getting away.

And that barbershop is going to come up a couple of times today. And you've heard about it in the course of the trial. That's a barbershop owned by someone named Guo Li. And that's a name you're also going to hear in the course of my summation, you may remember from the trial. Because he's a man connected to the defendant. He owns that barbershop, where some of these acts took place, and he's present at so many of these violent incidents, including the night of the murder.

Now, the defendant also used guns. In 2000, he was at a gambling parlor in Chinatown where he threatened a man named Pan Zhen Chao. And this was a friend of Huo Guang Chen who you heard from.

That time, Ding Pa came in, pulled out a gun, and pointed it at Pan's head. And he said, I am going to kill you tonight.

And why?

Because Ding Pa said Pan was not giving him face.

So Pan begged for his life. Once he begged, Ding Pa said, Okay. I'll let you go for now, as long as I get face in the future.

But then to make his point, took out that gun, he fired a bullet into the floor. And that bullet, that's in evidence. That was recovered. It's Government Exhibit 40.

Ding Pa fired bullets again, July 2002, also at a gambling parlor. But this time, Ding Pa wanted shares of the

gambling parlor run by Yi Feng, another dailo in Chinatown. So Ding Pa brought a group of his followers who were armed to Yi Feng's gambling parlor. Those followers included Shun Qing Chen, who goes by the name "Cousin," which is what I'll used today, make it a little easier.

And that night, after the defendant got into an argument with some of Yi Feng's followers, it led to both Cousin and the defendant being stabbed. But the defendant did not just get stabbed that night. He fired bullets, shooting up the gambling parlor.

And you've heard about what happened that night from both Cousin and Huo Guang Chen and Cai Xiang Li, who later saw both Cousin and the defendant after they had been stabbed.

The violence committed by the defendant continued into 2003. That's when Song Di Xiang was stabbed on the defendant's orders. Xiang went to a restaurant where he saw Guo Li. Guo Li, again, owner of that barbershop, friend of the defendant. What did Xiang do? He said he didn't want to have a drink with the defendant, because he thought the defendant looked like a thug. What did he get instead? He got stabbed. Insulted by Xiang, the defendant called his followers inside, and they took action on his orders. Two of them, with separate knives, went after Xiang. Xiang tried to defend himself. Remember he described that for you, that he went for the knife that one of them had, and his hand got cut in the process. And he also got

stabbed in the side.

And there's no meaningful dispute about the defendant being there that night. Xiang pointed him out in court. And defendant also admitted to the police that he was there. That's Government Exhibit 34. And he did more than say he was just there; he admitted he had a dispute with the stabbing victim, and that he was face-to-face with the victim when this all took place.

That same year, the defendant orchestrated a beating on Yi Qun, Yi Qun, who you know, was later murdered.

The defendant led and gave that beating to Yi Qun in Guo Li's barbershop. He took three to four people with him, dragging Qun out from the back. The defendant and his followers then beat him with their fists, and they kicked him. You heard about that.

MR. SKINNER: Sorry. Go ahead. I didn't mean to interrupt you. Okay.

MS. BURNS: You heard that from Cai Xiang Li and Huo Guang Chen. And all of these acts of violence were done to show that the defendant had face and had to keep face, which he would do at any cost.

Now, let's turn to the extortion.

The defendant also used threats, violence, to get money. Specifically, he threatened Chen to get a bigger portion of Chen's profits in his bus company. Chen's testimony

on this was clear.

In 2001, he started up a van company. And then in 2002, Chen and his partners got the defendant involved. They were afraid of competition coming along and taking their business. So they went to Ding Pa to get rid of that competition, plain and simple. And for that work, for keeping the competition away, Ding Pa got one-third of the company. And the payout for that, three to $4,000 a month. And he was successful. He beat back that competition --

MR. COHEN: Objection.

THE COURT: Let's move on.

MS. BURNS: No other company ran buses on that route.

And those payments kept up, even after the defendant moved out of New York to Atlanta. But those payments, they weren't enough for the defendant; he wanted more. So in the summer of 2003, he changed the terms; he demanded more. He wanted an additional ten percent share of the bus company. And why? Not for doing anymore work, but to pay for his followers, to pay for their expenses, their housing. Those were the defendant's words to Chen. He had followers, and he had to support them.

You know from Qun Li and Cousin that that's what dailos do; they provide for their followers housing, food, going out at night. But when Chen refused to give over that extra money, the defendant said he wanted Chen out of the

business.

So Chen turned to Yi Qun for help. And after he did that, Chen was not kicked out of the company.

So let's put Yi Qun in context here again. He was a friend of Yi Feng, the dailo that you've heard about who owned a gambling parlor that the defendant had wanted shares of, and which he shot up just a year before. And the defendant had made clear that he would beat up anyone who was in a good relationship with Yi Feng.

So now after Chen went to Yi Qun, he wasn't kicked out of the company, but he's called to a meeting the next day by the defendant, that meeting in Corona Park. And at that meeting, Ding Pa told him that refusing his request, refusing to give that extra ten percent, was not giving him face, which you know was all important to Ding Pa.

Ding Pa told Chen his followers had guns, and they carry them every day. These were not just words. One of those followers in that park made a gesture, pointed to his side, indicating like he had a gun. And Chen also knew -- as he knew about that night that Ding Pa shot up Yi Feng's gambling parlor -- these were not empty words about those guns on those followers.

So Ding Pa told Chen he had to make a decision that day. If not, he'd lose face in front of his followers. That couldn't happen.

So Chen gave in to Ding Pa's demands. In part, he was scared, called his partner, and they agreed to give the defendant an additional $2,000 per month. That was on top of the three to 4,000 he was already getting. So unsurprised, Ding Pa accepted that deal. Remember, they had already driven out the competition.

So this payment here is payment for face; payment secured by threats, payment secured by threats of violence. But because they now had to pay this extra money to Ding Pa, Chen and his partner had to sell part of their company to Yi Qun. But Yi Qun didn't know about those extra payments. And once he did find out, he told Chen, stop making them. And Chen did. He made a payment in June of 2004, but not in July of 2004. And that timing is important.

When he stopped making the payment, Chen called Ding Pa and told him that because of a shareholder, the extra $2,000 payments were going to stop.

What was Ding Pa's response? Yelled. He was angry. He told Chen he knew who it was that did not agree to giving this extra money. And he made clear he'd find this person. And find Yi Qun he did. And he killed him.

This now takes us to the murder, July 30th, 2004, the night the defendant callously took two lives.

Now, you've heard about that murder from three people that were there; two that were inside the room, and one that

was at the club, but on the outside. You've also heard about it from Huo Guang Chen and Oh-Yang, who spoke to the defendant after the murder. So we're going to start with those who were at the club.

Around midnight, the group arrived at Heaven On Earth in Flushing. There's the entrance there. And if we can pull up the diagram of the club, which you've seen. He went down the stairs. Those are the stairs over there. This is the common area that you heard about, and the bar. And then back here, these are the private rooms. This was the room that the group, including the victims, was in. This down here at the other end, that's the room that Ding Pa was in. And you see that room, that has a staircase, a staircase leading to the outside; separate from the staircase over here, where everyone entered.

Now, inside that room where the shooting took place -- do we have a picture of that room? If you recall, the group included Cheng Yong, who used the nickname Mayong; Cai Xiang Li, Guang Zhou, who also used the nickname Yi Pei, No. 4, Madan, Yita, and Yi Qun. Three witnesses gave you that same list of names who was there that night.

Now, that common area on the diagram, this common area here, Cheng Yong told you that that night he was singing a song while he was out there. Did he see Guo Li, same Guo Li who owns a barbershop, where Yi Qun was assaulted, the same guy

Song Di Xiang spoke to before he was stabbed by Ding Pa's followers.

So then the group went into their private room down here, the end of the hall. They were joined by some women who worked there, including Mei Ying Li. They were drinking and singing, enjoying their night. And while they were in the room, Guo Li came in. You heard that from Xiang Li and Yong.

Guo Li stayed for a little while, and then went back out. And after he left that private room where Yi Qun was, Xiang Li went with him. Guo Li was going to see the defendant. Xiang Lee wanted to see the defendant.

There's no question why Guo Li headed out of that room. He'd just seen Yi Qun, the man Ding Pa had sworn to harm, the man that Ding Pa had beaten in his barbershop, was in a room down the hall. Ding Pa knew Yi Qun was there. And then Ding Pa went to that room with purpose. Ding Pa and his follower stormed down that hallway, rushing right past Cai Xiang Li, who tried to say hi to the defendant, calling out his name. And you remember that Cai Xiang Li and the defendant, they've known each other for about eight years at that point. But the defendant didn't stop. He just kept going, with that other man, walking fast, right to the room. The defendant was focused; he's not drunk, nothing else, but focused. Went into that room, and the door was slammed shut. From the outside, Cai Xiang saw flashes, sparks, and he heard the sounds of a

gun. And you know those sounds were the sounds of a gun being fired repeatedly. You've heard that now from Zhou and Yong; you heard in detail what happened in that room. And that timing that Cai Xiang said, the shots started basically once Ding Pa went into the room, that matches what Zhou and Yong told you, that they saw Ding Pa come in with this other man and shut the door. Zhou got up. He wanted to toast the defendant. And Zhou, like Xiang, he'd known the defendant for about seven, eight years at the time of this shooting. But, again, Ding Pa rebuffed him, said, Sit down. This has nothing to do with you. Because he was focused; he was there for a reason. Focused on killing Yi Qun.

Yi Qun, on seeing Ding Pa and this man -- he was scared -- stopped singing, threw down the microphone, put his arms up. But he couldn't stop what came next: "Shoot." An order from the defendant, a fatal order. You know it was followed, because what was heard next: Bang, bang, bang, bang. Shots fired into Yi Qun's chest. "Shoot." A word you heard from Zhou and Yong. They were inside that room. They heard it out of the defendant's mouth clearly and distinctly. That's the word they used when they spoke to the police in 2004; it's the word they used on the stand when they told you about the events of that night.

The other man, he followed Ding Pa's order. He put six bullets in total into Yi Qun, aiming right at him.

But once Yi Qun fell from those first shots, fell over, that wasn't enough. What did the shooter do? He got up on the table, he stood over Yi Qun, and kept firing that gun until it clicked and clicked, and there were no bullets left. Yi Qun's body, face down, riddled with bullets, and that man just kept going until he could shoot no more, finishing the job that Ding Pa ordered him to do.

Now, that's how the shooting was described to you by Yong, and that's confirmed by what you heard from Dr. Nields, the medical examiner; confirmed that there were six gunshot wounds; that one of those wounds was a shot to Yi Qun's back. He explained to you, because there was stippling, which are abrasions that are caused by gun powder against the skin. And what that meant was that the muzzle of that gun was only about a foot and-a-half to two feet from Yi Qun when it was fired.

Dr. Nields described for you the gunshot wounds to Yi Qun's arms and hands. Remember he gestured holding them up, he was trying to defend himself, but instead he got hit in the arm and the hand. That's where two of those bullets went through. Yi Qun tried to block those shots; he failed. He died.

You know he wasn't the only one shot. Mei Ying Li was shot in the head. You heard from Dr. Tranchida about her injuries: A penetrating gunshot wound to the head, delivered at a downward angle, right through the front of her head and breaking her skull. And it makes sense that's how she died.

When the shooting started, she did what anybody would do: Crouch down, hope not to get hit. But it didn't work, because, as I said, the shooter was up on that table, taking fire.

And there was another woman there, another innocent bystander. She was shot in the leg. Fortunately, she lived. But it makes sense to you, too, she's also hit, downward angle, the bottom of her body.

All those bullets, all the same caliber, all the same gun.

So now, what did defendant do after ordering this murder? He ran. He took the guy he brought with him and ran out of that room. You heard that from the three witnesses that were there. He didn't stick around to talk to the police. You heard that from all three witnesses, as well. And the stipulation that you heard, Defense Exhibit E, nothing about any interview that Detective Ng conducted that night of the defendant. He didn't go to the precinct, like the others, and describe what happened. He ran.

But he did try to cover his trail. Later that night, early-morning hours, he called Oh-Yang, a livery car driver he knew to go pick up his car in Flushing.

Now, I just want to stop and talk about the phone he used, because, as you remember, Chen told you that at one point he'd given the defendant a phone. That phone was in Chen's ex-wife's name, Loh Kit Mun. And that's the name on the phone

billing records, which are Government Exhibit 11. And that's the name you also saw on bank documents.

And those phone records confirm those calls happened from the defendant to Oh-Yang that morning. And in those calls, defendant told Oh-Yang, something had happened the night before. And the defendant needed to get that car that he had left behind out in Flushing. And the car was there. Oh-Yang described it for you. A bigger vehicle, light in color. And that car was seized by the NYPD. And we have pictures of that car you saw, that's 6A and 6B.

Oh-Yang picked up two men that morning and took them to go get the car. And they confirmed it was the right car when they got there; but when they saw the yellow tape and the police, they took off. And as you know, when you look at what was inside that car, you know why the defendant wanted to get it back, the items he knew were in that car, a car parked just yards from the karaoke club.

And what's in Government's Exhibit 7? His license up here. Do you see that picture? His employment authorization card; his name, his picture, putting him in that car at that scene. Also in Government's Exhibit 7, there are checks. And the checks on that address, they match the same address the defendant had on his driver's license.

But leaving these things behind didn't stop him from being able to move on. Because as you know, he did move on.

After ordering this murder, causing two people to die, and another to be shot, what did defendant then do? He just picked up and moved on. Moved his operation up to Canada, where he went on with business as usual. What's his business? Gambling, assaults, extortion.

And one early order of business that Ding Pa made sure to take care of was to call Chen and make sure Chen knew that he had ordered that shooting on Yi Qun. About a week after the murder, Chen got a call from defendant. He didn't use his name; he specifically said don't say names. But Chen knew who it was. And Chen asked Ding Pa, Why did you kill Yi Qun? Ding Pa's response: He claimed the shooter misheard or misunderstood him somehow, misunderstood what Ding Pa said was his instruction to get rid of him.

Seriously? That makes no sense.

Can there really be any misunderstanding from an empty gun into the body of Yi Qun that somehow there is some confusion about what he had ordered and what he wanted to happen? There was no misunderstanding about what he wanted done that night.

But in this call to Chen, who was a friend of Yi Qun, defendant, of course, claimed he didn't kill him. But he made sure Chen understood that he did order him to be shot, and that he was, and his order was followed. And that message to Chen was clear, and clearly received.

Yi Qun, another shareholder who the defendant said he knew, was against him getting that extra money; Yi Qun, friend of Yi Feng, who the defendant said he'd find a way to harm; Yi Qun, shot and killed, because the defendant told his follower to get rid of him.

The defendant then made clear what he wanted from Chen. He wanted those payments he'd been receiving to be continued to be made, but make them to his wife now. And for good measure, to make sure that Chen paid up, Ding Pa made clear to Chen that he still had followers in New York, even though he was gone. Those followers, they had already made clear to Chen, carry guns every day, followers who did what he said.

So, of course, Chen didn't go to the police; he kept paying the money. He made those payments of about six to $7,000 every month for five more years. And those payments were confirmed. You saw them in the bank records. That's Government Exhibit 20. They had Chen's information on them, his driver's license, the information for Ding Pa's wife. He was getting that money in a bank account. That's Hua Chen Lin. They also show that Chen's wife, Loh Kit Mun, made deposits on his behalf. So defendant's message: Pretty effective. Kept Chen in check. Those payments kept coming every month for five years.

So now, ladies and gentlemen, from what we've just

reviewed, it's clear the defendant committed the murder that night. You also know that he intended to do so. There's no mistake; this was no accident; no coincidence. He knew Yi Qun was in that room; he armed his follower, that shooter --

MR. COHEN: Objection.

MS. BURNS: -- like he had done many times before, and made a beeline for that room. Rushed by Cai Xiang, ignoring him. Burst into that room, pushed all Zhou, and got right to what he had planned to do: Kill Yi Qun. And once he gave that order, there was no confusion, no hesitation. Shots were fired, repeatedly.

And what did defendant do? Just stood there as this man that he brought with him emptied that gun, not caring where those bullets went, aiming at Yi Qun, small room, lots of people. Didn't care about those consequences. And they kept firing till those bullets were gone.

And then the defendant, he just ran. Took off. Ran down that hallway, not out back the main door; there's no evidence he went back through that common area where Cai Xiang Li was. Out the other exit. He didn't go back. Didn't go back to the precinct and give a statement, like the other people in the room you heard about. Certainly didn't go give the police the same story he gave to Chen about this misunderstanding, because that's just ridiculous. It's not true.

And defendant got away, but he made a mistake. And he knew he made a mistake leaving those belongings behind, because there's no dispute that he was there. He was there. His car was there. He meant to kill Yi Qun. And with his order, he did.

And after this murder, and ensuring he'd still get his money every month from Chen, moved on to Canada, doing more of the same of what he did here: Ran a gambling parlor. You heard that from Qun Li and Allen Chen. And just like he had done in New York with Yi Feng, he demanded shares of Allen Chen's gambling parlor. And when he didn't get those shares or the $20,000 he would have taken as substitute, and his followers beat up Chen, leaving him with stitches in his eye.

So, undaunted by the deaths he caused, the victims he left behind, just picked up, moved on. Business as usual. And all that evidence, ladies and gentlemen, that's why the defendant is guilty on every count as is charged.

(Continued on next page)

MS. BURNS: Doing all theses things -- gambling, extortion, murder -- that's racketeering. That is a pattern of criminal activity. That is what makes the defendant guilty of the racketeering charges in this indictment. He was a Dai Lo, a leader of a gang, the gang committed these crimes all for the benefit of the gang and the benefit of the defendant. The other evidence you have heard about, other than the specific crimes I mentioned, that is all relevant to your consideration in the racketeering conspiracy and his role in that organization.

This gang, their actions also had an effect on commerce. You heard about the bus company he was extorting, the one run by Chen. Those buses traveled across state lines. Because the defendant demanded money from Chen and threatened him to get that money and Chen gave it over unwillingly that is extortion and that is charged in more than one way in the indictment and the defendant is charged of that extortion. On that count you have Chen's testimony and the bank records that confirm those payments that he made.

The defendant is also charged with conspiring or agreeing to commit extortion. The defense in the charge there is that conspiracy needs an agreement to commit this with others. You know the defendant was involved others. They were part of it. He brought two of his followers to Corona Park and he made clear that to get payments.

Finally, the defendant is charged with murder. He is charged under state law and federal law. He is guilty of the murder under state law because he intended to kill Yi Qun. He is also guilty of conspiring to commit that murder. You know he brought that shooter with him and gave that order. That makes him guilty.

He is also guilty of murder under federal law. The difference there from state law is that the defendant is guilty of that charge because he committed that murder in furtherance of the extortion and that his conduct caused those deaths. You know that it was in furtherance of the extortion because the defendant wanted money from Chen, wasn't getting it, he knew Yi Qun was the reason why, and he killed him. By giving that order he furthered the extortion. Chen paid up after that and he made clear to Chen that he did it, he ordered the shooting, and that he wanted that money.

So those are just basic summaries of the charges. The judge will go over that with you in more detail. I wanted to give you that so you can see how it fits in with the various charges here.

So now let's talk about the witness. Your common sense tells you that evidence of a criminal organization comes from people who are close to it or part of it most of the time. The government, we take our witnesses as we find them. We didn't choose these witnesses. You know who did choose them?

The defendant. You heard from his follower, you heard from people he calls on to help him commit crimes like Oh Yang. You heard from witnesses to his crimes, Zhou and Yong and Cai Xiang Li. You heard from his victims, Allen Chen, Guo Li Dan Jian and Huo Guang Chen. That is how these people came to be before you, ladies and gentlemen, because of the defendant's actions. The question now you have to consider is whether to believe what they have told you about the things they saw, the things they experienced and the things they heard.

Now, based on what we heard from the defense opening and we heard through cross-examination, I expect that the defense is going to ask you not to believe these witnesses. Because if you do believe them, the defendant is guilty on all charges. So in deciding whether you should believe them, and you should, here is some ways for you to consider why. You can think about how they appear. You recall their demeanor. You have had a long chance to observe these people, some longer than others. They were nervous. They were scared. Certainly they didn't want to be here. You can consider that in evaluating whether what they told you was true.

I have gone over this before, but what they told you is consistent with each other, meaning they corroborated what each other said. The witnesses to and about that murder told you a lot of same essential facts about what happened that night in 2004. When we came into the room, Ding Pa and the

other man ran out, Ding Pa said shoot, Ding Pa and the other man did not show up the the precinct that night. That is just some of the ways that they are consistent with each other about what happened that night. As they told you, none of them talked to each other before they talked to the police that night.

The witnesses corroborated each other on gambling. You heard from the five witnesses that told you about the gambling parlor on Eldridge Street and the two about the parlor on Madison. The testimony mirrors each other. You don't have to take their word. The witnesses have been corroborated by documents and other evidence in this case -- the bank records that confirmed the payments Chen made, the bullets recovered from the crime scenes and the murder victims, the phone records confirming the calls between the defendant and Oh Yang, the medical examiners' report and their testimony and they explain to you what was described to you by the witnesses in that room matched the the physical medical evidence taken from the victims, the defendant's car that he left at the scene and his belongings inside. All of these reasons the witnesses should be believed and their testimony relied on for you to convict the defendant.

Ladies and gentlemen, the evidence has shown the defendant's pattern of racketeering was deliberate, it was intentional, it is not some accident, no mistakes. It is a

deliberate pattern of serial criminal conduct -- gambling, threats, extortion, knives, guns, fists, kicking, murder. The evidence shows the path of crime that this defendant has taken for well over a decade. It is showing his intent to commit all these crimes to profit by fear and violence. It has shown you what is left in his wake, the victims, physically hurt, mentally scarred, dead. And all this done why? To protect that man's reputation so he could have face no matter what it costs, no matter who it hurt.

So now, ladies and gentlemen, we ask you to return the only verdict that is consistent with that evidence and the law and that is a verdict of guilty on all counts. Thank you.

THE COURT: Members of the jury, would you like to stand up and stretch for a moment before you hear the closing argument on behalf of the defendant?

MR. COHEN: Judge, can we step up for a moment?

THE COURT: Excuse me?

MR. COHEN: May we approach.

THE COURT: Very well.

(Continued on next page)

(At the side bar)

MR. COHEN: Judge, I am going to respectfully move for a mistrial based on Ms. Burns' statements during her summation in which she indicated that Mr. Lin had scared the competition away. There was no evidence to that effect. On the fact that she misstated what was in the stipulation, that was Defendant's Exhibit E, which does not say that Mr. Lin was not at the precinct. It simply names the people who were.

Finally, on her statement that the evidence showed that my client had armed the other fellow who was in the room, there is no evidence in the record whatsoever to suggest that he provided a firearm to that person.

THE COURT: That's something that you will point out to the jury.

MR. COHEN: Judge, can we take a five-minute break?

THE COURT: I really hadn't planned to.

MR. COHEN: I need to use the rest room.

THE COURT: Very well. Go ahead. Less than five minutes if possible.

MR. COHEN: I don't want the jury to sit in the box when I come back and put my papers together.

THE COURT: You should go immediately. Right now.

MR. COHEN: I will.

(Continued on next page)

(In open court; jury present)

THE COURT: Very well. We should all be seated now.

Mr. Cohen will present the closing argument of the defendant.

MR. COHEN: Thank you, your Honor. Thank you all for being here. Like Mr. Skinner's opening statement, Ms. Burns' summation was professional, it was adept, it was emotional, and it was well put together. This case as you know is not about the words. It is not about how articulate the lawyers can be. It is not about how adept and adroit we can be in formal arguments. What I am going to say to you can really be boiled down to almost a single sentence and this is it: If you can't trust the messengers, you cannot trust the message. If you can't trust the messengers, you cannot trust the message. Everything that Ms. Burns described within the confines of a beautiful courtroom with lovely carpets and beautiful veneer was a great story. The only problem with it is that for you to believe it, you have to believe the storytellers. The storytellers are not Mr. Skinner, not Ms. Burns and not me. They are the folks that occupy the witness stand. And you know -- you know -- as you sit here now neither they nor their message is worthy of your belief and if is that the case, your verdict must be not guilty.

On April 15th I asked the witness name Chen Huo Guang the following question, and you can at any time you want ask to

have a read back from the record because it is all here, and I asked him at page 409 the following question:

"Q. Is that because it is harder to remember a story than it is to remember the truth, sir?"

He gave an astonishing, amazing answer.

"A. About this, the story from the truth, I think has nothing to do with each other."

That statement sums up the entire bill of goods that these folks have sold the government for nothing but their own benefit, their own benefit, or because they don't like Ding Pa or because they were friends with Yi Qun or because they are doing something for Cash. I am not talking about cash money and I think you all know that. One thing that is crystal clear is that all the people that went onto this witness stand and stood there and said, I swear to tell the truth, the whole truth and nothing but the truth have absolutely no regard for the truth. It could mean less than nothing to them.

When I was asking Yi Pei how many times he met with the government he said, It was a long time ago. I don't remember. Every witness that testified had a pretty phenomenal memory on direct examination and when it came to cross-examination they developed cross-examination amnesia. They couldn't remember. I couldn't count how many times in the record I asked questions and the answer was, It was a long time ago and I don't remember. What these witnesses care about, and

all they care about, and they don't care about justice, and they don't care about the truth, what they care about is staying in the good graces of the people that have the power to keep them in the United States, period, end of story.

Who can help them do that? The people at this table. All of them promised that they had been promised no immigration benefit in return for their testimony. I am not suggesting for a second that anybody here did anything underhanded. I am not suggesting that anybody at the prosecution table made under-the-table promises, off-the-record promises. But, you know what, there was a choreographer in this case, there was a director of this play and his name is Dong Jain. His presence has permeated the trial, but we don't know what he looks like and we don't know what he sounds like and we don't know what his deal is with the government. We don't know what benefits he is getting. We don't know if he is being paid for his services. We don't know like every other witness he has a deportation order and is working off that deportation order by doing what he thinks the government wants him to do.

The witnesses have shown repeatedly over and over and over again that they have no loyalty to the truth. All they do is serve their self-interest and their self-interest here is to stay in the United States and they have proven that beyond any doubt at all.

Try to think about whether the government presented a

single witness that was reliable, trustworthy and believable. They say, Well, you know, don't blame us because we don't pick the witnesses. The defendant picked the witnesses. They were the people he associated with. Well, maybe that is true. Maybe that is true. Maybe you think he is a bad guy because of the people that he hung out with. You know what? He is not asking you to believe those witnesses. The government is asking you to believe those witnesses. I am sure that if they could, they would have had some credible witnesses testify, but they played the hand that they got dealt. They didn't pick the witnesses, but that doesn't lessen their burden of proof beyond a reasonable doubt. You don't cut them any slack because they had to call a bunch of clowns to testify. It doesn't help.

Now, I have to remind you that there is nothing in the indictment that charges Mr. Lin with not being a nice guy. There is nothing in the indictment that charges him with having bad habits, bad friends or a bad reputation. You might think that is what he is charged with since so much of the truth that was presented had little or nothing to do with the discrete crimes is he charged with, but that is not what he is charged with. If he was charged with having bad habits and a bad reputation, find him guilty but that is not what he is charged with.

The indictment charges specific discrete federal crimes, and Judge Cedarbaum will instruct you that the

prosecution must prove each and every element of those crimes beyond a reasonable doubt before you can find Mr. Lin guilty of anything. Again, the government presented evidence of nasty things, uncharged crimes. He is not charged with committing a crime in Canada. He is not charged with stabbing someone in a restaurant on Division Street. These are all uncharged crimes. They are here to make you think that Mr. Lin is a bully, he is a bad guy, he drinks too many.

Take Allen Chen's testimony. He is Dong Jain's cousin. Actually, he is either his cousin if you ask him in the morning or cousin's cousin if you ask him in the afternoon. He is someone here at the behest of Dong Jain and he talks about this extortion in Canada. What does it mean? He is not charged with that here. It is just another effort to make him look like a bad guy. The government says that my client wanted a piece of a gambling parlor that Allen Chen owned in Toronto and he wouldn't give it up. Mr. Chen wouldn't give it up so my client trashed the place and Mr. Chen was assaulted. You know that is not what he is charged with. He is charged with extortion of a bus company here owned by Huo Guang.

You heard the word "pattern" in Ms. Burns' summation. That is a very important word in this trial. You will hear a lot about the word pattern tomorrow from Judge Cedarbaum when she charges you on the law. You will hear about a pattern of racketeering activity, what is a pattern of racketeering

activity, what is not a pattern of racketeering activity. I am going to tell you about the pattern that the evidence does show. It is not a pattern of racketeering activity. It is a pattern of deception and deceit and dishonesty on the part of the witnesses who were called by the government. They hope that they have thrown so much dirt onto Mr. Lin that you believe he is such a bad guy that he must be guilty of the crimes that he is charged with, serious federal crimes. They paraded in these awful witnesses chronic liers.

One of the ways to evaluate the way someone is telling the truth is look at their track record for telling the truth. Look at their track record not only for telling the truth in an informal conversation, but look at their track record for telling the truth under oath. Was there a single witness who hasn't lied under oath to the Immigration Service? To the government? To you? There wasn't a single witness like that. Talk about serial patterns, these guys are serial liers. I don't have to argue to you that they might be lying. You know. You know. You heard it from their own lips when they admitted the false statements that many of them made. Why did they do it? To get a benefit for themselves. How many lies does a person have to tell before you reject their testimony out of hand? How many?

Judge Cedarbaum told you, and she is going to tell you again tomorrow, and tell you specifically what she means that

Lin Xing is presumed to be innocent. These arn't just words on a piece of paper. They are not something in a law book. They mean something. They are important. They are real and they are so very important in your deliberations.

Now, the judge has also told you and she will tell you again that the government has the burden of proof. I ask you respectfully when you begin to deliberate, they have the burden of proof and you should ask yourselves a question. Start by asking a question. Why should we find this man guilty? Why? What reliable evidence? What trustworthy witnesses? What proof beyond a reasonable doubt has the government brought into this courtroom to make you believe that you should convict Lin Xing of these serious federal crimes? It is not enough if you think he might be guilty. That doesn't cut it. That is not proof beyond a reasonable doubt. Nobody, nobody, nobody wants to see murders or other serious crimes go unpunished. Nobody wants to see that. Justice is not served -- not served -- by convicting somebody, anybody, Lin Xing or anybody else, on the quality of the evidence that you've heard here.

I am going to talk to you for a little while about the witnesses. I am not going to stand here and go through every lie and falsehood that each of them has told whether to the Immigration Service or the government or the Probation Department or the courts or you because for me to do that, I would have to be here for hours and I know that you don't want

to hear me speak to you for a couple hours.

Let me make something clear also by the way. When I talk about the witnesses for the government lying, I am not talking about the EMT, Mr. Benedetto. I am not talking about Detective Filshie or Detective LaCova. I am not talking about Detective Clark who came up from Georgia. I am not talking about the law enforcement people. I am talking about the people that have deportation orders. I am talking about the people who testified that don't even have the right under the law to be in the United States of America. Remember, the testimony of these pathologist and police officers and technicians don't answer the question of what, if anything, Lin Xing said to Little Beijing in that room. They just don't answer that question.

Let's start with Yi Pei, Chen Guang Zhou. He was the first real substantive witness. Imagine for a minute -- please, bear with me hear -- that you have to make a decision, a really important decision that is going to affect you and the people that you love. It doesn't really matter what the decision is, but it is really important and you don't know what to do. You you are agonizing over it. You are thinking about it. You are thinking about it for a day. You think about it for a week. You just don't know. What happens? Yi Pei comes along. Yi Pei comes along and you know everything about Yi Pei that you learned during this trial. He says to you, listen,

you know you can trust me. You can trust me. I know you are thinking about this important thing. Just do it. Just do it. It's cool. Just do it. You can rely on me. You sit there for a minute and you think about, Well, this is Yi Pei. What do I know about this guy? At the very least are you not going to hesitate to rely on what he tells you? Arn't you going to hesitate at the very least if not just completely ridiculously dismiss this guy out of hand? You know you are going to do that. If you would hesitate to act on what he tells you is something really important to you, then you have a reasonable doubt about his word. And if you have a reasonable doubt, your verdict has to be not guilty.

Does it matter that the government called one worthless witness or six or 12? Does it matter? Is anyone better than Yi Pei? They are all basically -- when you think about, when you saw their demeanor, Ms. Burns mentioned demeanor, you saw their demeanor on the witness stand. She said they were scared. She said they had to be subpoenaed. They didn't like being cross-examine very much and you can tell the demeanor changed completely. One of them even said when I asked him, Did the government prepare you? Did you sit and talk to them? Yes. Yes. Yes. And what did they say? Did they ask you questions Mr. Cohen would ask and he said, I said that is your problem. He said no, that is what I am saying. The demeanor on direct. The demeanor on cross. They may not

like being in a courtroom. They may not like to to speak in front of a lot of English people with a translator. You better believe that every single one of them was glad to be here and you know why.

Yi Pei was the guy that couldn't even tell you the truth about who he went to lunch with. Imagine the guy is here in the morning. He goes out to lunch in Chinatown and he sees my client's son and daughter and wife. They wave to each other. Who is he with? Guo Guang and Dong Jain during the trial. During the trial the witnesses are together and they are together with the puppet master. When I asked him about it he says, Who is Guo Guang. Not only is not admitting that he had lunch with the guy. He will not even tell you who he is, but the government says believe this guy a reasonable doubt. Are they kidding? He tells you he doesn't know who Dong Jain is and two minutes later is he admitting Dong Jain is my sister's boyfriend. Is this a guy that is worthy of belief?

This is a guy that claims he was persecuted in China because he a assaulted the family planning police. That is his story that you heard more than once. The Red head told you the same thing. He told the immigration service the same thing, that he was persecuted in China because he assaulted the family planning police. You know what? The Immigration Service didn't believe either one of them and issued deportation orders for both of them. Years ago. Year ago. You know that Agent

Varian works for Immigration Service for the Office of Homeland Security investigations. I think you understand that enforces the immigration laws. Here are all these guys in the country illegally. They are here.

Yi Pei tells you that he was on the Heaven On Earth club the night of these awful shootings. Is the testimony about what he saw and claims to have heard there any more believable than his testimony about not having lunch with Guo Guang? Is there any reason for you to believe that a guy that would so blatantly lie is going to be truthful about some other aspect of his testimony? The judge will tell you probably that you can accept it or reject it or you can accept part of it or reject part of it, just remember to think about having to make that important decision and what he told you.

What does he tell you? I will not use the visual aides. He is in this room at the Heaven on Earth and my client and another fellow walk into the room. He says Ding Pa looked at him. He stands up because he wants to toast Ding Pa. He wants to give him face. He stands up and he wants to toast him. Ding Pa says, "Sit down. This has nothing to do with you." He has been interviewed by law enforcement numerous times for years. He has been interviewed by Detective Ng the morning after the shooting. He is interviewed by agents numerous times, but it is not until July of 2012 that for the first time he mentions this comment, "Sit down. This has

nothing to do with you." You have a stipulation that tells you that Detective Ng never recorded that fact in his DD-5. Of course he didn't review it with the guy, but you know what a DD-5 is. It's a police report. He is a detective. You would think that he would record something important that he was told. It is not there.

You would think that when Agent Varian who is a professional agent who has worked for this country, serving it for a long time prepares a report, interviews people, he will write down the important thing that the guys says. Yi Pei doesn't say anything, nothing reflected in the notes that he said anything about "Sit down" for several years before he says that in July of 2012. You know what? Not another single witness in the room heard him say that. Not another witness who testified that they were in the room at the time of the shooting said he heard him say that. Jian Chen, Tall Guy, didn't hear him say that. You know why? He never said it.

Now, Yi Pei tells you that Yita the fellow that we haven't met was holding the microphone and singing when Mr. Lin and this other fellow walked into the room and the shooting starts. Tall Guy tells you it was Yi Qun that was singing, that it was Yi Qun who tossed the microphone, that it was quiet in the room after Mr. Lin and Little Beijing enter the room and the microphone is tossed. You don't hear a word of that from Yi Pei. Witnesses describing the same event, especially a

traumatic event, there may be some minor inconsistencies on what they say, some small things that differ, but this was probably one of the most traumatic events for lives of anybody in that room, I don't care how tough they were, and there is no consistency between how the events were described by these witnesses who were there.

Quo Guang. Now, the government says forget about what Mr. Cohen says about Yi Pei. You don't have to rely on him. He has Quo Guang. You can trust him. Quo Guang is the guy who actually works for Cash. He works for Dong Jain. He is a dispatcher in his bus company. He is one of the witnesses who would not testify, would not take that witness stand unless he was first promised that he would have immunity. Well, you know what? Why not immunize the guy? If we're going to let people into the courtroom to testify that are here in violation of deportation orders, why not give immune, too? You know what? They were not promised any benefits by the government. They told you that.

Judge Cedarbaum is going to tell you tomorrow about how you should consider the testimony of the witnesses who received immunity. It is not of my job to tell you the law. It is not the government's job to tell you the law. It is Judge Cedarbaum's. I guarantee she will do it much better than any of us could anyway. Although, you have to listen to all of her instructions, I beg you to take to heart the instructions

that she gives you on how to consider the testimony of immunized witnesses.

Quo Guang is also easy to remember because the guy's testimony was grossly offensive, grossly offensive. He didn't just tell a little fib. He didn't just tell a little tiny misstatement on his sworn immigration application. He made up an elaborate story, a heartwarming story. It is a heartwarming story that broke my heart. She meets this woman. She is a lovely girl. She shows pulls up her pants leg an she has an artificial leg. He says he doesn't believe in God and she brings him to Jesus. She brings him to God. She turns him around and he preaches the gospel. He preaches the gospel in a communist country. Well, that is not okay.

What happened? Because he has this underground printing press and printing these Christian tracks and handing them out to folks, he gets arrested. He gets beaten and forced to confess that he is a member of an underground church. You know what? There wasn't a word of it that was true. Not a word of it was true.

Now, you have to bear with me for a second because I have some notes here. I asked him on page 390 of the trial transcript starting -- sorry 389, starting at line 17 through the next page, line 5:

"Q. Sir, this is a question that can be answered yes or no. Is it true that you thought the best chance you had to stay in

the United States was to lie to the government?
"A. What do you mean the high chance of lying to the government? I never thought it to be this big. I was only trying to make up a story.
"Q. Right. And the story you he made up was a lie; right?
"A. Yes.
"Q. And you told that lie to the government in order to convince them to let you stay in the United States?
"A. Yes."

It doesn't work. This great story, this beautiful romance novel filled with religion doesn't work. So what does he do? He waits a few years and then he files a second application for asylum. This time he says he was persecuted because of his support for the pro-democracy movement in China. Well, that is an appealing story. Nobody likes communism. Nobody likes communist China. This guy is pro-democracy. We should let him stay in the United States. He tells you that this story, this sworn application is all true. He told you that. He told each and every one of you. Except then he has to deal with cross-examination. His story changes a little bit.

He tells you there were no false statements in that application, but in that application he swore that he never filed with the immigration service before. We know that is a lie. He said he never committed a crime in the United States.

We know that is a lie. He lied about his employment and his ownership in a bus company. That is a lie. The best part -- the best part -- is what he says on page 390, starting at line 22:

"Q. But you told the jury that you were persecuted in 1994 because you participated in some sort of democratic movement of; correct?

"A. Yes.

"Q. And you are telling us now that that is the truth; correct?

"A. Yes.

"Q. So isn't it so when given a choice between lying and telling the truth, you do whichever one you think is going to work best for you?

"A. What do you mean? I don't understand."

Do you think he didn't understand? Here is a guy that claims that he had a legitimate claim of persecution, but the truth means nothing to him because his family told him, Oh, it is better to go with a story of Christianity. That is what is work these days. As you saw just like the oath he came into this courtroom, he swore to tell the truth and there wasn't a word of truth to anything.

Last month, March 21st, he goes to immigration to try to sell them the second story and his second asylum. What happened? They cuffed him. He got locked up. Why? Because

he had a deportation order that he had for years that he claims he didn't know anything about. They locked him up. On direct examination he tells you that he called Agent Varian that day, that Agent Varian spoke to the agent who arrested him and he was released from custody. Cross-examination was a little bit different. Now it is not he who calls Varian. It is the arresting agent. Either way the result is the same. He has got a deportation order, he is handcuffed, he has been brought to an immigration detention center, but he makes the agent who arrested him that he is going to be a witness at this trial. What do they do? They don't bring him before a judge and arraign him and say, We'll release you on bond if you promise to come back. They don't require him to post bond or pay bail. He doesn't see a judge. They call him a cab. They tell him to come back on April 22nd. That was yesterday. How many people think that he didn't sleep in his own bed last night because he came here and did what he thought the government wanted him to do? No immigration benefit? I would say getting released from a detention center by an agent is an immigration benefit.

Chen Jian, the the formal confidential source that was recruited by Dong Jain told you he is getting no immigration benefit in return for his testimony. I said do you have an immigration order, sir? Yep. Are you still here? Yep. Do you consider that to be a benefit? No. How ridiculous is that? That is like an insult on the intelligence of everyone

who is here. Maybe they weren't suggested by anything by the government and I don't suggest that we were. We don't know what Dong Jain told him. We don't know what Cash told them. The the government had the ability to call Cash as a witness at this trial. He is their informant, their agent. I say agent in the legal sense meaning he acts on their behalf, not that he is a special agent like Agent Varian. He may be special but he is not a special agent.

They could have called Cash to explain that he didn't offer these guys anything, that he when he sat down with them two of the witnesses that were testifying at this trial last week for lunch never talked to them about their testimony. They could have called him to say that. I would have called him to say that if he were under my control.

MR. SKINNER: Objection, your Honor.

MR. COHEN: But they didn't do that. They didn't do that.

THE COURT: Let's proceed.

MR. COHEN: No benefits for their testimony? Don't you wonder what his deal is with the government? Wouldn't you like to know? Is he working off a case? Is he avoiding his own deportation order? Does he get paid? These are all things that are relevant and you are not going to know the answer to any of them.

Now, they have no obligation to call him as a

witness. They can pick their witnesses. They can decide who to call and who not to call. I think the fact that they didn't call him speaks volumes -- volumes -- about what his testimony would have been had he testified truthfully. Now the government charges that Quo Guang is the extortion victim in this case. Let's try to focus on what the actual charges are and not all these other ancillary incidents that you heard about. Quo Guang owns a bus company and comes a time in 2002 that he is afraid that a bigger company is going to compete with him. They are going to put him out of business. He told you that they were going to put him out of business. He reaches out to his partner Ding Chen and they talk about what they should do.

Now, Guo Guang knows Ding Chen has a good relationship with Ding Pa and they both know that Ding Pa has a good relationship with the owner of the other company. So they say to Ding Pa, Listen, we have got this problem and we would like you to help us with it and if you do, we'll give you a third of the shares of the company. He doesn't go barging into their office and demand part of the company. He doesn't ask for anything. He doesn't ask for anything. They tell you they talked about it and they made a business decision that they would give him a third of the company. The government says that he scared the other guy off. There is no evidence of that. You heard the witness say that he had a good

relationship with the other guy. One way or another there is a mediation, there is a discussion, there is no competition. Quo Guang and Ding Chen get to stay in business, they get to stay in business and paid a third of their profits to my client and it goes on for a while.

Again, you have to take everything that is being said here with a grain of salt because everything that is being said requires that you believe what the witnesses said. I am not saying for a minute that you should believe what any of these guys said. But let's say for a minute that you do believe that there was a discussion and Mr. Lin asked for more money, an extra couple thousand dollars a month. Quo Guang talks about Yi Qun who he has now brought into the company because these businesses are so competitive that they are each even competitive within one another. So he brings Yi Qun into the company. Mr. Lin asked for an extra $2,000 a month. He talks to Ding chen about it and they pay it.

Actually, he asked for more. He asked for a percentage of the company. They say No, no, but we'll pay you $2,000 a month. He accepts it. A request, a demand, an offer, a counteroffer, and it is accepted. Everybody saw Good Fellas. They take over this business in Good Fellas and the guy says, I cannot pay it. And the guy says, You pay me. That is not what he says. That is not what he says. He says, You can pay less. I will take less. Where is the threat? Where is the

extortion?

You talk about in meeting in Corona Park where supposedly Ding Pa goes with a couple of fellows and some guy goes like this? You know what? In order to believe that you have to believe everything that Quo Guang tells you. Is Quo Guang more believable than Yi Pei? If you hesitate to act in an important decision based on what you know about Quo Guang, you have a reasonable doubt.

He didn't force himself into that company. He didn't demand anything. The government says, Well, did he ever do anything for you other than get the competition to not compete? No. You know what? He never asked him to do anything else. He never asked him to sell tickets. He never asked him to advertise or do whatever they do. They didn't ask him. The government says he never did anything else. He is not earning his money. It must be extortion. Well, extortion has a specific legal meaning. Judge Cedarbaum will explain it to you and you will know what to do once you hear the explanation.

Quo Guang tells you that sometime after the shooting at Heaven on Earth he gets a phone call from Ding Pa and he asked that the monthly payments be made to his wife and they have a conversation and Ding Pa says, Oh, that Kid misunderstood me. I didn't really mean for him to kill him. Whatever. You don't have any corroboration that that conversation took place or that it ever happened. You can rely

on Quo Guang. He is a reliable guy. He has told so many truthful stories in the past.

The government says that here is the proof of the extortion, that he told him when he was telling him to make the payments to his wife, that Ding Pa is saying make the payments to my wife, he told him he still had followers in New York and you are supposed to infer from that that he intended to scare him. You know what? Go to the trial record because if you listen to the details, you are going to understand that something completely different was being said. At page 342, line 16.

"Q. Did he say anything during the phone call about whether he still had followers in New York?

"A. Yes. He said if there is anything, just give them a call."

If there is anything, just give them a call. Does that sound like Ding Pa was using the fact that he had followers in New York to threaten Quo Guang, or does it sound more like if you got problems with anybody, call my people. Common sense. It is not the lawyer's argument that carries the day in this courtroom. It is your common sense applied to what we said. If you look at the detail of what was said and you listen to the details of that conversation from the witness' own words. If anything, call them. That is not a threat. That is an offer.

Let's talk about Li Qun. He gets arrested for extortion with a bunch of other people in 2006. First thing he does in this courthouse, the first thing he does in this courthouse, is he swears to an affidavit that says he doesn't have the assets to afford an attorney. So you all paid for his attorney. He doesn't disclose that he is making thousands of dollars a month by ripping off hard-working bus drivers. He doesn't disclose that he has got money put away. He says I make a few hundred dollars a week, a few thousand dollars a month. That's a lie. First thing he does in this courthouse.

What is the second thing he does in this courthouse? He gets released on bond. When he gets released on bond, he makes a promise to the court. That is what a bond is. It's a promise if you let me go home, I will come back when you tell me to. Come back. He has got people that love him, care about him, trust him that are on the hook for 75 large for the government. He says, you know what, maybe the evidence against me is kind of strong, I don't want to go to jail. So what does he do? He sticks it to the people that trusted him and he leaves. He runs a way. He gets himself smuggled into Canada. He gets smuggled into the country and smuggled out of the country. He betrays his friends. He betrays the promise to this court that he would return.

So what happens? He is up there a couple years. He is arrested. He comes back to the United States. Immediately

he decides to enter into a cooperation agreement. If I can't beat jail by running away, I will beat jail by cooperating with the government. He is a pragmatic guy just like all these witnesses are. He testified in another trial. He told you that. He was in jail because they weren't going to let him out on bail again. He was in jail and he said to that jury he is facing 70 years in prison, that no promises were made to him by the government about what sentence he would get. He was facing 70 years. Did he get 70 years? 60? 50? 40? 30? 20? 10? Five? He got time served. He went home. But not quite home because he got a deportation order.

So instead of walking out of the prison yard like you see on TV into the sunshine, they put him on a bus and ship him off to immigration jail because he has got to go. What happens? He spends a couple months there. Calls a couple agents, writes the summations. What does the FBI do? They put him back out on the streets of New York so that he can work for them and be their source. It doesn't work out very well, but that is what he promises to do. He says he doesn't have any immigration benefits. This is a guy that should be in Foochow right now along with the rest of the government witnesses. He is in New York City. God knows what he is doing, but he is here.

(Continued on next page)

MR. COHEN: He's the guy, Page 457 of the trial record, says -- and I'm just quoting now -- he says: "Ding Pa punched me when I called him a dick."

I wasn't sure if I heard it right. I checked with a couple of people.

And I asked him on cross-examination: "Ding Pa punched you, and you called him a dick?"

He says: "I never called him a dick. I said, Ding Pa, what's happening."

I mean come on. Right in front of you, the guy changes the story. How often does that happen during this trial? And they want you to believe, these witnesses, they hope that because the charges are so serious, a man died, a young woman died, another young woman was shot, these are terrible things, they are terrible things, but justice is not served by finding this man guilty based on the quality of evidence that you've heard.

Song Di Xiang, the guy who --

THE COURT: Exhibits should be up here.

MR. SKINNER: We'll try to get them for you.

MR. COHEN: He's the guy who was stabbed on Division Street when he went to buy rice. He was a little bit confused; maybe the guy is a little bit slow. He certainly seemed the most uncomfortable of any witness. He says he goes into this place to buy rice; he's never been there before. And he sees

Guo Li, who he knows. And Guo Li asks him to come back and have a drink. And he walks into the back, and he sees somebody that he identifies as Ding Pa. And he says -- and it's not really clear, because he never answered the question, whether he said it out loud or he said it to himself -- "This guy looks like a thug." That's what he testified to. I don't think -- well, maybe it's clear to you; my impression was it was never made clear whether he said it out loud or to himself.

And he says, I wouldn't have a drink with this guy. And the next thing I know, he made a phone call. And the next thing I know after that, some guys came in and stabbed me; two guys came in and stabbed me.

So I asked him whether you heard gunshots that night.

No, no, I didn't hear any gunshots.

And then, of course, he changed his story. It wasn't that Guo Li wanted him to have a drink; it's that he walked into the room, and he already had a couple. And he says to the group, We're all Foochinese; have a drink. Now he's inviting all these people to have a drink with him. And his story changes back and forth a number of times.

But you have the stipulation as to the testimony of Ming Li. And I'm going to quickly read it, that Ming Li -- and I'm going to summarize it.

Ming Li testifies that he was a detective with the New York City Police Department in 2003. And on November 24th, he

went to a call concerning a shooting and stabbing that took place at a restaurant at 31 Division Street. At 9 p.m., I interviewed the shooting victim, Xing Lin, at the hospital. Mr. Lin, who was shot. Mr. Lin had been shot in the right leg while at 31 Division Street earlier that evening. Government Exhibit 34 is a report that I wrote after interviewing Lin that memorializes what he told me. Although both were interviewed by the police, neither the shooting victim nor the stabbing victim were arrested in connection with the incident at 31 Division Street.

And there's a police report. And in the police report, Mr. Lin is interviewed by Ming Li. The report is in evidence. You can read it.

He says, Yeah, I was -- I was in a room. I was opposite this guy at a table. And I had a dispute with him. And then a friend of his -- of the witness pulls out a gun and shot him.

What happens after that Mr. Lin is not responsible for. But what makes sense, what makes sense is the story that Xing Lin told. That this guy, who said, Oh, other people say I follow a dailo, but I don't. He volunteered that. Other people say I follow a dailo, but I don't. That this simple, poor guy walks into a restaurant, and all of a sudden somebody is going to shoot this powerful dailo on his behalf.

Doesn't it make more sense, doesn't it appeal to your

common sense, that what happened was this fellow was friends with somebody who didn't like Ding Pa; Ding Pa got shot; and then that guy got stabbed by somebody? And for that, my client is not responsible.

And you have the fact that he was in the hospital. Guo Gong told you, That might have been a different occasion he was hospitalized, but Detective Li tells you that he interviewed Mr. Lin at the hospital following a shooting.

It's kind of amazing that as this guy is tumbling down the stairs, he doesn't hear any of the gunshots that are going off. And you heard ballistics evidence that showed that several rounds were recovered from that location after this incident.

And you got to remember also, Mr. Lin is not charged with that stabbing here. That's just another thing, another little bit of dirt they bring in to dump.

Let's talk about Cai Xiang Li, Redhead. Another guy with a deportation order. Another guy who refused to testify in this courtroom unless he was granted immunity. He's the other guy that swore that he beat up the family planning people in China, got persecuted.

He's also with the Heaven On Earth Club the night of the shootings. He sees Ding Pa and another guy go into Room No. 3. And he walks over to the window to see what happens, and he sees flashes of light, and he hears shots. And then he

sees Ding Pa and the other guy come out very quickly and run off.

But you know what? If I'm Ding Pa, and I'm standing next to a guy that just shot somebody in the midst of a bunch of gangsters, I'm running out, too. I'm not sticking around to try to reason with anybody or explain anything.

Cousin claims that he followed Ding Pa. He's the guy that got stabbed the same night that Ding Pa was stabbed by Yi Feng's followers. He tells the government when he meets with them that Ding Pa hadn't been stabbed that night. When he testifies in front of you, he says, Oh, Ding Pa was beaten up. This is a guy who, if I remember correctly, and the record stands for itself, while he was cooperating with ICE, was extorting bus drivers.

Cheng Yong, Tall Guy, the subject of another removal order entered in 1996. He got a stay of removal at the request of Immigration and Customs Enforcement because he was providing information to law enforcement. Another snitch who was recruited by Cash with a deportation order. And he also says that he was not promised any immigration benefit, but he's still here.

He was at the Heaven On Earth Club. And his story of what happened is different from the story that you heard from Yi Pei. It's significantly different.

Yi Pei told you that Yi Dau was singing. This guy

tells you that Yi Qun was singing. He says that Ding Pa and the other fellow walk into the room, it's quiet. That Yi Qun tosses the microphone. And then he heard Ding Pa say, "Shoot."

Now, even if you believe that for a minute, okay, Ding Pa was shot, Ding Pa was stabbed, other people in this case have been shot and stabbed, they didn't die. So even if you believe -- and I'm not suggesting for a moment that you do, that Ding Pa said "shoot," that doesn't mean shoot to kill; that doesn't mean murder somebody; that doesn't mean stand over somebody and empty a gun into them. It means shoot.

If you believe it -- and I'm not suggesting that you do -- but we have a stipulation in evidence that on other occasions, he said different things to the government. Once he said "shoot," once he said that's -- he points at him and says "that's the guy," once he points at him and says "finish him." One time he said "do him in." You know, these things matter. They matter. Because we're not talking about witnessing a baseball game, which, for some people can be a traumatic event maybe. We're not talking about what happened at a basketball game or a baseball game. We're talking about a shooting where people died, okay. Don't you think that people who witnessed the same event, as traumatic as this one was, are going to be fairly consistent with themselves and one another when they're describing what they saw?

Now, here's a reasonable, common-sense explanation for

all the discrepancies and all the contradictions in these people's stories, and it's this: Not a single one of them heard Ding Pa say anything to Little Beijing. They heard nothing. They all say Ding Pa is a powerful guy; they all say he's a dailo; they all say he's got a bad reputation; and they're all friends of Yi Qun.

The reason there are so many inconsistencies, both every time the witness himself describes what happened and between what the witnesses claim they saw and heard, is because nobody heard him say anything. Common sense. The government says common sense. I say use your common sense. They testified to what they made up because that sounded good to them. They assume -- Ding Pa is a boss, this other guy's a kid. They assume if he shot him, Ding Pa must have ordered it, so they all have a different story to describe how it happened.

When you're asked to remember something and to describe it several times over a period of years, if it's an event as dramatic and traumatic as this, are you going to have a totally different phrase each time you say it?

The words matter. The words matter.

The inconsistencies arise from this fact, not in describing what they heard. It arrives from the fact that they are telling a story.

Now, these witnesses are an insult to your intelligence. They may have been chosen by my client, but my

client is not asking you to believe them, the government is.

Where is the forensic evidence in this case? They talked about this huge gambling conspiracy? Where are the search warrants? Where are the wiretaps? Where are the sweeps?

You heard Detective Clark testify from Doraville, Georgia, that, in 2004, little while before the shooting, he went to a premises and he arrested Ding Pa and four or five other male Asians, and charged them with gambling. Is that a shock to anybody that five Foochinese guys sitting together were gambling? Was there evidence in the record that showed that that was Ding Pa's gambling parlor and not somebody else's? It's not there.

I may have left some stuff out. I'm sure you remember things that I didn't. You all were chosen to sit on this jury because both sides agree that of all the people that sat in this box, 60, 70 people, that you would be the fairest group; that you would be the group that brought your intelligence, your life experience, your common sense, to these deliberations.

I watched you guys. I watch out of the corner of my eye, sometimes I look over. I know that you paid real close attention and careful attention. And because of your common sense and your intelligence and your life experience, I trust that you're going to do the right thing.

You are not a group of 12; you're a group of 12 individuals. When you go in to deliberate, it will be 12 individuals talking to one another. You may have hung out, you've had lunch together, it seems like a congenial group, and you may have formed friendships with other people, and you think as a group.

Judge Cedarbaum will tell you that your decision, your verdict, is your individual conscience. Your individual conscience. It doesn't have to be a group decision, if that's not what your conscience says. If it is, that's a different story.

The government has to prove to your satisfaction, beyond a reasonable doubt, that every one of these crimes was committed, committed intentionally. And tomorrow the judge will instruct you on the law. Please listen to what she tells you about the burden of proof, presumption of innocence. And, most importantly, listen to what she tells you about reasonable doubt.

Who among you would not hesitate to act in an important matter based on the word of any of these witnesses? If you'd hesitate, you have a reasonable doubt.

The government gets to go again. They have the burden of proof. So they get to open, then I speak, and then they get to stand up again. Mr. Skinner is going to stand up again, and he's going to give you what's called a rebuttal. He's going to

knock down everything I just told you. Tell you why I'm wrong, why I had it all wrong, why you shouldn't accept my arguments. And he gets the last bite at the apple, so to speak, and you guys are the apple.

All I'm going to ask you to do is this: When you go in to deliberate, after you heard the instructions on the law, if you would, if some argument that he makes on his rebuttal appeals to you, just ask each other, What do you think Mr. Cohen would have said about that? Please.

Thank you very much.

THE COURT: Again, you may want to stand up and stretch for a few minutes, because we will have a rebuttal now.

What is your best estimate?

MR. SKINNER: I would say 20 minutes, probably half an hour. I will finish up as promptly as I can, given the late hour.

THE COURT: Good.

MR. SKINNER: I will not respond to everything.

THE COURT: Mr. Skinner will now give the government's rebuttal speech.

MR. SKINNER: Your Honor, I don't know if the defense counsel is here.

THE COURT: We'll give him a few minutes, too.

(Pause)

THE COURT: You may proceed.

MR. SKINNER: Thank you, your Honor.

Ladies and gentlemen, if you had walked into this courtroom and only heard Mr. Cohen's summation, you just came in the last hour, who do you think you would think this trial was about?

Mr. Guang Zhou, the man that Mr. Cohen insists on calling "Yi Pei," even though his name is Guang Zhou?

Huo Guang Chen, the man Mr. Cohen insists on calling Guo Gong? This guy Cash? Any of the government's witnesses?

You might. You really might.

Why is that?

Because that's who he talked about. He didn't spend much time talking about his client, Mr. Xing Lin, did he?

Now, why is that?

Well, he doesn't want you thinking about Xing Lin; he wants you thinking about anything else but Xing Lin. He wants you thinking about what might be up over there, or up over there. He doesn't want you thinking about beatings, and stabbings; he doesn't want you thinking about guns and knives. He doesn't want you thinking about the evidence in this case.

What is the evidence in this case? It's eight days of trial testimony from 15 witnesses. There's ballistics evidence from three separate shootings, there's medical examiner findings, there's photographs, there's phone records, there's bank records. That's the evidence in this case. That is what

this case is about.

What does the defense want you to focus on? Basically, anything but.

What did you hear about during the trial and during closings from the defense? Asylum applications, tiger tattoos, bus companies --

MR. COHEN: Objection.

MR. SKINNER: -- artificial legs.

MR. COHEN: I didn't mention tiger tattoos during my summation.

MR. SKINNER: I said during trial and summation, your Honor.

THE COURT: Well, all right. But let's try to move on.

MR. SKINNER: He wants you focused on anything but the evidence itself, anything he could think of. Because the evidence is overwhelming and the evidence is devastating to his client. It's clear Xing Lin ran a gang for years. That gang rigged gambling parlors; that gang extorted Huo Guang Chen; that gang used violence to protect its turf ruthlessly; that gang beat people; that gang stabbed people; that gang murdered people. And he was at the top of that gang, and he directed all of it.

What is the defense to all this testimony and all this other evidence? Essentially, it's all made up. It's all a

lie. It's all fabricated. The government's case is a lie. The defendant says none of this happened. He says it's all a lie.

It's kind of amazing, ladies and gentlemen. He's not saying there was a mistake; he's not saying, I ran a gang, but I didn't murder anyone; he's not saying, There's one key witness you should disregard, and that the government's whole case falls apart without that witness; he's not saying that we're misinterpreting some innocent acts as something criminal; he's not saying that there's another way to look at the evidence that has come in. No. He's saying all of that evidence is false; it's fabricated; it didn't happen. The government's entire case is a lie. The defense says the government witnesses lied.

Now, okay, he takes a step back from that and he says, I don't mean Detective Clark, but he means everyone who testified about something that they saw or heard the defendant say. Everyone's testimony really matters. It's nine people, ladies and gentlemen. If you tally up the people here who testified about an event, about what they saw or heard the defendant -- or something they saw, something they heard him say, it's nine people. He's not saying that they were mistaken; he's saying that they lied. Seriously, that's what he's saying. The audacity of this defense --

MR. COHEN: Objection.

THE COURT: Objection sustained.

MR. SKINNER: There are many things wrong with this defense, so many things wrong with it, that I'm not entirely sure where to start. But we have to start somewhere. So let's take a hard look at this alternative universe --

MR. COHEN: Objection.

THE COURT: I haven't yet heard what --

MR. SKINNER: Let's look at what would have had to have happened for this defense to be true.

First, you have to swallow the defendant's theory that all of these illegal immigrants are lying because they wanted to stay in the country. Does that make sense? Does that jibe with your common sense, with your understanding of how things work in this country? Would illegal aliens really prefer to meet regularly with the government, give them their cell phones, let them know where to find them, or would they rather just disappear and hope that they were never found? If you have a final order of removal, is your best option to come in and meet with immigration, or is your best option to move someplace else?

Now, putting that aside, putting aside that this is the bias that he wants you to swallow; this is the motive that all of these witnesses apparently have to lie.

If the defendant is correct, all of these witnesses would have had to have come together to lie in one of two ways.

The first way that it would have had to have played out is that they all lied independently. They didn't talk to each other, but they all came up with these falsehoods independently and on their own. He's just decided lying was the best way to go. And each of them somehow lies in the same way without any discussion or coordination amongst them.

When talking about gambling parlors, they all say Ding Pa ran them. Not that he worked there, not that he just provided security; he ran them. They all say 13 Cards was played; they all give the same addresses; they all say that it was behind a barbershop. They all come up with these details on their own somehow. A bunch of them independently bring up this guy Guo Li. What are the odds of that?

The stabbing victim, the stabbing victim, he says that Guo Li invited him into the back for a drink after he went into that restaurant to buy rice. Cai Xiang Li says that the defendant administered a beat-down in Guo Li's barbershop. He also says that on the night of the shooting, Guo Li showed up right before the shooting happened. Cheng Yong, the other eyewitness, he also says that the night of the shooting he ran into Guo Li out in the common room.

If they are all making that up, all making these stories up, how do they all know to include a detail like that? And just think about the witnesses' testimony about what happened at the night of the karaoke club. They all describe

what they did in a consistent manner; they all identify the same people who were at that dinner; they all talk consistently about where they went, when they got into the club; they all talk consistently about what happened leading up to the shooting. Oh, and, of course, two of them consistently told you that this man ordered the shooting.

Mr. Cohen actually said that the eyewitnesses weren't consistent. Really? They were consistent about the single most important thing they had to testify about, that what he said was "shoot him."

Somehow, an independently fabricated story about what happened that night, no one tells a different story. Nobody comes up with some significant detail that is just way out of whack with what the other people are saying.

No one even says that Ding Pa did the shooting himself. I mean if they are lying about who did the shooting, why say he ordered it? No one even puts the gun in his hands. It doesn't add up. It doesn't make sense. There's no way all of these people came up with the same story on their own. It just doesn't make any sense.

So there's the second way this could have played out. It's all a massive conspiracy to frame this man. This would explain the common links between the stories. When you go back and look at what they say happened, and you see that it all lines up, it all comes together in ways that there's no way

they could have independently come up with, well, if there's somebody coordinating all of this, then maybe that's how it happened. And that's what he's saying happened. He's saying it's all one big conspiracy to get him.

First of all, why would they do it? Why are they coming into this courtroom and committing perjury? Why are they committing a crime? Why are they risking going to jail?

It doesn't hold water, ladies and gentlemen.

The timing doesn't add up.

Three of these witnesses gave statements right after the shooting to the New York City Police Department. They didn't have the opportunity to coordinate their stories. They gave their statements to the NYPD right there that night. They all told you they didn't talk to anybody else in between.

Is defense really saying that in the wake of this horrific murder, that these three people came together and decided to frame Xing Lin because they thought --

MR. COHEN: Your Honor, objection. This is improper rebuttal. There was no comment during my summation about whether the people got together or not. It's just not -- this could have been said in the government's direct summation. It's not proper rebuttal.

THE COURT: Let's move on.

MR. SKINNER: Well, I actually think that during the closing statement there was an argument made that this was all

coordinated, and it was all coordinated by one person. I believe the word used by Mr. Cohen was choreographer, director, puppet master, the evil puppet master defense that what is going on here is that this guy Dong Jai, also known as Cash, put it altogether, and he brought all of these witnesses together and told them what to say. That's what he's saying happened. That's what he wants you to swallow.

Why would this guy Cash do this?

There's no evidence that he had a vendetta against Mr. Lin. There's nothing to suggest why he would convince multiple people to lie to law enforcement, to perjure themselves, to lie to you. Cash wasn't even there the night of the shooting. There's no testimony that he was at the bar. How could he have told these two eyewitnesses what to say before they went in to talk to the NYPD? He wasn't there. Cash doesn't even know all of the witnesses who testified.

He doesn't know Oh-Yang, Heng De Oh-Yang, the driver of the livery cab. There's no testimony that they knew each other. Somebody knows who he is. But he had nothing to do with bringing Oh-Yang in to testify. He doesn't know Song Di Xiang, the stabbing victim. How could he have told those people what to say?

And just as an aside, the suggestion that we're somehow putting one over on all of you by not bringing Cash in to testify, it needs to be addressed, at least briefly.

He doesn't have a burden to do anything. He does not need to bring anybody in to testify; he does not need to submit any stipulations. It's our burden of proof. And we don't shy from it. It's our burden; he doesn't need to do anything.

That said, he knows where Cash is.

MR. COHEN: Objection.

MR. SKINNER: The defense attorney said --

MR. COHEN: Objection.

MR. SKINNER: The defense in this case repeatedly suggested that everyone in Chinatown knows where Cash is.

THE COURT: Just a moment.

I think you should move to something else, about whether who knows where Cash is.

MR. SKINNER: All right.

If it wasn't Cash coordinating these lies, then was it someone else? And Mr. Cohen is a nice guy; he doesn't want to openly accuse the people in the front table of fabricating this case. He went out of his way to say he didn't think that we made any promises to any of these witnesses. But isn't he really saying that the front table was a part of this?

MR. COHEN: Objection.

MR. SKINNER: That we're relying --

MR. COHEN: Objection.

MR. SKINNER: That we're relying --

THE COURT: I've heard your objection.

MR. SKINNER: We're relying on witnesses, lying witnesses, witnesses whose lies are apparently so obvious to prove that his guy committed murder?

What did he say in the opening statements to you, ladies and gentlemen? This is a quote:

"The witnesses have a great deal to gain from giving the government what it wants. And the government wants Mr. Lin."

Why? What do we have against Mr. Lin? Why is he so important to us? What do the agents and prosecutors in this case have to motivate them to suborn perjury?

MR. COHEN: Objection.

MR. SKINNER: To risk their careers.

THE COURT: During closing arguments, we should not do much objecting.

MR. COHEN: I agree, your Honor.

THE COURT: Good. Then let's move on.

MR. SKINNER: Ladies and gentlemen, if there was a conspiracy to get the defendant, why weren't the witnesses' stories better? As I mentioned a moment ago, why didn't the two people -- the two most important witnesses -- testify to you that they were in the room, and they saw who shot Yi Qun and the hostess, and that it was Ding Pa? Wouldn't that have made it easier to prove up the case? We wouldn't have had to worry about what was said or how loud it was. We wouldn't have

had to worry about anything. The gun would have been in his hand.

But that's not what they told you. That's not what they told you because that's not what happened. They testified as to what they remember. They testified truthfully. They testified that he ordered the shooting, and that someone else committed it.

THE COURT: You have to be careful about endorsing.

MR. SKINNER: With regard to Cai Xiang Li, the man who was outside the room, why not -- if he's making it all up, why not have him say that he heard the order to shoot, as well? Why is it just that he saw the defendant walking down that aisle -- walking down that hallway quickly and with purpose? Why wouldn't he say that he stopped and told him what he was going to do? Why doesn't he say that he was able to hear it through the door? If he's lying, why not lie a little better? Why not make it a little easier?

If it's all a lie, how does the defendant explain the evidence that couldn't have been fabricated? How does he explain his car at the scene? How does he explain his documents --

MR. COHEN: Burden shifting, your Honor. Objection.

THE COURT: I think that you should move to something else.

MR. SKINNER: Ladies and gentlemen, the idea that this

was a conspiracy to frame Mr. Lin is ridiculous. The amount of testimony in this case is staggering; it's consistent; and it shows you what happened, that Mr. Lin ran for years, he ran gambling parlors, he extorted Mr. Chen, and he murdered Yi Qun and Mei Ying Li.

I just want to try and respond to a few of the things that came up in the closing arguments.

At one point, Mr. Cohen said that all of the government's nine witnesses, who are apparently lying to you guys, were serial liars, and said is there a single witness who didn't lie on an asylum application.

Just to be clear as to what the testimony was, three of the government's witnesses admitted lying previously on their asylum applications. Everyone else was either a citizen or denied having lied on their asylum applications.

And also the idea that if you lie on your asylum application, you must be lying now. Is that really consistent with your understanding of human nature? If you fudge your taxes or you tell a lie at one point, does that mean you're always a liar? Does that mean that everything you say from here on in can't be believed, can't be trusted? That is essentially what they are saying: They lied on their asylum applications, so therefore they must be lying here. That doesn't add up, ladies and gentlemen. They are apples and oranges. One is an asylum application; one is a murder trial.

Mr. Cohen points out that there were some differences between what the witnesses said in their meetings with the government and what they said when they testified. It happened a couple of times. He pointed it out. It's normal. People are testifying about events that happened nine years ago. People have come in and met with the government in 2010, in 2011, in 2012, and in 2013. Do you really think that if you were called in --

THE COURT: Objection sustained.

MR. SKINNER: Do you really think that human beings who are present for a traumatic event, when asked years after an event occurred, over the course of separate years, to sit down each and every time describe what happened, that they are going to use the exact same words? No. It's not how people explain things. We use different words. We also don't know from these notes that were put in that indicate what was said -- what the question was. A lot was made of Cheng Yong's statements and how he said different things over the course of the trial.

Could we put up that slide?

While we're waiting for it, let me note that of course, as you saw with these people testifying, they are all testifying through interpreters. The interpreters might interpret what's being said differently. They didn't review the notes; they didn't sign onto them; they didn't verify that

they said what was said.

So we tried to put down on the screen what the notes indicate. Of course, this isn't what he said; this is what the notes indicate he said over the course of different times that he met with the government.

The first time, on July 30th, 2004: Get rid of him. Shoot.

July 2nd, 2009: That is the guy. Take him out.

June 4, 2010: Finish him.

December 5, 2011: Do him in.

July 17th: Get rid of him.

July 22nd, 2012: Go for it. Do it. Get rid of him.

Now, according to Mr. Cohen, because things are all different, he must be lying. Ladies and gentlemen, we don't even know what he was asked. If you ask somebody what happened? What happened? He ordered the killing. He said to do it. You describe; you editorialize what happened. If you ask specifically, Well, let's break it down for a second what was said, how did he do it, where was he. Those are different questions. Different answers might come out. And at the end of the day, I mean are these things really different? He testified that in Foochinese "get rid of him" and "shoot" are the same thing.

MR. COHEN: Objection. I think he testified that that's what he meant.

MR. SKINNER: The record will speak for itself.

THE COURT: I think you should not get into the words of the language that nobody in this courtroom can really testify about except the interpreters.

So I think you should move to something else.

MR. SKINNER: The witness testified, I think inconsistent with what Mr. Cohen was saying, that "get rid of him" and "shoot" means the same thing here. So when asked the question, it means the same thing; same answer.

The bottom line is when you look at what this says, is it really that different, ladies and gentlemen? How many different ways can he say the same thing? He murdered the guy. He ordered the shooting. In none of these meetings did he say, I'm not sure. Don't know if I heard him. Actually, Ding Pa wasn't there. Oh, I was on the other side and things were really loud.

No. In each and every meeting with the government, he consistently says that the shooting was ordered by that man. He might have used different words to describe what happened; but the substance of what happened is identically the same each and every time he talks about it.

Take that down, Ms. Chace. Thank you.

Mr. Cohen has also talked about the number of witnesses. Number of witnesses don't matter. I think in his opening he said ten times zero equals zero. Is that consistent

with what you understand to be true? If nine people come in and testify, isn't it more likely that what they are testifying about is true, for all of the reasons that I just went through, that they would have had to lie about their -- they would have had to coordinate and all that stuff. Is it really true that ten times zero is zero?

You'll be happy I'm skipping through a lot of the other things I was going to cover, given the late hour that we have here.

One thing I want to make sure that we correct before I sit down. In the closing statement we made a mistake. We said that Yi Qun was the person who was beaten up in that barbershop on East Broadway. That's not right. The guy's name was Yi Qui, not Yi Qun, the murder victim. A different guy, Yi Qui. It's understandable that even we got a little confused; the names are similar.

And also, Huo Guang Chen testified that the defendant Xing Lin told him that he tried to beat up Yi Qun in that barbershop, but Yi Qun was too fast. You may remember that.

But the testimony from Cai Xiang, who was talking about when he was in the barbershop that night, and he came in and beat the guy up, different guy, Yi Qiu, not Yi Qun.

With regard to the extortion here, the defendant -- defense counsel wants you to believe that this was a business deal; that when everything came together, there wasn't an

element of fear here; that it was all just something between arm's-length negotiations.

Now, look, the defendant certainly was invited into this, and he was certainly invited into this with the hope that he would be able to help them convince the competition to go away in whatever way he was going to do. But the idea that it didn't eventually become an extortion in that Huo Guang Chen would eventually become victimized by the defendant is just wrong. Because when he came back to him a year later and demanded more shares or more money, that's when it became an extortion. And the testimony on this was unequivocal. He met him in --

MR. COHEN: Testimony was what?

MR. SKINNER: Unequivocal.

He met him in Corona Park. Ding Pa had his followers with him. Ding Pa said that he was losing face, and that he needed more money. And that he told them, told Chen, the followers were carrying a gun. One of them gestured to his shirt by his hip.

And Mr. Chen testified, this is on Page 426 of the record: "I was scared. If I was not scared, then I didn't need to call my partner to have a discussion with him."

So at that point, this becomes an extortion. And that's in 2003. And it's an extortion straight on through to the end of the payments in December of 2009. And that's in

part because of that phone call that followed the shooting.

Now, Mr. Cohen wants you to believe that he called, and during this phone, call mentioned that he still had followers in New York, if he ever needed anything. This was kind of like, Oh, do you a favor. Of course. So Cohen said that wasn't a threat.

Well, ladies and gentlemen, he had just told him in the phone call about how he had ordered the shooting of his friend Yi Qun. So he says, Oh, yeah I ordered the shooting. You got to keep paying me the money. I still have followers in New York.

Is that really, really -- that is really -- the take on this from defense is that this is, Hey, I'll do you a solid if you ever need a favor? No, of course it isn't.

The witness testified on Page 343 of the record that he was afraid that Ding Pa had not been arrested, and he still had a lot of followers nearby. So he was afraid to go to the police and tell the police that he had gotten this phone call. He was afraid of him. That was the purpose of telling Mr. Chen that the followers were there. It was so that, going forward, he would continue to have this income stream after he moved up to Canada.

Let me leave you with three thoughts on the murder that happened in that karaoke room. Three final thoughts. You've heard a lot about it, and it's going to be your

responsibility soon to go in and weigh all of the evidence on it and decide what happened.

The three things I would like you to bring back with you, in addition to what you've heard from Ms. Burns and Mr. Cohen:

First, keep in mind that dailo/follower relationship. The dailo is on the top; he tells the followers what to do.

MR. COHEN: Judge, this is improper rebuttal.

MR. SKINNER: Mr. Cohen --

MR. COHEN: I'm sorry, it's just improper rebuttal.

MR. SKINNER: Your Honor, I'll get there in one second; explain exactly how I responded.

THE COURT: I understand. I understand. We really shouldn't be having a discussion. Why don't you just proceed.

MR. SKINNER: Thank you, your Honor.

Mr. Cohen said in his closing arguments that a lot of people you heard about have been shot and stabbed, and a lot of people didn't die. So just because he said "shoot him" doesn't mean that he meant shoot him.

Now, let's put aside all of the other evidence about his stomping down the hallway and telling Mr. Zhou to sit down. Just focus on that dailo/follower relationship. And you heard from both a member of his gang, as well as another person who served as both a follower and a dailo about what the

relationship was between dailos and followers. And it's simple. The orders go down, and the people on the bottom follow the instructions they are given. They don't freelance. They don't, in front of their dailo, commit other crimes that he doesn't know about. They don't do things without his --

THE COURT: Now you're talking about matters that are not in evidence. I think you should move on.

MR. SKINNER: The idea that this follower of Ding Pa shot this person in the chest for reasons other than the fact that Ding Pa ordered it is completely contrary to that dailo/follower relationship.

Second thing I want you to keep in mind is the timing of the statements that were given by the three eyewitnesses who were at the club who testified here. They all testified that they gave statements to the New York City Police that night. There's a stipulation between -- well, that night and the following morning. There is a stipulation between the government and defense that they gave statements the following morning. And the substance of what was in those notes is in the statements and is in the testimony that they gave. And what they said to the NYPD that night is exactly the same as what they've testified to at this trial. So keep that in mind.

Last thing I'd like you to keep in mind is the fact that this man fled. He fled the scene.

Now, Mr. Cohen says that a shooting just happened.

It's traumatic. There's a roomful of gangsters. No evidence that these people were gangsters, but put that aside. Understandable. It's a traumatic experience. Some of the government's witnesses took off, too. They all came back. They all came back to give statements to the police. This man didn't. This man fled.

And even later, even later after the blood was down, the passion of the moment was over, he didn't go back. He didn't go back to explain to anyone why he was allegedly missing.

And if you're wondering how did he get away, is it because he had documents in his car, and how do you flee, you left your driver's license and your credit cards in the car. Ladies and gentlemen, just compare Government Exhibit 7 with Government Exhibit 50. 50 is the driving permit, a photocopy of that driving permit that was presented two weeks prior to the shooting in Doraville, Georgia. Government 7 is the driver's license that was in the car.

And if we can put them up on the screen side-by-side, right there on the left, if you take the time to look at these two documents -- and I won't go through it in detail -- but aside from the fact that one's a photocopy and one is the actual document, a color copy, they are different. One is a limited permit, one is a driver's license. In one he's smiling, in one he's not. Wearing different clothes. He had

two different forms of identification. He wanted to go back to get that car because he wanted to get rid of all the IDs that he had managed to leave in that car. And that's why he asked Oh-Yang to go back and get it the next day, evidence that's corroborated by independent phone records.

MR. COHEN: Judge, again, I never mentioned Oh-Yang during my summation. I don't see how this is proper rebuttal. I'm sorry.

THE COURT: All right.

I think that that was not. We're going to strike that.

MR. SKINNER: Ladies and gentlemen --

THE COURT: Not for that reason, but because of the absence of evidence as to what happened.

MR. COHEN: Thank you.

MR. SKINNER: The third thing I want you to take away from all of this is that he fled. And unlike the government witnesses, unlike the victims, unlike the people who have been disparaged repeatedly in this trial and during the jury addresses, he didn't come back.

And you know what guilty people do, ladies and gentlemen? They run.

Thank you.

THE COURT: Very well.

Members of the jury, before you begin your

deliberations, there's only one more part of this trial, and that is my instructions on the law, which I will give you tomorrow morning.

Once again, if you come at 9:30, you can have coffee and muffins, and we will convene at 10 o'clock sharp. And I will give you instructions on the law, and you will then proceed to your deliberations.

Have a pleasant evening.

And it's still true, until you hear my instructions on the law and retire to the jury room, you should not discuss anything you have seen or heard with anybody, not your family, not your friends, and not even each other, until the time comes for you to sit together, and then you will talk to each other about your views on what you have seen and heard.

Have a pleasant evening.

(Jury excused)

THE COURT: Everybody is excused. We are now adjourned until tomorrow morning at 10 o'clock.

MR. COHEN: Your Honor, I have another mistrial application.

THE COURT: Very well.

MR. COHEN: But I need to see a transcript of Mr. Skinner's rebuttal summation before I actually articulate it. So I just want to reserve a couple minutes in the morning to do that.

THE COURT: Very well.

MR. COHEN: Thank you.

THE COURT: But I think I have made very clear to the jury that the lawyers are not witnesses, and what they say is not evidence. And I think the fewest objections or interruptions of summations are a good thing.

Very well.

MS. BURNS: Good night, your Honor.

THE COURT: Good night.

MR. SKINNER: Thank you, your Honor.

MR. COHEN: Good night, Judge.

(Adjourned to April 24, 2013 at 10 o'clock a.m.)

**In The Matter Of:**

*UNITED STATES OF AMERICA, v*
*XING LIN,*

*April 24, 2013*

*SOUTHERN DISTRICT REPORTERS*
*500 PEARL STREET*
*NEW YORK, NY 10007*
*212 805-0330*

Original File D4OVLINf.txt
Min-U-Script® with Word Index

**A. 688**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

          v.                    11 CR 114 (MGC)

XING LIN,

          Defendant.           JURY TRIAL

------------------------------x

                               New York, N.Y.
                               April 24, 2013
                               10:34 a.m.

Before:

          HON. MIRIAM GOLDMAN CEDARBAUM,

                               District Judge

                    APPEARANCES

PREET BHARARA,
     United States Attorney for the
     Southern District of New York
PETER M. SKINNER
JENNIFER E. BURNS
     Assistant United States Attorneys

JOEL S. COHEN
     Attorney for Defendant

ALSO PRESENT:  BRENDA CHEN, Fuchow Interpreter
               DANIEL YANG, Fuchow Interpreter
               LILY LAU, Fuchow Interpreter
               DANIEL CHAN, Fuchow Interpreter
               JESSICA CHACE, Paralegal
               TIMOTHY VARIAN, Special Agent, HSI
               JIAYING WANG, Legal Assistant

(Trial resumed)

(In open court; jury not present)

THE COURT: Good morning.

Please be seated. Let's get the jury.

MR. COHEN: Your Honor, I have a motion.

THE COURT: Yes.

MR. COHEN: I indicated yesterday at the close of the day that I would move for a mistrial this morning after I had an opportunity to review in writing the government's rebuttal summation.

I now make that motion for the reasons I'm about to state, and because of my belief that the government's summation amounted to, in essence, an ad hominem attack on defense counsel, and, for that and other reasons, deprived Mr. Lin of his right to a fair trial. And I just want to review very briefly the items that Mr. Skinner mentioned during his rebuttal that I think cumulatively add up to this deprivation.

Initially, he indicated that -- on Page 999, he stated: "He's not saying that they were mistaken, he's saying that they lied. Seriously, that's what he's saying. The audacity of this defense."

I objected; your Honor sustained that objection.

In two further sentences later, he says: "Let's take a hard look at this alternative universe," suggesting that my summation came out of the twilight zone.

I objected to that; there was no ruling.

A couple pages later, on Page 1003, at Line 15, he stated: "Is defense really saying that in the wake of this horrific murder, these three people came together and decided to frame Xing Lin because they thought -- "

And I objected because I had not suggested during my summation that they had come together to create a frame, and I thought it was improper.

You just said to move on.

Most egregious, I think, was that during the charge conference, your Honor specifically made a finding that Dong Jai, Cash, was not a witness that was available to both sides, and that your Honor would not charge as such.

THE COURT: Equally available witnesses.

MR. COHEN: Right.

And despite your Honor's very clear instruction that was the case, Mr. Skinner said at Page 1005: "It's our burden; he doesn't need to do anything. That said, he knows where Cash is.

"Objection.

"The defense attorney said --

"Objection.

"The defense in this case has repeatedly suggested that everybody in Chinatown knows where Cash is."

And your Honor said: "Just a moment. Move on to

something else."

THE COURT: Well, I denied the application to include in the charge equally available.

MR. COHEN: But, your Honor, I don't think that it's -- first of all, that's burden-shifting for him to suggest that I had to call any witness, much less a witness that your Honor indicated was not a witness available equally to both sides.

And because of the burden-shifting aspect of it and because your Honor made a finding that he wasn't equally available to both sides, I don't see how the government gets to stand up and says that he is equally available to both sides. It's not fair.

Moreover, after I specifically said, specifically said that the prosecutors, the agents in this case, had not gotten together to frame anybody, had not done anything underhanded, had not done anything improper, and that they had been sold a bill of goods by their witnesses, Mr. Skinner said: "Mr. Cohen is a nice guy; he doesn't want to openly accuse the people at the front table of fabricating the case. He went out of his way to say he didn't think that we made any promises to any of these witnesses. But isn't he really saying that the front table was a part of this?

"Objection.

"That we're relying --

"Objection.

"That we're relying --

"I've heard your objection."

A few lines later: "What did the agents and prosecutors in this case have to motivate them to suborn perjury, to risk their careers?

"Objection."

Your Honor indicated that we shouldn't do much objecting during closings, and I agreed with you. But I felt that what was being said was so egregious, that it needed to be addressed promptly.

He then vouched for those witnesses --

THE COURT: Well, you have certainly preserved your objections.

MR. COHEN: I understand.

He then vouched for his witnesses by stating that they had testified truthfully.

Moreover, on Page 1007 at Line 18, Mr. Skinner said: "If it's all a lie, how does the defendant explain the evidence that couldn't have been fabricated? How does he explain his car at the scene? How does he explain his documents?

"Burden shifting, your Honor. Objection.

"I think you should move on to something else."

On Page 1009 --

THE COURT: Well, I intend to tell the jury very

clearly who has the burden of proof. I think that that will cure a lot of your objections.

MR. COHEN: Well, Judge --

THE COURT: But, in any event, I hear what you are telling me, and I reserve decision.

MR. COHEN: There's just one or two things I want to add, if I may.

THE COURT: Very well.

MR. COHEN: At Page 1015: "First, keep in mind that dailo/follower relationship. The dailo is on top; he tells the followers what to do."

Me: "Judge, this is improper rebuttal. I'm sorry, it's just improper rebuttal."

On Page 1018, he makes reference to Oh-Yang and why he asked -- why Mr. Lin asked Oh-Yang to go back and get the car. "Evidence that's corroborated by independent phone records."

I again say: "Judge, again, I never mentioned Oh-Yang during my summation; I don't see how this is proper rebuttal, I'm sorry."

Your Honor says: "I think that that was not. We're going to strike that. Not for that reason, because of the absence of evidence as to what happened."

I think, Judge, that all of those things viewed together did deprive Mr. Lin of his Sixth Amendment right to a

fair trial. I think if your Honor is reserving decision on the mistrial motion and intends to take care of this by instructing the jury that what the lawyers say is not evidence, that your Honor should make some specific references to what Mr. --

THE COURT: I understand that's your view.

MR. COHEN: I'm sorry, your Honor?

THE COURT: Off the record.

(Off record)

MR. COHEN: And finally, Judge, if the Court declines to make specific instructions to the jury on these things, and declines to at this time grant a mistrial motion, then I would ask for five minutes surrebuttal.

THE COURT: I'm sorry, that I deny.

MR. COHEN: Fine.

THE COURT: That I deny.

Let's get the jury.

(Jury present)

THE COURT: Good morning, members of the jury.

We are now at the stage of the trial at which you undertake your final function as jurors. And here you perform one of the most sacred obligations of citizenship, which is to decide the questions of fact in this case.

You are to discharge this final duty in an attitude of complete fairness and impartiality. And, as I emphasized when you were selected as jurors, you must have no bias or prejudice

for or against the government or the defendant.

This case is important. It is important to the defendant, who is charged with serious crimes. It is equally important to the government for the enforcement of the criminal law is a matter of prime concern to the community.

Let me add, the fact that the government is a party entitles it to no greater consideration than that accorded to any other party to a litigation. By the same token, it is entitled to no less consideration.

I told you at the very start of the trial that your principal function during the taking of testimony and admission of evidence would be to listen carefully to the evidence and observe each witness who testifies. It has been obvious to me that you have faithfully discharged this duty. Your interest never flagged, and you followed the evidence with close attention. I ask you to give me the same careful attention as I instruct you on the law.

You are the sole and exclusive judges of the facts. You determine the weight of the evidence. You appraise the credibility of the witnesses. You draw the reasonable inferences from the evidence. And you resolve such conflicts as there may be in the evidence.

You have now heard all of the evidence in the case, as well as the final arguments of the lawyers. As I've already told you, anything that counsel either for the government or

A. 690

D4OVLIN1          Charge          Page 1029

defense may have said with respect to matters in evidence, whether during the trial, in a question, in argument, or in closing arguments, is not to be substituted for your own recollection of the evidence. So too anything that I may have said during the trial or may refer to during the course of these instructions as to any matter in evidence is not to be taken in place of your own independent recollection. You, and you alone, are the judges of the facts. And my duty is to instruct you on the law. It is your duty to accept these instructions of law, and apply them to the facts as you determine them. The result will be the verdict.

You must accept the law as I give it to you. If any attorney has stated a legal principle different from any that I state in my instructions, it is my instructions that you must follow. Needless to say, a personal view of any of the lawyers in this case is entirely irrelevant and would be and should be totally disregarded. But you should not single out any one instruction as alone stating the law. You should consider my instructions as a whole when you retire to deliberate in the jury room. It is not your function to consider the wisdom of any rule that I state, regardless of any opinion that you may have as to what the law is or what the law ought to be. It would violate your sworn duty to have based a verdict upon any other view of the law than that which I give you.

At the beginning of the trial, I referred to certain

D4OVLIN1          Charge          Page 1030

principles of law which apply in every criminal case. I repeat those principles now. I remind you that the indictment, any indictment, is not evidence. An indictment is no more than a formal method of accusing a person of having committed a crime. You must give no weight whatsoever to the fact that an indictment has been returned against the defendant.

The defendant has pleaded not guilty. In doing so, he denies each and every allegation against him. That means that the government has the burden of proving the charges against the defendant beyond a reasonable doubt. This burden never shifts; it remains on the government throughout the entire trial.

Under our system of law, the defendant is presumed to be innocent of the charges against him. This presumption of innocence was in the defendant's favor at the start of the trial, continued in the defendant's favor throughout the entire trial, is in the defendant's favor even as I instruct you now, and remains in the defendant's favor during the course of your deliberations in the jury room. It is removed only if and when you are satisfied that the government has sustained its burden of proving the guilt of the defendant beyond a reasonable doubt.

What is a reasonable doubt? The words almost define themselves. It is a doubt based on reason and common sense and arising from the evidence, or lack of evidence. It is a doubt

D4OVLIN1          Charge          Page 1031

that a reasonable person would have after carefully weighing all of the evidence. It is a doubt that would cause a reasonable person to hesitate to act in a manner of importance in his or her personal life. Proof beyond a reasonable doubt must, therefore, be proof of such a convincing character, that a reasonable person would not hesitate to rely and act upon it in the most important of his or her own affairs.

A reasonable doubt is not a caprice or a whim, it is not a speculation or suspicion. It is not an excuse to avoid the performance of an unpleasant duty. And it is not sympathy. In a criminal case, the burden is at all times upon the government to prove guilt beyond a reasonable doubt. The test is reasonable doubt. Proof beyond a reasonable doubt is sufficient to convict.

If, after fair and impartial consideration of all the evidence, you have a reasonable doubt about the guilt of the defendant based on the evidence or lack of evidence presented during the trial, you must acquit.

On the other hand, if, after fair and impartial consideration of all the evidence, you are satisfied of the guilt of the defendant beyond a reasonable doubt, you should vote to convict the defendant.

I should note, each of the five counts in the indictment charges a separate crime, and you must consider each count separately.

D4OVLIN1          Charge          Page 1032

Count One charges the defendant with conspiring to violate the federal racketeering statute, commonly known as RICO. This means that the defendant has been charged with conspiracy to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity.

Count Two charges that the defendant participated in the conduct of an enterprise through a pattern of racketeering activity, specifically, murder, conspiracy to commit murder, extortion, extortion conspiracy, and operating illegal gambling businesses.

Count Three charges the defendant with murder, and aiding and abetting the murder of Chan Qin Zhou and Mei Ying Li by using a firearm during and in relation to extortion and conspiracy to commit extortion.

Count Four charges the defendant with extortion of the owners of a bus company.

Count Five charges the defendant with conspiring to extort the owners of a bus company.

I should note that the indictment alleges that the defendant had a nickname, Ding Pa. Use of a nickname is not evidence of criminal activity.

Even though extortion and conspiracy to commit extortion are charged in the last two counts of the indictment, Counts Four and Five, I am going to begin by explaining those charges first. This is because the law of extortion is also

A. 691

relevant to the crimes charged in Counts One, Two, and Three.

Extortion is a violation of the Hobbs Act, which is Section 1951 of the criminal code. That statute provides as relevant here whoever in any way or degree obstructs, delays, or affects commerce for the movement of any article or commodity in commerce by extortion or attempts to do so is guilty of a crime. Extortion is defined as obtaining another person's property or money with his consent when the consent is induced through the wrongful use or threatened use of force, violence, or fear.

Count Four reads as follows:

"From in or about March 2002, up to and including in or about December 2009, in the Southern District of New York and elsewhere, Xing Lin, also known as Ding Pa, the defendant, and others, known and unknown, willfully and knowingly did commit and attempt to commit extortion as that term is defined in Title 18, which is the United States Criminal Code, Section 1951(b)(2), by obtaining money and property from and with the consent of another person, to wit, individuals who owned a bus company, which consent would have been and was induced by the wrongful use of actual and threatened force, violence, and fear, and thereby did obstruct, delay, and affect commerce, and the movement of articles and commodities in commerce as that term is defined in Title 18, which is the criminal code of the United States, Section 1951(b)(3); to wit, it is charged that

Lin extorted and attempted to extort individuals who owned a bus company for money, that is, extort for money of individuals who owned a bus company."

I should note the following about extortion:

Extortion is a violation of the Hobbs Act, which, as I've told you, is Section 1951 of the United States Criminal Code. That statute provides as relevant here, and I quote:

"Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce by extortion or attempts so to do is guilty of a crime."

Extortion is defined as obtaining another person's property or money with his consent when the consent is induced through the wrongful use or threatened use of force, violence, or fear.

Count Four reads as follows:

"From in or about March 2002, up to and including in or about December 2009, in the Southern District of New York and elsewhere, Xing Lin, also known as Ding Pa, the defendant, and others, known and unknown, willfully and knowingly did commit and attempt to commit extortion by obtaining money and property with the consent of another person, to wit, individuals who owned a bus company, which consent would have been and was induced by the wrongful use of actual and threatened force, violence, and fear, and thereby did obstruct,

delay, and affect commerce and the movement of articles and commodities in commerce as that term is defined in Section 1951(b)(3) of the United States Criminal Code; to wit, Lin extorted and attempted to extort individuals who owned a bus company." That is, Lin extorted and attempted to extort money from individuals who owned a bus company.

In order to find that the defendant committed extortion, you must find that the government has proved beyond a reasonable doubt all of the following four elements:

First, that the defendant obtained money or property from another person with that person's consent; second, that the defendant induced that person's consent by the wrongful use or threat of force, violence, or fear; third, that interstate commerce was delayed, obstructed, or affected; and, fourth, that the defendant acted knowingly and willfully.

The first element the government must prove and that you must find for the charge that the defendant committed extortion is proof beyond a reasonable doubt that the defendant knowingly obtained money or property from another person with that person's consent. The term "property" includes money, as well as tangible and intangible things of value.

Now, if and only if you find that the defendant obtained money or property from another person, with that person's consent, you must then determine whether the defendant obtained the money or property through the wrongful use of

actual or threatened force, violence, or fear of physical injury or economic harm. You must determine whether the defendant obtained the money or property by using any of those unlawful means. It is not necessary that the government prove that force, violence, and fear were all threatened or used. The government satisfies its burden if it proves beyond a reasonable doubt that any of these methods were threatened or used.

You should give the words "actual or threatened force, violence, or fear" their common and ordinary meaning. A threat may be either implicit or explicit. The force or violence might be aimed at a third person or at causing economic rather than physical harm.

In determining whether the defendant used fear to obtain money or property, you must determine whether a victim experienced anxiety, concern, or worry over expected personal harm or economic loss. These are matters which require you to consider the victim's state of mind at the time of the defendant's actions. It is, as with other matters, involving state of mind. You cannot look inside a person's mind. But a careful consideration of the circumstances should enable you to decide whether fear was the victim's state of mind. Fear need not be a consequence of an implicit or explicit threat. The wrongful use of fear requires that the defendant create or instill fear, or use or exploit existing fear with the specific

A. 692

purpose of inducing another to part with property.

The government must prove beyond a reasonable doubt that the defendant was aware of a victim's fear, and did or said something to wrongfully exploit that fear. If you decide that the defendant obtained money or property by the wrongful use of actual or threatened force, violence, or fear, you must then decide whether in doing so the defendant affected interstate commerce.

Interstate commerce means commerce between two or more states, such as the movement of goods, services, or money from one state to another. It's not necessary to find that the effect on interstate commerce was substantial, nor is it necessary to find that the effect on interstate commerce was adverse. A minimal effect is sufficient, so long as the activities of the defendant affected interstate commerce in some way. If you decide that there was any effect on interstate commerce, that is enough to satisfy this element. It is not necessary to find that the defendant knew that his acts would affect interstate commerce or that he intended to affect such commerce.

Finally, in order to find the defendant guilty of Count Four of the indictment, you must find that the defendant acted knowingly and willfully with respect to the first and second elements. "Knowingly" means to act voluntarily and deliberately, rather than mistakenly or inadvertently or

accidentally. A person acts willfully who acts with the intent to do something that the law forbids, that is, with a bad purpose, to violate or deliberately disregard the law. To act willfully, a defendant need not know that he is breaking any particular law; he needs only to be aware of the generally unlawful nature of his conduct.

Knowledge and intent exist in the mind. And again, since it is not possible to look inside a person's mind, the only way to arrive at a decision on knowledge and intent is for you to take into consideration all of the facts and circumstances shown by the evidence.

Count Five of the indictment charges conspiracy to commit extortion. Conspiring to commit extortion is also a violation of the Hobbs Act, Section 1951 of the criminal code of the United States. That statute provides as relevant whoever in any way or degree obstructs, delays, or affects commerce, or the movement of any article or commodity in commerce, by conspiring to do extortion is guilty of a crime.

Before I instruct you on the elements of a conspiracy to violate the extortion statute, let me say a few words about the difference between the conspiracy charged in Count Five, and the extortion charged in Count Four on which I have just instructed you.

The crime of conspiracy is separate and distinct from the actual violation of the law, which the law refers to as a

substantive crime, the actual violation. Count Four charges a substantive violation of the extortion statute; that is, it charges that the defendant actually committed extortion. Count Five charges the defendant with a different crime; that is, it charges him with conspiring or agreeing to commit extortion.

A conspiracy is a kind of criminal partnership, an agreement, of two or more persons who join together to commit one or more crimes. You may find the defendant guilty of the crime of conspiracy even if the conspiracy was not actually -- the object of the conspiracy was not actually committed, that is, if the conspiracy was not successful.

Congress has deemed it appropriate to make conspiracy standing alone a separate crime, even if the conspiracy is not successful. In order to find that the defendant was a member of the conspiracy charged in Count Five, you must find that the government has proved beyond a reasonable doubt both of the following two elements:

First, that at some time during the period alleged in the indictment, the defendant entered into an agreement with at least one other person to violate the federal extortion statute; and, second, that the defendant unlawfully, knowingly, and willfully participated in that agreement.

The first element that the government must prove beyond a reasonable doubt is that at some time during the period of March 2002 to December 2009, the defendant and at

least one other person entered into the unlawful agreement charged in Count Five of the indictment. In order for the government to satisfy this element, you need not find that the agreement or its object was written down or expressed in specific words.

The government is not required to show that two or more people sat around a table and entered into a solemn pact orally or in writing, stating that they had formed a conspiracy to violate the law and spelling out all of the details. But the government must show that the conspirators came to a mutual understanding to commit extortion by means of a joint plan.

In a very real sense, in the context of conspiracy cases, actions often speak louder than words. If, upon consideration of all the evidence, you find beyond a reasonable doubt that the defendant agreed to work with at least one other person in furtherance of the object charged in the indictment in Count Five, then proof of the existence of a conspiracy is established.

According to the indictment, the object of the conspiracy charged in Count Five was to commit extortion. I have just explained to you the elements of extortion. If you find that the defendant and at least one other person agreed to accomplish that object, the unlawful purpose element will be satisfied.

The second element that the government must prove

A. 693

beyond a reasonable doubt in order to prove Count Five of the indictment is that the defendant unlawfully, knowingly, and willfully, participated in a conspiracy with at least one other person.

I've already explained what it means to act knowingly and willfully, and that knowledge and intent exists in the mind. Again, it is not possible to look inside a person's mind. So the only way to arrive at a decision on knowledge and intent is for you to take all of the facts and circumstances shown by the evidence into consideration. But I want to caution you that mere knowledge or acquiescence without participation in the unlawful agreement is not sufficient. A defendant's mere presence at the scene of the alleged crime does not make him a member of the conspiracy charged.

I turn back then to Count Two of the indictment, rather than Count One, because I think it will be easier to understand both Count Two and Count One if we start with Count Two.

In Count Two of the indictment, the defendant is charged with violating the Racketeer-Influenced and Corrupt Organization Act, which is commonly known as RICO, R-I-C-O, a statute which is found at Section 1962(c) of the United States Criminal Code. That statute provides, in pertinent part, and I quote:

"It shall be unlawful for any person employed by or

associated with any enterprise engaged in or the activities which affect interstate or foreign commerce to conduct or participate directly or indirectly in the conduct of such enterprise's affairs through a pattern of racketeering activity."

Count Two of the indictment -- well, initially, let me say that the phrase "racketeering activity" is specifically defined by Congress in the RICO statute to mean certain criminal acts, and is not to be thought of as you might in an everyday context. Consequently, you must put aside any preconceived ideas about the phrase "racketeering activities" in your deliberations, and concentrate only on its meaning in this statute.

And the racketeering activities that are charged in this case are set out in Count Two of the indictment.

Count Two of the indictment charges that: At all times relevant to this indictment, Xing Lin, also known as Ding Pa, the defendant, and others, known and unknown, were members and associates of an organized crime enterprise led by Lin. The Ding Pa Organization engaged in crimes including murder, manslaughter, assault, operating illegal gambling businesses, extortion, and other crimes.

The Ding Pa Organization constituted an enterprise as that term is defined in Section 1961, Sub 4, of Title 18 of the United States Code. That is, a group of individuals associated

in fact. The enterprise was engaged in and its activities affected interstate commerce. The Ding Pa Organization was an organized criminal group based primarily in the Chinatown section of Manhattan that operated in the Southern and Eastern District of New York and elsewhere. This is the charge in the indictment. The Ding Pa Organization constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the exercise. This enterprise was engaged in and its activities affected interstate commerce.

This is a long count.

It is alleged in the indictment, in Count Two, that Xing Lin, also known as Ding Pa, was a member and associate of the enterprise which the government calls Ding Pa Organization, and was, at various times relevant to the indictment, the leader of the organization. In that capacity, Lin participated in the operation and management of the enterprise, and participated in unlawful and other activities in furtherance of the conduct of the enterprise's affairs, and profited from the enterprise's affairs.

Count Two also charges that the purposes of the enterprise included enriching the leaders, members, and associates in the Ding Pa Organization through criminal activities, preserving, protecting and augmenting the power, territory, and financial profits of the Ding Pa Organization,

its leaders, members, and associates, through the use of intimidation, violence, and threats of physical and economic harm, and keeping victims and citizens in fear of the Ding Pa Organization, its leaders, members, and associates, by committing and threatening to commit physical violence, and by causing and threatening to cause physical and economic harm.

The racketeering acts set out in Count Two of the indictment, murder and conspiracy to commit murder, that is charged as Racketeering Act 1.

Racketeering Act 2 is charged as follows:

From in or about March 2002, up to and including in or about December 9th, 2009, Ding Pa, the defendant, and others, known and unknown, willfully and knowingly combined, conspired, and agreed together to commit extortion, as that term is defined in the United States Criminal Code, by obtaining money and property from and with the consent of other persons, to wit, individuals who owned and operated a bus company.

Racketeering Act 3 is charged as follows:

In or about 1996, in the Southern District of New York and elsewhere, Xing Lin, also known as Ding Pa, the defendant, and others, known and unknown, willfully and knowingly did conduct, finance, manage, supervise, direct, and own all and part of an illegal gambling business, to wit, a mahjong parlor, in violation of New York State Penal Law, and which business involved five and more persons who conducted, financed,

A. 694

managed, supervised, directed, and owned all and part of it, and which business had been and remained in substantially continuous operation for a period in excess of 30 days, and had gross revenues of $2,000 in a single day, all in violation of Section 1955 of the United States Criminal Code.

Racketeering Act 4, which is charged in Count Two of the indictment, charges that:

From in or about 1996, up to and including in or about 1997, Xing Lin, also known as Ding Pa, willfully and knowingly did conduct, finance, manage, supervise, direct, and own an illegal gambling business, to wit, a gambling parlor where tien len and other card games were played, in violation of New York State Penal Law, and which business involved five and more persons who conducted, financed, managed, supervised, directed, and owned, all and part of it, which had been and remained in substantially continuous business -- excuse me, continuous operation for a period in excess of 30 days, and had gross revenues of $2,000 in a single day.

Now, there is a fifth racketeering act charged in Count Two of the indictment as part of the activities of the RICO enterprise, that from in or about 1999, up to and including in or about 2002, the defendant, Ding Pa, willfully and knowingly did conduct, finance, manage, supervise, direct and own, all and part of an illegal gambling business, to wit, a gambling parlor where tien len and other card games were

played, in violation of New York State law, and which business involved five and more persons who conducted, financed, etc., all and part of the business, and which business had been and remained in substantially continuous operation for a period in excess of 30 days, and had gross revenues of $2,000 in a single day, in violation of Title 19 of the United States Code, Section -- excuse me -- Section 1955 of the United States Criminal Code.

Now, in order to prove the defendant guilty of the crime charged in Count Two, the government must establish beyond a reasonable doubt each of the following five elements:

First, that on or about the dates charged in the indictment, the enterprise alleged in the indictment existed.

Second, that the enterprise affected interstate commerce.

Third, that the defendant was employed by or associated with that enterprise.

Fourth, that the defendant engaged in a pattern of racketeering activity.

And, fifth, that the defendant conducted or participated in the conduct of the enterprise through that pattern of racketeering activity.

The first element that the government must establish beyond a reasonable doubt is the existence of the enterprise charged in the indictment.

An enterprise within the meaning of the RICO law does not have to be a legal entity, such as a partnership, a corporation, or an association. Under RICO, an enterprise can be a group of people who informally associate together for the common purpose of engaging in a course of conduct.

In addition to having a common purpose, this group of people must have an ongoing organization, either formal or informal, and it must have a core of personnel who function as a continuing unit. This group may be organized for a legitimate and lawful purpose or for an unlawful purpose.

Here, in this case, or so the indictment alleges, the enterprise charged to have existed is what the government calls the Ding Pa Organization. Just because the indictment charges that the Ding Pa Organization was an enterprise, does not establish that there was an enterprise within the meaning of the law. That is for you to decide.

The first question that confronts you is has the government proven beyond a reasonable doubt that the enterprise charged in the indictment existed, that there was such an enterprise. In essence, the government contends that a group of individuals which it calls the Ding Pa Organization associated together in order to make money and achieve other objectives through a pattern of racketeering. If you find that there was, in fact, a group of people characterized by, one, a common purpose, two, an ongoing formal or informal organization

or structure, and, three, core personnel who functioned as a continuing unit, then you may find that an enterprise existed.

(Continued on next page)

A. 695

THE COURT: If you find that the enterprise charged in the indictment existed, you must also determine whether this enterprise continued in essentially unchanged form during substantially the period charge in the indictment. This does not mean that everyone involved has to be the same. Essentially the core of the enterprise has to have been the same throughout.

In sum, your first task is to determine whether the government has established beyond a reasonable doubt that, first, the existence of the he price charged in the indictment. If your answer to that question is yes, then you will proceed to consider the other elements of Count Two. If your answer is no, that is to say if you have a reasonable doubt about the existence of the enterprise charged in Count Two, then you must acquit the defendant on this charge. The second element that the government must prove beyond a reasonable doubt is that the activities of the enterprise had some affect on interstate commerce. I have already discussed what it means to have an affect on interstate commerce in connection with Count Four and you should apply those instructions here as well.

Now, if you conclude that the existence of the enterprise and the affect on interstate commerce has been established beyond a reasonable doubt, your next task will be to determine whether the government has proved beyond a reasonable doubt that the defendant was associated with that

enterprise.

Now, for Count Two, the fourth element that the government must prove beyond a reasonable doubt is that the defendant engaged in a pattern of racketeering activity. A defendant engages in a pattern of racketeering activity if he commits at least two acts of racketeering within 10 years of each other and the two acts are sufficiently related to continue in criminal activity of the enterprise to constitute a pattern. A RICO pattern may not be established without some showing that the racketeering acts are interrelated and that there is continuity or a threat of continuity in the activities of the organization.

It is important to note that isolated acts of racketeering do not form a pattern. A pattern is an arrangement or order of things or activity. It is not the number of acts, but the relationship that they bear to each other or to some external organizing principle that renders them ordered or arranged.

Criminal conduct forms a pattern only if it embraces acts of racketeering that have the same or similar purposes or results and participants and victims or methods of commission that show a relationship between the acts of racketeering. The the racketeering acts must be interrelated. The acts of racketeering must also be a part of a continuing course of conduct where the enterprise is an entity whose business is

racketeering activity. An act performed in furtherance of that business automatically carries with it the threat of continued racketeering activities. If and only if you find that the defendant committed at least two acts of racketeering, which were part of such related and continuing criminal activity, then you may find that the the government has proved that the defendant engaged in a pattern of racketeering activity.

Further, it is not enough that all of you believe that the defendant engaged in a pattern of racketeering activity by committing at least two acts of racketeering. You may not find the defendant guilty unless all of you agree that he engaged in a pattern of racketeering activity by committing at least two particular acts of racketeering. That is, you may not find the defendant guilty if some of you think that only Acts Racketeering One and Two were committed by the defendant and the rest of you think that Acts Three and Four were committed by the defendant. There must be at least two specific acts of racketeering that all of you agree were committed by the defendant in order to find that the defendant engaged in a pattern of racketeering activity.

I will instruct you on the specific racketeering acts charged in the indictment in a moment, but before I do that I will turn to the fifth and final element of the substantive RICO charge which is Count Two of the indictment. If you find that the defendant engaged in a pattern of racketeering

activity, then you must consider the fifth and final element of the RICO offense charged in Count Two. The government must prove beyond a reasonable doubt that the defendant conducted or participated in the conduct of the enterprise through that pattern of racketeering activity. In other words, it is not enough that there be an enterprise and that the defendant engaged in a pattern of racketeering activities. More is required. To conduct or participate in the conduct of the enterprise means that the defendant must have played some part in the operation or management of the enterprise.

The government must also prove that there is a meaningful connection between the defendant's charged acts of racketeering and the enterprise. The government must prove that the acts of racketeering were in some way related to the affairs of the enterprise or that the defendant was able to commit these acts solely by virtue of his position or involvement in the affairs of the enterprise.

I will now review with you the six specific acts of racketeering which are charged in Count Two of the indictment. You need only find that the defendant committed one of the crimes charged within a single racketeering act in the indictment in order to find the entire racketeering act proved. However, I remind you that you must all agree on which particular crime the defendant committed in order to find that he committed the racketeering act. Again, if some of you find

A. 696

one part and the others of you find another part, you are not all finding the same act and you may not find the defendant guilty under those circumstances.

Now, the first racketeering act, Racketeering Act One in the indictment charges the defendant with murdering and conspiring to murder change Chan Qin Zhou on or about July 10th, 2004 in violation of New York State law. As I just instructed you, the violation of any one of the charged statutes alone constitutes the commission of Racketeering Act One. Under New York State Penal Law 125.25, a person is guilty of murder in the second degree when with intent to cause the death of another person he causes the death of such person or of a third person. In order to find that the defendant committed this charge of murder, the government must prove beyond a reasonable doubt both of the following two elements: First, that on or about July 30th, 2004, the defendant caused the death of Chan Qin Zhou, and second that the defendant did so with the intent to cause the death of Chan Qin Zhou.

Now, the term "intent" under New York law means conscious objective or purpose. Thus, a person acts with intent to cause the death of another when that person's conscious objective or purpose is to cause the death of another. Under New York State Penal Law Sections 105.15 and 125.25, a person is guilty of a conspiracy to commit murder when with intent that the murder be committed he agrees with

one or more persons to engage in or cause the commission of the murder. Accordingly, the government must prove beyond a reasonable doubt that all of the following three elements -- that it must prove all of the three following elements: First, that on or about July 10th, 2004 the defendant agreed with one or more persons to murder Chan Qin Zhou; second, that the defendant did so with the intent that the murder be committed; and third that the defendant or a person with whom he agreed committed the murder of Chan Qin Zhou. I've already instructed you on the conduct constituting murder and the meaning of intent under New York law and you should follow any instructions here as well.

Racketeering Act Two charges the defendant with extortion and conspiracy to commit extortion of the owners of a bus company. From in or about March 2002 to December 2009 in violation of federal law as I've already instructed you, any one violation constitutes the commission of Racketeering Act Two. That is, violation of the extortion statute. I've already instructed you on the elements of extortion under federal law in Count Four. You should follow my instructions here as well. I've also already instructed you on the elements of conspiracy commit extortion under federal law in Count Five. You should follow my instructions here as well.

Now, Racketeering Act Three charges the defendant with operating an illegal gambling parlor, specifically a Mahjong

parlor, in or about 1996 in violation of federal law. Section 1955 of the criminal code of the United States provides as here relevant "Whoever conducts, finances, manages, supervises, directs or owns all or part of an illegal gambling business is guilty of a crime.

In order to find that the defendant committed this charge of illegal gambling, the government must prove beyond a reasonable doubt all of the following three elements: First, that the gambling business charge violated New York State law; second that the gambling business was in substantially continuous operation for a period in excess of 30 days or had gross revenue of $2,000 or more in any one day; and third that five or more persons including the defendant knowingly conducted, finance, managed, supervised, directed or owned all or part of such business.

Now I am going to explain illegal gambling. The first element the government must prove beyond a reason doubt is that the gambling business charged in Count Two of the indictment violated one of two New York State Penal Laws, but only one law has to be violated. Again, you must all agree on which law it is. You must be unanimous as to the law that was violated. Let me begin by defining certain terms that are used in the New York criminal statutes. Under New York State Penal Law Section 225 gambling occurs and I quote "When a person stakes or risks something of value upon the outcome of a contest of chance or

of future contingent event not under his control or influence upon an agreement or understanding that he will receive something of value in the event of a certain outcome. A contest of chance is any game in which the outcome depends in a material degree on chance. Something of value includes money."

New York State Penal Law Section 225.05 makes it a crime to "knowingly profit from unlawful gambling activity." Profiting from gambling activity means when a person other than as a player accepts or receives money or other property pursuant to an agreement or understanding with any person whereby he anticipates or is to participate in the proceeds of gambling activity. "Unlawful" simply means contrary to law. Under New York law with certain exceptions not applicable here gambling activity is not authorized by law. Indeed is contrary to law.

Finally, a person knowingly profits from unlawful gambling activity when he is aware that he is profiting from gambling activity. New York State Penal Law Section 225.10 makes it a crime to "knowingly profit from unlawful gambling activity by engaging in bookmaking to the extent that a person receives or accepts in any one day more than five bets totaling more than $5,000." I've already explained what it mean to knowingly profit from unlawful gambling activity. "Bookmaking" mean unlawfully accepting bets from members of the public as a business rather than in a casual or personal fashion upon

A. 697

D4o6lin2    Charge    Page 1057

the outcome of future contingent events.

I think we all should stand up and stretch for a minute before I continue.

MR. COHEN: Judge, may we have a five-minute break?

THE COURT: Very well. We'll take a five-minute break. I should comfort you with the thought that I will give you a copy of this charge to take with you into the jury room, but I first want to read it to you so that you will hear it as well as read it. Very well. We'll take a five-minute recess.

(Jury excused)

(Continued on next page)

D4o6lin2    Charge    Page 1059

MS. BURNS: We had that as well, your Honor.

MR. SKINNER: You said July 30th once and July 10th twice.

MS. BURNS: It was correct in the written charge. It was just spoken as to 10th.

THE COURT: Thank you.

(Recess)

D4o6lin2    Charge    Page 1058

(In open court; jury not present)

MR. COHEN: Two things I want to bring to your Honor's attention now. I didn't want to interrupt. I think you read Count Four twice to the jury inadvertently. I would ask that you instruct them not to give any particular attention to that count, that it was inadvertently read twice.

THE COURT: Let me ask the court reporter, is that true?

MR. COHEN: The government and I agree that you read Count Four twice.

MR. SKINNER: The indictment twice, your Honor.

MR. COHEN: The indictment.

THE COURT: The indictment but not the charge.

MR. COHEN: It was lengthy, the second.

THE COURT: What difference does that make?

MR. COHEN: He don't want the jury to think they should give any special emphasis to that.

THE COURT: Do you think by the end of this charge they will even remember?

MR. COHEN: I don't know, Judge, but I have to protect the record.

The second thing is that the homicides occurred on July 30th, and both times that you referenced them you said they occurred on July 10th. I think that might confuse the jury.

D4o6lin2    Charge    Page 1060

(In open court; jury present)

THE COURT: You may all be seated. We're coming down the home stretch.

The second element the government must prove beyond a reasonable doubt is that the gambling business was either in substantially continuous operation for a period in excess of 30 days or that the gambling business had gross revenues of $2,000 or more in one day. Either one is sufficient as long as you are in agreement as to which one has been proven beyond a reasonable doubt. The government is not required to prove that the business operated on an every day basis throughout the entire period alleged. Instead, the government must prove that over some period in excess of 30 days the gambling business was conducted with sufficient regularity that it existed as an ongoing business rather than a casual activity. The government is not required to prove that the defendant knew that the business was in substantially continuous operation. It is for to you determine the specific period when the business was in substantially continuous operation. If you find that the period was longer than 30 days, then you should consider the third element.

Another way the government can prove the second element is by proving beyond a reasonable doubt that the gambling business had gross revenues of $2,000 or more in any one day. Gross revenue means the total amount wagered in one

A. 698

day regardless of how much was paid out to betters as winnings. The government is not required to prove that the defendant knew that the business had gross revenues of 2,000 or more in any one day. If you find that gross revenues were equal to or greater than $2,000 on any one day, then you should go on to consider the third element of illegal gambling. The third element the government must prove beyond a reasonable doubt is that five or more persons, including the defendant, knowingly conducted, financed, managed supervised, directed, or owned the gamble business during the period when you found it was in substantially continuous operation or had gross revenues of $2,000 or more in one day. The terms "finance," "managed," "supervised," "directed," and "owned" should be given their every day ordinary meaning.

However, I would like to explain the term "conducted" in more detail. To conduct a gambling business means to perform any act, function or duty which is necessary or helpful in the regular operation of the business. Five or more people, including the defendant must have participated during the period that you found that the gambling business or that you find if you do that the gambling business was in substantially continuous operation or had gross revenue of $2,000 or more in one day. The government does not have to prove that all five were engaged at any particular time in conducting the business as long as it proves that all five participated in the business

during the period you identified. It is not required that all five be charged in the indictment.

Each of the five persons must have knowingly participated in the business. This means that each of them knew that they were involved in conducting a gambling business and were not involved by accident, negligence, or mistake. The government does not have to prove that the defendant or any others knew that the gambling business was illegal.

Now, Racketeering Act Four of Count Two charges the defendant with operating an illegal gambling parlor, a Tien Lin or 13 card parlor from in or about 1996 to in or about 1997 in violation of federal law. I just instructed you on the elements of illegal gambling under federal law. You should follow those instructions here as well.

Racketeering Act Five charges, that is Racketeering Act Five in Count Two, charges the defendant with operating an illegal gambling parlor, a Tien Lin or 13 Card parlor -- Tien Lin is 13 Card in Chinese -- from in or about 1999 to in or about 2002 in violation of federal law. I've already instructed you on the elements of illegal gambling under federal law. You should follow my instructions here as well.

Now, we come to Count One of the indictment, which charges the defendant with conspiracy to violate the RICO statute. This means that the defendant has been charged with agreeing to conduct or participate in the affairs of an

enterprise through a pattern of racketeering activity. Section 1962(d) of the United States Criminal Code provides that it shall unlawful for any person to conspire to violate the RICO statute. I've already read part of Count One. I will give you a copy of the indictment to take into the jury room so you can read it as well. Before I instruct you on the elements of a conspiracy to violate the RICO statute, let me say a few words about the difference between the conspiracy charge in Count One and the RICO charge contained in Count Two on which I've already instructed you.

As I instructed you earlier in the context of Count Five, a conspiracy to commit a crime is an entirely separate and distinct offense from the substantive crime that is the object of the conspiracy. Count Two charges a substantive violation of the RICO statute. That is, it charges the defendant with actually having participated in the affairs of an enterprise through a pattern of racketeering activity. Count One charges the defendant with a different crime. That is, it charges him with conspiring or agreeing to participate in the affairs of an enterprise through a pattern of racketeering activity.

A RICO conspiracy is never simply an agreement to commit predicate acts that allegedly form a pattern of racketeering nor is it merely an agreement to join in a particular enterprise. Rather, it is an agreement to conduct

or to participate in the conduct of a charged enterprise's affairs through a pattern of racketeering activity.

I've already explained the law of conspiracy in my instructions to Count Five and you should follow those instructions here as well except of course Count Five involves a conspiracy to violate the federal extortion statute and Count One charges a conspiracy to violate the federal RICO statute. I will now provide you with additional instructions specific to the RICO conspiracy charged in Count One.

In order to prove a defendant guilty of conspiracy to violate the RICO statute as charged in Count One, the government must establish beyond a reasonable doubt the following four elements: First, that an enterprise was established as alleged in the indictment.

(Continued on next page)

A. 699

THE COURT: Second, that the enterprise affected interstate commerce; third, that the defendant was associated with or employed by the enterprise; and, fourth, that the defendant knowingly and willfully agreed with at least one other person to participate in the affairs of the enterprise through a pattern of racketeering activity.

The first three elements of Count One are very similar to the first three elements of Count Two, which I've already instructed you. However, they are different in an important respect. Unlike Count Two, for purposes of Count One, the government is not required to prove that the alleged enterprise was actually established -- this is a conspiracy charge -- or that the defendant was actually employed by or associated with the enterprise, or that the enterprise actually affected interstate commerce. Rather, because the agreement to commit a RICO offense is the essence of the RICO conspiracy offense charged in Count One, the government need only prove that if the conspiracy offense were completed as contemplated, that the enterprise would be established, that the defendant would be employed or associated with the enterprise, and that the enterprise would affect interstate commerce.

Of course, if you find that the alleged enterprise was actually established, the first element would be met. Likewise, if you find that the defendant was actually employed by or associated with the enterprise, and that the enterprise

actually affected interstate commerce, then the second and third elements would be met.

I turn now to the fourth element, the agreement.

To prove the defendant guilty of the crime charged in Count One, the government must prove beyond a reasonable doubt that the defendant knowingly and willfully became a member of the conspiracy charged. This means that in order to meet its burden of proof, the government must show that the defendant agreed to participate directly or indirectly in the affairs of an enterprise through a pattern of racketeering activity. You may find -- but need not find -- that by actually committing two or more racketeering acts, the defendant has shown that he agreed to participate in the affairs of the enterprise through a pattern of racketeering activity. You may also find -- but need not find -- that the defendant agreed to participate in the affairs of the enterprise through a pattern of racketeering activity if you find that he agreed personally to commit two or more racketeering acts to further the affairs of the enterprise.

The government is not, however, required to prove that the defendant actually committed or agreed to commit two or more racketeering acts in order to find that this element has been met. Instead, the focus on this element is on the defendant's agreement to participate in the objective of an enterprise, to engage in a pattern of racketeering activity,

and not on the defendant's commission or agreement to commit the individual criminal acts. Thus, the government must prove that the defendant entered into the charged RICO conspiracy, and participated in some manner in the overall objective of the conspiracy, and that the conspiracy involved the commission of at least two racketeering acts.

I will now review the predicate acts that the government alleges were committed or agreed to be committed as part of the RICO conspiracy, all of which are listed in the indictment.

As I just explained, the government is not required to prove either that the defendant agreed to himself commit two of these acts, or that he actually committed such acts, only that the defendant conspired to participate in the conduct of the affairs of the alleged enterprise. However, proof that the defendant himself agreed to or did commit such acts may be used by you to conclude that the defendant agreed to participate in the conduct of the alleged enterprise.

Because the substantive RICO crime, that is, the crime that is the object of the conspiracy, requires the actual commission of two racketeering acts, in order to prove a RICO conspiracy, the government must prove that two of these acts either were committed or were intended to be committed as part of the conspiracy. There is no requirement in Count One, the RICO conspiracy, that the following predicate offenses were

actually committed by anyone.

Several of the charged categories of predicate offenses charge a violation of more than one specific law. In order to find that a given predicate offense was, in fact, an object of the RICO conspiracy, you need not find that the object of the conspiracy involved violations of all of the laws within each predicate act; rather, you need only find that the object of the conspiracy involved the violation of at least one of the specific laws. However, you must agree unanimously on which particular crime, if any, was the object of the charged RICO conspiracy.

The defendant is charged in Count One with being a member of a conspiracy engaged in racketeering activity involving murder and conspiracy to commit murder, in violation of New York State law. I have already instructed you on the elements of the substantive crimes, and you should follow my instructions here, as well.

The defendant is charged in Count One with being a member of a conspiracy engaged in racketeering activity involving extortion, in violation of federal law. I have already instructed you on the elements of this crime, and you should follow my instructions here, as well.

The defendant is charged in Count One with being a member of a conspiracy engaged in racketeering activity involving the operation of an illegal gambling business, in

**A. 700**

violation of both federal law and New York State law, New York State Penal Law 225.10. I've already instructed you on the elements of these crimes, and you should follow my instructions here, as well. However, I want to caution you that although a violation of New York Penal Law Section 225.05 is one way, the government may prove the first element of the federal gambling law. That section cannot, on its own, constitute a predicate offense here; only a violation of federal law, that is, Section 1955 of the criminal code of the United States, can constitute a predicate act.

Finally, I turn to Count Three.

If you have a reasonable doubt about whether the defendant committed the crimes charged in Counts Four and Five, you must acquit the defendant on Count Three. If, and only if, you find that the government has proven that the defendant committed a crime charged in either Count Four or Count Five do you proceed to consider Count Three.

Count Three of the indictment charges the defendant with violating Section 924(j)(1) of the criminal code of the United States. Section 924(j) refers to another section of the criminal code, Section 924(c). And Section 924(c) provides, in pertinent part, that, and I quote:

"Any person who, during and in relation to any crime of violence for which he may be prosecuted in a court of the United States, uses a firearm, shall be guilty of a crime."

Section 924(j) provides, in pertinent part, that: "A person who, in the course of a violation of Subsection C, causes the death of a person through the use of a firearm, shall, if the killing is a murder, as defined by statute, be guilty of a crime."

Now, Count Three of the indictment reads as follows:

On or about July 30th, 2004 -- oh, and I should tell you, I have used "July 10th" several times inadvertently. I have always meant July 30, which is the date in question in Count Three and in the other counts that I charged you on.

So I'm going to read Count Three now.

"On or about July 30, 2004, in the Southern District of New York and elsewhere, Xing Lin, also known as Ding Pa, the defendant, willfully and knowingly, during and in relation to crimes of violence for which he may be prosecuted in a court of the United States, namely, extortion and conspiracy to commit extortion, did use a firearm, and, in furtherance of such crime, did cause the death of a person through the use of a firearm, which killing is murder as defined in the criminal code of the United States. To wit, Lin directed another person to shoot Chan Qin Zhou inside a club in Queens, New York. And the other person did shoot Zhou, as well as two bystanders, Mei Ying Li, and another person, killing Zhou and Li, and wounding Victim 3, in violation of Sections 924(j)(1) and (2) of the United States Criminal Code."

Count Three of the indictment, which I've just read to you, charges the defendant with violating Section 924(j)(1) -- well, I have read you the language of those statutes.

In order to find the defendant guilty of Count Three, you must find that the government has proved beyond a reasonable doubt all of the following four elements:

First, that the defendant committed either the crime of violence charged in Count Four of the indictment, or the crime of violence charged in Count Five of the indictment. That is the first essential element of the crime charged in Count Three.

Second, that the defendant knowingly used a firearm during and in relation to the commission of one of those crimes.

Third, that the defendant's conduct caused the death of Chan Qin Zhou and Mei Ying Li.

And, fourth, that the death of those persons qualifies as murder as I will define that term for you in a moment.

The first element that the government must prove beyond a reasonable doubt is that the defendant committed one of the crimes of violence charged in Count Four or Count Five of the indictment. I instruct you that extortion and extortion conspiracy are crimes of violence which can be prosecuted in a United States court. However, in order to find that the government has satisfied this element, you must find that the

government has proved beyond a reasonable doubt that the defendant, in fact, committed one of the crimes charged in either Count Four or Count Five. If you have a reasonable doubt about both Count Four and Count Five, you must acquit the defendant of the crime charged in Count Three.

If you find beyond a reasonable doubt that the defendant committed the crime of violence charged in either Count Four or Count Five, then you must consider the second element of Count Three.

To establish the second element, the government must prove beyond a reasonable doubt that the defendant knowingly used or aided and abetted the use of a firearm during and in relation to the crime which you find the government has proved beyond a reasonable doubt. A firearm is defined in Section 921(a)(3) of the United States Criminal Code to mean any weapon which will or is designed to or may readily be converted to expel a projectile by the action of an explosive. I instruct you that a gun is a firearm. To knowingly use a firearm means to use the firearm purposefully and voluntarily, and not by accident or mistake. Use of a firearm requires an active employment of the firearm by the person. Active employment means brandishing, displaying, referring to a firearm so that others present knew the defendant had the firearm available, and, of course, firing or attempting to fire a firearm.

The government must establish that the defendant used

A. 701

the firearm during and in relation to the commission of a crime charged in this indictment of which you have found the defendant guilty beyond a reasonable doubt; here, extortion or extortion conspiracy. The circumstances surrounding the presence of the firearm must suggest that the defendant intended to have a firearm available for use during the commission of the underlying crime.

And the third element of Count Three is that the government must prove beyond a reasonable doubt that the defendant's conduct caused the death of a person.

The indictment charges that, as Count Three charges, the defendant caused the death of Chan Qin Zhou and Mei Ying Li. A defendant's conduct may be found to cause the death of a person if it had such an effect in producing that person's death as to lead a reasonable person to regard the defendant's conduct as a cause of the death. The death of a person may have one or more than one cause. You need not find that the defendant shot the victim or that he committed the final fatal act. The government need only prove beyond a reasonable doubt that the conduct of the defendant was a substantial factor in causing the victim's death.

Now, in considering Count Three, you should apply the following definition of "murder," which comes from Section 1111 of the criminal code of the United States.

And I quote: "Murder is the unlawful killing of a

human being with malice aforethought. It includes murder that is committed in the perpetration of or an attempt to perpetrate any murder.

If you do not find beyond a reasonable doubt that the defendant is guilty of Count Three, you should proceed to consider another legal theory of criminal liability that is called aiding and abetting.

In Count Three of the indictment, the defendant is also charged with aiding and abetting the use of a firearm during and in relation to the crimes charged in Counts Four and Five, namely, extortion and conspiracy to commit extortion. If the defendant did not himself commit a crime, but aided and abetted the commission of the crime by others, the defendant may be found guilty of the crime.

The aiding and abetting statute, Section 2 of the federal criminal code, reads as relevant here as follows:

"Whoever commits an offense against the United States, or aids, abets, counsels, commands, induces, or procures its commission, is punishable as a principle."

Under this statute, it is not necessary for the government to show that the defendant performed the act with which he is charged in order for you to find him guilty. A person who aids and abets another to commit an offense is just as guilty of that offense as if he had committed it himself.

Accordingly, you may find the defendant guilty of Count Three

if you find that the government has proven beyond a reasonable doubt that another person actually committed the offense with which the defendant is charged, and that the defendant aided or abetted that person in the commission of the offense.

As you can see, the first requirement is that you find that another person has committed the crime charged. Obviously, no one can be convicted of aiding and abetting a criminal act of another if no crime was committed by the other in the first place. But if you do find that a crime was committed, then you must consider whether the defendant aided and abetted the commission of the crime.

In order to aid or abet another to commit a crime, it is necessary that the defendant willfully and knowingly associate himself in some way with the crime, and that he willfully and knowingly seek by some act to help make the crime succeed. The mere presence of the defendant where a crime is being committed, even coupled with knowledge by the defendant that a crime is being committed, or the mere acquiescence by a defendant in the criminal conduct of others, even with guilty knowledge, is not sufficient to establish aiding and abetting. An aider and abettor must have some interest in the criminal venture.

To determine whether the defendant aided or abetted the commission of Count Three, ask yourself these questions:

One. Did the defendant participate in the crime

charged as something he wished to bring about?

Two. Did the defendant associate himself with the criminal venture knowingly and willfully?

Three. Did the defendant seek by his actions to make the criminal venture succeed?

If the answers to each of these questions is yes, then the defendant is an aider and abettor. If the answer to any of these questions is no, the defendant is not an aider or abettor.

As to all elements of the crimes, except venue, the government has the burden of proof beyond a reasonable doubt. With regard to venue only, the government meets its burden of proof if it establishes that it is more likely than not that an act in furtherance of the crime you are considering occurred in the Southern District of New York. In this case, the government and the defendant have agreed that venue is proper in this district for each of the crimes charged.

The law requires only substantial similarity between the indictment and the proof. That is sufficient. With respect to the dates mentioned in the indictment, the same principle applies.

For example, the indictment charges that the RICO conspiracy in Count One existed from 1996 up to and including December of 2009. The indictment charges that the extortion conspiracy in Count Five existed from March of 2002 up to and

A. 702

including December of 2009. It's not essential that the government prove that the conspiracy started and ended on those specific dates. It's enough if you find that, in fact, a conspiracy was formed, and existed for some time within that period. The law requires only a substantial similarity between the dates alleged in the indictment and the dates established by the evidence.

You are the sole judges of all of the questions of fact submitted to you and of the credibility of the witnesses. Your authority, however, is not to be exercised arbitrarily; it must be exercised with sincere judgment, sound discretion, and in accordance with the rules of law that I give you. You may not speculate.

In making your determination of the facts in this case, your judgment must be applied only to that which is properly evidence. The sworn testimony of the witnesses is evidence. The documents and exhibits actually received in evidence are evidence. Exhibits marked for identification, but not received, are not evidence, nor are materials brought forth to refresh a witness's recollection. Stipulations, that is, agreements between counsel that certain facts are true, constitute evidence, and you must regard such agreed facts as true.

There are two types of evidence that you may properly use in deciding whether the defendant is guilty or not guilty.

One type of evidence is called direct evidence. Direct evidence is the testimony of a witness about a fact in dispute that the witness saw, heard, touched, or tasted. Direct evidence can also be a document that self-establishes a fact in this view.

Circumstantial evidence is evidence that does not directly prove a fact in dispute, but that permits a reasonable inference or conclusion that a fact exists or that a fact does not exist. That is all there is to circumstantial evidence. You infer on the basis of reason and experience and common sense from an established fact the existence or nonexistence of some other fact.

Circumstantial evidence has the same weight as direct evidence. Federal law does not distinguish between direct evidence and circumstantial evidence, but simply requires that before convicting a defendant, a jury must be satisfied of that defendant's guilt beyond a reasonable doubt from all of the evidence in the case.

Now, what is not evidence?

The indictment, as I've already told you, is not evidence. Testimony that has been stricken or excluded is not evidence, and may not be considered by you in any way in rendering a verdict. The lawyers' questions are not evidence. It is the witnesses' answers that are the evidence, not the questions. And you may not treat the questions as evidence.

Arguments by lawyers are not evidence, because the lawyers are not witnesses. What they've said to you in their opening statements and in their summations is intended to help you understand the evidence to reach your verdict. However, if your recollection of the evidence differs from the lawyers' statements about the evidence, it is your recollection that controls.

So, too, you must not take the rulings that I have made during the trial as an indication of my view as to what your decision should be.

I should also say that counsel not only have the right, but also are under a duty, to present whatever legal objections there may be to the admissibility of evidence. Counsel also have the right to ask for conferences at the bench out of the hearing of the jury. These deal with questions of law which I alone must decide. You should not draw any inferences because counsel asks for a conference with the Court at the bench out of the hearing of the jury.

You are being called upon to resolve the factual issues in this case. You will have to now decide where the truth lies. And a part of that decision will involve making judgments about the testimony of the witnesses you have listened to and observed. In making those judgments, you should carefully scrutinize all of the testimony of each witness, the circumstances under which each witness testified,

prior inconsistent statements, if any, and any other matter in evidence that may help you to decide the truth and the significance of each witness's testimony.

There is no magic formula by which you should evaluate testimony. You bring with you to this courtroom all of the experience and background of your lives. In your everyday affairs, you determine for yourselves the reliability or unreliability of statements made to you by others. The same tests that you use in your everyday dealings are the tests you should apply in your deliberations. These tests apply to all the witnesses.

For example, the fact that a witness is a law enforcement officer does not in itself make that witness more or less credible than any other witness. You should size up each witness individually. The manner in which the witness gave testimony on the stand, the opportunity that the witness had to observe the facts about which the witness testified, the probability or improbability of the witness's testimony when viewed in light of all of the other evidence in the case, all these are factors you should take into consideration in determining the weight, if any, you should -- that you will assign to a witness's testimony.

Your decision whether or not to believe a witness may depend on how that witness impressed you. Was the witness candid, frank, and forthright, or did it seem as if the witness

A. 703

was hiding something, being evasive in some manner? How did the witness's manner on direct examination compare with the witness's manner on cross-examination? Was the witness's testimony consistent or was it contradictory? Did the witness appear to know what the witness was talking about? And did the witness strike you as someone who was trying to report knowledge accurately?

If you find that any witness has deliberately testified falsely as to any material issue in this case, you may disregard all or any material -- or whatever part of that witness's testimony you choose. How much you choose to believe a witness may be influenced by the witness's bias or interest. Does the witness have a relationship with the government or the defendant that may have affected how the witness testified? Does the witness have some incentive or motive that might have caused the witness to shade the truth? Or does the witness have some bias, prejudice, or hostility that may have caused the witness consciously or not to give you something other than a completely accurate account of the facts testified to?

Even if a witness is impartial, you should consider whether the witness had an opportunity to observe the facts testified about. Ask yourselves whether the witness's knowledge and recollection of the facts stand up in light of all the other evidence.

In other words, what you must do in deciding

credibility is to size up each witness in light of that person's knowledge and demeanor, prior inconsistent statements, if any, the explanations given, and in light of all the other evidence in the case, just as you would in any important matter.

In deciding what to believe, remember that you should use your common sense, your good judgment, and your experience. There is no legal requirement that the government must investigate or prove its case through any particular means or use any particular investigative technique. All of the investigative techniques used in this case were lawful. Use of evidence obtained pursuant to searches is lawful.

Your approval or disapproval of the techniques used or of the fact that particular techniques were not used is not to enter into your deliberations. Your duty is to determine whether or not based on your evaluation of the evidence before you, the guilt of the defendant has been proved beyond a reasonable doubt. That is the ultimate issue for your determination.

Evidence has been presented about some persons not on trial here, including persons the government contends are co-conspirators. You may not speculate about the reasons why any person is not named as a defendant in the indictment or is not on trial before you here. These matters have no bearing on the issues before you.

In this case, the defendant decided not to testify. Under our Constitution, every criminal defendant has a right not to testify at trial. You may not draw any adverse inference against the defendant because he did not take the witness stand. You may not consider this against the defendant in any way in your deliberations in the jury room.

You've heard the testimony of witnesses who have testified about a grant of immunity from the Court or who have been promised by the government in written agreements that in consideration for their truthful testimony and cooperation with the government, they will not be prosecuted for any crimes which they may have committed either here in court or in interviews with the prosecutors.

With respect to both categories of witnesses, what this means is that the testimony of the witness may not be used against the witness in any criminal procedure, in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the immunity order of this Court.

You are instructed that the government is entitled to call as a witness a person who has been granted immunity. You may convict a defendant on the basis of such a witness's testimony alone if you find that the testimony proves the defendant guilty beyond a reasonable doubt. However, the testimony of a witness who has been granted immunity by the

Court should be examined by you with greater care than the testimony of an ordinary witness. You should scrutinize it closely to determine whether or not it is colored in such a way as to place guilt upon the defendant in order to further the witness's own interests or such a witness confronted with the realization that he can win his own freedom by helping to convict another as a motive to falsify his testimony. Such testimony should be scrutinized by you with greater care, and you should act upon it with caution. If you believe it to be true and determine to accept the testimony, you may give it such weight, if any, that you believe it deserves.

You should ask yourselves whether a witness would benefit more by lying or by telling the truth. Was the witness's testimony made up in any way because the witness believed or hoped that he would somehow receive favorable treatment by testifying falsely?

The charge says "she," but really it should be "he." So when you get to this part of the charge, keep in mind that that's just a typographical error, because all of the witnesses were he's.

Was the witness's testimony made up in any way because the witness believed or hoped that he would somehow receive favorable treatment by testifying falsely, or did the witness believe that the witness's interests would be best served by testifying truthfully? If you believe that the witness was

A. 704

motivated by hopes of personal gain, was the motivation one which would cause the witness to lie, or was it one which would cause the witness to tell the truth?

These are all matters for you to consider. Your function is to weigh the evidence in the case, and to reach a verdict based solely upon the evidence and the instructions that I have given and will give you, without resorting to speculation, conjecture, or surmise.

The government, to prevail on a count charged in the indictment, must prove the elements of that count beyond a reasonable doubt as I've already explained to you. If the government succeeds, your verdict should be guilty. If the government fails, your verdict must be not guilty. You must consider each charge separately and return a separate verdict as to each count as shown on the verdict form that I will give you. To report a verdict as to any count, all jurors must agree. Your verdict must be unanimous.

Under your oath as jurors, you may not permit the punishment of the defendant, if convicted, to enter into your deliberations or to influence your verdict in any way. Your duty is to decide the case solely upon the evidence. It is my duty -- and my duty alone -- to impose whatever punishment I determine is prescribed by law.

Now is the time that each of you should exchange your views with your fellow jurors. That is the very purpose of

jury deliberations: To discuss and consider the evidence, to listen to the arguments of fellow jurors, to present your individual views, to consult with one another, and to reach an agreement based solely on the evidence, if you can do so, without doing harm to your own individual judgment. Each of you must decide the case for yourself, after consideration with your fellow jurors of the evidence in the case. But you should not hesitate to change an opinion that, after discussion with your fellow jurors, appears erroneous in light of the discussion and viewed against the evidence and the law. However, if, after carefully considering all the evidence and arguments of your fellow jurors, if you entertain a conscientious view that differs from others, you are not to yield your position simply because you are outnumbered or outweighed.

I further instruct you that you should deliberate without sympathy or prejudice as to any party. The law does not permit jurors to be governed by sympathy, prejudice, or public opinion. Both the accused and the public expect that you will carefully and impartially consider all the evidence in the case, follow the law as stated by me, and reach a just verdict regardless of the consequences.

Now, I am going to ask Juror No. 1, Michael McDonald, to act as foreperson. The foreperson will chair your meeting. But the foreperson's vote carries no greater weight during your

deliberations than that of any other juror.

When you begin your deliberations, a copy of this charge and a verdict form will be sent into the jury room with you. You will also receive a copy of the indictment. You may request that any exhibit be sent to you in the jury room; that is, any exhibit that has been received in evidence. If it is necessary during the course of your deliberations, you may also request that particular testimony be read back to you. But please remember that it's not always easy to locate the particular testimony that you want to hear. So be as specific as you possibly can.

After receiving your request, I must consult with the lawyers and consider their views on which portion of the transcript would respond to your request. As you can see, this is a time-consuming process, so please be patient and do not expect an immediate response.

If you have a question or wish to send a message to me during deliberations, put it in writing and have the foreperson sign it, then give the note to the marshal, who will be outside your door, and who will relay it to me. I will respond to you as promptly as I can either in writing or by calling you into the courtroom so I can address you orally.

When you communicate with me, if you are divided, never state or specify your numerical division at the time.

When you have reached a verdict as to each count,

please complete the verdict form and give it to the marshal, who will relay it to me.

I now have the unpleasant task of separating the alternate jurors. I say that because Ms. Lamboy, Mr. Silber, Ms. Miller, and Mr. Gica sat and very patiently heard everything. And I regret that you cannot be part of the final deliberations, but our system would not work if we did not make arrangements for alternates. However, I cannot excuse you entirely, because of the unpredictability of human affairs. Please be sure that Mr. Daniels has the telephone number at which you can be reached, because it may be necessary to call you back to participate in deliberations. For that reason, I'm going to ask you to continue to follow my instructions not to discuss this case with anyone until after a verdict has been reached.

Thank you for being with us, and thank you for the very close attention which you have given to everything during the trial. You have performed a very important civic duty, and the community is grateful to you.

Now we can swear in the marshal.

(Marshal sworn)

THE COURT: All right. I will give you to take with you into the jury room copies of my charge, copies of the indictment. I will mark one copy of my charge as Court Exhibit 1. I will also give you a verdict sheet which the foreperson

will fill out when you have reached a verdict.

Now, everyone must be hungry. So the first thing that will happen when you go to the jury room is you will get lunch.

You may now all retire to the jury room.

(At 1:23 p.m., the jury retired to deliberate)

THE COURT: We will be in recess until 2:30, but -- I'm sorry, until 3 o'clock. But I do require that one representative of each side be present in the courtroom in the event that we hear from the jury in the interim.

Now, I'm going to excuse all of you for lunch for an hour, in any event.

MS. BURNS: Thank you.

THE COURT: But after that, I need to have a representative of each side in the courtroom as long as the jury is deliberating.

MR. COHEN: I'm assuming, your Honor, for the defense, that's going to be me.

THE COURT: I'm not surprised.

MR. SKINNER: Your Honor, there was one small issue with the charge.

THE COURT: Yes.

MR. SKINNER: Something that probably should have been taken out yesterday that I think we all missed.

On Page 60, there's a reference to informal immunity written agreements from the government that would be

nonprosecution agreements. There weren't any nonprosecution agreements in this case. To avoid any confusion as to what's meant, and because we excised any references to nonprosecution agreements elsewhere, I propose that you simply send the jurors a brief note indicating that this language occurs, and that you should disregard it because there were no such written agreements.

THE COURT: Fine.

MR. COHEN: And, your Honor, I would request, if your Honor is inclined to send in such a note, you include in it that jurors may base their verdict on the evidence as you previously told them.

THE COURT: I'm sorry, I can't hear you.

MR. COHEN: I'm sorry, your Honor.

If your Honor is inclined to send in a note to the jury with Mr. Skinner's request on it, which, of course, I don't object to, I would ask also that you include in it that the jury may base their verdict on the evidence or on the lack of evidence.

THE COURT: I did say that.

MR. COHEN: You said it once. But I think there were probably seven or eight times that you said "on the evidence," without saying "lack of evidence."

And my other request, then -- I'm sorry I didn't pick up on this earlier -- is that your Honor --

THE COURT: It's just too complicated and too late. We should have picked that up at the charge conference.

MR. COHEN: And my other request is that your Honor instruct the jury that prior inconsistent statements are not admitted for their truth, but only as to the credibility of the witness. I think that's a crucial instruction.

THE COURT: Why?

MR. COHEN: I actually thought it was in there.

THE COURT: What is it that you're talking about?

MR. COHEN: Well, when your Honor told the jury in assessing the credibility of a witness they can consider, among other things, prior inconsistent statements that the witness may have made, I think that your Honor should also instruct the jury that those prior inconsistent statements were not introduced for the truth of those statements, but, rather, only as to assess the credibility of the witness.

THE COURT: Well, what prior inconsistent statements are you talking about? Are you really talking about the absence from some prior questioning of the answers that were given here; isn't that right?

MR. COHEN: There were some.

THE COURT: What is the clearest inconsistent statement you're talking about? That was a generalized charge; I didn't really have in mind --

MR. COHEN: What Mr. Lin was alleged to have said when

he came into the room with Little Beijing, which is really the crucial issue I see in this case.

And I think it's essential that the jury understand that what's been said in the past is not offered for its truth, but only as to assess the credibility of the witness.

MR. SKINNER: Your Honor, prior inconsistent statements are not hearsay; they are carved out of the meaning of Rule 801. I don't think that the proposed instruction is correct on the law, I think it's confusing, and I think it's unnecessary.

THE COURT: I don't think it will help the jury's deliberations at this stage.

Very well. But I will --

MR. COHEN: To the extent it's necessary, I'll note my exception.

THE COURT: Of course. I assume that anything I do not grant -- any request I do not grant you except to.

MR. SKINNER: Your Honor, we're excused until 2:30 for lunch, just so I know what time to be back?

THE COURT: 2:30.

MR. SKINNER: Thank you, your Honor.

THE COURT: But just let's agree on the language I'm sending the jury.

MR. SKINNER: Thank you.

THE COURT: Actually, I don't think it's appropriate

A. 706

for me to send anything to the jury. It is the jury's recollection that governs. And if they think there was any such thing here, they can consider it. And if they don't think so, they will not consider it.

MR. SKINNER: Okay, your Honor.

THE COURT: Very well.

MR. SKINNER: Trying to avoid confusion, but --

THE COURT: I understand. I would like to avoid confusion always, but I don't want to create confusion.

MR. SKINNER: I mean I think in the charge it says "you've heard this," so that might create some confusion, because it's coming from the Court.

THE COURT: You have heard what?

MR. SKINNER: It says: "You have heard testimony of witnesses who have been made promises by the government."

So I think it's a little confusing, because then they wonder, Well, which witnesses received those informal -- I guess it says informal.

THE COURT: Excuse me?

MR. SKINNER: Your Honor, I take back what I was just saying. I understand the Court's ruling.

THE COURT: Very well. Because I don't think it says exactly what you think, but that's --

MR. SKINNER: No, I was just rereading it myself, and I think I agree with what you're saying.

(At 1:30 p.m., a note was received from the jury)

THE COURT: Yes, you discovered it didn't say that. Fine.

THE COURT: I have just received a note from the jury which I will mark exhibit Court Exhibit 2, which reads as follows:

We, the jury, request all exhibits received into evidence (both gov. and defense).

We also request a list of witness names as they appeared. I can't read this word. Is this "here"? As they appeared here in court for direct examination.

MR. COHEN: Does anybody have a view on whether nicknames should be included, since I referred to them all, for simplicity during my summation, by their nicknames?

MS. BURNS: I think that probably makes sense, as I did the same with a couple of the witnesses.

THE COURT: Fine.

MS. BURNS: They actually acknowledged --

THE COURT: Where they gave it, the nickname, sure.

MS. BURNS: Right.

THE COURT: That's fine.

Anthony, we're going to mark this Court Exhibit 2.

(Luncheon recess)

AFTERNOON SESSION
3:00

THE COURT: I have given you a note that I received from the jury. Have you both read it?

MS. BURNS: We have.

MR. COHEN: We have read two notes, your Honor.

THE COURT: Yes. Thank you. One of them is much easier than the other.

MR. COHEN: Yes, indeed.

THE COURT: Now, what are the police reports that we're talking about? Is any of this in evidence?

MR. COHEN: I don't believe so.

THE COURT: I didn't think so. I thought it was brought out for refreshing recollection.

MS. BURNS: I think the note indicates they have the stipulation that refers to those reports and the times that they were taken. You see the times are reflected in the note. They may think they are in evidence, but they are not. We don't have a disagreement.

MR. COHEN: There is one police report that is in evidence.

THE COURT: What is that?

MR. COHEN: It was of the shooting and stabbing on Division Street. That is in evidence.

MS. BURNS: That is the defendant's police report.

They are asking for the statements of the eyewitnesses.

THE COURT: How do you know?

MS. BURNS: They lists.

THE COURT: Yes, you are right. Those are all the statements of witnesses?

MS. BURNS: That's right. They were the three individuals.

THE COURT: Who went to the police station?

MS. BURNS: That's right.

THE COURT: Those are not in evidence?

MS. BURNS: They are not.

MR. COHEN: Can I confer with Mr. Daniels for a moment?

THE COURT: Sure.

(Pause)

THE COURT: The next thing we have is can the victim of an extortion be a coconspirator to the same extortion? Does either of you have any idea what this means?

MS. BURNS: The only extortion that is charged is the extortion of the bus company owners. The bus company owners they heard about are both Chen Quo Guang or and Yi Qun, the murder victim. So from the note I don't really know which or both of them they are asking about. I didn't think there is any evidence that either of them was a coconspirator. I think they were both --

A. 707

THE COURT: To the same extortion.

MS. BURNS: Right. It's the only extortion at issue in the case.

THE COURT: There certainly was testimony that initially somebody went to Mr. Lin and asked for his help in calling off somebody's effort.

MS. BURNS: Efforts to compete in the company. That was Chen.

MR. COHEN: That is what I thought it was a reference to.

THE COURT: Right. But when was Chen a victim?

MS. BURNS: Our argument is he was subsequently extorted by the defendant when the defendant asked for additional shares in the company.

THE COURT: You call that extortion?

MS. BURNS: That's our extortion count.

MR. COHEN: Judge, I think there may be a stipulation that was received in evidence that did not go into the jury room. I am trying to find it.

THE DEPUTY CLERK: No. It went in.

MR. COHEN: I am sorry. I saw the one for Ng and Varian. I didn't see the one for Ming Li. It was a government exhibit. It was Government Exhibit 110.

THE DEPUTY CLERK: It's in there believe me.

MR. COHEN: Okay. Attached to it was Government

Exhibit 34.

THE DEPUTY CLERK: Yes. Those are in evidence. They all went inside.

THE COURT: How would that be the same extortion anyhow?

MR. COHEN: Judge, that was the only thing I could think of in trying to think like a layman about what they might be talking about and who among the players might be considered a coconspirator in an extortion was that if the jury thought that Mr. Lin and Chen, the government's alleged extortion victim agreed to somehow use force to keep the other guy out of the business, the competitor, that is that they are referring to.

MS. BURNS: The note is very unclear.

MR. COHEN: I don't know how to answer the question. Maybe your Honor can ask the jury to be more specific and to clarify exactly what it is that they want. That would be my request.

THE COURT: Who is the victim of the extortion supposed to be according to the government?

MS. BURNS: Chen and Yi Qun, or his legal name is Zhou, the victim of the murder.

THE COURT: I am not talking about the murder.

MS. BURNS: Right. But both of them were part of the same bus company that was extorted and the charge and the

indictment both read that in their to wit clause that the people extorted were the owners of a bus company and those are the owners that they have heard about in the course of the testimony.

MR. COHEN: I think in the context of the testimony the only person they could only be referring to is Chen.

THE COURT: I think that's right, but that doesn't answer the question. I think the closest I can come is can someone who was helped by the extorter be considered a victim.

MR. COHEN: That may be it, Judge, but rather than speculate, my request is that your Honor ask them to be more clear.

THE COURT: I will. I am going to say I do not understand your question about a coconspirator being a victim. Please be more specific.

MR. COHEN: Thank you.

MS. BURNS: Thank you, Judge.

MR. COHEN: Your Honor, with respect to the other note, are you going to tell them that the police reports are just not in evidence and they cannot see them.

THE COURT: Yes. I will read you what I write in a minute. I just want to send the first one in.

MR. COHEN: Sure.

THE COURT: Were those police reports brought forth to refresh recollection?

MR. COHEN: Yes.

THE COURT: I am going to say the police reports are not in evidence. They were only used to refresh recollection.

MS. BURNS: Thank you.

THE COURT: Very well. I take it you approve of that, Mr. Cohen.

MR. COHEN: Yes.

(Recess pending verdict)

THE COURT: In the Lin case we now have a response from the jury. On page 16 of the charge it states "that the defendant agreed to work with at least one other person in furtherance of the object charged." In the indictment it states that the owners of the bus company are the victims. In this one, Quo Quang Chen was one victim. Can he also be the other person stated in the charge?

MR. SKINNER: Can't be the coconspirator working with.

THE COURT: This explains why they say how can he both be the victim and the coconspirator.

MR. COHEN: That supposes I think that the extortion victim is somebody other than who the government says is it.

MR. SKINNER: Not necessarily.

THE COURT: No. It says in this case Quo Quang Chen was one victim. Can he also be the "other person" stated in the charge? They quote from the charge "that the defendant agreed to work with at least one other person in furtherance of

A. 708

the object charged." The defendant agreed to work with him to get his friend to not extort him.

MR. COHEN: I think we both agree the answer is no.

MS. BURNS: No.

THE COURT: Is Quo Guang Chen an owner of a bus company?

MR. COHEN: Yes.

MS. BURNS: He is.

MR. COHEN: He is the person that the government alleges is the extortion victim.

THE COURT: I understand.

MR. COHEN: He was the owner of a bus company.

THE COURT: Well, who is the other person?

MR. COHEN: The other person could be the coconspirators at the park. It could be the person engaged in the murder in the karaoke room with the defendant on his orders. I think we should probably just instruct them, No, you must find that the defendant worked with someone other than Quo Quang Chen in furtherance of the extortion to be an extortion conspiracy.

THE COURT: How can they?

MR. COHEN: There is none.

MR. SKINNER: There is.

THE COURT: What is the evidence?

MR. SKINNER: There were two followers in the Corona

Park, Queens that met with the defendant when the defendant threatened the victim, Quo Guang Chen and one of them touched his side gesturing to the gun.

THE COURT: There is no basis that the jury could find that the --

MR. SKINNER: I am not saying that is the same person. I am saying someone he worked with.

MR. COHEN: Judge, I think the simplest, most direct and least prejudicial answer is to simply say no. The question calls for a yes or no answer. I think the answer is no.

THE COURT: All right.

MR. COHEN: Judge, I will note for the record that for all the notes that have come up to now, I would waive Mr. Lin's presence and I will decide on a note by note basis.

THE COURT: He has to waive his appearance.

MR. COHEN: I will consult with him.

THE COURT: Go ahead. He is right inside here.

(Pause)

THE COURT: This is what I propose to writing. You talked to Mr. Lin?

MR. COHEN: I did.

THE COURT: What did he say?

MR. COHEN: He said that he is very satisfied to have waived his presence for the notes that have been discussed up until now, but he would like to be present for any future notes

that come out.

THE COURT: Very well. What I propose to tell the jury is a person cannot be both a coconspirator and a victim of an extortion. I was just reading the response.

MS. BURNS: That sounds good. Thank you, your Honor.

(Pause)

THE COURT: Request for testimony read back.

MR. COHEN: I am sorry, Judge?

THE COURT: I was going to read a new note that I just received, request for testimony read back. Quo Guang Chen's discussion on direct examination regarding a phone conversation with the defendant when Mr. Chen stated that he would not pay $2,000 to the defendant. We request to know his -- in regard to this entire phone call and related cross-examination. To know his testimony in regard.

Also, is Quo Guang Chen's testimony regarding the phone call with the defendant after the murder.

Do we have the transcript?

MR. SKINNER: I can find the direct testimony. I am not sure if Mr. Cohen crossed him on this or not. I will have to look it up, Judge.

THE COURT: The question clearly they have a pretty good recollection what happened, but I think they actually combined two things together. The phone called concerned a request for an additional 10 percent of the company and then it

was the following day at the meeting in Corona Park, Queens when he actually then agreed to give him $2,000.

Should we pull the testimony just for the phone call or both?

MR. COHEN: I think the jury should get what it asks for.

THE COURT: Yes. Testimony read back of Quo Guang Chen's discussion on direct examination regarding a conversation with the defendant. I can't read the middle word. Mr. Chen's stated that he would not pay $2,000 to the defendant. We request to hear his testimony in regard to this entire phone call and the related cross-examination.

Also, Quo Guang Chen's testimony regarding the phone call with the defendant after the murder.

MR. SKINNER: The testimony with regard to the phone call starts on page 322 at line 8 and it includes a rough time frame, which I think should answer the jury's question whether it was before or after the murder.

THE COURT: All right.

MR. SKINNER: Your Honor, how do you do read backs?

THE COURT: I am going to bring them into the courtroom.

MR. SKINNER: Do you want to us prepare the transcripts, or do you have the court reporter read it back omitting the objections? Logistically I have never done it

before.

THE COURT: I see. It works in different ways. I can just take a page of the transcript and expurgate everything that doesn't apply to it. That is one way of doing it.

MR. SKINNER: Probably the easiest.

THE COURT: On a discreet matter it is probably the easiest.

MR. SKINNER: We'll give you the pages and line numbers that apply.

THE COURT: If you hand it up, I will know. We'll make a copy.

MS. BURNS: Your Honor, may we see the note recording the two phone calls?

THE COURT: Yes, of course.

MS. BURNS: Thank you.

MR. COHEN: I have it on my lap top. What page?

MR. SKINNER: They are talking about the phone call at 339.

Are you going to read it or the reporter?

THE COURT: We're going to send it in.

MR. COHEN: With redactions and objections and things?

THE COURT: Of course.

MR. SKINNER: Let's agree on the page numbers and page number.

THE COURT: That's fine.

(Recess pending verdict)

MR. COHEN: We're going to go down to the command center, agree on the transcript.

MR. SKINNER: We agreed on the applicable pages and lines.

THE COURT: That's fine.

MR. COHEN: I don't want to be responsible for it so I am going to hand the note and envelope that it came in back to the clerk.

THE COURT: Absolutely. You should do that.

(Recess pending verdict)

THE COURT: I have received another note from the jury. This is a very actively writing jury. Request for testimony to read back Huo Guang Chen's testimony from the Corona Park incident. There were several times this was mentioned. We request all the testimony.

Mr. Burns, have you heard the note?

MS. BURNS: I have.

THE COURT: I wasn't looking in that direction.

MR. SKINNER: We heard it. We will gather that.

MS. BURNS: We have the other testimony ready.

THE COURT: That has been agreed to?

MR. COHEN: Yes, your Honor. We agreed to what is here. I've looked at the redactions. I have approved them and we're ready to send them in when you are.

THE COURT: Very well. We'll give them to Mr. Daniels.

MR. SKINNER: We'll get to work on the next one.

THE COURT: If you would like to read it, you are welcome to. We're mark it Court Exhibit 11.

(Recess pending verdict)

THE COURT: We have one more jury note, which I would like to answer in the affirmative. Can we go home now? Can we have the room open at 9:00 a.m. tomorrow? I have ascertained that both Mr. Daniels and the marshal will be available at 9:00 tomorrow morning.

MR. SKINNER: We will as well, your Honor.

THE COURT: We will continue deliberations to tell them that.

MR. COHEN: I don't want to be heard, Judge.

THE COURT: They are going to continue their deliberations.

MR. COHEN: Do you want us here at 9:00 as well?

THE COURT: I think you have to be.

MR. COHEN: Can the marshals have my client here?

MR. SKINNER: We can order him for 9:00. I am not sure what time they can produce him, but we'll order him at 9:00.

THE COURT: Let's get the jury in and let's let them go home.

(In open court; jury present)

THE COURT: Members of the jury, the answer to the question "Can we go home now" is yes and indeed you should be here to continue your deliberations at 9:00 tomorrow morning. But I should tell you that all of you have to be here in order to deliberate, which means that you may not begin your deliberations until everybody is in the jury room. That means that you all are responsible to each other to get here at 9:00 in the morning for a follow-up question on that.

UNIDENTIFIED JUROR: Can some of us come early, they would spend more time reading the indictment and charge.

THE COURT: I don't know if anybody is going to be here to guard the room.

UNIDENTIFIED JUROR: I mean at 9:00 in the morning as opposed to beginning deliberations.

THE COURT: I see. Once you all gather, you can agree on whatever procedure you want to agree on in terms of how you are going to deliberate; but you should not hold up the whole group. If one of you has a question, you should present it to the group and there is no reason why the group cannot look at whatever it is that you have in there at the time that the issue arises. But you shouldn't all be working on different things. You should be concentrating on the verdict form and taking it in sequence because that is the way you will have a more orderly deliberation and a more likely to complete your

A. 710

deliberation in an efficient fashion. Thank you all for your conscientious performance of a very important civic duty and you will continue again at 9:00 tomorrow morning. Have a pleasant evening.

(Jury excused)

THE COURT: Anything further?

MR. COHEN: Not from the defendant.

THE COURT: You are all excused.

(Adjourned to April 25th at 9:00 a.m.)

A. 711

# In The Matter Of:

## UNITED STATES OF AMERICA, v
## XING LIN

*April 25, 2013*

*SOUTHERN DISTRICT REPORTERS*
*500 PEARL STREET*
*NEW YORK, NY 10007*
*212 805-0330*

Original File d4p6linf.txt
**Min-U-Script® with Word Index**

A. 712

D4p6lin1            Page 1110

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

          v.                    11 CR 114 (MGC)

XING LIN,

             Defendant.              JURY TRIAL
------------------------------x
                               New York, N.Y.
                               April 25, 2013
                               10:15 a.m.

Before:

          HON. MIRIAM GOLDMAN CEDARBAUM,

                               District Judge


               APPEARANCES


PREET BHARARA,
     United States Attorney for the
     Southern District of New York
PETER M. SKINNER
JENNIFER E. BURNS
     Assistant United States Attorneys

JOEL S. COHEN
     Attorney for Defendant

ALSO PRESENT:  BRENDA CHEN, Fuchow Interpreter
               DANIEL YANG, Fuchow Interpreter
               LILY LAU, Fuchow Interpreter
               DANIEL CHAN, Fuchow Interpreter
               JESSICA CHACE, Paralegal
               TIMOTHY VARIAN, Special Agent, HSI
               JIAYING WANG, Legal Assistant
```

D4p6lin1            Page 1111

(Trial resumed)

(In open court; jury not present)

THE COURT: Good morning. Please be seated. People waiting for the motions, please be patient because I have a jury out deliberating that has just sent me a note. This is Note No. 13. In any event, counsel, I will now read the note.

"Can you please define 'malice aforethought'?

"Can you please provide the entire testimony of George Benedetto?"

Now, the testimony of George Benedetto, counsel should get together and expurgate all of the side commentary. When it comes to a definition of malice aforethought, it is an interesting question. We will send them George Benedetto's testimony. And in the meantime when you have collected your thoughts, I will hear you on malice aforethought.

(Continued on next page)

D4p6lin1            Page 1112

THE COURT: Now I would like to hear from counsel on malice aforethought.

MR. SKINNER: First, your Honor, we have the Benedetto testimony. I will give that to Mr. Daniels.

THE COURT: Good. Have you agreed on which testimony it is and have you expurgated all of the peripheral material?

MR. SKINNER: Yes, your Honor.

THE COURT: That's fine. We'll send it in to the jury.

MR. SKINNER: With regard to malice aforethought, it is a legal term that has a distinct meaning in the Second Circuit. The Second Circuit has said that in the context of the same statutes here, Section 924(j)(1) charge that then required proof of murder within the meaning of 18, U.S.C., Section 1111 said that the requisite malice can be found when the assailant acts with awareness of a serious risk of death or serious bodily harm, and then noted that the formulation was supported by our case law and cited by a Second Circuit case called United States v. Velasquez, which goes through some degree of analysis of the requisite intent.

THE COURT: Well, does it define malice aforethought?

MR. SKINNER: Yes. They are talking about malice aforethought. Unlawful killing of a human being with malice aforethought. The district court explained that the objective intent to call was not required and that requisite knowledge

D4p6lin1            Page 1113

can be found when the assailant acts with awareness of a serious risk of death or serious bodily harm and that formulation was affirmed by the Second Circuit. The Second Circuit also analyzed the meaning of malice aforethought at greater length in United States v. Velasquez, 246 F.3d 204 and again noted that in the context of second degree murder in federal law malice can be found where the assailant acts with awareness as a serious risk of death or serious bodily harm.

THE COURT: But that was malice, not malice aforethought.

MR. SKINNER: They are talking about the requisite malice, meaning the malice required by the second degree murder.

THE COURT: This is second degree murder that we're talking about?

MR. SKINNER: Yes, your Honor, it is Judge Sand --

THE COURT: Well, let's not accuse Sand for a volume for which he is an editor.

MR. SKINNER: The lead author of the volume of combined jury instructions that we sometimes shortcut by calling Sand --

MR. COHEN: Which are actually attributed to Judge Winefeld.

MR. SKINNER: -- that again referring to malice aforethought said that malice is the state of mind that would

cause a person to act without regard to the life of another. To satisfy this element, the defendant must have acted consciously with the intent it kill another person. So the Second Circuit standard seems to not require as much as what Judge Sand requires. And we can pass up copies of what we have here for the Court to look at.

THE COURT: Actually, the expression malice aforethought is a very old expression in the law and I have always thought that it required formation of an intent before the act.

What is your proposal for malice aforethought, Mr. Cohen?

MR. COHEN: Your Honor, given the the government's theory of the case throughout from their openings through their summation, I think that --

THE COURT: We all know what malice is.

MR. COHEN: Right.

THE COURT: That's simply intention.

MR. COHEN: Right.

THE COURT: The question is really what malice aforethought is, how much aforethought does there have to be is what the jury is asking I think.

MR. COHEN: In the element instruction from Modern Federal Jury Instructions --

THE COURT: Which editor is that?

MR. SKINNER: It's Sand. It is what I just read to the Court.

THE COURT: Thank you.

MR. COHEN: Well, the instruction that I would propose is in reading from this the second element the government must prove beyond a reason doubt is that the defendant acted with malice aforethought. Malice is the state of mind that would cause a person to act without regard for the the life of another. To satisfy this element, the defendant must have acted consciously with the intent to kill another person.

THE COURT: Right.

MR. COHEN: The surplusage or the additional language about not having to prove subjective intent to kill I think is contrary to government's theory of the case and contrary to the message that the government delivered in its summation. And I think that here in these circumstances of this case that once the Court has charged he acted consciously with the intent to kill another person that that is why the instruction should stop.

THE COURT: Do you doubt that he needs the intent to kill another person? Is that what you are saying, it doesn't require that?

MR. SKINNER: Your Honor, the Second Circuit says very clearly that malice can be found when the assailant --

THE COURT: Malice, but it doesn't say aforethought.

MR. SKINNER: The requisite malice. Sorry. They are referring to malice aforethought.

THE COURT: Have either of you looked at Black's Dictionary because this is a very, very old expression?

MR. SKINNER: Absolutely, Judge. I think that the Second Circuit law is saying in the context of second degree murder -- and it is clear and there is no dispute and I can pass it up to the Court--

THE COURT: Right. I would like to see what happened, what the facts of that case were because I never read sentences without facts?

MR. SKINNER: Fair enough, your Honor.

THE COURT: These cases are not a collection of sentences. They are a set of facts.

MR. SKINNER: I think here that the issue is with regard to the second person killed, there is certainly an act with serious disregard for risk of death.

THE COURT: Well, that is a different matter, disregard for risk of death.

MR. SKINNER: But it is part of and it satisfies malice aforethought according to the Second Circuit.

THE COURT: Let's just see. Let's see what the facts of this case were. Are we now able to cite summary orders? It has gone back and forth.

MR. SKINNER: Yes, your Honor, since 2008.

THE COURT: It has been changed on and off.

MR. SKINNER: I know. Thanks to the Supreme Court, they are all now the law of the land.

THE COURT: I can't find where in the opinion the issue is raised with respect so to the facts of the case. Which page did you read to me from?

MR. SKINNER: It's highlighted, your Honor. I thought I handed it up to you open from that page, but I may not have. I can find it for you.

THE COURT: Thank you. The only thing that troubles me is it speaks when an assailant acts and we're not dealing here with the assailant. We're dealing with --

MR. SKINNER: -- the person who ordered the assailant to act.

THE COURT: Right. That's clearly aiding and abetting whatever happened.

MR. SKINNER: Yes.

THE COURT: That's not the issue.

MR. SKINNER: I think we can address that.

MR. COHEN: As well, your Honor, with respect to the government's argument that the death of the unintended victim events depraved indifference.

THE COURT: I am sorry. Say that slowly.

MR. COHEN: I thought that Mr. Skinner had argued a few moments ago that this would apply to the death of the

unintended victim so to speak.

THE COURT: No. He is arguing that it applies to the death of the intended victim.

MR. SKINNER: I am arguing that it applies to be both. So let's be clear about that.

MR. COHEN: What I am saying is I believe it lessons the government's standard of proof since their theory of the case throughout has been that it was an intentional killing, not a reckless killing, not a depraved killing, that it was done with intent. I think for that reason it would be a lessening of their burden of proof to suggest otherwise.

THE COURT: The question is what did I use malice aforethought for in the charge?

MR. SKINNER: Because that is what the statute says, your Honor.

MS. BURNS: It was a very short instruction, your Honor, on page 48 that said, "In considering Count Three, you should apply the following definition of murder, which comes from Section 1111 of the Federal Criminal Code. Murder is the unlawful killing of a human being with malice aforethought."

MR. SKINNER: Directly quoting the statute.

THE COURT: Then the real question is the malice of the killer attributed to the aider and abettor? I think that is what the answer is.

MR. SKINNER: I don't think that is what they are

concerned about. I think they see a term in the charge and they want to know what the term means.

THE COURT: I understand. I don't think they would ask if we were talking about the person who pulled the trigger.

MR. SKINNER: The question is what does it mean and we should just give them a definition of what malice aforethought means.

THE COURT: The problem with the last is of course it was the assailant we're talking about. This is a little bit trickier because it is not the assailant.

MR. SKINNER: Your Honor, it's the person who causes the death.

THE COURT: Who directs the killer.

MR. SKINNER: Exactly. The intent of that person or that person's state of mind, whether they were acting with malice aforethought is what is at issue.

THE COURT: Right. But it is not the actual assailant that we're talking about. You have not had the time to find any case in which the murder was clearly directed by another and the question is what is the malice aforethought required for other.

MR. SKINNER: No, we haven't, and I don't think that it would be any different.

THE COURT: I understand that is your view, but I would be happier if we found a case that fit the facts. I

understand that is your view.

MR. COHEN: Your Honor, the facts in this case are that as alleged by the government's witnesses in their trial testimony was that Mr. Lin directed Little Beijing or Hao Chao to shoot. All these statements that came in with respect to get rid of him and things like that or finish him off, came in as impeachment material. So the actual evidence is that if it is believed that he said to shoot, that is not shoot to kill that, is not kill him, and I think that --

THE COURT: Well, now you are really slicing the onion very thin.

MR. COHEN: It's my job.

THE COURT: I understand.

MR. SKINNER: Your Honor, if we go back to the element of murder.

THE COURT: I would very much out of curiosity like to look at Black's Dictionary.

MR. SKINNER: If it is at all helpful, Judge Casey wrote a decision in 2004 in which he noted that malice aforethought is a term of art used for centuries in common law to delineate a state of mind and particularly worthy of punishment. He notes that a Supreme Court case in 1946 cited Blackstone, which in turn noted that murder of common law required proof of malice aforethought. Although, he doesn't say what it meant.

THE COURT: That is why I am interested in what it is, malice aforethought, because it is an ancient term of art.

MR. SKINNER: The only other think I wanted to say to your Honor is if we go back to the elements of murder that is charged here, which is 924(j), and I will not go through all of the elements, but it requires that the third element that the defendant's conduct cause of death of these people that the firearm was used in commission of the crime and finally that the death of those persons qualifies as murder as it is defined by Section 1111.

My point being that I don't think to qualify as murder it doesn't matter whether we're focusing on the assailant or the person who gave the order so long as the death qualifies as murder, which we obviously believe it does. I don't think it matters whose malice aforethought it was.

THE COURT: That's really the question, can you aid and abet malice aforethought.

MR. COHEN: I think it matters very much whose malice aforethought it was.

THE COURT: Clearly this is aiding and abetting not --

MR. SKINNER: Let's focus on what we're talking about here. We're talking about the use of a gun that results in the death of another where that death qualifies as murder. So within that definition --

THE COURT: That's a disembodied set of words.

MR. SKINNER: That's what we have.

THE COURT: You wouldn't have that if the defendant had not ordered it.

MR. SKINNER: I agree, your Honor.

THE COURT: Isn't that right?

MR. SKINNER: Because if you go back to the --

THE COURT: So it is not helping. It is not helping us or the jury.

MR. SKINNER: No.

THE COURT: The jury wants to know whether the defendant intended that the person aimed at died. That's what the jury wants to know.

MR. SKINNER: That is not what they asked. I am not going to speculate what they want to know.

THE COURT: I am not speculating. They want to know whether malice aforethought means that before it happens, it was intended. It really sort is asking whether it required a plan of some sort. It's a very close question.

MR. COHEN: I agree with you, your Honor. I think because it is a close question that the definition in the jury instruction that talks about -- I don't have it in front of me and I don't have the exact words. May I take it back for a moment, your Honor?

THE COURT: Yes.

MR. COHEN: Thank you. Where it says that malice is

the state of mind that would cause a person to act without regard for the life of another and that to satisfy the element, the defendant much of acted consciously with the intent kill another person answers the question that the jury is asking that I think your Honor has correctly identified.

THE COURT: Look, I don't think that answers it exactly either.

MR. SKINNER: I think what we should do is come up with --

THE COURT: I would like to see Black's Dictionary.

MR. SKINNER: I don't have a copy of Black's here.

THE COURT: We have it in chambers. This is just an ancient expression.

MR. SKINNER: They asked what it means. We should tell them what it means.

THE COURT: Of course.

MR. SKINNER: We should leave it to them to figure out how to apply it to the facts of this case.

THE COURT: I agree with you, but I want to be clear as to what it means. That is my only concern, what it means, because as we have all agreed a very ancient formulation.

MR. SKINNER: It is.

MR. COHEN: Counsel discussed it was an archaic term.

THE COURT: Malice literally means bad thought, a bad purpose.

MR. SKINNER: Exactly. I was going to say bad purpose. I don't know the Greek or Roman roots.

THE COURT: The roots of most of these things is Middle French, which is halfway between Latin and French. Malum in Latin means bad. Every word that starts with m-a-l means bad something.

MR. SKINNER: Well, none of us want to commit malpractice.

THE COURT: Exactly. That's a perfect example, a bad practice. Most of these expressions come from the period of the Norman Kings of England who spoke Middle French. Most of our expressions like "voir dire" are Middle French.

MR. SKINNER: I did not know that.

THE COURT: It doesn't mean to see and to speak, which would be modern French. It means to speak the truth, which is different --

MR. SKINNER: Definitely.

THE COURT: -- from current usage in France. V-o-i-r meant something closer to verity in Middle French than to see.

MR. SKINNER: So it is not just seeing.

THE COURT: It has nothing to do with seeing. It has to do with truth. That's why we have a petit jury and a grand jury. They are both French words, p-e-t-i-t and g-r-a-n-d. Because French was the language of the English courts from the

time that the Norman Kings arrived in England for a couple of centuries.

MR. SKINNER: From 1066 onward.

THE COURT: Not all the way. It switched to Latin eventually, but it was a couple hundred years and it is the Norman Kings who established what we call the common law courts, the king's courts and their language was French and that is what they spoke in the courts and that is what everyone in the courts spoke, Middle French.

I now have the Black's Law Dictionary or at least one of the recent versions of it. Malice aforethought: The requisite mental state for common law murder encompassing any one of the following:

One, the intent to kill;

Two, the intent to inflict grievous bodily harm;

Three, extremely reckless indifference to the value of human life, or;

Four, the intent to commit a dangerous felony.

The felony murder rule is also termed premeditated malice. Malice aforethought is the term which came into use during medieval times to indicate the mental element necessary in the felony of murder. It has been the subject of voluminous juris prudential inquiry.

So the jury is following a long tradition.

Every intentional killing is with malice aforethought

unless under circumstances sufficient to constitute justification, excuse, or mitigation. Malice is the intent without justification or excuse to commit a wrongful act.

The real issue here clearly is what aforethought means. That is what the the jury is concerned about.

MR. COHEN: Your Honor, my view is that here aforethought means intent.

THE COURT: Excuse me?

MR. COHEN: My view, your Honor, is that what they are looking for can be answered by the fact that aforethought --

THE COURT: Malice itself means intent.

MR. COHEN: Malice means bad purpose. I think aforethought is intent.

THE COURT: Aforethought means that it is not by accident.

MR. COHEN: Right. It is intentional. I agree with you.

MR. SKINNER: Your Honor, I will just note in addition with regard to the Gonzalez case that we handed up to you, turning to the last page, and it is a the summary order so we don't have a thorough discussion of the facts, but it appears to be a very similar situation.

THE COURT: That is what I was looking for. I am very interested in that. Where is that?

MR. SKINNER: If you look at the the last page of the

decision, Headnote 12.

THE COURT: I am not interested in headnotes.

MR. SKINNER: I am just trying to direct you to a location.

MS. BURNS: That's where it starts.

THE COURT: It is page 10?

MR. SKINNER: Page 10, yes. David is the defendant who was appealing this case. He was a coconspirator of Pedro who was the actual triggerman in the case.

THE COURT: Right.

MR. SKINNER: He was charged under 924(j) just as the defendant here has been charged.

THE COURT: Let me just read this. I appreciate that because I am interested in facts as you know. Under our system of the law, it is the facts of the case that determine whether a case applies.

It does bring it much closer. Of course we're not doing it through a Pinkerton charge.

MR. SKINNER: No.

THE COURT: That doesn't matter.

MR. SKINNER: They said as a principal.

THE COURT: They are just mentioning how it could have been. Here it is not.

MR. SKINNER: They said as a principal as opposed to an aider and abettor. He is liable as a principal as well as

an aider and abettor.

THE COURT: I think that's right.

MR. SKINNER: If you go back to page 8, which is the highlighted portion of what we cited, the Court sets out the standard under 924(j) for malice aforethought.

THE COURT: Yes.

MR. SKINNER: I think that is the standard we should be using here.

THE COURT: Unfortunately they are quoting from Vasquez, which had different facts. But these facts that you point out are much closer to -- the case that you are relying on are much closer to our facts.

MR. SKINNER: Yes, your Honor.

MR. COHEN: Again, your Honor, they are talking about the act of the assailant and not the acts of another person. Here the defendant is not the assailant.

MR. SKINNER: Again, your Honor, that is not actually right.

THE COURT: That is what we're looking to see. Here we're talking about a killing by a coconspirator in the case that has been cited to me.

MR. SKINNER: Yes. The appellant in that case was not the triggerman. He was the coconspirator.

THE COURT: Yes, I see that. What the defendant in that case was arguing was that malice aforethought requires

premeditation and the Court rejects that.

MR. COHEN: We're not, your Honor, arguing that it required premeditation but only that it only requires intent, which is different from premeditation.

THE COURT: That is true.

MR. SKINNER: Well, then the defendant raised that argument and said there was an impermissible lowering for the burden of proof for his conviction for murder in relation to the the drug conspiracy and the Court rejected that argument. That is at page 8 where they walk through what malice aforethought was.

MR. COHEN: What they rejected was his argument that premeditation should have been charged.

THE COURT: There is no question that the defendant argued that the jury should have been charged that premeditation was required.

MR. COHEN: Which we do not argue here, your Honor, only that intent need be charged.

MR. SKINNER: Well, it is intent. It is just an intent to do what.

THE COURT: The problem with premeditation means thinking before and before you give anybody an instruction, you are thinking before you say it.

MR. SKINNER: I think the cases that go to first degree murder say that premeditation can happen in a flash,

D4p6lin1                                                    Page 1130

very quickly, but that is neither here nor there because we're talking about second degree murder and what is meant by malice aforethought.

THE COURT: What you are asking is that I tell the jury that malice aforethought means with awareness of a serious risk of death or serious bodily harm.

MR. SKINNER: Yes, your Honor.

THE COURT: I think under the Second Circuit cases that is a fair reading.

MR. COHEN: Your Honor, then I think you have to define what serious bodily harm is.

THE COURT: Well, if you prefer I can just charge them a serious risk of death.

MR. COHEN: I think that would be preferable.

THE COURT: I have no problem with that.

MR. COHEN: I am not waiving my objection.

THE COURT: I understand. Nobody waives anything he does not agree with. What I am going to tell the jury is malice aforethought means with awareness of a serious risk of death.

MR. SKINNER: That's fine, your Honor.

MR. COHEN: Judge, I think you should charge that it means either with intent to kill or with the the awareness of a serious risk of death.

THE COURT: Intent to kill doesn't make much sense

D4p6lin1                                                    Page 1131

when it is not the person who pulls the trigger for malice aforethought. I am avoiding saying the assailant because it is not the assailant they are interested in or that is on trial here. So I am going to take from this case malice aforethought means awareness of a serious risk of death.

MR. SKINNER: Your Honor, just so the record is clear on the case we've all been discussing, it is United States v. Gonzalez, 399 Fed. App. 641.

THE COURT: But it is really based on --

MR. SKINNER: Velasquez.

THE COURT: -- the Second Circuit's reading of its own case United States v. Velasquez.

MR. SKINNER: That's correct. We cited that case earlier. Again it is 246 F.3d 204.

THE COURT: Fine.

MR. COHEN: Just so the record is clearly preserved my view, your Honor, is that because the government did not argue that what happened here was that Mr. Lin acted with disregard for the risk -- they argued that it was intentional and that the intent was transferred with respect to Mei Ying Li --

THE COURT: Whom did they argue that to? They didn't argue it to the jury.

MR. COHEN: I thought they did.

MR. SKINNER: Regardless of the government's arguments, one way or another, your Honor, it doesn't matter.

D4p6lin1                                                    Page 1132

What we're talking about here is the legal definition that the jury should be applying to their findings of the facts and that is what controls. Even if I came in and said that he acted with premeditation so therefore you clearly satisfied the lower standard doesn't change what the standard is.

THE COURT: Very well. You have an exception, Mr. Cohen.

MR. COHEN: Thank you, your Honor.

THE COURT: We're going to send this to the jury: Malice aforethought means with awareness of a serious risk of death.

We'll be in recess until the next note.

MR. SKINNER: Thank you, your Honor.

THE DEPUTY CLERK: All rise.

(Recess pending verdict)

D4p6lin1                                                    Page 1133

THE COURT: Good afternoon. We have another note from the jury. Request for testimony of Guang Yun Zhou.

One, speaking about Ding Pa operating gambling parlor and how he knew that Ding Pa was the owner.

Two, speaking about being a shareholder in the gambling parlor including how many other shareholder individuals.

Three, speaking about number of workers in the gambling parlor.

This is Guang Yun Zhou.

Now we go onto other testimony.

Shun Xing Chen wants the same information, the same three subjects.

I will let you see this in a minute.

Qun Li. They want the same information from Qun Li of his testimony, what he said about these things.

Cai Xiang Li, the same.

One, two, three, four different witnesses they want the testimony of.

MR. SKINNER: Okay.

THE COURT: This is Jury Note No. 14. I will let you all work on this.

MR. SKINNER: This will take a little while.

THE COURT: I am sure.

MR. SKINNER: Although two of the witnesses they

D4p6lin1                                                    Page 1134

picked actually had very minimal testimony.  There were a lot of witnesses that talked about gambling parlors.

THE COURT: Well, they weren't as concerned about them.

MR. SKINNER: Maybe.  Hopefully not.

THE COURT: We'll be in recess until the two sides reach agreement on which testimony is being asked for.

MR. SKINNER: Thank you, Judge.

THE COURT: Very well.

(Recess pending verdict)

D4p6lin1                                                    Page 1135

THE COURT: The jury has reached a verdict and I would like to get the.

(In open court; jury present)

THE COURT: You may be seated.  I have received your verdict and I will now read it.

Count One, RICO conspiracy, guilty.

Count Two, RICO substantive, guilty.

Racketeering Act One, murder of Chan Qin Zhou, proved.

Conspiracy to murder Chan Qin Zhou in violation of state law, proved.

Racketeering Act Two, extortion of individuals who owned and operated a bus company, proved.

Conspiracy to extort individuals who owned and operated a bus company, not proved.

Racketeering Act Three, operation of an illegal Mahjong parlor in 1996, proved.

Racketeering Act Four, operation of an illegal tien lin parlor in 1996 to 1997, proved.

Racketeering Act Five, operation of an illegal tien lin parlor in 1999 to 2002, proved.

Count Three, murder of Chan Qin Zhou, guilty.

Murder of May Ying Li, guilty.

Count Four, extortion, guilty.

Count Five, extortion conspiracy, not guilty.

Now I am going to go around the jury and ask each of

D4p6lin1                                                    Page 1136

you whether what I just read is your verdict.

(Jury polled; each juror answered in the affirmative)

THE COURT: You all performed a very, very important civic duty carefully and well and the community is in your debt.  We are the only country in the the world, although I am told that New Zealand is now such a country, which places so much importance on trial by jury that it is guaranteed in our Constitution both in criminal and civil cases.  Apart from New Zealand, we're the only country in the world that guarantees the right of jury trial in civil cases because we consider it so important for a cross-section of the community to participate in the administration of justice.  We believe very much in the importance of citizens helping in the administration of justice and participating in it.  This is a fundamental American tradition and because we have enormous confidence in the judgment of American citizens.  So you have once again provided evidence of the wisdom of our Constitution.

You are all now excused and can feel that you have performed a major and important public duty this week and last week.  You may all go home to your families now and you are no longer muzzled.  You can now speak about anything you want to speak about either among yourselves or with anyone that you choose.  Have a very pleasant evening.

(Jury discharged)

THE COURT: Very well, you may be seated.

D4p6lin1                                                    Page 1137

Is there any application at this time?

MR. COHEN: Your Honor, I would like to reserve motions until possibly a week or two before sentencing.

THE COURT: Excuse me?

MR. COHEN: I would like to reserve any post-verdict motions.

THE COURT: That is, you would like to postpone the deadline on post-judgment motions by how long?

MR. COHEN: I guess until two weeks before your Honor fixes a date for sentencing.

THE COURT: You mean two weeks before that?

MR. COHEN: Yes, or three if that would be better for the Court.

THE COURT: I will want a presentence report and that normally takes a minimum of three months.  I am not sure that I can give you that much time.  I can certainly extend the 10-day deadline, but I think you should make the motion before the date of sentence, which is at a much more distant time.  That is, for sentence I will set a date in early September for sentence.  Is September 10th at 11:00 in the morning an acceptable date?

MR. COHEN: If that's not a holiday, it is okay with me, your Honor.

THE COURT: It is not.  It's a Tuesday.

MR. COHEN: Yes.

THE COURT: The holidays you are looking at are on the 4th and 5th and 13th of September. They are very early this year.

MR. COHEN: So September 10th it is, your Honor.

THE COURT: September 10th at 11:00 in the morning. I don't see any reason why you cannot make whatever motions you choose by June 4th.

MR. COHEN: That's fine, your Honor.

THE COURT: Is there anything further?

MR. SKINNER: Not for the government, your Honor. Thank you.

MR. COHEN: No.

THE COURT: Very well. You are then all excused.

MS. BURNS: Thank you, your Honor.

MR. SKINNER: Thank you.

MR. COHEN: Your Honor, can I have a moment with my client?

THE COURT: Yes, of course. Please do not remove Mr. Lin for a few minutes. You can even sit down together for a minute.

MR. COHEN: Thank you.

o0o

<u>United States of America v. Xing Lin, a/k/a "Ding Pa"</u>

11 Cr. 114 (MGC)                                         April 24, 2013


<u>JURY VERDICT FORM</u>


<u>COUNT ONE</u>:  RICO Conspiracy

                    Not Guilty _____        Guilty _____


<u>COUNT TWO</u>:  RICO Substantive

                    Not Guilty _____        Guilty _____


        If and only if you have found the defendant guilty of Count Two, please check "not proved" or "proved" as to each of the acts of racketeering listed below.  If you have found the defendant not guilty of Count Two, proceed directly to Count Three.

        <u>Racketeering Act One</u>
        (a)   Murder of Chang Qin Zhou in violation of state
              law

                    Not Proved _____        Proved _____

        (b)   Conspiracy to murder Chang Qin Zhou in violation
              of state law

                    Not Proved _____        Proved _____

        <u>Racketeering Act Two</u>
        (a)   Extortion of individuals who owned and operated a
              bus company

                    Not Proved _____        Proved _____

        (b)   Conspiracy to extort individuals who owned and
              operated a bus company

                    Not Proved _____        Proved _____


                            1

**A. 721**

Racketeering Act Three
(a)   Operation of an illegal mahjong parlor in 1996

                    Not Proved _____          Proved _____

Racketeering Act Four
(a)   Operation of an illegal Tien Lin parlor in 1996-
      1997

                    Not Proved _____          Proved _____

Racketeering Act Five
(a)   Operation of an illegal Tien Lin parlor in 1999-
      2002

                    Not Proved _____          Proved _____


COUNT THREE:   Murder

       (a)   Murder of Chang Qin Zhou

                         Not Guilty _____          Guilty _____

       (b)   Murder of Mei Ying Li

                         Not Guilty _____          Guilty _____


COUNT FOUR:   Extortion

                         Not Guilty _____          Guilty _____


COUNT FIVE:   Extortion Conspiracy

                         Not Guilty _____          Guilty _____



                    _____
                              FOREPERSON

                    Dated:            , 2013


                                 2

**A. 722**

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York   10007*

September 15, 2014

**BY ECF**

The Honorable Miriam Goldman Cedarbaum
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

> Re:  United States v. Xing Lin,
>        S2 11 Cr. 114 (MGC)

Dear Judge Cedarbaum:

The Government respectfully submits this letter in advance of defendant Xing Lin's sentencing scheduled to take place before Your Honor on September 17, 2014.[1]

On April 25, 2013, Lin was convicted following a three-week jury trial of one count of engaging in a racketeering conspiracy, one count of racketeering, one count of murder in aid of a crime of violence, and one count of extortion.   The evidence at trial demonstrated beyond a reasonable doubt that Lin was the leader (or "Dai Lo") of a gang, the members of which (known as "kids" or "followers") acted at Lin's instruction and engaged in violence, including murder, on Lin's behalf.   As the leader of the gang, Lin operated several gambling parlors, extorted the owners of a bus company, and murdered a man who interfered with that extortion, as well as an innocent bystander.   The Government proved Lin's guilt through the testimony of fifteen witnesses and dozens of exhibits, including items of physical evidence, photographs, ballistics evidence, medical evidence, and bank and telephone records.   This evidence included the testimony of the extortion victim, eyewitnesses to the murders and other acts of violence, law enforcement officers, medical examiners, a ballistics examiner, and associates of Lin. The eyewitness testimony was corroborated by, among other things, the testimony of law enforcement officers who participated in the investigation of the murders, evidence recovered from the crime scenes (including ballistic evidence), bank records showing payments made by the extortion victim, and telephone records showing contact between Lin and others.   All of this evidence established Lin's guilt beyond a reasonable doubt.

The Government respectfully requests that the Court impose sentence of life

---

1 The Government has not yet received the defendant's submission and respectfully reserves the right to respond to arguments set forth therein, as needed.

**A. 723**

imprisonment on Counts One and Two, a sentence of twenty years on Count Four, and a consecutive sentence of life imprisonment on Count Three.

## BACKGROUND

**A.      The Charges**

Count One and Count Two of the Indictment charged Lin with participating and agreeing to participate in the affairs of a racketeering enterprise, from at least in or about 1996 up to and including in or about December 2009, in violation of 18 U.S.C. §§ 1962(c) and (d).   The charged racketeering enterprise was called the Ding Pa Organization. Counts One and Two charged that Lin and his co-conspirators participated and agreed to conduct and participate in the affairs of the Ding Pa Organization through a pattern of racketeering activity comprised of multiple state and federal law violations.   Specifically, the Indictment charged state law violations of murder, conspiracy to commit murder, extortion, and operation of illegal gambling businesses.   The charged federal law violations include murder, extortion, conspiracy to commit extortion, illegal gambling operations, and extortionate collection of credit.   Count Three charged Lin with the murders of Chan Qin Zhou and Mei Ying Li, in violation of 18 U.S.C. §§ 924 (j) and 2.   Count Five charged Lin with extortion of individuals who owned a bus company, in violation of 18 U.S.C. § 1951 and 2.   Count Five charged Lin with conspiring to commit the extortion of those same individuals, in violation of 18 U.S.C. § 1951.   (Presentence Investigation Report dated May 12, 2014 ("Presentence Report" or "PSR") ¶¶ 1-11).

**B.      The Offense Conduct And The Defendant's Conviction**

Lin was tried on all five counts of the Indictment at a trial before this Court and a jury commencing on April 9, 2013, and concluding on April 25, 2013, when Lin was found guilty on Counts One through Four. The Jury acquitted Lin of the extortion conspiracy charge contained in Count Five of the Indictment.

The evidence at trial demonstrated overwhelmingly Lin's guilt.

### 1.      Lin Was a Dai Lo Leading a Gang in Chinatown and Elsewhere

The testimony at trial established that Lin was a Dai Lo with a group of "kids" or "followers" who acted at his instruction, worked in his gambling parlors, and engaged in violence on his behalf.    One of Lin's former followers, Shun Qing Chen, testified that he followed Lin along with ten to twenty other followers.   (Tr. 590-641, 665).   In return for following Lin, Qing Chen received shares in one of Lin's gambling parlors, as well as food, alcohol and spending money.   (Tr. 606).   Qing Chen further testified that he got into a fight on behalf of Lin (Tr. 607) and that on occasion he and Lin armed themselves with guns and went looking for people who had crossed Lin (Tr. 615).

Five other witnesses — Huo Guang Chen, Cai Xiang Li, Qun Li, Cheng Yong and Allen Chen — also testified that Lin was a Dai Lo who headed a gang that operated in Chinatown and elsewhere.   (Tr. 289-90, 449, 689-90, 825).   In particular, Huo Guang Chen (the extortion victim discussed below) explained that Lin demanded additional money from Chen to help cover expenses Lin incurred providing housing, food and entertainment for his followers.   (Tr. 322). Huo Guang Chen (Tr. 291-292), Qun Li (Tr. 450-58), Cai Xiang Li (Tr. 690-96), and Allen Chen

## A. 724

(Tr. 517-21) further testified about numerous acts of violence perpetrated by Lin and Lin's gang.

### 2.    Lin Operated Gambling Parlors

From the mid-1990s until the early 2000s, while based principally in New York City, Lin and his gang operated three illegal gambling parlors in and around the Chinatown neighborhood of Manhattan.   The evidence established that Lin profited from each of these gambling parlors by collecting "commissions" from the gamblers.

Five witnesses — Guang Zhu (Tr. 100-102), Cai Xiang Li (Tr. 686-689), Huo Guang Chen (Tr. 286-289), Shun Qin Chen (Tr. 603-605) and Cheng Yong (Tr. 822-824) — testified about a gambling parlor located behind a barbershop located at 21 Eldridge Street in the Chinatown neighborhood of Manhattan.   A card game called "13 Card," or "Tien Lin," was played at 21 Eldridge Street.   At that location, workers handled thousands tens of thousands of dollars a night bet on the game with those bets nearing hundreds of thousands of dollars some nights (Tr. 287), and Lin profited from "commissions" charged on those bets.

In fact the defendant with several others beat an individual named Yi Qui over a gambling debt in the barbervship at the front of 21 Eldridge Street. (Tr. 691-693).   Lin and his followers punched and kicked Yi Qui, leaving him bleeding from the mouth and bruised.   (Tr. 693).

Zhu and Xiang Li further testified about a gambling parlor located on Madison Street in Chinatown where 13 Card was also played.   (Tr. 95-99, 679, 682-686).   Thousands of dollars were also bet at the Madison Street gambling parlor.

Finally, Xiang Li testified about a mahjong parlor run by the defendant that was located upstairs from the room on Madison Street where 13 Card was played.   (Tr. 679-682). This mahjong parlor also generated substantial profits for Lin.

In addition to the gambling parlors in Chinatown, Allen Chen testified that Lin and his gang operated gambling parlors in Toronto, Canada.   (Tr. 511-512).   Lin moved to Toronto following the July 29, 2004 murders described below.   (Tr. 458-59, 517).   Once there, he operated at least two gambling parlors in the Toronto area and used violence to force Allen Chen to abandon a competing gambling parlor.   (Tr. 511-521).

### 3.    Lin Used Violence to Maintain his Position as a Dai Lo

Lin used violence and threats of violence to maintain "face," or respect, in the Chinatown community, to maintain his position as a Dai Lo, and to get rid of rivals.   In particular, Qun Li, a former follower of another Dai Lo and eventual Dai Lo himself who operated in and around Chinatown in the mid-1990s, had a series of violent encounters with Lin. Qun Li testified that in or about 1996, Lin and three followers entered a restaurant in the Chinatown neighborhood of Manhattan and approached Li.   (Tr. 450).   Lin then picked up a soy sauce bottle, threatened to hit Li with the bottle, and stated "I'm going to kill you today." (Tr. 450).   Qun Li's friends and other patrons intervened between Lin and Qun Li before Lin

˘3˘

**A. 725**

could hit Li with the bottle. (Tr. 450).

Qun Li also testified about an altercation with Lin in or about 2000 in a private room in a nightclub in the Flushing neighborhood of Queens, New York.   (Tr. 452).   Li and others were in the nightclub when Lin and two followers entered the club and Lin pointed at another man and told his followers to "beat him up for me."   (Tr. 451-52).   Lin's followers tried to fight the man Lin had pointed out, but Qun Li interceded and stopped them from beating the man.   (Tr. 452).

Qun Li testified that shortly after that incident at the nightclub in Flushing, he was eating at a restaurant in Brooklyn.   (Tr. 454-455).   Lin entered the restaurant with three followers.   (Tr. 455).   Qun Li tried to leave the restaurant, but Lin told him not to leave.   (Tr. 457).   Lin also punched Qun Li, and Qun Li punched Lin.   (Tr. 457).

A day or two after the incident at the Brooklyn restaurant, Qun Li was walking on Eldridge Street in Chinatown.   (Tr. 457).   When he neared the barbershop where Lin operated a gambling parlor, Lin came up behind Qun Li, grabbed Li, and tried to pull Li into the barber shop.   (Tr. 458).   Li held onto the doorframe of the front door to prevent Lin from pulling him all the way into the barber shop.   (Tr. 458).   He testified that he saw a screwdriver jammed into the area between the front door and the door frame that was holding the front door open, and that he pulled out the screwdriver and stabbed Lin on his lower body with the screwdriver.   (Tr. 458, 499).   Lin then released Li, who ran away.   (Tr. 458).

In addition to the incidents with Qun Li, Lin and his gang members used guns and knives against rivals and other people who crossed them.   For example, Huo Guang Chen testified that on or about July 16, 2000, Lin entered a gambling parlor located at 21 Orchard Street in Chinatown.   (Tr. 291).   Lin approached the owner of the gambling parlor, a man named Pan Zhen Chao, and put a gun to Chao's head.   (Tr. 291).   Lin told Chao that Chao was not giving Lin "face" and that Lin was going to kill Chao.   (Tr. 291-292).   Chao begged for his life, and Lin agreed not to kill him on the condition that Chao give him face in the future.   (Tr. 292).   Lin then fired one shot into the floor of the gambling parlor and left.   (*Id.*).

Huo Guang Chen's testimony about the July 16, 2000 shooting was corroborated by ballistics evidence.   Shortly after the incident, the New York City Police had responded to a call for assistance.   (Tr. 292).   They found a bullet lodged in the ceiling of the Orchard Street gambling parlor, which was introduced as evidence at the trial.   (GX 40, GX 106).

Similarly, in or about September 2002, Lin and his followers went armed to a gambling parlor in Chinatown that was owned by Yi Feng, a rival gangster.   (Tr. 611).   Lin fired shots at the gambling parlor (Tr. 318), and Lin and his followers then fled (Tr. 612).   Yi Feng's followers chased Lin down the street, caught him, and stabbed him.   (Tr. 614).   Following the stabbing, Lin relocated to Atlanta.   (Tr. 318-19).

Further, on or about November 14, 2003, Lin ordered his followers to stab a man who was not giving Lin face.   Lin and his followers were at a restaurant in Chinatown when Lin

˘4˘

**A. 726**

got into an argument with a man named Song Di Xiang.   (Tr. 525-34, 539-562).   Lin ordered two of his followers to stab Xiang.   (Tr. 541, 542).   The followers stabbed Xiang, who then fell down a staircase into the basement where the restaurant's kitchen was located.   (Tr. 542-43, 545).   Following the stabbing, someone else in the restaurant shot Lin in the leg.   (Tr. 570; GX 34, GX 110).   The NYPD responded and recovered three bullets from the restaurant.   (Tr. 570-73; GX 31-34, GX 107 and GX 110).

Lin and his followers also used physical force — punching and kicking — to injure and intimidate their victims.   For example, in approximately 2001, Lin and three to four of his followers entered a gambling parlor located behind a barbershop on 109 East Broadway.   (Tr. 690, 691).   They dragged a man named Yi Qui who had been gambling in a back room into the front room where the barbershop was located.   (Tr. 692-93).   They then punched and kicked Qui a dozen times.   (Tr. 693-694).

Similarly, Lin and his followers beat up Allen Chen in Toronto in December 2010.   In or about July 2010, Allen Chen had refused Lin's demand for a share of a gambling parlor that Chen was running.   (Tr. 512-514).   Chen next saw Lin at a nightclub in about December 2010, and Lin and his followers beat Chen, putting him into the hospital.   (Tr. 517-521).

### 4.    Lin Extorted the Owners of a Bus Company

Beginning in 2002, Lin extorted Huo Guang Chen, the owner of a company that operated buses on a route from Chinatown, Manhattan to Raleigh, North Carolina.   Chen and his partner had learned that a rival bus company was going to start operating buses on the same route to North Carolina, and they turned to Lin for help.   Lin took a one third share of Chen's company, met with the competing company, and the competition then went away.   From that point on, Chen and his partner paid one third of their profits to Lin every month. (Tr. 294-297).

In or about July 2003, Lin demanded a larger share of the company from Chen. After Chen refused, Lin told Chen that Lin and Chen's partner were going to kick Chen out of the company.   Chen turned for help to one of his partner's friends, a Chinatown businessman named Chan Qin Zhou, who also went by the nickname Yi Qun.   After Chen enlisted Zhou's help, Chen's partner decided not to side with Lin, and Chen remained in the company.   (Tr. 322-325).

The next day, Lin and his followers met Chen in a park in Queens and threatened Chen for causing Lin to lose "face."   (Tr. 327).   Chen testified that he was scared of Lin and that he agreed to make monthly payments to Lin of $2,000 on top of the monthly profit payments.   (Tr. 327, 338).   Around the same time, Chen had sold some of his shares in the bus company to Chan Qin Zhou, but Chen did not tell Zhou about the $2,000 payments to Lin.   (Tr. 327, 329).

In or about May 2004, Chan Qin Zhou learned that Chen was paying Lin $2,000 per month on top of Lin's share of the profits from the bus company.   Zhou ordered Chen to

˘5˘

## A. 727

stop the payments. (Tr. 339, 406).   Chen called Lin and told Lin that another shareholder had ordered Chen to stop making the $2,000 payments.   Lin told Chen that he knew who the other shareholder was and threatened to harm the other shareholder.   Chen stopped paying Lin the extra $2,000 in July 2004.   (Tr. 339-406).   Lin murdered that shareholder and an innocent bystander on July 29, 2004.

**5.        Murder of Chan Qin Zhou and Mei Ying Li**

Two eye witnesses — Guang Yun Zhu and Cheng Yong — testified about the July 29, 2004 murders.   Their testimony was corroborated by forensic evidence, including ballistics and medical evidence.   (Tr. 102-109, 168-176, 179-195, 763-777; GX 8, GX 9, GX 10, GX 11, GX 12, GX 14, GX 105).   An additional witness present at the club — Cai Xiang Li — also testified about the events of that evening, though he was not inside the room at the time of the murders.   In addition, Huo Guang Chen and Heng De Oh-Yang testified about their conversations with the defendant after the murders.   (Tr. 341-42, 794-795).

In the early morning hours of July 29, 2004, Chan Qin Zhou was in a private room in a karaoke bar in Queens, New York.   (Tr. 105, 699-703, 830-31).   Xiang Li testified that he was outside the room in the hallway when he saw Lin and one of Lin's followers walk quickly down the hall and into Zhou's room.   (Tr. 707-710; *see also* Tr. 107, 834).   Once they were in the room, Lin told his follower to "shoot" Zhou, and the follower pulled out a gun and started shooting.   (Tr. 108-109, 835-37).   Zhou was hit and fell to the ground.   (Tr. 109, 836-37).   Lin's follower then stood above Zhou and kept shooting Zhou until his gun was empty.   (Tr. 836-37).

Zhou was hit six times and was killed.   (Tr. 184).   The forensic evidence demonstrated that Zhou was in a defensive position with his arms up when he was shot and that the bullets struck him in a manner consistent with the eyewitness testimony — twice on the hands and arms, twice in the chest, once in the side, and once in the back.   (Tr. 184-187; GX 14). Two waitresses who were in the karaoke room were also shot.   A waitress named Mei Ying Li was hit in the head and died later that night.   (Tr. 170, 172).   The forensic evidence demonstrated that she was ducking down when she was struck by a bullet on the top of the head. (Tr. 170-171; GX 12).   The other waitress was hit in the leg and survived.   (Tr. 68).   After the shooting, Lin and his follower fled together from the karaoke room.   (Tr. 109).

The following morning, Lin called Heng De Oh-Yang, a livery cab driver, and asked Oh-Yang to drive Lin to retrieve a car Lin had left at the scene.   (Tr. 795-799).   That vehicle was recovered instead by police and found to contain Lin's belongings, including a driver's license and bank records.   (GX 6, GX 7, GX 103).

Roughly ten days after the murders, Lin called Huo Guang Chen.   Lin refused to use his name and did not tell Chen where he was.   (Tr. 341).   Chen asked Lin why he had killed Zhou, and Lin confirmed that he had told his follower to "get rid of" Zhou.   (Tr. 341-42). According to Lin, however, he only meant for Zhou to be shot "on the arms or legs."   (Tr. 342). During that call, Lin also demanded that Chen continue making monthly payments to Lin's wife and told Chen that he still had followers in New York.   (Tr. 342).

**A. 728**

The Honorable Miriam Goldman Cedarbaum
September 15, 2014
Page 7

Chen made the payments monthly payments Lin demanded, comprising one third of his bus company's profits, to Lin's wife until November 2009.   (Tr. 344).   The payments into Lin's wife's account were corroborated by bank account evidence.   (Tr. 344-351; GX 20).

**C.      The Applicable Sentences And Guidelines Calculation**

The United States Probation Office ("Probation Office") identifies the maximum sentences applicable to Lin as follows.   Pursuant to Title 18, United States Code, Sections 1963(a) and 924(j)(1), the maximum sentence for Counts One, Two, and Three is life imprisonment.   (PSR ¶ 124).   Pursuant to Title 18, United States Code, Section 1951, the maximum sentence for Count Four is twenty years' imprisonment. (PSR ¶ 124).

According to the PSR, based on a total offense level of 43 and a Criminal History Category of III, the guidelines range applicable to Lin is life imprisonment. (PSR ¶ 125).   The Probation Office recommends that the Court impose a total term of life imprisonment.[2]   (PSR, at page 29).

**<u>DISCUSSION</u>**

The United States Sentencing Guidelines still provide strong guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005).   Although *Booker* held that the Guidelines are no longer mandatory, it held also that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing.   *Booker*, 543 U.S. at 264.   As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" -- that "should be the starting point and the initial benchmark."   *Gall v. United States*, 128 S. Ct. 586, 596 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, *see id.* § 3553(a)(2); "the kinds of sentences available," id. § 3553(a)(3); the Guidelines range itself, *see id.* § 3553(a)(4); any relevant policy statement by the Sentencing Commission, *see id.* § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and "the need to provide restitution to any victims," id. §

---

[2]      Specifically, the Probation Office recommends that Court sentence Lin to life imprisonment on each of Counts One, Two, and Three; and 20 years' of imprisonment on Count Four, all of which the Probation Office recommends run concurrently.

**A. 729**

The Honorable Miriam Goldman Cedarbaum
September 15, 2014
Page 8

3553(a)(7).   *See Gall*, 128 S. Ct. at 596 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)   to afford adequate deterrence to criminal conduct;
>
> (C)   to protect the public from further crimes of the defendant; and
>
> (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process."   Gall, 128 S. Ct. at 596 n.6. Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives,"   *Rita*, 127 S. Ct. at 2463, and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," Gall, 128 S. Ct. at 594; *see also Rita*, 127 S. Ct. at 2464; *United States v. Rattoballi*, 452 F.3d 127, 133 (2d Cir. 2006) (the Guidelines "'cannot be called just 'another factor' in the statutory list, 18 U.S.C. ₵ 3553(a), because they are the only integration of the multiple factors and, with important exceptions, their calculations were based upon the actual sentences of many judges.'") (quoting *United States v. Jiminez-Beltre*, 440 F.3d 514, 518 (1st Cir. 2006) (en banc)).   To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance."   *Gall*, 128 S. Ct. at 597.

**B.     The Court Should Sentence Lin To Multiple Terms of Life Imprisonment**

The Government submits that the Court should sentence Lin to multiple terms of life imprisonment.     Lin is subject to an extremely severe sentence, and rightly so.   The evidence at trial overwhelmingly established that over the course of several years Lin was the

˘8˘

**A. 730**

The Honorable Miriam Goldman Cedarbaum
September 15, 2014
Page 9

leader of a gang that engaged in a variety of criminal activity at Lin's direction and for Lin's benefit.

Significantly, Lin and his followers used violence and threats of violence to maintain Lin's position in the community and make clear to others the lengths to which Lin would go to protect his business and status.   As set forth above, Lin used guns, knives and fists to maintain his position within the Chinatown criminal underworld.   Nor was Lin's violence limited to his time in New York.   To the contrary, after murdering Zhou and the waitress and fleeing New York, Lin brought his gang to Canada.   There, Lin and his followers kept doing what they always did — running gambling parlors and beating rivals, including Allen Chen, to further their criminal operation.   For years, Lin left a path of violence in his wake, injuring many and ultimately leaving two dead.

While Lin profited from his gambling parlors he sought more money by committing extortion, extracting payments from Chen through threats and intimidation resulting in Chen making payments to Lin for over five years.

Finally, Lin's criminal quest led him to commit the ultimate criminal act – murder. With his order to Hao Chao, Lin caused the murder of Zhou and an innocent bystander. Lin ordered his follower, Chao, to fire his gun in a closed, crowded room showing a complete disregard for the lives of the innocent individuals gathered there.   Indeed, in addition to killing two people, a second waitress was shot in the leg during the hail of gunfire.

Zhou was a young man, 34 years old, and a friend to many of the witnesses at trial, who knew him as Yi Qun. (*See, e.g.,* Tr. 219; GX 14)   Zhou was described as a nice and friendly person, known to have a "very good relationship" with people in Chinatown. (Tr. 405, 324).   But Lin took his life, with six gunshot wounds.   (Tr. 184; GX 14).   Lin's follower emptied that gun of bullets into Zhou's body, standing over him to complete the job. (Tr. 836).

As the statement provided by Edwin Chu, the boyfriend of victim Mei Ying Li (PSR ¶ 42) sets forth, Li was a young woman, only 30 years old, working as a waitress, when she was struck and killed by a stray bullet. That bullet was only fired because of Lin's order.   Li was working here in the United States and sending money back to her family in China. To this day Chu remains affected deeply by her passing.

Taking those lives did not stop Lin.   Rather, Lin's quest for power and control continued after the murders. He showed no remorse; rather he fled to Canada and then leveraged the murder as a threat to Chen to show him the consequences if he failed to stay in line.

The Government submits that a sentence of life imprisonment is necessary to sufficiently reflect the seriousness of these offenses, to promote respect for the law, and to afford adequate deterrence to criminal conduct.   *See* 18 U.S.C. § 3553(a)(2)(A).   Lin engaged in an

˘9˘

**A. 731**

The Honorable Miriam Goldman Cedarbaum
September 15, 2014
Page 10

extensive pattern of criminal activity spanning years and locations, using violence without hesitation.

Lin has been convicted of the most serious of crimes, and society must be protected from him. Nothing short of a life sentence will be adequate to protect society from so dangerous an offender.

**3. The Sentence On The Murder Count Must Be Consecutive To The Sentences Imposed On the Other Counts**

The jury convicted Lin of one count of using and carrying a firearm during and in relation to, and possessing a firearm in furtherance of, a crime of violence, resulting in the murders of Chan Qin Zhou and Mei Ying Li, in violation of Title 18, United States Code, Section 924(j)(1). As set forth in the indictment, this murder was caused by the discharge of the firearm. The Second Circuit has recently explained that Section 924(j) "incorporates the penalty enhancements of [Title 18, United States Code, Section] 924(c)." *United States* v. *Young*, 561 F. App'x 85, 94 (2d Cir. 2014). This includes the mandatory consecutive sentencing provisions of Section 924(c). *Id.* at 93 (holding that Section "924(j)'s failure to repeat the penalty enhancements set forth in § 924(c) does not evince Congressional intent to permit concurrent sentencing and to eliminate mandatory minimum sentences"). Here, because the firearm was discharged, Section 924(c) requires that this Court impose no less than 10 years' imprisonment, which must run consecutively to any other term of imprisonment. *See* 18 U.S.C. § 924(c)(1)(A)(iii). The Sentencing Guidelines recommend a sentence of life imprisonment. *See* U.S.S.G. § 2A1.1(a) (setting forth a base offense level of 43 for murder). Whatever sentence this Court imposes on the Section 924(j) count – whether the mandatory minimum sentence of ten years' imprisonment, the maximum of life imprisonment, or something in between – this Court must first determine Lin's sentence on the other counts of conviction, without regard to the Section 924(j) count, and then determine the sentence to impose on the Section 924(j) count, which must run consecutively to all other terms of imprisonment. *See United States* v. *Chavez*, 549 F.3d 119, 135 (2d Cir. 2008) (holding that the Court must first determine the appropriate punishment for the non-section 924(c) counts on their own, not reducing them to account for the Section 924(c) count, and then determine the sentence for the Section 924(c) count, which must be consecutive to all other counts); 18 U.S.C. § 924(c)(1)(A) (requiring that the sentence be "in addition to the punishment provided for such crime of violence or drug trafficking crime"); *United States* v. *Young*, 561 F. App'x at 94 (holding that Section 924(j) "incorporates the penalty enhancements of § 924(c)").

Each of Counts One and Two based on the defendant's racketeering activity carries a sentence of life imprisonment. Based on the evidence set forth at trial and highlighted here of the defendant's long-standing and extensive criminal conduct, the Government submits that a sentence of life on each count would be sufficient but not greater than necessary to serve the goals of sentencing. Moreover, the sentences on Counts One and Two should run consecutively to each other, as well as to the sentence for Lin's conviction on Count Four for extortion.

The Honorable Miriam Goldman Cedarbaum
September 15, 2014
Page 11

 In this case, the Court should exercise its discretion and run the sentence for Lin's racketeering convictions consecutively to one another, and to the sentence imposed on the extortion count.   Upon making those sentences, the Government requests that the Court then impose a consecutive sentence of the maximum term of life imprisonment on Count Three.   We recognize, of course, that imposition of multiple consecutive life sentences is symbolic. Nevertheless, it is appropriate here to take into account the fact that Lin perpetrated numerous violent and dangerous acts throughout his criminal career, killed two separate people, each of whom is entitled to have his or her murderer brought to justice, and that his criminal activity caused significant physical and financial harm to others.

## CONCLUSION

 For the reasons set forth above, the Government respectfully requests that the Court impose a sentence of life imprisonment.

Respectfully submitted,

PREET BHARARA
United States Attorney

By:  _____/s/_____
Peter M. Skinner
Jennifer E. Burns
Assistant United States Attorneys
(212) 637-2601/2315

cc: By ECF
Joel Cohen, Esq.

By Email
USPO Emily Frankelis

ˇ11ˇ

# A. 733

Joel S. Cohen, PC
225 Broadway, suite 1203
New York, NY 10007
Tel:  212-571-8899
Fax:  212-571-9557
Email:  jcesq99@gmail.com

October 1, 2014

By ECF

The Honorable Miriam Goldman Cedarbaum
Senior United States District Judge
United States District Court
500 Pearl Street
New York, NY 10007

Re: United States v. Lin Xing
    11 CR   114 (MGC)

Dear Judge Cedarbaum:

I write in mitigation of punishment on behalf of Xing Lin.  Mr. Lin faces sentences of from ten years to life following his convictions of Racketeering and Murder last year.  The Government now recommends that he serve two consecutive life sentences and another twenty years after he dies in prison.  For the reasons set forth below I ask respectfully the Court not impose a sentence of life imprisonment.  Had the Government not made a plea offer before trial,  I would have only a single sentencing argument, which is also set forth below.  That is not the case here though.  Prior to trial the Government offered to allow Mr. Lin to plead guilty in accord with a plea agreement with a stipulated Guidelines range of 120 months, reserving to him the right to appeal from any sentence exceeding 120 months.  At the time that plea was offered Lin had already been charged with the 924 (j) violation, it that he aided and abetted in possessing a firearm in connection with an extortion conspiracy thereby causing the deaths of two people at the Heaven on Earth karaoke club.  In other words, that plea encompassed the same harm that he is now held accountable

**A. 734**

The Honorable Miriam Goldman Cedarbaum
Senior United States District Judge
Re: U.S. v. Xing Lin
Page two

for.  When the plea was offered, the Government knew as much about Mr. Lin and his past criminal activities as it does now.  While the elements of the offense in the plea agreement differed from the counts of conviction, the harm they addressed and sought to punish was essentially not different.  Nothing was revealed at the trial or since then that came as a surprise to them. The exceedingly Draconian sentencing recommendation now made by the Government can **only** be viewed as a very thinly veiled effort by the prosecution to punish Mr. Lin for exercising his right to put the Government to its proof.  In fact Mr. Lin tried hard not to put the Government to its proof and wished to avoid the risks attendant to a trial, but was unable to allocute with sufficient specificity as to satisfy the Court.  As noted below, he did, in his allocution, satisfy almost all of the elements of the offense to which he was attempting to plead.  The fact that their present sentencing recommendation so enormously exceeds the plea offer initially made proves that this is so, and that there can be no other reasonable explanation for it.

In light of the seriousness of the charges, the offer of plea carrying a stipulated Guidelines range of ten years was extremely attractive.  The Court will recall that Mr. Lin was eager to accept the Government's plea offer, and on June 27 and 28, 2013 attempted to change his plea to guilty.  During a lengthy plea allocution Lin admitted, among other things, that Chen Qin Zhou was the owner of a bus line that competed with one in which Lin had an interest, that it was common in that industry that competitors frequently used violence against competitors, that he intended to use violence or the threat of violence against Zhou, that Hao Chen, a/k/a Little Beijing was his bodyguard, that he was trying to force Zhou to sell him his bus company for much less than its value and that he ordered Little Beijing to teach Zhou a lesson, knowing that he possessed a firearm.  He did not, and could not affirmatively say that he ordered Little Beijing to **shoot** Zhou.  Nor in my view, as is addressed below, did the Government adduce evidence about this event sufficient to remove doubt all about the incident.

The Honorable Miriam Goldman Cedarbaum
Senior United States District Judge
Re: U.S. v. Xing Lin
Page three

No experienced defense attorney who practices in Federal Court starts a trial expecting an acquittal, and prior to trial I didn't expect a full acquittal in this one.  As the case progressed, and the Government called one scoundrel after another as witnesses I began to feel twinges of optimism.  How could a jury possibly believe these people?  The very first witness called by the Government,

Chen Guang Guo, a/k/a Yi Pei, lied about who he went to lunch with on the very first day of trial testimony.  This lie was exposed because my clients wife and children saw him at a restaurant having lunch with Guo Guang, the next witness the Government called, and with Dong Jai, the Homeland Security informant who procured the attendance of every single Chinese witness the Government called. When questioned about it on cross examination, Yi Pei actually even denied **knowing** Dong Jai.  Cross examination quickly established that he not only knew Dong Jai, but that Dong Jai is his sister's boyfriend.  Significantly Yi Pei was one of the witnesses that testified about the shootings in the Heaven on Earth witness that was in the room at the time of the shootings was Cheng Yong, a/k/a Tall Guy.  Their descriptions of the shootings were differed substantially from each other's, as well as from statements they've made in the past.  Every single witness except Song Di Xiang, (the man who was buying rice moments before Mr. Lin was shot on Division Street and who was unable to give a coherent description of those events) was involved in criminal activity.  Every single Government witness lied under oath to Immigration authorities.  Some told extremely elaborate stories in immigration proceedings containing great detail which were complete fabrications.  One jumped bail in a case in this District and fled the country, agreeing to testify only after being extradited here from Canada.  They not only lied, but each told remarkably similar and quite detailed stories to U.S. Immigration about being persecuted in China.  Every Government witness is presently the subject of a Removal Order from the United States and is here in violation of that Order.  Two of the witnesses testified under grants of immunity.  All are here illegally yet testified that they expected no immigration benefit in return for their testimony.

**A. 736**

The Honorable Miriam Goldman Cedarbaum
Senior United States District Judge
Re: U.S. v. Xing Lin
Page four

One of these was Guo Guang, who is actually a paid employee of Dong Jain. Guo Guang was the witness that was arrested at an Immigration office about a month before the trial where he had gone to pitch a second false story seeking asylum after the first one failed. Although he claims he doesn't expect any benefit for his testimony, one phone call to Agent Got him released from custody that day.

Attorneys rarely have more to work with in terms of impeaching witness's credibility as these witnesses provided. Despite this the jury gave credit to their testimony and convicted Mr. Lin. I'll not repeat my entire summation, and I well understand that the jury has spoken. The reason I recall some of what I suggest were the very real and troubling weaknesses in the Government's case is to suggest to Your Honor that the evidence was not so trustworthy as to warrant the imposition of a life sentence. Although recommended both by the Government and the Probation Department such a sentence is not mandatory in this case. In its sentencing submission, the Government claims that the evidence at trial demonstrated **overwhelmingly** Lin's guilt. Any reasonable observer would know that this is a gross overstatement, and in fact the opposite is true.

There is, I respectfully suggest, more than a little residual doubt as to Mr. Lin's responsibility for the deaths of Yi Qun and Mei Lee. Lingering or residual doubt differs from reasonable doubt. It is real possibility that genuine doubt may still exist despite. It may reflect a mere possibility. It is an absence of certainty. It is the Earth shootings fall between reasonable doubt and absolute certainty. I say this with deference to the fact that a jury found Lin guilty, although I believe the verdict was clearly against the weight of the credible evidence. This is so because there was, in my view, no credible evidence presented. The term residual doubt is most frequently used in connection with capital cases. A sentence of life imprisonment without parole is as close to capital punishment as our system of justice provides. I suggest that the Court may and should consider the strong presence of such residual doubt based on the extremely poor quality of the evidence presented by the Government.

The Honorable Miriam Goldman Cedarbaum
Senior United States District Judge
Re: U.S. v. Xing Lin
Page five

In my experience both as a former prosecutor that tried more than 30 murder cases, and someone who has tried many as a defense attorney, I've found that juries are far more likely to lessen the burden of proof where the crime involved was one either of extreme violence or when an innocent non-criminal civilian is a victim. In this case the death of Mei Ying Lee, a waitress who was evidently killed by the same bullet that killed Yi Qun.

It would be foolish to suggest that Xing Lin led an exemplary or law abiding life, and I don't do so here. The mere fact that he was associated with the Government's witnesses precludes that argument. Starting his life in the United States working in a garment factory, he turned his gambling addiction into a profession by operating gambling parlors in Chinatown. He lived in a segment of our population that operates under a completely different set of rules than we do. It's a sometimes violent world were Lin was frequently the victim rather than the perpetrator. The evidence at trial showed that he has been stabbed and shot in separate incidents in Chinatown. He nearly died as a result of the stabbing and spent weeks in the hospital. He's had a serious and long term problem with alcohol, and in fact during his attempt to plead guilty on June 27 stated that he was drunk on the night of the shootings at the karaoke club which resulted in the deaths of Zhou and Mei Lee.

## CONCLUSION

Prior to trial the Government offered Xing Lin a ten year plea covering the shooting deaths at the Heaven on Earth karaoke club in 2004, which he unsuccessfully attempted to accept. In his allocution though he admitted many of the elements required by the plea agreement. They now recommend consecutive life sentences. The only changed circumstance is that Lin went to trial and was convicted. I suggest respectfully that the imposition of such a sentence would, in effect, serve to punish Xing Lin for exercising his rights under the Sixth Amendment.

**A. 738**

The Honorable Miriam Goldman Cedarbaum
Senior United States District Judge
Re: U.S. v. Xing Lin
Page six

Moreover, the quality of evidence presented to the jury was as poor as any I've even seen in a case where the defendant was convicted. I think this is large part was due both to the dismal credibility of the Government's witnesses as well as to the admission of 404 (b) evidence which portrayed the defendant as an extremely violent and unsympathetic person, with a propensity for violence. In a case involving the murder of two people in a night club, the presence of such evidence, though purportedly not admitted to show propensity, and despite the Court's best effort to give limiting instructions, must have seriously impacted the jury and prejudiced it against Mr. Lin.

The evidence about the events at the karaoke club is far from overwhelming. Thus there is ample room for the Court to be left with residual doubt as to what if anything Mr. Lin said to Hao Chen in the karaoke club that night before Chen went on a shooting rampage. For these reasons a sentence of life imprisonment is not warranted for Xing Lin.

I apologize to Your Honor and to the Government for filing this just one day before sentencing. I had a sentence scheduled for last Friday before Judge Hellerstein where my client also faced a life sentence, and a few days before that I lost my laptop. Both sentence submissions were well under way, but unfortunately not backed up, requiring me to start each from scratch. Thank you for considering the foregoing.

Very truly yours,

/S

Joel S. Cohen (JC6998)

cc: AUSAs Peter Skinner and Jennifer Burns

**A. 739**

A. 740



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

**BY ECF**

The Honorable Miriam Goldman Cedarbaum
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

        Re:    <u>United States v. Xing Lin</u>,
              S2 11 Cr. 114 (MGC)

Dear Judge Cedarbaum:

      The Government respectfully submits this letter in advance of defendant Xing Lin's sentencing scheduled to take place before Your Honor on October 21, 2014, and in brief response to the defendant's submission dated October 6, 2014 ("Defense Submission"). The Court should reject the arguments advanced by the defendant. The Defense Submission requests that in sentencing the defendant the Court ignore the jury's verdict based on arguments previously rejected by the jury. The Defense Submission further seeks leniency based on inappropriate and irrelevant arguments related to a prior failed attempt to plead guilty to conduct which constituted only part of the defendant's criminal conduct of which he was convicted.

      First, the Defense Submission is largely a recitation of counsel's closing argument. (Defense Submission at 3-4). Defense counsel cross-examined the Government's witnesses extensively, and in particular focused on any prior misstatements and perceived inconsistencies. Counsel made extensive arguments to the jury regarding his view of the witnesses' credibility. Those arguments were of course rejected by the jury and bear no weight here. In addition, those arguments when made during closing argument misstated the trial record and do so again here. For example, defense counsel claims again that Dong Jai "procured the attendance of every single Chinese witness." (Defense Submission at 3). However, Guang Yun Zhu (referred to in the Defense Submission by the nickname of "Yi Pei"), Song Di Xiang and Heng De Oh-Yang were witnesses who were not brought to the Government by Dong Jai. Counsel again also claims in the Defense Submission that every witness lied under oath to immigration authorities. The record, however, established that only three witnesses admitted to making false statements made on asylum applications.

A. 741

These arguments about the credibility of witnesses have already made to – and rejected by – the jury in this case, which found the defendant guilty of virtually all of the charged conduct. Thus, these arguments have no bearing on the appropriate sentence to be imposed based upon the jury's verdict.

Second the defense seeks to effectively undo the trial and go back to July 2012 when the defendant attempted to plead guilty and was unsuccessful. (Defense Submission at 1-2). In reality, the defendant withdrew his guilty plea after being given an opportunity to continue his allocution by the Court. At that time, the defendant was charged in a single count with violating 18 U.S.C. § 924(j). The plea agreement was predicated on the defendant pleading guilty to aiding and abetting a single count of a lesser included offense, 18 U.S.C. § 924(c), relating to his associate's possession and discharge of a firearm on July 29, 2004. The defense focuses on the sentencing Guidelines range which the parties agreed to at that time while conveniently ignoring that the plea agreement required the defendant to plead guilty to conduct that was only a part of the conduct for which he was ultimately convicted. Indeed, prior to trial, the Government obtained a superseding indictment, S2 Cr. 114, which added charges including RICO conspiracy, a substantive RICO count, extortion conspiracy and extortion.

The conduct underlying those charges spanned years, both before and after the July 2004 conduct, to which the defendant attempted to plead guilty. At trial, evidence was presented of not only the shooting and murder on July 29, 2004, but also multiple incidents of violence perpetrated by Lin and his followers including: (1) the stabbing of Song Di Xiang (Tr. 525-34, 539-562); (2) the beating in a Canadian nightclub of Allen Chen (Tr. 517-521); (3) the beating of Yi Qui (Tr. 693-694); and (4) putting a gun to the head of man named Pan Zhen Chao who had to beg for his life. The trial evidence also established the defendant's decade long pattern of criminality ranging from gambling to extortion. It also demonstrated that Lin was the leader (or "Dai Lo") of a gang, the members of which (known as "kids" or "followers") acted at Lin's instruction and engaged in violence, including murder, on Lin's behalf. Finally, Lin profited from his criminal activities, running lucrative gambling parlors and extorting others for even more gain. A Guidelines sentence life imprisonment is an appropriate punishment for all of Lin's extensive criminal activity. The Guidelines applicable to the aborted Section 924(c) plea are inapplicable and insufficient to reflect the full scope of the conduct for which Lin was convicted.

The Court should swiftly reject the Defense Submission which is, at bottom, nothing more than a transparent effort to go back in time and re-write the history of this case. The defendant stands before Your Honor convicted of serious offenses for which a life sentence is warranted. Lin engaged in an extensive pattern of criminal activity spanning years and locations, using violence without hesitation. Lin has been convicted of the most serious of crimes, and society must be protected from him. Nothing short of a life sentence will be adequate to protect society from so dangerous an offender.

**A. 742**

A. 743

## CONCLUSION

For the reasons set forth herein as well as in the Government's September 12, 2014 submission, the Government respectfully requests that the Court impose a sentence of life imprisonment

Respectfully submitted,

PREET BHARARA
United States Attorney

By:     /s/_____

Peter M. Skinner
Jennifer E. Burns
Assistant United States Attorneys
(212) 637-2601/2315

cc:     By ECF
        Joel Cohen, Esq.

**A. 743**

Joel S. Cohen, PC
225 Broadway, suite 1203
New York, NY 10007
Tel:  212-571-8899
Fax:  212-571-9557
Email:  jcesq99@gmail.com

October 21, 2014

By ECF

The Honorable Miriam Goldman Cedarbaum
Senior United States District Judge
United States District Court
500 Pearl Street
New York, NY 10007

Re: United States v. Lin Xing
    11 CR   114 (MGC)

Dear Judge Cedarbaum:

I write in reply to the Government's most recent sentence submission.  Initially they say that the defense is seeking "...leniency based on inappropriate and irrelevant arguments related to a prior failed attempt to plead guilty to conduct which constituted only part of the defendant's criminal conduct of which he was convicted.  This suggestion is erroneous for two reasons.  The first is that ANY sentence the Court imposes will be far from lenient.  The second is that Mr. Lin's attempt to enter a guilty plea is hardly irrelevant nor is it something the Court should ignore.

 As well the Government alleges that I misstated the record by saying that **all** the Chinese witnesses were brought to the Government by Dong Jai.  Perhaps that was an overstatement, and instead of **all** those witnesses being brought by Dong Jai, only **most** of them were brought by him.  Dong Jai was clearly the elephant in the room; he was seen eating lunch with two of the witnesses on the first day of trial testimony.  The Government claims that Yi Pei wasn't procured by Dong Jai. Perhaps not.  But Yi Pei was the witness that testified

**A. 744**

The Honorable Miriam Goldman Cedarbaum
Senior United States District Judge
Re: U.S. v. Lin Xing
Page two

that he didn't know who Dong Jai was, although he later admitted that his sister was Dong Jai's girlfriend. They further aver that "...only three witnesses admitted to making false statements made on asylum applications", while I said they **all** lied to Immigration.   The key word is "admitted". It is readily apparent that even those that didn't **admit** they'd lied told ridiculous stories to Immigration under oath.  Further that the jury convicted Mr. Lin does not mean that they accepted every word of the Government's witnesses as gospel. To say otherwise is absolute sophistry.

The Government claims that I want to "...effectively undo the trial and go back to July 2012 when the defendant attempted to plead guilty..."  As much as I might want to do that, it's by no means what my letter suggests.  Though the Government goes to great lengths seeking to distance itself from its 10 year plea offer, it simply can't do it.  Yes, the plea offer was to a single count of aiding and abetting the possession of a firearm, resulting in two deaths in furtherance of a bus company extortion conspiracy.  They declare that they filed superseding Indictment S 2 prior to trial, but fail to mention that the filed S1 two weeks after he aborted pea.  S2, with a few minor exceptions related to gambling and loan sharking, simply reframes the conduct previously charged.   It's true that the superseder held Lin accountable for additional criminal conduct.  But it's crystal clear that the deaths at the Heaven on Earth have **always been the gravamen of the Government's case.**  The superseding Indictment was filed to give the Government the tactical advantage that comes with any RICO Indictment.  As well it formed the basis for the other crimes evidence that came in.  To say that gambling and bus company extortions warrant the difference between 10 years and multiple consecutive life sentences in beyond disingenuous.

The Government is entirely accurate when they say that the conduct underlying those charges spanned years, both before and after the July 2004 conduct, to which the defendant attempted to plead guilty.  And had they been **unaware** of the length and nature of Lin's background and criminal conduct when they

**A. 745**

The Honorable Miriam Goldman Cedarbaum
Senior United States District Judge
Re: U.S. v. Lin Xing
Page three

offered him ten years, their current position would be reasonable.  They have been investigating Mr. Lin for years.  They knew exactly who he was and what he'd done when they offered him ten years.  They can't **possibly** claim that they any newly discovered material is the basis for the Draconian recombination they've made.   The Government characterizes my submission was "…a transparent effort to go back in time and re-write the history of this case."   On the contrary, it is they who seek to do that by claiming that, after trial, Lin must be held accountable for "the full scope of the conduct for which Lin was convicted."  This is conduct they've known about since well before his voluntary return to the United States from Canada.

CONCLUSION

The Government now maintains that "Nothing short of a life sentence will be adequate to protect society from so dangerous an offender."  This suggestion belies the fact that, having known when they offered Lin a ten year plea, they knew **everything** about him and what he'd done that they know now.  Moreover he faces certain deportation to China should he be released from custody.  Certainly the Court can impose a sentence short of life in prison that meets the goals of sentencing yet recognizes all the issues set forth in our prior submission.  Thank you.

Very truly yours,

/S

Joel S. Cohen (JC6998)

cc:  Peter Skinner and Jennifer Burns

**A. 746**

**A. 747**

Eal1lins

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

        v.                                    11-CR-114 (MGC)

XING LIN,

               Defendant.              Sentencing

------------------------------x

                                    New York, N.Y.
                                    October 21, 2014
                                    2:47 p.m.

Before:

                HON. MIRIAM GOLDMAN CEDARBAUM,

                                    District Judge

                        APPEARANCES

PREET BHARARA
     United States Attorney for the
     Southern District of New York
BY:   PETER M. SKINNER, ESQ.
     JENNIFER E. BURNS, ESQ.
     Assistant United States Attorney

JOEL E. COHEN, ESQ.
     Attorney for Defendant

ALSO PRESENT:   LILY LAU, Chinese Interpreter

Eal1lins

(Case called)

THE COURT:  Mr. Lin, have you read the presentence report?

THE DEFENDANT:  Yes.

MR. COHEN:  Your Honor, just so the record is clear, Mr. Lin doesn't read English.  I've reviewed the presentence report with him verbatim.

THE COURT:  I'm sorry.  Yes, he knows English, right?

MR. COHEN:  He doesn't read English, Judge, and he speaks very little.

THE COURT:  I see.  Well, did you translate it for him?

MR. COHEN:  Yes.

THE COURT:  Good.  All right.  Do you have any errors you would like to bring to my attention?

MR. COHEN:  No, your Honor.

THE COURT:  Then I will hear anything you want to tell me and anything your lawyer wants to tell me in connection with sentence.

MR. COHEN:  Would you like to hear from Mr. Lin first, your Honor?

THE COURT:  As you wish.

MR. COHEN:  Judge, this is a statement that the defendant essentially dictated to me, which I've had rendered into Chinese so he can read it to you.

Eal1lins

THE COURT:  I see.  But it doesn't come from him originally.

MR. COHEN:  No.  I'm saying he essentially dictated it to me during a lengthy conference at the MCC.  I then read it back to him confirming that they were his words and asked the interpreters to translate it into Chinese so that he would be able to read it to you.

THE COURT:  Well, did he tell you, though?

MR. COHEN:  I'm sorry, Judge?

THE COURT:  That is an accurate reflection of what he told you?

MR. COHEN:  Yes, ma'am, and I confirmed it with him just now once again for the third time.

THE COURT:  Very well.

THE DEFENDANT:  I am very sorry for the harm I have caused to other people and to my community.

I didn't come to this country to become a criminal.  I worked at a garment factory for quite some time.  The work was very hard and paid very little.

I have been gambling for many years and saw this as a way to earn a better living.  When you own gambling business in Chinatown, people try to take advantage of you if you aren't strong.  I was drinking and doing drugs and I often got into fights.  As you heard during the trial, I myself have been stabbed and shot and almost died.

**A. 750**

Eal1lins

I moved my family to Atlanta to get away from being in dangerous situations. Unfortunately, in July 2004, I came back to New York and was at the karaoke in Queens when the shooting there happened.

I know I would probably be convicted after trial and be facing life in jail, and I wanted to accept the offer. I tried to plead guilty but I could not tell you that I order Little Beijing to shoot or kill Yi Qun, because it wasn't my intention. Still, I shouldn't have been there with a bodyguard carrying a gun.

I am very sorry for the families of the victims. I have two children and a wife and I can't imagine how they would feel if it was me that had died.

I am not saying I led a law-abiding life. I did some of the things the witnesses at my trial said was true. My lawyer showed that a lot of their testimony was false.

I know that any sentence you give me will be severe. I ask that you not sentence me to life in prison.

I will be deported to China if I am ever released and will never pose a danger to people in the United States.

If I ever get out of jail, I will be much older and much more mature. It has already been between 10 and 20 years since the conduct I was found guilty of. I am done with that lifestyle and only want to live for my wife and children, who have remained loving and loyal to me through all of this.

Eal1lins

Thank you.

THE COURT:  Very well.  I will now hear what your lawyer wants to tell me.

MR. COHEN:  Your Honor --

THE COURT:  I have read your submissions, Mr. Cohen.

MR. COHEN:  Did you see the one that I submitted this morning, your Honor?

THE COURT:  I did.

MR. COHEN:  Okay.  I don't have too much to add to those things.  I did want to emphasize the fact that the government did offer Mr. Lin, knowing everything they know about him now, a ten-year sentence.  The government said in its submission that that's not relevant, it doesn't matter.  I think it matters a lot.  Their position now is that he is such a dangerous person that nothing short of a life sentence will protect the community.  I don't see how they can reconcile that with their initial willingness to allow him to plead guilty and receive ten years.  And I note in none of their submissions did they deny that they did have all this information about him at the time that they offered him a ten-year plea.  I don't expect that your Honor will sentence him to ten years, if you sentence him to anything less than life, but I think it's disingenuous of the government to take this position.

THE COURT:  I am not here this afternoon to reach a judgment on the government.

Eal1lins

MR. COHEN:  I understand that, your Honor.  I understand that.  A sentence of life in this case is not mandatory.  It's recommended by the probation department.  It's recommended by the government.  I'm asking the court to look at the totality of the circumstances, the full picture, and to decide whether a sentence less than life would be sufficient but not greater than that which is needed to accomplish the goals of sentencing set forth in 3553(a).  I think that any sentence that the court imposes will be substantial and significant.

I think it's worth noting that, as Mr. Lin said, much of the conduct that came in at trial -- and it's almost difficult to separate what he was charged with and the other crimes evidence that came in and the 404(b) stuff, but much of his conduct happened between 10 and 20 years ago, when he was much, much younger, and although one of the goals of sentencing is to punish, certainly, I think the court can mitigate that punishment with the fact that he was much younger, much less mature, and had a very, very significant problem with alcohol and drugs.

THE COURT:  What is the age you are talking about?

MR. COHEN:  I'm sorry, your Honor?

THE COURT:  What age are you talking about?

MR. COHEN:  Early 20s to early 30s.  He's 42 years old now.

Eal1lins

Other than that, your Honor, I would rest on the submissions and ask that your Honor consider very seriously something less than a life sentence. Obviously every judge has their own views of sentencing. A few months ago Judge Dearie in the Eastern District, in a case involving home invasion robberies by a Dominican drug gang, sentenced two shooters to 22 and 27 years. Judge Gleason, a couple of years ago, vacated the conviction because it was his view that the cooperators, although the jury believed them, were not truthful. Vacated the defendants' conviction, released them and sentenced the cooperators to life in prison.

I'm only bringing these matters up, your Honor, to share the fact that other judges have, despite jury verdicts that would seem to militate in favor of very harsh and lengthy sentences, have exercised discretion and sentenced to less, and I would ask your Honor to do the same.

Thank you.

THE COURT: Very well. You may be seated.

I don't think the government really has anything to add here. I don't think it's appropriate.

MR. SKINNER: Well, your Honor, one thing not related to the sentence -- if you don't want to hear our views on it, I know you read our written submission.

THE COURT: I have indeed, and I listened to all of the evidence at the trial. I don't really need additional

Eal1lins

argument.

MR. SKINNER:  We will not make any argument on that at all.

THE COURT:  Good.

MR. SKINNER:  There was, at the end of the trial, a motion for a mistrial under Rule 29, and I believe that's still open.

THE COURT:  That's correct.  I gather that, yes.

MR. SKINNER:  So we feel the court should likely address that before imposing sentence.  Nothing further then.

THE COURT:  I deny both of those motions because I think that the evidence fully proves the conclusion that the jury reached in this case.  There was ample evidence to support the jury verdict and I therefore deny a motion for a directed verdict, in effect, to set aside the jury verdict.  And what is the other?

MR. SKINNER:  There was a motion pursuant to Rule 29 to dismiss the extortion conviction.

THE COURT:  That's what I'm addressing, the Rule 29.

MR. SKINNER:  Yes, and there was a motion for mistrial based on prosecutorial misconduct in the summation and rebuttal summation.

THE COURT:  Once again, I listened carefully and I try to supervise what happens in the courtroom very carefully so I am satisfied that there was not a mistrial in this case, and

Eal1lins

accordingly, I deny the motion for a mistrial.

This was a very serious and heavy case, and it is no pleasure to have to sentence a young man to life in prison, but on Counts One, Two, and Three, I do now sentence you, Mr. Lin, to life in prison. There is no question, based on the evidence in this case, that you are responsible for the death of another human being.

Now on Count Four, I set a sentence of 20 years, to run concurrently with the sentence on Counts One, Two, and Three.

I do not see the purpose of setting supervised release when life in prison is the sentence.

There is a requirement of a fine. Are you able to pay a substantial fine, Mr. Lin?

THE DEFENDANT:  I don't know.  I have to ask my attorney.

THE COURT:  Very well.

(Defendant and his counsel conferring)

MR. COHEN:  Your Honor, Mr. Lin is asking me -- he does not have funds to pay a fine.

THE COURT:  Any funds?

MR. COHEN:  He says he has no funds to pay a fine.

THE COURT:  Well, that's a different statement.  I am asking whether you have any money from your prior business.

THE DEFENDANT:  No.

**A. 756**

Eal1lins

THE COURT:  Have you earned any money since the trial?

THE DEFENDANT:  What do you mean by that?

THE COURT:  Have you done any kind of work that brings you money?

THE DEFENDANT:  Yes.  Since I've been in jail, I have not earned any money.

THE COURT:  Well, we understand that.  I'm not talking about that.

MR. COHEN:  Well, your Honor, the question was whether he had earned any money since the trial.

THE COURT:  Thank you.  I mean since you were arrested the first time.

THE DEFENDANT:  I didn't make any money after I was arrested.

THE COURT:  But before you were arrested you did, is that correct?

THE DEFENDANT:  Yes.

THE COURT:  What kind of work did you do for the money?

THE DEFENDANT:  I operated a mahjong parlor and buses.

THE COURT:  All right.  Well, I do impose a fine from money that you earned before you went to jail of $25,000, which you do not have to pay all at once.  You may pay it in installments.  And I gather that you are working in prison, is that correct?

Eal1lins

THE DEFENDANT:  I'm not working in jail.

THE COURT:  Isn't there a program under which you are working?

THE DEFENDANT:  Not in MCC.  There is no work.

THE COURT:  No, but you will be when you are in a federal penitentiary.

THE DEFENDANT:  I do not know about that.

THE COURT:  All right.  Well, I direct that you pay installments of those payments to you of up to $25,000.

MR. COHEN:  Judge, the effect that the imposition of a fine like that will have is that whatever the prison pays, whether it's 12 cents an hour or 50 cents an hour, that probably for the rest of his life Mr. Lin will have no access to any commissary.  Any money that he earns will go toward that fine; any money that's put into his commissary account will go towards those fines.

THE COURT:  How much does he earn in that program?

MR. COHEN:  I don't know, Judge.  I honestly don't know.  It's certainly not anything close to the minimum wage.

THE COURT:  Let me ask the government.

MS. BURNS:  Your Honor, as the presentence report sets forth, if the defendant is engaged in a BOP program, the defendant would pay $25 per quarter.  I don't know how that would balance out based on what he's making.  We just don't have that information available.  But they do I think

Eal1lins

anticipate this situation and set aside that amount so there would be something left over for the defendant.

THE COURT:  Very well.  I will direct that the fine be paid in installments of $1,000 per receipt of income.  I'm sorry.  How much income will he receive?

MS. BURNS:  That I'm not sure of, your Honor, but what the probation reports provide -- this is at page 32 -- is that what they recommend is that if the defendant's engaged in a nonUNICOR program, the defendant pay $25 per quarter toward the criminal financial penalties.  However, if the defendant participates in the BOP's UNICOR program, that the defendant pay 50 percent of his monthly earnings consistent with BOP regulations.  So maybe if your Honor would prefer just to follow the language of the presentence report, that seems to be the way BOP administers it.

THE COURT:  Very well.

MR. COHEN:  And I would ask that the language incorporate the recommendation of the probation department.

THE COURT:  Yes.  I do incorporate the recommendation of the probation officer as to the amount of the fine and the installment payment.

Now there is also a special assessment of $100 per count, which in this case, since there are four counts, would be $400.  Are you able to pay that now or do you need more time?

Eal1lins

THE DEFENDANT:  I don't know if my wife has $400 on her.  Can I ask her?

THE COURT:  Yes, of course, you may.

THE DEFENDANT:  My sister has it.

THE COURT:  Very well.  Then there is a special assessment of $400 that you are also required to pay as part of your sentence.

Mr. Lin, I know this is a very heavy sentence and I know you are a young man, and it is a pity that someone as capable as you are should be in this position, but you have brought this on yourself.  I hope you will take the time in prison to think about your life and how you have used it.

Is there anything further?

MS. BURNS:  Just a couple points, your Honor.

One, as we were discussing financial penalties, we had prepared a proposed order of restitution that we provided to counsel in an amount of $425,000.  As you know, your Honor does not have to set restitution today.  You can do so within 90 days by statute, but we believe that amount is supported by the trial record and the evidence relating to particularly the extortion offense committed by the defendant.  So we can provide a copy of the order to your Honor.

THE COURT:  What you are proposing, right?

MS. BURNS:  Yes.  And just so the record is clear, we are not seeking an order of forfeiture because there were no

**A. 760**

Eal1lins

forfeiture allegations in the superseding indictment.

THE COURT:  There is no forfeiture here.  I agree. And whether I will direct restitution depends in part on what it is you are claiming as restitution, since you have not submitted an order.

MS. BURNS:  Yes, your Honor, and we have the order itself and we can provide a letter to your Honor just setting forth the support we believe from the trial record for that amount of restitution.

THE COURT:  Very well.  Very well.  And I will consider the matter.

MR. COHEN:  Does your Honor want to fix a schedule for --

MS. BURNS:  I had one more point -- sorry -- regarding the imposition of the sentence.  It's largely academic in some ways, as your Honor has said, the sentence is life imprisonment, but as noted in our submission, the Second Circuit has recently advised that on a 924(j) count, that sentence should be imposed consecutive to the other counts, so we would ask here that Counts One and Two be imposed life sentences to run concurrently, Count Four you've already stated would be 20 years concurrent, and then Count Three be a life sentence imposed consecutive to those other counts.

THE COURT:  That makes no sense.

MS. BURNS:  I agree.  It's largely academic.  I'm just

Eal1lins

trying to follow the Second --

THE COURT:  Well, I don't think the Second Circuit has asked whether two life sentences have to be consecutive.

MS. BURNS:  Well, we're only asking that the consecutive sentence be the one related to the 924(j) count here.

THE COURT:  It doesn't matter.  Any consecutive sentence of life.

MS. BURNS:  I agree.  It seems somewhat form over substance.  However --

THE COURT:  It's not something that a court should entertain.  But thank you.

MS. BURNS:  And the government would move to dismiss the underlying indictment and information filed in this matter.

THE COURT:  And that motion is granted.

MS. BURNS:  Thank you.

THE COURT:  Is there anything further?

MS. BURNS:  Just, I'm sure your Honor already intends to do so, to advise the defendant of his right to appeal.

THE COURT:  Yes.  Mr. Lin, as was just requested, I do advise you that you have a right to appeal my sentence.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  And if you wish to do so, you should advise your lawyer promptly because he has a short time in

Eal1lins

which to file a notice of appeal, ten days.  So that's something you should promptly discuss with your lawyer, the appeal of the sentence.

MR. COHEN:  Your Honor, I've already discussed requesting of an appeal with Mr. Lin and his family, and I will be filing a notice of appeal.

THE COURT:  Good.  That's fine.

Is there anything further?

MS. BURNS:  No, your Honor.  Thank you.

MR. COHEN:  No, your Honor.

THE COURT:  Very well.  Then this matter is adjourned.

MR. SKINNER:  Thank you, your Honor.

oOo