# 14-4133

*To Be Argued By*:
Jennifer E. Burns

# United States Court of Appeals

## FOR THE SECOND CIRCUIT
## Docket No. 14-4133

◄ ••• ►

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

XING LIN, also known as Sealed Defendant 1,
also known as Ding Pa,

*Defendant-Appellant,*

HAO CHAO, also known as Sealed Defendant 2,
also known as Little Beijing,

*Defendant.*

On Appeal from the United States District Court
for the Southern District of New York

# BRIEF FOR THE UNITED STATES OF AMERICA

Preet Bharara,
*United States Attorney for the
Southern District of New York,
Attorney for the United States
of America.*
One St. Andrew's Plaza
New York, New York 10007
(212) 637-2200

Jennifer E. Burns,
Michael Ferrara,
*Assistant United States Attorneys,
Of Counsel.*

**TABLE OF CONTENTS**

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .  1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . .  2

    A.  The Government's Case . . . . . . . . . . . . . . . .  2

          1.  Lin Was a Dai Lo Leading a Gang in Chinatown and Elsewhere . . . . . . . . . .  3

          2.  Lin Operated Gambling Parlors . . . . . .  4

          3.  Lin Used Violence to Maintain His Position as a Dai Lo . . . . . . . . . . . . . . .  5

          4.  Lin Extorted the Owners of a Bus Company . . . . . . . . . . . . . . . . . . . . . . . . .  7

          5.  Murder of Chan Qin Zhou and Mei Ying Li . . . . . . . . . . . . . . . . . . . . . . . . .  8

    B.  The Defense Case . . . . . . . . . . . . . . . . . . . .  10

    C.  The Mistrial Motions . . . . . . . . . . . . . . . . .  10

    D.  The Sentencing Proceedings . . . . . . . . . . .  12

ARGUMENT:

POINT I—Judge Cedarbaum Did Not Abuse Her Discretion in Rejecting Lin's Attempted Guilty Plea . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

    A.  Relevant Facts . . . . . . . . . . . . . . . . . . . . . . .  16

    B.  Applicable Law . . . . . . . . . . . . . . . . . . . . . .  18

ii

C. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

   1. Lin Waived His Right to Challenge
      Judge Cedarbaum's Decision . . . . . . . 20

   2. Judge Cedarbaum Did Not Abuse
      Her Discretion . . . . . . . . . . . . . . . . . . . 21

POINT II—The Court Should Not Vacate Lin's
Conviction on Count Three . . . . . . . . . . . . . . . . 23

A. Applicable Law . . . . . . . . . . . . . . . . . . . . . . 24

   1. Section 924(j) and *Johnson* . . . . . . . . . 24

   2. Aider and Abettor Liability . . . . . . . . 26

   3. Plain Error Review . . . . . . . . . . . . . . . 26

B. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

   1. Hobbs Act Extortion Is a Crime of
      Violence Under Section 924(c)(3)(B) . . 28

   2. The Incorrect Aiding and Abetting
      Instruction Was Harmless . . . . . . . . . 29

POINT III—Evidence of Gambling was Sufficient
Factually and Legally as Predicate
Racketeering Acts, and the Court Should
Affirm Lin's Convictions on Counts One and
Two . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

A. Applicable Law . . . . . . . . . . . . . . . . . . . . . . 32

PAGE

B.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . .  35

    1.  The Evidence Sufficiently Established
the Gambling Predicate Acts . . . . . . .  35

    2.  In Any Event, Lin's Racketeering
Convictions Stand . . . . . . . . . . . . . . . .  38

POINT IV—The Government's Rebuttal
Summation Was Proper . . . . . . . . . . . . . . . . . . .  39

A.  Relevant Facts . . . . . . . . . . . . . . . . . . . . . .  40

B.  Applicable Law . . . . . . . . . . . . . . . . . . . . . .  44

C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . .  45

    1.  The Government's Rebuttal Was
Appropriate . . . . . . . . . . . . . . . . . . . . .  45

        a.  The Prosecutor Did Not Engage
in Burden Shifting . . . . . . . . . . . .  46

        b.  The Government Did Not Attack
Defense Counsel . . . . . . . . . . . . . .  49

        c.  The Government Did Not Vouch
for Its Witnesses . . . . . . . . . . . . . .  50

    2.  Any Possible Error Could Not Have
Affected the Verdict . . . . . . . . . . . . . . .  53

POINT V—Judge Cedarbaum's Sentence Was
Reasonable . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  55

PAGE

A. Applicable Law . . . . . . . . . . . . . . . . . . . . . . 55

    1. Procedural Review . . . . . . . . . . . . . . . . 55

    2. Substantive Review . . . . . . . . . . . . . . . 56

B. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . 58

    1. The Sentence Was Procedurally
       Reasonable . . . . . . . . . . . . . . . . . . . . . . 58

    2. The Sentence Was Substantively
       Reasonable . . . . . . . . . . . . . . . . . . . . . . 62

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

## TABLE OF AUTHORITIES

*Cases*:

*Alleyne v. United States*,
    133 S. Ct. 2151 (2013). . . . . . . . . . . . . . . . . . . . . . 21

*Anderson v. Bessemer City*,
    470 U.S. 564 (1985). . . . . . . . . . . . . . . . . . . . . . . . 56

*Descamps v. United States*,
    133 S. Ct. 2276 (2013). . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Diaz*,
    176 F.3d 52 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . 61

*DiCarlo v. United States*,
    6 F.2d 364 (2d Cir. 1925) . . . . . . . . . . . . . . . . . . . 47

PAGE

*Gall v. United States,*
552 U.S. 38 (2007). . . . . . . . . . . . . . . . . . . . . . . . 56

*Griffith v. Kentucky,*
479 U.S. 314 (1987). . . . . . . . . . . . . . . . . . . . . . . 48

*Jackson v. Virginia,*
443 U.S. 307 (1979). . . . . . . . . . . . . . . . . . . . . . . 34

*Johnson v. United States,*
135 S. Ct. 2551 (2015). . . . . . . . . . . . . . . 23, 25, 26

*Johnson v. United States,*
520 U.S. 461 (1997). . . . . . . . . . . . . . . . . . . . . . . 27

*North Carolina v. Alford,*
400 U.S. 25 (1970). . . . . . . . . . . . . . . . . . . . . . . . 19

*People v. Dubinsky,*
31 N.Y.S.2d 234 (Ct. Sp. Sess.
Bronx County 1941) . . . . . . . . . . . . . . . . . . . . . . 37

*People v. Jun Feng,*
34 Misc. 3d 1205(A). . . . . . . . . . . . . . . . . . . . . . . 37

*People v. Li Ai Hua,*
24 Misc. 3d 1142 (Crim. Ct.
Queens County 2009) . . . . . . . . . . . . . . . . . . . . . 37

*People v. Turner,*
165 Misc. 2d 222 (N.Y. Crim. Ct. 1995). . . . . . . . 33

*Rita v. United States,*
551 U.S. 338 (2007). . . . . . . . . . . . . . . . . . . . . . . 62

*Rosemond v. United States,*
134 S. Ct. 1240 (2014). . . . . . . . . . . . . . . . . . . 26, 30

PAGE

*Santobello v. New York,*
404 U.S. 257 (1971). . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Abelis,*
146 F.3d 73 (2d Cir. 1998) . . . . . . . . . . . . . . . . . 34

*United States v. Acosta,*
470 F.3d 132 (2006) . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Banks,*
464 F.3d 184 (2d Cir. 2006) . . . . . . . . . . . . . . . . 59

*United States v. Bautista,*
23 F.3d 726 (2d Cir. 1994) . . . . . . . . . . . . . . . . . 48

*United States v. Biaggi,*
909 F.2d 662 (2d Cir. 1990) . . . . . . . . . .   38, 40, 42

*United States v. Broxmeyer,*
699 F.3d 265 (2d Cir. 2012) . . . . . . . . . . . . . . . . 63

*United States v. Carr,*
424 F.3d 213 (2d Cir. 2005) . . . . . . . . . . . . . . 47, 61

*United States v. Cavera,*
550 F.3d 180 (2d Cir. 2008) . . . . . . . . . . . . . . 55, 57

*United States v. Crosby,*
397 F.3d 103 (2d Cir. 2005) . . . . . . . . . . . . . . 59, 60

*United States v. Cuevas,*
496 F.3d 256 (2d Cir. 2007) . . . . . . . . . . . . . . . . 56

*United States v. Culbertson,*
670 F.3d 183 (2d Cir. 2012) . . . . . . . . . . . . . . 20, 22

*United States v. Delano,*
55 F.3d 720 (2d Cir. 1995) . . . . . . . . . . . . . . . . . 38

PAGE

*United States v. Dervishaj,*
169 F. Supp. 3d 339 (E.D.N.Y. 2016). . . . . . . . . . 28

*United States v. Eberhard,*
525 F.3d 175 (2d Cir. 2008) . . . . . . . . . . . . . . . . 63

*United States v. Elias,*
285 F.3d 183 (2d Cir. 2002) . . . . . . . . . . . . . . 44, 45

*United States v. Espaillet,*
380 F.3d 713 (2d Cir. 2004) . . . . . . . . . . . . . . . . 34

*United States v. Farhane,*
634 F.3d 127 (2d Cir. 2011) . . . . . . . . . . . . . . . . 45

*United States v. Fernandez,*
443 F.3d 19 (2d Cir. 2006) . . . . . . . . . . . . . . . . . 59

*United States v. Geibel,*
369 F.3d 682 (2d Cir. 2004) . . . . . . . . . . . . . . . . 34

*United States v. Gomez,*
617 F.3d 88 (2d Cir. 2010) . . . . . . . . . . . . . . . . . 21

*United States v. Guang,*
511 F.3d 110 (2d Cir. 2007) . . . . . . . . . . . . . . . . 55

*United States v. Henry,*
325 F.3d 93 (2d Cir. 2003) . . . . . . . . . . . . . . . . . 27

*United States v. Hill,*
832 F.3d 135 (2d Cir. 2016) . . . . . . . . . .   25, 26, 28

*United States v. Ivezaj,*
568 F.3d 88 (2d Cir. 2009) . . . . . . . . . . . . . . . . . 29

*United States v. James,*
520 F. App'x 41 (2d Cir. 2013) . . . . . . . .   20, 21, 23

PAGE

*United States v. Kozeny,*
667 F.3d 122 (2d Cir. 2011) . . . . . . . . . . . . . . . . . 34

*United States v. Lopez,*
615 Fed. App'x 24 (2d Cir. 2015) . . . . . . . . . . 58, 59

*United States v. Marcus,*
560 U.S. 258 (2010). . . . . . . . . . . . . . . . . . . . . . 27, 56

*United States v. Marrale,*
695 F.2d 658 (2d Cir. 1982) . . . . . . . . . . . . . . . . 47

*United States v. McDermott,*
245 F.3d 133 (2d Cir. 2001) . . . . . . . . . . . . . . 35, 36

*United States v. Minicone,*
960 F.2d 1099 (2d Cir. 1992) . . . . . . . . . . . . . . . 61

*United States v. Newton,*
369 F.3d 659 (2d Cir. 2004) . . . . . . . . . . . . . . . . 45

*United States v. Olano,*
507 U.S. 725 (1993). . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Perez,*
144 F.3d 204 (2d Cir. 1998) . . . . . . . . . . . . . . . . 52

*United States v. Perry,*
643 F.2d 38 (2d Cir. 1981) . . . . . . . . . . . . . . . . . 52

*United States v. Persico,*
645 F.3d 85 (2d Cir. 2011) . . . . . . . . . . . . . . . . . 34

*United States v. Pope,*
554 F.3d 240 (2d Cir. 2009) . . . . . . . . . . . . . . . . 57

*United States v. Prado,*
815 F.3d 93 (2d Cir. 2016) . . . . . . . . . . . . . . 27, 31

PAGE

*United States v. Reilly,*
    76 F.3d 1271 (2d Cir. 1996) . . . . . . . . . . . . . . . . . 56

*United States v. Rigas,*
    490 F.3d 208 (2d Cir. 2007) . . . . . . . . . . . . . . . . . 63

*United States v. Rigas,*
    583 F.3d 108 (2d Cir. 2009) . . . . . . . . . . . . . . . . . 57

*United States v. Riggi,*
    541 F.3d 94 (2d Cir. 2008) . . . . . . . . . . . . . . . . . 34

*United States v. Rivera,*
    22 F.3d 430 (2d Cir. 1994) . . . . . . . . . . . 47, 50, 52

*United States v. Rivera,*
    971 F.2d 876 (2d Cir. 1992) . . . . . . . . . . . . . . . . 50

*United States v. Severino,*
    800 F.2d 42 (2d Cir. 1986) . . . . . . . . . . . 19, 20, 23

*United States v. Shareef,*
    190 F.3d 71 (2d Cir. 1999) . . . . . . . . . . . . . . . 45, 54

*United States v. Temple,*
    447 F.3d 130 (2d Cir. 2006) . . . . . . . . . . . . . . . . . 34

*United States v. Tocco,*
    135 F.3d 116 (2d Cir. 1998) . . . . . . . . . . . . . . . . . 46

*United States v. Valentine,*
    820 F.2d 565 (2d Cir. 1987) . . . . . . . . . . . . . . . . . 44

*United States v. Vilar,*
    729 F.3d 62 (2d Cir. 2013) . . . . . . . . . . . . . . . . . 27

*United States v. Villafuerte,*
    502 F.3d 204 (2d Cir. 2007) . . . . . . . . . . . . . . 56, 61

PAGE

*United States v. Viola,*
　　35 F.3d 37 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . 27

*United States v. Williams,*
　　690 F.3d 70 (2d Cir. 2012) . . . . . . . . . . . . . . . 49, 52

*Statutes, Rules & Other Authorities*:

18 U.S.C. § 924(c)(3). . . . . . . . . . . . . . . .  24, 25, 26, 28

18 U.S.C. § 924(j) . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

18 U.S.C. § 1111 . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

18 U.S.C. § 1951(a). . . . . . . . . . . . . . . . . . . . . . . . . 25

18 U.S.C. § 1951(b)(2) . . . . . . . . . . . . . . . . . . . . 25, 28

18 U.S.C. § 1955(a). . . . . . . . . . . . . . . . . . . . . . . . . 33

18 U.S.C. § 1961(5). . . . . . . . . . . . . . . . . . . . . . . . . 38

N.Y. Penal Law § 225.00(2) . . . . . . . . . . . . . . . . . . . 33

N.Y. Penal Law § 125.25 . . . . . . . . . . . . . . . . . . . . . 61

Fed. R. Crim. P. 11(b)(3) . . . . . . . . . . . . . . . . . . . . . 19

U.S.S.G. § 2A1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

U.S.S.G. § 2A1.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

U.S.S.G. § 3D1.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

### Docket No. 14-4133

---

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

XING LIN, also known as Sealed Defendant 1,
also known as Ding Pa,

*Defendant-Appellant,*

HAO CHAO, also known as Sealed Defendant 2,
also known as Little Beijing,

*Defendant.*

---

## BRIEF FOR THE UNITED STATES OF AMERICA

---

### Preliminary Statement

Xing Lin appeals from a judgment of conviction entered on October 29, 2014, in the United States District Court for the Southern District of New York, following a three-week trial before the Honorable Miriam Goldman Cedarbaum, United States District Judge, and a jury.

Superseding Indictment S2 11 Cr. 114 (MGC) (the "Indictment") was filed on September 28, 2012, in five counts. Count One charged Lin with conspiracy to commit racketeering, in violation of Title 18, United States Code, Section 1962(d). Count Two charged Lin with racketeering, in violation of Section 1962(c). Count Three charged Lin with murder through use of a firearm during and in relation to a crime of violence, in violation of Title 18, United States Code, Sections 924(j) and 2. Count Four charged Lin with extortion, in violation of Title 18, United States Code, Sections 1951 and 2. Count Five charged Lin with conspiracy to commit extortion, in violation of Section 1951.

Trial commenced on April 9, 2013 and ended on April 25, 2013, when Lin was convicted on Counts One through Four, and acquitted of Count Five.

On October 29, 2014, Judge Cedarbaum sentenced Lin to a term of life imprisonment on Counts One, Two, and Three, and a sentence of 240 months' imprisonment on Count Four, to run concurrently to the life sentence. Judge Cedarbaum also imposed a fine of $25,000 and a $400 mandatory special assessment.

Lin is currently serving his sentence.

## Statement of Facts

### A.  The Government's Case

During a three-week trial the Government presented overwhelming evidence that Lin was the leader of a criminal enterprise based in Chinatown, Manhattan. Lin's organization engaged in gambling, extortion, assaults, and ultimately murder.

### 1. Lin Was a Dai Lo Leading a Gang in Chinatown and Elsewhere

The testimony at trial established that Lin was a Dai Lo with a group of "kids" or "followers" who acted at his instruction, worked in his gambling parlors, and engaged in violence on his behalf. One of Lin's former followers, Shun Qing Chen, testified that he followed Lin along with 10 to 20 other followers. (Tr. 590-641, 665).[1] In return for following Lin, Qing Chen received shares in one of Lin's gambling parlors, as well as food, alcohol, and spending money. (Tr. 606). Qing Chen got into a fight on behalf of Lin (Tr. 607) and on occasion he and Lin armed themselves with guns and went looking for people who had crossed Lin (Tr. 615).

Five other witnesses—Huo Guang Chen, Cai Xiang Li, Qun Li, Cheng Yong, and Allen Chen—also testified that Lin was a Dai Lo who led a gang that operated in Chinatown and elsewhere. (Tr. 289-90, 449, 689-90, 825). In particular, Huo Guang Chen explained that Lin demanded additional money from Chen to help cover expenses Lin had incurred providing housing, food, and entertainment for his followers.

---

[1] "Tr." refers to the trial transcript; "Br." refers to Lin's brief on appeal; "A." refers to the appendix filed with that brief; "PSR" or "Presentence Report" refers to the Presentence Investigation Report prepared by the United States Probation Office (the "Probation Office"); and "SOR" refers to the sealed Statement of Reasons, which the Government recently provided to Lin's appellate counsel will file with the Court under seal.

(Tr. 322). Huo Guang Chen (Tr. 291-92), Qun Li (Tr. 450-58), Cai Xiang Li (Tr. 690-96), and Allen Chen (Tr. 517-21) further testified about numerous acts of violence perpetrated by Lin and his gang.

### 2. Lin Operated Gambling Parlors

From the mid-1990s until the early 2000s, while based principally in New York City, Lin and his gang operated three illegal gambling parlors in and around the Chinatown neighborhood of Manhattan. The evidence established that Lin profited from each of these gambling parlors by collecting "commissions" from the gamblers.

Specifically, Lin ran a gambling parlor located behind a barbershop at 21 Eldridge Street in Chinatown, where gamblers played a card game called "13 Card," or "tien lin." Every night, thousands of dollars were wagered on the games, and Lin profited from "commissions" charged on the bets. (Tr. 100-02, 286-89, 603-05, 686-89, 822-24). Lin ran a similar gambling parlor on Madison Street in Chinatown, where 13 Card was played downstairs and mahjong was played upstairs. (Tr. 95-99, 679-86).

In addition to the gambling parlors in Chinatown, Lin and his gang operated gambling parlors in Toronto, Canada. (Tr. 511-12). Lin moved to Toronto following the July 29, 2004 murders described below. (Tr. 458-59, 517). Once there, he operated at least two gambling parlors in the Toronto area and used violence to force a competing gambling parlor out of business. (Tr. 511-21).

### 3. Lin Used Violence to Maintain His Position as a Dai Lo

The evidence at trial established that Lin used violence and threats of violence to maintain "face," or respect, in the Chinatown community, to maintain his position as a Dai Lo, and to eliminate rivals. In particular, Qun Li—a former follower of another Dai Lo and eventual Dai Lo himself, who operated in and around Chinatown in the mid-1990s—had a series of violent encounters with Lin. In or about 1996, Lin and three followers entered a restaurant in the Chinatown neighborhood of Manhattan and approached Li. (Tr. 450). Lin then picked up a soy sauce bottle, threatened to hit Li with the bottle, and stated "I'm going to kill you today." (*Id.*). Qun Li's friends and other patrons intervened before Lin could strike Li with the bottle. (Tr. 450).

Qun Li also had an altercation with Lin in or about 2000 in a private room in a nightclub in the Flushing neighborhood of Queens, New York. (Tr. 452). Li and others were in the nightclub when Lin and two followers entered the club and Lin pointed at another man and told his followers to "beat him up for me." (Tr. 451-52). Lin's followers tried to assault the man whom Lin had pointed out, but Qun Li interceded and stopped them from doing so. (Tr. 452).

Shortly after that incident at the nightclub in Flushing, Qun Li was eating at a restaurant in Brooklyn. (Tr. 454-55). Lin entered the restaurant with three followers and got into a physical altercation with Qun Li. (Tr. 455, 457). A day or two later, Qun Li was walking on Eldridge Street in Chinatown. (Tr. 457). As

he neared the barbershop where Lin operated a gambling parlor, Lin grabbed him from behind and tried to pull him into the barber shop. (Tr. 458). Li grabbed a screwdriver being used to hold open the door and used it to stab Lin in his lower body before fleeing. (Tr. 458, 499).

In addition to the incidents with Qun Li, the evidence at trial also established that Lin and his gang members used guns and knives against rivals and others who crossed them. For example, on or about July 16, 2000, Lin entered a gambling parlor located at 21 Orchard Street in Chinatown. (Tr. 291). Lin approached the owner of the gambling parlor, a man named Pan Zhen Chao, and put a gun to Chao's head. (*Id.*). Lin told Chao that Chao was not giving Lin face, and that Lin was going to kill Chao. (Tr. 291-92). Chao begged for his life, and Lin agreed not to kill him on the condition that Chao give him face in the future. (Tr. 292). Lin then fired a shot into the floor of the gambling parlor and left. (*Id.*).

Similarly, in or about September 2002, Lin and his followers went to a gambling parlor in Chinatown that was owned by Yi Feng, a rival gangster. (Tr. 611). Lin shot at the gambling parlor and fled (Tr. 318, 612). Yi Feng's followers chased Lin down the street, caught him, and stabbed him. (Tr. 614). Following the stabbing, Lin relocated to Atlanta for a period of time. (Tr. 318-19).

Further, on or about November 14, 2003, Lin ordered his followers to stab a man who was not giving Lin face. Lin and his followers were at a restaurant in Chinatown when Lin began to argue with a man

named Song Di Xiang. (Tr. 525-34, 539-562). Lin ordered two of his followers to stab Xiang, which they did, before someone else shot Lin in the leg. (Tr. 541-43, 545, 570-73).

Lin and his followers also used physical force to injure and intimidate their victims. For example, in approximately 2001, Lin and three or four of his followers entered a gambling parlor located behind a barbershop at 109 East Broadway. (Tr. 690-91). They dragged a man named Yi Qui, who had been gambling in a back room, into the barbershop, and punched and kicked him a dozen times. (Tr. 692-94).

Similarly, Lin and his followers assaulted Allen Chen in Toronto in December 2010. In or about July 2010, Chen had refused Lin's demand for a share of a gambling parlor that Chen ran. (Tr. 512-14). So when Lin next saw Chen in approximately December 2010, he and his followers beat Chen so severely that he was hospitalized. (Tr. 517-21).

### 4. Lin Extorted the Owners of a Bus Company

Beginning in 2002, Lin extorted Huo Guang Chen, the owner of a company that operated buses on a route from Chinatown to Raleigh, North Carolina. Chen and his partner had learned that a rival bus company planned to operate buses on the same route to North Carolina, and they turned to Lin for help. In exchange for a one-third share of Chen's profits, Lin ensured that the rival company did not operate on that route. (Tr. 294-97).

In or about July 2003, Lin demanded a larger share of Chen's profits. When Chen refused, Lin told Chen

that Lin and Chen's partner were going to force Chen out of the company. Chen turned for help to one of his partner's friends, a Chinatown businessman named Chan Qin Zhou, who convinced Chen's partner not to side with Lin. (Tr. 322-25). The next day, Lin and his followers met Chen in a park in Queens and threatened Chen for causing Lin to lose face. (Tr. 327). Chen testified that he was scared of Lin and had agreed to make monthly payments to Lin of $2000 in addition to Lin's one-third share of the profits. (Tr. 327, 338). Around the same time, Chen had sold some of his shares in the bus company to Chan Qin Zhou, but Chen did not tell Zhou about the $2000 payments to Lin. (Tr. 327, 329).

In or about May 2004, Chan Qin Zhou learned about those additional $2000 monthly payments and ordered Chen to stop making them. (Tr. 339, 406). Chen therefore told Lin that another shareholder had ordered Chen to stop making the payments. Lin told Chen that he knew who the other shareholder was and threatened to harm the other shareholder. Chen stopped paying Lin the extra $2000 in July 2004. (Tr. 339-406). Lin murdered Zhou and an innocent bystander on July 29, 2004.

### 5.   Murder of Chan Qin Zhou and Mei Ying Li

In the early morning hours of July 29, 2004, Chan Qin Zhou was in a private room in a karaoke bar in Queens, New York. (Tr. 105, 699-703, 830-31). Xiang Li testified that he was outside the room in the hallway when he saw Lin and one of Lin's followers walk quickly down the hall and into Zhou's room. (Tr. 707-

710; *see also* Tr. 107, 834). Once they were in the room, Lin told his follower to "shoot" Zhou, and the follower pulled out a gun and started shooting. (Tr. 108-09, 835-37). Zhou fell to the ground injured. (Tr. 109, 836-37). Lin's follower then stood above Zhou and continued shooting Zhou until his gun was empty. (Tr. 836-37).

Zhou was shot six times and killed. (Tr. 184). The forensic evidence demonstrated that Zhou was in a defensive position with his arms up when he was shot, and that the bullets struck him in a manner consistent with the eyewitness testimony: twice on the hands and arms, twice in the chest, once in the side, and once in the back. (Tr. 184-187). Two waitresses who were in the karaoke room were also shot. A waitress named Mei Ying Li was shot in the head and died later that night. (Tr. 170, 172). The forensic evidence demonstrated that she was ducking when struck by a bullet on the top of the head. (Tr. 170-71). The other waitress was hit in the leg and survived. (Tr. 68). After the shooting, Lin and his follower fled. (Tr. 109).

The following morning, Lin called Heng De Oh-Yang, a livery cab driver, and asked Oh-Yang to drive Lin to retrieve a car Lin had left at the scene of the murder. (Tr. 795-99). That vehicle was recovered instead by police and found to contain Lin's belongings, including a driver's license and bank records. (*Id.*).

Roughly 10 days after the murders, Lin called Huo Guang Chen. Lin refused to use his name and did not tell Chen where he was. (Tr. 341). Chen asked Lin why he had killed Zhou, and Lin confirmed that he had told Chao to "get rid of" Zhou. (Tr. 341-42). According to

Lin, however, he meant only for Zhou to be shot "on the arms or legs." (Tr. 342). During that call, Lin also demanded that Chen continue making monthly payments to Lin's wife, and told Chen that he (Lin) still had followers in New York. (Tr. 342).

Chen continued to pay Lin's wife one-third the bus company's profits every month until November 2009. (Tr. 344-51).

## B.  The Defense Case

In addition to extensive cross-examination of each of the fact witnesses, Lin offered three testimonial stipulations, including a stipulation for Keith Ng, a retired New York City Police Department ("NYPD") detective who interviewed Guang Zhu, Cheng Yong, and Cai Xiang Li shortly after the July 29, 2004 murders (Tr. 876); a stipulation for Special Agent Timothy Varian concerning notes of statements that Huo Guang Chen had made to the Government (Tr. 878); and a stipulation for Special Agent Varian concerning notes of statements Guang Zhu had made to the Government (Tr. 880). Lin also introduced three other exhibits: an asylum application filed by Huo Guang Chen (Tr. 432), an application for appointment of counsel filed by Qun Li (Tr. 485), and a portion of a Presentence Investigation Report for Shun Qing Chen (Tr. 674-75).

## C.  The Mistrial Motions

Following the Government's closing argument, Lin moved for a mistrial on the ground that the prosecutor

had allegedly misstated the record during her summation. Judge Cedarbaum did not rule on the motion and observed that defense counsel could "point out to the jury" any misstatements of the record in his closing argument. (Tr. 962).

Following the Government's rebuttal argument, Lin again moved for a mistrial but asked for time to review the record before stating the grounds for the motion. Judge Cedarbaum permitted defense counsel time to review the record and observed that she had "made very clear to the jury that the lawyers are not witnesses, and what they say is not evidence." (Tr. 1019-20).

The next morning, defense counsel renewed his mistrial motion on the ground that the Government, in its rebuttal, had engaged in "an ad hominem attack on the defense counsel." (Tr. 1022). Defense counsel then argued that a series of arguments made by the prosecutor during his rebuttal summation allegedly, when taken together, deprived Lin of his right to a fair trial. (Tr. 1022-26). Judge Cedarbaum did not rule on the mistrial motion at that time. (Tr. 1027).

After the jury reached its guilty verdict, defense counsel asked to "reserve any post-verdict motions." (Tr. 1137). Judge Cedarbaum granted defense counsel's application. (*Id.*). On June 24, 2013, Lin informed Judge Cedarbaum by letter that he would "rest on the present record with respect to the mistrial and Rule 29 motions." (A. 17). On October 21, 2014, Judge Cedarbaum denied Lin's mistrial motion. (A. 755-56).

### D. The Sentencing Proceedings

In its Presentence Report dated May 12, 2014, the Probation Office found that the maximum sentence on Counts One, Two, and Three was life imprisonment. (PSR ¶ 124). The maximum sentence for Count Four was 20 years' imprisonment. (PSR ¶ 124). According to the Presentence Report, based on a total offense level of 43 and Criminal History Category III, the applicable Guidelines range for all counts was life imprisonment. (PSR ¶ 125). The Probation Office recommended a total term of life imprisonment. (PSR at 29). Lin filed no objections to the Presentence Report. (PSR at 26).

The Presentence Report set forth information about Lin's background including his family, education, and employment history (PSR ¶¶ 93-123), and his criminal history (PSR ¶¶ 80-91) which was comprised of two convictions for driving while under the influence of alcohol. The Presentence Report further indicated that Lin was on probation at the time he committed the conduct proven at trial (PSR ¶ 86), and that a bench warrant had previously been issued for his arrest in connection with gambling charges filed in Georgia (PSR ¶ 89).

The Government filed a sentencing submission dated September 15, 2014, arguing that Judge Cedarbaum should impose sentences of life imprisonment on Counts One and Two, a sentence of 20 years' imprisonment on Count Four, and a consecutive sentence of life imprisonment on Count Three. (A. 723-33).

Lin filed a submission on October 1, 2014, arguing for a sentence of less than life imprisonment. (A. 734-

39). Lin's arguments centered on the sentence attached to the prior plea offer in the case. Lin claimed that the plea had been unsuccessful due to his being "unable to allocute with sufficient specificity as to satisfy the Court." (A. 735). That plea offer contained a stipulated Guidelines range of 120 months, the mandatory minimum. (A. 27). Lin contended that the Government's sentencing recommendation was punishment for Lin proceeding to trial. (A. 738). Lin's submission also focused on the credibility of the trial witnesses. (A. 736-37).

On October 20, 2014, the Government filed a submission responding to Lin's submission. (A. 741-43). The Government argued that Lin's submission was a recitation of his closing argument and sought to have Judge Cedarbaum ignore the jury's verdict. The Government further contended that revisiting Lin's failed attempt to plead guilty was irrelevant to the sentencing. (A. 742). Lin then filed a second submission responding to the Government's October 20 submission. (A. 744-47).

The parties appeared for sentencing on October 21, 2014. (A. 748-63). Lin's counsel stated that there were no errors in the Presentence Report. (A. 749). Lin read a statement (A. 750-52). Judge Cedarbaum said that she had read both of Lin's submissions. (A. 752). Defense counsel relied on and reiterated the arguments advanced in his submissions. (A. 752-54). Judge Cedarbaum then stated that she had read the Government's submissions, listened to all of the evidence at trial, and did not believe further argument from the

14

Government was appropriate. (A. 754-55). Judge Cedarbaum then denied the pending motions under Rule 29 and for a mistrial stating that "the evidence fully proves the conclusion that the jury reached." (A. 755). As to the mistrial motion Judge Cedarbaum stated that she had "listened carefully" and "tried to supervise what happens in the courtroom carefully" and was "satisfied there was not a mistrial in this case," and denied the motion. (A. 755-756).

Judge Cedarbaum then proceeded to sentencing and stated that this "was a serious and heavy case," and it was "no pleasure to have to sentence a young man to life in prison." (A. 756). Judge Cedarbaum then sentenced Lin to life in prison on Counts One, Two, and Three. Judge Cedarbaum stated, "[T]here is no question, based on the evidence in this case, that you are responsible for the death of another human being." (A. 756). Judge Cedarbaum also sentenced Lin to a term of 20 years on Count Four to run concurrently to the other sentences imposed. (*Id.*). After a colloquy with Lin about his earnings and finances, Judge Cedarbaum imposed a fine of $25,000. (A. 757). Judge Cedarbaum stated, "I know this is a very heavy sentence and I know you are a young man, and it is a pity that someone as capable as you should be in this position, but you brought this on yourself." (A. 760). The Government requested that Judge Cedarbaum impose the sentence on Count Three (the violation of Section 924(j)) to run consecutively to the other sentences. (A. 761-62). Judge Cedarbaum declined to do so. (*Id.*).

In a sealed Statement of Reasons dated October 21, 2014, Judge Cedarbaum adopted the Presentence Report. (SOR 1). In the Statement of Reasons, Judge Cedarbaum determined that the applicable Guidelines offense level was 43, and that Lin was in Criminal History Category III. (SOR 1).[2]

# ARGUMENT

## POINT I

### Judge Cedarbaum Did Not Abuse Her Discretion in Rejecting Lin's Attempted Guilty Plea

Lin first argues that Judge Cedarbaum abused her discretion in rejecting Lin's attempted guilty plea to a violation of Title 18, United States Code, Section 924(c)(1)(A)(iii). (Br. 32). But Lin's failed attempt to plead guilty was a result of his inability to truthfully allocute to all of the elements of the crime, and the decision not to plead guilty ultimately was his own.

---

[2]   Judge Cedarbaum checked a box on the Statement of Reasons indicting that the "sentence is within an advisory guideline range that is not greater than 24 months and the court finds no reason to depart." (SOR 2). That was inaccurate. In light of the sentence imposed, Judge Cedarbaum should have checked the box just below, because the sentence imposed was greater than 24 months but within the applicable Guidelines range.

Judge Cedarbaum did not abuse her discretion in refusing to accept his attempted guilty plea, and the Court should reject Lin's argument.

## A. Relevant Facts

The original indictment filed on February 9, 2011, charged Lin with one count of violating Title 18, United States Code, Sections 924(j) and 2. (A. 23-24). On June 27, 2012, Lin appeared before Judge Cedarbaum to plead guilty, pursuant to a plea agreement, to a superseding information (the "S1 Information") charging Lin with using, carrying, or possessing a firearm in connection with a crime of violence, in violation of Title 18, United States Code, Sections 924(c) and 2. (A. 31-32, 34). The crime of violence was a conspiracy to commit extortion, in violation of Title 18, United States Code, Section 1951, relating to the July 29, 2004 murders. That charge carried a mandatory-minimum term of 10 years' imprisonment and maximum term of life. 18 U.S.C. § 924(c)(i)(A)(iii).

During his allocution, Lin stated that on July 31, 2004, a friend of his, an individual with the nickname "Small Beijing," i.e., Lin's co-defendant Hao Chao, fired a gun. (A. 57). Lin initially said that he and Chao were "[j]ust friends" and that Chao did not work for Lin. (*Id.*). But Lin later admitted that Chao was his bodyguard. (A. 73). Lin stated that he had told Chao to "teach Mr. Zhou [i.e., the victim] a lesson," and Chao had then fired the gun, which Lin had known Chao was carrying. (A. 57). Lin, who claimed to have been drunk at the time, had wanted to teach Zhou a lesson "because of the bus business," which Zhou had owned

"at the beginning" until Lin "took over later." (A. 57-58). When Judge Cedarbaum asked what lesson Lin had wanted Chao to teach Zhou, Lin responded, "I only wanted the other person to curse at that person." (A. 59). Lin emphasized, "I thought he was going to curse or beat him, but I didn't expect he would pull out the gun and then shoot him." (A. 66).

At that point in the allocution, Judge Cedarbaum noted, "You know there has to be some violation in this crime. We haven't really gotten a clear notion of aiding and abetting here." (*Id.*). After discussing Lin's desire to obtain the bus business from Zhou (A.67-71), Lin said that he had wanted to frighten Zhou "out of using that [bus] route from New York to South Carolina." (A. 71). Lin then repeated that he had simply wanted Chao to "make a threat to" Zhou or "[t]each him a lesson." (A. 74).

Though the Government believed that Lin's allocution had been sufficient, Judge Cedarbaum believed it was a "close question" and asked for legal authority regarding constructive possession of firearms, because she wanted Lin "to be clear that he knows exactly what he's pleading to." (A. 77-78). Judge Cedarbaum remarked, "[T]here is a lot here that's just not being said, but I think it has to be said." (A. 77).

Judge Cedarbaum asked Lin more questions in an attempt to clarify what had occurred. When Judge Cedarbaum asked Lin, "You said you intended him [i.e., Chao] to beat up the man [i.e., Zhou], is that right?," Lin responded, "Or curse." (A. 83). Recognizing that beating someone and cursing someone were very different, and responding to defense counsel's proffer that

"it would have been fine with [Lin] if Little Beijing [i.e., Chao] beat Mr. Zhou," Judge Cedarbaum asked, "Did Little Beijing beat other people for you?" (*Id.*). Lin responded, "No." (*Id.*). Lin also told Judge Cedarbaum that he had never before ordered Chao to teach someone a lesson, and that he had done so on this occasion simply "[b]ecause at that time we were drinking and then we happened to see him drinking there at the same time." (A. 84). Nevertheless, Judge Cedarbaum said she would accept the plea but would "like to hear another allocution," remarking that Lin did not want to answer her questions "too completely." (*Id.*).

The parties appeared again the next day. At the outset, defense counsel stated that Lin was "not prepared to go forward with his plea of guilty that we attempted to enter yesterday." (A. 91). Judge Cedarbaum commented, "Well, I also had the sense he just wasn't really quite ready to admit what he did." (*Id.*). Counsel suggested that there had been an issue with the Chinese interpreter he had used to communicate with Lin. (A. 92-93).

When the parties next appeared, on July 12, 2012, Judge Cedarbaum immediately asked about the status of the case and noted, "Without any intention that the body guard shoot it is very hard to establish aiding and abetting." (A. 102). With no other discussion, defense counsel responded, "I think this matter is going to have to be resolved through trial." (*Id.*).

## B.  Applicable Law

Section 924(c) provides, in relevant part:

> [A]ny person who, during and in relation to any crime of violence . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime—. . . if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

18 U.S.C. § 924(c)(1)(A)(iii).

Federal Rule of Criminal Procedure 11(b)(3) requires that "[b]efore entering judgment on a guilty plea, the court must determine that there is a factual basis for the plea." A district court is not required to "accept every constitutionally valid guilty plea merely because a defendant wishes so to plead," because "[a] criminal defendant does not have an absolute right under the Constitution to have his guilty plea accepted by the court." *North Carolina v. Alford*, 400 U.S. 25, 38 n.1 (1970). Indeed, a district court "may reject a plea in exercise of sound judicial discretion." *Santobello v. New York*, 404 U.S. 257, 262 (1971). "[I]f the court has reasonable grounds for believing that acceptance of the plea would be contrary to the sound administration of justice, it may reject the plea." *United States v. Severino*, 800 F.2d 42, 46 (2d Cir. 1986).

As the Court recently explained, " 'it is error for the court to find that a factual basis exists when the defendant actively contests a fact constituting an element of the offense in the absence of circumstances

warranting the conclusion that the defendant's protestations are unworthy of belief.'" *United States v. James*, 520 F. App'x 41, 44 (2d Cir. 2013) (quoting *United States v. Culbertson,* 670 F.3d 183, 190 (2d Cir. 2012)).

The Court typically reviews a district court's decision not to accept a guilty plea for abuse of discretion. *United States v. Severino*, 800 F.2d at 46-47. Here however, as discussed below, Lin waived his right to challenge Judge Cedarbaum's rejection of his plea.

## C. Discussion

### 1. Lin Waived His Right to Challenge Judge Cedarbaum's Decision

Judge Cedarbaum engaged in a lengthy and thoughtful allocution with Lin and his counsel, seeking to ensure that there was a factual basis for Lin's guilty plea to a violation of Section 924(c)(i)(A)(iii), and that Lin was being honest in his allocution. As discussed below, Lin was not truthful and his allocution did not establish all of the elements of the charged crime.

Nevertheless, Judge Cedarbaum was prepared to give Lin another opportunity to allocute fully and honestly, saying at the end of the first plea proceeding that she would accept the plea but would "like to hear another allocution." (A. 84). When the parties returned the next day, however, defense counsel stated at the outset that Lin was "not prepared to go forward with his plea of guilty that we attempted to enter yesterday." (A. 91). Counsel suggested that, due to a problem

with an interpreter hired by defense counsel for purposes of communicating to Lin out of court, he and Lin had not properly understood each other. (A. 92-93). At a later proceeding, defense counsel was perfectly clear: "I think this matter is going to have to be resolved through trial." (A. 102). The plea offer had remained open until that time. (A. 97).

Therefore, because he chose to go to trial and rejected the Government's plea offer, Lin waived his right to argue that Judge Cedarbaum abused her discretion in rejecting the plea. *See United States v. James*, 520 F. App'x at 44 n.1 (noting that "[h]aving affirmatively rejected the Government's offer, James likely waived his right to claim its benefit" (citing *United States v. Gomez*, 617 F.3d 88, 92 (2d Cir. 2010))).

## 2. Judge Cedarbaum Did Not Abuse Her Discretion

In any event, Lin's allocution did not satisfy all the elements of Section 924(c)(i)(A)(iii), and Lin was not entirely truthful during his allocution. Judge Cedarbaum was within her discretion to reject the plea for either reason.

First, in *Alleyne v. United States*, 133 S. Ct. 2151 (2013), decided after Lin attempted to plead guilty, the Supreme Court held that facts that increase the mandatory minimum sentence to be imposed for a Section 924(c) offense—namely, whether the firearm in question was brandished or discharged—must be found by a jury, not by the sentencing judge. *Id.* at 2162-63. De-

spite being asked multiple times, Lin was unable to allocute to knowing or intending that Chao would discharge the firearm. Rather, Lin claimed that he simply wanted Chao to "teach Mr. Zhou a lesson," meaning "curse or beat him." (A. 57, 66). Indeed, Lin expressly disavowed knowledge that Chao would shoot Zhou: "I thought he was going to curse or beat him, but I didn't expect he would pull out the gun and then shoot him." (A. 66). Moreover, Zhou claimed to have been drunk at the time of the shooting, further negating intent. (A. 58). Judge Cedarbaum therefore did not abuse her discretion in refusing to accept Lin's plea to a Section 924(c) discharge offense. *Cf. United States v. Culbertson*, 670 F.3d at 190 (concluding that district court lacked factual basis for plea due to defendant's "persistent disavowal of" drug weight, an element of the crime).

Second, and in any event, Lin was not truthful throughout his allocution. For example, Lin first claimed that Chao was simply a friend (A. 57), but later admitted that Chao was his bodyguard (A. 73). As another example, Lin claimed that he expected Chao to "curse or beat" Zhou. (A. 66). Judge Cedarbaum therefore reasonably asked, "Did Little Beijing beat other people for you?" (A. 83). Lin responded, "No." (*Id.*). Lin also told Judge Cedarbaum that he had never before ordered Chao to teach someone a lesson, and that he had done so on this occasion simply "[b]ecause at that time we were drinking and then we happened to see him drinking there at the same time." (A. 84). Judge Cedarbaum observed that if Lin "never told him [i.e., Chao] before to beat anybody, that is a

little weird—that saying teach him a lesson means that he should beat him." (A. 86).

Judge Cedarbaum therefore was correct that Lin had not answered her questions "too completely" and was "reluctant to face up to the fact that he may well have instructed violence" (A. 84, 86), and was well within her discretion in rejecting Lin's guilty plea based on Lin's dishonesty during his allocution. *See Severino*, 800 F.2d at 46-47 (concluding that court did not abuse its discretion in refusing to accept plea "on the ground that it believed he was, in his plea allocution, not testifying truthfully); *James*, 520 F. App'x at 44 (holding that court did not abuse discretion in declining to accept guilty plea where defendant's "allocution was confused as to several essential elements of the charged conspiracy").

For either or both of these reasons, Judge Cedarbaum did not abuse her discretion in rejecting Lin's guilty plea, and the Court should reject Lin's argument.

## POINT II

### The Court Should Not Vacate Lin's Conviction on Count Three

Lin argues that his conviction under Title 18, United States Code, Section 924(j) must be vacated because (1) Hobbs Act extortion does not qualify as a crime of violence in light of the Supreme Court's decision in *Johnson v. United States*, 135 S. Ct. 2551 (2015), and (2) the aiding and abetting instruction was

erroneous. (Br. 36). The Court should reject these arguments and affirm Lin's conviction on Count Three. First, the Hobbs Act Extortion predicating Lin's Section 924(j) conviction qualifies as a crime of violence under Section 924(c)(3)(B) because it involved "a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C. § 924(c)(3)(B). Second, though the aiding and abetting instruction was erroneous, the error did not affect the jury's verdict.

## A. Applicable Law

### 1. Section 924(j) and *Johnson*

A violation of Section 924(j) requires proof of both a Section 924(c) violation and a related death, and so requires proof that the defendant used, carried, or possessed a firearm in connection with a crime of violence (or aided and abetted another person to do so), that the use of the firearm caused the death of another person, and that the resulting death was a murder. 18 U.S.C. § 924(j); Sand, *Modern Federal Jury Instructions*, Instr. 35-87.

Section 924(c)(3) defines "crime of violence" as

> an offense that is a felony and—
>
> (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> (B) that by its nature, involves a substantial risk that physical force against the

> person or property of another may be
> used in the course of committing the of-
> fense.

18 U.S.C. § 924(c)(3). This Court has referred to sub-section (A) as the "force clause," and subsection (B) as the "risk-of-force" clause. *United States v. Hill*, 832 F.3d 135, 138 (2d Cir. 2016).

Here, the predicate crime of violence was Hobbs Act extortion, 18 U.S.C. § 1951(a). Section 1951(a) pro-vides:

> Whoever in any way or degree obstructs,
> delays, or affects commerce or the move-
> ment of any article or commodity in com-
> merce, by robbery or extortion or at-
> tempts or conspires so to do, or commits
> or threatens physical violence to any per-
> son or property in furtherance of a plan
> or purpose to do anything in violation of
> this section shall be fined under this title
> or imprisoned not more than twenty
> years, or both.

*Id.* § 1951(a). "Extortion" is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." *Id.* § 1951(b)(2).

In *Johnson v. United States*, 135 S. Ct. 2551 (2015), decided after Lin's trial, the Supreme Court invali-dated the Armed Career Criminal Act's residual clause, which defines a "violent felony" as any felony that "is burglary, arson or extortion, involves use of ex-plosives, or otherwise involves conduct that presents a

serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B)(ii). The Court found that enhancing punishment under this provision violated due process because it was "so vague that it fail[ed] to give ordinary people fair notice of the conduct it punishes." 135 S. Ct. at 2556. In *Hill*, this Court ruled that Hobbs Act robbery is categorically a predicate "crime of violence" for a Section 924(c) or (j) conviction for two reasons: (1) it qualifies as a crime of violence under the force clause, 18 U.S.C. § 924(c)(3)(A); and (2) the risk-of-force clause, *id.* § 924(c)(3)(B), is not void for vagueness in light of *Johnson. United States v. Hill*, 832 F.3d 135.

### 2.  Aider and Abettor Liability

To be liable as an aider and abettor of a section 924(c) violation, the defendant must have either knowingly performed some act that directly facilitated and encouraged another person's use, carrying, or possession of a firearm during and in relation to or in furtherance of the underlying crime of violence, or actively participated in the underlying crime of violence with the advance knowledge that another participant in the underlying crime would use or carry a firearm possess a firearm in furtherance of the crime. *Rosemond v. United States*, 134 S. Ct. 1240, 1243 (2014).

### 3.  Plain Error Review

Where a defendant fails to raise an objection to a jury instruction below, this Court reviews the claim only for plain error. This exacting standard can be satisfied only by showing " '(1) there is an error; (2) the

error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the [defendant]'s substantial rights, which in the ordinary case means it affected the outcome of the [trial]; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." ' *United States v. Vilar*, 729 F.3d 62, 70 (2d Cir. 2013) (quoting *United States v. Marcus*, 560 U.S. 258, 262 (2010)).[3]

---

[3] Because the "source of [the alleged] plain error is a supervening decision," review might be pursuant to this Court's modified plain-error standard, which—if it still exists—would dictate that "the government, not the defendant, bears the burden to demonstrate that the error was harmless." *United States v. Henry*, 325 F.3d 93, 100 (2d Cir. 2003) (quotation marks and ellipses omitted). The Government has long argued that the reasoning underlying the creation of the modified plain-error rule in *United States v. Viola*, 35 F.3d 37 (2d Cir. 1994), did not survive the Supreme Court's decision in *Johnson v. United States*, 520 U.S. 461 (1997) (applying strict plain-error review to an unpreserved claim based on a supervening decision), and cannot be reconciled with the unqualified allocation of the burden in *United States v. Olano*, 507 U.S. 725, 734-35, 739-40 (1993). While this Court has recognized the tension between *Johnson* and modified plain-error review on numerous occasions, it has never found it necessary to decide the question. *See, e.g.*, *United States v. Prado*, 815 F.3d 93, 102-03 (2d Cir. 2016).

## B. Discussion

### 1. Hobbs Act Extortion Is a Crime of Violence Under Section 924(c)(3)(B)

Putting aside the "under color of official right" prong of Section 1951(b)(2), which is divisible, *see Hill*, 832 F.3d at 139 n.5 ("A divisible statute 'sets out one or more elements of the offense in the alternative.'" (quoting *Descamps v. United States*, 133 S. Ct. 2276, 2281 (2013))), Hobbs Act extortion "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense," 18 U.S.C. § 924(c)(3)(B).

Lin points to cases involving "economic pressure aimed at eliminating competitive bidding" and offers "to cease publishing derogatory articles in exchange for" money. (Br. 43 (internal quotation marks omitted)). But Lin was convicted of committing murder using a firearm during the course of a violent extortion —conduct that falls well within the core of Section 924(c)(3)(B) and "involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense," 18 U.S.C. § 924(c)(3)(B); *cf. United States v. Acosta*, 470 F.3d 132, 136-37 (2006) ("Since applying physical force is perhaps the most obvious way to injure, threaten, or intimidate, a conspiracy to engage in such conduct is, by its nature, a conspiracy that involves a 'substantial risk that physical force' will be used"); *United States v. Dervishaj*, 169 F. Supp. 3d 339 (E.D.N.Y. 2016) (denying defense motions based on

*Johnson* to dismiss Section 924(c) counts predicated on Hobbs Act extortion).

In addition, the Indictment and the evidence at trial further ensure that the Hobbs Act extortion predicating Lin's Section 924(j) conviction undoubtedly involved the use of force. *See United States v. Ivezaj*, 568 F.3d 88, 96 (2d Cir. 2009) (holding that where "underlying predicate acts, with one exception, allegedly involved the use of violent means, including loansharking and violent acts of extortion; unquestionably, the conduct charged in Count One posed a substantial risk that physical force against the person or property of another would be used in its commission" (internal quotation marks and footnote omitted)).

The Court therefore should reject Lin's *Johnson* challenge to his Section 924(j) murder conviction.

### 2. The Incorrect Aiding and Abetting Instruction Was Harmless

As to the Section 924(j) charge, Judge Cedarbaum instructed the jury, in pertinent part:

> To establish the second element, the government must prove beyond a reasonable doubt that the defendant knowingly used or aided and abetted the use of a firearm during and in relation to the crime which you find the government has proved beyond a reasonable doubt. . . .
>
> To knowingly use a firearm means to use the firearm purposefully and voluntarily, and not by accident or mistake. Use of a

firearm requires an active employment of the firearm by the person. Active employment means brandishing, displaying, referring to a firearm so that others present knew the defendant had the firearm available, and, of course, firing or attempting to fire a firearm.

The government must establish that the defendant used the firearm during and in relation to the commission of a crime charged in this indictment of which you have found the defendant guilty beyond a reasonable doubt; here, extortion or extortion conspiracy. The circumstances surrounding the presence of the firearm must suggest that the defendant intended to have a firearm available for use during the commission of the underlying crime. . . .

If you do not find beyond a reasonable doubt that the defendant is guilty of Count Three, you should proceed to consider another legal theory of criminal liability that is called aiding and abetting.

(Tr. 1072-74).

Judge Cedarbaum then proceeded to give an aiding-and-abetting instruction (Tr. 1074-76) that was erroneous because it did not explain that Lin "needed advance knowledge of a firearm's presence." *Rosemond v. United States*, 134 S. Ct. at 1251. However, Lin cannot demonstrate "a reasonable probability that the error

affected the outcome of the trial." *United States v. Prado*, 815 F.3d at 102.

The evidence at trial established that Lin was aware that Chao had a gun prior to the murder, and indeed ordered Chao to use it. Specifically, Lin and Chao walked quickly together into the private room occupied by Zhou, the victim, and others. (Tr. 707-10; *see also* Tr. 107, 834). Once there, Lin told Chao to "shoot" Zhou, and Chao pulled out a gun and did so. (Tr. 108-109, 835-37). Chao shot Zhou, who fell to the ground. (Tr. 109, 836-37). Lin did not instruct Chao to stop shooting, take any other steps to prevent the murder, or leave the room. Rather, Lin was present as Chao stood above Zhou and continued shooting Zhou until his gun was empty. (Tr. 836-37).

Furthermore, following the shooting and after learning that Zhou had died from his injuries, Lin admitted having known that Chao was armed. Roughly 10 days after the murders, Lin called Huo Guang Chen. Chen asked Lin why he had killed Zhou, and Lin confirmed that he had told Chao to "get rid of" Zhou. (Tr. 341-42). According to Lin, however, he meant only for Zhou to be shot "on the arms or legs." (Tr. 342). *See United States v. Prado*, 815 F.3d at 104-05 (finding no reasonable probability of a different trial outcome where defendant Martinez, among other things, played a "pivotal role in the offense, even after he knew that brandishing a firearm had played a part in it," as a leader of the group "could have called the crime off or ended his participation in it after the gun was brandished").

The Court therefore should reject Lin's challenge to the jury instructs and affirm his Section 924(j) conviction.

## POINT III

### Evidence of Gambling was Sufficient Factually and Legally as Predicate Racketeering Acts, and the Court Should Affirm Lin's Convictions on Counts One and Two

Lin contends that the evidence of his operation of gambling parlors presented at trial does not suffice as a violation of the Illegal Gambling Businesses Act ("IGBA"), and that therefore the Court should vacate Lin's convictions on Counts One and Two of the Indictment. (Br. 50). The gambling evidence formed predicate acts Three, Four, and Five of those Counts. At bottom, Lin contends that there is no evidence that the games of mahjong and 13 Card, which were played at Lin's parlors, depended "in a material degree on chance" as required by New York law. (Br. 53). The Court should reject Lin's argument, as the evidence at trial supported the jury's findings of those gambling predicate acts. In any event, even if the Court were to set aside those predicate acts, the convictions on Counts One and Two stand in light of the remaining predicate acts.

### A. Applicable Law

The IGBA provides that "[w]hoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business" commits a felony.

18 U.S.C. § 1955(a). An "illegal gambling business" includes a gambling business that (1) is a violation of the law of the state where it is conducted, (2) is conducted by five or more people, and (3) has been "in substantially continuous operation" for more than 30 days. *Id.* § 1955(b).

Under New York law,

> [a] person engages in gambling when he stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under his control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome.

N.Y. Penal Law § 225.00(2). A "[c]ontest of chance" is "any . . . game . . . in which the outcome depends in a material degree upon an element of chance, notwithstanding that skill of the contestants may also be a factor therein." *Id.* § 225.00(1).

> Games of chance range from those that require no skill, such as a lottery, to those such as poker or blackjack which require considerable skill in calculating the probability of drawing particular cards. Nonetheless, the latter are as much games of chance as the former, since the outcome depends to a material degree upon the random distribution of cards.

*People v. Turner*, 165 Misc. 2d 222, 224 (N.Y. Crim. Ct. 1995) (citation omitted).

"A defendant challenging the sufficiency of the evidence bears a heavy burden." *United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011). Although this Court reviews a claim of insufficient evidence de novo, *United States v. Geibel*, 369 F.3d 682, 689 (2d Cir. 2004), a jury verdict must be upheld if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). A "court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004) (internal quotation marks omitted).

In considering the sufficiency of the evidence supporting a guilty verdict, the evidence must be viewed in the light most favorable to the Government. *United States v. Temple*, 447 F.3d 130, 136-37 (2d Cir. 2006). A reviewing court must analyze the pieces of evidence "in conjunction, not in isolation," *United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011), and must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others," *United States v. Riggi*, 541 F.3d 94, 108 (2d Cir. 2008) (internal quotation marks omitted). It is not the Government's burden to "disprove every possible hypothesis of innocence." *United States v. Abelis*, 146 F.3d 73, 80 (2d Cir. 1998). To the contrary, the Court must "credit[] every inference that the jury might have drawn in favor of the government," *United States v. Temple*, 447 F.3d at 136-37 (internal quotation marks omitted), because "the task of choosing

among competing, permissible inferences is for the [jury]," not for the reviewing court," *United States v. McDermott,* 245 F.3d 133, 137 (2d Cir. 2001).

## B. Discussion

### 1. The Evidence Sufficiently Established the Gambling Predicate Acts

The record in this case fully supports the jury's verdict that Lin operated an illegal gambling business in violation of federal and state law. As described above, the evidence established that from the mid-1990s until the early 2000s, while based principally in New York City, Lin and his gang operated three illegal gambling parlors in and around Chinatown. The evidence established that Lin profited from each of these gambling parlors by collecting "commissions" from the gamblers. Five witnesses—Guang Zhu (Tr. 100-102), Cai Xiang Li (Tr. 686-689), Huo Guang Chen (Tr. 286-289), Shun Qin Chen (Tr. 603-605) and Cheng Yong (Tr. 822-824) —testified about a gambling parlor located behind a barbershop located at 21 Eldridge Street in Chinatown. The witnesses consistently testified that the card game called 13 Card, or tien lin, was played at 21 Eldridge Street, thousands of dollars a night were bet on the game, Lin profited from "commissions" charged on the bets, the gambling parlor had many shareholders and workers, more than 20 people gambled there at a time, and the gambling parlor was operated for more than 30 days. (Tr. 100-102, 286-289, 603-605, 686-689, 822-824).

Zhu and Xiang Li also testified about a gambling parlor located on Madison Street in Chinatown where

13 Card was played. (Tr. 95-99, 679, 682-686). Their testimony established that thousands of dollars were bet at the Madison Street gambling parlor, that the parlor had numerous workers, gamblers and shareholders, and that the parlor operated for more than 30 days. (*Id.*). Finally, Xiang Li testified about a mahjong parlor run by Lin that was located upstairs from the room on Madison Street where 13 Card was played. (Tr. 679-682). This mahjong parlor was also operated for several months, employed several workers, serviced numerous gamblers, and generated substantial profits for Lin. (*Id.*).

Lin's argument centers on the notion that the jury could not have concluded, based on the evidence, that mahjong and 13 Card were "contests of chance" under New York law. (Br. 53-55). But the evidence at trial made clear that the games involved "gambling." Zhu described "gambling" at the parlors and "bet[ting]" a hundreds of dollars. (Tr. 99-102; *accord* Tr. 687 (Li testimony)). Guang testified that money was "bet" on the game of 13 Card, up to $10,000 per "hand." (Tr. 287; *see also* Tr. 823-24 (Yong testifying to bets of $2000 to $3000 per hand)). Chen also testified about 13 Card, describing "dealers" "passing out cards," and "20 to 30 people" "betting," "though only four actually held cards." (Tr. 605). The gambling parlors had no signage and did not announce themselves to the street (*e.g.*, Tr. 686), further allowing the jury to conclude that the parlors were operating in violation of the law. The evidence was therefore sufficient for the jury to conclude that mahjong and 13 Card were contests of chance under New York law.

In addition, as described above, the evidence established that Lin charged commissions on bets. Guang and Li both testified that Lin charged a five percent commission on bets. (Tr. 288, 685-86; *see also* Tr. 605 (Chen testimony about commissions)). Lin's charging of commissions "exhibited his 'understanding' that" he "would " 'receive something in value in the event of a certain outcome' of a 'future contingent event' not under" his " 'control or influence.' " *People v. Jun Feng*, 34 Misc. 3d 1205(A), at *4 (in addressing sufficiency of charging instrument, declining "to declare Mah Jong to be a *per se* 'contest of chance,' " but concluding that allegations that defendants charged commissions on mahjong bets were sufficient (citing *People v. Dubinsky*, 31 N.Y.S.2d 234, 238 (Ct. Sp. Sess. Bronx County 1941) ("[W]here a host receives some consideration or some payment for permitting a card game to be played or other gaming to take place in his premises, that . . . constitutes gambling."))). Therefore, Lin's conduct in running the mahjong and 13 Card parlors fell comfortably within New York's definition of gambling.

Lin's reliance on *People v. Li Ai Hua*, 24 Misc. 3d 1142 (Crim. Ct. Queens County 2009) (Br. 54-55), is misplaced. There, the court dismissed a charging instrument because it failed "to contain a factual basis for the detective's conclusion that mah jong is gambling." *Id.* at 1147. The decision said nothing about whether, as a legal matter, mahjong was or was not a contest of chance under New York law, and certainly does not suggest that the evidence at trial in this case was insufficient.

As the evidence was sufficient to support the jury's findings on the gambling predicate acts, the Court should reject Lin's argument and affirm his conviction.

### 2. In Any Event, Lin's Racketeering Convictions Stand

Even assuming the gambling evidence was somehow defective, Lin's racketeering convictions on Counts One and Two stand. A "'pattern of racketeering activity' requires at least two acts of racketeering activity." 18 U.S.C. § 1961(5). In addition to the gambling Racketeering Acts, Lin was convicted of two other predicate acts, namely murder in violation of state law and conspiracy to commit murder in violation of state law (Racketeering Act One) and extortion (Racketeering Act Two). (A. 719). In cases where two valid predicates have been found, this Court has overturned a RICO conviction only where the evidence relating to the defective predicates dominated the trial or was likely to have influenced the jury's consideration of other issues. *See United States v. Delano*, 55 F.3d 720, 728-29 (2d Cir. 1995) (reversing convictions where evidence relating to 17 invalidated predicates "represented the bulk of the RICO prosecution, eclipsing all else"); *United States v. Biaggi*, 909 F.2d 662, 693 (2d Cir. 1990) (overturning conviction where invalidated predicates "dominated th[e] prosecution," and where evidence relating only to those crimes may have caused jury to find that other elements of the RICO offense had been satisfied).

The thrust of the Government's case against Lin was his involvement in acts of violence and, ultimately, the July 2004 murders. The gambling evidence did not so permeate the trial as to infect the other Racketeering Acts. The gambling testimony came from five witnesses and was largely similar in nature. And the gambling evidence was of course far less sensational than the evidence of murder, violence, and gunplay. In a trial transcript of over 1000 pages, the testimony about Lin's New York-based gambling parlors comprised less than 30 pages. The parties' summations also naturally focused on the evidence of violence. The Government began its closing by describing the July 2004 murders. (Tr. 936-37). Defense counsel also discussed the evidence of the murders and other violence at length. (*E.g.*, Tr. 973-74, 983, 989-92). Similarly in rebuttal, the Government began by focusing on the evidence of the murders. (Tr. 997). Therefore, the gambling evidence neither permeated the trial nor was closely connected to the other Racketeering Acts, and the Court should affirm Lin's conviction on Count

## POINT IV

### The Government's Rebuttal Summation Was Proper

The Government's rebuttal summation advocated a theory of the case supported by the testimony of its witnesses and the evidence while pointing out flaws in the defense theory and closing argument that the Government's witnesses lied. The Government did not vouch for its witnesses, attack defense counsel, or shift the burden of proof. Rather, the Government's rebuttal

summation properly addressed Lin's arguments and argued the Government's theory of Lin's guilt based on the evidence. Accordingly, there was no misconduct, let alone misconduct rising to the level that would warrant disturbing the jury's verdict.

## A. Relevant Facts

At the beginning of trial, Judge Cedarbaum instructed the jury that "[t]he lawyers are not witnesses" and had "no personal knowledge of the facts," and that opening and closing statements were not evidence, but rather the lawyers' attempt "to summarize their cases and help you to understand the evidence that was presented." (Tr. 13-14).

After the parties rested, they discussed an "uncalled witness instruction" with Judge Cedarbaum. (Tr. 927-31). Defense counsel stated that he was "certainly going to argue that Cash was a witness the Government should have called." (Tr. 929). The Government responded that Judge Cedarbaum should instruct the jury that "Cash"—the nickname of a Government informant who was not called as a witness but who was repeatedly referenced during the trial—was "equally available to both sides" because there had been testimony about "where he lives [and] and where is bus company is." (Tr. 929-30). Judge Cedarbaum declined to offer such an instruction because Cash was a "Government agent," but stated that the Government "may want to argue" that Lin could have called him as a witness. (*Id.*). The Government then provided notice to Lin that if defense counsel argued that the Government should have called Cash, it would "argue that

[Lin] knew where Cash was, and he could have brought him in himself." (Tr. 930-31). Judge Cedarbaum answered, "You can argue that, but I'm not going to instruct the jury that that's the same thing." (Tr. 932).

Following the Government's closing, defense counsel made a closing argument. (Tr. 963-96). Defense counsel spent much of his argument attacking the credibility of the Government's witnesses, arguing that they could not be believed because they were lying to obtain immigration benefits, because they did not like Lin, or because they were following Cash's instructions. (*E.g.*, Tr. 964). Defense counsel accused the Government's witnesses of, among other things, selling the Government "a bill of goods" for "nothing but their own benefit" (Tr. 964); having "no loyalty to the truth" (Tr. 965); being "worthless" (Tr. 971) and a "bunch of clowns" (Tr. 966); "blatantly l[ying]" (Tr. 973); testifying in a "grossly offensive" (Tr. 976) and "ridiculous" (Tr. 979) manner; and "insult[ing] the intelligence of everyone" in the courtroom (Tr. 980; *see also* Tr. 993). In short, defense counsel claimed that every non-law enforcement witness—that is, every Government witness who testified about something he saw Lin do or heard Lin say—was lying. (*E.g.*, Tr. 970).[4]

_____

[4] In addition to attacking the credibility of the Government's witnesses generally, defense counsel spent considerable time seeking to discredit specific witnesses. (*See* Tr. 967, 970-79, 981-93).

The defense also argued that the Government was complicit in the scheme to frame Lin. Defense counsel accused the Government of "call[ing] a bunch of clowns to testify" (Tr. 966) and "parading in these awful witnesses [and] chronic liars" (Tr. 968). He said of the Government attorneys: "They hope that they have thrown so much dirt onto Mr. Lin that you believe he is such a bad guy that he must be guilty of the crimes he is charged with." (*Id.*). He further told the jury that Cash, the Government informant, was the "choreographer," "director," and "puppet master" who had orchestrated the lies of the Government's witnesses (Tr. 965, 972), and that the Government "could have called Cash to explain" whether he offered the testifying witnesses anything, but "they didn't do that" (Tr. 980). Defense counsel then added, "I would have called him to say that if he was under my control." (Tr. 980). Although it was clear by that point that defense counsel was accusing the Government of keeping Cash off the stand to avoid having Cash admit suborning perjury from the Government's witnesses, defense counsel continued (over the Government's objection and despite the Court's instruction to "move on" (Tr. 980)), "I think the fact that they didn't call him speaks volumes—volumes—about what his testimony would have been had he testified truthfully." (Tr. 981).

Following the defense summation, the Government delivered its rebuttal summation. (Tr. 997-1018). The Government responded to Lin's attack on the credibility of the witnesses, focusing on the ways their testimony interlocked, highlighting the corroboration that was admitted into evidence, and responding to defense

counsel's claims that witnesses changed their testimony over time. (Tr. 1000-03, 1009-11). In addition, the Government addressed the defense argument that witnesses had fabricated their testimony in collaboration with an informant and with the knowledge and assent of law enforcement and the prosecution team. (Tr. 1004-06). The prosecutor further noted allegations and evidence that were not addressed during defense counsel's summation. (Tr. 1007).

Consistent with the discussion during the charge conference, the Government also responded to Lin's argument that Cash should have been called as a Government witness by observing that Lin knew where Cash was:

> And just as an aside, the suggestion that we're somehow putting one over on all of you by not bringing Cash in to testify, it needs to be addressed, at least briefly.
>
> He doesn't have a burden to do anything. He does not need to bring anybody in to testify; he does not need to submit any stipulations. It's our burden of proof. And we don't shy from it. It's our burden; he doesn't need to do anything.
>
> That said, he knows where Cash is.

(Tr. 1004-05).

The Government concluded its rebuttal by emphasizing three facts that undercut the defense argument that the Government's witnesses had lied in their testimony about Lin: First, the eyewitnesses to the murders gave accounts to the jury that were consistent

with what they had told the NYPD the night of the shootings; second, Lin's order for a follower to shoot Zhou was consistent with Lin's role as a Dai Lo; and third, Lin's flight following the shooting was evidence of his guilt. (Tr. 1014-18). During the rebuttal summation, Lin's counsel objected several times. Judge Cedarbaum sustained at least one objection (Tr. 999-1000) and at other times directed the prosecutor to move on.

In its final instructions to the jury, Judge Cedarbaum again reminded the jury that "anything that counsel either for the government or defense may have said with respect to matters in evidence, whether during the trial, in a question, in argument, or in closing arguments, is not to be substituted for your own recollection of the evidence." (Tr. 1028-29).

## B. Applicable Law

"[R]eversing a criminal conviction for prosecutorial misconduct is a drastic remedy that courts generally are reluctant to implement," *United States v. Valentine*, 820 F.2d 565, 570 (2d Cir. 1987), and the Court has made clear that "[i]nappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding," *United States v. Elias*, 285 F.3d 183, 190 (2d Cir. 2002). A defendant who seeks to overturn a conviction based on a prosecutor's comment in summation bears the "heavy burden" of showing that "the comment, when viewed against the entire argument to the jury, and in the context of the entire trial, was so severe and significant as to have

substantially prejudiced him, depriving him of a fair trial." *United States v. Farhane*, 634 F.3d 127, 167 (2d Cir. 2011); *see also United States v. Shareef*, 190 F.3d 71, 78 (2d Cir. 1999) (prosecutor's remarks in summation "do not amount to a denial of due process unless they constitute egregious misconduct"). When evaluating statements by the Government in rebuttal, the Court "make[s] some allowance for the fact that rebuttal summations are not detached expositions . . . carefully constructed before the event." *United States v. Farhane*, 634 F.3d at 167 (alterations omitted).

In assessing whether prosecutorial misconduct caused "substantial prejudice," the Court assesses (1) the severity of the misconduct; (2) the measures adopted to cure the misconduct; and (3) the certainty of conviction absent the misconduct, and the defendant must show that "absent the isolated impropriety of the prosecutor in rebuttal summation (taken in the context of the entire trial), [the defendant] would not have been convicted." *United States v. Elias*, 285 F.3d at 190, 192. It is "a rare case" in which a prosecutor's improper comments are "so prejudicial that a new trial is required." *United States v. Newton*, 369 F.3d 659, 680 (2d Cir. 2004).

## C.   Discussion

### 1.   The Government's Rebuttal Was Appropriate

The Government committed no error in its rebuttal summation, much less error warranting a new trial. In its rebuttal summation, the Government appropriately addressed the evidence that was admitted at

trial and argued inferences from that evidence. The prosecutor did not mislead the jury, assert facts not in evidence, or introduce personal views. As a result, there was no misconduct on the part of the Government. Lin's arguments to the contrary are meritless.

### a. The Prosecutor Did Not Engage in Burden Shifting

Defense counsel objected to the prosecutor's characterization of the defense as "audac[ious]" and an "alternative universe." (Tr. 1022). Lin now contends those arguments amount to burden shifting. (Br. 59). Where, however, "the defense summation makes arguments and allegations against the government, the prosecutor may respond to them in rebuttal." *United States v. Tocco*, 135 F.3d 116, 130 (2d Cir. 1998). As described above, defense counsel argued that the Government's witnesses had lied to inculpate Lin in order to receive benefits from the Government and/or at the instruction of a Government informant. Defense counsel also suggested that the Government was complicit in the scheme by "parading in these awful witnesses [and] chronic liars" (Tr. 968) and keeping the informant from the jury.

Given this direct attack on the credibility and integrity of the Government's case, the prosecutor's response on rebuttal was measured, fair, and certainly not outside the "wide latitude" afforded arguments that do not misstate the evidence. *See United States v. Tocco*, 135 F.3d at 130 ("The prosecution and the defense are generally entitled to wide latitude during closing arguments, so long as they do not misstate the

evidence."); *see also United States v. Carr*, 424 F.3d 213, 227 (2d Cir. 2005) ("[T]he government is allowed to respond to an argument that impugns its integrity or the integrity of its case, and when the defense counsel have attacked the prosecutor's credibility or the credibility of the government agents, the prosecutor is entitled to reply with rebutting language suitable to the occasion." (internal quotation marks omitted)); *United States v. Rivera*, 22 F.3d 430, 438 (2d Cir. 1994) (Government is permitted to respond to an argument "that impugns its integrity or the integrity of its case"); *United States v. Marrale*, 695 F.2d 658, 667 (2d Cir. 1982) (Government may "dispute defense histrionics"); *DiCarlo v. United States*, 6 F.2d 364, 369 (2d Cir. 1925) (Hand, J.) ("To shear [the prosecutor] of all oratorical emphasis, while leaving wide latitude to the defense, is to load the scales of justice; it is to deny what has always been an accepted incident of jury trials, except in those jurisdictions where any serious execution of the criminal law has yielded to a ghostly phantom of the innocent man falsely convicted.").

In any event, even if the Government's statements were improper, any possible error was amply cured when Judge Cedarbaum sustained Lin's objection to that portion of the rebuttal and instructed the jury that the attorneys' statements were argument and not evidence. (Tr. 13-14, 999-1000, 1028-29; *see also* Tr. 17 (instructing the jury "if I tell you not to consider a particular statement, you should put that statement out of your mind, and you may not refer to that statement in your later deliberations")).

As another example, Lin mistakenly argues (Br. 59) that the following Government rebuttal argument shifted the burden of proof: "If it's all a lie, how does the defendant explain the evidence that couldn't have been fabricated? How does he explain his car at the scene? How does he explain his documents . . . ." (Tr. 1007). The Government did not argue that Lin was obligated to present evidence. Rather, the Government was responding to the defense argument that the Government witnesses had lied, by referencing evidence (the presence of Lin's car and identification documents at the scene of the murder) that corroborated the witnesses' testimony.

Lin also points to the Government's arguments about Lin's ability to call Cash as a witness. (Br 59-60). This argument fails for multiple reasons. First, the Government did not argue that Cash was equally available to both sides, but rather stated in response to Lin's suggestion that the Government had intentionally hid Cash from the jury that Lin also "knows where Cash is." (Tr. 1004-05). Second, Judge Cedarbaum had ruled that the Government could argue that Lin knew where Cash was if Lin opened the door by arguing that the Government should have called Cash. (Tr. 931-32). Third, the "government is ordinarily permitted to respond to arguments impugning the integrity of its case" and "may comment on a defendant's failure to call witnesses to support his factual theories." *United States v. Bautista*, 23 F.3d 726, 733 (2d Cir. 1994) (internal quotation marks omitted), *overruled on other grounds, Griffith v. Kentucky*, 479 U.S. 314 (1987). Fourth, the prosecutor prefaced his statement that Lin knew where Cash was by telling the jury

that the burden of proof rested solely on the Government. (Tr. 1005). Finally, Judge Cedarbaum repeatedly instructed the jury that the burden of proof rested solely with the Government. (Tr. 13, 20, 1030-31, 1076). Jurors are presumed to follow a judge's instructions. *E.g.*, *United States v. Williams*, 690 F.3d 70, 77 (2d Cir. 2012).

### b. The Government Did Not Attack Defense Counsel

Lin also claims that the Government improperly attacked defense counsel. (Br. 60). Lin points to the Government's rebutting of defense counsel's argument that the witnesses had tried to frame Lin. (Br. 60). At trial, defense counsel claimed that he "had not suggested during my summation that they had come together to create a frame." (Tr. 1023). During closing argument, however, defense counsel had done just that, arguing that Cash, the Government informant, was the "choreographer," "director," and "puppet master" who had orchestrated the Government's witnesses' lies. (Tr. 965, 972). Moreover, three witnesses had given statements to the police the night of the murder (Tr. 115-17, 236-49, 258-59, 718-19, 837-38), and defense counsel argued that each of them had lied (Tr. 970-75, 990-93). The Government responded that if the witnesses had all lied, they had either thought up their lies independently—which was highly unlikely given the consistencies in their testimony—or had coordinated their stories. (Tr. 1000-04). The Government's characterization of the defense theory as a "frame" was thus a fair response to Lin's closing argument.

Similarly, the Government's rebuttal argument that defense counsel was "saying that the front table was a part of this" was a measured and reasonable response to the defense summation. (*See, e.g.*, Tr. 966 (accusing the prosecutors of "call[ing] a bunch of clowns to testify"), 968 (accusing the prosecutors of "parading in these awful witnesses [and] chronic liars" and "hop[ing] that they have thrown so much dirt onto Mr. Lin that you believe he is such a bad guy that he must be guilty of the crimes he is charged with"), 980 (accusing the prosecutors of hiding Cash from the jury and stating, "I would have called him . . . if he was under my control."). It is well-settled that the Government is permitted to respond to an argument "that impugns its integrity or the integrity of its case." *United States v. Rivera*, 22 F.3d at 438.

Lin also claims that the statement "the audacity of this defense" amounts to attacking counsel. (Br. 60). But trial counsel objected and Judge Cedarbaum sustained that objection, addressing any concern. (Tr. 999-1000). Nonetheless, use of "colorful adjectives" is not necessarily improper. *United States v. Rivera*, 971 F.2d 876, 884 (2d Cir. 1992).

### c.     The Government Did Not Vouch for Its Witnesses

Lin's argument that the prosecutor vouched for its witnesses (Br. 60) also fails. In response to defense counsel's lengthy and vitriolic attack on the credibility of the Government's witnesses, the Government pointed out the weaknesses in that attack. The Government observed that counsel had argued not that

the witnesses were mistaken or that a few had testified falsely, but rather that the *entire* case against Lin had been fabricated. (Tr. 998-99). The Government further pointed out consistencies in the witnesses' testimony and argued that, given these consistencies, the witnesses would have had to coordinate their stories if they were testifying falsely. (Tr. 1001-03). The Government also argued that if the witnesses were lying to inculpate Lin, they could have made their stories stronger to do so:

> Ladies and gentlemen, if there was a conspiracy to get the defendant, why weren't the witnesses' stories better? As I mentioned a moment ago, why didn't the two people—the two most important witnesses—testify to you that they were in the room, and they saw who shot Yi Qun [Chan Qin Zhou] and the hostess, and that it was Ding Pa? Wouldn't that have made it easier to prove up the case? We wouldn't have had to worry about what was said or how loud it was. We wouldn't have had to worry about anything. The gun would have been in his hand.

(Tr. 1006; see also Tr. 1002). The Government continued:

> But that's not what they told you. That's not what they told you because that's not what happened. They testified as to what they remember. They testified truthfully. They testified that he ordered the shooting, and that someone else committed it.

(Tr. 1007).

The prosecutor's statement that the Government witnesses "testified truthfully" was in context clearly not vouching. As this Court has explained,

> [a]ttorney statements vouching for the credibility of witnesses are generally improper because they imply the existence of evidence not placed before the jury, and because prosecutorial vouching carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.

*United States v. Williams*, 690 F.3d at 76 (internal quotation marks and citations omitted). Here, there was no suggestion that the prosecutor had special knowledge of facts not before the jury. Rather, the prosecutor permissibly argued that the jury should find that the witnesses "testified truthfully" based on the evidence discussed in the Government's summations. *See id.* (argument that law enforcement witnesses' testimony was "the truth" was not "improper vouching" because it was based on "the evidence the government urged proved in its case" and "did not imply the existence of extraneous proof"); *United States v. Perez*, 144 F.3d 204, 210 (2d Cir. 1998) ("Because the prosecutor did not 'imply the existence of extraneous proof,' we cannot say that his statements were an improper vouching for the credibility of witnesses." (quoting *Rivera*, 22 F.3d at 438)); *United States v. Perry*, 643 F.2d 38, 51 (2d Cir. 1981) ("[I]n light of the fact that

the defense lawyers attacked the credibility and honesty of the Government's case in their closings, the Government's statements vouching for witnesses were understandable if not laudable.").

### 2. Any Possible Error Could Not Have Affected the Verdict

The Government's rebuttal was steeped in the evidence at trial and did not inject any personal knowledge or perspective into the case. This was for good reason: The evidence against Lin was abundant. As described at length above, two eyewitnesses had testified that Lin ordered the July 29, 2004 shooting, and their account of what they saw in the karaoke room was consistent and corroborated by ballistics evidence, medical evidence, and the testimony of other witnesses. The eyewitness accounts were further corroborated by the evidence of Lin's flight, the evidence that Lin tried to get his car back from the scene of the crime (testimony that was in turn corroborated by phone records), and the testimony that Lin later admitted to Huo Guang Chen that he ordered the shooting. Nine witnesses testified about Lin's other racketeering activities, including the operation of gambling parlors, the extortion of the bus company, and the repeated use of violence to protect his gang's interests. That testimony was consistent from witness to witness and was corroborated by ballistics evidence and bank records. In short, the evidence of Lin's guilt was overwhelming and there can be little question that Lin would have been similarly convicted even if the challenged statements during the rebuttal summation had not been made.

Moreover, any error was amply cured by Judge Cedarbaum's jury instructions. Judge Cedarbaum instructed the jury at the beginning and end of trial that the parties' addresses were not evidence, and sustained objections during rebuttal or urged the prosecutor to move on. Judge Cedarbaum even struck a portion of rebuttal at the defense request. Defense counsel claimed the Government's argument concerning testimony from Heng De Oh-Yang was improper rebuttal because defense counsel "never mentioned Oh-Yang" during his summation. (Tr. 1026). Judge Cedarbaum therefore struck the Government's argument about Oh-Yang because of "the absence of evidence about what happened." (Tr. 1018). Thus, Judge Cedarbaum responded to the defense's objections and arguments; made clear to the jury that counsel's statements were argument, not evidence, and that the burden of proof was with the Government; and maintained control of the proceedings to avoid prejudice to Lin. *See United States v. Shareef*, 190 F.3d at 78 ("Even where a prosecutor's argument was clearly impermissible, we have been reluctant to reverse where the transgression was isolated, the trial court took swift and clear steps to correct the implication of the argument, and the evidence against the defendant was strong.").

Lin therefore was not unduly prejudiced by the Government's rebuttal, and the Court should reject his argument.

## POINT V

### Judge Cedarbaum's Sentence Was Reasonable

Judge Cedarbaum's sentence was procedurally and substantively reasonably. Having presided over a three-week trial in a case pending before her for over three years, Judge Cedarbaum conducted a brief but procedurally sufficient sentencing. The sentence of life imprisonment imposed, which was within the applicable Guideline range, was substantively reasonable based on the evidence, the nature and circumstances of the offense, and the lack of mitigating evidence. The Court should therefore affirm the sentence.

### A. Applicable Law

This Court's review of a district court's sentence "encompasses two components: procedural review and substantive review." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc).

#### 1. Procedural Review

A district court commits procedural error where it fails to calculate the Guidelines range (unless omission of the calculation is justified), makes a mistake in its Guidelines calculation, treats the Guidelines as mandatory, does not consider the factors in Title 18, United States Code, Section 3553(a), or rests its sentence on a clearly erroneous finding of fact. *United States v. Cavera*, 550 F.3d at 190 (internal citations omitted).

A finding of fact made at sentencing is clearly erroneous only where, viewing the evidence in the light most favorable to the Government, *United States v.*

*Guang*, 511 F.3d 110, 123 (2d Cir. 2007), "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed," *United States v. Cuevas*, 496 F.3d 256, 267 (2d Cir. 2007) (internal quotation marks omitted). Put another way, a district court's findings should be affirmed if they are "'plausible in light of the record viewed in its entirety.'" *United States v. Reilly*, 76 F.3d 1271, 1276 (2d Cir. 1996) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985)).

The Court applies "rigorous plain error" analysis to an unpreserved claim that a sentence was procedurally unreasonable. *United States v. Villafuerte*, 502 F.3d 204, 208 (2d Cir. 2007). To show plain error, a defendant must establish that "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Marcus*, 560 U.S. 258, 262 (2010) (internal quotation marks and alteration omitted).

### 2. Substantive Review

If there was no procedural error, the Court considers "the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." *Gall v. United States*, 552 U.S. 38, 51 (2007). Under this form of review, the Court must "take into account the totality of the circumstances, giving due deference to

the sentencing judge's exercise of discretion, and bearing in mind the institutional advantages of district courts." *Cavera*, 550 F.3d at 190. In applying this deferential standard, this Court cannot "substitute [its] own judgment for the district court's on the question of what is sufficient to meet the § 3553(a) considerations in any particular case," and should "set aside a district court's substantive determination only in exceptional cases where the trial court's decision cannot be located within the range of permissible decisions." *Id.* at 189 (internal quotation marks omitted). Further, the weight that a district court placed on any one factor need not be the weight that this Court would have given the factor, as long as "the factor, as explained by the district court, can bear the weight assigned to it under the totality of circumstances in the case." *Id.* at 191; *accord United States v. Pope*, 554 F.3d 240, 247 (2d Cir. 2009). At bottom, the substantive reasonableness standard "provide[s] a backstop for those few cases that, although procedurally correct, would nonetheless damage the administration of justice because the sentence imposed was shockingly high, shockingly low, or otherwise unsupportable as a matter of law." *United States v. Rigas*, 583 F.3d 108, 123 (2d Cir. 2009). It is not "an invitation to mischief by tinkering with any sentence that appellate judges simply do not like." *Id.* at 123.

## B. Discussion

### 1. The Sentence Was Procedurally Reasonable

Lin's sentencing was procedurally sound. Though the sentencing proceeding was brief, in light of the lengthy trial, the Presentence Report, and the parties' detailed submissions, the sentence was procedurally reasonable. *See United States v. Lopez*, 615 Fed. App'x 24, 25 (2d Cir. 2015) (stating that while it found that the district court's calculation of the sentence was "brief," the court could not conclude that "the district court failed to fulfill its duties under the statute, and the error, if any, was not plain"). In addition to the trial evidence, Judge Cedarbaum had a thorough sentencing record in front of her, including multiple sentencing memoranda from both parties (A. 723-47), the Presentence Report, Lin's statement in court, and the arguments of his counsel at the sentencing proceeding (*e.g.*, A. 752-55).

Though at sentencing Judge Cedarbaum did not explicitly adopt the Presentence Report or its Guidelines calculation, she did so later in the October 29, 2014 Statement of Reasons, with the additional comment that a "[s]ingle life sentence is adequate and [n]o supervised release." (SOR 1). Also in the Statement of Reasons, Judge Cedarbaum determined that the applicable Guidelines offense level was 43, and Lin was in Criminal History Category III. (*Id.*). Furthermore, at sentencing, Judge Cedarbaum ensured that Lin had read the report, had it translated, and had no objections. (A. 749). Defense counsel made no objections to

the report, either in his submissions or during sentencing. (*E,g.*, *id.*). Judge Cedarbaum acknowledged that she had read all of the parties' submissions. (A. 752, 754).

Judge Cedarbaum did not engage in an explicit analysis of the factors set out in Title 18, United States Code, Section 3553(a), but a "robotic incantation" is not required. *See, e.g.*, *United States v. Fernandez*, 443 F.3d 19, 29-30 (2d Cir. 2006) ("[N]o 'robotic incantations' are required to prove the fact of consideration and we will not conclude that a district judge shirked her obligation to consider the § 3553(a) factors simply because she did not discuss each one individually or did not expressly parse or address every argument relating to those factors that the defendant advanced."); *United States v. Banks*, 464 F.3d 184, 190 (2d Cir. 2006) ("[T]here is no requirement that the court mention the required factors, much less explain how each factor affected the court's decision."); *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005) ("In other words, we will no more require 'robotic incantations' by district judges than we did when the Guidelines were mandatory.").

Judge Cedarbaum had presided over the trial, during which she had heard evidence of Lin's criminal conduct that spanned more than a decade. Judge Cedarbaum also had the benefit of two sentencing submissions from Lin, and the Presentence Report detailed Lin's personal characteristics. (*See* PSR ¶¶ 93-100). Judge Cedarbaum also had the opportunity to observe Lin during his attempted guilty plea, throughout the trial, and during sentencing.

At sentencing, Judge Cedarbaum stated that this "was a serious and heavy case," and it was "no pleasure to have to sentence a young man to life in prison." (A. 756). Imposing terms of imprisonment of life, Judge Cedarbaum stated, "[T]here is no question, based on the evidence in this case, that you are responsible for the death of another human being." (A. 756). Judge Cedarbaum concluded by saying, "I know this is a very heavy sentence and I know you are a young man, and it is a pity that someone as capable as you should be in this position, but you brought this on yourself." (A. 760). Judge Cedarbaum's references to the seriousness of the conduct, Lin's personal traits, and the conclusion that Lin was responsible for murder demonstrate her considered reasoning for imposing such a significant sentence.[5]

For the first time, Lin contends that the Guideline for second-degree murder should have been used, not the Guideline for first degree murder. Because Lin did

---

[5] Lin suggests in a footnote that Judge Cedarbaum was biased against Lin because of his ethnicity. (Br. 68 n.23). Lin concedes that Judge Cedarbaum said nothing at sentencing about his ethnicity, but argues that comments from the failed plea allocution and trial "could appear . . . as having informed the sentence." (*Id.*). Lin points to three comments—one of which was praise of people of Chinese descent, one of which was an entirely innocuous comment about age, and a third which was about a witness's facility with English—none of which demonstrated any bias whatsoever, or had any impact on the sentence imposed.

not object below (A. 749; Br. 63), the Court applies "rigorous plain error" analysis to his claim. *United States v. Villafuerte*, 502 F.3d at 208 (2d Cir. 2007).

Lin's argument is foreclosed by this Court's decision in *United States v. Minicone*, 960 F.2d 1099 (2d Cir. 1992). In *Minicone*, which involved the precise New York statute at issue here, the defendant argued that it was error to conclude that the most analogous federal offense was federal first degree murder because state law would have categorized the murder at issue only as second degree murder. *Id.* at 1110. The Court rejected that claim by comparing the language of New York's second degree murder statute with Title 18, United States Code, Section 1111, which defines murder in the first degree as "'willful, deliberate, malicious, and premeditated killing.'" *Id.* at 1110 (quoting 18 U.S.C. § 1111). Thus, contrary to Lin's claim, the absence of reference to premeditation or malice aforethought in New York Penal Law Section 125.25 does not mean that federal first-degree murder is not the most analogous federal offense. *See also United States* v. *Carr*, 424 F.3d at 230-31 (concluding that the most analogous federal offense to the New York offense of second degree murder was first degree murder under Section 1111, notwithstanding the absence of reference to premeditation or malice aforethought in the state law); *United States v. Diaz*, 176 F.3d 52, 123 (2d Cir. 1999) ("[W]e find there is no error, much less clear error, in the district court's conclusion that fed-

eral first degree murder was the most analogous federal offense, and thus, that U.S.S.G. § 2A 1.1 provided the appropriate offense level.").[6]

### 2. The Sentence Was Substantively Reasonable

Finally, the sentence was substantively reasonable. Put simply, Lin was convicted of ordering the murder of another man over a bus business, and, in the process, also killing a completely unrelated bystander and non-fatally shooting another. A sentence of life imprisonment for the murders of two people is not unreasonable. Moreover, the evidence at trial also established Lin's pattern of criminal behavior spanning over a decade; violence committed by Lin and on his behalf, including numerous assaults; and the possession and use of firearms by Lin's followers on his behalf. A life sentence was warranted, but nevertheless Judge Cedarbaum did not impose it easily, stating that it was "no pleasure to have to sentence a young man to life in prison." (A. 756).

In addition, the sentence of life imprisonment was within the applicable Guidelines range on each of the three counts of conviction where it was imposed. *Rita v. United States*, 551 U.S. 338, 355 (2007) ("[W]here

---

[6] Had the Court applied Section 2A1.2, the base offense level would have been 38, with a four-level enhancement for Lin's role, resulting in an adjusted offense level of 42. After conducting the grouping analysis under Section 3D1.4, the resulting total offense level still would have been 43.

[the sentencing] judge and [the Sentencing] Commission both determine that the Guidelines sentence is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors."); *United States v. Eberhard*, 525 F.3d 175, 179 (2d Cir. 2008) ("[I]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances.").

Thus a life sentence for two murders was well within the "range of permissible decisions" available to Judge Cedarbaum, *United States v. Rigas*, 490 F.3d 208, 238 (2d Cir. 2007) (internal quotation marks omitted), and was neither so " 'shockingly high, shockingly low, or otherwise unsupportable as a matter of law' that allowing [it] to stand would 'damage the administration of justice,' ' *United States v. Broxmeyer*, 699 F.3d 265, 289 (2d Cir. 2012).

## CONCLUSION

### The judgment of conviction should be affirmed.

Dated:    New York, New York
          November 23, 2016

                    Respectfully submitted,

                    PREET BHARARA,
                    *United States Attorney for the*
                    *Southern District of New York,*
                    *Attorney for the United States*
                    *of America.*

JENNIFER E. BURNS,
MICHAEL FERRARA,
    *Assistant United States Attorneys,*
              *Of Counsel.*

# CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the undersigned counsel hereby certifies that this brief does not comply with the type-volume limitation of Rule 32(a)(7)(B). However, this brief—which contains 14,743 words, as measured by the word processing system used to prepare it—complies with the Court's August 8, 2016 order allowing each party to file an opening brief of up to 20,000 words.

PREET BHARARA,
*United States Attorney for the*
*Southern District of New York*

By: MICHAEL FERRARA,
*Assistant United States Attorney*